# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

===========================================

**ANNE DAMMARELL, et al.,**

    **Plaintiffs,**

       v.                     **Civil Action No. 01-2224 (JDB)**

**ISLAMIC REPUBLIC OF IRAN, et al.,**

    **Defendants.**

===========================================

**FILED**

SEP 0 8 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION
## (FINDINGS AND CONCLUSIONS)

On April 18, 1983, the United States Embassy in Beirut, Lebanon, was devastated by a massive car bomb that ushered in two decades of terrorist attacks on the United States and its citizens. Sixty-three persons, including seventeen U.S. citizens, were killed, and over one hundred others were injured. Now, in this civil action, over eighty plaintiffs -- victims of the bombing and their families -- seek to assign liability for their injuries to the Islamic Republic of Iran ("Iran") and its agent the Ministry of Intelligence and Security ("MOIS"). Below, the Court sets forth its findings of fact and conclusions of law as to those claims.[1]

The Court will proceed in three steps. First, it will present its findings as to the causes of the bombing -- specifically, its findings that Iran and MOIS were indeed responsible for supporting, funding, and otherwise carrying out the unconscionable attack. Second, the Court will detail the personal accounts of the plaintiffs in this action -- stories that supply the

---

[1] The Court conducted a six-day evidentiary hearing from April 7 through April 16, 2003, focused on liability issues and the claims of ten victims or families of victims. Guided by the findings and conclusions in this Memorandum Opinion, the claims of the remaining victims and families will be tried before a Magistrate Judge of this Court.



necessary human dimension to the stark, horrifying skeleton of the bombing itself. Third, and finally, the Court will set forth its legal and remedial conclusions to bring this litigation to a close with some measure of relief for the plaintiffs.[2] Given recent developments in the law, that relief will not include punitive damages, but does consist of a total award of $123,061,657 in compensatory damages to this group of plaintiffs.

To be sure, neither this Memorandum Opinion nor this litigation can truly afford satisfactory relief from or bring closure to the terror and tragedy intentionally caused by the bombing. As the witnesses often recognized, no amount of monetary or other relief can ever bring back those who were killed or restore the past twenty years of the lives of those who have been injured and have suffered. But as those same witnesses frequently observed, perhaps it is only through the financial impact of damage awards in cases such as this that the governments (and their agents) responsible for terrorist conduct such as the bombing of the American Embassy in Beirut will be dissuaded from similar conduct in the future.

## FINDINGS OF FACT

## I.   CAUSES OF THE EMBASSY BOMBING

### A.   Lebanon Before 1984 and the Emergence of Hizbollah

The country of Lebanon consists of dozens of different ethnic and religious groups, including Sunni Muslims, Shi'ite Muslims,[3] Maronite Christians, and Druze. In the first part of

---

[2] The Court enters the findings and conclusions below pursuant to 28 U.S.C. § 1608(e). That provision requires plaintiffs under the FSIA to "establish [their] claim or right to relief by evidence satisfactory to the court" even where, as here, defendants have failed to appear after proper service.

[3] This group is variously referred to as "Shi'ites," "Shiites," and "Shia." The first spelling is generally used herein except where alternative spellings are reflected in either exhibits or the official transcript of the evidentiary proceedings.

the twentieth century, Lebanon's political system was structured to provide for the sharing of power among the different ethnic and religious groups.  See, e.g., Tr. Vol. I at 94-95.[4]

By 1975, however, the political power sharing arrangements did not reflect the country's actual demographics, causing general unrest among the population.  See, e.g., Tr. Vol. I at 95-96. These tensions culminated in the outbreak, in 1975, of what became a fifteen-year civil war.  In the early years of the civil war, the United States and its nationals were not specifically targeted by the warring factions.  See Tr. Vol. I at 123.  This changed after the occurrence of two historically significant events.

First, in 1979, the Shah of Iran, an ally of the United States, was overthrown by the Ayatollah Ruhollah Khomeini and his followers, who set up a fundamentalist Islamic regime in Iran.  One of the revolutionaries' objectives was to establish Iran as the preeminent power in the Middle East by, among other things, forcing the United States and other Western nations out of the region.

Second, in the summer of 1982, Israel invaded southern Lebanon, putatively in order to prevent the Palestinian Liberation Organization ("PLO") from conducting terrorist activities across Lebanon's border with Israel.  See Tr. Vol. I at 100.  Southern Lebanon at that time was home to a substantial portion of Lebanon's Shi'ite population.  See Tr. Vol. I at 96.

Together, the 1979 Iranian revolution and the 1982 Israeli invasion of Lebanon led to a radicalization of Lebanon's Shi'ite community.  As Dr. Patrick Clawson, Deputy Director of the

---

[4] "Tr. Vol." refers to the transcript for each day of the bench trial in this case, beginning on April 7, 2003.  Accordingly "Tr. Vol. I" refers to the transcript for the first day of testimony on April 7, 2003, "Tr. Vol. II" refers to the transcript of day two of the bench trial on April 8, 2003, and so on.  "Exh." refers to those exhibits admitted into evidence during the trial.

Washington Institute for Near East Policy (see Tr. Vol. II at 3) and an expert in Iranian politics, the Iranian economy, and Iranian sponsorship of terrorism, testified:

> [T]he Lebanese Shi'a community had historically been politically quietistic and had deep links with Iran, a fellow Shi'a country. . . . [A]fter the Iranian Revolution in 1979, there's a lot of interest by this new Iranian government encouraging political activism among the Lebanese Shi'ites.

Tr. Vol. II at 9.  Iran's efforts met with "mixed success" until the 1982 Israeli invasion of southern Lebanon.  Id.  With the invasion, the "Israelis quickly alienate[d] the Shi'ite population," which in turn became "much more receptive to the Iranian message of anti-Western, anti-Israeli propaganda." Tr. Vol. II at 9-10; see also Exh. 34(1) at 2 (declassified 1984 CIA document noting that "[t]he [1979] Iranian revolution . . . and the Israeli invasion of predominantly-Shi'a southern Lebanon galvanized the Shi'a and set the stage for the emergence of radical groups prone to terrorism").  The United States was a principal target of propaganda because by this time it "had become identified with the Israelis and . . . [was] seen as an enemy of Islam and as an enemy of Iran because [of its support for] the Iraqis in the war against Iran." Exh. 19 (Transcript of Deposition of Robert Oakley) at 15.

It was in this context that Iran began pouring money and personnel into southern Lebanon to empower and train the Lebanese Shi'ites -- who traditionally had been economically oppressed -- to aid Iran in its goals of eradicating Westerners from the country and establishing an Islamic state.  See Exh. 19 at 20-22, 50-52; Tr. Vol. II at 12-13; see also Exh. 34(7) at 2.  Of principal importance in this regard, Iran began cultivating the development of a terrorist group among the Shi'ites that went by various names, including Hizbollah,[5] Islamic Jihad, Right

---

[5] The name of this organization has been spelled in a variety of ways including "Hizbollah," "Hizballah," and "Hezbollah."  For ease of reference, the first spelling is used herein, except where an

Against Wrong, and the Revolutionary Justice Organization.  See Exh. 19 (Oakley Depo. Tr.) at 46; see also Oakley Depo. Exh. 10 (also at Exh. 29) at 304.

Among other things, Iran provided Hizbollah with military arms, training, and other supplies, and issued propaganda to encourage Lebanese Shi´ites to join the organization.  Exh. 34(5) at 2; see Exh. 34(1) at 2 (CIA analysis finding that Iran provided "training and military support to the radical Shi'a groups based in the Bekka Valley").  In fact, soldiers from Iran's elite military unit, the Revolutionary Guard, set up headquarters in Lebanon's Bekaa Valley to train Hizbollah recruits.  Oakley Depo. Exh. 9 (also at Exh. 28); Exh. 10 (also Exh. 29) at 304; Exh. 34(5) at 2.  By early 1985, the U.S. Government had "fresh and convincing evidence that radical elements highly placed within . . . the government of Iran [were] giving operational policy advice to terrorists in Lebanon, specifically terrorists operating under the name 'Islamic Jihad' or Hizbollah."  Exh. 27 at 1; (also at Oakley Depo. Exh. 8).

Iran also provided Hizbollah with financial support.  Indeed, while support of Hizbollah was not specifically provided for in Iran's annual budget, "Hisballah, the supreme religious leader and the president openly acknowledged that Iran was providing financial support, in fact proudly acknowledged that Iran was providing the financial support" for Hizbollah.  Tr. Vol. II at 30.  Dr. Clawson estimated that in 1983, the year of the Beirut Embassy bombing, Iran spent in the range of $50 million to $150 million on its terrorist efforts.  Tr. Vol. II at 31.

Beginning in the early 1980s, Hizbollah undertook a series of terrorist acts directed at Westerners.  See Tr. Vol. II at 15-16; 24; see also Exh. 31 (chronology of Hizbollah terrorist activities targeting United States interests in Lebanon from 1982 - 1988).  One of the first events

_____

alternative spelling is reflected in exhibits or the official transcript of the evidentiary proceedings.

was the July 1982 kidnaping of David Dodge, then the Acting President of the American

University of Beirut. <u>See</u>, <u>e.g.</u>, Tr. Vol. I at 124-25. This was a significant development, as

"after the American embassy or maybe even more than the American embassy, the American

University of Beirut is the symbol of America in Lebanon, indeed a very proud symbol in many

respects." <u>Id.</u> at 124.

Other acts of terror against Western interests followed: the bombings of the U.S. Marine

Corps barracks and French paratrooper base in October 1983 (<u>see</u>, <u>e.g.</u>, <u>Peterson v. Islamic</u>

<u>Republic of Iran</u>, Nos. 01-2094 and 01-2684, 2003 U.S. Dist. LEXIS 8915 (D.D.C. May 30,

2003)); the murder of Malcolm Kerr, President of the American University of Beirut, in January

1984; the United States Embassy Annex bombing in September 1984; and the kidnaping, from

1982 to 1991, of 50 Western hostages, including American, British, French and German

nationals. <u>See</u> Exh. 34 (8) at 3; Exh. 29 at 305-307; <u>see also</u> Exh. 19 (Oakley Depo. Tr.) at 27-

28, quoting Oakley Depo. Exh. 3; <u>see generally</u> Tr. Vol. II at 22- 30.

Hizbollah accomplished its terrorist acts not just with the support of the Iranian

government generally, but with the specific assistance of MOIS. An Iranian government

ministry, MOIS was formally established by law in 1983 or 1984, although it had previously

existed as an offshoot of the secret police under the regime of the former Shah of Iran. <u>See</u> Tr.

Vol. II at 32-33. At the time, it was the second-most respected intelligence agency in the Middle

East, after the Israeli intelligence apparatus. <u>See id.</u> at 33. As part of its operations, MOIS

acted, and continues to act, as "a prime conduit to terrorist and extremist groups." Exh. 34 (8) at

2. <u>See also</u> Exh. 19 (Oakley Depo. Tr.) at 47; Oakley Depo. Exh. 10 (also at Exh. 34). In

Lebanon in particular, MOIS supported Hizbollah, nurturing it with "financial assistance, arms

6

and training." Oakley Depo. Attach. 10 at 304 (also at Exh. 29); see also Tr. Vol. II at 12; Exh. 34 (8) at 1-2.  With this support, Hizbollah evolved into "one of the most capable and professional terrorist organizations in the world." Exh. 34 (8) at 2.

**B.      The April 18, 1983 Bombing**

On April 18, 1983, at approximately 1:05 p.m., an unidentified driver crashed a vehicle laden with hundreds of pounds of explosives into the main entrance of the United States Embassy in Beirut.  See generally Exhs. 2-10; Exh. 11.   Upon crashing into the Embassy, the vehicle exploded with a force so powerful that seven floors in the center section of the crescent-shaped building collapsed, or "pancaked."  See Exh. 17 at 3-4.  Portions of the Embassy, including the Marine security guard post, the cafeteria, the United States Information Service library, the personnel section, and the consular section, were completely destroyed by the blast. Other parts of the building were severely damaged.  See Tr. Vol. I at 131, 133; see also Exh. 16 at 6-17; see generally Exhs. 2-11.

As a result of the blast and the resulting damage and destruction of portions of the Embassy, sixty-three people, including seventeen U.S. citizens, were killed.  Over one hundred others were injured.  See, e.g., Tr. Vol. I at 117, 135; see also Exhs. 2-11.

The bombing was the first large-scale attack against a United States Embassy anywhere in the world.  Exh. 19 (Oakley Depo. Tr.) at 22; see also Tr. Vol. I at 121-22; Exh. 35 at 13.  At the time, it was not immediately clear who was responsible for the bombing.  See, e.g., Tr. Vol. II at 27-28; Tr. Vol. I. At 121.  But by 1984, the U.S. State Department, in its annual publication *Patterns of Global Terrorism: 1983*, noted that "radical Lebanese Shi'a using the nom-de-guerre Islamic Jihad" and "operat[ing] with Iranian support and encouragement"  were "responsible for

the suicide attack[s] against the U.S. Embassy." Exh. 20 at 11 (also at Oakley Depo. Exh. 1);[6]

see Exh. 22 (discussing Islamic Jihad, or Hizbollah's, terrorist activities, including, *inter alia*, the

1983 Beirut Embassy bombing, as "part of a major terrorist campaign aimed at the elimination of

U.S. and western influence in Lebanon"); Oakley Depo. Tr. at 23-25.  In connection with the

evidentiary hearing in this matter, Ambassador Robert Oakley, the coordinator of the State

Department's counter-terrorism efforts who was tasked with assessing who was behind the 1983

Beirut Embassy bombing (see Exh. 19 (Oakley Depo. Tr.) at 9), testified that it was ultimately

"very clear that Islamic Jihad [Hizbollah] was behind the bombing in 1983." Id. at 21.

Ambassador Oakley further expressed "confiden[ce] that the government of Iran was involved

directly in the Hisballah organization, which was created, armed, trained, protected, provided

technical assistance by the Iranian Revolutionary Guards." Id. at 21.

Among other things, the complexity of the attack upon the U.S. Embassy in Beirut

evidenced Iran's central role in the attack.  Dr. Clawson testified:

> [T]here's no question that Iran was responsible for the selection of the target,
> provided much of the information for how to carry out the bombing, the expertise
> for how to build the bomb, the political direction that said that this was an
> important target to bomb, provided financial support for the bombers.  It has the
> Iranians' fingerprints all over it. . . .
>
> [T]his was quite a sophisticated and large bomb against a well-guarded target.
> And at the time, the people from the Shi'a community who claimed responsibility
> for this were just getting into the business of having a militia and having -- and
> engaging in some kinds of bombings.  They hadn't done a whole lot.  They didn't

---

[6] As Ambassador Oakley explained, the U.S. Department of State Patterns of Global Terrorism is
an annual report highlighting worldwide patterns of terrorism, and reflects the formal and official position
of the U.S. Government with respect to responsibility for various terrorist acts. *See* Exh. 19 (Oakley
Depo. Tr.) at 24-25.

have established expertise; they didn't have a group of people locally whom they could draw upon to do this.

And furthermore, at this time they were so dependant upon financial support from Iran, they had no independent means of financial support, and furthermore, they were so dependant upon political guidance from Iran, Iran was quite directly ordering what targets to do, what not to do.

Tr. Vol. II at 20-21.

The bombing of the U.S. Embassy in Beirut in April 1983 represented a turning point

with respect to Iran-sponsored terrorism conducted in Lebanon by Hizbollah.  As Ambassador

Oakley testified:

I think it was a seminal event in anti-U.S. terrorism and Lebanon seems to be the easiest place for the Iranians to operate.  As I've said before, they had several purposes, one was to drive the United States out of Lebanon, its military forces and also as you see subsequently from the attacks on professors at the -- and the President of the American University in Beirut, a cultural influence.  Same thing is true of the French who were supporting universities there and also had military forces there as part of the Multinational Force.  The Iranians wanted to drive us out so they could put in an Iranian Shi´a revolutionary state.  The second thing they wanted to do is to punish the United States for its support of Iraq, against Iran in the Iraq/Iran war, which at that stage was at its peak and the Iranians were at the losing end of it at that stage so they wanted to make it very, very clear they were going after us.  The third thing they wanted to do was -- all of these were helped by blowing up our embassy, was to show the power which Iran and its supporters could generate.  And here you have something that's not quite as powerful, but almost as the removal of the Shah as supported by the United States and indirectly by Israel.  And finally they wanted to cement their relationship within the entire Middle East by showing what they could do against us, which made them a force throughout the Moslem world, if you will.  Here they were taking on the great power, taking on the great Satan in a very clear way and yet doing it with plausible deniability by saying, Look, these Lebanese feel so strongly against the United States they are willing to take this type of action.  So it serves several different purposes for the government of Iran and did so with a degree of success.  [Although] we stood our ground, we weren't driven out of Lebanon at this stage.  It was only later on when they blew up the [Marine] barracks, which was a huge shock to the American people that finally public and political pressure convinced the Reagan administration they should pull the U.S. forces out of Lebanon.

Exh. 19 (Oakley Depo. Tr.) at 50-52.

On January 19, 1984, President Reagan designated Iran a state sponsor of terrorism. See Exh. 32. This designation was in response to Iran's role in sponsoring a number of terrorist acts in Lebanon, including the April 18, 1983, Embassy bombing at issue here. See Tr. Vol. II at 28. Iran has ever since remained on the State Department list of state sponsors of terrorism. See 22 C.F.R. § 126.1(d)(2003); 31 C.F.R. § 596.201 (2003). In fact, according to the U.S. Department of Defense, "[f]or over two decades, Iran's involvement in international terrorism has been unmatched by any other state. Iran remains the world's most capable and persistent state sponsor of terrorism." Exh. 34(8) at 1. See also Exh. 29 at 304 ("Iran is currently one of the world's most active states supporting international terrorism and subversion against other countries."); Tr. Vol. II at 34 (Dr. Clawson responding, when asked whether Iran and MOIS continue to sponsor terrorism, "[o]h yes sir. No question about that.")

## II.    PLAINTIFFS

Plaintiffs in this matter consist of individuals who were either personally injured in the April 1983 attack on the U.S. Embassy in Beirut, Lebanon, or who are family members of those killed or injured in the attack. The Court will discuss the testimony of each plaintiff in the order in which he or she testified, and will then discuss the testimony of expert witness Dr. Larry Pastor.[7]

### A.    Anne Dammarell

Plaintiff Anne Dammarell was assigned to the United States Embassy in Beirut as a

---

[7] Dr. Larry Pastor was offered to, and qualified by, the Court as an expert in the areas of (1) analysis and psychology of disasters and (2) post-traumatic stress disorder. See, e.g., id. at 46-48.

General Development Officer with the United States Agency for International Development ("AID").  See Tr. Vol. I at 14-15; see also Exh. 12.

She was born January 2, 1938, in Cincinnati, Ohio.  She is a United States citizen and presently resides in Washington, D.C.  See Tr. Vol. I at 12.

Ms. Dammarell graduated from Our Lady of Cincinnati College in 1960, with a Bachelors Degree in English, and a minor in History and Philosophy.  See Tr. Vol. I at 13.  After graduation, Ms. Dammarell worked for Procter and Gamble as a market researcher, and thereafter traveled through Europe; worked as an au pair in France; and taught English as a second language in Spain.  See id.

In 1965, Ms. Dammarell joined AID, in the Office of International Training, in Washington, D.C.  See Tr. Vol. I at 14.  A few years later, Ms. Dammarell transferred to the Afghan desk, where she remained until 1980.  See id.

In the fall of 1980, Ms. Dammarell was posted overseas to the United States Embassy in Beirut, as a program officer with the then three-person AID mission.  See id. at 14-15.  She managed AID's contacts with non-governmental organizations for a $5 million development program.  See id. at 15.  According to Ms. Dammarell, "Beirut was not a nine-to-five job by any stretch of the imagination.  I think people who were there wanted to be there. They had a sense of mission and dedication, and you worked anytime to get the work done."  Id. at 15-16.

Ms. Dammarell was evacuated from Beirut following the Israeli invasion in the summer of 1982, returning to the city in July 1982.  See id. at 21-23; Exh. 12 at 1.  In the following months, the AID mission at the Embassy increased to 17 people, and the Embassy staff in general increased as the United States' efforts to bring peace to Lebanon intensified.  See Tr.

11

Vol. I at 27, 28.  Ms. Dammarell extended her stay twice, in part to help train her replacement.

See id. at 28.  She was scheduled to leave Beirut on April 25, one week after the Embassy

bombing.  See id.

April 18, 1983 was overcast and rainy.  See Tr. Vol. I at 30.  Ms. Dammarell spent the

morning at home, interviewing contractors to move her belongings back to the United States the

following week.  See id. at 31.  She arrived at the Embassy around noon, and planned on writing

a report for William McIntyre, her supervisor.  See id.  She met Robert Pearson, who was

coming out of the Embassy when she arrived, and the two decided to have lunch in the Embassy

cafeteria to discuss her going away party.  See id. at 31-32.  The cafeteria was located on the

same floor as and to the left of the main entry to the Embassy.  See id. at 30.  Mr. Pearson and

Ms. Dammarell opted to sit in the front of the cafeteria, closest to the Corniche, which was a

place Ms. Dammarell did not ordinarily sit.  See id. at 31-32.

As the pair discussed the possibility of peace, Ms. Dammarell:

[H]eard a huge noise, an explosion, and I felt intense heat.  And the only way I
can describe that heat is if you've ever had an oven going full blast and you
opened the door and the heat jumps out at you.  That's how I felt, except it wasn't
just my face; it was my entire body.  The silence followed that -- it happened all
at once.  It was the big noise, dead silence, tremendous heat, and then a sensation
of being shocked, meaning as you put your finger in a wall electrical outlet, you
can get a little shock . . . I had that through my entire body, from my head to my
toes. . . .  The odd thing is I made up a story.  It had nothing to do with reality, but
I assumed that we were struck by lightning . . . and I thought . . . the contractors
decided to save money . . . and they're going to put all the electrical system . . . in
the cafeteria, and I sat next to that and one of the wires came down and hit me and
I've been electrocuted. . . .   And then I thought -well, I'm dead.  So I'm going to
lean over and tell Bob that I'm dead.  And when I tried to do that, I realized I
didn't have a body.  And then I thought -isolation like I've never felt before. . . .  I
remember thinking, well, I can't touch anybody.  I can't talk to Bob.  I can't see or
hear.  And this was not . . . what . . . they told me what death was going to be like
and that I simply couldn't endure the pain, the isolation.  It was clear.  I said - in

> my mind's eye I said I couldn't endure this.  And when I did that, I got angry.
> And then the next thing I remember was being outside, waking up.  I was very
> alert.  I wasn't groggy.  And my jaw ached.  It ached terribly.  And I remembered
> thinking I'm glad I didn't have all that dental work, because clearly my teeth are
> going to fall out.

Tr. Vol. I at 33-34.

Ms. Dammarell had been blown out of and along the cafeteria wall, landing somewhere

outside the Embassy.  See Tr. Vol. I at 33-35.  After regaining consciousness, she:

> [L]ooked up [and] felt what I thought was a slab.  I had thought it was a wall.
> And I'm claustrophobic, so I began to panic. . . .  And I said, now, just calm down
> and you can get out of it. . . .  I thought, well, I'll see how heavy this wall is, so I
> thought I was going to pick up my arms and push, and I realized that I was telling
> . . . my brain . . . to do that, but I couldn't get my arms to move.  They were like
> jello.  And it seemed a very slow process, but eventually I did raise them, and
> when I pushed against what was on my face, it crumbled. . . .  And when I could
> pick away some of the debris and see the sky -it was a blue sky- I relaxed because
> I knew I'd get a supply of air.

Id. at 35.

Ms. Dammarell lay there for a bit, seeing "thick" and "tacky" blood on her right hand and

attempting, but failing, to move her arms to pull herself out from under the debris.  Tr. Vol. I at

35-36.  She called out for Robert Pearson, and when he did not respond, assumed that he was

dead.  See id. at 36, 37.  Ms. Dammarell heard people moaning, and turned her head to the right,

towards the noise.  See id.  She saw smoke and flames in the distance, but did not worry because

the fire was far away.  See id.  She turned her head to the left and saw:

> [F]ire coming towards me that was small, close to the ground, yellow, and getting
> nearer. . . .  I thought I was going to be burned to death.  I thought my hair would
> catch fire, and that would be the end of me.  I looked up to see this big, black curl
> of smoke. . . .  [I]t was thick and full and puffy, and I thought if I could inhale the
> smoke, I would suffocate before being burned to death.  And I thought that would
> be easier.  And the cloud began to dissipate, so that wasn't possible, to be
> suffocated.  And so I was trying -I suppose 'prepare for death' would be a way of
> saying it.  But I didn't have any . . . deep religious insight . . . but I remember

13

feeling a deep sense of remorse; I wish I had been a better person, and that was a
sadness, a deep sadness.

Id. at 36-37.

At one point, Ms. Dammarell looked at her left side and saw a "mass of red blood."  She

assumed that her heart had been "ripped open" only to realize that she would not be alive if that

were true.  Tr. Vol. I at 37.  She then assumed that the blood was due to her lung collapsing, and

tried to remember that to tell her eventual rescuers.  See id. at 37-38.

Finally, several young men located Ms. Dammarell.  They removed an air conditioner

that had pinned her legs down, and picked her up.  See Tr. Vol. I at 38.  That was the first time

Ms. Dammarell felt "searing pain."  Id.  When they picked Ms. Dammarell up, she "seemed to go

rigid."  Id.  Ms. Dammarell's rescuers ran with her towards the street and "toss[ed her] in [to an

ambulance] like a sack of cement."  Id. at 39.  She tried in vain to tell the attendant that her lung

was collapsed, but could not make herself understood.  See id.  Ms. Dammarell was transported

to the American University of Beirut ("AUB") Hospital.  See id.

Once at AUB, she was placed on a gurney and rushed into the hospital.  Her body got

"stiffer and stiffer and more rigid, and so it got to a point where [she could] only look up."  Tr.

Vol. I at 40.  Ms. Dammarell was able to see and hear the commotion around her.  See id.  A

nurse came and took her blood pressure, and for a moment she felt "really good."  Id.  Ms.

Dammarell then noticed that her gurney was being pushed "further and further and further down"

the hallway; she assumed that she must be seriously injured and was going to die.  Id.

At one point, a doctor she knew approached her.  Ms. Dammarell, still focused on what

she thought was a punctured lung, tried to tell him about her lung.  The doctor told her not to

worry because she was "far better off than most people." Tr. Vol. I at 41. A friend from Catholic Relief Services saw Ms. Dammarell and told her that he would tell the Embassy that she was alive. See id. Ms. Dammarell was eventually given a glucose drip. She felt the pain of the needle, but generally did not feel much pain from her injuries, recalling that "[t]he body goes into some sort of shock under these types of trauma. . . . And it's remarkable . . . what you don't feel until later on." Id. at 41-42. While lying there, Ms. Dammarell heard Robert Pearson's voice, the first indication she had that he had survived the bombing. Tr. Vol. I at 42.

Late in the afternoon, Ms. Dammarell was finally taken to be x-rayed. See Tr. Vol. I at 42. When the technicians moved her to take the x-rays, Ms. Dammarell began to feel "the horrible pain that [she] can now associate with broken bones." Id. at 42-43. The technicians then wanted to move Ms. Dammarell from the gurney to a bed, but Ms. Dammarell "wouldn't let them touch [her]." Id. An American doctor intervened and told the technicians to leave her alone. See id. She does not remember how long she stayed on the gurney. See id.

That night, Ms. Dammarell was placed in a room with a Lebanese roommate. See Tr. Vol. I at 43. She was not given any pain medication because she had a concussion. See id. at 43-44. Around midnight, an Embassy colleague, Diane Dillard, found her. She informed Ms. Dammarell that William McIntyre had been killed and generally informed her of others who were killed or injured. See id. at 44, 64. Ms. Dammarell asked Ms. Dillard to tell her friends in Rome that she would not be meeting them the following week. See id. While the Embassy lacked any means of communication, Ms. Dillard assured Ms. Dammarell that she would do so, simply to reassure her. See id.

The next day, April 19, Ms. Dammarell was informed that she needed an operation. See

Tr. Vol. I at 45.  The operation was postponed because others who were injured needed immediate surgery.  See id. at 46.  Ms. Dammarell received a private room that evening, but had difficulty sleeping because she feared that the hospital would be bombed.  See id.  Ms. Dammarell also remembers feeling euphoric at being alive, a feeling that lasted for months.  See id.

For the next few days, Ms. Dammarell was attended to by a rotating group of women, on whom Ms. Dammarell depended on because she "could do literally nothing for [herself]."  Tr. Vol. I at 46-47.  Many people from the Embassy and the community came to visit, a process that Ms. Dammarell was thankful for, but found "exhausting."  Id. at 47-48.  From her visitors, she learned the identities of some of the individuals who had been killed and injured.  See id. at 64.  She also viewed for the first time news video of the bombing, which included scenes of her being carried out of the wreckage.  See id. at 65.  At some point, Ms. Dammarell was told that she could go to Germany for surgery, and have a family member meet her there.  See id. at 47-48.  Ms. Dammarell agreed to go and asked for her sister, Elizabeth, to meet her.  See id. at 48.  Ms. Dammarell felt very "alone and frightened and vulnerable" because she had little control over her life, and no control over her body.  Id. at 48-49.  She wanted her sister to join her because she knew her sister loved her and would take care of her.  See id. at 49.

The night before her flight to Germany, Ms. Dammarell was given a barbiturate to help her sleep.  See Tr. Vol. I at 49.  She was worried about the pain she would feel during her transport, because touching one part of her body made pain radiate throughout.  See id.  The barbiturate caused nightmares, and Ms. Dammarell awoke exhausted.  See id.  The following morning, the United States government transported Ms. Dammarell to the airport for a

government flight to Germany.  See id. at 49-50.

Ms. Dammarell was transported to the United States military hospital in Wiesbaden,

Germany.  See Tr. Vol. I at 50; see also Exh. 12 at 3.  At the hospital nurses, for the first time,

cleaned the black tar-like residue of the bombing off of her.  See id.  After being cleaned, Ms.

Dammarell asked for, and received, a chef's salad, the same meal that she ate the day of the

bombing.  See id. at 50-51.  While in Germany, Ms. Dammarell still felt a "sense of joy," even

though she knew people had been killed and injured in the bombing.  Id. at 54; see, also Tr. Vol.

II at 71-72 (expert testimony of Dr. Larry Pastor indicating that a "sense of euphoria" or

"honeymoon stage" is a common post-trauma reaction based on a "tremendous relief as to what

could have happened, but didn't").  She became worried that she was unable to mourn and asked

to see a psychiatrist, who told her that she would first have to focus on physically healing before

she could focus on the loss of life.  See Tr. Vol. I at 54; Tr. Vol. II at 70.

Ms. Dammarell was told that if she had surgery in Germany, she would have to remain

there for months until she recuperated.  See Tr. Vol. I at 51.  She opted instead to be transported

to Georgetown University Hospital ("Georgetown") in Washington, D.C.  See id. at 52.  From

the various examinations she received, Ms. Dammarell ultimately learned that she had nineteen

broken bones:  her left foot was broken in three places; her left ribs were broken; her pelvic bone

was broken; both arms were broken; two fingers in her left hand were broken; her collar bone

was broken and her scapula was broken.  See id. at 45.  In May 1983, Ms. Dammarell underwent

three operations on her left arm at Georgetown.  See id. at 52, 59.  The pain following the first

operation was "searing."  Id. at 52-53.  She received morphine every four hours, but after the

first hour or two, she "moaned and moaned."  See id.  The next year she had an operation on her

left hand and the following year she had an operation on her left foot.  See id.  During one of her

procedures, Ms. Dammarell also had glass surgically removed from her neck.  See id.

Ms. Dammarell testified that while she received "excellent care" at Georgetown, she

needed a "mother or ombudsman" to supervise her treatment and ensure that she was being

looked at "from head to toe."  Tr. Vol. I at 54.  While she received any treatment she asked for,

she felt like no one was looking at the "whole picture."  Id. at 54-55.

During her recuperation, Ms. Dammarell felt a "drive to be normal."  Tr. Vol. I at 53.

She realized in Germany that she could not walk when a nurse tried to help her into a

wheelchair.  See id. at 55-56.  She received physical therapy at Georgetown to relearn.

Similarly, when Ms. Dammarell was asked to fill out a food menu at Georgetown, she realized

that she could not write.  Ms. Dammarell received occupational therapy at Georgetown to relearn

these skills.  See id. at 55.

Overall, Ms. Dammarell felt that the "minute one problem was solved," another would

present itself, and as if she had "gone back to kindergarten."  Tr. Vol. I at 55.  What bothered her

most during her time in the hospital was "a sense of not being protected."  Id.  She testified that

on one occasion, she heard noises outside the hospital that she interpreted as gunshots, only to be

informed by the nurse that it was construction.  See id.; see also Tr. Vol. II at 54 (Dr. Larry

Pastor testifying that aversion to stimuli such as sounds that make a victim re-experience a

traumatic event is one of the symptom clusters found in trauma victims).

Ms. Dammarell first went outside in May 1983.  See Tr. Vol. I at 59; see also Exh. 12 at

5.  In the summer of 1983, Ms. Dammarell began receiving out-patient treatment, returning to

the hospital every day.  See Tr. Vol. I at 60.  She rented a house near Georgetown, and two of

her nieces came to care for her.  See id.  During this time, Ms. Dammarell began to experience anxiety attacks, and feared that someone would attack and kill her.  See id. at 60-61.  She also began to experience nightmares, involving the occurrence of a variety of tragedies that resulted in her death.  See id. at 61; see generally Tr. Vol. II at 53-55 (Dr. Larry Pastor testifying that anxiety attacks, flashbacks, and nightmares are among manifestations of symptom clusters associated with aftermath of trauma).  To address the anxiety attacks and nightmares, Ms. Dammarell began seeing a psychiatrist.  See Tr. Vol. I at 61.

Additionally, Ms. Dammarell became very concerned that she would not be able to return to work and would become a burden to her family.  See Tr. Vol. I at 67.  When a State Department psychiatrist informed her that she might not be able to go to her next scheduled posting in Sri Lanka, that "pushed a panic button." Id.  Ms. Dammarell became determined to recover and assume her post, in part because it gave her a feeling of control over her life.  See id. at 67-68.

During the next several months, Ms. Dammarell concentrated primarily on her treatment. See Tr. Vol. I at 56.  During this time, she received a visit from Robert Pugh, the Embassy's Deputy Chief of Mission, who gave Ms. Dammarell, for the first time, a detailed explanation of the bombing.  See id. at 64-65.

In January 1984, Ms. Dammarell was declared medically fit, and assumed her post as an AID Program Officer at the U.S. Embassy in Sri Lanka.  See Tr. Vol. I at 68.  At this time, Ms. Dammarell could walk, but not run, and was incapable of rolling over.  See id.  When she arrived in Sri Lanka, the country's civil war was heating up.  See id.  When AID contractors were kidnaped, Ms. Dammarell was so frightened that she "did not sleep for two or three days." Id.  at

69; see also Tr. Vol. II at 54, 59 (Dr. Larry Pastor testifying that sleeplessness is part of cluster of trauma-related disabilities, as are fears and anxieties in connection with events mirroring circumstances of underlying traumatizing event). When people asked Ms. Dammarell if she was well, she "lied through [her] teeth" and said yes, because of the Foreign Service's cultural belief that its members "have stiff upper lips and [can] do anything and [can] come through it unscathed and . . . will succeed." Tr. Vol. I at 69-70.

Ms. Dammarell realized in Sri Lanka that she "really wasn't functioning." Tr. Vol. I at 70, 80. She testified that she "wasn't sleeping. I was anxious, I was worried. I was afraid of being bombed again. I was having these dreadful nightmares that I couldn't stop." Id. at 80. When a colleague suggested that she might have "survivor's guilt," Ms. Dammarell dismissed the suggestion. Id. Ms. Dammarell completed her three-year tour in Sri Lanka in 1987, and returned to Washington, D.C. See id. at 70. After working for several months with AID in Washington, D.C., Ms. Dammarell opted to retire early, at the age of fifty. See id. Her retirement became effective in January 1988. See id. Before the bombing, Ms. Dammarell had expected to serve overseas in the foreign service and retire at age 65.

After retiring, Ms. Dammarell spent two years in Cairo, Egypt, teaching English as a second language. See Tr. Vol. I at 71. She remained in Egypt until the first Persian Gulf War began in 1991. See id.

Upon returning to the United States, Ms. Dammarell enrolled at Georgetown University, and ultimately received a Masters in International Studies. See Tr. Vol. I at 72, 78. In her Master's-level studies, Ms. Dammarell was primarily interested in learning about Beirut, and the Embassy bombing. See id. at 72. As Ms. Dammarell testified:

> I wanted to get rid of Beirut [and] the nightmares and everything else, and part of
> that getting rid of is the process . . . [of] trying to forgive the person who did it to
> me, and I could do it with the driver.  I couldn't do it with whoever thought of it.
> And I was so ignorant.  I didn't know a lot. . . .  I thought maybe if I studied I
> could find out.

Id. at 73-74.  Ms. Dammarell eventually learned through her research that Iran was behind the

bombing.  See id. at 73.  It was also through this research that Ms. Dammarell first learned of

Post-Traumatic Stress Disorder ("PTSD").  See id. at 74-75.  Ms. Dammarell testified that the

descriptions of the syndrome "seemed very familiar.  I was grateful, actually, when I found out

that it was a known entity.  It wasn't something that I was just hallucinating; it wasn't just me."

Id. at 75.

Ms. Dammarell chose to write her Master's Thesis on the effects of the Embassy bombing

on its survivors.  See Tr. Vol. I at 74, 78; Exh. 14 (Dammarell thesis).  Ms. Dammarell found

that most of the materials she reviewed in her research dealt with the October 1983 bombing of

the United States Marine Corps barracks, with very little literature dealing directly with the

Embassy bombing.  See Tr. Vol. I at 75.  Ms. Dammarell thought that focusing on the Embassy

bombing "[w]ould be useful . . . it's written down and it's outside of me and it's on paper and it's

there.  So if anybody really wanted to look into the matter they could; there would be a

document they could go to."  Id. at 79.

After receiving her Master's Degree, Ms. Dammarell worked with family members of the

victims of the 1998 bombings of the United States Embassies in Kenya and Tanzania.  Id. at

59.  Since the Beirut Embassy attack, Ms. Dammarell has had an "acute awareness of being

vulnerable."  Tr. Vol. I at 82.  She testified that:

> [A]fter the bombing . . . I was super-aware of people when I would be at the
> airport boarding a plane.  I would look at the people in front of me and say, well,
> these may be the last people on Earth I see.  And then I would go and look at
> people if they had like a big bulgy briefcase, I would say, now, is there a bomb in

> that? . . .  I would go into a room, and I did this at State Department, and
> rearrange the furniture so that my desk wasn't near the glass.  I had a hissy fit in
> the post office when nobody would come and open up a box that was not
> identified by anybody. . . .  All of that was a result of living in Beirut.  Since 9/11,
> the things that I've just mentioned are not at all unusual. . . .  So what was odd,
> strange behavior then is not odd, strange behavior now.

Id. at 81-82; see also Tr. Vol. II at 50-51 (Dr. Larry Pastor testifying that hyperarousal and

related symptoms such as "exaggerated startle response, constant anxiety, being on edge,

hypervigilence, [and] scanning the environment" are among manifestations of one of three

primary symptom clusters characterizing PTSD).

In November 2000, Ms. Dammarell saw an article in The Washington Post regarding

lawsuits against Iran for claims of state-sponsored terrorism.  See Tr. Vol. I at 82-83.  Ms.

Dammarell and several other litigants decided to investigate whether Iran could be sued for

sponsoring the 1983 Beirut Embassy bombing.  See id. at 83-84.  When Ms. Dammarell

discovered she could sue Iran she opted to do so:

> I resented the fact that nobody was held responsible.  It was a front-page item for
> a while, it slipped off the front page, and I had the impression that nobody really
> cared to pursue it to find out who did it and why.  It wasn't politically expedient to
> do that, didn't really matter because we were government workers and we
> wouldn't be a threat in any way.  I wanted an authority figure; I wanted an open
> public discussion.  I wanted to identify who was responsible, to get it outside of
> me.  It was no longer just me and my neurosis or me and my thinking or not
> thinking straightly.  It was clear-cut and here, outside.  I had the naive belief when
> I first started that we would actually face the government of Iran, that somehow
> there would be some sort of discussion.  And of course, that would not be.  That
> will not.  That's how I wanted it to be.  I wanted it to be open and public, well-
> known, and somebody of authority would say, well, now, this isn't a very nice
> thing to have had happen.

Id. at 85-86.

The economic damages suffered by Ms. Dammarell are set forth in the expert report of

Steven A. Wolf.  See Exh. 39 at 18 and Tab 5.

**B.      Daniel Pellegrino**

Plaintiff Daniel Pellegrino served as a Naval Intelligence Specialist in the Defense Attaché's Office at the U.S. Embassy in Beirut.  See Tr. Vol. II at 111-112.; see also Exh. 40; Exh. 14 at 213.  Mr. Pellegrino was born November 28, 1950 in Cambridge, New York, and is a United States citizen.  See Tr. Vol. II at 109.  At the time of his testimony, Mr. Pellegrino resided at the United States Embassy compound in Tokyo, Japan.  See id. at 108.

Mr. Pellegrino graduated from Greenwich Central High School in Greenwich, New York, in June 1968 and joined the Army the next month, as a private.  See Tr. Vol. II at 109.  Mr. Pellegrino specialized in the area of intelligence, with his subsequent postings at various bases in the United States and Vietnam.  See id. at 110.  Mr. Pellegrino left the Army in July 1971.  See id.  Subsequently, he was briefly employed as a Sky Marshall; attended Hudson Valley Community College in New York; and worked for the Postal Service as a clerk-carrier.  See id. at 111.

Mr. Pellegrino left the postal service in November 1976, and re-joined the military, this time the Navy, as a seaman.  See Tr. Vol. II at 111.  He was subsequently stationed at various bases in the United States, Japan and Korea.  See id. at 112.  During this time, he received Russian language, naval intelligence, and attaché training.  See id. at 111, 112.

While stationed in Korea, Mr. Pellegrino inquired about obtaining a position in the Naval Attaché Office of a United States Embassy.  See Tr. Vol. II at 112.  He was offered postings in Ankara, Turkey, and Beirut, Lebanon.  See id.  Mr. Pellegrino chose Beirut because it was a shorter tour and would satisfy his sea obligation with the Navy.  See id.  He arrived in Beirut in April 1982, as the Intelligence Assistant in the Naval Attaché Office.  See id. at 112-113.

On the morning of April 18, 1983, Mr. Pellegrino arrived at the Embassy, grabbed a snack, and went to work in his office on the sixth floor.  See Tr. Vol. II at 115.  He broke for

lunch around noon, and ate in the cafeteria with friends, including Dorothy Pech and Beth Samuel.  See id.  Mr. Pellegrino left the cafeteria around 1:00.  See id.  He passed by Post 1, where Marine Robert McMaugh was on duty.  While Mr. Pellegrino would normally stop to speak with Mr. McMaugh, on this occasion he did not stop, and instead immediately returned to his office.  See id. at 115-116.  Mr. Pellegrino spoke with his supervisor, Colonel Winchell Craig, for a few minutes, and then made a phone call to cancel a flight.  See id. at 116.[8]  At that moment, the bomb exploded.  See id.

As Mr. Pellegrino testified, he heard:

[A] tremendous explosion, and I thought I had blinked.  The office looked normal, and then when I opened my eyes, which I thought was a blink away, it was completely changed.  It was just completely devastated.  The ceiling had come down, the windows were gone, the air conditioner came out, the door was off its hinges, the walls were all sprayed with shrapnel or glass or debris, and lots of smoke, tear gas.

Tr. Vol. II at 117.  Mr. Pellegrino, who had been sitting in his chair, was thrown out of his chair and up against the wall behind him.  See id.

Mr. Pellegrino could not tell at this point whether he had been injured.  See Tr. Vol. II at 117.  He was puzzled because he saw a "fair amount of blood," but "felt no pain."  Id. at 117-118.  Mr. Pellegrino put his hands up to his ears, and when he brought them down, saw blood all over them and his shirt.  See id. at 118.  He then realized that he had been cut on his head, nose, side of his face, neck, and hands, and had glass embedded in his skin.  See id. at 118, 122.

Mr. Pellegrino initially assumed that his office had taken a direct hit from a rocket propelled grenade or airplane missile.  See Tr. Vol. II at 118.  While he was trying to determine the cause of the damage, a Marine came into his office and handed him a first aid pouch to stop

---

[8] Dorothy Pech, Beth Samuel, Winchell Craig, and the Estate of Robert McMaugh are all participants in this litigation.

the bleeding on his head.  See id. at 118-119.  Mr. Pellegrino initially hesitated to leave his

office, even though his training dictated that he head towards the center of the Embassy, because

he feared either that another round would hit the Embassy or a second bomb would detonate, a

common practice in Beirut.  See id. at 119.  Eventually, Mr. Pellegrino left his office and made

his way to the center of the Embassy, where other people were waiting, including Colonel Craig.

See id.

 While waiting for instructions, Mr. Pellegrino asked Colonel Craig for a paper towel,

which he used to blow his nose.  As Mr. Pellegrino testified "it just came out all blood."  Tr. Vol.

II at 119.  Eventually, Mr. Pellegrino followed other individuals down to the fourth floor, where

they attempted to exit the Embassy through a window.  See id. at 120.  The window was blocked

by a beam that could not be moved, forcing the group to walk down to the second floor, where

Mr. Pellegrino was able to exit the Embassy by climbing out a window and down a ladder.  See

id.  Once on the ground, Mr. Pellegrino saw a crater, twenty to forty feet in diameter, in front of

the Embassy, and realized that the Embassy had been hit by a car bomb.  See id. at 120.

 Mr. Pellegrino was taken to AUB Hospital by ambulance.  See Tr. Vol. II at 121.  At the

hospital, Mr. Pellegrino was directed to a waiting room with other bombing victims.  See id.  He

recalls seeing one victim who "came in with his arm open, and it looked just like something out

of a textbook as far as you could see the upper layer [of] skin, the bottom layer."  Id.  A doctor

ordered that Mr. Pellegrino be given two tetanus shots.  Id.  Mr. Pellegrino testified that "the

shots hurt.  And at that point, then I think my wounds started hurting.  I really didn't feel

anything up until that time.  Those two shots sort of made my pain come up."  Id.  After that, Mr.

Pellegrino was examined and received stitches.  See id. at 122.

 After receiving treatment, Mr. Pellegrino left the hospital, dodging reporters along the

way, and saw Colonel Craig.  <u>See</u> Tr. Vol. II at 123.  Colonel Craig transported Mr. Pellegrino to

the Colonel's apartment, where he spent the night.  <u>See id.</u> at 123-24.  He was able to telephone

his parents that evening to tell them he was alive.  <u>See id.</u> at 124.  Mr. Pellegrino could not sleep

that night because his experiences that day "hark[ened] back to Vietnam."  <u>Id.</u>  He knew that his

parents would be worried for him, and he "said some prayers because . . . a lot of people had

gotten killed."  <u>Id.</u>

The following day, Mr. Pellegrino returned to the Embassy, and eventually returned to

his duties, which were relocated first to the Deputy Chief of Mission's apartment and then to the

British Embassy.  <u>See</u> Tr. Vol. II at 124-26.  Mr. Pellegrino remained in Beirut until October,

1983.  <u>See id.</u> at 126.

In the following years, Mr. Pellegrino was posted to bases in the United States, Diego

Garcia, Korea, and Japan.  <u>See</u> Tr. Vol. II at 127-28.  He retired from the military in October

1993.  <u>See id.</u> at 128.  Mr. Pellegrino's retirement was prompted by lack of promotions.  <u>See id.</u>

at 136.  Prior to Beirut, Mr. Pellegrino had been regularly promoted; subsequent to Beirut, the

promotions stopped.  <u>See id.</u>; <u>see also</u> Tr. Vol. II at 75 (psychiatric expert Larry Pastor testifying

that "one could predict overall lower occupational achievement and more difficulties along the

way" among those with PTSD and similar trauma-related disorders stemming from Embassy

bombing).  Mr. Pellegrino testified that he stopped receiving promotions because after the

bombing "I wasn't the same person I was when I got [to Beirut].  I think just overall I was a

different kind of person, completely changed."  <u>Id.</u>  at 136; <u>see also</u> Tr. Vol. II at 55 (Dr. Larry

Pastor testifying that deterioration of performance in major life areas, including in the

workplace, is one of ten symptom clusters often seen in aftermath of trauma).

In December 1993, Mr. Pellegrino began working for the Department of Veterans Affairs

in Albany, New York.  See Tr. Vol. II at 128.  He remained with the Department until 1997,

when he joined the State Department as an Office Manager.  See id.  Since 1997, Mr. Pellegrino

has been posted to Moscow, the Ivory Coast, and most recently Japan.  See id. at 129.

After the bombing, Mr. Pellegrino suffered psychological effects:

> I know my temper was very short most of the time.  Little things would make me
> very angry.  We were advised . . . to keep a weapon in our apartments, and I --
> instead of just keeping it unloaded in the chamber, I kept it loaded all of the time.
> I was always hyper-aware of where I was going or what I was doing.  Kept a low
> profile. . . .  I think I had problems with concentration at times.  I never slept well.
> I've really never slept well since Beirut. . . .  I know I didn't sleep well, and when
> I did, things were bothering me . . . [like s]afety, physical safety, and someone
> may come crashing through the door.  Kidnaping was -- the whole time I was [in
> Beirut], kidnaping was a threat. . . .

Tr. Vol. II at 129-130, 131, 133; see generally Tr. Vol. II at 53-56 (Dr. Larry Pastor discussing

symptom clusters involved in PTSD, with specific symptoms including, inter alia, sleeplessness;

nightmares; fearfulness; avoidance of sights, smells and other stimuli that might trigger a re-

experiencing of traumatic event; difficulty in emotionally connecting with others, moodiness and

irritability; hypervigilence; and preoccupation with underlying trauma).  Mr. Pellegrino never

sought counseling to treat these issues, because he feared that his security clearance would be

taken away:

> I had a security clearance, and I think in those days if you had walked in and said
> something like that, then you would automatically have lost your security
> clearance.  I had in mind that I wanted to continue with my career, so I chose not
> to say anything.

Id. at 132.  In retrospect, Mr. Pellegrino believes that he would have benefitted from counseling.

See id. at 133.

Mr. Pellegrino believes that the bombing negatively impacted at least one of his post-

Beirut postings with the State Department.  See Tr. Vol. II at 133.  Specifically, at his Moscow

posting, Mr. Pellegrino's office at the Embassy was a windowless room within a windowless

room.  See id. at 133-34.  Because Mr. Pellegrino had escaped from the Beirut Embassy through

a window, the windowless rooms made him feel "trapped," thus effecting his performance.  See

id. at 134.  Accordingly, he "did not perform as well as [he] could have and had trouble

concentrating and learning new things."  Id.

Mr. Pellegrino testified that he decided to participate in this lawsuit because he wanted

"to come up here and try and speak for the people who can't speak.  And that refers to the people

that were killed back on April 18, 1983, and I'm here to respectfully request that this Court

assign accountability and responsibility to that act, that murderous act, on that day."  Tr. Vol. II

at 135.

The economic damages suffered by Mr. Pellegrino are set forth in the expert report of

Steven A. Wolf.  See Exh. 39 at 25 and Tab 8.

### C.      Dorothy Pech

Plaintiff Dorothy Pech was posted to the U.S. Embassy in Beirut as secretary to

the Deputy Chief of Mission.  See Tr. Vol. III at 9-10; see also Exh. 41; Exh. 14 at 206.  She

was born November 6, 1929 in Portsmouth, Ohio, and is a United States citizen.  See Tr. Vol. III

at 6.  She currently resides in Vienna, Virginia.  See id. at 5.  Ms. Pech graduated from

Southeastern High School in Detroit, Michigan, in 1948.  See Tr. Vol. III at 6.  After graduating

from high school, Ms. Pech worked for various employers as a secretary.  See id.

In 1952, Ms. Pech joined the State Department Foreign Service, as a secretary.  See Tr.

Vol. III at 6-7.  In the following years, she was assigned to the United States Embassies in India

and Ethiopia.  See id. at 7.  Ms. Pech remained in Ethiopia until April 1956, when she resigned

her position to marry.  See id.  Ms. Pech thereafter lived with her family in Switzerland,

Michigan, and Virginia, and was largely out of the work force.  See id. at 7-8.

In 1969, Ms. Pech rejoined the work force, as a secretary for Marymount College.  See Tr. Vol. III at 8.  She returned to the State Department in 1975, and subsequently rejoined the Foreign Service.  In 1982, Ms. Pech was transferred to the United States Embassy in Beirut as secretary to the Deputy Chief of Mission.  See Tr. Vol. III at 9-10.

On the morning of April 18, 1983, when Ms. Pech first arrived at the Embassy, she spoke with Corporal Robert McMaugh, the Marine on duty at Post 1.  Ms. Pech testified, "I looked at him and [said], how are you doing, Bob?  [He replied,] Oh, I don't feel too good.  I said, oh, you guys are going out too much.  And I said, well, maybe it will be a short day.  And I will always remember that, because he was blown away . . . later."  Tr. Vol. III at 13.

Ms. Pech spent the morning in her office at the Embassy working and also attempting to make travel arrangements for her son to visit Beirut.  See Tr. Vol. III at 13-14.  Ms. Pech took lunch at 12:00 in the Embassy cafeteria with Beth Samuel and a few others.  See id. at 14.  Ms. Pech left the cafeteria at about 12:55, and went to the Embassy's budget and fiscal section to cash a check.  See id. at 14-15.

Ms. Pech testified that she had:

> [J]ust finished writing the check when everything -- I thought [it] was an earthquake. . . .  And the checkbook fell, and I fell down and something -- we'll never know, I guess a piece of the wall -- hit me, a big large gap across the forehead, and you start bleeding a lot.  But very oddly, very calm . . . [the cashier] helped me up. . . .  Of course, he was spared, being in that little box of his . . . and we went out in the hall and just kind of stood there.  And somebody said, sit down, I think you've lost your eye.

Tr. Vol. III at 15.

Once in the hallway, Ms. Pech testified that she saw that the:

> Marines were trying to get a Lebanese friend of mine, who had been also in personnel, she had literally been scalped.  It was horrible.  They were trying to get her out. . . .  And there was a . . . high metal gate they were trying to get her over and then get us out.  We all started kind of lining up, but it jammed. . . .  We

simply couldn't get out so easily. And so we were just kind of standing there and
bleeding, and most of us, after all, were able to stand, which was something. And
one person got very excited, and I just said, please keep quiet, you'll make the
rest of us -- and she did. And then . . . a Red Cross person . . . came and said,
there's another way we can get you out. So just a few of us . . . decided to go. . . .
[W]e went one floor . . . down, although the stair, the elevator, everything was
very, very bad. But we could get down that flight. . . . But then we had to jump,
oh, maybe three, four feet across to the other building to get to the ladder to go
down, and I was just -- I was bleeding. Someone had given me a handkerchief,
and I couldn't see at all. I said, I can't do that. I said, it's just too hard. Well, it
was either that or not, you know. So I did, and somebody grabbed me and
proceeded to go down the ladder just, you know, backwards, just dripping,
dripping. And I got to the ground floor and then realized what devastation had
happened.

Tr. Vol. III at 16-17.

Ms. Pech was immediately "hustled . . . into [a] taxi" for transport to AUB Hospital. Tr.

Vol. III at 17. As the taxi passed the front of the Embassy, Ms. Pech "saw someone hanging

from the Embassy and . . . all the smoke and the debris and the noise." Id. Ms. Pech testified

that at the hospital:

Those of us who could walk, we were all in one huge . . . room, and many people
had, you know, glass and stuff like that all around, some bleeding and stuff, and I
was bleeding pretty bad. But at some point they gave me something to kind of
stop it from dripping. . . . And finally [they] got to me and . . . the doctor came
and he said, now just lie down and don't move. So they give you nothing.
Nothing. . . . So I said, okay, you know, just lying there, but my leg was jumping
in sort of shock, and then someone held it down a bit. . . . And [the doctor] said in
English, oh, if this had been a breath more it would have been very serious. I
said, speak Arabic so I don't understand. And he proceeded to sew me up.
Apparently, when you're in that shock, you don't feel the pain until later.

Tr. Vol. III at 17-18; see Exh. 41 at 2.

As a result of her injury, Ms. Pech temporarily lost sight in her left eye, regaining it three

weeks after the Embassy bombing. See Tr. Vol. III at 23. The injury may have permanently

harmed her eyesight in that eye. See id. at 25. In addition to her physical injuries, Ms. Pech lost

a number of friends in the bombing. One friend, Mrs. Amal, had planned a party for the

Saturday following the bombing.  Instead of a party, Ms. Pech attended Mrs. Amal's funeral.
See id. at 28-29.

After receiving treatment, Ms. Pech went back to her apartment.  See Tr. Vol. III at 19.
While Ms. Pech considered herself "tough and always very independent," she was unable to
remain in her apartment alone.  Id. at 19-20.  She called Deputy Chief of Mission Robert Pugh,
who picked her up and took her to his apartment.  See id. at 20.  She remained at Mr. Pugh's
apartment for the next several days, helping with the phones and typing up cables listing the
names of those killed and injured in the bombing.  See id.

Ms. Pech did not have contact with her family until two days after the bombing.  See Tr.
Vol. III at 21-22.  During those days, her family did not know whether she had survived.  They
had contacted the State Department, but were told only that Ms. Pech had been "accounted for."
Id. at 21.

Several days after the bombing, the bodies of the United States citizens killed in the
attack were transported back to the United States from the Beirut airport.  See Tr. Vol. III at 22.
Ms. Pech attended the ceremony in Beirut, recalling:

> I had been very, very . . . what's the word, stoic or something, sort of cold,
> whatever you want to call it, about this whole thing.  But at the airport when the
> flag-draped coffin goes by, especially of [Robert McMaugh], it was tough. . . .
> Especially when I told him it would be a short day.  But actually, that was the
> only time I really had, I believe, showed any real emotion.

Id.

Several weeks after the bombing, Ms. Pech returned to the wreckage of the Embassy.
See Tr. Vol. III at 22.  She found her checkbook outside the cashier's office, and then went to
her office to view the destruction.  See id. at 23-24.  Ms. Pech was thankful that she was late
returning from lunch, and not in her office at the time of the bombing, because the glass from the
office windows was sprayed across her desk.  See id.

At the end of May 1983, Ms. Pech returned to the United States for home leave, and

attended her son's college graduation from the University of Texas.  Ms. Pech testified that

following the graduation:

> [W]e were just sitting there in a little garden, and I had gotten some champagne
> for the occasion.  I think I had about half a glass.  Nothing, nothing, nothing was
> said.  There was utterly no reason.  I just broke down in tears and felt really bad
> because this was supposed to be a happy occasion.

Tr. Vol. III at 24.  While Ms. Pech believed that she had coped well with the Embassy bombing,

she recently learned from a friend that she was "quite a basket case when [she] came back" from

Beirut, and was "sharp with people."  Id. at 25.

Ms. Pech returned to Beirut in August 1983, against the wishes of her supervisors.  See

Tr. Vol. III at 25-26.  She had no reservations about returning, as she "felt [work] was the best

therapy."  Id. at 26.  Ms. Pech did not seek professional counseling because she believed it

would harm her career if people at the State Department learned of her treatment.  See id.

Ms. Pech remained in Beirut until the spring of 1984.  See Tr. Vol. III at 26.  She was

sleeping in her apartment when the United States Marine Corps barracks were bombed in

October, 1983.  While Ms. Pech heard the explosion, she was so accustomed to hearing

explosions in the city that she simply took the pillow off her bed and went back to sleep on the

floor.  See id. at 26-27.

After leaving Beirut in the spring of 1984, Ms. Pech was subsequently posted to the

United States Embassies in China, Denmark, and Haiti.  See Tr. Vol. III at 29-30.  She retired in

October 1992, to care for her mother.  See id. at 30-31.  Since her retirement, Ms. Pech has

worked periodically as a secretary for the State Department.  See id.

Ms. Pech agreed to participate in the litigation because:

[A] friend of mine, Dan [Pellegrino] . . . called me and said, Dorothy, we should do this. And I said, I don't believe in litigation. But then thinking about it . . . I said, well, okay. . . . Why did I do it? We all like to be idealistic, I guess, but I'm kind of a nonviolent person, you know, the Martin Luther King way. And I thought, well, if this gets them in their pocketbook, that's fine, too. Maybe that's just the way to show them without shootings and killings . . . that, hey, you keep this up, you're going to be out an awful lot of money. And that was the purpose of it.

Tr. Vol. III at 32.

### D.    Rayford Byers

Plaintiff Rayford Byers was assigned to the U.S. Embassy in Beirut as a Chief Warrant Officer 3 with the U.S. Army's Mobility Training Team. See Tr. Vol. III at 38-39; see also Exh. 42. Mr. Byers was born September 9, 1944 in Crobyston, Texas, and is a United States citizen. See Tr. Vol. III at 33. Mr. Byers married his wife, Arnesia, in 1966, and has two children -- a son, Terry, and a daughter, Angela. See id. at 34. He presently resides in Lawton, Oklahoma. See id. at 33.

Mr. Byers graduated from high school in Flaton, Texas, in 1962, and attended Texas Tech University for two years. See Tr. Vol. III at 34. Mr. Byers left Texas Tech in July 1964 to join the U.S. Army, enlisting as a Private. See id. at 34-35. After basic training, Mr. Byers was posted to various locales, including bases in the United States and Germany. He also served two tours in Vietnam. See id. at 35-38. In the military, Mr. Byers became specialized in several areas, particularly automotive maintenance. See Tr. Vol. III at 35. By 1981, Mr. Byers had risen to the rank of Chief Warrant Officer 3. See id. at 38.

In the early spring of 1983, Mr. Byers was sent to Beirut for a temporary duty assignment with the Mobility Training Team. See Tr. Vol. III at 40, 41. On the morning of April 18, 1983, Mr. Byers and his team went on maneuvers with the Lebanese Army. See Tr. Vol. III at 42-43. The team returned to the Embassy at approximately 11:00, for their scheduled lunch hour. See

33

id. at 43.  Mr. Byers asked a team member to order him a ham sandwich from the cafeteria, while

he went to the ticket office on the Embassy's fifth floor to make preparations for the team's

return to the United States.  Id. at 43-44.

After in the ticket office, Mr. Byers heard a "large explosion."  Tr. Vol. III at 44.  He ran

out of the office, and was thereafter blown out of a fifth story window by a second explosion.

See id.  He landed on a pile of debris, including a metal fence with arrow-shaped stakes designed

to prevent intruders from scaling the Embassy.  See id. at 45.  One of the stakes pierced Mr.

Byers' left eye, exiting out the back of his skull.  Another stake pierced his hand.  See id. at 45-

46.

After being blown out of the window, Mr. Byers remembers very little, as he fell in and

out of consciousness.  See Tr. Vol. III at 45-47.  He recalls "hollering and screaming" for help.

Id. at 45-46.  A young Lebanese boy heard his cries and brought rescue workers to his aid.  See

id.  The rescue workers extricated Mr. Byers from the rubble and transported him to the AUB

Hospital.  See id.  Mr. Byers could vaguely hear his rescuers discuss the seriousness of his

injuries and whether to transport him to AUB Hospital, or a U.S. military ship stationed off-

shore, for treatment.  See id. at 46-47.

At AUB Hospital, Mr. Byers remembers saying, as a nurse tried to take off his boots,

"whatever you do, please don't pull my boots off, please don't pull my boots off."  Tr. Vol. III at

47.  Mr. Byers objected to the nurse's actions "because you don't pull a soldier's boots off."  Id.

After Mr. Byers' injuries were assessed, he was taken into surgery.  During surgery, Mr. Byers

was twice pronounced dead.  See id. at 49-50.  He fell into a coma after surgery, and did not

wake up until four or five days later.  See id.

When Mr. Byers awoke from his coma, he was in a great deal of pain from his injuries,

which included: a crushed skull; the loss of his left eye; two broken collar bones; fourteen

broken ribs; two broken arms; a twisted back; injuries to his legs and knees; internal bleeding;

nerve damage in his hands and hips; broken fingers; and a puncture wound to his left hand from

the fence spike. See Tr. Vol. III at 47-50. Mr. Byers knew he was in a hospital when he awoke,

but did not know the cause of his injuries. See id. at 50. His doctors and nurses told him that the

Embassy had been bombed and that many people were injured and killed. See id. at 52. A

special forces major from the United States military later informed Mr. Byers that members of

his training team had all been in the Embassy cafeteria at the time of the attack, and were among

those killed. See id.

Several days after the bombing, Mr. Byers' wife and son traveled to Beirut. See Tr. Vol.

III at 50; Exh. 42 at 3. While Mrs. Byers thought that Mr. Byers would survive his injuries, Mr.

Byers felt that he "would never be normal anymore . . . [and] didn't think [he] was going to live

through it at all." Tr. Vol. III at 51.

While at AUB, Mr. Byers feared for his safety. See Tr. Vol. III at 51-52. He believed

that the persons responsible for the Embassy bombing would "come back and finish the job,"

i.e., kill him. Id. at 52. Mr. Byers asked hospital officials to let his wife remain at his bedside

around the clock, but they denied the request. See id.; see also Vol. II at 58-59 (Dr. Larry Pastor

testifying that fears and anxieties connected with anything related to circumstances of bombing

are among first symptoms of trauma among those severely injured in an attack).

Approximately ten days after the bombing, Mr. Byers was transported from AUB

Hospital to the U.S. military hospital at Wiesbaden, Germany. See Tr. Vol. III at 54-55. While

at Wiesbaden, Mr. Byers received dental work and some other minor treatment. See id. at 54.

Because Mr. Byers had not yet been able to move his legs, he believed he was paralyzed. See id.

at 54-55.  That possibility made Mr. Byers "wan[t] to die."  Id.  at 55.  Mr. Byers testified that "I was always a family man, and I didn't want to be hampering my family.  I didn't want to be where someone would have to take care of me the rest of my life, so I'd have been better off being dead."  Id.

Mr. Byers was transported from Wiesbaden to Andrews Air Force Base, and from there to Darnell Army Hospital in Fort Hood, Texas.  See Tr. Vol. III at 56.  He received in-patient care at Fort Hood for approximately two weeks, and then received outpatient care for approximately two and a half years.  See id.  During this time, Mr. Byers continued to suffer pain from his injuries.  See id.

At Fort Hood, Mr. Byers underwent surgery to repair injuries to his arms, hands, and collar bone.  See Tr. Vol. III at 57.  Mr. Byers underwent therapy to relearn how to walk, think, and write.  See id.  He did not begin walking again until early 1984, and did not begin writing again until approximately six months later.  See id. at 59-60.  He also underwent psychiatric counseling for approximately a year.  See id. at 57.

Mr. Byers returned to active duty at Fort Sill, Oklahoma, in 1984.  See Tr. Vol. III at 58. He retired from the military on August 5, 1984, after serving over twenty-one years.  See id.  Mr. Byers had originally planned to retire from the military after thirty years of service, in order to see his children through college.  See id. at 59.  He retired early because he felt that he was "physically unfit for the military."  Id.

Mr. Byers remained in the Fort Sill area upon retirement, but was unable to secure immediate employment due to his injuries.  See Tr. Vol. III at 59.  He ultimately obtained a civilian job as a records clerk with the Artillery Board at Fort Sill in 1985.  See id. at 60.  Mr. Byers remained in this position until 1990, when he began working as a Military Pay Clerk at

Fort Sill, where he is employed today. See id. at 61. Mr. Byers also returned to college, and graduated in 1988 from Cameron University in Oklahoma with a major in Sociology and a minor in Military Studies. See id. at 60-61.

The Embassy bombing continues to impact Mr. Byers' life. For eighteen years Mr. Byers commemorated the Embassy bombing by going to church on April 18 to "thank the Lord for being here, still being alive." Tr. Vol. III at 55. He is still under a doctor's care for the injuries he received in the Embassy bombing. See id. at 61-62. Mr. Byers recently underwent a procedure that restructured his left eye socket, and received a new prosthesis for the eye. See id. at 62. The loss of Mr. Byers' left eye in the Embassy bombing, combined with diabetes-related deterioration of vision in his right eye, prevents Mr. Byers from driving at night. See id. Mr. Byers continues to suffer pain from his injuries, including pain associated with rheumatoid arthritis and recurrent headaches. See id. at 56, 62, 63. In total, Mr. Byers takes eighteen pills a day for various bombing-related ailments, including Dilantin (to prevent seizures), Motrin (to control pain), and Naprelan (for arthritis). See id. at 56, 63.

In addition to his physical symptoms, Mr. Byers continues to suffers from nightmares which began shortly after the Embassy bombing. See Tr. Vol. III at 64. In his nightmares, Mr. Byers relives the experience of the Embassy bombing. See id. at 64-65. Events such as the Oklahoma City bombing, the 9/11 terrorist attacks, and the recent war in Iraq contribute to his psychological trauma. See id.; see also Tr. Vol. II at 64-65 (Dr. Larry Pastor testifying that events such as Oklahoma City bombing and events of September 11, 2001 may trigger memories of underlying trauma and bring onset or recurrence of psychological symptoms of trauma or PTSD). In part because of the nightmares, Mr. Byers is currently seeking psychiatric treatment. See Tr. Vol. III at 65.

Mr. Byers testified that he decided to participate in the lawsuit because:

> I'm not the same person as I was before this happened to me, and I know I'll never be the same person that I was. And I had high hopes and high things for my family that I won't be able to do for them, provide for them, so it affected me in many ways, and my family also. . . . I don't dislike or hate anybody, but if I think somebody would come and do something like what they did to me and my other fellow Americans, they deserve to pay for it. I'm left as -- I'm basically an invalid. People look at me and say, well, you look perfectly normal. I'm not normal. By no shape, form or fashion am I normal. Anybody have to take the medication I take and bear the pain that I bear every day, you're not normal.

Tr. Vol. III at 66.

The economic damages suffered by Mr. Byers are set forth in the expert report of Steven A. Wolf. See Exh. 39 at 22 and Tab 7.

**E.      Robert Essington, Sr.**

Plaintiff Robert Essington, Sr. was posted to the U.S. Embassy in Beirut as the General Services Officer with the U.S. Department of State. See Tr. Vol. III at 77; see also Exh. 43. Mr. Essington was born May 28, 1945, in Wausau, Wisconsin. See Tr. Vol. III at 68. He is a United States citizen. See id. at 69. Mr. Essington married his wife, Judith, in 1967, and has two children, a son Robert Jr., and a daughter Renee. See id. at 69. Mr. Essington presently resides in Sterling, Virginia. See id. at 68.

Mr. Essington graduated from the University of Wisconsin in Milwaukee in June 1967, with a Bachelor's of Science Degree in History, English and Military Science. See Tr. Vol. III at 69. Upon graduation, Mr. Essington was commissioned in the Army as a Second Lieutenant. See Tr. Vol. III at 69. Mr. Essington's subsequent postings included tours in the United States and Vietnam. See id. at 69-70. During his time in the military, Mr. Essington specialized in investigations. See id. at 70. He left the military in September 1975. See id. at 70-71.

After leaving the military, Mr. Essington held various jobs, including car salesman and

credit collector.  See Tr. Vol. III at 71.  He joined the Department of State as a security officer in

September 1976.  See id.  In November 1979, Mr. Essington assumed the position of an

administrative officer.  See id.  Between 1976 and 1982, Mr. Essington was posted in

Washington, D.C. and Pakistan.  See id. at 71-72.

In September 1982, Mr. Essington was transferred to the Beirut Embassy as a Senior

General Services Officer.  See Tr. Vol. III at 72, 77.  On April 17, 1983, Mr. Essington, along

with a number of other Embassy personnel, participated in the Beirut marathon, which he

completed in four hours and two minutes.  See Tr. Vol. III at 73-74.  That evening, he dined with

Embassy friends, including Kenneth and Allison Haas and James and Monique Lewis.[9]  See id.

at 74.

On the morning of April 18, Mr. Essington arrived at the Embassy at 6:30 a.m.  See Tr.

Vol. III at 75.  He worked in his office most of the morning, finalizing purchasing contracts, and

travel and hotel arrangements for various individuals.  See id.  When the bomb exploded, Mr.

Essington was in his office, which was located above Marine Post 1.  See id.  He was standing

behind his desk, with his back to the windows, while speaking to his secretary, Huda Shweri.

See id. at 75-76.  He heard a loud noise, like a "clap of thunder," and the "next thing [he] knew .

. . [he] was on the other side of his desk."  Id.  at 76.  Mr. Essington testified:

> I bent backwards [over the desk] because my thighs caught the desk.  So [I] was
> sort of [in] a reversed U [position when I was blown over the desk].  So it put a
> lot of pressure on my back, but I landed on my face after I had gotten blown over.
> And my glasses had gotten blown off.  And as I was lying there, it was a hard
> time breathing because I think [I] probably had the wind knocked out of me or
> something when I hit the floor.  And then the only thing I remember -- the next
> thing was Huda screaming and yelling, Mr. Essington, Mr. Essington, you know,
> here's your ear!  And she was holding my ear in her hand.  My ear had gotten

---

[9] Allison Haas, and the Estates of Kenneth Haas, James Lewis, and Monique Lewis are
participants in this litigation.

> severed, and I really hadn't noticed it.  So I picked myself up off the floor, [and]
> basically took my ear. . . .

Id. at 76-77.   In addition to his severed ear, Mr. Essington noticed that he was bleeding, and felt

pain in the back of his neck and head from embedded glass.  See id. at 77-78.

After collecting his ear, Mr. Essington and his secretary went into the hallway, and found

that his office was immediately adjacent to the portion of the Embassy that had collapsed as a

result of the blast.  See Tr. Vol. III at 78.  Mr. Essington found an injured member of his staff in

the hallway.  See id. at 78-79. He then led the injured man and his secretary down a back

stairwell, over the roof of the garage, and down a ladder to the ground.  See id. at 79.

When he reached the ground, Mr. Essington was transported via taxicab to AUB

Hospital.  See Tr. Vol. III at 79.  A doctor sewed his ear back on, without anesthesia, and

removed some of the glass from his body.  See id. at 79-80.  He received over 400 stitches.  See

id. at 80; see also, e.g., Exh. 43 at 2.  At this time, Mr. Essington was in "tremendous pain [and

also] had a tremendous ringing in [his] ears."  Tr. Vol. III at 80.

After receiving treatment, Mr. Essington returned to his apartment to change clothes.  See

Tr. Vol. III at 80-81.  He then returned to the Embassy, and assisted in recovery efforts.  See id.

at 81.  Of this experience, Mr. Essington testified:

> I think that was the first time that I noticed -- between the slabs . . . an individual .
> . . which was Frank Johnston, and I had heard with some of the people who were
> standing there that a doctor from the Navy . . . had gone up to -- I guess when he
> first went up he was alive, but there wasn't much left below his waist.  I guess he
> gave him a shot to put him out of his misery. . . .  And after that . . . they were
> trying to find Bob McMaugh, who was the Marine on duty [at Post 1] . . . [a]nd I
> saw them bring him out, and he didn't look dead.  I mean, he looked a little
> flatter, a little thinner than he was, but other than that, he didn't look like he was
> dead. . . .  [After that] we basically started to sift through a lot of the rubble to
> find classified materials and also trying to find other bodies of people who had
> been killed or if there was anybody still alive. . . .  We found . . . Jim and
> Monique Lewis, who we presumed had probably just come up from the cafeteria.
> . . .  When we found them, they were laying there holding hands.  But there again,

> they didn't look dead.  And then a little later, Phyllis Faraci was found . . . and the
> doctor said they probably suffocated more than anything else. . . .  Of course,
> having been out with them the night before, it was kind of hard to take.

Id. at 82-83.

Mr. Essington participated in the recovery effort until approximately two or three o'clock the next morning, when he went home to rest.  See Tr. Vol. III at 83.  When Mr. Essington returned to the Embassy later that day, U.S. Ambassador to Lebanon Robert Dillon and Deputy Chief of Mission Pugh asked him to locate space where the Embassy could temporarily operate, and to gather the necessary supplies.  See id. at 83-84.

On April 18, 1983, Mr. Essington's wife learned of the attack through a television news report.  See Tr. Vol. III at 84.  She contacted the State Department, but was told only that Mr. Essington was "accounted for."  Id.  She did not learn that her husband had survived until she saw pictures of him, injured but alive, on the ten o'clock evening news.  See id. at 84-85.

Mr. Essington returned to the United States for leave in May 1983.  See Tr. Vol. III at 85. Because he was experiencing back pain, hearing loss, and difficulty swallowing, Mr. Essington underwent a physical examination.  See id.  Testing indicated that Mr. Essington had herniated the L3, L4, L5 and S1 disks in his back and that there was glass embedded in his back, neck and head.  See id.  Further examinations showed that his hearing loss was caused by tinnitus, and his difficulty swallowing was caused by a hiatal hernia.  See id. at 85-86.  The only treatment Mr. Essington received at that time was removal of the stitches that he had received at AUB, and removal of additional glass from his body.  See id. at 86.

In September 1983, Mr. Essington returned to Washington, D.C. from Beirut, where he remained until 1989.  He was thereafter posted to Abu Dhabi (1989-1990), Washington, D.C. (1990-1993), and South Africa (1993-1996).  See Tr. Vol. III at 96, 97, 100.  In June 1996, Mr.

Essington became the Area Management Officer in the Office of Foreign Buildings for the Near

East Asia Bureau of the State Department, based in Washington, D.C.  He retired from that

position in September 2001.  See id.  Since his retirement, Mr. Essington has worked for the

Washington Field Office for Diplomatic Security, as a contractor for the State Department.  See

id.

From 1983 until the present, Mr. Essington has suffered from the physical and

psychological injuries caused by the Embassy bombing, and received extensive treatment for

those injuries.  These include: (1) tinnitus (incurable, persistent ringing in the ears); (2) the

continued effects of some 500-600 pieces of embedded glass, approximately 200 pieces of which

have either worked their way out of Mr. Essington's body or required periodic removal; (3) a

hiatal hernia (which causes acid reflux and requires Mr. Essington to sleep on his back in an

elevated position); (4) herniated disks; and (5) psychological trauma.  See generally Tr. Vol. III

at 86-89.

The pain related to herniated disks has been quite severe.  From 1983 to 1989, Mr.

Essington attended approximately 80 chiropractic sessions to relieve this pain.  See Tr. Vol. III

at 89-90.  In August 1989, Mr. Essington fell, and immediately felt searing pain in his back.  See

id. at 90.  Testing determined that the herniated disks were close to rupturing, and doctors

prescribed an epidural injection to relieve pain.  See id.  Immediately thereafter, Mr. Essington

was posted to the United States Embassy in Abu Dhabi.  While in Abu Dhabi, the pain

worsened, atrophy set in to Mr. Essington's right leg because of trauma to his sciatic nerve, and

Mr. Essington was forced to use a cane to walk.  See id.  Doctors prescribed extensive physical

therapy and another epidural injection to relieve pain.  See id.  In March 1990, when Mr.

Essington returned to the United States for treatment, tests showed that the herniated disks had

completely ruptured, with Mr. Essington undergoing surgery involving a fusion of his L3, L4, L5 and S1 vertebrae. See id. at 91. By April 1990, the pain had not subsided, and doctors prescribed additional pain medication and physical therapy. See id. The pain never subsided, and a second fusion surgery was conducted in July 1990. See id. From that point until 1992, Mr. Essington took Percoset to control his pain, although it did not completely relieve it. See id. By December 1992, the pain again became severe. In April 1993 Mr. Essington underwent a third surgery, wherein several of his vertebrae were replaced with artificial disks, his spine was fused at the L3, L4, L5 and S1 vertebrae, and steel rods were placed in his back. See id. at 92. In 2000, the pain worsened, and tests indicated that Mr. Essington's sciatic nerve had begun to grow into the steel rods placed in his back. Doctors prescribed methadone and oxycontin, which Mr. Essington became addicted to. See id. at 91-92. In February 2002, Mr. Essington underwent a fourth surgery, during which a dorsal column stimulator was implanted in his back. See id. The stimulator is an electronic device which controls pain; Mr. Essington will live with the device for the remainder of his life. See id. at 93-94; Exh. 43 at 3.

Mr. Essington's psychological injuries have also been pronounced. In 1993, while posted to South Africa, Mr. Essington experienced a "breakdown" in response to the Oklahoma City bombing. See Tr. Vol. III at 97-98. Mr. Essington stated that upon seeing the images, he "cried right there. Didn't want to go to work, didn't want to do anything" and experienced nightmares wherein he relived the Embassy bombing. Id. [10] As a result, Mr. Essington received psychiatric counseling. See id. at 98.

---

[10] Dr. Larry Pastor testified that events such as the Oklahoma City bombing "can refresh our memories of the [underlying] trauma and bring back symptoms." Tr. Vol. II at 64. Such events also have a "cumulative" effect, in that after exposure to a series of "trigger" events, "some people may reach the point of not necessarily breakdown, but the point of experiencing symptoms. We all have a limit." Id. at 65.

Mr. Essington stated that he decided to participate in the lawsuit because:

> The State Department has always been reluctant to admit who did it, and whether they will ever admit the Iranians did or not, I don't know. . . .  I guess I'm like Ray [Byers]; I'd like to see somebody suffer financially . . . the Iranians, I think, should suffer financially for what they've done throughout the years and the act of terrorism.

Tr. Vol. III at 102.

The economic damages suffered by Mr. Essington are set forth in the expert report of Steven A. Wolf.  See Exh. 39 at 27 and Tab 9.

### F.    Charles Light

Plaintiff Charles Light was a Sergeant in the Marine Security Guard contingent assigned to protect the Beirut Embassy.  See Tr. Vol. IV at 7-8; see also Exh. 44.  Mr. Light was born January 26, 1950 in Hobbs, New Mexico, and is a United States citizen.  See Tr. Vol. IV at 3. Mr. Light has two children from a previous marriage, a son Michael and a daughter Laura, and a son Kiel, from his current marriage.  See id.

Mr. Light graduated from Sulfur Springs High School in Sulfur Springs, Texas in June 1968, and thereafter enlisted in the United States Marine Corps.  See Tr. Vol. IV at 4.  After several initial postings and training, in June of 1969 Mr. Light reported to Vietnam.  See id.  Mr. Light served in Vietnam for thirteen months, during which time he received a number of commendations, including four Purple Hearts, Meritorious Service Medals, the Vietnamese Cross of Gallantry, and a Bronze Star II.  See id. at 5, 8.  In August, 1970, Mr. Light was discharged from the Marine Corps:  "I guess I'm like a lot of guys.  I'd seen more than I wanted to see of death and carnage, and I thought it was time to go back home."  Id.  at 5.

After leaving the Marines, Mr. Light worked with the Standard Oil Company of Indiana in Longview, Texas, as an automated field technician.  See Tr. Vol. IV at 5.  Mr. Light's salary

with Standard Oil was about four times more than his salary as a Marine.  See id. at 6.  Mr. Light remained with Standard Oil for nine years, from approximately 1970 through 1979.  See id.

In 1979 Mr. Light, motivated by the 1979 takeover of the United States Embassy in Tehran, Iran, re-enlisted in the Marines.  See Tr. Vol. IV at 6.  Mr. Light reported for duty in February 1980, spending the first year and a half at Camp Lejeune, North Carolina training combat troops.  See id. at 6-7.

After approximately a year and a half at Camp Lejeune, Mr. Light's commanding officer recommended him for Marine Security Guard ("MSG") School.  See Tr. Vol. IV at 7.  Mr. Light reported to MSG School in Quantico, Virginia in May 1982, and trained for approximately two months.  See id.  After this initial training, Mr. Light learned that he had been selected to go to Beirut, Lebanon.

Shortly before he left for Beirut, Mr. Light accepted an invitation from Corporal Robert McMaugh to have dinner with his family.  See Tr. Vol. IV at 8. Of this dinner, Mr. Light recalls, "I . . . went over there to try to ensure his family that I would be bringing his son back to them and I would be taking care of him.  And it didn't work out that way."  Id.

Mr. Light arrived in Beirut in late August-early September of 1982.  See Tr. Vol. IV at 8. On the morning of April 18, 1983, Mr. Light was preparing his troops for an inspection.  See Tr. Vol. IV at 10-11.  Mr. Light left his office and stopped by Marine Post I, where Corporal McMaugh was standing post.  See id.  Mr. McMaugh indicated that he was not feeling well, and Mr. Light responded that he would have Jacques Massengill relieve him in 30 minutes.  See id. Mr. Light then returned to his office, which was on the front of the Embassy approximately forty feet away from Marine Security Guard Post 1, and was shining his boots when the bombing took place.  See id. at 11-12. As Mr. Light testified:

> Well, [the blast] knocked me out.  The blast.  As you can see, that embassy is sort of a half moon shape, and on the back of the embassy was a V-shaped retaining wall.  It was very tall in places.  The blast evidently had gone through and hit that retaining wall and then came through a window that was next to me, picked me up and blew me through a cinder block wall into the next office.  And then the cinder block ceiling fell on top of me, and I woke up in that situation, probably six, seven minutes after the initial blast. . . .

> There was probably a million tons of debris floating in the air; and I took a breath and it coated my throat, and I thought I was choking to death.  In fact -- but luckily, as I was going to my knees, my head went below the strata of the debris, and I took a breath; and that's the first time I looked around and noticed that the building was no longer the one I thought I was in a few minutes ago, you know. . . .

> The RSO, regional security officer's armory had gone up in smoke, and all the CSCN, all the gas was cooking off and it was burning, you know.   A few days later, in fact, all the skin on my eyeballs peeled off like a sunburn.  Rounds were popping off, were cooking off, what we call in the Marine Corps cooking off, and rounds were going off everywhere you looked.

Id. at 12-13.  A breeze then blew through the bombed Embassy, blowing away the dust and chemicals.  See id. at 13.  When Mr. Light stood up, he realized that his shoes had been blown off.  See id.  He also realized that the desk where he had been sitting -- and which had taken seven men to move into his office -- had been reduced to splinters.  See id.

> The next thing that Mr. Light recalled was the chaos of the situation:

> And I'm standing in the rubble anywhere from sofa size to grain particles.  There's reinforcement bar everywhere.  The place is on fire, the gases as I described before, and rounds popping off.  And then my hearing came back to me, because it just about deafened me.  And I started hearing screams and moans and pleas for help, and then I heard the Lebanese sirens and all that kind of business going on all at one time.  It was absolute chaos.  It was crazy.

Tr. Vol. IV at 14.  At that point, Mr. Light still was not entirely clear where he was, and could not orient himself, "because the only things [left] standing were the 12-by-12 concrete pylons," partially supported by re-bar.  See id.  Mr. Light was also in "serious pain" at this point, testifying, "I suppose the window that was next to me had sort of vaporized into tiny, tiny

particles of, you know, like hair filaments of glass, and it had penetrated through this arm and across this [part of my] face. And I had a serious problem with my neck, and it crushed this thumb here; and then part of my hip and then my feet, of course, were bleeding by now." Id. at 14-15.

Mr. Light began to make his way towards what he assumed was the front of the Embassy. See Tr. Vol. IV at 15. As he did so, he heard a woman screaming. As Mr. Light testified:

> This woman had been sitting at her desk in the consular's section, and she was almost directly above the blast. And it had blown her face off of her head to where the only thing holding her face on was this part of her skull here and then the face had flopped back down on top of her face. So she had jagged scars and she was bleeding profusely. . . . She was in bad shape.

Id. at 15-16. When Mr. Light got to this woman he "lied to her" and, as he recounted, "I told her I was going to get her out of that embassy and that I knew exactly how to do it. And I had no idea how to get out of that embassy. I didn't know where I was at, I didn't know what I was going to do, but I held her for a minute and tried to comfort her." Id. at 16. As he looked towards the front of the building, he saw a v-shaped opening, about a foot and a half tall and two and a half feet wide, with flames coming from the other side. See id. at 16. He also, upon looking through the opening, saw a flaming vehicle, and a human leg, lying in the driveway. See id. Mr. Light then grabbed the woman, stood with her under water running from the upper floors of the Embassy until they were wet, and crawled through the opening and pulled her through behind him. See id. They emerged into the circular driveway running in front of the embassy.

Mr. Light led the woman he had rescued out into the street, where he noticed that the gates and flag poles around the embassy had been "blown to pieces," and that cars parked in front of the embassy had been blown into the street. Tr. Vol. IV at 17-18. He also noticed that "[t]here were bodies floating in the Med[iterranean]; there were bodies floating everywhere you

looked; there were bodies on fire." Id. at 18.  Once he had reached the Corniche, he hailed a cab to take the woman to the hospital.  See id.  The cab driver, upon seeing Mr. Light, put his car into reverse, whereupon Mr. Light "pulled [his] weapon on him and forced him to come up." Id.  After pulling out a wad of Lebanese cash and helping the woman to get inside, he told the driver "mostashfa," or hospital.  Id.  He then, as he testified, "turned around to look at that embassy, and that was the first time that I got a panorama shot of the place. . . .  My first impression was that we were in deep trouble, that we had been hit.  I didn't know that it was a car bomb, but I knew that something horrible had happened to that embassy." Id.  He was particularly struck by the collapsed center floors of the Embassy, realizing that he had heard them fall as he was lying in his office immediately following the explosion.  See id. at 18-19.

After looking at the Embassy, Mr. Light ran towards the entrance to the consular section because he wanted to check on the condition of the Marines that he had posted there.  Tr. Vol. IV at 19.  While the stairs had been mostly blown out Mr. Light was able, using the remaining stairs and a pile of rubble, to enter the second floor.  See id.  Once he got into the consular section's waiting room, he saw one of his sergeants, whom he described as "pretty messed up," denying access to the room to "a hysterical Lebanese man," whose daughter had been in the waiting room, and who, as it turned out, had been killed in the bombing.  Id.  As he continued to make his way through what had been the consular section, he came upon a crater of rubble:

> And I looked down and I saw a lady that had been blown up, but she had been blown through the air.  And in an oddity of some magnitude like this, you know, her legs had actually been thrown into a filing cabinet, open filing cabinet.  And the force of her body had slammed her into that filing cabinet and slammed that door and crushed her inside that filing cabinet.  And she was hanging from that filing cabinet, but she was still alive.
>
> It was a pretty deep hole there, and it opened off down into the street -- or not to the street but, you know, a good little fall of maybe 10, 15 feet.  So I had a Lebanese Red Cross worker, male, that was there grab me by the belt and held

> [sic] on to me while I reached in there. And I pulled that drawer open and took that lady out of that drawer.
>
> And she -- of course, her legs and everything were broken and crushed, and her right hand had been blown off with only a piece of meat, skin holding her hand on. And her breast was blown off, and her face had been hit by what looked like buck shot. Anybody in here that's ever been a hunter, looked like powder burns, but it had blown most of her facial features off.
>
> And she was talking to me, talking to somebody in Lebanese. And I held her and -- I held her there until she died, and then I put her down and went on inside the embassy.

Id. at 20-21. Mr. Light then ran back to his office, found his handheld radio, and started trying to contact his Marines. See id. at 21. He and available Marines then went to the Embassy's sixth floor communications center to help Faith Lee secure the communications site, which contained classified information. See id.

After securing the communications site, Mr. Light began working on the "digging detail," which he described as follows:

> There were so many people in that embassy that, you know, it's easy to say killed and wounded, but the wounded were traumatic amputations. And there was so many people that lost their hands and fingers and parts of their bodies, and we had Marines that were with the Marine Amphibious Unit off the coast of Beirut that came in.
>
> And we gave them buckets, and their mission was to pick up all the body parts that they could. The backhoes would come in and pick up a load of rubble; and then they would slowly sift it to the ground, and if you saw a body part, you had to retrieve it. And then this load was put on a truck, the truck was taken out to the dump grounds and dumped where we had another detachment of Marines going through it again.

Despite his own injuries, Mr. Light worked twenty-two straight days, in 20 hour shifts, on the detail. Tr. Vol. IV at 23.

Mr. Light first sought treatment for the injuries he had suffered in the Embassy bombing in late June, about two months after the attack. See Tr. Vol. IV at 24-25. He went to the

headquarters of the Battalion Landing Team ("BLT") -- the same Marine detachment at the Beirut Airport that would be bombed later that year, and was sent from there on a small boat to an amphibious warship anchored off the shore of Lebanon, where an orthopedic surgeon examined Mr. Light and found that he had crushed the C4 and C5 vertebrae in his neck. See id. at 25. Soon thereafter, in late July, Mr. Light left Beirut. See id.

After leaving Beirut, Mr. Light reported to Bethesda, Maryland, where he was put on physical therapy for approximately one month before his crushed vertebrae were operated on. See Tr. Vol. IV at 26. In October 1983, a C4-C5 fusion was performed on Mr. Light, using a bone harvested from Mr. Light's right hip and titanium wire to fuse the vertebrae. See id. at 26-27. Mr. Light remained in the hospital for only two days following this operation, as "the BLT was destroyed; and they were bringing in a lot of patients, and they needed the space for them." Id. at 27. Thus, in an ironic twist, Mr. Light was released prematurely from the hospital to make way for victims of the October 1983 bombing of the Marine barracks in Beirut. See id. While Mr. Light explained to doctors at the time that he had been injured in the April 18, 1983 Embassy attack, "[i]t didn't make a difference," in terms of his early release. Id.

After Mr. Light was released from Bethesda, he was placed in a neck brace, put on six months limited duty, and transferred to the Medical [Hold] platoon at Quantico, Virginia. See Tr. Vol. IV at 27. He was thereafter sent to an interrogator/translator platoon at Camp Lejeune, North Carolina, and, in early 1984, to the Defense Language Institute to study Arabic. See id. at 27-28. After a year and six weeks of Arab language study, Mr. Light was sent on two "floats" with Marine Amphibious Readiness Groups, the first with the 24th Marine Expeditionary Unit, and the second with the 26th Marine Expeditionary Unit. See id. at 28. Mr. Light returned from the second tour in the spring of 1989. See id.

During the six years between the Beirut Embassy bombing and the end of his second

"float," Mr. Light had been experiencing "serious pain." Tr. Vol. IV at 29. He turned to various

substances for relief, testifying, "I did crawl into a bottle. I believe it was Southern Comfort for

about three years. I drank myself silly for about three years." Id. at 29. When asked why he

"drank himself silly," Mr. Light responded:

> First off, it did have an effect. It did help the pain. And second of all, I was
> trying to -- I guess I was feeling sorry for myself, actually. I was thinking about
> Beirut and the things that I'd seen. There were several people in that embassy that
> I actually loved.
>
> I mean, there were some Lebanese men in that embassy that was like my father,
> and they were vaporized on the ground floor. And then that lady in the filing
> cabinet. And then, you know, I stepped outside the embassy; and I see Anne
> Dammarell coming out on a stretcher, and it didn't look like she was going to
> make it.
>
> You know, just things like that that will eat on you after a while. So I took the
> easy way out, I suppose. I drank myself into oblivion for a few years.

Id. at 29. Mr. Light's wife Fadia, whom he had met in Beirut, convinced him to stop drinking

by threatening to leave him. See id. at 30.

After completing his "floats," in 1989 Mr. Light reported to Cairo, where he still

experienced pain from the injuries he had suffered in Beirut. See Tr. Vol. IV at 30. In Cairo, the

United States Embassy doctor was "shooting [him] up with steroids," and Mr. Light found a

Yugoslavian acupuncturist to administer treatment when the Embassy doctor reached the legal

limit on the amount of steroids that he could administer. Id. at 30-31. While the acupuncture

helped, Mr. Light stopped the treatments after three sessions when the government refused to

pay for any more. See id. at 31. The three sessions cost a total of $900. See id.

After three years in Cairo, Mr. Light spent the next five years as the noncommissioned

officer in charge of the interrogator/translator platoon at Camp Lejeune, North Carolina. See Tr.

Vol. IV at 31.  In 1997, he received orders to go to Okinawa as the intelligence chief of the 3rd

Marine Expeditionary Force, where he was in charge of intelligence operations encompassing

some 4,000 men.  See id.  While in Okinawa, he continued to experience pain from his Beirut

injuries.  Id. at 32.  Neurosurgeons in Okinawa did another procedure on Mr. Light, during

which they discovered that the original fusion had collapsed, and which they repaired.  See id.

Mr. Light's pain did not diminish and, after testing revealed that this second fusion had

collapsed, doctors did a third fusion, this time harvesting bone from Mr. Light's left hip.  See id.

The neurosurgeons in Okinawa then decided that Mr. Light needed specialized care, and

arranged for him to be transported to the Bethesda Naval Hospital to have yet another operation,

during which titanium plates were installed on the inside of Mr. Light's neck.  See id. at 32-33.

As a result, Mr. Light testified, "[m]y spine was sandwiched in titanium plates bolted to my

spine."  Id. at 33.  Only two days after this surgery, Mr. Light was put on a commercial flight

back to Okinawa.  See id. at 33.  When he arrived in Okinawa, Mr. Light testified that he "was in

so much pain that [he] couldn't stand it."  Id.  Further tests revealed that the doctor who had put

the plates in Mr. Light's neck had put in screws that were twice too long, and had screwed them

into the nerves of Mr. Light's spine.  See id.  Mr. Light was placed on a commercial flight back

to Bethesda where his wound was reopened, the original screws taken out, and new screws put

in.  This time, Mr. Light was permitted to recuperate for 10 days.  See id.  As was the case with

his previous surgeries, following this last operation, Mr. Light had to wear a neck brace for the

next ninety days.  See id. at 34.

     Mr. Light continues to suffer pain from the injuries suffered in the 1983 Beirut Embassy

bombing, describing the pain as follows:

> [I]t's a sharp, stabbing pain in my neck.  It radiates through my shoulders.  It still
> continues to cause migraine headaches, serious migraine headaches, and it's

> constant. And the Veterans Administration has rated me at an 80 percent
> disability and has determined that there's never going to be any more operations
> on me. So they've got me into pain management, and they're prescribing drugs
> for me for the pain.

Tr. Vol. IV at 33-34. He takes a variety of medications to control the pain, testifying, "I take six

oxycondins [sic], maybe 12 tramadols, six or eight amocrystalline. There's six or seven

tenzanadine, and there's several more that I quit taking because of the side effects. But I take 25

to 30 pills a day." Id. at 34.

Mr. Light rotated from Okinawa back to the United States in 2000 as a Master Gunnery

Sergeant, E-9. See Tr. Vol. IV at 34-35. While this is the highest rank attainable as an enlisted

man in the Marine Corps, Mr. Light feels that he would have achieved that rank earlier were it

not for his injuries, noting that "the Marine Corps is very stringent on physical fitness." Id. at

35. In July 2001, Mr. Light retired from the Marine Corps. See id. After spending a year

working for a defense contractor, Mr. Light joined the U.S. State Department as a GS-13 level

security specialist. See id. at 35-36.

Mr. Light's current career is not the one that he anticipated, and was, in his opinion,

directly impacted by the injuries suffered in the Beirut Embassy bombing. See Tr. Vol. IV at 37.

As Mr. Light testified:

> I wanted to be a carpenter, I wanted to be -- I wanted to restore antique vehicles
> and things of that nature, but I can't do anything that's very physical anymore. So
> I have to rely on jobs where I can use my mind and use a computer and use, you
> know, that kind of thing. So I can't work physical labor very well.

Id. at 37. He had also anticipated going back to the oil industry after his second enlistment in

the Marines ended in 1983, noting that he was making more money in 1970 as an oil field

worker that he was making when he retired from the Marine Corps as a Master Gunnery

Sergeant. See id.

In the years since the Embassy bombing, Mr. Light never sought counseling, noting "I just never -- was just raised that -- I just don't believe in counseling. I think a man should be able to do it himself, even though I'm probably wrong." Tr. Vol. IV at 36. Certain terrorist acts, such as the Oklahoma City bombing, and the World Trade Center attacks, "shock" him "back to 1983, just like that," id. , as do certain loud noises and smells. Id. at 36-37; see also Tr. Vol. II at 54 (Dr. Larry Pastor testifying that "a sound or a smell or a certain cue may make a victim [of trauma] suddenly re-experience [the underlying event] as much as to sort of remember it in the past, but to feel as if they are there and reliving it again").

The 1983 Beirut Embassy bombing affected Mr. Light's overall view of the world. As Mr. Light testified:

> I don't trust anybody anymore. When I go overseas -- and I travel a lot; last year I was in 14 countries -- and everybody I see, I'm thinking that this guy wants to hurt me because I'm American. He wants to kill me or he wants to cause me problems.
> So I've got this real cynical view of this world, and every single time something happens, it just reinforces my idea that because I'm an American, everybody wants to shoot me full of holes, you know. So I'm distrustful of everything and everybody, just about.

Tr. Vol. IV at 38; see also Tr. Vol. II at 51 (expert psychiatric testimony indicating that anxiety, "being on edge," and hypervigilence are typical symptoms exhibited by victims of trauma).

Mr. Light also feels that Americans have largely forgotten about the 1983 attack on the U.S. Embassy in Beirut. He has been active in efforts to get Americans to remember the 1983 Beirut Embassy attack, participating in a documentary on the event. See id. at 30. In his job as a diplomatic security specialist, Mr. Light goes to various posts to inspect U.S. Embassy security, and in so doing gives Marines at these postings "a class on that bombing of the American embassy in April of '83." Id.

When asked why he elected to participate in this lawsuit, Mr. Light responded:

I had no idea this was happening until Ms. Dammarell called.  I want somebody to pay, and I'm tired.  I'm really, really tired of Americans getting injured and killed, kidnaped and abused in every way, and no one having to pay the price. And it's time -- you know, we could lecture Iran all day long for all the good that's going to do, or we can demand they surrender the people who perpetrated this crime against us, which is not going to happen.  But what can we do?  We can hit them where it hurts.  We can hit in the pocketbook.

And the next time they decide to send somebody out to kill innocent and inoffensive children and civilians and ladies and old men and gentlemen, maybe they'll think the next time it might be a little bit too costly for them, and we need to get in there and get the world's attention on this.  We need to fire them up and take everything we can away from them to discourage this kind of business.

Tr. Vol. IV at 40-41.

The economic damages suffered by Mr. Light are set forth in the expert report of Steven A. Wolf.  See Exh. 39 at 20 and Tab 6.

### G.    Robert McMaugh and Family

#### 1.    Robert McMaugh

Lance Corporal Robert "Bobby" McMaugh was the son of Plaintiffs Earl McMaugh and Annie Mullins, and the brother of Plaintiffs Teresa Younts, Michael McMaugh, and Cherie Jones.  See Tr. Vol. IV at 18, 73, 56; Exh. 46 at 3-4.  He was assigned to the U.S. Embassy in Beirut as a Marine Security Guard.  See Tr. Vol. IV at 4, 7-8, 10, 11, 21, 22.

Corporal McMaugh was born February 22, 1962 in Fort Meade, Maryland.  See Tr. Vol. IV at 43.  He was a United States citizen.  See id. at 42.  Corporal McMaugh was twenty-one years old when he was killed in the Embassy bombing.  See id. at 52.  The Estate of Robert McMaugh is represented by Earl McMaugh and Annie Mullins, as co-administrators, for purposes of this lawsuit.  See id. at 43-44, 55-56; see also Exh. 45.

Corporal McMaugh graduated from Osbourn High School in Manassas, Virginia in June 1980.  See Tr. Vol. IV at 40, 48.  He reported for Marine Corps basic training at Parris Island

shortly thereafter.  See id. at 48; Exh. 46 at 2.  After basic training, Corporal McMaugh was assigned to 29 Palms, in California, where he trained in aircraft capture.  See Tr. Vol. IV at 48. Corporal McMaugh was thereafter selected to attend Marine Security Guard ("MSG") school at Quantico, Virginia, see id. at 49, graduating from MSG school in the fall of 1982.  See id. at 53. Corporal McMaugh volunteered for assignment at the United States Embassy in Beirut, and was transferred there immediately upon graduation from MSG school.  See id. 51, 52.  Corporal McMaugh never saw his family again after leaving for Beirut.  See id. at 23, 43, 54, 59-60.

Corporal McMaugh was stationed at Guard Post 1 in the Embassy's main lobby, near the center of the blast, at the time of the bombing.  See Tr. Vol. II at 115-16; Tr. Vol. III at 13, 75. As a result of the blast, he was buried beneath the Embassy's collapsed center floors, and sustained fatal injuries.  See Tr. Vol. IV at 11.

The economic damages suffered by the Estate of Robert McMaugh are set forth in the expert report of Steven A. Wolf.  See Exh. 39 at 16 and Tab 4.

### 2.   Earl McMaugh

Plaintiff Earl McMaugh is the father of Lance Corporal Robert McMaugh.  See Tr. Vol. IV at 42; Exh. 46.  Mr. McMaugh, who is retired, currently resides in Virginia and is a United States citizen.  See Tr. Vol. IV at 42.

Mr. McMaugh described his son as a "first-class person."  Tr. Vol. IV at 50, 83.  As a teenager, Corporal McMaugh was a "very good kid.  He was energetic, very competitive, light-hearted, free spirit[ed] . . . [and] an excellent athlete."  Id.  at 44.  Mr. McMaugh knew that his son was "going to do something with his life."  Id.  Mr. McMaugh testified that he "lived through" his son's athletic successes in football, soccer, basketball and other sports.  Id.  He

instilled in his son a drive to win at competitive sports, teaching Corporal McMaugh that "whatever you do, you do it well." Id. at 46.

Although Mr. McMaugh encouraged his son to attend college immediately after high school, Corporal McMaugh surprised his father by enlisting in the Marine Corps. See Tr. Vol. IV at 48. While Mr. McMaugh counseled his son to be the best Marine he could be (see id. at 48), he also advised him to set aside funds for his college education. See id. at 49.

Mr. McMaugh was concerned about Corporal McMaugh's decision to volunteer for the Beirut posting, because he did not believe that his son -- at age twenty -- fully understood the danger he faced. See Tr. Vol. IV at 52. Mr. McMaugh testified that his son called home more frequently from Beirut than he had from his earlier postings. See id. at 61-62. During early phone calls from Beirut, Corporal McMaugh would tell his father what a "good time" he was having, cruising the Mediterranean on a speed boat and meeting young women. Id. at 59, 60. However, Mr. McMaugh testified, in retrospect those phone calls were probably "trying to assure me that it was okay." Id. at 60. In what was probably the last telephone conversation Mr. McMaugh had with his son, Mr. McMaugh detected for the first time a change of attitude in Corporal McMaugh, when he admitted to his father that he had been "knocked on his rear-end by a car bomb." Id. at 59.

On the morning of April 18, 1983, upon his arrival at work with the Defense Intelligence Agency, a co-worker informed Mr. McMaugh that the Embassy in Beirut had been bombed. See Tr. Vol. IV at 63. Mr. McMaugh telephoned the Embassy directly, testifying:

> I got a busy signal. . . . And the strangest thing happened to me at that time; and I never had it before, and I've never had it since. And I believe it was the understanding at that time that Bobby had been killed. . . . The sense was my knees almost fell out from under me. I felt this weak-legged thing. I was standing there, and all of a sudden, my knees and my legs wanted to give out.

> That's the only reaction I had.  Now, I didn't know anything at that time, but I
> kept calling back.  I must have made 10 phone calls to the embassy.

Id. at 64.

Mr. McMaugh went home, and watched coverage of the bombing on television.  See id.
at 66.  The lack of information that day and in the following days regarding the fate of the
Embassy and of his son convinced Mr. McMaugh that when news came, it would be bad.  See id.
at 66-67.

One evening, a few days after the bombing, a Navy captain and commander came to the
McMaugh home in Manassas and informed Mr. McMaugh and his family that Corporal
McMaugh had been killed in the bombing.  See Tr. Vol. IV at 67-68.  Mr. McMaugh testified,
"the bright sunlight went away and the clouds came in.  It was like a biblical time. You could see
the clouds coming in. . . .  And I just wanted to put a blanket over my head, and I didn't want
anybody to talk to me."  Id.  at 70.  Mr. McMaugh's other children, Michael and Teresa, were so
distraught at the news that Mr. McMaugh had to take them to the hospital to be sedated.  See id.

In the following days, members of the Marine Corps came to the house to settle Corporal
McMaugh's estate.  See Tr. Vol. IV at 70.  Corporal McMaugh's remains were returned to the
United States on April 27, at a ceremony at Andrews Air Force Base, of which Mr. McMaugh
remembers very little.  See id. at 71; Exh. 46 at 9.  Mr. McMaugh recalls that then-President
Ronald Reagan and Secretary of State George Shultz were present, but does not recall anything
that the President said.  See Tr. Vol. IV at 71, 72.  Corporal McMaugh was ultimately laid to rest
at Arlington National Cemetery, after services at Ft. Myers Chapel and in Manassas, Virginia.
See id. at 72, 73; Exh. 46 at 3, 6-7.  The funeral procession to the cemetery was so large that it
"closed down [Route] 66."  Tr. Vol. IV at 74.  In subsequent years, the Marine Corps dedicated a

conference room at Quantico, Virginia to Corporal McMaugh; the American Legion named Post

10 in Manassas, Virginia, after Corporal McMaugh's football number; and the American Legion

dedicated their new facility in Manassas, Virginia, to Corporal McMaugh.  See id. at 75-76, 94,

136.

Mr. McMaugh testified that he was motivated to participate in the lawsuit because:

Bobby was in the military.  I thought that, okay, you're in the military, you get killed, and that's the end.  But it may not be the end.  There was no -- we're not at war in the sense of war.  We didn't declare anything.  It was something that happened that really shouldn't have happened, but it did. . . .  [W]e were sticking our heads in the ground to think that you could be in another country in this kind of situation and not take the necessary steps to protect your own people. . . .  And as everyone has said, it's as if our country wanted to sweep this thing under a rug and not -- and never bring it up again. . . .  Financially, [you can't] put a price on someone's life . . . you want to set a billion or 2 billion or $3 billion on my son's life?  That may not even be enough.  That's not enough.  No one can understand the depth of hurt and pain that a family goes through.  It's not something that you can comprehend, even though you get other people who say, oh, I feel for you . . . because it's part of your heart that's ripped right out of you . . .[but] our country forgets. . . .  But somebody has to be held accountable for the nasty, dirty deed they do. . . .  I never had an enemy until this.  And as far as I'm concerned, Iran is my enemy.  They took something from me that they shouldn't have . . . and if the only way to hold people accountable . . . is through economic[s] . . . then we need to pursue it to the maximum extent.

Tr. Vol. IV at 86-88.

3.    Annie Mullins

Plaintiff Annie Mullins is the mother of Lance Corporal Robert McMaugh.  See Tr. Vol.

IV at 91; Exh. 46.  Ms. Mullins, who is retired, currently resides in Virginia, and is a United

States citizen.  See Tr. Vol. IV at 91.

Ms. Mullins describes her son as "great" and "special" to her.  Id. at 92.  Ms. Mullins

testified that she would tell Corporal McMaugh, the oldest of her three children, that they were

"learning partners."  Id. at 93.  Her son "always tried to make me laugh," particularly when he

was trying to convince Ms. Mullins to agree with a request he had made that she initially

refused.  Id.  Ms. Mullins testified that Corporal McMaugh was "lovable, not just because he's my son.  That's just the personality that he had.  I think he touched a lot of people, and I think that that was evident when we had his funeral."  Id.  at 104.

Before enlisting in the Marine Corps, Corporal McMaugh asked his mother for her opinion on the matter, so it was no surprise to her when he enlisted.  See Tr. Vol. IV at 96.  Ms. Mullins believed that while "everyone saw the funny side and happy side and the teasing side" of her son, he also had a "serious side" that she believed the Marine Corps would develop by teaching him to "see the world a little differently, a little bit more maturely."  Id.

Corporal McMaugh wrote letters to his mother while in boot camp.  See Tr. Vol. IV at 97.  He wrote one letter home as a Mother's Day gift, telling Ms. Mullins that "boot camp is great and I'm doing well because you are the greatest mom and you had prepared me for all this yes, sir; no sir."  Id.  Ms. Mullins took her mother and daughter, Cherie, to visit Corporal McMaugh during his birthday when he was stationed in California, an experience that Ms. Mullins found "special," particularly because Cherie and her brother "were so great together." Id.  at 97-99.  When Corporal McMaugh was stationed in Quantico, Virginia, for MSG school, he would frequently invite his mother to lunch, and would often come home to visit his family whenever he had a weekend pass.  See id. at 99-102.

After Corporal McMaugh was transferred to the U.S. Embassy in Beirut, he would telephone and write letters home.  See Tr. Vol. IV at 102-103.  He did not confide in his mother about the dangers of living in Lebanon, with the exception of a car bomb that knocked him down.  See id. at 104.  Instead, Corporal McMaugh told his mother about social things, like the women that worked at the Embassy, and his friend, Dan Pellegrino.  See id.

On the morning of April 18, 1983, Ms. Mullins was approached by her son, Michael, who told her that there had been a bombing in Beirut. See Tr. Vol. IV at 106. Ms. Mullins initially believed that the bombing "was just a part of regular things that happened there," and did not become worried at the news. Id. Sometime later, Ms. Mullins' daughter, Teresa, called and told her to turn on the television. See id. Ms. Mullins saw bodies being pulled from the rubble of the Embassy on a news report, but tried to think positively. See id. at 106-107. The day after the bombing, a friend of Ms. Mullins, whose husband worked at the State Department, asked her husband whether he knew of Corporal McMaugh's fate. See id. at 109. The friend returned to Ms. Mullins in tears, saying that her husband could not answer the question. See id. At that point, Ms. Mullins "thought the worst." Id. Her fears were confirmed when, shortly thereafter, government officials arrived at the family's front door and informed them that Corporal McMaugh was missing in action and presumed dead. See id. at 109-110.

Ms. Mullins attended the ceremony at Andrews Air Force Base, when her son's remains were returned to the United States. See Tr. Vol. IV at 112-13. Ms. Mullins tried to remain "dignified" at the Andrews ceremony and not be "hysterical and emotional," because her son would have wanted that. Id. at 117.

Ms. Mullins testified that as a result of Corporal McMaugh's death:

I was hurt. I was angry. I was mad. I was beside myself. And I went to Father Kelly at our church, and he told me that I could handle it, and that I would get through this part of my life, and I said I can't because Bobby was planning on coming home and finding a place for us all to be together, and that wasn't going to happen. And I just didn't see how I could handle all the other problems that was happening. Teresa was in the hospital before Andrews, and she had a miscarriage, and that would have been my first grandchild, and it was gone. Cherie was so . . . sad. And I hid my tears from her so bad, because I knew if I cried she would cry right with me. . . . I had nightmares . . . and so did she. . . . I saw Father Kelly, I bet, every other day. I kept telling him, it's so hard for me, because [my children] hurt so much that there wasn't anything that I could say or

anything that I could do but hug them.  And if I hugged them, then it made me
want to cry, and I felt like I wasn't allowed that luxury.

Tr. Vol. IV at 114-15.

Ms. Mullins testified that she decided to participate in the lawsuit in part because she was

angry with her own government for not understanding what was happening in the region and

using its power to protect the Embassy.  See Tr. Vol. IV at 120.  In fact, she stopped voting for a

number of years in protest of the government's actions.  See id. at 119-20.  Ms. Mullins agreed

to participate in the lawsuit because, as she testified:

> [I]t's not fair for somebody to come in and hurt my family and my other children
> and break my heart and take something so precious from me that -- somebody
> said something about, hit them where it hurts the most, and I agree with that.  But
> I would give them every penny, whatever the judge decides, I would give it all
> back to have my son back.  It's just not worth it.

Id.  at 121-22.

### 4.   Teresa (McMaugh) Younts

Plaintiff Teresa Younts is the sister of Lance Corporal Robert McMaugh.  See Tr. Vol.

IV at 122; Exh. 46.  Ms. Younts currently resides in Virginia, and works for the City of Fairfax,

Virginia.  See id.  She is a United States citizen.

Ms. Younts, who is two years younger than Corporal McMaugh, described her brother as

her "protector."  Tr. Vol. IV at 123.  She testified that Corporal McMaugh "helped me through

my high school years; he gave me advice.  He was always there whenever I needed him. . . .  He

was very strong, and we just relied on each other because we were so close."  Id.  Corporal

McMaugh did not mind when his little sister "tagg[ed] along."  Id.  at 124.  Ms. Younts testified

that her brother escorted her to her first dance "because he didn't think anybody was . . . good

enough to take me."  Id.  at 125.

Ms. Younts was aware that her brother had applied to attend college after high school, as the two had discussed the matter. See Tr. Vol. IV at 125. Bobby McMaugh's decision to join the Marine Corps was, in Ms. Younts' opinion, a "pride thing." Id. Her brother "wanted to do something good. He always wanted to be the best. . . . In everything he touched, he was the best, and I think this was an opportunity for him to see the world and make a difference." Id. at 125.

While Ms. Younts did not want to see her brother leave, she was very proud of his decision to join the Marine Corps. See id. at 126. When Corporal McMaugh was at MSG school, Ms. Younts enjoyed their frequent contact, particularly when he brought home his fellow Marines for dinner. See id. at 127. He was even able to attend Ms. Younts' high school graduation. See id. She recalls that life overall with her brother was "fun and happiness." Id. at 128.

After Corporal McMaugh was transferred to the Embassy in Beirut, he frequently called his sister, who by that time was living in her own apartment, from Beirut. See id. at 129. On the night of April 17, 1983, Ms. Younts spoke to her brother on the telephone. See Tr. Vol. IV at 130. She was the last person that Corporal McMaugh had contact with in his family. See id.

Ms. Younts first heard about the Embassy bombing while watching Good Morning America on the morning of April 18. See Tr. Vol. IV at 132. She thereafter called her mother, and then went to her mother's house. See id. The next few days are a "blur" to Ms. Younts. Id. She remembers spending a lot of time with her sister, Cherie, keeping her entertained and shielding her from news of the bombing. See id. at 133. Several days after the bombing, Ms. Younts went to visit her fiancé's parents. Her father and brother, Michael, drove to the house and told her that Corporal McMaugh had been confirmed dead. See id. Ms. Younts testified

"[a]t 18 years old, I didn't know what to think. I knew I was angry, and I knew someone took something from me. And I was -- truthfully I was angry at God because he let this happen to someone very special in my life." Id.

In the following days, Ms. Younts helped her family tell her sister, Cherie, that Corporal McMaugh had been killed in the bombing. See Tr. Vol. IV at 133. Ms. Younts testified that seeing her father cry during those days "unglued me to the point where I couldn't put everything I was feeling inside. It didn't fit. And my mom's like, you have to keep it together for Cherie. So I did. I had to keep it together for Mike, so I did after that." Id. at 134. Shortly thereafter, Ms. Younts, who was pregnant, was hospitalized due to a miscarriage. See id. at 134-135. Ms. Younts attended the ceremony at Andrews Air Force base when her brother's remains were returned to the United States. See Tr. Vol. IV at 135.

In subsequent years, Ms. Younts often felt guilty that she was able to spend eighteen years with her brother Bobby, while her younger brother and sister had far less time with him. See Tr. Vol. IV at 137. Ms. Younts felt particularly bad for Cherie, who was only seven when Corporal McMaugh died. See id. Cherie came to Ms. Younts sometime after the bombing and told Ms. Younts that she was scared because she was forgetting her brother. See id. at 137-38. Ms. Younts vowed to show her sister pictures and tell her stories about Bobby McMaugh so that Cherie would not forget him. See id. at 138.

Ms. Younts testified that as a result of the bombing:

Life from that day has changed my entire being. My entire family was ripped apart in many different facets, not just by losing my brother. I feel like I lost a child. I lost a brother, I lost my mom and dad as a family unit, all in a matter of a very short period of time. And I wanted, like my dad says, to crawl away, go away. I wanted to go away, far away and never come back. I thought that was the cure, and I did go away. . . . And I went away for several months. I lost my job; I lost my apartment. And then you kind of grab it and pull it together, and I guess that's what we all have done.

Tr. Vol. IV at 138.

Ms. Younts testified that she decided to participate in the lawsuit because:

I'm angry, and I'm mad. . . . I want to send a message. I feel like putting it on a
billboard, but I can't do that, so this is the next best thing. And I just want
everybody to know that there were a lot of lost lives. There were a lot of injured
people that are suffering to this day. But my family will suffer as long as we're
here, because he's not here. . . . They say they know who did this. Well, damn it,
if you know who did it, let's go get them and let's do something about it . . . as far
as I'm concerned you cannot put a value . . . there's no value you can put on a
human being's life and the loss that my family went through. No value. . . . [I]f
there's any good that came from this [lawsuit], it's meeting all the wonderful
people and the wonderful things that they said about my brother and the
information that we got that I waited for 20 years to get, because I couldn't as an
18 year old ask my parents anything. . . . And I internalized for 20 years what his
last meal was about, how he felt, and it was these proceedings that told me that he
had spaghetti the last night that he was alive . . . and that he had champagne and
he was with his friends. . . . I don't want this to happen to anybody else. And if
we can make them pay and understand that this is not something that their
government can do and get away with it, make it hurt and make it hurt bad, why
do we have to hurt? Why do we have to go through what we went through? We
don't. We just need people . . . to understand that we need to send a message.
And the message is it does not pay.

Tr. Vol. IV at 134-41.

5.    Michael McMaugh

Plaintiff Michael McMaugh is the brother of Lance Corporal Robert McMaugh. See Tr.

Vol. IV at 142; Exh. 46. Mr. McMaugh currently resides in Virginia and is a United States

citizen. See Tr. Vol. IV at 142.

Mr. McMaugh, who is four years younger than Corporal McMaugh, enjoyed a good-

natured athletic rivalry with his brother. See Tr. Vol. IV at 143. The two would wrestle every

day after school, fight with wooden swords, race against each other, and play football, baseball

and soccer together. See id. at 143-144. Mr. McMaugh testified that he looked up to his older

brother who, according to Mr. McMaugh, "made everybody laugh, he kept everybody happy,

and he kept everybody safe." Id. at 150  He added that Corporal McMaugh "looked after us, looked after me, and that was nice to have." Id. at 151.

When Corporal McMaugh told his brother that he was joining the Marine Corps, Mr. McMaugh was surprised. See Tr. Vol. IV at 146.  He knew that the Marines were "sharp, organized and respected," id. , but Bobby McMaugh had "long hair" before he joined the Marine Corps. Id.  When Corporal McMaugh first came home after attending boot camp, Mr. McMaugh was "really impressed" to see him looking so "squared away" and "sharp." Id. When Corporal McMaugh announced that he would be going to Beirut, he told his brother that the assignment would help him advance his career because it was in a "hot zone." Id. at 147. The last time Mr. McMaugh saw his brother, Corporal McMaugh told him to "keep working out" because he would be "coming back." Id.

On the night of April 17, 1983, Mr. McMaugh had a dream involving "[w]hat it would be like if something happened to [my brother]." Tr. Vol. IV at 149.  The dream "terrified" him, and he spent the rest of the night trying to get the images out of his mind. Id.  The morning of April 18, Mr. McMaugh awoke to his radio alarm, and the first thing he heard was a news report regarding the Embassy bombing. See id. Mr. McMaugh then went downstairs and told his mother. See id. His mother assured Mr. McMaugh that his brother was safe, and Mr. McMaugh proceeded to watch television for news of the bombing. See id. at 150.  The feeling that his brother was dead never left him. See id.

The next several days involved "a lot of waiting, a lot of not knowing, and a lot of praying. And a lot of guilt. I thought that -- I was 16, geez. You shouldn't dream, even think about things like that. They could come true." Tr. Vol. IV at 150.

Mr. McMaugh graduated from high school in 1984. See Tr. Vol. IV at 151. He testified that he joined the Marine Corps upon graduation because "I wanted to fight. I wanted to try and live up to his -- to what he had done." Id. at 152.

Mr. McMaugh testified that a death, such as his brother's:

[C]hanges your life. It changes who you are, it changes what you look forward to and accomplishments that you make in your life. You have nothing to gauge. I had everything up until that point. My brother did everything so well, and I was always number two. And I didn't mind being number two because number two meant that I was 99 percent better than everybody else because [my brother] was really good at what he did. And the accomplishments that I made in my life, and the things that I did, I had no one to share it with, like a brother. . . . And advice. People to turn to when I always needed something or I needed to know . . . what direction should I lean towards. . . . I miss the excitement that he brought, because he was the center of attention, and he was such a fun person to be around that I'm sure -- and everybody said that he was easy to love; and it's not easy to get over, and I don't think that anybody in my family has.

Tr. Vol. IV at 152-153.

Mr. McMaugh testified that he decided to participate in this lawsuit because:

[My brother] would do the same thing for me. I want to make sure that people recognize, you know, this didn't need to happen. And let me tell you, if they would have showed up at the front door . . . that would have been a big mistake, because Bobby would have kicked some butt. . . . And if they were to fight like a man, they would have lost because Bobby had honor and respect, and he had a lot of fight. . . . I want [to do this] for him. . . . He's a person that deserves to be remembered in a way that befits who he is. . . . [Y]ou don't have enough money to replace my brother. . . . [M]y brother may not be here now, but you can see the love in this room, because he will never be forgotten.

Tr. Vol. IV at 153-54.

### 6.    Cherie (McMaugh) Jones

Plaintiff Cherie Jones is the sister of Lance Corporal Robert McMaugh. See Tr. Vol. IV at 156; Exh. 46. Ms. Jones currently resides in Virginia, and is a United States citizen. Ms. Jones was fourteen years younger that her brother Bobby McMaugh, and seven years old at

the time of his death.  See id. at 158.  She testified that her brother "was very much like a parent to me because of his age.  Our relationship was solid.  We were always together."  Id. at 156-57. He often brought Ms. Jones presents to make her happy.  See id. at 157-18.  Whenever Corporal McMaugh wanted to borrow the family car he would take Cherie along, because their mother knew that with Cherie in the car, Corporal McMaugh would drive safely.  See id. at 157.  Ms. Jones felt "fearless" when she was with her brother because she knew that "it didn't matter what I did or how fast I was going . . . he was going to catch me."  Id.

While she was very young when Corporal McMaugh died, Ms. Jones testified that she remembered her brother's personality: "He was a big character.  He was a big comedian.  He used to grab my grandmother . . . and hold her tight and growl in her neck, and she would laugh."  Tr. Vol. IV at 157.

Ms. Jones was sitting on her brothers' bunk bed when she first learned that Corporal McMaugh was joining the Marine Corps.  See Tr. Vol. IV at 158.  She did not know what a Marine was, but she knew that her brother was going away, and that made her unhappy.  See id. She has no distinct memory of her brother leaving for Beirut, but she does remember talking to him on the phone while he was stationed there.  See id. at 159.  Ms. Jones particularly remembers the last phone call Corporal McMaugh made to the house.  She was playing and refused to talk to him.  See id.  Ms. Jones testified that since that time she has had to deal with the "feeling that he called but [I was] preoccupied."  Id.

Ms. Jones was kept home from school on the day of the Beirut Embassy bombing and in subsequent days, but was not told why until after the military had confirmed her brother's death. See Tr. Vol. IV at 161.  By her second day off, Ms. Jones began to realize that being out of school was "kind of weird."  Id.  Ms. Jones remembers that on the day the military informed the

McMaugh family that Corporal McMaugh had been killed, her family took her upstairs to a

bedroom and told that her brother was dead.  See id.  Ms. Jones testified that she "felt hurt.

Anger. Disbelief. I was very upset. . . . I felt like a huge part of me was gone."  Id.  Ms. Jones

explained that her grief over her brother's death was compounded because her parents were

going through a divorce at that time.  See id. at 160.  Ms. Jones stated that she was "okay" with

the divorce only because she had an "ulterior plan" to live with her brother when he came home

from the military.  Id.

> Ms. Jones testified that she participated in this lawsuit because she hoped to gain:

> Acknowledgment for [her brother].  Some type of closure, I'm hoping for,
> because it hasn't been there.  Just for people to stand up and acknowledge that
> things like this happen, that there are people out there that will do this, and I don't
> know why they're allowed to and why that makes it okay. . . .  I used to ask my
> mom, and I'd be like, you know, why are these things happening?  Why isn't
> there anything happening to the people that did this or who did this. . . .  And it
> was . . . we don't know. . . .  I feel really hurt that someone that's that negative
> and just destructive could take something very beautiful and just take it away.  I
> think that people need to hear how it affects long-term, because it hurts still after
> 20 years. . . .  No one's being punished.  No one's being punished.  No one.  It
> was just something that happened that was fine, that it's okay.  And it's not okay.
> At all.  Even after 20 years.

Tr. Vol. IV at 164.

### H.   Robert Ames and Family

####     1.   Robert Ames

Robert Ames was the husband of Plaintiff Yvonne Ames.  See Tr. Vol. V at 4.

He was also the father of Plaintiffs Andrew Ames, Kevin Ames, Kristen (Ames) Brown, Karen

(Ames) Hale, and Adrienne (Ames) Opdyke.  See id. at 6; Exh. 48.  Mr. Ames was not posted to

the Beirut Embassy, but rather, at the time of the bombing, was visiting the Embassy on official

business as the Director of Near East and South Asian Analysis for the Central Intelligence

Agency.  See Tr. Vol. V at 8-9.  Mr. Ames sustained fatal injuries in the Embassy attack.  See

also Exh. 3-4.  The Estate of Robert Ames is represented by Yvonne Ames, as Administrator, for purposes of this litigation.  See Tr. Vol. V at 4; Exh. 47.

Mr. Ames was born March 6, 1934 in Philadelphia, Pennsylvania.  See Tr. Vol. V. at 7. He was a United States citizen.  See id. at 6-7.  Mr. Ames graduated from LaSalle University in 1956.  See Tr. Vol. V at 5.  Soon thereafter, Mr. Ames was drafted into the Army, where he spent two years.  See id.  After leaving the Army, Mr. Ames began working for the Government, spending a significant portion of the next two decades on various overseas postings.  See Tr. Vol. V at 7.

In April of 1983, Mr. Ames was employed with the Central Intelligence Agency. See Tr. Vol. V at 8.  On April 16, 1983, Mr. Ames departed for an assignment in Beirut, Lebanon that was to last for approximately two weeks.  See id. at 9.  Mr. Ames was killed in the Embassy bombing.  See also Exhs. 3-4.

The economic damages suffered by the Estate of Robert Ames are set forth in the expert report of Steven A. Wolf.  See Exh. 39 at 11 and Tab 2; Exh. 39A (errata sheet for expert report of Steven A. Wolf).

### 2.   Yvonne Ames

Plaintiff Yvonne Ames is the widow of Robert Ames, and the mother of Plaintiffs Andrew Ames, Kevin Ames, Kristen (Ames) Brown, Karen (Ames) Hale, and Adrienne (Ames) Opdyke.  See Tr. Vol. V at 5-6; Exh. 48.  Mrs. Ames, who is retired, currently resides in North Carolina, and is a United States citizen.  See Tr. Vol. V at 3-4.

Robert and Yvonne Ames met in 1959, and were married in 1960.  See Tr. Vol. V at 5. After Mr. Ames began working for the government, Mrs. Ames accompanied him on a number of overseas postings, including postings in the Middle East and Africa.  See id. at 7.  The couple

had six children, with three children born overseas and three born in the United States.  See id.

By the early 1980's, the Ames family had taken up residence in Reston, Virginia.  See id.

> Ms. Ames described her late husband Robert Ames as:
>
> [A] family man, very involved in the children's activities.  He coached their
> basketball teams, always went to the soccer games.  For all that Bob has been said
> to have done, he left at the same time every morning; and he was always home for
> dinner, and he was always there on the weekends.
>
> And what we -- what I came to understand is that it wasn't my strength that held
> the family together; it was Bob.  He was the cornerstone of the family, and when
> we traveled abroad, it was just we traveled as a unit.

Tr. Vol. V at 10.

On April 16, 1983, Ms. Ames dropped her husband off at National Airport so that he

could begin a trip to Beirut, Lebanon.  See Tr. Vol. V at 11.  This was the last time that Ms.

Ames either saw or spoke with her husband.  See id.

On the morning of April 18, Ms. Ames arose early, and so did not have an opportunity to

watch the morning news.  See Tr. Vol. V at 11.  At about 9:00 or 10:00 in the morning, one of

her husband's co-workers at the Central Intelligence Agency called and stated that the Beirut

Embassy had been attacked.  See id. at 11-12.  At the time, however, there was no further

information as to whether Robert Ames was among those killed or injured.  See id.

Ms. Ames continued with her day, mentioning the Beirut Embassy bombing to one

friend.  See Tr. Vol. V at 11.  She did not mention the attack to her children, because she did not

have any specific information about her husband, and because she "did not want to be

speculating."  Id. at 11-12.

That evening, Ms. Ames kept plans to get together with friends.  She did, however, leave

a phone number where she could be reached, just in case more information about Beirut was

forthcoming.  See Tr. Vol. V at 12.  While with her friends, Mrs. Ames received a phone call

informing her that colleagues of her husband from the CIA had arrived at the Ames home.  See

id. at 12-13.

    After she received the call, Mrs. Ames immediately returned home.  While she

remembers seeing, upon arriving home, the two individuals from the CIA who had been sent to

inform the Ames family of Robert Ames's death, Mrs. Ames does not remember any other

details about the rest of that evening, other than making phone calls to various family members

to inform them of Robert Ames' death.  See Tr. Vol. V at 13.  After this initial period:

> [T]he house was filled with people for about two weeks.  They were my support,
> my strength, but it didn't give us any time to be alone together and to grieve
> together and to come to some sort of closure.  People from the neighborhood
> supplied food.  I don't remember having to do anything except get up in the
> morning and go to bed at night.  That's all I remember.

Id.  Among the visitors was William Casey, the director of the CIA.  See id.  Indeed, throughout

this period, the CIA was very supportive of and helpful to the Ames family.  See  id. at 14.

    A few days after the attack the remains of Robert Ames, along with those of most of the

other Americans killed in the Beirut Embassy attack, were brought back to Andrews Air Force

Base.  See generally Tr. Vol. V at 15-17. Mrs. Ames and the Ames children attended the

ceremony at Andrews, where Mrs. Ames was greeted by, among other dignitaries, then President

Ronald Reagan and Nancy Reagan.  See id. at 16.  The caskets at Andrews were not marked, so

neither Mrs. Ames nor anyone else in her family knew which casket belonged to Robert Ames.

As Mrs. Ames recalled, "[w]e just had to walk by and assume that one of them was Bob.  We

had no knowledge of which one, so there was no way to reach out and even touch the casket."

Id. at 16.  As a result, "there's not been any closure for that."  Id.  This lack of closure has had a

devastating impact on the Ames family for the past twenty years:

> There was no closure for us.  I think if we had been able to see Bob or at least a
> family member had been able to see Bob, we could have had closure.  I know I

> have spent these 20 years thinking, well, perhaps he was involved in something
> and for the safety of the family -- I feel ridiculous saying this, but it is truth -- that
> he was alive somewhere.  And I have spent all these years looking:  television,
> news programs.  And I think that's true for all of us.

Id. at 21-22.

After the ceremony at Andrews Air Force Base, the CIA, assisted by Mrs. Ames's

brother and father, took charge of remaining funeral and burial arrangements for Robert Ames.

See Tr. Vol. V at 17.  The actual burial took place on a Sunday afternoon at Arlington National

Cemetery.  See id.  A few days after the burial, the Ames family attended a public memorial

service at the Washington National Cathedral.  This day stood out to Yvonne Ames for two

reasons.  First, the National Cathedral service itself was "beautiful."  Id. at 18.  Second, the day

of the National Cathedral service:

> [W]as also the day that family members started leaving -- I remember that
> specifically -- and going back to their homes, which left me with my children,
> which was a lot.
>
> But when I say that, I was overcome by the responsibility of having still five
> children at home; and until then I had always thought that I was very strong, but
> that's when I realized that the strength of the family came from Bob's presence.
> He was dependable, he was reliable.  He was someone you could turn to, you
> could lean on, and whatever children's problems there were, I could go to get
> help.  And that was gone, and it became my responsibility.  It was frightening.

Id.

Mrs. Ames went back to work almost immediately after her husband's death.  See Tr.

Vol. V at 20.  After about a month, she realized that "it was just too much," and started to work

part-time.  Id.  Within a year and a half of her husband's death she remarried.  See id.

Even though Mrs. Ames and her family appeared to be handling the loss of Robert Ames

with a "stiff upper lip," (Tr. Vol. V at 18, 20), in reality:

> Bob's death fractured our family.  It's like when you take a photograph and you
> rip it or it's ripped.  You can try to piece it back together, but it's never the same.

And that is what I think the stiff upper lip was doing, was trying to piece a family back together, and it was never complete and it was never whole. I made decisions and choices that affected my life and my family's life, which at the time I thought was good, but it turned out to be disastrous.

People would look at me and say, I can't believe your strength. But I'm here to tell you now, they weren't seeing strength. They were seeing a result of fear, and it was fear that propelled me forward, fear of feeling pain, fear of facing reality.

Id. at 19.

When asked why she had elected to participate in the pending litigation, on her own

behalf and on behalf of the estate of her late husband Robert Ames, Mrs. Ames responded that

she had, when originally contacted by Anne Dammarell, been hesitant to do so, as "[l]awsuits are

not something that I would particularly get involved with, and they are in my mind to be

avoided." See Tr. Vol. V at 22-23. She subsequently thought about it for a month, contacted her

children to let them know that it was their personal choice as to whether to participate, and

ultimately elected to join the suit. Id. at 23. As Mrs. Ames testified:

My reasoning for going ahead with it is that in order to deter or even hope to begin to deter the terrorists, the money has to be stopped. Their funding needs to be stopped. I still had some question until 9/11 when I saw our government go after the funding for al-Queda to prohibit their activities, and if I wasn't convinced before 9/11, I am very convinced now. The money needs to be taken from their hands; and perhaps that will make a difference, and perhaps that will stop some of this.

Id. at 23.

> 3.    Adrienne (Ames) Opdyke

Plaintiff Adrienne Opdyke is the daughter and second-oldest child of Robert and Yvonne

Ames. See Tr. Vol. V at 24-25; Exh. 48. Ms. Opdyke currently resides in North Carolina, and is

a United States citizen. See Tr. Vol. V at 24-25.

Ms. Opdyke remembers having "a good childhood" with her family. Id. at 26. She has

special memories of traveling with her family, recalling "traveling with six kids and always

being together and taking time to go see the sights that were of historic interest or value. . . ." Id.

When the family returned to suburban Virginia from overseas, she recalled that her father:

> [W]as involved in every aspect of what we did in the morning and school.
> Academics was really important to him.  He really stressed that.  And having
> structure, eating dinner together was real important to him, even talking about it,
> when I was older and I was interested in boys, even, you know, watching them on
> the basketball court and giving me information, you know, about their character
> and what type of person they were.  He was -- that was real important to him.

Id.

Ms. Opdyke spent her senior year at a Lutheran high school in Nebraska (see Tr. Vol. V

at 27), and thereafter, in 1982, went to Concordia Lutheran College in Austin, Texas.  See id. at

25.  The last time that Ms. Opdyke saw her father was in December 1982, while she was at home

on Christmas break during her freshman year at Concordia.  See, id. at 27.  Her father picked her

up at the airport, and "was real proud" of her for having gone to college.  Id.  at 28.

The last time that Ms. Opdyke spoke with her father was in April of 1983, approximately

one week before Robert Ames left for Beirut.  See Tr. Vol. V at 28.  While she knew that he was

about to depart on an overseas trip, she was not aware of who her father worked for.  See id. at

27.  Indeed, it was her understanding at the time that he worked for the Foreign Service.  See id.

April 18, 1983 began as "just a normal day" for Ms. Opdyke.  Id.  She went to class and

didn't watch the news, both because she was not terribly interested in it, and because her dorm

room did not have a television.  See id.  She went over to her boyfriend's house to have dinner,

and while there received a call from her mother Yvonne Ames.  See id. at 28-29.   At that point:

> [M]y mom . . . asked me if I had been watching the news, and I told her, no, I
> hadn't.  She said there was a bombing at the embassy in Lebanon and that my dad
> was there and that he had been killed.  I remember I just threw down the phone.  I
> screamed and threw down the phone and just kind of got hysterical.

Id. at 29.  Mrs. Ames also told Ms. Opdyke -- for the first time -- that her father had

actually worked for the CIA.  See id. at 30.  Ms. Opdyke's reaction over this piece of

information was "[c]omplete shock.  Had no idea that that was my dad."  Id.  After taking the

phone call from her mother, Ms. Opdyke left her boyfriend's apartment and "[j]ust walked,

seemed like for a long time, just crying and crying."  Id. at 29.

Ms. Opdyke then went back to her dorm, where she was contacted by a person from the

CIA, who indicated that he would pick her up from school the next day, and arrange for her

travel to Virginia.  See Tr. Vol. V at 29-30.  The next day, April 19, there was a chapel service at

Concordia in honor of Robert Ames.  See id. at 29.  Ms. Opdyke recalls that the CIA contact

person "met all my friends and went to the service with me and then let my friends come to the

airport in Austin. . . ."  Id.  Once she arrived at National Airport, she was met by additional

Agency personnel, who took her to the family's home in Reston.  See id. at 29-30.

When she arrived home, the scene was one of "chaos:"

> I came in and I didn't know the people that were in my house and couldn't answer
> the door; I couldn't answer the phone.  Didn't really have that much contact with
> my mom because there was just so much going on.  My brothers and sisters were
> crying.  It was real confusing, just trying to figure out how you fit back into this
> place.  It was hard.

Tr. Vol. V at 30-31.  Soon thereafter, in an effort to escape from the "chaos," Ms. Opdyke left

the house to spend time with some high school friends.  Id. at 31-32.

Ms. Opdyke accompanied the other members of her family to the Andrews Air Force

Base ceremony.  Id. at 32.  A picture of the two appeared, the next day, on the front page of the

Washington Post, with Ms. Opdyke thinking, "how horrible is that?  You know, to have that

privacy invaded.  But you know, it was because who my dad was that we had to go through

that."  Id.

Like her mother Yvonne Ames, Ms. Opdyke felt a lack of closure due to her inability to view her father's remains or touch his casket.  See Tr. Vol. V at 33.  She added:

> Like my mom, it feels a bit uncomfortable to say this out loud outside the family, but because of what my dad did, you thought, well, maybe he's really not dead. Maybe he was just so important that he had to go undercover, and there was just, maybe he was in that casket, maybe he wasn't.  And that's -- I don't think that's a good thing to think about.

Id. at 33.  Ms. Opdyke has since taken the opportunity to learn more about her father, and exactly what he did.  As Ms. Opdyke testified:

> Like most of my siblings, I have collected all the articles and information that was written about him.  And I have this habit.  I like book stores anyway, but when I go to book stores, I always go to the historical section or the government section; and I flip through the index, and I look for his name.
>
> And I'm surprised how many times I see Robert Ames in the index; and I just flip open the book, and I'll just read more about him and who he was as a person of the agency and what he was doing and what he stood for and his values.

Id. at 39-40.

Ms. Opdyke described the private burial service for Robert Ames, held at Arlington National Cemetery a few days after the Andrews Air Force Base service, as "a surreal experience," as the Ames family was still "just kind of finding out who my dad was and learning about his responsibility and his impact on our country and his beliefs, other than what I knew of him as just being a dad."  Tr. Vol. V at 34.  She also attended the memorial service to honor those killed in Beirut at the National Cathedral, and recalls being moved by "the beauty of the ceremony and again, you know, understanding who my dad was and what he did for our country."  Id. at 35.

After the National Cathedral service, Ms. Opdyke returned to Concordia to finish her freshman year.  Although she did not seek counseling upon her return, she ultimately did do so, and it had "a big impact" on her.  Id. at 36, 39.

After her freshman year, Ms. Opdyke returned to Virginia to spend the summer with her family.  See Tr. Vol. V at 36.  It was, in Ms. Opdyke's words "a tough summer."  Id.  As Ms. Opdyke put it, "[w]e were all struggling pretty bad."  Id.  Ms. Opdyke had originally planned not to go back to school in the fall, but her mother indicated the she needed to go back.  See id. at 36-37.  Once she went back to college, Ms. Opdyke "kind of kept the same pattern that we did as a family, I kept trying to move every two years, it seemed like, even in my academics," ultimately leaving Concordia Lutheran College to enroll in the nursing program at Valparaiso. Id. at 37.  In her first nursing rotation, she was put in charge of looking after a patient who was "code blue," or under orders that she not be resuscitated.  See id. at 38.  At this point Ms. Opdyke, still recovering from the loss of her father, "couldn't deal with death," and switched the focus of her studies to social work.  Id.  Ms. Opdyke also, during this period, got married, and moved to Denver.  See id. at 38.

Ms. Opdyke subsequently remarried (See Tr. Vol. 5 at 38), and is now the mother of a five year old daughter.  See, id.  The loss of her father has made her very protective of her daughter, as she doesn't want her daughter "to experience anything like" Ms. Opdyke's loss of her father.  Id. at 39.

Like her mother Yvonne Ames, Ms. Opdyke was initially reluctant to participate in this litigation, but later changed her mind and elected to take part:

> When my mom told me about it, my initial reaction was, no.  I'm not going to be a part of this. . . .
>
> And then I thought about these people who just make -- these terrorists who just make decisions to make a statement, and the focus is on that statement and -- but there's people involved -- husbands, wives, children -- who really suffer a huge loss.  Some recover.  Some, like probably me, are still processing the whole thing 20 years later, and it needs to stop.

It's more than -- the impact is huge on our country, and it's huge on the children and the families.  And based on that, I made my decision to be here today.

Tr. Vol. V at 40-41.

4.   Kristen (Ames) Brown

Plaintiff Kristen Brown is the daughter and third child of Robert and Yvonne Ames.  See Tr. Vol. V at 42; Exh. 48.  Ms. Brown, who currently resides in Texas and works as a legal assistant, is a United States citizen.  See Tr. Vol. V at 42, 52.

Ms. Brown has fond memories of her childhood and recalls that:

My dad, he was just dad.  He built a carport, he made a garage -- he did all our lawn, painting.  He could do anything.

One of his hobbies was building electronic clocks and thermometers and things like that from kits, just always involved.  I remember he loved the Beach Boys and music and reading, and he would sing for us.  He had a great voice.

Tr. Vol. V at 43.

In April of 1983, Ms. Brown was an eighteen year old high school senior, and the oldest of the Ames children still living at home.  Id. at 42, 45.  She last saw her father on April 16, 1983, as he departed for Beirut.  While Ms. Brown was generally aware that he was headed overseas, she did not know precisely where he was going.  See id. at 44-45.  At the time that he departed, Ms. Brown was also not aware that her father worked for the Central Intelligence Agency.  See id. at 44.

On the evening of April 18, 1983, Ms. Brown was watching television in her parents' bedroom.  Id. at 45.  Her mother was not at home at the time.  See id. at 46.  She saw television news reports of the Embassy bombing, thought "that's interesting," but did not immediately connect the attack with her father.  Id. at 45.  Later that evening, the doorbell rang, and two people, a man and a woman who Ms. Brown did not recognize, were standing at the door.  See

id. at 45.  When the visitors indicated that Robert Ames had been in the U.S. Embassy when it

was attacked and might have been killed, Kristen responded that Robert Ames had not been there

and had not been killed.  See id. at 45-46.  At this point, the gentleman responded that Robert

Ames had been there, and was dead.  See id.  When Ms. Brown again stated that they must be

mistaken, the women replied "we don't think.  We know."  Id. at 46.  Ms. Brown screamed, and

then collapsed.  She does not remember anything else from that night.  See id. at 46.

Ms. Brown was present at Andrews Air Force Base when her father's body was returned

to the United States.  See Tr. Vol. V at 47.  Like other family members, Ms. Brown was struck

by the fact that no one was allowed to touch the caskets as they lay in state.  See, id. at 48.

While Robert Ames' burial ceremony at Arlington National Cemetery and the memorial

service at National Cathedral were both otherwise a "blur" for Ms. Brown (Tr. Vol. V at 48-49),

she was struck by the fact that even at her father's burial at Arlington National Cemetery, the

family was not permitted to touch Robert Ames' casket.  Id. at 48.  As she recalled, "at some

point, we had asked if we could leave a flower or just touch the casket, just to touch it, and we

were told we couldn't do that."  Id.  This, combined with the recently learned knowledge that

her father had worked for the CIA, raised in her mind the prospect that perhaps her father had

not actually been killed:

> All I knew of my dad is that he worked for the State Department.  He traveled.
> So to lose your dad and then find out that he was working for the CIA, when they
> wouldn't allow us to touch the casket or see it, I guess the way we put it in our
> mind was then he is doing something noble for us, and he's not really in there;
> he's just protecting us from whoever's trying to get him so that he's alive
> somewhere.

Id. at 48-49.  Ms. Brown has continued to have these feelings over the past twenty years, and

feels to this day that "[t]here's a hope" that her father is "alive somewhere."  Id. at 49.  Despite

this feeling, Ms. Brown was very proud of the fact that her father had worked for the Central Intelligence Agency.

After the various memorial services, Ms. Brown remembers that family members "all just tried to get ourselves together and go on with going back to school and things that needed to be done, help mom around the house with whatever needed to be done." Tr. Vol. V at 49.  As the oldest child still living at home, Ms. Brown had a number of added responsibilities.  Id. at 50.

Ms. Brown graduated from high school less than two months after her father's death.  Id. She greatly missed having her father at the ceremony, recalling that "[h]e wasn't there to see it. Schooling was very important for him, that we tried our best and did as best we could.  And you know, graduation was just one of those things where your dad, who was proud of what you had done, should be there to see that."  Id. at 50-51.

After being contacted by her mother Yvonne Ames, who indicated that she had elected to join this litigation, Ms. Brown did not hesitate to join herself:

> When mom first contacted me about the case, she said that she had made her decision and she was now leaving it up to the children.  And as she said she was going to do it, that was good enough for me.  And she told me her reasonings for, you know, this may have some positive impact on stopping terroristic activities, and she having said that was enough for me.

Tr. Vol. V at 53.  Ms. Brown added that she shares her mother's views, given the broad impact of terrorism:

> [Y]ou see it on the news and you feel sorry for those people who are involved and the people who are killed in these terrorist acts, but it goes so much further than that, to their families and extended families and friends; and there's just so much more than that, and it needs to stop.

Id.

5.   Karen (Ames) Hale

Plaintiff Karen Hale is the daughter and fourth child of Robert and Yvonne Ames.  See

Tr. Vol. V at 54; Exh. 48.  Ms. Hale currently resides in Georgia, and is a stay-at-home mother.

She is a United States citizen.  See Tr. Vol. V at 54.

Ms. Hale testified that she has "great memories" of her childhood generally, and her

relationship with her father Robert Ames specifically.  Id.  She has particular memories of family

life in Reston, Virginia:

> We would ride our bikes up and down our hill during the warm weather and slide
> down it in the winter.  And I loved my dad.  We had a great relationship.  He was
> a lot of fun.  I looked up to him.  I looked forwards to every day he came home
> from work, and we'd greet him and hug him.  He smoked a pipe sometimes.  He'd
> have a great smell on him.  It was just wonderful memories.

Id.

Ms. Hale was a fifteen year old high school sophomore at the time of the Embassy

bombing.  Id. at 55-56.  On the night of April 18, 1983, her mother, Yvonne Ames, was out for

the evening, and she was at home with her sister, Kristen, and her brothers, Kevin and Andrew.

See id. at 56.  As she sat downstairs and talked with a friend on the phone, her brother came

running in and said that their sister Kristen had "just seen something on the news about a

bombing in Beirut."  Id.  Ms. Hale hung up on her friend and went upstairs.  At that point, she

decided that her father probably was not in Beirut and that if he had been, the family "would

have known something about it."  Id.  She called her friend back and apologized for having hung

up.  Her friend reassured her ". . . you're probably right, you would have known something by

now; nothing's wrong."  Id.

Ms. Hale finished her phone call, and went to her bedroom to finish her homework.  Id.

She was memorizing a line for French class, when:

> [A]s I was staring at that page trying to memorize that line, a chill came over me; and I just looked up, and my brother was standing in my doorway and his hands were stuffed in his pockets.
>
> And I just said, he's dead. And he shook his head and ran off crying. I ran to the phone, called my friend, hysterically saying What am I going to do? My dad's dead! My dad's dead! Hung up on her, ran upstairs, and that's when I saw two people, strangers, and my brothers and my sisters everyone just crying.

Id. at 56-57. Ms. Hale remembers wanting to call her older sister Kathy, but she was not allowed to use the phone, and was simply told to wait until her mother arrived home. Id. at 57. While she does not recall what happened the remainder of that evening, she does remember learning that evening that her father had worked for the CIA. See, id. at 55.

Over the next few days, "lots of friends and family members" visited the Ames home. Tr. Vol. V at 57. What Ms. Hale most remembers, however is that "the only escape I had for me, it was when I got to go take a shower. And that's the only time I had to just sit there and cry, be by myself, try to figure things out. It's just a lot of people, a lot going on." Id.

Prior to the Andrews Air Force Base ceremony, Ms. Hale recalls that CIA personnel sat down with the family and explained what was going to take place over the next several days. Id. at 58. On the day of the Andrews Air Force Base ceremony, Ms. Hale recalls "looking out my living room window and seeing just a caravan of limousines coming down our street." Id. Once at Andrews, the family waited in a lobby. While she was standing in the lobby, Ms. Hale overheard several people discussing how they had found her father, Robert Ames, in Beirut:

> I overheard them saying that they had found my dad, that he was in a stairwell and he looked like he had just probably been leaving the cafeteria, heading up to a meeting, that he was face down, that his eyes were already closed, and that he was killed by the impact of the explosion, not that anything had fallen on him, and that there was just a small cut on his neck.

Id. at 58-59. When Ms. Hale heard this she "just kind of collapsed, just started crying." Id. at 59.

Soon thereafter, Ms. Hale and the rest of her family were ushered into an aircraft hangar at Andrews for the ceremony.  Id. at 59.  Ms. Hale remembered "just seeing the coffins all lined up and wondering which one was my dad, and I remember specifically thinking, oh, but he can't be here, because they just look too small.  My dad was six-four.  I'm like, he's not here."  Id.

At the burial of Robert Ames at Arlington National Cemetery, Ms. Hale remembers herself and her family seated in the front, and seeing a horse-drawn carriage coming with the coffin and a riderless horse, but she does not remember much after that, until the family turned to leave the burial site.  See id. at 60-61.  She too was struck, like her other family members, by the fact that no one was able to touch Robert Ames's coffin, as she wanted "to have some kind of concrete something, touch something, have our own way to say goodbye."  Id. at 61.  As Ms. Hale recalls:

> [D]riving away, I just remember I just turned around.  I [didn't] want to leave.  It was when they were trying to usher us out.  I don't know if it was for security, press, I don't know, but we were kind of ushered out into our limousines, and I didn't want to leave.
>
> We needed some time, I think, but I just remembered turning around in the limousine and looking out the back window and just driving away and watching it get smaller and smaller and saying, you know, I'm leaving my dad, and that's the last time I'm going to see him.

Id. at 61.  Indeed, Ms. Hale, like other family members, felt and to some extent still feels that given the nature of her father's job, perhaps he had not been killed, but rather had gone undercover and is "still be out there thinking about us, protecting us in some way, watching over us, being able to see us grow and see our children."  Id. at 62.

After the burial of Robert Ames, Ms. Hale and her family tried to return to normal.  However, "[i]t was really hard."  Id.  While Ms. Hale had at first thought that there were too many people at the Ames home following her father's death, when they all left it was "just too

quiet" and she found herself wanting them back.  Id.  She also, for the first time in her life, felt a

sense of fear, testifying:

> Like my sister, I had a fear for the first time in my life. . . . [A]fter my dad was
> killed, I had so much fear.  I'd be afraid.  I'd want our doors locked.  I wouldn't
> want my mom not to be home; I wouldn't want to be left alone.  So there was a lot
> of fear.

Id. at 62-63.  There were also times when she was directly confronted with the reality of her

father's death:

> [J]ust when you're starting to think that your life is somewhat getting back again,
> something happens.  Like my dad's belongings came back, and we had to go
> through that.  We didn't have to, but we sat down with my mom; you know, all
> his jewelry and personal items were returned.  His wedding ring was in the bag
> and had to have been cut off, and there was still blood on the ring.  This chain my
> dad was wearing when he was killed.  I've never taken it off.  It's just -- it's been
> really hard.

Id. at 63.

A year and a half after the death of Robert Ames, Yvonne Ames remarried.  Ms. Hale

recalled that ". . . it was really tough.  We had barely had a chance -- we didn't have really a

chance to cope with our loss. . . .  And a man who was gentle and loving and kind, the gentlest

spirit, funny, was gone, and in came a man that was totally opposite.  Totally opposite.  And

being a teenager, I just totally rebelled against his entrance into our little world, so that it made

for a really tough time."  Id. at 64-65.  In fact, she felt that "in a way, I think if our spirits weren't

already broken, that experience probably broke it, at least for me watching -- not that it was so

much me, but watching what my brothers had to go through."  Id. at 65.

In the years since her father's death Ms. Hale, like her other siblings, has made an effort

to learn "every bit of information about my dad, trying to learn as much as I can about his life.  I

just think it's amazing that he was able to be the kind of father and man that he was and hold the

kind of position that he held, and we had no idea."  Id.

Ms. Hale was initially reluctant to participate in the litigation, but ultimately elected to join the suit:

> Like my mother and sisters, my first reaction was absolutely not. I'm not going to do this. I was thinking I didn't want to send out the wrong message, that I was -- that I blamed the government or the agency or anyone, that they didn't protect my dad or anything like that.
>
> I didn't understand what it was about. And when it was described what it could do, I remembered a plaque that's at LaSalle College, a plaque of my dad, a picture of him, and under it, it says "Blessed are the peacemakers." And I thought, you know, that's what my dad want -- you know, that's what he did, try to keep peace, and anything I can do to help that, try to keep peace, try to make peace, and anything I can do to help that, then I want to be part of it, spread the peace.

Id. at 66.

### 6. Andrew Ames

Plaintiff Andrew Ames is the fifth child and oldest son of Robert and Yvonne Ames. See Tr. Vol. V at 67; Exh. 48. He currently resides in Georgia, and is a United States citizen. See Tr. Vol. V at 67.

Mr. Ames had an "unbelievable relationship" with his father:

> Growing up, him being into sports his whole life, he brought me up into sports. He was my coach, my mentor, my summer league coach. He was my basketball camp. He was -- he taught me how to do -- work on cars. He would have me watch him do it.
>
> You know, he taught me everything about growing up, about being a kid, having fun, how to learn. He helped me with my homework. Anytime I had any problems, he was always there for me.

Id. at 68.

Andrew Ames was fourteen years old and in the eighth grade in April 1983. Id. The day that Robert Ames left for Beirut, he and his son Andrew had had an argument. As Mr. Ames testified:

[I] can't remember what the argument was about, but I was a little mad at him, so I decided that I wasn't going to speak with him before he left. His comments were to me always before he left was, you know, take care of your mom and bye. And I just -- I remember I was downstairs, and I just -- I looked up and turned away, never having the opportunity to tell him bye before he left. And that's the last that I saw him.

Id. at 70. This final exchange with his father haunted Mr. Ames for years:

Well, being 14, you know, I blamed myself. My idea was, God took my father away from me because, you know, I -- because we were in a fight. And I guess -- again, I can't remember what I did; but he took him away from me because we weren't getting along, and I took complete blame for the longest time. Longest time.

Id. at 70-71.

Mr. Ames's sister Kristen, who was in their parents' room watching television, mentioned the Beirut Embassy bombing. Andrew passed this information along to his sister Karen. See id. Mr. Ames then went upstairs to his room. Later that night, Mr. Ames heard someone knock on the door, and then heard his sister Kristen scream. See id. At that point:

I went downstairs, and that's when I found out that he was killed. And I went immediately downstairs to my -- to Karen's room, and I stood in the doorway, and I remember this: She looked up at me, and she saw it right away.

I just -- she said that he's dead, and I just nodded my head and ran back to my room. I went back upstairs. That was the last I remember, is going back up into my room. That's the last that night.

Id.

The next day, Mr. Ames was lying in his parents' bedroom watching television when a news report identified his father as having been the leading Middle East analyst for the CIA. Mr. Ames went downstairs to ask his mother whether this was true, and believes that she confirmed this information. Id. at 71. According to Mr. Ames, "I was in disbelief. I still didn't believe it because I figured growing up he worked for the State Department, and my dad would never lie to

me about anything.  So what they're saying is false, is the way I figured it."  Id.  Later, Mr. Ames

thought that his father's position was a "neat thing."  Id.

Mr. Ames attended the ceremony at Andrews Air Force Base with the rest of his family,

Id. at 72.  During the service, Mr. Ames was seated in the front row, and recalls "seeing the line

of coffins on the left-hand side pretty much lining the wall."  Id.  Like his mother and sisters, Mr.

Ames thought that perhaps Robert Ames really did not die, but was instead alive and protecting

his family by going undercover.  See id. at 73.

At his father's burial at Arlington National Cemetery, Mr. Ames has vivid memories of

the horse-drawn carriage carrying his father's coffin, and of the Marines struggling with his

father's coffin, as Robert Ames had been "a large man."  Id.  He also remembers sitting

underneath the tent at the burial site, the 21-gun salute, and the folding of the flag draping Robert

Ames' coffin and its presentation to Yvonne Ames.  Mr. Ames did not remember the subsequent

service of National Cathedral.  Indeed, he testified that "I think from the funeral until my mother

remarried is blank, completely.  I don't know.  I know I was in school.  That's about it."  Id. at

73-74.

A year and a half after the death of Robert Ames, Yvonne Ames remarried.  The

remarriage hit Andrew Ames particularly hard, as his relationship with his stepfather was

difficult.  Id. at 74-75.  The summer after Mr. Ames finished the eighth grade, his mother and

stepfather moved to Georgia.  Id. at 75.  Mr. Ames remained in Virginia with his uncle that

summer to go to summer school, as his grades had dropped because he "just wasn't ready to go

back to school."  Id.  The next school year in Georgia, Mr. Ames "failed miserably."  Id. at 76.

Indeed, for the next two years Mr. Ames "didn't know a soul.  I didn't want to know anybody,

didn't care to know anybody.  I always thought of myself as an outgoing person, but I wasn't

being one.  I was kind of the loner in school the first couple of years."  Mr. Ames's academic

career changed after he thought to himself one day "is this what my dad would have wanted of

me? . . . absolutely not."  By the end of senior year, Mr. Ames was on the Dean's List, because

he knew that that is where "my father would want me to be."  Id.

      While he had played a lot of organized sports with his father, Mr. Ames did not continue

his involvement in organized sports once the family moved to Georgia.  Id.  Instead, he testified

that he:

> Made some poor choices.  I developed a pretty bad drug habit throughout high
> school, dropped all sports, and just kind of mellowed my way through life.  I
> didn't -- at that point, I even dropped sports altogether.  I really didn't go out and
> play.  I had no interest in it whatsoever.

Id.  After high school graduation Mr. Ames, after taking off a year, began studies at DeKalb

Community College, but quit after one quarter.  See id. at 76-77.  He then dropped out, was

kicked out of the family's house in Georgia, and lived on his own for a year.  Id. at 77.

      In terms of the impact of his father's death on his life, Mr. Ames testified:

> I travel with my job, and I'm gone a week at a time.  The hardest thing to do is to
> leave my boys.  Going through what I went through, I make it an absolute point to
> pick them up, hug them, kiss them, and say good-bye every time I leave.
>
> I don't want my boys to go through what I went through.  The loss was enough,
> but never having the chance to say good-bye or -- there's never a good time, and
> you should never leave a place that you're not going to see someone for a while,
> doesn't matter how mad you are to them, not to say good-bye.
>
> And I think that's the biggest impact it's had on me, and it kills me still today.
> That's one thing I will never get over.  There's nothing that can be said or done
> for me to ever get over that situation.

Id. at 78.

      As to why he elected to participate in the litigation, Mr. Ames stated:

> I'm never going to get complete closure from anything that happens.  And
> listening to, you know, when we were at dinner last night listening to the rest of

the family members say, you know, we need to stop terrorism, and this is hitting
them in the pocket where it counts, and I agreed.
You know, like they're doing with bin Laden, going in, taking all the money out,
try to keep him from being able to get what they can get is the best thing that can
happen.  Take their money away.  Make it harder for them to get what they need.

Id. at 78-79.

### 7.    Kevin Ames

Plaintiff Kevin Ames is the son and youngest child of Robert and Yvonne Ames.  See Tr.

Vol. V at 80; Exh. 48 (Ames family photographs).  He currently resides in North Carolina, and is

a United States citizen.  See Tr. Vol. V at 80.

Mr. Ames described his childhood as "a pretty typical one.  I was involved in

community sports, my dad being one who was always present for those, being basketball and

soccer for me, and at one point he was even my basketball coach."  Id.  Mr. Ames was eleven

years old at the time of the Embassy bombing.  Id. at 80, 82.  April 18, 1983 began as "just

another school day" for Mr. Ames.  That evening at home Mr. Ames saw a replay, on television,

of the Beirut Embassy bombing.  There was a discussion among the Ames siblings at home

about their father and whether he was possibly at the Embassy.  The siblings having concluded

that Mr. Ames had not been in Beirut, Mr. Ames thought "okay, it was no big deal."  Id. at 81.

That evening, as he spent his first night in his own bedroom, Mr. Ames heard his sister scream:

[A]nd by the scream you could tell, I mean, that something horrific had happened,
and I tried real hard to close my eyes and go back to sleep, just hoping I wouldn't
have to find out what happened.  And of course, I couldn't, and I just knew I had
to go downstairs and find out what happened.

Id.  Mr. Ames cannot recall who actually told him that his father had been killed; all he

remembers is going to the family's living room and sitting in his father's rocking chair:

[W]hile I was rocking in it, I had taken my thumbnail and had just throughout the
course of the evening had worn a groove in it.  I have that chair at my house
today, and it still has that groove in it where I had just sat while I was rocking and

I guess, you know, for an 11 year-old trying to comprehend what was going on at that point.

Id. at 81-82.

Mr. Ames remembers the ceremony at Andrews Air Force Base, and recalls that he "was just so amazed at what I had learned at this point about my father and what he had done." Id. at 82. While other family members thought that perhaps Robert Ames had not been killed, but had gone undercover, Mr. Ames "had no reason not to believe" that his father had not been killed. Id. at 84. As he testified, "I was told that he was killed, and I just took that for what it was." It wasn't until later, when Mr. Ames was older, that he started to have the "kind of thought process" where it was conceivable that his father might have gone undercover. Id.

According to Mr. Ames, there were "a lot of things still occurring" after the funeral of his father Robert Ames:

> I know there was an agency, and I'm not sure what agency it was, that was helping us out. And they were taking me and my brother to meet to like -- I know we went to the Washington Redskins football camp, got to meet Al Pacino, got to meet the Philadelphia Phillies baseball players.
>
> So it was real -- I mean, it wasn't normal what was happening. It was great as a kid, you know. I loved it, but it wasn't normal. Things didn't get back to normal until I got back into school, which I think happened maybe a week and a half, two weeks after that.
>
> And I think I pretty much went back to my normal routine. I have to chalk it up to resiliency of childhood. You just bounce right back. You don't think of anything else of it. You just get right back into the mode of life.

Id. at 85.

While Mr. Ames maintained a "cordial" relationship with his stepfather following the remarriage of Yvonne Ames, he does not feel that he got the guidance he needed, "which of course led to very, very poor decision-making on my part, which I believe I'm still feeling the ramifications of today." Id. at 86. While Mr. Ames "did do a little counseling" following his

father's death, he did not find it helpful, and did it "more to appease everybody else" than for

himself.  Id.

Mr. Ames described the loss of his father Robert Ames in the Beirut Embassy bombing

as:

> [A] major turning point.  It changed the path that everybody was going down.  I
> believe -- I sincerely believe that if my father was here today, you know, I would
> be in a totally different position than where I am today.
>
> I believe I missed out on learning from a very intelligent man, for one thing,
> someone I know could have guided me to where I needed to be.  And I mean,
> that's a huge thing to think about.  I mean, I think about that all the time.  I
> wonder what kind of man I could have become today if he was there.  I wonder if
> he would be proud of what I became; and all I can do is wonder and hope I have,
> but I'll never know for certain.

Id. at 87.  Mr. Ames also testified that he has "maintained a distance not to get too close, just for

fear of losing" loved ones, and that this has affected every relationship that he has developed

since the death of his father.  Id. at 88.

The decision to participate in this litigation was initially a "hard' one for Mr. Ames:

> I felt like it was a moral decision I had to make.  I wanted to make sure that my
> motives for doing this were correct, and I wasn't sure how I was going about
> doing that.
> So the way I went about it is I tried to, and did, contact some of my father's
> colleagues, just to get an idea of what my dad would have thought about the
> situation, how maybe they thought he -- would he approve of doing this.  And I
> say that just because I knew his love and understanding of their people.
>
> And one of this colleagues was like, oh, he would be all for it.  He said that -- he
> said, your father was all about peace and trying to achieve peace in the Middle
> East, and that's all I needed to hear.  And if there was anything I could do to this
> point to help with that, then I was willing to do it.

Id. at 87-88.

**I.      Janet Lee Stevens and Family**

      1.      <u>Janet Lee Stevens</u>

Janet Lee Stevens was the sister of Plaintiffs Hazen Stevens, Jo Ann Stevens, and Scott Stevens, and the daughter of the late Hazen Stevens. See Tr. Vol. V at 90, 117-18, 134; Exh. 50. Ms. Stevens was a civilian journalist working in Beirut, doing freelance work for the Japanese newspaper Asahi and the English language periodical Monday Morning. See Tr. Vol. V at 104, 125, 144-145; Exh. 50 at 2. The Estate of Janet Lee Stevens is represented by Jo Ann Stevens, as Administrator, for purposes of this litigation. See Tr. Vol. V at 91; Exh. 49.

Janet Stevens was born December 1, 1950 in Michigan. She was a United States citizen. Tr. Vol. V at 89-90. She entered Stetson University in 1968, following high school graduation. Id. at 93-94. While at Stetson, she focused on the area of international studies. Janet Stevens had a particular interest in foreign languages, with a speaking knowledge of Arabic, French, Spanish, Russian, and some Chinese, though Arabic was her primary concentration. See id. at 94.

By the time Ms. Stevens graduated from Stetson in 1972 with a degree in international studies, she had expressed a particular interest in the Middle East. Id. at 95. She thereafter enrolled at the University of Pennsylvania in 1973, in a Doctoral program in Arabic Studies. See id. at 95-96. At the time that she was killed in the Beirut Embassy bombing, Ms. Stevens had completed all of her course work towards her Ph.D. at the University of Pennsylvania, but had not submitted her dissertation. See id. at 96.

Ms. Stevens, who had decided to dedicate her life to a better understanding of the Arab world, began living and working in the Middle East in the mid-1970's. She first went to the American University in Cairo, where she studied and taught Arabic. Id. at 97. From Cairo she moved to Tunisia, where she lived for almost two years, and married a Tunisian playwright. Ms. Stevens, who "was a wonderful letter writer," conveyed her experiences in these different

locations to her sister Jo Ann Stevens through "very long and informative" letters.  Id.  at 97-98.

At the time of the bombing, Ms. Stevens was interviewing U.S. AID personnel in the Embassy

cafeteria.  Ms. Stevens sustained fatal injuries as a result of the attack.

The economic damages suffered by the Estate of Janet Lee Stevens are set forth in the

expert report of Steven A. Wolf.  See Exh. 39 at 10 and Tab 1.

2.    Jo Ann Stevens

Plaintiff Jo Ann Stevens is the identical twin sister of Janet Lee Stevens.  See Tr. Vol. V

at 90; Exh. 50 at 3-9.  Ms. Stevens currently resides in Georgia, and is a United States citizen.

See Tr. Vol. V at 89-90.

In describing growing up with her twin sister Janet, Ms. Stevens testified:

Well, being twins, we of course were very close, and she was my best friend.  She
-- of course, I'm prejudiced, but she was an incredible sister.  I tended to be the
shy one, and she always brought me out of that and always gave me confidence
and always showed belief in me and never took advantage of that, always just
helped bring me out.

And she, even at an early age -- it's really something.  She, I believe, always
knew that she would go to a far-away land and do something.  She was always
interested in other countries.  It was almost as if she had been an older soul in
another life in another land.

Id. at 92.  Janet Stevens also showed an early interest in literature and poetry, and loved playing

her guitar.  See id.  The twins' independence occasionally rankled their older brothers Hazen and

Scott Stevens.  Ms. Stevens recalled, "of course, those were the years when males used to think

they were dominant, and we used to tease our brothers about being independent women, even

way before that scene came along, but they were wonderful brothers."  Id. at 93.

The Stevens sisters graduated from high school in 1968, with Ms. Stevens attending

college at Auburn University, and Janet Stevens enrolling in Stetson University in Florida.  Id.

at 94-95.  While at Stetson, Janet Stevens' interest in the Middle East became more focused.  See

id. at 95.  The Stevens family was not quite sure what to make of this interest.  As Ms. Stevens

observed:

> I'm not sure my parents completely understood.  I think my dad and brothers both
> were a little bit worried because -- I think like any parents, you don't want your
> daughter to go far away, especially when you're not sure, you now, how
> experienced they are.
>
> You don't want them to go far away where you can't keep track of them.  I think
> that was probably a large part of it, along with Janet was just a very unique
> person.  She was one of these people that just -- she did what she felt from her
> heart and didn't try to fit into anybody's mold, so to speak.  She tried to follow
> what she naturally felt like was her calling and her wish to do.

Id. at 95-96.

In late 1981-early 1982, Janet Stevens moved to Beirut, Lebanon.  Id. at 100.  Because

Janet Stevens was fluent in Arabic, it was Ms. Stevens' impression that "the people in Beirut . . .

tended to trust her more with information" than they trusted to other journalists.  Id. at 101.  In

the months immediately prior to the Beirut Embassy bombing, Janet and Ms. Stevens had begun

to discuss getting together, and forming a "photo-journalistic twin team," id.  at 98-99, and in

early 1983, the sisters decided to meet in London in the spring of 1983 to discuss pursuing this

plan.  See id. at 101.  Ms. Stevens had proposed that they meet in Beirut, but Janet Stevens told

her sister that she thought that the city was too dangerous for her to visit.  This exchange of

telegrams regarding the planned meeting in London was the last correspondence that Ms.

Stevens had with her sister.  Id. at 102.

Approximately a week and a half to two weeks prior to the Beirut Embassy bombing, as

the sisters continued to correspond regarding their planned rendezvous in London, Ms. Stevens,

". . . actually had a fear -- I don't know if you call it a fear dream or had a premonition in which

I dreamt that my sister was in a dangerous situation, and all I could think of was to tell her to go

the other way." Id. at 101. Ms. Stevens discussed this dream with her father, Hazen Stevens, who reassured her that she was just being fearful and that everything was fine. See id. at 101-02.

Ms. Stevens was at work at CNN headquarters in Atlanta on April 18, 1983. Id. at 103. She first learned of the Embassy attack through information transmitted to CNN through various news wires. See, id. She did not, at this point, think that her sister had been at the Embassy, though she was concerned that she might have been in the general area. Ms. Stevens returned to her apartment that evening, and went to sleep. Sometime later, she received a phone call from her sister's boss at Asahi, who reported that Janet Stevens had been in the bombing. When Ms. Stevens asked him if he was sure that her sister had been involved, "he said yes." Id. at 104-05. After the passage of a period of time, Ms. Stevens "gathered enough courage" to call her father Hazen Stevens and tell him that Janet Stevens had been killed. Id.

Several days later, the Stevens family traveled to Washington, D.C., for the service at Andrews Air Force Base. Id. at 105-06. She remembers thinking that " . . . it was so strange that you didn't know which coffin your loved one was in; and I remember thinking I wasn't sure why they did that, but I just thought it was respectful that they had them all together and that they had each one draped in a flag." Id. at 106. The Stevens family held a private burial for Janet Stevens in Atlanta. Id. at 108. Ms. Stevens particularly recalls the Marines doing a 21-gun salute in honor of her sister. See id. at 108.

In the immediate aftermath of her sister's death, while Ms. Stevens thought at the time that she "was being strong," in hindsight she spent the next six months thinking only about her sister and their memories, and "everything that we did together and wanted to do." Id. at 111. What helped her "start trying to get out of that" was the knowledge that her sister "would be mad at me for, you know, being sort of like a victim." Id. While Ms. Stevens recognized this, getting

over her sister's death was "easier said than done." Id. About a year and a half after her sister's

death, Ms. Stevens reached a turning point in terms of dealing with the loss of her sister:

> I don't know if you'd call it a dream or a vision. I actually felt like it was a real
> experience. I went kind of on this rainbow ride with my sister, and it was like
> these flashes of light. And it was -- I felt instinctively like she was telling me,
> okay, you know, I'm with you, don't doubt it, and now I've got to do my thing
> and you've got to do yours. And then I felt like that was, you know, a special
> spiritual good-bye and a way to, you know, to start again.

Id. at 112.

Every April 18th, on the anniversary of her sister's death, Ms. Stevens does "something

that I think my sister and I would have loved to have done together." Id. at 108. Thus, one year,

she had a friend photograph her with the flag that had draped Janet's coffin when she was

brought back to the United States. See id. And one year, she went to a Lebanese restaurant, and

"just thought about Janet." Id.

> In terms of the lasting impact of her sister's death on her life, Ms. Stevens testified:

> I think the greatest thing is probably just that she was truly my best friend. She
> really was. And I'm proud that I had her for as long as I did, and I'm proud that
> she chose me to be a twin soul. So that -- and I try to remember how adamant she
> was about things and how she tried to challenge people into being the best they
> could be.

> And I just -- I fail miserably all the time, but I try to remember that she, you
> know, would always say, come on, you can do it, and I believe in you, and I know
> you will do it. So that's what I remember.

Id. at 113-14.

> When asked why she elected to participate in the litigation, Ms. Stevens responded:

> Well, at first I didn't want to do it, because I had a misunderstanding about it. I
> thought it was a group of people trying to sue the federal government; and I didn't
> think that was right, and I'm not the kind of person that wants to sue for -- I mean,
> money doesn't bring people back.

> And then when I -- my brother helped me understand that it was going to help
> hold funds against the -- you know, so the terrorists can't use it, and that sounded

very convincing to me.   So that's mainly why, and I hope that is the truth.  I hope
it does help.

Id. at 116.

3.   Hazen Hadley Stevens

Plaintiff Hazen Hadley Stevens is the oldest brother of Janet Lee Stevens.  See Tr. Vol. V

at 117-18; Exh. 50 at 3-11.  Mr. Stevens currently resides in Georgia and is a United States

citizen.  See Tr. Vol. V at 117.

In describing his sister Janet, Mr. Stevens testified:

Well, I was eight years older, and sometimes you don't pay much attention to
another seven or eight year-old going through high school, but Janet and Jo Ann
were both exceptional at a young age.  And Janet was a terrific athlete, even at a
young age, and I tried to be of help to her in developing that.

Id. at 118.  As Janet passed through high school, Mr. Stevens observed:

She was a cheerleader, she played basketball, and I think she was the most
valuable player when she was a sophomore.  But my brother and I kind of talked
her out of playing any more after that, because we didn't feel like it was very
ladylike.

But Janet, she was a major leader in her school.  She was on the student counsel,
and she participated in most of the clubs.  She was an officer in a number of
things, and she made all A's in these advanced classes.  I think that she was
probably the smartest kid in school.

Id. at 118-19.  Personality-wise, he described his sister as "very outgoing," testifying that "she

loved life," and further observing that he had "kind of loved watching her succeed in the events

that she was in, whatever those events were, including her schoolwork."  Id. at 119.

Mr. Stevens communicated with his sister primarily on holidays during her stay at the

University of Pennsylvania, as he had started his own family by this time.  Id. at 121-22.  After a

point, he became aware that his sister Janet had gone to live in the Middle East.  See id. at 122.

In April of 1983, Mr. Stevens was the Southeast regional manager for Merrill Lynch commercial real estate, and temporarily residing in Washington, D.C. Mr. Stevens heard news reports about the Embassy bombing on April 19, the day after the attack, but was unaware that his sister was in Beirut generally or at the U.S. Embassy specifically. See id. at 126. That day, in The Washington Times, Mr. Stevens saw an article about, and accompanying picture of, his sister, indicating that Janet Lee Stevens was believed to have been killed in the attack. This was the first indication to Mr. Stevens that his sister had even been at the Embassy on April 18. See id. After that, Mr. Stevens recalls that "I, unlike my sister, didn't have the courage to call my father. I believe I called my brother, and then I called my father after that." Id.

After learning of his sister's death, Mr. Stevens began to make arrangements for his family to come to Washington, D.C., but learned that the State Department was already in the process of making those arrangements. Id. at 127. Soon thereafter, the Stevens family arrived in Washington for several services, including the service at Andrews Air Force Base, when "Janet was flown home." Id.

Mr. Stevens described the subsequent family funeral service held for his sister in Atlanta as "an absolutely lovely service" attended by hundreds of people, including friends of each member of the Stevens family. Id. at 129. During this time, Mr. Stevens was in charge of escorting his mother, who was mentally ill. He indicated that the entire situation was "extremely difficult for her," and that she "would refuse to go to the funeral and really refused to go to the graveside ceremony." Id.

In the aftermath of his sister's death, Mr. Stevens, as the oldest of the Stevens siblings, "[t]ried to be a little stronger and tried to be protective to some degree, and helpful." Id. at 130. In terms of his own grieving process, Mr. Stevens stated, "I think that -- I think that I tried to

block a lot of things out." Id. at 131.  From his observations, his sister Jo Ann Stevens went

through a prolonged period of grief, as he testified, "I think that Jo Ann feels like she became

much more with life in a year and a half, and I'm afraid that she's probably miscalculated.  I

think it took her a number of years" before "she came back to some kind of really feeling of

confidence and reality." Id. at 130.  He does not think that his father ever recovered from the

loss. See id.

> When asked why he elected to participate in the litigation, Mr. Stevens responded:
>
> When [Anne] Dammarell called, I really didn't think that my stepmother or my
> sister -- or my brother, for that matter -- would be interested.  But I called my
> stepmother, and although she would not be a direct, I guess participant, I asked
> her if she thought if it were okay to talk to Jo Ann regarding this.  And she told
> me that I had to make that decision on my own and that she just did not want to
> hear any more about anything of this nature and that she didn't want to hear us
> repeat the  words Lebanon, Beirut, Hisballah, or even Hamas.  I mean, she just
> was very much against any type of action.  And then I called my sister, and she
> was also.  And I  started thinking about it, and I thought that I should again talk to
> her and see if she would reconsider, because I thought that this event had
> damaged her quite a bit and that she really deserves some remuneration, if any
> remuneration ever takes place, as well I think it is a good thing to have Iran on
> notice that there should be no more Hisballahs of any sort and that at some point
> in time they're going to have to pay for those actions.  And when I say pay, I
> mean that somehow they're going to be harmed, and I think at some point in time
> they're going to pay some form of price for this that they've done to the Marines
> and that they continue to do these things.  Hisballah is still a very, very active part
> of the Middle Eastern problem.

Id. at 132-33.

4.    Scott Stevens

Plaintiff Scott Stevens is the brother of Janet Lee Stevens.  See Tr. Vol. V at 134; Exh. 50

at 2-6, 12-18.  Mr. Stevens resides in Georgia, and is a United States citizen.  In describing

growing up with his sisters, Mr. Stevens testified:

> It's a wonderful experience.  It's a wonderful experience to grow up with twin
> sisters.  I was a little bit closer than Chip [Hazen Stevens], because every morning
> . . . we were going to the same high school; and he was at the University of
> Georgia, and it was a very, as Jo Ann pointed out, it was a very active household.
>
> They were very active in their classes, and I was very active in my class.  And as
> a result, it was kind of a central point, because we were only a block away from
> school when the school had about 1600 students.  And as a result, we just had a
> wonderful childhood.
>
> We were always playing in the front yard, or we were playing pool downstairs or
> shuffleboard.  And it was, I guess I would characterize it, it was just a wonderful
> experience that most children hopefully could have environmentally and a lot of
> precious memories.  And those are the things that you hold on to.

Id. at 135.

Mr. Stevens graduated from high school in 1965, three years before his sisters.  Id.  After

enrolling in Auburn, he did not have very many direct communications with Janet, although he

noted that "we did an excellent job of making sure we saw each other at the holidays and that

when we all had spring breaks or that we had the breaks for Thanksgiving and Christmas, and we

would congregate back in Atlanta."  Id.  at 137.

During these visits home with her family, Janet Stevens began to express an interest in

the Middle East.  Id.  In terms of what motivated this interest, Mr. Stevens noted:

> I think it was an outgrowth of Janet's really -- she had a wonderful interest in
> international politics, and I think that we were raised with sensitivities.  Janet was
> very sensitive to the needs of others.  I think that what she wanted to do was to
> tell the truth from different varied viewpoints and that she would do that -- I think
> she had an interest in doing that through her international studies.
>
> And she -- quite frankly, we haven't discussed this among the surviving siblings,

but a lot of this had to do with our father. He was a historian. He had every World War II book. He would always talk about Churchill. I think Janet absorbed some of that. Janet and Jo Ann both absorbed some of that while we were growing up.

And I think that that affected her. She always loved English and poetry. She was an honor student in all of those programs, and I think that it was just natural following.

Id. at 137-38.

The last time that Scott Stevens saw his sister Janet was in December 1981, when Janet came to visit her family for the Christmas holidays, and resolve the timetable for the completion of her thesis at the University of Pennsylvania. See id. at 142. As he recalled, "[s]he was homesick for us, and we were certainly homesick for her." Id. at 143. According to Mr. Stevens, he, his brother and father made "comments" to Janet Stevens along the lines of "hey, Janet, it's time to come home. It's time to get out of harm's way." Id. Indeed, Mr. Stevens felt that the circumstances in the Middle East were such that his sister was in danger. See id. While Janet Stevens considered her family's concerns, she opted to return to the Middle East, ultimately settling in Beirut in early 1982. See id. at 144. Once Janet Stevens arrived in Beirut, she worked as a freelance journalist for Monday Morning, which was then the largest English-speaking newspaper in Beirut. She also did work for the Japanese newspaper Asahi. See, id. at 145.

Stevens heard news reports about the Embassy attack on April 18, but "[n]ever even made a connection that Janet would be at the embassy because of her position." The manager at Asahi contacted the Stevens family on April 19, after Janet Stevens failed to show up for a staff meeting. See id. Eventually, Hazen Stevens called his son Scott Stevens to inform him of the attack. Scott Stevens recalled that when he heard the news, he was "very angry" that "anybody . . . could take innocent life." Id. at 146.

The Stevens family initially was unsure whether the government would transport the body of Janet Lee Stevens back with the other U.S. victims of the attack "because she was the only private citizen that was not attached as a federal employee." Id. Ultimately, the State Department charged the Stevens family $2,100 to bring the body of Janet Lee Stevens back from Beirut. See id. at 147.

Scott Stevens was with other family members at the Andrews Air Force Base ceremony. Mr. Steven also described a family ceremony that the Stevens family subsequently held in Atlanta, Georgia.   In terms of how his family was doing emotionally at this point, Mr. Stevens recalls, "[w]ell, I think we were as a family, knew what we had to, and we had to do a lot because dad quite frankly couldn't -- he just couldn't function.  He was just heartsick." Id.

Mr. Stevens, who was married with three children at the time, dealt with his grief in another way, noting ". . . what I ended up doing is I ended up avoiding, I guess for several years,  the impact by concentrating on trying to advance my own personal career and make more money, and you know, take the children to soccer games every Saturday . . .  So there was a lot of opportunity for me to -- there was a lot of opportunity for me to bury myself in my own family." Tr. Vol. V at 149.  Despite these efforts, none of these activities took away Mr. Stevens' grief, or his feeling that "our family got cheated, cheated [out] of the times and the future memories.  So what you have to hold on to are the past memories." Id.  When asked why he elected to participate in the lawsuit, Mr. Stevens responded "I think it's right.  I think somehow we just shouldn't have American justice; we have to have international justice, and we can't have people going around killing people," and further noted that he "had no hesitation about being a part of this legal action, because someone needs to stop these people." Id. at 149-50.

5.   Estate of Hazen Stevens

Hazen Stevens was the father of Janet Lee Stevens. See Tr. Vol. V at 151; Exh. 50. Mr.

Stevens, who was alive at the time that his daughter was killed in the Beirut Embassy bombing,

died in 1997. The Estate of Hazen Stevens is represented by Scott Stevens for purposes of this

litigation. See Tr. Vol. V at 151; Exh. 49A.[11]

Hazen Hadley Stevens was very close to Janet, and last spoke with her by phone less than

two weeks before her death. See, e.g., Tr. Vol. V at 101. From the perspective of Hazen Hadley

Stevens, the oldest of the Stevens siblings, Hazen Stevens never got over the loss of his daughter

Janet in the Beirut Embassy bombing. As Mr. Stevens testified:

> My father never recovered, and he just -- he was very -- it was a very difficult
> time for him for the rest of his life, which was about 15 years. And I mean, he
> would break into tears from time to time when you go visit him, just out of
> nowhere. For a great man, he wasn't acting so great. Of course, I've never lost a
> child.

Id. at 130.

This grief affected every aspect of Mr. Stevens' life. As Scott Stevens testified:

> He made very poor decisions economically, retreated. I think he had a very
> difficult time. I think he tried to overcome it. I think his experience with our
> mother, who was mentally ill, I think it probably kept him from seeking
> professional help himself because that was a hard experience for him to go
> through. So he did the best he could. He just made a lot of mistakes. Made a lot
> of mistakes economically, made some very -- took his retirement money and
> made some investments in oil, which was very speculative, you know, instead of
> looking out for his economics and those kind of things.

---

[11] Jo Ann, Hazen Hadley and Scott Stevens each presented testimony regarding the impact that
the loss of his daughter Janet had on Hazen Stevens. Based on this evidence, and the post-trial
amendment of a complaint to permit the addition of an immediate family member, under nearly identical
circumstances, in Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27 (D.D.C. 2001), aff'd sub nom.
Bettis v. Islamic Republic of Iran, 315 F.3d 325 (D.C. Cir. 2003), the Court granted plaintiffs' request to
amend their First Amended Complaint to add the Estate of Hazen Stevens as a participant in this
litigation.

Id. at 148-49.  Ultimately, as a result of these decisions, Mr. Stevens, "lost his condominium," and "went from owning a condominium on the ocean to living five miles inland struggling to pay rent."  Id. at 149.

### J.   William and Mary Lee McIntyre and Family

#### 1.   William McIntyre

William McIntyre, the husband of Plaintiff Mary Lee McIntyre and father of Plaintiffs Margaret (McIntyre) Matteucci, Andrew McIntyre, and Julie McIntyre, was assigned to the Beirut Embassy as Deputy Director of U.S. AID.  See Tr. Vol. VI at 10; Exh. 13; Exh. 54.  At the time of the bombing, Mr. McIntyre was eating lunch in the Embassy cafeteria.  Exh. 54.  Mr. McIntyre sustained fatal injuries as a result of the attack.  The Estate of William McIntyre is represented by Mary Lee McIntyre, as Executrix, for purposes of this litigation.  See Tr. Vol. VI at 4; Exh. 53.

Mr. McIntyre was born March 15, 1931, in Detroit, Michigan, and was a United States citizen.  See Tr. Vol. VI at 9.  He graduated from the University of Michigan in 1952 with a degree in Political Science.  See Tr. Vol. VI at 6.  He received a Master's Degree in Political Science in 1953, also at the University of Michigan, and thereafter spent a year studying abroad on a Fulbright Scholarship at Queen's University in Belfast, Ireland.  See id.; Exh.54A (Preface). Mr. McIntyre subsequently completed course work towards a Ph.D. in political philosophy, but did not complete a dissertation.  See Tr. Vol. VI at 6; Exh. 54A (Preface).

Mr. McIntyre met his future wife, Mary Lee, in 1957, after joining Editorial Research Reports, a research firm specializing in writing background information for newspaper editors. The couple married in 1959.  See Tr. Vol. VI at 7-8; Exh. 54A (Preface).  Mr. McIntyre

subsequently accepted a position as a writer for the news program of Edward P. Morgan and ABC News.  See Tr. Vol. VI at 8.

Mr. McIntyre joined AID in April 1963 as a journalist, ultimately producing two award-winning films for the agency.  See Tr. Vol. VI at 8-9; Exh. 54A (Preface).  Mr. McIntyre was first posted overseas with the Food for Peace Program in 1967, to India.  See Tr. Vol. VI at 10. He was accompanied by his wife Mary Lee McIntyre, and their three children, who at the time ranged in age from 11 months to five years of age.  See id.  The McIntyre family left India in 1971, and thereafter went to Islamabad, Pakistan.  See id. at 12.  Mr. McIntyre had added responsibilities in Pakistan: in addition to the Food for Peace program, he did family planning on what was then the largest development project that AID had ever had.  See id. at 13.

The McIntyre family moved back to the United States in 1977.  Id. at 14.  William McIntyre did not come back to a particular AID position; rather, he was "put on complement" for six months, and thereafter assigned to AID's legislative office, where, according to Mary Lee McIntyre, "he got to work not only for high-ranking AID officers in the agency, but also to work with congressional staffers, committee staffers as well as individual, senatorial as well as representatives' individual staffs, and it was quite an exciting assignment for him.  He really loved it."  Id. at 17.

In the fall of 1980, William McIntyre learned that his next posting would be in Beirut. Mrs. McIntyre testified that when he learned of this, her husband "was thrilled because he was going to run the mission," and he "relished the responsibility of directing a whole program."  Id. at 18-19.  While the entire McIntyre family had accompanied William McIntyre on his previous overseas postings, Beirut was considered too dangerous, so that while his wife Mary Lee McIntyre made arrangements to join him in Beirut, the McIntyre children were enrolled in

schools in the United States.  See id. at 19.  William McIntyre left for Beirut in March 1981,

with Mary Lee McIntyre arriving in September.  See id. at 19, 21.  From March through

September, William McIntyre would write and call his family frequently.  Id. at 20.

Mr. McIntyre's AID responsibilities in Beirut focused primarily on trying to secure as

much humanitarian assistance from as many non-governmental organizations, or NGOs, as

possible.  Id. at 22.  AID also assisted hospitals in caring for those wounded in Beirut's fighting,

with a particular stipend that went directly to AUB Hospital.  See id. at 23.  Overall, Ms.

McIntyre testified, ". . . the best we could do was try to make life livable for the people who just

could not leave.  You know, it was their home, it was their country, and they were just trying to

live day to day."  Id.

On the morning of April 18, 1983, Mary Lee McIntyre woke up and began her normal

routine, which included her "duty" to "sort of stay out of my husband's way so that he could use

the bathroom and shave and all that."  Id. at 27.  On this particular morning, Mrs. McIntyre

testified:

> [A] voice kept coming to me to say good-bye, and I kept saying, well, there's
> plenty of time.  I'll just walk Smokey, and I'll be right back.  So I walked him,
> and came back.  And he [William McIntyre] was always thinking about his job
> and how to do certain things, and the last I saw of him alive, he was on the
> balcony just looking out from the view he had of the sea and the flowers we had
> on our balcony, and that was it.

Id. at 28.  Mr. McIntyre left for work, and was thereafter killed in the Embassy bombing.

2.    Mary Lee McIntyre

Plaintiff Mary Lee McIntyre is the widow of William McIntyre, who was killed in the

Embassy bombing, and she was herself injured in the attack.  See id. at 3-4; Exh. 54.  She is the

mother of Plaintiffs Margaret (McIntyre) Matteucci, Andrew McIntyre, and Julie McIntyre.  See

Exh. 54.  Mrs. McIntyre, who is retired, currently resides in Virginia, and is a United States

citizen.  See Tr. Vol. VI at 3-4.

Mrs. McIntyre, who was born in Paoli, Pennsylvania, received a Bachelors Degree in

History from Washington College in 1954, and a Masters Degree in Political Science and

International Relations from the Johns Hopkins University School of Advanced International

Studies in 1959.  See id. at 4-5.  In the 1960's, she began work towards a Ph.D. in American

Studies but had to drop her studies because she was teaching, had two children and became

pregnant with her third.  Id. at 5.

Mrs. McIntyre met William McIntyre in 1957, and the couple married in 1959.  Id. at 8.

After the birth of her first child and continuing through the family's move to India in 1967, Mrs.

McIntyre taught at several institutions, including George Washington University and the D.C.

Teachers' College, on a part-time basis.  See id. at 5.

Mrs. McIntyre and her children accompanied William McIntyre on his overseas postings

in India and Pakistan.  See id. at 10-16.  Initially upon moving to India in 1967, Mrs. McIntyre

did not work.  She eventually joined the lecture staff of the United States Information Service.

See id.  Later during her husband's stay in India, Mrs. McIntyre taught at the American

International School.  Id. at 12.  After the McIntyre family moved to Pakistan in September

1971, Mrs. McIntyre taught for the first year.  She then worked for AID for the next two years as

a "local hire," and taught at the international school in Islamabad for the family's final three

years in the country.  See id. at 13.  She also had responsibilities as a "diplomatic wife,"
testifying that she essentially "ran a small hotel in [her] house."  Id. at 13.

In 1977, the McIntyre family returned to the United States, and settled in McLean,
Virginia.  See Tr. Vol. VI at 15-16.  Mrs. McIntyre worked intermittently during this period of
time.  In the late fall of 1980, the McIntyres learned that William McIntyre had been posted to
Beirut.  Id. at 18.  Mary Lee McIntyre knew very little about Beirut at this time, testifying, "[a]ll
I knew was that the Middle East was a hot spot, and I knew there was a civil war going on in
Lebanon.  And I was scared."  Id.  She privately expressed these concerns to her husband,
recalling that she asked him "what in the world are you doing?  And why are you going?  And
his reply was, it's a chance to help, and he relished the responsibility of directing a whole
program."  Id. at 18-19.

Mrs. McIntyre joined in husband in Beirut in September 1981.  Id. at 21.  When she
arrived in Beirut, Mrs. McIntyre resumed her teaching career.  Id. at 23.  She ultimately took
teaching posts at the American University of Beirut, al-Maqasa (also a school), and Hagassian,
an Armenian college.  See id. at 23-24.  In several of these instances, Mrs. McIntyre taught
because other faculty members were too afraid of the situation in Beirut to remain in the city.
See id.

Mrs. McIntyre drove over to the Embassy on April 18, 1983.  Id. at 28-29.  When she
arrived, it was close to 1:00 in the afternoon.  See id. at 29.  She greeted the Marines and went up
to her husband's office.  Mrs. McIntyre went into the ladies' room when, as she testified:

> [A]ll of a sudden, I saw a flash that was so brilliant; and it was tinged in lavender
> and then yellow, and I turned and I thought, what was that?  And I was concerned
> because I don't recall if I ever heard the roar, but I saw the window just
> disintegrate and the glass, in sort of slow motion, start to come for me.
>
> I saw screws spin out and a whole window frame start to come for me, and I

raised my arm and glass hit it here.  I had stuff embedded here and in my shoulder; and it just came at me, and I didn't know what it was.

And I just knew I was taking a lot of stuff in my face and it, you know, tore across my -- I never felt anything, no pain, nothing, but just tore across my neck.  And I suddenly was blinded in one eye; and I started to scream, and I ran for the door.  I unlocked it and got the handle open; and I pushed it open, and I was screaming the entire time.

And I -- because I thought it was just my window that had exploded.  I didn't know what else it could be because I had heard about a week or so before that the bathroom glass had had wire mesh in it, and it had taken an electric charge and it exploded.  And I thought that's what had happened, and I wanted to rush out and report that.

But then when I saw -- I could barely see, but I was crunching on plaster that had fallen, and I looked to my right.  The secretary that had told me there was no mail was on the floor, and her Lebanese companion was also on the floor.  And here were the draperies billowing in and everywhere -- and then I looked -- one of the drivers, I heard a voice say, "Silva, stop screaming;" and that was the secretary who was on the floor, and I realized I had been screaming.  So many thoughts came all at once.  You know, panic is not working here, and I've just got to pray.

Id. at 30-31.  At that point, Mrs. McIntyre made her way to a stairwell, recalling that "I looked down, and every time I looked down, I was just getting bloodier.  My clothes were just getting sopped in it.  I just held on, and I said, God is, God is.  I just felt I had to reach out to something that was bigger than I was, and I remembered a line from my hymn that we used to sing 'not what I am, Lord, but what thou art.'  And I said that.  And then another line came to me: 'I have nothing but love to meet and nothing but love to meet it with.'"  Id. at 31.  Two Embassy drivers saw Mrs. McIntyre, and one of them carried her downstairs.  See id. at 31-32.  At a lower level in the Embassy, there was a chasm that Mrs. McIntyre was carried over.  Once on the other side, she saw Ambassador Robert Dillon, whom she hugged, and then asked whether he had seen William McIntyre.  As Mrs. McIntyre testified, "[a]nd I backed away, and he looked at me straight in the eye and said, no, I haven't.  And then I apologized for having -- I said oh, I'm so sorry, because I had bled all over him, and he had these splotches on his clothes.  And I thought,

geez, what a mess." Id. at 33.  Mrs. McIntyre climbed down a ladder out of the Embassy and, accompanied by Tish Butler, the wife of the AID director, got into an ambulance and was taken to AUB Hospital.  See id.

Once she arrived at AUB Hospital, Mrs. McIntyre was placed on the floor, where one physician came over to her and said "madam, you're not seriously hurt."  Id. at 34.  After that, Mrs. McIntyre, "recalled everything I'd ever learned in Sunday school and everything I ever memorized from Psalms or Romans or whatever, and I tried to make sure that, even though we'd been through hell, that God would be there for us."  Id.  Her clothes were cut off, though Mrs. McIntyre tried to dissuade doctors from cutting off her skirt, as it was one of her better ones, and she was wheeled into the operating room.  See id. at 34-35.  She was told to count backwards from 100 -- she "didn't make it to 95" before she lost consciousness.  Id. at 36.

As Mrs. McIntyre next recalled:

While on the operating table, I roused briefly to realize that I was not breathing, and my heart was not beating.  I didn't hear that thud in my ears, and I thought, oh, I wonder what this is.  And then it was as if a trap door opened, and I just went in it.  I just sank, and everything was darkness.

I saw all of my life pass before my eyes, from the present all the way back to the Stone Age.  It encompassed world history as well, and it was all in color.  I have no idea how long that took.  Later, someone biblical I saw with a headdress, a full beard, and garments down to his knees.  I didn't see beyond that.

And he was looking at me about as close as this young man; and he looked at me obliquely, and he had a very determined look on his face.  And yet it was full of compassion and authority, and it was as if he was willing me to do something.  And blessed if I knew what it was.  I just -- I thought, my gosh, is he looking at me?  And then he turned and looked at me full face, as if still willing me to do something, and I didn't know what it was.

And I thought because I had been praying so very hard, I hope it's not presumptuous to say that I thought it was either Jesus or Paul, because they both had that energized forceful appearance. . . .

That image faded, and then another one came that was a little bit more distant  . . .

> And it was just the bust of somebody wearing brown homespun like a monk, with a hood on.  And he had brown eyes and a beard, and he had the most beatific smile; and he smiled at me as if to say, everything's going to be all right.  And then he was gone.

> I saw the yin and yang symbol.  I also saw a pulse beat.  I also saw, as in some people who are near death, being in a tunnel and going toward light, and I was bodiless.  I was  becoming light, and I remember being fully conscious thinking, so -- an expanded consciousness, and thinking, so this is what it's all about.  But I never made it.  I never got that far.  How long all this took, I don't know.

Id. at 36-37.  When Mrs. McIntyre woke up she was on a respirator; as she recalled, she "would hear the machine click, and I would exhale; and then suddenly it would be back at me, and I would have to go -- and then it would click, and I would exhale.  And then I lapsed into unconsciousness again."  Id. at 38.  Upon being removed from the respirator, she was wheeled into a room in the maternity ward, because there was no room anywhere else in the hospital.  She awoke to find that "my head was wrapped.  I sustained injuries to my ear.  This eye was totally covered.  There was a space for my nose and my moth, one eye, and this ear; and my neck was swaddled and my shoulders, and I was propped up."  Id.

Soon after she had been taken into the room, the doctor who had initially interceded for her after her arrival at AUB Hospital came in.  At this point, as Mrs. McIntyre testified:

> [H]e said, I have news of your husband, and then he said he didn't make it.  And I lost it.  And I said, oh, my God, I never got to say good-bye.  And I said, oh, my poor children.  And I was -- I was in despair.  And he said, do you want to be alone?  And I said, no, not particularly.

Id. at 38; see Exh. 54.  Mrs. McIntyre's students came in with flowers, candy, and "kind words."  Id. at 39.  Later that evening, she was visited by the wife of another AID officer.  See id.  The next morning, Mrs. McIntyre first called her Christian Science practitioner, who gave Mrs. McIntyre news of where her children were, and confirmed that everybody in the United States by that time knew what had happened.  She waited a few hours to call her cousin, Margaret Powell.

Id. at 40.  In the interim, Mrs. McIntyre had "nonstop visitors," both American and Lebanese.

Id. at 40-41.  At one point, after realizing that her left side was bruised from her shoulders all the

way down to her feet, she asked one of her visitors what she looked like, with her visitor

responding "sweetie, you're in living color," as Mrs. McIntyre's bruises "were yellow and

purple and green."  Id. at 41.

On the Friday or so after the Embassy bombing an official delegation, which had arrived

to take the bodies of those killed in the attack back to the United States for the Andrews Air

Force Base ceremony, paid its regards to Mrs. McIntyre.  Members of this delegation included

Ambassador Dillon, Lawrence Eagleburger of the State Department, and the head of AID.  See

id. at 42.  Mrs. McIntyre's cousin Margaret Powell had also arrived with the delegation, and was

to accompany Mrs. McIntyre home.  Id..  While everyone was "very cordial and supportive,"

Mrs. McIntyre recalled that "[o]ne of the things that I had panicked about was that as a single

parent, how in the world was I going to support not only myself but three children in the most

expensive years in their lives?  I tried not to panic about it because the only thing it would bring

is tears and almost inner screaming on my part.  So I just did a Scarlett O'Hara: I will think

about that tomorrow."  Id.  Before he left, the head of AID told Mrs. McIntyre to come by and

see about a job working for AID once she recovered.  Id. at 43.  After a plastic surgeon had

removed the stitches used to reconnect the nerves and blood vessels in Mrs. McIntyre's face, she

was discharged from AUB after approximately a week in the hospital.  See id. at 43-44.

After her release, Mrs. McIntyre was sent back to the apartment she had shared with her

husband to pack their belongings.  As she noted, "I was no longer an official person."  Id. at 44.

While she had wanted to stay to finish the semester teaching, she testified that "I was being told

in increments that I could not return, so I had to go back to the apartment and pack -- at least

designate things: I couldn't do it physically.  Had to get rid of my husband's things."  Id.

Two doctors had previously made arrangements for Mrs. McIntyre to be medivaced to

the U.S. military hospital in Frankfurt, Germany.  Id. at 45.  She arrived in Frankfurt from Beirut

at 11:00 at night, but personnel in Frankfurt were not prepared for her.  See id.  Upon her arrival,

a "young corporal" let her in, and began to grill her about her identification.  Id. at 46.  He finally

let her into the facility, where she was placed in a room with three other women.  While her

condition was monitored, she was given no medication.  See id.  After these experiences, Mrs.

McIntyre recalled, "what I really wanted was just to get out of there, and so we finally leaned on

a few folks to get us out on the next plane, which was the next morning."  Id.

After leaving Frankfurt, Mrs. McIntyre and her cousin Margaret Powell flew into

Andrews Air Force Base.  Id. at 47.  Mrs. McIntyre had called her brother from Germany, and

asked him only to meet the plane, and then take her and Ms. Powell to Union Station in

Washington so that they could get a train to Philadelphia.  See id.  When they arrived at

Andrews, however, in addition to her brother and sister-in-law, Mrs. McIntyre was greeted by

her mother and aunt, her Christian Science practitioner, and her son Andrew McIntyre.  Mrs.

McIntyre was thereafter driven to Philadelphia by her brother, where she recuperated for the next

several months.  See id. at 48

During her period of recuperation, Mrs. McIntyre held a memorial service for her

husband.  See id. at 48-49.  Ultimately, he was laid to rest in Mrs. McIntyre's family plot in

Philadelphia.  Id.

Mrs. McIntyre continued to receive support and counseling from her Christian Science

practitioner.  Id. at 50.  Mrs. McIntyre added that "[a]t that time the State Department did not

offer that.  I think at one point they said, you're okay, aren't you?  I said, yeah, I guess." Id.  She

did not seek grief counseling until "many years" after the Beirut Embassy bombing, at a point

where she felt that she "was coming apart." Id. at 51; see Tr. Vol.II at 68-69 (Dr. Larry Pastor

testifying that late onset or delayed PTSD may not occur for up to 20 years after traumatic

event).

Mrs. McIntyre spent the balance of the summer of 1983 completing paperwork relating to

her husband's death.  See Tr. Vol. VI at 49.  She also had a real estate agent trying to locate a

new residence for her in Northern Virginia.  Id. at 50.  As Mrs. McIntyre testified:

> I had to go to work and I had to start, you know, supporting myself and my
> children.  I was very concerned about that because they had education bills.  They
> had tuition to pay.  My son was going off to his first year of college; my younger
> daughter was finishing up at boarding school.  I thought she should stay there.
> And so this big question, how to pay for it all, and so I just -- I was eager to get to
> work.

Id.  At this point, Mrs. McIntyre became, for the first time, the primary (and sole) wage-earner

for her family.  The job offer that had been made to her by the AID director while she was

recuperating in Beirut remained open, and after receiving her clearance and completing the

necessary background materials and checks, she went to work with AID in late December 1983.

Id.

Mrs. McIntyre worked for AID for the next seventeen years, retiring in January 2000.  Id.

at 51; Exh. 54.  Among her various postings was a three and a half year posting in Bangladesh

that Mrs. McIntyre describes as "a chore." Tr. Vol. VI at 51-52.  She recalled that it "was an

uphill battle just to gain the respect of my colleagues who really didn't think I deserved to be

there, some of them anyway. . . .  Many of them were personally very supportive; and I was

grateful for that, but there was always that lingering doubt that I was just not good enough." Id.

When asked to describe the lasting impact of the loss of her husband William McIntyre

on her life, Mrs. McIntyre testified:

> Oh, God.  Well, I lost my best friend, my best guide, his wit, his charm, his
> support.  It was devastating.  I felt I'd had the insides knocked out of me, and it
> was so hard to go on.  At times I bemoaned the fact that I survived, because my
> children were at an age where they needed their father.  He was so wise in the
> ways of the world, whereas I was not.
>
> He was sophisticated.  He used to -- he always had answers for everything that
> were workable.  He was so bright, and they needed him more than they needed
> me.  I couldn't match him for what he could earn, and I just quailed at the thought
> that I would let him down.  And I just had to be strong.  I just had to stuff those
> feelings.
>
> It wasn't until many years later that I finally sought grief counseling, because I
> was coming apart.  I felt I had to be strong for my children.  And at one point, one
> of them said, Mom, you never cry.  Don't you feel the loss?  And I said, yes, but I
> can't cry because I would let you down. . . .
>
> It was pretty awful.  There's no tougher job than being a single parent.  None.
> And to be the sole support.
>
> And I just had to keep at it, and I always felt I was struggling to get my footing.
> He would have made light of it with his wit and his charm and his powerful
> intellect and his great charm, his love.

Id. at 51-52.

Mrs. McIntyre was, along with Anne Dammarell, one of the first victims of the 1983

Embassy bombing to consider pursuing a lawsuit.  When asked why she elected to pursue this

course of action, Mrs. McIntyre responded:

> I saw the newspaper.  I was -- I just refreshed my memory.  It was October --
> Sunday, October 22, 2000.  It was on the first page.  And I saw it, and I read the
> entire article because I thought, gee, that might apply to us, all of us.
>
> And it wasn't the award of the money that was so -- that really grabbed my eye.  It
> was the fact that there had been a law passed; and since that was a Sunday, I
> couldn't call anybody, but I hardly slept that night.  And the first thing I did the
> next morning was to call my lawyer to see if he would help me, and he said he
> didn't do that.  And so he referred me to call Congress, call my congressman and
> the committees on Capitol Hill.

I called Anne, who had not seen the article yet.  I called Darrell [sic -- Beryl] Blacka, and I said, I think we have a chance here.  And we sort of went our -- you know, Anne did her thing notifying people, and I called various committees on Capitol Hill to sound out this particular law.  Yes, they knew what I was talking about, and they referred me to subcommittees of the judiciary committee of both the House and the Senate.

And I also called the Treasury office that handles these accounts, and they didn't welcome my phone call, let's say.  But anyway, I did call, and I called one of the lawyers' groups that had won the Flatow case, and Anne called you folks, Crowell & Moring, and spoke with Mr. Newberger.

And then I figured the official Americans would know more about the people involved.  I was just married to it.  I was not considered official, but I really thought this was something we could do.  And I thought it was about time that we be recognized, even though the hostages had a horrible situation, and I don't want to take anything away from Terry Anderson, they lived.  We didn't.

And everybody that remembers anything about Beirut remembers the Marines going up six months later, but they don't recall us.  And I just didn't think that hired killers, assassins, should be paid to kill just Americans, official Americans. I felt often that if the members of Hisballah -- we found out later through Anne's research and others that it was Hisballah -- that if they had just spent 10 minutes in the company of any of the folks in the embassy or with AID or anybody, they wouldn't have done that.  They wouldn't have felt that they had to blow us up.

We felt not that we were blind to what was going on in the Middle East or sometimes the tilt toward Israel and away from the Palestinians; we felt we were reasonable and we could reach common ground.  And that never happened. Instead, they read the worst about us and decided to act and blow us up.  I just felt there's something better we can do here.

And I've actually taken the liberty of talking to my financial advisor, and if there should be an award, I would like to form a foundation to help people in this area, Third World women especially, with their education and getting them launched in the idea that they don't have to depend -- just like Susan B. Anthony said, "Every woman should have a purse of her own."  And I'm a firm feminist, and I believe that, not because I have to, but because I thought of it anyway.  These women could curtail some of the extremes that men can tend to get wrapped up in.  The bombers tend to be men, and they take these public stances from which it is very awkward to back down.  And I just thought, there's got to be a better way, and I would prefer that my husband be honored like that.

Id. at 55-57.

3.     Julie McIntyre

Plaintiff Julie McIntyre is the daughter and oldest child of William and Mary Lee

McIntyre.  Tr. Vol. VI at 59, 64; Exh. 54.  Ms. McIntyre currently resides in New Mexico, and is

a United States citizen.  See Tr. Vol. VI at 59-60.

Ms. McIntyre described her father William McIntyre as:

Very entertaining, very -- probably the smartest person I've ever encountered, one
of them for sure.  Just had a very strong spirit, had kind of leadership qualities.

Very interactive, would draw people out right away, was familiar with all of my
friends, and every day would question me, you know, what did you do?  Who
were you with?  What's going on?  Very in touch, very knowledgeable, just -- I
don't think there was ever a question that I asked that he didn't have an answer
for, some kind of answer. . . .

[A]lways kind of strategizing and finding solutions to problems.  He was
physically pretty fit and energetic; and we were both night people, so we would --
he was a night person.  We would hang out at night, have private times.

Id. at 60-61.

Ms. McIntyre accompanied her parents on her father's posting with AID in India from

1967-1971.  During this period of time, she remarked that her father "worked a lot.  He was kind

of a workaholic."  Id. at 61.  When Ms. McIntyre was nine, her father was posted to Pakistan.  Id.

at 62.  She has particular memories of time spent with her father during the family's six year stay

in the country:

We lived in a beautiful place, right across the street from the foothills of the
Hindu Kush Mountains, and I've always been kind of a nature person; and we
would go out for walks, and my brother and sister and mom would usually stay
home.

But we would go out and explore in the mountains, and we found -- there was a
special grove of trees we would visit that were mango trees, and they had all these
bats.  And I just remember that vividly as a child, and we would carve our initials
in them and visit them every year, at least, and look at our initials.

And other events, he would participate.  We had sports day; and we were all fairly

involved with sports, and he would come and always -- well, he ran in some races, and he just showed great spunk and spirit to do that.  To me, he was such an old guy, you know, running in these races, and it was pretty funny.

And he would help with various homework projects and always had a great idea for, you know, when I couldn't come up with any, he would have good ideas and remained very interactive with my friends.

Id. at 62-63.

In 1977, when Ms. McIntyre was 15, the McIntyre family moved back to the United States.  Id. at 63.  Her father helped her make the transition to life in the United States:  "He was always helpful, yeah.  We would meet in the kitchen and have midnight snacks, especially chocolate.  We had a lot of chocolate, dark chocolate, and we would talk about different problems. . . .  We had -- we were very connected.  We had a very similar approach to life."  Id. at 64.  Once William McIntyre arrived in Beirut, he sent family members tapes, which often reflected sounds from the civil war then raging in the city.  As Ms. McIntyre recalls, "I listened to one, and it was kind of too much for me.  I didn't like it.  So we wrote, and I would call him on the phone and talk."  Id. at 66.

The last time that Ms. McIntyre saw her father was over the Christmas holidays in 1982, and the last time that she spoke with him was in March 1983, as she made it a rule to call Beirut every two months or so.  Id. at 71.  This last phone call in particular stands out for Ms. McIntyre, as "I guess we were one of those families that -- God -- never said I love you.  And it was the first time that I ever said 'love you' to my dad . . . unlike my mom, who didn't get to say good-bye, that was one of the regrets that I didn't have out of all the regrets that I did have.  Everyone should say that."  Id. at 71-72.

On April 18, 1983, Ms. McIntyre was a junior at the University of Virginia.  She had not heard anything about the bombing, as she "kind of reveled in my lack of contact with a lot of

mainstream media." Id. at 72.  Later in the day, she was pulled from class by a dean at UVA,

who indicated that her Aunt "Boog" [Margaret Powell] was on the phone, and needed to talk

with her "about something in Lebanon." Id. at 72-73.  When Ms. McIntyre picked up the phone,

her aunt asked her whether someone was with her, at which point Ms. McIntyre "started to kind

of get that weird feeling like when you know that something is not normal." Id.  Her aunt (who

is in fact her mother's cousin) told her that the U.S. Embassy in Beirut had been bombed, and

that her father had been killed and her mother "significantly injured." Id. at 73-74.  As Ms.

McIntyre testified:

> [I]t's one of those moments that you just never forget what you were doing and
> where you are and that flood of emotions that come in.  And my whole body went
> weak, and I kind of just fell to the floor.  And I was still holding the phone,
> because I was just in shock, I think, and just letting this information kind of
> permeate my being.
>
> And I said, well, you know, are you sure?  And she said yeah.  And I just started -
> - I totally broke down, like I do so easily, and I just started crying.  I cried for
> days.  I just was a crier.  And the dean was really great, and he came up and he
> held me and he said, let me call a friend, and I said no, no, I don't want to bother
> anybody.  Because I didn't even know how to handle it.  It was like my whole
> reality had shattered, and I didn't really know what to do.
>
> And so he said, well, are you going to be okay?  And I said, yeah, I guess.  And so
> I walked out to this bus stop right by the library, and coincidently [sic], one of my
> best friends was there waiting for the bus.  So she held me, and I told her what
> happened and she took me home.  And then I had several friends come -- my
> friends were great.  They just were very comforting and brought me food and just
> came and talked to me.

Id. at 74.  A day or two later, Ms. McIntyre joined the rest of her family in Pennsylvania.  See id.

at 75.

Ms. McIntyre recalled "pieces" of the ceremony at Andrews Air Force Base.  Id.  As she

looked at the caskets she felt:

Empty. . . . I don't know. I just really missed him. I think I tried to connect with his spirit, because I didn't really feel ready for him to be taken away on the physical plane. I wasn't ready for it. So I think I was just trying to connect.

And I don't like pomp and ceremony very much. You know, I don't like any of that stuff. So I wasn't interested in all the dignitaries. I was just interested in honoring my father.

Id. at 76.

When Ms. McIntyre returned to the University of Virginia, the rest of the semester "didn't go that well." Id. at 77. She dropped some classes and got some "incompletes" in others. It ultimately took Ms. McIntyre nine years to finish her college degree. See id. at 81-82.

Ms. McIntyre cannot specifically recall the first time that she saw her mother following the Beirut Embassy bombing, but her first impression was that somebody "might be hurting more than me. I thought she looked good in spite of everything she'd been through, and I was just really happy to see her. It was really connecting." Id. at 78.

The summer of 1983, Ms. McIntyre took a job with the American Political Science Association in Washington, D.C. Id. at 78-79. While she "tried to lead a normal life," looking back she recalls, "I really couldn't do much. I was so preoccupied; and I would just take long walks all the time, and I didn't socialize. . . . It was kind of a heavy thing to happen when you're 20. . . . I kind of hibernated." Id. at 79.

In terms of seeking counseling in connection with the loss of her father, while Ms. McIntyre testified that she likes to solve her own problems, she did seek counseling once. She found, however, that she "had more life experience" than the counselor, and overall "just found it pretty useless, so I never went back." Id. at 80.

Ms. McIntyre testified that she has missed her father's presence at a number of "life" events, such as the births of her two children, and "just celebrating. I think that's really important to celebrate things together, and that's what I wish he could be here for." Id. at 80-81.

When asked how the loss of her father in the Beirut Embassy bombing has affected her life, Ms. McIntyre testified:

> Well, that's a big question. I would say that he was my biggest kind of support system, emotionally and energetically, and I felt like the rug was taken out from under me for a long time. And I didn't realize it, of course until it happened, but -- and I think I floundered a lot academically. I proceeded to get a lot of incompletes that turned to Fs, and I didn't have the energy to complete them. And it took me nine years to finish my undergraduate work, because I always worked on the side with school anyway, which was something my dad taught me to do. When I was 16, he said go get a job, and I always worked in high school and college. But I've missed his advice, you know, when you need that trusted advice from somebody who knows you, and I feel like I would just love to share my life with him. That's all. It's just been just a hole that's never been filled. I mean, I've filled it with a lot of other things in life that are rich and diverse and a great life, full of a lot of love, but there's just -- there's something that nothing else will ever take that place. That's all.

Id. at 81.

Ms. McIntyre indicated that she had "mixed feelings" about the litigation, but in the end elected to participate:

> I'm here because I think it's something that needs to be recognized and honored, and especially the people that were there in the bombing and especially the people that gave their lives. And I feel that most -- probably all the people there were there to do good, and there needs to be more of that on this planet. And I support that, and I think that needs to be honored. So I'm here to honor my father and all the others as well. So that's probably my answer.

Id. at 82-83.

        4.    Andrew McIntyre

Plaintiff Andrew McIntyre is the son and second child of William and Mary Lee McIntyre.  Id. at 83-84; Exh. 54.  Mr. McIntyre currently resides in Seattle, Washington, and is a United States citizen.  See Tr. Vol. VI at 83.

Mr. McIntyre had fond memories of living in India, where William McIntyre was first posted overseas with AID.  As Mr. McIntyre recalled:

> I have all sorts of memories of playing and swimming and doing things like that, being involved in a play my mother was putting on and playing catch with my dad and my father playing softball and being very wrapped up in that.  He was on the TWA team, and that was a big thrill.  And things like that.

Id. at 84.  Mr. McIntyre had similar recollections of his stay, from ages six through twelve, in Islamabad, Pakistan:

> I have a lot of memories, like my sister was saying, of hiking in the hills with my dad and my two sisters.  We would do things like carve our initials in trees and whatnot.  I have a lot of memories of playing games.  He taught me how to play chess, for example, and of course would use more and more effort as I got better and better.  I actually remember, he gave me a set of boxing gloves, and I would box with him, and he of course would just stick out his arm and I would, you know, flail, and thinking he was impervious, trying to hit him very hard at the time.  And he would laugh.  And I remember word games that he would play to basically help -- rhyming games to help us develop our vocabularies and deductive processes, things like that.  A lot of fun board games, things like that.  It was very fun.

Id. at 85.

When the McIntyre family moved back to the United States in 1977, Andrew McIntyre "wasn't that thrilled, quite frankly."  Id. at 85-86.  His father attempted to help him make this transition, with Mr. McIntyre testifying that his father:

> Tried to encourage me to do various activities.  He tried to get me involved with things like little league; and I had done a lot of that, actually, in Pakistan under his guidance, and it was a lot of fun there.  And he helped me actually get involved with starting a business, just a lawn mowing business with a friend.  And we'd do that of course during the summers and earn some money that way.  So he would help in that regard, yeah.

Id. at 86-87.

Mr. McIntyre was fifteen when he learned that his father's next posting would be to Beirut. Id. at 87. He particularly remembers a series of tapes that his father, before being joined by his wife Mary Lee McIntyre, sent back from the city, recalling that "some of them were kind of intense, and you'd hear bombs go off, or whatever they were, cannons go off in the background. And my dad would sort of discreetly -- or just sort of say, geez, I'll catch up with you guys later kind of thing, or turn off the tape and then would resume when the gunfire and bombs had ceased, or subsided anyway." Id. at 88. As his parents transitioned to Beirut, Mr. McIntyre was enrolled in boarding school at Westtown School, outside of Philadelphia. Id. at 89.

The last time that Andrew McIntyre saw his father was over the Christmas holidays in 1982, when his father presented him with a "beautiful watch." Tr. Vol. VI at 91. The last time that he spoke with his father was a couple of weeks before April 18, when he called his parents to tell them that he had been accepted into Swarthmore College. His father was "very pleased." Id. at 91.

On April 18, 1983, Mr. McIntyre turned on the radio as he prepared for a morning meeting, "and there was news all over the radio about the explosion" at the U.S Embassy in Beirut. Id. at 91. He initially thought that the incident was similar to the previous year's grenade attack and thought "[n]o big deal," even after faculty members at Westtown had begun approaching him and asking him about his parents' safety. Id. at 91-92. After he got out of sixth period English class, his advisor was standing across the hall and indicated that Mr. McIntyre needed to call his aunt, Margaret Powell. See id. at 92. After Mr. McIntyre said that he would give his aunt a ring on a nearby pay phone, his advisor suggested that he use the phone in his

apartment instead. See id. At that point, Mr. McIntyre testified, "[n]othing has dawned on me at all. I had no clue." Id. Once he reached his aunt:

> She just said, sweetie, your father was killed this morning. And I just let out some wail, I'm sure. And then I asked how's mom, meaning how's she taking it? And she said, sweetie, she's in critical condition. Which was very confusing, because I didn't know that she was in the embassy itself.
>
> And then that came out. She had told me she was in the embassy, and I think she had been operated on or something and she was alive. And I just said, I gotta go. And she just said, call me later. And I said, whatever. Fine. You know, I gotta go. And my advisor tried to be very consoling and, you know, what can you do. . . .
>
> So I just remember walking, and I walked to my best friend's dorm room. And I just opened up, and he was studying, and I just said, God, they killed my father. And of course, there was nothing he could say. He just said he was sorry.

Id. at 93. Mr. McIntyre thereafter went on a very long walk with his girlfriend. See id. Later that evening, he learned that the headmaster was going to drive him to his aunt's house in Philadelphia. See id. at 93-94. Mr. McIntyre was the first family member to arrive at his aunt's house, testifying "I'm sure that must have been just freaking awful for her." Id. at 94. He later got a call from one of his best friends in McLean, who "was just so cool and wonderful. And I just remember being really grateful for having friends like that." Id. Mr. McIntyre then spent "the next couple of days in a daze." Id.

After having briefly returned to Westtown, Mr. McIntyre rejoined his family, and together they drove to Washington for the Andrews Air Force Base service. Id. at 95. Roughly two weeks after the Andrews Air Force Base service, Mr. McIntyre drove back down to Andrews to meet his mother, who was just returning from Beirut. Id. at 96. As he describes seeing his mother for the first time following the attack:

> [T]hat was pretty incredible, just pretty wrenching. . . . And I saw her, and she was basically holding my aunt and limping down the aisle. I don't remember if I

> lost it or not, but it was incredible seeing her. And I remember hugging her really
> hard, when she did finally get into the reception area, and she winced because, of
> course, I hadn't realized that she had all these bandages and wounds and
> everything else on her entire left side of her body. And they were hidden. All I
> could see was the stuff on her face.

Id. at 96-97.

After seeing his mother, Mr. McIntyre returned to Westtown, where, he testified,

"basically I just wanted to sleep a lot. You know, you want the world to stop, and it doesn't."

Id. at 97. Mr. McIntyre had made the varsity baseball team for the first time, but simply did not

"want to do it. I want[ed] to sleep." Id. He also turned to various substances to help him deal

with his emotional pain, testifying:

> Unfortunately, I had been experimenting obviously with a lot of substances and
> whatnot, and just went through the roof, unfortunately. I drank a lot and did
> basically any substance I could find to escape and to get out of reality. I mean,
> you know, reality was blowing up my parents, so it seemed to be a pretty good
> thing to avoid, escape. So I did that for, unfortunately, a long time on and off.

Id.

Mr. McIntyre had hoped to spend the summer of 1983, following graduation from

Westtown, with a friend doing painting, but his mother Mary Lee McIntyre requested that he

come home and spend the summer with her and his sister Margaret. Id. at 98. Mr. McIntyre

"barely even remember[s] much about" the summer, other than the fact that he "was doing acid,

LSD, whatever. Anything I could find, frankly, just to get away." Id.

Mr. McIntyre had seen a counselor "off and on" at Westtown, but "didn't like him and

didn't see him at all during the summer or anything like that." Id. at 99. Once he enrolled in

Swarthmore the next fall, he testified that he did "seek someone out, mainly because I

recognized things were getting completely out of control. I was drinking probably a six pack

every night." Id. at 99. While Mr. McIntyre "squeaked" by his first semester at Swarthmore, he

was, by the spring semester, able "to pull off decent enough grades to ultimately transfer to

Harvard." Id. Mr. McIntyre missed his father's presence through his college years, stating:

> I missed the discussions that I would have had with him, I mean, he was an
> intellectual, and I was, you know, experiencing the honeymoon that anybody does
> when they first really get exposed to a lot of the great thinkers, historically. . . .
> And it would have been great to have discussions about that kind of thing. We
> were both debaters and argumentative and just to sort of have fun, you know,
> sparring matches around issues like that just would have been very neat.

Id. at 100. Mr. McIntyre graduated from Harvard in 1988. See id. at 99.

Overall, Mr. McIntyre feels that the 1983 Beirut Embassy bombing:

> [H]ad a cohesive effect, actually, in some respects. I mean, you know, it just
> draws you together. In some respects, that's a good thing. We've grown a lot
> closer and learned to say the things that matter. We tell each other we love each
> other. But you know, we all remember functioning as a five-person unit and miss
> that. But you know, you grow, and we've been okay.

Id. 101.

When asked why he elected to participate in this lawsuit, Mr. McIntyre responded:

> [W]hen I heard about it from my mother, actually, whenever it was, a couple
> years ago, it just seemed like, boy, a very useful way to provide a disincentive for
> what happened. I mean, of all people to target, first off -- or all people who were
> collateral damage, perhaps, if they were going after the ambassador, perhaps, I
> don't even know. But I mean, you had people engaged wholeheartedly with
> financial backing in the restructuring and construction of their own country. And
> for a foreign -- a third party to sit there and sponsor this because they have some
> sort of political grievance, yeah, I'd like to participate in providing a massive
> disincentive for that. So yeah, if it costs them, so be it. It should.

Id. at 101-02.

### 5. Margaret (McIntyre) Matteucci

Plaintiff Margaret Matteucci is the daughter and youngest child of William and Mary Lee

McIntyre. See Tr. Vol. VI at 102-03; Exh. 54. Ms. Matteucci currently resides in New Mexico,

and is a United States citizen. See Tr. Vol. VI at 103.

As a child, Ms. Matteucci traveled with her family to her father's postings with AID in India and Pakistan. Id. at 103-04. During this period of time, Ms. Matteucci testified that her father "had two passions, and it was work and family. And I just remember doing a lot of stuff together as a family." Id. at 105. While the family resided in Pakistan, Ms. Matteucci remembers going on family hikes in the Margala Hills (the foothills of the Himalayas), and that her father "had this red Swiss Army knife, and he would carve our initials in this grove of mango trees; and we'd come back year after year and try to find the previous ones that we put our initials in." Id. at 105. She also described her father as a "workaholic," noting that "he would go into the office almost every Saturday, and I would go in with him and occupy myself doing what, I don't know, but I just thought it was a big adventure to go in with him." Id. Ms. Matteucci recalls playing in her father's office:

> My father was a population officer in Islamabad, and he had condoms all over his office. I had no idea what they were. And I remember playing with them and asking him, what are these? And he was trying to explain in a genteel way that these were things to help ladies not have babies of something like that, to help with the population and to help people try and plan their families. And that's -- you know, I tried to visualize how this little thing would do that, but we're not going there.

Id. at 105-06.

The McIntyre family's departure from Pakistan in 1977 marked, for Ms. Matteuci, "one of the two times I've seen my father cry, we were all sobbing on this van leaving Pakistan on the way to the airport." Id. at 106. Once the family returned to the United States, the McIntyres continued their family routines:

> We had this routine before, but we'd always eat dinner together. We did that in India and Pakistan, and that continued in Virginia. And my dad was really good at kind of taking a pulse of where we were, you know. He'd ask, Margy, what did you learn today? And how was your day? And he kind of, you know, would do that with Andy and Julie, too.

> We also watched the news together every single night as a family, and you know, if we had questions about something that was on the news, we'd talk about it. But the dinner hour or hours, that was something that was rarely -- we very rarely did not eat together and spend that time together.

Id. at 107.

Ms. Matteucci was a junior high school student when she learned that her father had been posted to Beirut. Id. In September of 1981, as her mother prepared to join her father, who had departed earlier, Ms. Matteucci was enrolled in Principia Upper School in St. Louis, Missouri. Id. at 108. The last time that Ms. Matteucci spoke with her father was over Christmas 1982, but she wrote to her parents after that time. Id. at 111. As she testified:

> I too remember one of the last letters that I wrote my parents. . . . We weren't a very touchy-feely emotive family; and one of the last letters I wrote, I told my parents that I loved them, and I'm just so grateful that I did. So I don't specifically remember the content of the last letter. I do remember in one of the last letters that I did say that, not just love Margy, but I love you guys, you know, that kind of thing.

Id. at 111-12.

Ms. Matteucci remembers April 18, 1983 as starting as a "great morning," as she and a group of friends "kidnaped" Ms. Matteucci's roommate for a birthday breakfast at Denny's. Id. at 112. When the group arrived back on campus, Ms. Matteucci's house mother let everyone else go, and then told Ms. Matteucci that there had been a bombing at the Embassy in Beirut. Ms. Matteucci proceeded to watch news coverage of the bombing on television. See id. Ms. Matteucci was initially relieved at the news accounts, as "one [of] the things they kept saying were no senior officials had been killed; and I knew that my father was a senior official, and so I was just like, whew. Got out of that one. And I had no reason to believe my mom was in the embassy, so I went on with my day." Id. at 112-13. Later in the day, Ms. Matteucci was pulled

out of U.S. History class -- she does not recall by whom -- and told that her mother was injured but alive. Id. at 113. This took Ms. Matteucci by surprise, as she had not known that her mother was even at the Embassy. With respect to her father, she still, in her mind, "had the assurance from the media that there was no senior officials killed," so she again went back to class. Id.

Later that day, Ms. Matteucci was called out of fifth period choir class by the school receptionist. When Ms. Matteucci saw the receptionist, "her body energy and her body language was just, you know, just made me think something was up, and she said, you need to call your aunt. You need to go back to the dorm and call your aunt." Id. at 113-14. When Ms. Matteucci asked the receptionist what was going on, ". . . she just kept saying, call your aunt. And it just made the hair on the back of my neck stand up. She wouldn't look at me, she was very agitated, very nervous, and I knew something was terribly wrong." Id. at 114.

When Ms. Matteucci got back to the dorm, the dean of girls, Ms. Wilk, was waiting for her. She went to the dean's apartment, ". . . and we called my Aunt Margaret, Auntie Boog, and she asked me if I was alone, and I said no, Mrs. Wilk is here. And then she said, Margy, I need to let you know that your father was killed this morning. I think my first question -- I think I probably just crumpled, and then I asked, how are Julie and Andy and how's Mom?" Id. After Ms. Matteucci had received this news, Ms. Wilk kept her in isolation for about two hours, and had Ms. Matteucci call a Christian Science practitioner. Soon thereafter, as Ms. Matteucci recalled, "this person I've never met before came and was trying to console me with, you know, passages from the Bible and Science and Health, and I was inconsolable. I was sitting on the couch just sobbing with my head in my hands, and all I wanted to do was see my friend, Ruth." Id. at 114-15. After approximately two hours, Ms. Matteucci was allowed to leave. As she was doing so, she walked into a room "full of people, the dean of boys and one of the trustees of the

school, and there's just all these dignitary-type people you never see, were waiting for me, consoled me." Id.  These people included her friend Ruth, who had waited two hours to see her. Id.  Ms. Wilk made travel arrangements for Ms. Matteucci to join her family in Pennsylvania.

When Ms. Matteucci arrived in Pennsylvania, the first person she saw was her brother Andrew McIntyre, at which point "it just totally hit me.  I think it was finally someone who understood just how horrible that day had been, and I just remember -- just embracing him and holding him for a long time, and he was crying and I was crying." Id. at 116.  Ms. Matteucci subsequently attended the Andrews Air Force Base ceremony with her family.  During the ceremony itself, Ms. Matteucci, her brother and sister were seated near the press bleachers.  Ms. Matteucci recalled, ". . . I remember being really annoyed, because during the Lord's Prayer, they were clocking their cameras in our faces, and it was just a really private, sad moment of getting their photo op." Id. at 118.  She further remembers, ". . . I was mad.  I was mad at Reagan.  I was mad that this had happened.  And so, you know, I did the protocol, and I shook his hand.  And we were all -- stepped up to the plate and we were gracious, but I was mad.  I was mad at him." Id.  Like many others who attended the Andrews Air Force Base ceremony, Ms. Matteucci was struck by the flag-draped coffins of those killed in the Beirut Embassy attack, including her father, recalling:

> I remember wondering which one he [William McIntyre] was in and wondering what he looked like.  But it also just felt like totally unreal, totally surreal, like a third-person, out-of-body type experience, like you're watching the whole thing happen.  Like that can't be my dad; that's a flag-draped coffin.  I don't have whole lot of conscious memories of exactly what I was thinking, feeling.

Id.

After the Andrews Air Force Base service, Ms. Matteucci went back to school to participate in a choir concert, and overall "was ready to just continue burying stuff.  I just didn't

want to feel anything. It's too hard." Id. at 119. When she returned to Principia, Ms.

Matteucci's immediate friends were very supportive. There had, however, in her absence been

an all-school assembly "so everybody knew everything. So there was no anonymity coming

back. Everybody knew everything." Id. In addition, she felt that she had no real guidance in

dealing with her grief:

> I had never really seen a Christian Scientist grieve, and so I assumed the position
> of, I'm done. I've grieved. Even like weeks later, I actually even stood up in
> church and gave a testimony that I had been healed of grief. I was that convinced
> that -- I guess we had immense respect for my father, and I don't think I was
> doing it out of disrespect; I just honestly -- I think my psyche couldn't go there,
> and I really wanted to believe that.

Id. at 119-20.

The first time that Ms. Matteucci saw her mother Mary Lee McIntyre following the

Beirut Embassy bombing was in late May, when Mrs. McIntyre visited her at Principia. Ms.

Matteucci was struck by her mother's appearance, testifying,

> I just remember seeing her and I thought she looked -- she looked like she was
> older, and I was really shocked to see her scars on her face. And she had a patch
> on her eye covered with really dark glasses. In decent spirits, all things
> considered, but it was just a sight. I was pretty shocked by what I saw and pretty
> saddened by what I saw.

Id. at 120. While Ms. Matteucci and her mother were at the airport, Mrs. McIntyre began to

recount her recollections of April 18. Ms. Matteucci "remember[s] sobbing in the waiting area

and just begging her to stop. It was too much -- way too much for me to hear." Id. at 121.

The summer of 1983, Ms. Matteucci was slated to work as a camp counselor in Lebanon,

Missouri. Id. She felt so guilty about her mother spending the summer alone that she went

home, and spent the summer with her mother. During this time, she began to find people who

cried "very threatening." Id. at 126. She recalls her sister Julie crying that summer, and

testified, "I would hear her crying, and I wouldn't do anything to comfort her because it was -- you know, I think I didn't have a whole lot of patience for it.  I was like, hello.  Have a healing like me.  You know, this is how it's done.  I didn't have a lot of compassion for it."  Id.  She also remembers when her mother received sea and air freight containing family belongings from Beirut, and leaving the room as her mother began crying.  As she now recalls, "I think I knew on some level that if and when the dam broke, it was going to be big.  And so I just avoided feeling."  Id.  Ms. Matteucci returned to Principia in the fall.  She graduated from Principia Upper School in 1984, and Principia College in 1988.  See id. at 125.

In late 1991, Ms. Matteucci received a call from her mother indicating that she was not doing very well, and had missed work because her eye, injured in the Beirut bombing, was bothering her.  Id. at 122.  Concerned because her "mom never misses work," and by her mother's revelation that a nurse had been coming and helping her in the evenings, Ms. Matteucci arranged to go home.  Id.  As she testified:

> When I got there, I was really shocked at the -- at what I saw.  And my mom's eye that had been injured in the explosion was extremely painful.  I don't know if it was scar tissue or if it was ever medically diagnosed . . . .
>
> But it was just extremely painful, and I just remember her -- there were times when I'd be in bed or something and I would hear screaming, like blood-curdling screaming.  And I would go into her room and she's holding her head in her hands and just rocking and screaming.  And she was just in so much pain.
>
> And a couple of times I tried to say the Lord's Payer louder than she was screaming to, you know, try and calm her down, and that didn't seem to work; and so I just reasoned that, you know, God would hear my prayer whether it was silent or audible.  So I would sit next to her and pray for her comfort and so for -- so she wasn't in so much pain.
>
> And I stayed -- and I read to her a lot, and did her meals and did her bills.  I don't know how long it was, maybe three or four weeks, but by the time I left, she was -- she could see out of that eye and she was driving, and so I felt like I could leave.

Id. at 122-23.  Ms. Matteucci similarly helped her mother in 1996, when Mary Lee McIntyre

indicated that she was again having trouble with her eye.  See id. at 124.  As Ms. Matteucci

testified:

> Again, she was in excruciating pain.  I think it was the other eye this time.  And I
> was -- we were there, gosh, maybe six weeks or something? A long time.  A long
> time before she could, you know, function on her own and drive and that kind of
> thing, and all this time she's working with a practitioner and slowly being able to
> see a little bit better.
>
> The condition she was in both times was pretty alarming.  She was in a lot of
> pain, and she was -- it was just really hard to see someone you love in that much
> pain.  It's really hard.

Id. at 124-25.

California's North Ridge earthquake in early 1994, which destroyed Ms. Matteucci's

home, triggered a sort of emotional release for Ms. Matteucci and, in her words, "just knocked

me off my rocker . . . I felt totally out of control of the situation.  I felt -- I started to feel, and that

was a scary thing."  Id. at 126.  After moving in and talking with a friend from boarding school

and college who had experienced similar family loss, Ms. Matteucci began a grieving and

healing process:

> And I think I just avoided it because grief takes a lot of courage, and grief is
> messy.  And I didn't want  it to be messy.  And so I did -- I kind of resisted it until
> I couldn't resist it anymore; and I think the earthquake had rattled me. . . .
>
> Later on, that -- the whole year was process for me, . . . it was actually January. . .
> .  I remember writing my mom a letter; and it was in late January, and the dam did
> break one night.  I don't know what set me off.
>
> But I was up all night long and went through several rolls of toilet paper and just
> cried.  Just finally released.  So it was about 12 years later, and I wrote my mom a
> letter.  And I told her I had not had a healing in Christian Science, and I was
> beginning to look at it honestly.  And I remember making it through that.
>
> April 18 came, and I finally, you know, I didn't do any major memorializing . . . I
> guess I thought I only had that day to grieve.  So I just felt like in previous years,
> but I had been grieving all of '94, really.

So on that day, on that particular day, April 18th of '95, I just felt really raw, but it was a good thing. But it was just a really hard day. And the next day was the Oklahoma City bombing, and that just knocked me off my butt. Just really -- I had just made it through a really difficult day, and then just seeing the images and seeing the panic on people's faces and the terror in people's eyes. I thought that must have been what everybody who's testified and who was in the bombing, that must have been what they went through, and I just felt just such -- I felt.

And it was messy, but it was good. And I remember that evening going to church, and the readings were -- I don't even remember what they were on, but the testimonies were just really hard to hear. They were just, you know, isn't God wonderful and good, and I just got up and I just stormed out.

And an usher followed me, and a good friend of mine, and said, are you okay? And I just started yelling. And I was like, people's lives are shattered today! These people's lives are never going to be the same, and we're here, people are standing up and testifying about how good God is. And God is good, but at that moment I just felt it was a platitude that was just really -- it just pissed me off. I couldn't go back into the service, I was so angry.

Id. at 127-29. Ms. Matteucci eventually sought counseling, when she started graduate school to

get a Master's Degree in counseling, feeling that if she was going to be a therapist, she needed to

"wear the other hat." Id. at 129-30. Indeed, Ms. Matteucci feels that the loss of her father has

had a "huge" impact on her career choice, as she saw "through [her] own healing and [her] own

process how valuable and how it just makes you a more honest person, to feel." Id. at 130.

Overall, Ms. Matteucci testified that the loss of William McIntyre in the Beirut Embassy

bombing drew the remaining McIntyre family members closer together. Id. at 132. As she

observed, "I think we all realized that this life is temporal, and we have to make the best of what

we have now. We have to live in the present. We have to say the important things. . . . We tell

each other we love each other." Id.

When asked why she elected to participate in the litigation, Ms. Matteucci responded:

To be given a voice, so that people could know what amazing people and what -- I mean, specifically my father of course, but these are people whose life mission it is to serve and to do good for mankind and to do good for our world. And you know, my sister used the term, these people gave their lives. They didn't give

their lives.  Their lives were taken.  They would have continued to give of their sweat, blood, and tears to make this world better, but they were taken.  And I don't have revengeful thoughts, I've never been a revengeful person, but I think it's the principle of the matter that people need to be held responsible for their actions.  Also, other people have also said this, too, but this bombing was the first bombing, and it's largely been forgotten.  I mean, when CNN, when they talk about bombings, they generally start with the Marine barracks bombing.  And I know that families were horribly torn apart by that, and I have complete compassion for them, but it started earlier that year.

Id. at 133.

### K.    Expert Larry Pastor

In addition to the testimony of victims and their family members, plaintiffs also presented the Court with the expert testimony of Dr. Larry Pastor, MD.  Dr. Pastor testified regarding the types of emotional distress commonly suffered by individuals such as survivors of the 1983 Beirut Embassy bombing, as well as the family members of those killed in the attack.  See generally Tr. Vol. II at 43-76.

Dr. Pastor's testimony focused primarily on Post-Traumatic Stress Syndrome ("PTSD"), which he described as:

> . . . a characteristic set of signs and symptoms that may follow in the aftermath of traumatic event.  Traumatic event is defined by the American Psychiatric Association as an event that is capable of producing death, the threat of death, serious injury, and involves the victim confronting those threats or witnessing death or serious injury to another person.
>
> The victim responds with intense fear, horror, or grief, and if the symptoms do not resolve after a specified period of time but the person develops certain patterns, thinking, reacting, the diagnosis of PTSD is made.  In making a diagnosis, the psychiatrist looks for a response a qualifying stressor event, three clusters of symptoms.
>
> The first cluster are reexperiencing or intrusive symptoms: anxiety, fear, or intense emotion associated with places, factors, features, that remind one of the event itself.

136

The second cluster is almost a reaction to the fear of reexperiencing, and that's numbing or avoidance.  The person tries to avoid these situations or emotions that may lead to recollections.

The third set of symptoms is a physical set of symptoms.   It's called hyperarousal or autonomic nervous system overactivity: exaggerated startle response, constant anxiety, being on edge, hypervigilance, scanning the environment, and so forth.

A person has to have these symptoms to the extent they impair major life areas, such as work or relationships or inner sense of well-being, peace of mind.

Id. at 50-51.

According to Dr. Pastor, in the immediate aftermath of a traumatic or "stressor" event, the affected person generally experiences a sense of shock and a feeling of being overwhelmed; followed by a brief "honeymoon" phase (in which a person "feels tremendous relief as to what could have happened but didn't"), a period of disillusionment, and then finally a phase of active symptoms, with a "sawtooth" recovery.  Id. at 51-52, 71.  The "recovery" period can last weeks, months, or years, and may be marked by the occurrence of "triggering events" that can either "precipitate" a relapse of symptoms, or trigger symptoms for the first time.  Id. at 52.

In terms of the experience of victims of PTSD and related disorders, Dr. Pastor identified ten symptom areas, or clusters, involved in the aftermath of trauma:

(1)     Nervousness, fearfulness, and being easily startled:  Any reminder of the incident can increase anxiety and remembrance of the event.  Id. at 53;

(2)     Preoccupation with trauma:  The affected person relives the underlying event and cannot otherwise get the event out of their mind.  For example, a person who was in a building that was destroyed is likely, when walking into a building, to have concerns about the building's structural integrity, and to consider possible escape routes, etc.  See id.;

(3)     An altered sense of self, and a foreshortened future:  One's sense of self usually does not include the experience of being a victim; once this occurs, a

137

person is likely to feel "a sense of inefficacy about controlling their fate," and may feel guilty about having survived when others did not.  Id.;

(4)     Depression and psychic pain.  See id.;

(5)     Avoidance and phobias:  victims attempt to avoid anything that will remind them of the underlying event, as "[t]o remember the event is to reexperience the event.  To reexperience the event is to be retraumatized and to live through it again."  Id.  at 54.  This cluster also encompasses flashbacks, or when certain sounds, smells, or other cues cause a person to "suddenly reexperience" the event.  Id.;

(6)     Problems with emotional isolation and failed relationships: Affected persons "restrict their lives to avoid coming into contact with reminders of the trauma, and it's so restricting, they get a fear of any kind of arousal."  Id.;

(7)     Sleeplessness, fatigue, and nightmares: Nearly all affected persons have nightmares of their experiences, and can subsequently develop a fear of sleep, as sleep may precipitate a nightmare.  This lack of sleep, in turn, may lead to fatigue. See id. at 54-55;

(8)     Pain and physical discomfort:  Affected persons may exhibit muscle tension, physical pain, and disrupted sleep patterns.  Emotional factors may stimulate this physical pain, with chronic physical pain being one of the most common complications of PTSD.  Id. at 55;

(9)     Deterioration of performance in major life areas:  Affected persons "deploy their emotional resources to control their anxiety," leaving little for use elsewhere and impacting their skills in the workplace, and in personal relationships.  Id.;

(10)     Personality change: Affected persons "come across as withdrawn," and may be seen by others as either inflexible or as passive and helpless, particularly if they have been repeatedly traumatized.  Id. at 55-56.

See also, id. at 73 (underscoring that these 10 "survivor themes" may occur in victims of trauma with disabilities other than diagnosable PTSD).

Individuals impacted by events such as the 1983 Beirut Embassy bombing might also experience what is referred to as "survivor's guilt," which Dr. Pastor described as follows:

Usually, there's a variety of factors that are really beyond any one person's control as to who becomes a victim and who doesn't, who survives unscathed or

> who shouldn't have been there but was, or who should have been there but wasn't.
>
> And these questions have just deep implications, and they may sound academic if you've never been through a disaster or trauma, but they have meanings about, do I deserve to live?  What shall I do with my life?  What was the purpose of all this?  What's the purpose of anything?  Is it all random?  Do I have control over my fate?
>
> And these become very pertinent psychological questions, and they affect a person's mood, behavior, choices in life.  So survivor's guilt is a very common theme.

Id. at 69-70.  Despite the name, "[s]urvivor's guilt is one theme that certainly applies to family members as well as professional colleagues."  Id. at 75.

With respect to the family members of those killed, symptoms of PTSD might manifest themselves as part of a syndrome referred to as traumatic grief, or complicated grief, which pertains to the "aftermath of losing someone unexpectedly or under certain traumatic circumstances."  Id. at 60.  Indeed, Dr. Pastor noted that while the resulting PTSD might not be as intense as that of a person directly involved in a trauma itself, the most common cause of PTSD is the sudden death or traumatic injury of a family member.  See id. at 60-61.

Dr. Pastor further testified that in his expert opinion, victims and relatives of victims of events such as the 1983 Beirut Embassy bombing are affected by the continuing ongoing violence in the Middle East generally, and Lebanon specifically.  Id. at 63-64.  They are likewise affected by terrorist events such as the 1995 Oklahoma City bombing and the events of September 11, 2001.  See id. at 64-65.  These events serve as reminders that may "precipitate reexperiencing" the trauma of the Embassy bombing, and may bring back various symptoms, including those associated with PTSD.  Id.

The Court finds that Dr. Pastor's testimony provides a useful context for understanding the degree and the type of emotional injuries suffered by plaintiffs in this matter.  Although the

Court was not presented with evidence that every plaintiff victim and family member suffers from diagnosed PTSD, the Court finds that many, if not all, of the plaintiffs who testified suffered from psychological symptoms consistent with those described by Dr. Pastor as being common consequences of traumatic, violent events.  Dr. Pastor's testimony thus reinforces and rounds out the plaintiffs' testimony concerning the severity and nature of the mental pain and suffering they have experienced.

## LEGAL AND REMEDIAL CONCLUSIONS

**I.    Jurisdiction**

Section 1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 et seq., eliminates sovereign immunity for a claim against a foreign state for personal injury "caused by an act of torture, *extrajudicial killing*, aircraft sabotage, hostage taking, or the provision of material support or resources … for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605(a)(7) (emphasis supplied).  Section 1605(a)(7) applies only where the foreign state was designated a state sponsor of terrorism at the time of the act or as a result of the act, the foreign state has been given a reasonable opportunity to arbitrate the claim if the act at issue occurred within the foreign state's territory, and either the claimant or the victim was a national of the United States at the time of the alleged act.  Id. § 1605(a)(7)(A), (B)(i)-(ii).[12]

---

[12]  Although Section 1605(a)(7) was enacted in 1996, as part of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 1605(a)(7), the Section applies retroactively, and thus covers the events at issue from 1983.  See Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 13 (D.D.C. 1998) (citing section 221(c) of Public Law 104-132: "The amendments made by this subtitle shall apply to any cause of action arising before, on or after the date of the enactment of this Act [April 24, 1996].").
    It bears noting as well that the Court has both subject matter jurisdiction over this case under 28 U.S.C. § 1330(a) (Actions Against Foreign States) and personal jurisdiction over defendants under 28 U.S.C. § 1330(b).  See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 91--95 (D.C. Cir. 2002).

The requirements for applying Section 1605(a)(7) and eliminating Iran's sovereign immunity for the purposes of this suit are undoubtedly fulfilled here. As an initial matter, the more technical requirements of the Section are satisfied: Iran was designated a state sponsor as a result of the April 18, 2003 Embassy bombing; the bombing did not occur within Iran's territory; and all of the plaintiffs fulfill the citizenship requirement.

Turning to the sufficiency of the acts alleged, the FSIA adopts the definition of "extrajudicial killing" in the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). See 28 U.S.C. § 1605(e). That Act defines an "extrajudicial killing" as:

> [A] deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

8 U.S.C. § 1350 note.

With respect to each of the victims of the 1983 Embassy bombing, the evidence is conclusive that they were deliberately targeted for death and injury without authorization by a previous court judgment. The deadly bombing was "'clearly contrary to the precepts of humanity as recognized in both national and international law,'" Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 107 (D.D.C. 2000) (quoting De Letelier v. Republic of Chile, 488 F. Supp. 665, 673 (D.D.C. 1980)), and constitutes an act of "extrajudicial killing," within the meaning of 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1), and the Torture Victim Protection Act of 1991. Moreover, the evidence adduced in this case -- including the testimony from Ambassadors Oakley and Dillon, and Dr. Patrick Clawson -- leaves no doubt that Iran and MOIS are responsible for the bombing. Thus Iran and MOIS fall within the FSIA's definition of a state

sponsor of terrorism for their role in the "extrajudicial killing," and are liable for the injuries suffered by the plaintiffs.

It is worth noting that the Court's conclusion on this point is consistent with numerous other federal decisions finding that Iran and MOIS are subject to jurisdiction under the FSIA for terrorist acts committed by Hizbollah in Lebanon against U.S. citizens.  See Peterson, 2003 U.S. Dist. LEXIS, at *24 (Judge Lamberth finding MOIS, through Iranian operative, liable in deaths of 241 U.S. Marines in October 23, 1983, bombing of Marine barracks in Beirut, Lebanon); Kerr, 245 F. Supp.2d at 64; Surette v. Islamic Republic of Iran, 231 F. Supp.2d 260, 266 (D.D.C. 2002); Stethem v. Islamic Republic of Iran, 201 F. Supp.2d 78, 87 (D.D.C. 2002); Sutherland v. Islamic Republic of Iran, 151 F. Supp.2d 27, 44 (D.D.C. 2001); Polhill v. Islamic Republic of Iran, No. 00-1798, 2001 U.S. Dist. LEXIS, 15322 at *10; (D.D.C. Aug. 23, 2001); Turner v. Islamic Republic of Iran, No. 01-1981, Slip. Op. at 5 (D.D.C. Oct. 2, 2002); Higgins v. Islamic Republic of Iran, No. 99-00377, 2000 U.S. Dist. LEXIS, 22173, * 14 (D.D.C. Sept. 21, 2000); Anderson v. Islamic Republic of Iran, 90 F. Supp.2d 107, 113 (D.D.C. 2000); Cicippio v. Islamic Republic of Iran, 18 F. Supp.2d 62, 68 (D.D.C. 1998).

## II.     Cause of Action Against Iran

Having determined that defendants are not immune from suit, the Court must proceed to consider the substantive causes of action asserted.  A principal question in this regard is whether Congress has provided a substantive cause of action against a state sponsor of terrorism. The Court of Appeals recently "flag[ged]" this issue but declined to decide it.  See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 86-87 (D.C. Cir. 2002); see also Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 n.3 (D.C. Cir. 2003); Bettis v. Islamic Republic of Iran, 315 F.3d 325, 330 (D.C. Cir. 2003).

By way of background, Section 1605(a)(7) of the FSIA initially was enacted as part of the comprehensive 1996 anti-terrorism legislation and was designed to remove sovereign immunity as a defense in cases against certain designated state sponsors of terrorism. The Flatow Amendment, Pub. L. 104-208, div. A, title I, § 101(c) [title V, §589], Sept. 30, 1996, 110 Stat. 3009-172, <u>codified</u> <u>in</u> 28 U.S.C. § 1605 note, adopted five months after § 1605(a)(7), provides a federal statutory cause of action for such cases. However, whereas § 1605(a)(7) waives the sovereign immunity of *foreign states* for certain terrorist acts and provides jurisdiction over claims that the employees or agents of such states engaged in terrorist activity while acting within the scope of their offices, the Flatow Amendment explicitly refers only to the *officials, employees, and agents* of those state sponsors of terrorism. The question thus arises as to whether the Flatow Amendment "creates a federal cause of action . . . *against foreign states*" as opposed to just against their officials, employees, or agents. <u>See</u> <u>Price</u>, 294 F.3d at 87.

Judge Lamberth was the first judge to address this issue following <u>Price</u>, concluding that Congress had in fact created a cause of action against Iran and other culpable foreign state sponsors of terrorism under the FSIA even though the actual text of the Flatow Amendment does not explicitly so provide. <u>Cronin v. Islamic Republic of Iran</u>, 238 F. Supp. 2d 222, 231 (D.D.C. 2002).[13] Judge Lamberth identified three reasons for this conclusion. First, the 1996 amendments to the FSIA must be read in conjunction with the Flatow Amendment. The largely

---

[13] Other judges of this Court have since followed Judge Lamberth's approach. <u>See</u>, <u>e.g.</u>, <u>Kilburn v. Republic of Iran</u>, Civ. No. 01-1301, 2003 WL 21982239, at *11 (D.D.C. August 8, 2003) ("adopt[ing] the reasoning of Judge Lamberth in . . . <u>Cronin</u> in reaching the conclusion that the Flatow Amendment does provide victims of state-sponsored acts of terrorism with a cause of action against the culpable foreign state"); <u>Acree v. Republic of Iraq</u>, Civ. No. 02-0632, 2003 WL 21537919, *36 (D.D.C. July 7, 2003) (citing <u>Cronin</u> for the proposition that "Section 1605(a)(7) . . . creates a federal cause of action against officials, employees and agents of a foreign state, as well as the state and its agencies and instrumentalities themselves"); <u>Kerr v. Islamic Republic of Iran</u>, 245 F.Supp.2d 59, 63 n.9 (D.D.C. 2003) (the "construction of the Flatow Amendment [in <u>Cronin</u>] is in keeping with this Court's understanding of the Flatow Amendment").

parallel language of the two provisions, both of which refer to officials, employees, or agents of

a foreign state, Judge Lamberth held, indicates that Congress intended to create a cause of action

against state sponsors of terrorism modeled on respondeat superior principles.  Id. at 231-32.  To

hold otherwise, Judge Lamberth concluded, "would turn the scheme of § 1605(a)(7) on its head."

Id. at 232.

Second, the legislative history of both section 1605(a)(7) and the Flatow Amendment

fully support the conclusion that Congress intended to create a cause of action against foreign

state sponsors of terrorism.

> The stated purpose[s] of the Antiterrorism Act [are] to deter terrorist acts against
> U.S. nationals by foreign sovereigns or their agents and to provide for justice for
> victims of such terrorism."  Elahi, 124 F.Supp.2d at 106 (citing 110 Stat. 1214
> (1996)).  See also Flatow, 999 F.Supp. at 12-13 ("The brief explanation of the
> Flatow Amendment's purpose in the House Conference Report explicitly states
> that it was intended to increase the measure of damages available in suits under
> 28 U.S.C. § 1605(a)(7).") (citing H.R. Conf. Rep. 863, 104th CONG, 1996).
> These stated intentions would both be thwarted by construing the Flatow
> Amendment in a manner that precludes victims of terrorism from bringing suit
> against the responsible foreign states.  At the same time, the purposes of the
> legislation would clearly be advanced by victims having a cause of action against
> the responsible foreign state.  Indeed, to construe the Flatow Amendment as not
> conferring a private cause of action against foreign states would mean that what
> Congress gave with one hand in section 1605(a)(7) it immediately took away with
> the other in the Flatow Amendment.

Id. at 232.

Third, congressional enactments since section 1605(a)(7) and the Flatow Amendment

make clear that Congress intended to create a cause of action against foreign states.  For

example, the Victims of Trafficking and Violence Protection Act of 2000, P.L. No. 106-386, 114

Stat. 1464 (2000) created a mechanism whereby, among other things, plaintiffs in several cases

then pending against Iran or other foreign states for state sponsored acts of terrorism could

obtain damages awards.  Cronin, 238 F. Supp. 2d at 232-33.  As Judge Lamberth noted: "It is

inconceivable that Congress would enable plaintiffs who obtained judgments against foreign states like Iran to recover the damage awards from the United States if the plaintiffs did not have a cause of action against the foreign state in the first place." Id. at 232.

This Court agrees with the analysis and conclusions of Judge Lamberth in Cronin and likewise holds that plaintiffs have a cause of action against Iran.  Moreover, on the evidence presented, as discussed above, there is no doubt that plaintiffs have satisfied the substantive requirements for stating a claim under the Flatow Amendment, as Iran undeniably sponsored Hizbollah's bombing of the Embassy.[14]

Even if the Flatow Amendment were held not to create a federal statutory cause of action against state sponsors of terrorism,[15] plaintiffs nevertheless would have valid claims against Iran and MOIS under state and/or federal common law.  Courts have regularly concluded that common law claims for, e.g., wrongful death, survival, assault, and battery may be asserted against state sponsors of terrorism under the FSIA.  See Jenco, 154 F. Supp.2d at 32-33; Sutherland, 151 F. Supp. 2d at 47-50; Elahi, 124 F. Supp. 2d at 109-13; Flatow, 999 F. Supp. at 27-32.

---

[14]  The Flatow Amendment contains the additional requirement that "an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency, would . . . be liable for such acts if carried out within the United States." 28 U.S.C. § 1605; Elahi, 124 F. Supp. 2d at 107.  This requirement is satisfied here, as American officials would be liable for the act of violence at issue if it were commited in the United States.  See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 288 (1971); Elahi, 124 F. Supp. 2d at 108 n.14.

[15]  Plaintiffs also assert that, even if it does not provide a cause of action against Iran, the Flatow Amendment provides a cause of action against MOIS as an "official, employee, or agent" of Iran.  As discussed with relation to punitive damages below, however, the D.C. Circuit's ruling in Roeder, 333 F.3d at 234-35, forecloses the argument that MOIS is an "agent" of Iran rather than the state of Iran itself for purposes of the Flatow Amendment.  While theoretically the Flatow Amendment would allow recovery from an "official" or "employee" of Iran, plaintiffs have not in their Second Amended Complaint named any "official" or "employee" of Iran or MOIS as a defendant in this matter; they have brought suit only against Iran and the entity MOIS.

### III.   Plaintiffs' Damages

#### A.   Wrongful Death/Economic Damages

The Estates of the plaintiffs who were killed in the Embassy bombing -- Robert Ames, William McIntyre, Robert McMaugh, and Janet Lee Stevens -- seek compensation for economic losses in the form of, among other amounts, lost wages, benefits, and retirement pay, suffered as a result of their wrongful deaths in the Embassy bombing.  The FSIA, as amended, permits plaintiffs to seek economic damages from a foreign state for "death" caused by an act of "extrajudicial killing," in this case, the 1983 Beirut Embassy bombing.  28 U.S.C. §§ 1605 (a)(7); see 28 U.S.C. § 1605 note (money damages include "economic damages, solatium, pain and suffering, and punitive damages").  Moreover, courts commonly have awarded economic damages in the form of lost wages, benefits, and retirement pay to the estates of individuals in analogous cases brought pursuant to the FSIA, as amended.  See, e.g., Kerr, 245 F. Supp.2d at 64; Surette, 231 F. Supp.2d at 274; Stethem v. Islamic Republic of Iran, 201 F. Supp.2d 260, 287-88 (D.D.C. 2002); Wagner, 172 F. Supp.2d at 136; Elahi, 124 F. Supp.2d at 115; Flatow, 999 F. Supp. at 28.  As the Court of Appeals recently explained, "to recover damages a FSIA plaintiff must prove that . . . projected consequences are 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate.'"  Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C.Cir. 2003).

To support their claims for economic damages in the form of lost wages, benefits, and retirement pay, plaintiffs introduced not only the testimony of the Estate representatives and family members of the individuals killed in the Embassy bombing, but also the testimony of Steven A. Wolf, a Director with FTI Consulting (a firm providing economic loss analysis), who provided an expert opinion as to the economic losses to the Estates of plaintiffs Robert Ames,

William McIntyre, Robert McMaugh and Janet Lee Stevens over the course of what would have been their expected lifetimes of productive work.  See Tr. Vol. II at 78-107.[16]  Mr. Wolf submitted an expert report to the Court detailing the analysis his firm performed when calculating the economic losses to the plaintiff Estates.  See Exh. 39 [hereinafter the "Wolf Report"].

Mr. Wolf testified that his analysis of the economic harm suffered by the Estates consisted of "projecting, but for the events, how the individuals' career and future income streams would have been and compared that to the actual income and benefits . . . received. . . ."  Tr. Vol. II at 84.  To do this, Mr. Wolf identified income, benefits and retirement provisions in 1983 for each estate, by reviewing documents such as tax returns, Social Security histories, and pay tables and charts, or in the alternative, by researching typical salaries and benefits for a profession where documentation was not available.  See id. at 86-89.  He then "grew" the wages, benefits and retirement provisions of each deceased individual by a conservative estimate of three percent a year, based on the average Consumer Price Index increase from 1983 through 2002, until the estimated retirement date of each individual considered.  See id. at 90-91.  Mr. Wolf adjusted that amount to reflect an economic damages total in 2003 dollars, by accounting for income tax rates, interest rates, and discount rates, and by applying a mid-year convention.  See id. at 91-94.  Finally, Mr. Wolf subtracted from that total any mitigating amounts received by the Estates, such as life insurance or death benefits received by each decedent's heirs-at-law.  See id. at 100-101.

Based on his analysis, Mr. Wolf calculated that the Estate of Robert Ames suffered $3,249,000 in economic losses (see Exh. 39 at Tab 2); the Estate of William McIntyre suffered

---

[16] Mr. Wolf was qualified as an expert by the Court for the subjects of economic analyses, accounting, and analyses of future streams of income.  See Tr. Vol. II at 83; Exh. 38.

$3,101,000 in economic losses (see id. at Tab 3); the Estate of Robert McMaugh suffered $2,903,000 in economic losses (see id. at Tab 4); and the Estate of Janet Lee Stevens suffered between $1,949,000 and $3,844,000 in economic losses (see id. at Tab 1).  The Court finds that these figures represent reasonable estimates for the economic losses suffered and that they are calculated with sufficient certainty to satisfy the standards in this Circuit.  See Hill, 328 F.3d at 683-685.  Accordingly, the Court shall award damages in those amounts.[17]

**B.    Solatium**

Plaintiffs who are family members of Robert Ames, William McIntyre, Robert McMaugh, and Janet Lee Stevens[18] seek compensation in the form of money damages for loss of solatium.[19]  The FSIA, as amended, permits plaintiffs to seek solatium damages from a foreign state for "death" caused by an act of "extrajudicial killing."  28 U.S.C. § 1605; see 28 U.S.C. § 1605 note (money damages include "economic damages, solatium, pain and suffering, and punitive damages).

A claim for solatium refers to the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort.  See Flatow, 999 F. Supp. at 30;

---

[17] The Court will use the lower of the two estimates provided with respect to the Estate of Janet Lee Stevens, as the Court has insufficient evidence that Ms. Stevens would have pursued a higher paying career as a television journalist.

[18] Plaintiffs seeking money damages for solatium include: Yvonne Ames, Andrew Ames; Kevin Ames; Kristen (Ames) Brown; Karen (Ames) Hale; Adrienne (Ames) Opdyke; Mary Lee McIntyre, Andrew McIntyre, Julie McIntyre, Margaret (McIntyre) Matteucci, Earl McMaugh; Annie (McMaugh) Mullins; Cherie (McMaugh) Jones, Michael McMaugh, Teresa (McMaugh) Younts, Jo Ann Stevens, the Estate of Hazen Stevens, Hazen Hadley Stevens, and Scott Carlton Stevens.

[19] Plaintiffs who are family members of those killed in the Embassy bombing have also asserted a damages claim for intentional infliction of emotional distress.  Courts have found in similar state sponsored terrorism cases that, for damages purposes, "in an intentional homicide case such as a terrorist killing, solatium appears . . . to be indistinguishable from . . . intentional infliction of emotional distress."  Surette, 231 F. Supp. 2d at 269 n.8 (internal quotations omitted); accord, Wagner, 172 F. Supp. 2d at 135 n. 11 (stating same).

Elahi, 124 F. Supp.2d at 110. These awards have explicitly been limited to "immediate family" members, which is defined as including spouses, children, parents and siblings. See Jenco, 154 F. Supp. 2d at 36-37 (rejecting claim that nieces and nephews are within definition of "immediate family").

Unlike a claim for economic damages, a claim for solatium "cannot be determined through economic models and variables," nor can it be reduced to present value. Flatow, 999 F. Supp. at 32; Elahi, 124 F. Supp. 2d at 111. "[T]he scope and uncertainty of human emotion renders such a calculation wholly inappropriate." Flatow, 999 F. Supp. at 32. Instead, when determining an award of solatium, the court may consider: "(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death." Stethem, 201 F. Supp. 2d at 89-90; see Kerr, 245 F. Supp. 2d at 64 (reciting factors). Courts have placed special emphasis on the cause of the decedent's death, stating that where the death results from terrorism, "the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." Elahi, 124 F. Supp.2d at 111; see also Flatow, 999 F. Supp. at 31 ("[D]eath as a result of terrorism, with its attendant horrific surrounding circumstances, prevents the anguish [felt by a relative of the deceased] from subsiding.").

Courts have awarded damages for loss of solatium in analogous cases brought pursuant to the FSIA. Spousal consortium and solatium awards have ranged from $8 million to $12 million.

See Kerr, 245 F. Supp. 2d at 64 (wife of AUB President assassinated by Hizbollah awarded $10 million); Surette, 231 F. Supp. 2d at 274 (companion of CIA officer kidnaped, tortured and executed by Hizbollah awarded $10 million); Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 23 (D.D.C. 2002) (wife of naval officer killed in terrorist bombing awarded $8 million); Higgins, 2000 U.S. Dist. LEXIS 22173, at *23 (wife of Army Colonel kidnaped, tortured and executed by Hizbollah awarded $12 million); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1249 (S.D. Fla. 1997) (wife of humanitarian worker killed when his plane was shot down by Cuban Air Force awarded $8 million).  Awards to children of the victims of terrorism have generally ranged from $1.5 million to $12 million.  See, e.g., Stern v. Islamic Republic of Iran, No. 00-2602, Slip. Op. at 27 (D.D.C. July 17, 2003) (awarding $3 million to each of four children); Kerr, 245 F. Supp. 2d at 64 (four adult or near adult children of AUB President assassinated by Hizbollah each awarded $3 million); Weinstein, 184 F. Supp. 2d at 23 (each of three children of naval officer killed in terrorist bombing awarded $5 million); Higgins, 2000 U.S. Dist. LEXIS 22173, at *23 (daughter of Army Colonel kidnaped, tortured and executed by Hizbollah awarded $12 million); Alejandre, 996 F. Supp. at 1249 (small child of humanitarian worker whose plane was shot down by Cuban Air Force awarded $8 million).  Awards to siblings of the victims of terrorism have ranged from $2.5 million to $5 million.  See, e.g., Kerr, 245 F. Supp. 2d at 64 (each of two siblings of AUB President assassinated by Hizbollah awarded $1.5 million); Surrette, 231 F. Supp. 2d at 273 (sister of CIA employee kidnaped, tortured and executed by Hizbollah awarded $2.5 million); Stethem, 201 F. Supp. 2d at 93 (each of three siblings of naval officer beaten, shot in head, and thrown out of a grounded airplane by Hizbollah awarded $3 million); Wagner, 172 F. Supp. 2d at 137 (each of two siblings of government employee killed in Hizbollah bombing of U.S. Embassy Annex in Beirut awarded

$2.5 million); Elahi, 124 F. Supp. 2d at 112 (each of two brothers of Iranian dissident assassinated by terrorists awarded $5 million); Flatow, 999 F. Supp. at 32 (each of four siblings of university student killed in tourist bus bombing perpetrated by Islamic Jihad awarded $2.5 million).

In this case, plaintiffs introduced the testimony of the family members of those killed in the Embassy bombing in support of the family members' claims for loss of solatium.  Plaintiffs also presented the testimony of expert Dr. Larry Pastor concerning the severe psychological impact on the families of victims of events such as the 1983 American Embassy bombing.  The sum of the testimony leaves little question as to the depth of emotion, grief, and loss occasioned by the deaths in the bombing -- an event that was unexpected and malicious, and that changed forever the lives of surviving family members.  Accordingly, the Court shall award as solatium damages $10 million to each spouse, $5 million to each child, $3.5 million to each parent, and $2.5 million to each sibling (except Jo Ann Stevens, who shall be awarded $3 million).

### C.    Battery/Intentional Infliction of Emotional Distress

Plaintiffs Anne Dammarell, Rayford Byers, Robert Essington Sr., Charles Light, Mary Lee McIntyre, Dorothy Pech, and Daniel Pellegrino seek compensatory money damages for battery, including physical and mental pain and suffering, and for intentional infliction of emotional distress, as a result of injuries they suffered in the Embassy bombing.  The FSIA permits plaintiffs to seek money damages for battery and intentional infliction of emotional distress from a foreign state for "personal injury . . . that was caused by an act of extrajudicial killing." 28 U.S.C. § 1605 (a)(7);[20] see 28 U.S.C. § 1605 note (money damages include

---

[20] There may be some question whether plaintiffs who were **survivors** of the bombing may seek recourse under the FSIA's exception to sovereign immunity in the case of "extrajudicial **killing**." 28 U.S.C. § 1605(a)(7).  However, given that, by its specific terms, § 1605(a)(7) strips sovereign immunity for claims of "**personal injury** . . . that was caused by an **act** of extrajudicial killing," id. (emphasis added), claims by injured survivors of acts involving extrajudicial killing of others appear to be proper.

"economic damages, solatium, pain and suffering, and punitive damages). Courts have awarded damages for battery and intentional infliction of emotional distress in other cases brought pursuant to the FSIA arising out of acts of state-sponsored terrorism. See, e.g., Acree v. Republic of Iraq, No. 02-632, 2003 U.S. Dist. LEXIS 11421, at *112-17; Cronin, 238 F. Supp. 2d at 234-35; Surette, 231 F. Supp. 2d at 268-69; Stethem, 201 F. Supp. 2d at 91-92; Sutherland, 151 F. Supp.2d at 48-51.

While battery, including pain and suffering, and intentional infliction of emotional distress are "particularly difficult to quantify in terms of assessing damages," courts in cases involving claims under the FSIA have looked at the "totality of the [plaintiff's] experience." Stethem, 201 F. Supp. 2d at 88, 92. This includes the intensity, frequency, and duration of the physical and mental pain and suffering, as well as the intensity of (i.e., the victim's personal experiences during) the terrorist act itself. Id. at 89, 92. The court also evaluates whether the terrorist act rises to the level of "extreme and outrageous" conduct. Sutherland, 151 F. Supp. 2d at 49; Jenco, 154 F. Supp. 2d at 33-35.

To support their claim for compensatory damages for battery, including physical and mental pain and suffering, and intentional infliction of emotional distress, plaintiffs presented the testimony of the victim plaintiffs, as well as, in some cases, their family members. Plaintiffs also introduced the expert testimony of Dr. Larry Pastor, MD, concerning the psychological effects of traumatic, violent events. Combined, the testimony underscores the conclusion that the 1983 Beirut Embassy bombing rose to the level of "extreme and outrageous" conduct supporting a finding of battery/intentional infliction of emotional distress in this matter.

Based on the evidence adduced at the hearing in this matter, and giving due weight to the

---

See generally Peterson, 264 F. Supp. 2d at 59-62 (concluding that Iran and MOIS were liable under FSIA to, inter alia, injured survivors of 1983 bombing of Marine barracks in Beirut).

evidence as to varying levels of physical and emotional injuries suffered by the plaintiffs, the Court awards damages for battery and intentional infliction of emotional distress as follows: Anne Dammarell, $5 million; Rayford Byers, $7 million; Robert Essington Sr., $2 million; Charles Light, $5 million; Mary Lee McIntyre, $2 million; Dorothy Pech, $750,000; and Daniel Pellegrino, $750,000.

### D.    Economic Damages

Plaintiffs Anne Dammarell, Rayford Byers, Robert Essington Sr., Charles Light, and Daniel Pellegrino seek compensation for economic losses in the form of, among other amounts, lost wages, benefits, retirement pay, and out-of-pocket medical expenses incurred as a result of injuries they suffered in the Embassy bombing. The FSIA, as amended, permits plaintiffs to seek economic damages from a foreign state for "personal injury" caused by an act of "extrajudicial killing." 28 U.S.C. §§ 1605 (a)(7); see 28 U.S.C. § 1605 note (money damages include "economic damages, solatium, pain and suffering, and punitive damages"). Courts have awarded economic damages in the form of lost wages, benefits, and retirement pay, and other out-of-pocket expenses, to individuals in other FSIA cases involving terrorist acts. See, e.g., Kerr, 245 F. Supp. 2d at 63; Surette, 231 F. Supp.2d at 268; Daliberti v. Republic of Iraq, 146 F. Supp. 2d 19, 24 (D.D.C. 2001); Cicippio v. Islamic Republic of Iran, 18 F. Supp. 2d 62, 69-70 (D.D.C. 1998).

In support of their claim for economic damages, plaintiffs introduced testimony, described in Part II above, concerning the adverse impact of the bombing on the careers of Anne Dammarell, Rayford Byers, Charles Light, and Daniel Pellegrino. The Court also received testimony that Robert Essington Sr. incurred out-of-pocket medical expenses. Plaintiffs also introduced the testimony and expert economic analysis of Steven Wolf. Based on his analysis,

Mr. Wolf calculated that, as a result of the Embassy bombing, Anne Dammarell suffered $1,774,602 in economic losses (see Exh. 39 at Tab 5); Rayford Byers suffered $345,580 in economic losses (see id. at Tab 7); Robert Essington Sr. suffered $48,567 in economic losses (see id. at Tab 9); Charles Light suffered $894,869 in economic losses (see id. at Tab 6); and Daniel Pellegrino suffered $296,039 in economic losses (see id. at Tab 8).  The Court finds that these figures represent reasonable estimates for the economic losses suffered and that they are calculated with sufficient certainty to satisfy the standards in this Circuit.  See Hill v. Republic of Iraq, 328 F.3d 680, 683-685 (D.C. Cir. 2003) (discussing standard for determining amount of economic damages under FSIA); Samaratin Inns, Inc. v. District of Columbia, 114 F.3d 1227, 1235 (D.C. Cir. 1997).  Accordingly, the Court shall award damages for economic losses in those amounts.

### E.    Punitive Damages

Plaintiffs also seek an award of punitive damages.  Section 1606 of the FSIA provides that "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state *except for an agency or instrumentality thereof* shall not be liable for punitive damages." 28 U.S.C. § 1606 (emphasis supplied).  Thus while the FSIA does not permit the award of punitive damages against a foreign state, See Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 24 n.1 (D.D.C. 2002), it does allow such damages against an "agency or instrumentality" of the foreign state.

The FSIA defines "agency or instrumentality" of a foreign state as any entity

(1)  which is a separate legal person, corporate or otherwise, and

(2)  which is an organ of a foreign state or political subdivision thereof, or a

> majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3)  which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).  In several cases, courts have found MOIS liable for punitive damages as an "agency or instrumentality" of Iran in light of its role in funding, training, and directing Hizbollah in its terrorist activities in Lebanon.  See, e.g., Surette, 231 F.Supp.2d at 273; Weinstein, 184 F.Supp.2d at 24 & n.1; Elahi, 124 F.Supp.2d at 114.  Consistent with this line of authority, plaintiffs here seek punitive damages not against Iran, but against MOIS.[21]  This issue is obviously an important one.

Since the evidentiary hearing in this matter, the D.C. Circuit has ruled that Iran's Ministry of Foreign Affairs "must be treated as the state of Iran itself rather than as its agent."  Roeder, 333 F.3d at 234.  In Roeder, the court was not considering the punitive damages provision in 28 U.S.C. § 1606, but rather was analyzing whether Iran's Ministry of Foreign Affairs was an "agent" of Iran for purposes of the Flatow Amendment.  Id.  at 234-35.  The court referred to its earlier opinion in Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994), in which it adopted a "categorical approach" to the question whether, under the FSIA's service-of-process provisions, an entity is a "foreign state or political subdivision" as opposed to an "agency or instrumentality."  The court held that "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state."  Roeder, 333 F.3d at 234-35 (citing Transaero, 30 F.3d at 153).  In Transaero, the D.C. Circuit, applying this categorical test, had concluded that the Bolivian Air Force, and,

---

[21]  Because the Court has concluded that the Flatow Amendment does not provide a cause of action against MOIS, see note 15 supra, MOIS's liability for punitive damages (if MOIS were, indeed, an "agency or instrumentality" of Iran) would arise only with respect to claims asserted under state and/or federal common law.

indeed, "armed forces . . . in all cases," must "be considered as the 'foreign state' itself rather than a separate 'agency or instrumentality' of the state" under 28 U.S.C. § 1603. 30 F.3d at 153.   In Roeder, the court applied the categorical approach again -- this time under a different provision of the FSIA -- in concluding that Iran's Ministry of Foreign Affairs must be considered as Iran itself and could not be considered an agent of Iran because the conduct of foreign affairs "is an important and 'indispensable' governmental function." Roeder, 333 F.3d at 235 (citation omitted).

In light of the decision in Roeder, plaintiffs are hard-pressed to argue that MOIS is an "agent or instrumentality" of Iran, rather than Iran itself.[22] Although the Roeder court was not directly considering the question of punitive damages under § 1606, its ruling indicates that the categorical approach to analyzing the § 1603 distinction between the foreign state and an "agency or instrumentality" of the foreign state applies to FSIA contexts other than the service-of-process provision at issue in Transaero. Applying the categorical approach here leads inexorably to the conclusion that MOIS should be treated as the foreign state itself. The undisputed evidence is that MOIS, named as an official Iranian ministry in 1983 or 1984, is the "intelligence service of Iran," and was, in fact, merely a continuation of the well-respected intelligence agency that had existed under the pre-revolutionary Iranian regime. See Tr. Vol. II at 32-34. Plaintiffs have presented no evidence to suggest that the intelligence activities conducted by MOIS in the early 1980s or, for that matter, the activities conducted by MOIS today, had or have any commercial effect or purpose. Indeed, it is difficult to conceive how intelligence and security activities -- in this case, providing training and support for terrorism

---

[22] In fact, plaintiffs concede that the D.C.Circuit's ruling in Roeder "may well lead to the conclusion that MOIS is effectively the state of Iran and that punitive damages may not be available." Proposed Findings of Fact and Conclusions of Law at 332 n.67.

abroad in order to advance Iran's political agenda -- could be considered predominantly "commercial" rather than "governmental."

The Court notes that its ruling is consistent with the recent decision of Chief Judge Hogan in Tracy v. Islamic Republic of Iran, Civ. No. 01-2517, slip op. at 17 (D.D.C. August 21, 2003), which concluded that Roeder precludes an award of punitive damages against MOIS. Nevertheless, the Court is also aware that its conclusion is at odds with many pre-Roeder decisions of this Court and with the recent post-Roeder decision of Judge Urbina in Kilburn v. Republic of Iran, Civ. No. 01-1301, slip op. at 28-32 (D.D.C. August 8, 2003). In that case, Judge Urbina noted that "if the court were to strictly apply th[e] categorical approach, the result undoubtedly would be the court's denial of the plaintiff's punitive damages claim against defendant [Libyan External Security Organization]." Id. at *16. However, Judge Urbina "decide[d] not to strictly apply the categorical approach," reasoning that the D.C. Circuit's discussion of the distinction between the foreign state itself and an "agency or instrumentality" was framed as a "preliminary issue" in Roeder, and hence is dictum. Id. Judge Urbina further opined that he lacked the "heightened discretion" necessary to deviate from the "tide of uniform rulings" in other cases in this Court awarding punitive damages against the security agencies of foreign states. Id. at *17. In this vein, Judge Urbina expressed particular concern that, "if the D.C. Circuit intended . . . [the categorical] approach to apply across-the-board in all FSIA cases, then the vast number of cases allowing for such punitive damage claims would be called into question or flatly reversed, even where judgments have been entered and collection efforts on these judgments have been or are being advanced." Id. at *16.

This Court shares many of the same concerns expressed by Judge Urbina in Kilburn, and there is much to be said for his reasoning. Other judges have repeatedly found MOIS liable for

punitive damages.  See, e.g., Cronin, 238 F. Supp. 2d at 235-36; Surette, 231 F. Supp. 2d at 273-74; Weinstein, 184 F. Supp. 2d at 25-26.  Moreover, as Judge Urbina observed, Congress appears to "monitor[] the pulse of this area of law," Kilburn, at *16 n.17, yet has not taken definitive action "to alter the courts' interpretation authorizing punitive damages against foreign states' security agencies," id. at *16.  As a more general matter, the extent of the efforts that Congress has made since 1996 to open the courts to plaintiffs seeking recourse for acts of state-sponsored terrorism (through, for example, the promulgation of 28 U.S.C. § 1605(a)(7) and the Flatow Amendment) might suggest that Congress would approve of judicial rulings punishing foreign intelligence agencies for participating in terrorist acts through the imposition of punitive damages.[23]

But this Court must nevertheless respectfully disagree with Judge Urbina's conclusion that the D.C. Circuit's ruling in Roeder may be disregarded.  Although the analysis of "agency or instrumentality" in Roeder pertained to a "preliminary issue," the analysis -- which was the subject of an entire subpart of the court's opinion -- was not dictum; it was a considered ruling on a distinct issue presented on appeal.  See Roeder, 333 F.3d at 234-35; see also id. at 228 (noting that "several issues [were] presented on appeal").  Even if the relevant language in Roeder were

---

[23]  On the other hand, the passage of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386 § 2002(f)(2) (October 28, 2000), may actually reflect a congressional policy disfavoring the award of punitive damages in cases of state-sponsored terrorism.  By way of background, between 1998 and 2000, the key language in 28 U.S.C. § 1606 provided that a "foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages *except any action under section 1605(a)(7) or 1610(f).*" (emphasis supplied).  Thus, punitive damages were recoverable in actions under those provisions against both state sponsors of terrorism and their agencies and instrumentalities.  The Victims of Trafficking and Violence Protection Act of 2000, which provided partial payment of § 1605(a)(7) judgments in certain pending or concluded cases against Cuba and Iran, deleted the language in § 1606 providing for an exception to immunity for "any action under section 1605(a)(7) or 1610(f)." Thus, it may be that the reinstatement of immunity from punitive damages for actions under §1605(a)(7) was a compromise of sorts -- allowing collection of prior judgments in exchange for reinstated immunity against the future award of punitive damages.  Counsel for plaintiffs has not briefed the issue, and the Court is reluctant to so conclude without any briefing.

dictum, moreover, this Court would still be constrained to apply the categorical approach by virtue of the force of the analysis in Roeder and the fact that the same approach was expressly adopted by the D.C. Circuit in Transaero. See 30 F.3d at 151.

Congress has specifically limited the availability of punitive damages in a § 1605(a)(7) case to an "agency or instrumentality" of a foreign state, See 28 U.S.C. § 1606, and has done so (as recently as 2000, see note 23 supra) against the background that the D.C. Circuit uses a categorical approach for the interpretation of that term, See Transaero, 30 F.3d at 151. It is not the place of this Court to rewrite the language of §1606 or to avoid D.C. Circuit precedent, despite the Court's sympathy for the plaintiffs here and the extraordinarily heinous nature of the conduct at issue in this and many other FSIA cases.

The Court reaches this conclusion reluctantly. There is no question that, in the broad scheme of things, punitive damages seem warranted in this and similar cases against Iran and MOIS for the support and sponsorship of terrorism through bombings, killings, and hostage-taking, and this Court would not hesitate to award substantial punitive damages in this case. But Congress' language in §§ 1603(b) and 1606 and the D.C. Circuit's interpretation in Roeder and Transaero constrain this Court. Concerns about the implications of applying the categorical approach in the context of § 1606 are more appropriately addressed to Congress or the D.C. Circuit. Accordingly, this Court must deny plaintiffs' claim for punitive damages.

## **CONCLUSION**

For the foregoing reasons, final judgment will be entered against defendants by way of a

separate Judgment Order in the amounts set forth above and in that Order.

_____
JOHN D. BATES
United States District Judge

Signed this __8th__ day of September, 2003.

Copy to:

Stuart Henry Newberger
Crowell & Moring, L. L. P.
1001 Pennsylvania Avenue, Northwest
Washington, D. C.   2004-2595
202-624-2649 (telephone)
202-628-5116 (fax)
          Attorney for Plaintiffs