**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ANNE DAMMARELL, et al.,**

    **Plaintiffs,**

       **v.**

**ISLAMIC REPUBLIC OF IRAN, et al.,**

    **Defendants.**

---

      **Civil Action No. 01-2224  (JDB)**

---

**MEMORANDUM OPINION**

On April 18, 1983, a massive car bomb exploded at the United States Embassy in Beirut, Lebanon, killing sixty-three people and injuring over one hundred others.  Among those killed in the blast were seventeen United States citizens.  The explosion was the first large-scale attack against a United States embassy anywhere in the world, and marked the onset of two decades of terrorist attacks on the United States and its citizens overseas and at home.  In this civil action, more than eighty plaintiffs -- citizens of the United States who were victims of the bombings, and their families and estates -- seek damages from the Islamic Republic of Iran ("Iran") and its Ministry of Intelligence and Security ("MOIS") for their material support of the terrorist organization that carried out this devastating attack.

Following a six-day evidentiary trial concerning the claims of a group of representative plaintiffs, the Court on September 8, 2003, issued a memorandum opinion setting out its findings of facts and conclusions of law.  In that opinion, the Court held that the sovereign immunity of defendants from suit was revoked by the state-sponsored terrorism exception to the Foreign

Sovereign Immunities Act ("FSIA"); that plaintiffs had raised valid causes of action under the so-called Flatow Amendment to the FSIA, as well as under state and federal common law; and that plaintiffs were entitled to compensatory damages for wrongful death, solatium, battery, and intentional infliction of emotional distress (although not punitive damages, which were foreclosed by the FSIA).  See Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 191-203 (D.D.C. 2003).   The Court entered judgment in favor of the representative plaintiffs, and referred the case to Magistrate Judge John M. Facciola, serving as a special master for the purpose of receiving evidence as to damages for the remaining plaintiffs.  Proceedings before Judge Facciola have gone forward.

Several months after this Court filed its memorandum opinion, the D.C. Circuit issued a decision in Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024 (D.C. Cir. 2004), holding that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government." Id. at 1033.  This Court invited briefing from the plaintiffs regarding the issues raised by Cicippio-Puleo and the continuing viability of their claims.  While the plaintiffs were preparing that filing, the D.C. Circuit issued another FSIA decision, this time holding that plaintiffs cannot state a right of action under the "generic common law" or merely "allude[] to the traditional torts . . . in their generic form" but instead must "identify a particular cause of action arising out of a specific source of law." Acree v. Republic of Iraq, 370 F.3d 41, 58-59 (D.C. Cir. 2004) (quotation omitted).

Plaintiffs have now submitted a 100-page motion for final judgment in which they propose several sources of law that they contend continue to furnish a cause of action against foreign states in the wake of Cicippio-Puleo and the other recent authority.  The Court has carefully considered

plaintiffs' motion, along with two even more recent decisions by the D.C. Circuit interpreting the state-sponsored terrorism exception, and the entire area of jurisprudence in this still-evolving area of law.  In this memorandum opinion and the accompanying order, this Court holds that defendants are subject to suit under the state-sponsored terrorism exception to the FSIA, and that state common and statutory law -- specifically, the law of the state of domicile of each of the plaintiffs (or, in the case of an estate, the law of domicile of the decedent) -- may provide a cause of action against defendants in this action.

These causes of action, however, can be found nowhere in plaintiffs' complaint.  Although plaintiffs state generalized claims in their complaint for wrongful death, battery, and the like, they do not specify whether these claims are based in state law (or some other source of law), or whether they arise out of the common law or a particular statute.  In other words, the complaint fails to "identify a particular cause of action arising out of a specific source of law," and therefore falls short of the standard recently set by the D.C. Circuit.  See Acree, 370 F.3d at 58.  Because plaintiffs have made clear that they desire to press state law claims, the proper course -- and the one this Court will follow -- is to allow plaintiffs an opportunity to amend their complaint to plead state law causes of action against these sovereign defendants with the necessary detail under the law.

Plaintiffs testified at trial that they brought this lawsuit for a variety of reasons.  Some explained that they wanted to ensure that history does not forget the participation of defendants in a brutal and devastating act of terror.  Others were hoping to create a financial disincentive for the support of similar acts in the future.  Still others were seeking a measure of compensation for the staggering toll that the attack has exacted on their lives and the lives of their loved ones.  These

intertwined goals are within reach.  Reliving this tragedy at trial was manifestly difficult for

plaintiffs, and this Court understands that this opinion may not yet provide the finality that

plaintiffs seek.  However, the Court affirms today that plaintiffs may state valid causes of action

against these defendants under state law and that a judgment will soon be entered against these

defendants for their role in this senseless attack.  Once plaintiffs amend their complaint to specify

causes of action consistent with the governing law in this nascent and sensitive area of

jurisprudence, the redress and the closure plaintiffs desire should finally be at hand.

## BACKGROUND

Early in the afternoon on April 18, 1983, an unknown driver crashed a vehicle carrying

hundreds of pounds of explosives into the main entrance of the United States Embassy in Beirut,

Lebanon.  See Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 111 (D.D.C. 2003).

The vehicle exploded with such violent force that it caused seven floors of the embassy building

to collapse.  Sixty-three people died in the blast, including seventeen United States citizens.  More

than one hundred others were wounded.  The bombing was the first attack of its kind on a United

States embassy, ushering in an era of more than two decades of terrorist strikes on United States

citizens and facilities at home and abroad.  See id.

Soon after the bombing, the State Department concluded that "radical Lebanese Shi'a . . .

operating with Iranian support and encouragement" were "responsible for the suicide attack

against the U.S. Embassy."  Id.  The Republic of Iran and the MOIS for several years had been

cultivating a terrorist organization from among the Lebanese Shi'a to advance the goal of driving

the West out of the Middle East.  Iran and the MOIS provided this group with money, arms,

training, and political and strategic leadership.  With the ongoing support and direction of Iran and

the MOIS, this group -- known as Hizbollah -- would carry out a series of terrorist attacks directed at Westerners, including the embassy bombing that gives rise to this case.  See id. at 111-12. [1]

This action commenced on October 29, 2001, when more than sixty plaintiffs filed a complaint seeking damages from Iran and the MOIS for their material support of Hizbollah in the embassy bombing.  Each plaintiff is a United States citizen or the estate of a United States citizen. The plaintiffs fall into three categories:  (i) individuals injured in the bombing, (ii) family members of individuals killed in the bombing, and (iii) the estates of individuals killed in the bombing.  In the course of this litigation, plaintiffs have twice amended their complaint to add new plaintiffs (bringing the number of plaintiffs to more than eighty), but they have never substantially altered the content of their allegations or the nature of their claims.

The complaint alleges that each of the plaintiffs was injured as "a direct and proximate result" of the willful acts of Hizbollah members, "whose acts were funded and directed by the Islamic Republic of Iran through its agent MOIS."  E.g., Second Am. Compl. ¶ 192.  The six counts in the complaint refer in general terms to claims for wrongful death and solatium, battery, intentional infliction of emotional distress, survival damages, economic damages, and punitive damages.  See id. at pp. 53, 61, 62, 67, 69.  There is no indication in the complaint whether these are common law or statutory claims, or whether the claims purport to arise out of state, federal, or international law.  The lone reference to any source of law in the six counts is in the count for punitive damages, which cites the Flatow Amendment to the FSIA (29 U.S.C. § 1605 note) as authorizing "a cause of action for punitive damages in civil actions for money damages resulting

_____

[1]  A full account of the role of Iran, the MOIS, and Hizbollah in the bombing can be found in the Court's earlier opinion.  See Dammarell, 281 F. Supp. 2d at 108-113.

from terrorist acts."  Second Am. Compl. ¶ 245.

Plaintiffs effectuated service of the complaint on defendants through diplomatic channels.

Defendants failed to appear, and the Clerk entered default against them.  In an order dated October

8, 2002, the Court outlined the procedures that would guide the remainder of the case.  The case

would proceed in two phases.  In the initial phase, certain plaintiffs would present evidence

concerning the liability of defendants for the embassy bombing, expert witnesses concerning

damages, and factual testimony from a representative group of plaintiffs.  The Court would issue

findings of fact and conclusions of law with regard to the claims of those plaintiffs based on the

evidence presented during that phase.  In the second phase, the claims of the remaining plaintiffs

would be heard by Magistrate Judge Facciola sitting as a Special Master, who would prepare a

report consistent with Fed. R. Civ. P. 53(e)(1).

This Court held a six-day evidentiary hearing in April 2003.  At this hearing, the Court

heard testimony from ten victims or families of victims, two former United States Ambassadors,

and several experts on the topics of Iranian sponsorship of terrorism, the psychological effects of

trauma, and economic damages.  On September 8, 2003, the Court issued its findings of fact and

conclusions of law.  See Dammarell, 281 F. Supp. 2d at 105.  The Court held in that opinion that

Iran and the MOIS were responsible for the embassy bombing, id. at 191; that Iran and the MOIS

were subject to jurisdiction under the state-sponsored terrorism exception to the Foreign

Sovereign Immunities Act ("FSIA"), id. at 193-94; that plaintiffs stated a cause of action against

Iran and the MOIS under the Flatow Amendment and, in the alternative, under state or federal

common law, id. at 192-94; and that plaintiffs should recover economic damages for wrongful

death and personal injuries, compensatory damages for loss of solatium, battery, and intentional

infliction of emotional distress, but no punitive damages, id. at 194-203.[2]  The Court entered

judgment in favor of the representative plaintiffs in the amount of $123,061,657, and referred the

matter to Magistrate Judge Facciola for further proceedings as to the remaining plaintiffs.  See id.

at 202-03.

Several months later, the D.C. Circuit issued its decision in Cicippio-Puleo v. Islamic

Republic of Iran, 353 F.3d 1024 (D.C. Cir. 2004).  The plaintiffs in Cicippio-Puleo were the

children and siblings of a United States citizen abducted and held hostage by Hizbollah.

The plaintiffs brought suit against Iran and the MOIS, stating claims that purported to arise

directly under the state-sponsored terrorism exception to the FSIA (28 U.S.C. § 1605(a)(7)) and

the Flatow Amendment (28 U.S.C. § 1605).  The D.C. Circuit concluded that the plaintiffs failed

to state a claim upon which relief could be granted, explaining that "neither 28 U.S.C. §

1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right

of action against a foreign government."  Cicippio-Puleo, 353 F.3d at 1032.  The court remanded

the case to the district court "to allow plaintiffs an opportunity to amend their complaint to state a

cause of action under some other source of law, including state law."  Id. at 1036.

Cicippio-Puleo was decided before the second phase of proceedings had commenced

before Magistrate Judge Facciola.  Following a status conference to discuss the status of the case,

this Court ordered that the second phase proceedings should continue unaltered, but that plaintiffs

would be required to submit a brief addressing the viability of their claims and the jurisdiction of

this Court in light of Cicippio-Puleo.  See Order of Jan. 22, 2004.  While the second phase of the

_____

[2]  The Court found punitive damages unavailable under section 1606 of the FSIA based on
D.C. Circuit decisions.  See id. at 199-203.

case was proceeding forward, and plaintiffs were briefing the <u>Cicippio-Puleo</u> issues, the D.C. Circuit issued another FSIA decision holding that a plaintiff cannot state a cause of action against a state sponsor of terrorism merely by referencing the "generic common law," but instead "must identify a particular cause of action arising out of a specific source of law." <u>Acree</u>, 370 F.3d at 58.

Plaintiffs have now submitted their brief in response to this Court's January 22, 2004, order.  In this submission, plaintiffs maintain that even after <u>Cicippio-Puleo</u> and <u>Acree</u>, their allegations continue to support a cause of action under any number of sources of law, including the Torture Victims Protection Act (28 U.S.C. § 1350 note), the Flatow Amendment, federal common law, state common and statutory law, and norms of international law.  The D.C. Circuit has issued two more decisions interpreting section 1605(a)(7) in the months since plaintiffs' filing.  <u>See</u> <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 389 F.3d 192 (D.C. Cir. 2004); <u>Kilburn v. Socialist People's Libyan Arab Jamahiriya</u>, 376 F.3d 1123 (D.C. Cir. 2004).  The second phase of proceedings before Magistrate Judge Facciola is now complete, and he has stayed issuing his findings of fact and conclusions of law as to the remaining plaintiffs until this Court rules on the pending legal issues in the case.  <u>See</u> Order of July 28, 2004.

In the sections that follow, this Court outlines its conclusions of law and the legal principles that will steer the case in the months to come.  The Court also describes the procedures that will guide the case to its conclusion.

## <u>ANALYSIS</u>

Although the lines may sometimes blur, every case brought against a foreign state raises two very distinct legal questions.  <u>See</u> <u>Price</u>, 389 F.3d at 199; <u>Cicippio-Puleo</u>, 353 F.3d at 1029-30.  The first question is the jurisdiction to hear the claim.  In the context of the FSIA, this

question principally requires a court to determine whether the case falls within one of the statutory

exceptions to the sovereign immunity of a foreign state.  See Kilburn, 376 F.3d at 1126-27;

Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d 230, 232 (D.C. Cir. 2003).  The

second question is the liability of the defendant foreign sovereign.  Under this inquiry, the court

must assess what, if any, causes of action the plaintiff may bring against the defendant, and

whether the foreign state is liable on any of those claims.  See Kilburn, 376 F.3d at 1133-36;

Cicippio-Puleo, 353 F.3d at 1029-30.

**I.      Jurisdiction**

    The Foreign Sovereign Immunities Act establishes the broad rule that foreign states[3] are

immune from suit in United States courts.  See 28 U.S.C. § 1604 ("Subject to existing

international agreements to which the United States is a party at the time of enactment of this Act

a foreign state shall be immune from the jurisdiction of the courts of the United States and of the

States except as provided in sections 1605 to 1607 of this chapter.").  The statute also sets out

certain exceptions to this rule for limited categories of cases.  See id. § 1605.  The most recent of

the exceptions in the statute was enacted in 1996 and revokes the sovereign immunity of a foreign

state that sponsors acts of terrorism.  See Pub.L. No. 104-132, § 221, 110 Stat. 1214 (codified at

28 U.S.C. § 1605(a)(7)).

    This exception provides that a foreign state "shall not be immune from the jurisdiction of

courts of the United States or of the States in any case" where

      money damages are sought against a foreign state for personal injury or death that
      was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage

---

    [3] The statute defines a "foreign state" to include "a political subdivision of a foreign state
or an agency or instrumentality of a foreign state."  Id. § 1603.

taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7).  This provision applies to a foreign state only if three other criteria in the statute are met as well:  the foreign state was designated a state sponsor of terrorism at the time of the terrorist act or as a result of the act, the foreign state was afforded a reasonable opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim has been brought, and either the claimant or the victim was a national of the United States at the time of the terrorist act.  See id. § 1605(a)(7)(A), (B); see Kilburn, 376 F.3d at 1127; Dammarell, 281 F. Supp. 2d at 191.

In its earlier opinion, this Court concluded that these requirements were undeniably satisfied in this case.  See Dammarell, 281 F. Supp. 2d at 191-92.  Iran was designated a state sponsor of terrorism as a result of the April 18, 2003 Embassy bombing, and Iran has remained on the State Department list of state sponsors of terrorism ever since.  See 22 C.F.R. § 126.1(d); 31 C.F.R. § 596.201.  The bombing did not occur within the territory of Iran.  All of the plaintiffs are citizens of the United States (or the estates of citizens of the United States), and the victims of the bombing were injured[4] or killed as a result of an act of extrajudicial killing.[5]

---

[4] Plainly, section 1605(a)(7) allows even individuals who were injured (but not killed) by an act of "extrajudicial killing" to bring an action against the foreign state.  See Dammarell, 281 F. Supp. 2d at 198 n.20; see also Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 269 (D.D.C. 2003) ("[T]he court determines that the bombing was an act of extrajudicial killing that caused the plaintiffs' injuries."); Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46, 59-62 (D.D.C. 2003) (concluding that Iran and the MOIS were liable to the injured survivors of a Marine barracks bombing in Beirut that killed more than 200 United States Marines)

[5] An "extrajudicial killing" is defined as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are

-10-

Finally, it is evident that Iran and the MOIS provided "material support or resources" for the killing within the meaning of section 1605(a)(7).  One expert witness explained at trial that there was "no question that Iran was responsible for the selection of the target, provided much of the information of how to carry out the bombing, the expertise for how to build the bomb, the political direction that said that this was an important target to bomb, [and] provided financial support for the bombers."  <u>Dammarell</u>, 281 F. Supp. 2d at 112.  Another witness who coordinated the State Department's counter-terrorism efforts and was tasked with investigating who was responsible for the Beirut embassy bombing, expressed his "confidence that the government of Iran was involved directly in the Hisballah organization, which was created, armed, trained, protected, [and] provided technical assistance by the Iranian Revolutionary Guards."  <u>Id.</u>  This Court concluded that the evidence adduced at trial "leaves no doubt that Iran and MOIS are responsible for the bombing," and therefore these entities have lost their sovereign immunity for purposes of this case under section 1605(a)(7).  <u>Id.</u> at 192.[6]

Nothing in the D.C. Circuit's more recent decisions suggests a contrary result.  Indeed, in one of the decisions the court states explicitly that "it is clear that the District Court had jurisdiction" of a suit against Iran and the MOIS for their material support of Hizbollah's taking

———————————

recognized as indispensable by civilized peoples."  <u>See</u> Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 8 U.S.C. § 1350 note) (incorporated by reference into 28 U.S.C. § 1605(e)).  The embassy bombing in this case unquestionably is an extrajudicial killing within the meaning of section 1605(a)(7).  <u>See</u> <u>Peterson</u>, 264 F. Supp. 2d at 60-61 (terrorist bombing of Marine barracks leading to death of more than 200 United States Marines is an extrajudicial killing); <u>Flatow</u>, 999 F. Supp. at 18 ("[A] suicide bombing . . . is an act of 'extrajudicial killing' within the meaning of 28 U.S.C. § 1605(a)(7).").

[6]  This Court noted that prior decisions had consistently found Iran and the MOIS to be subject to suit under section 1605(a)(7) for their support of Hizbollah carrying out acts of terrorism against United States citizens.  <u>See</u> <u>id.</u> at 191 (citing cases).

hostage of a United States citizen "pursuant to the statutory waiver of sovereign immunity under 28 U.S.C. § 1605(a)(7)." Cicippio-Puleo, 353 F.3d at 1030.  The others hold that a plaintiff need not show that a foreign state's material support was the "but for" cause of an alleged victim's injuries (proximate causation is sufficient), or that it went directly to the specific terrorist act giving rise to the claim, Kilburn, 376 F.3d at 1126-31, and that a defendant cannot show that a case falls outside of section 1605(a)(7) merely by identifying minor variations or inconsistencies in the plaintiff's complaint, Price, 389 F.3d at 198.

These holdings do not undermine in any way the conclusion that Iran and the MOIS are susceptible to suit in this case.  The evidence presented at trial shows unquestionably that Iran and the MOIS provided material support to Hizbollah, and that this support was a proximate cause of the 1983 Beirut embassy bombing and the deaths and injuries that resulted.  See Dammarell, 281 F. Supp. 2d at 108-113.  With the ongoing assistance of Iran and the MOIS, Hizbollah "evolved into one of the most capable and professional terrorist organizations in the world," and Iran and the MOIS played a "central role" in the planning of the particular embassy bombing giving rise to the action in this case.  Id. at 111.  Accordingly, the Court reaffirms its prior holding that section 1605(a)(7) removes the sovereign immunity of Iran and the MOIS for their role in the bombing.

## II.    Liability

Having concluded that defendants are not immune from suit, the Court turns to a discussion of the causes of action that are permitted against a foreign state for its sponsorship of terrorism.  Section 1605(a)(7) only removes the immunity of a foreign state; it does not itself describe a cause of action against the foreign state.  See Cicippio-Puleo, 353 F.3d at 1032.  Therefore, a plaintiff must look elsewhere for a cause of action, and in its earlier opinion, the

Court concluded that plaintiffs state a viable cause of action against Iran and the MOIS under the Flatow Amendment to the FSIA.  The Court noted that "[e]ven if the Flatow Amendment were held not to create a federal statutory cause of action against state sponsors of terrorism, plaintiffs nevertheless would have valid claims against Iran and the MOIS "under state and/or federal common law."  Dammarell, 281 F. Supp. 2d at 193.

Two recent D.C. Circuit decisions require the Court to re-examine these holdings.  In the first case, the court held that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government." Cicippio-Puleo, 353 F.3d at 1033.  In the second case, the court explained that "generic common law cannot be the source of a federal cause of action" against a foreign state.  Acree, 370 F. 3d at 58.  These decisions expressly leave open the question whether a cause of action against a foreign nation might exist under "some other source of law, including state law," Cicippio-Puleo, 353 F.3d at 1036, and can even be read to leave open the possibility that, although the Flatow Amendment does not give rise to a cause of action of its own force, it might do so through other statutes, id. at 1033.[7]

Plaintiffs maintain that there are several causes of action available against foreign states consistent with the D.C. Circuit's recent rulings.  They propose that causes of action exist under state common and statutory law, federal common law, the law of foreign countries, the Torture Victims Protection Act, and even the Flatow Amendment (through section 1606 of the FSIA).

---

[7]  Cicippio-Puleo indicated that its reasoning was confined to an analysis of the "language of section 1605(a)(7) and the Flatow Amendment -- the only provisions upon which plaintiffs rely."  Id. at 1033.  Notably, the court also suggested that it "cannot be assumed" that there is any cause of action against a foreign state at all.  Id.

The Court will examine each of these potential sources of a cause of action against a foreign state in a moment.  To determine the claims that a plaintiff may assert against a state sponsor of terrorism under the FSIA, however, the Court finds it necessary to begin first with the passage of the FSIA itself and an examination of the jurisprudence that developed in its wake.

### A.   Interpretation of the FSIA Prior to Section 1605(a)(7)

The FSIA was enacted in 1976.  As noted earlier, the statute simultaneously granted foreign states immunity from suit in the United States and withdrew that immunity for certain designated classes of cases.  The legislative history of the statute reveals that it was enacted to create "comprehensive rules" regarding the immunity of foreign states from suit and discontinue "the practice of judicial deference to suggestions of immunity from the executive branch."  H.R. Rep. No. 94-1487, at 11 (1976).  The statute was "not intended to affect the substantive law of liability" or "the attribution of responsibility between or among entities of a foreign state; for example, whether the proper entity of a foreign state has been sued; or whether an entity sued is liable in whole or in part for the claimed wrong."  Id.  As one sponsor of the statute described it, "this bill deals only with jurisdiction; the substantive law of liability would remain unchanged." 122 Cong. Rec. 17462 (June 10, 1976).

Consistent with these principles, the statute contained a provision directing courts to existing causes of action in determining the liability of a foreign state.  Section 1606 of the statute provided in full at the time of enactment, and continues to provide to this day, as follows:

> *As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances*; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has

been construed to provide, for damages only punitive in nature, the foreign state
shall be liable for actual or compensatory damages measured by the pecuniary
injuries resulting from such death which were incurred by the persons for whose
benefit the action was brought.

Pub.L. 94-583, § 4(a), 90 Stat. 2894 (codified at 28 U.S.C. § 1606) (emphasis added). The

legislative history of this section is unrevealing, suggesting only that the provision was intended to

"make clear" what should have been true in any event: "if the foreign state, political subdivision,

agency or instrumentality is not entitled to immunity from jurisdiction, liability exists as it would

for a private party under like circumstances." H.R. Rep. No. 94-1487, at 22 (1976).

    As enacted, the statute contained exceptions to the sovereign immunity of a foreign state

for actions to enforce maritime liens, expropriation claims, and others. The two broadest

exceptions were section 1605(a)(2), which withdrew foreign sovereign immunity in suits arising

out of commercial activities with a connection to the United States, and section 1605(a)(5), which

removed the immunity of a foreign state for noncommercial torts committed in the United States.

Long before the addition of section 1605(a)(7), courts addressing claims arising out of section

1605(a)(2) (the "commercial activities" exception) and section 1605(a)(5) (the "noncommercial

torts" exception) developed a clear and straightforward method of determining the causes of

action that may be asserted against a foreign state under the FSIA.

    Consistent with its plain text, section 1606 was read as a "portal" or "pass-through" to the

causes of action that would exist against a private individual in like circumstances. That is, courts

held that when section 1605 lifts the sovereign immunity of a foreign state, section 1606 allows a

plaintiff to bring any claim against the foreign defendant that the plaintiff could have brought in

like circumstances were the defendant a private individual. See, e.g., First National City Bank v.

Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983) ("Where state law provides

a rule of liability governing private individuals, the FSIA requires the application of that rule to

foreign states in like circumstances."); Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 12

(2d Cir. 1996) ("[T]he FSIA . . . operates as a 'pass-through' to state law principles.").

      As these cases suggest, interpreting section 1606 as a pass-through often leads to the

application of state law in damages actions against foreign states.  See, e.g., Schoenberg v.

Exportadora de Sal, S.A. de C.V., 930 F.2d 777, 782 (9th Cir. 1991) (applying California law to

wrongful death action against company owned by Mexican government); Pittston Co. v. Allianz

Ins. Co., 795 F. Supp. 678, 687-88 (D.N.J. 1992) (applying New Jersey law to contract claims

brought against insurance company wholly owned by the Government of Ireland).  To this day, it

is customary for courts to look to state law for the causes of action under the "commercial

activities" and "non-commercial torts" exceptions to the FSIA.  See, e.g., Maalouf v. The Swiss

Confederation, 208 F. Supp. 2d 31, 34 (D.D.C. 2002) (applying District of Columbia law to tort

claim against Swiss government arising out of sledding accident on Swedish embassy grounds);

Nazarian v. Compagnie Nationale Air France, 989 F. Supp. 504, 510 (S.D.N.Y. 1998) (applying

New York law to claims of negligence for defendant airline's detention of plaintiffs brought under

commercial activity exception to FSIA); In re Aircrash Disaster Near Roselawn, Indiana, 948 F.

Supp. 747, 758 (N.D. Ill. 1996) (applying state law in FSIA action brought by survivors of

passengers who died in airplane crash against airplane manufacturers owned by foreign states).[8]

      However, state law is not the exclusive source of a right of action under the FSIA.  Where

---

    [8]  These causes of action can include claims arising under state statutes.  See, e.g.,
Mukaddam v. Permanent Mission of Saudi Arabia, 111 F. Supp. 2d 457, 470 (S.D.N.Y. 2000)
(allowing claim under New York State Human Rights Law to proceed against foreign state
through section 1606).

plaintiffs would be able to bring federal claims against a private individual in like circumstances, and where such a result would not be inconsistent with the will of Congress, courts have not hesitated to permit those claims to proceed against foreign states as well.  See, e.g., Southway v. Cent. Bank of Nigeria, 198 F.3d 1210, 1216 (10th Cir. 1999) ("[W]e hold that the FSIA confers subject-matter jurisdiction upon the district court over civil RICO claims against foreign states, their agencies, and instrumentalities, provided that the commercial activity exception, or another exception contained in §§ 1605-07 of the FSIA applies."); Mukaddam v. Permanent Mission of Saudi Arabia, 111 F. Supp. 2d 457, 470 (S.D.N.Y. 2000) (foreign state "is liable under Title VII in the same manner and to the same extent as a private employer would be in like circumstances"); Outboard Marine Corp. v. Pezetel, 461 F. Supp. 384, 396 (D. Del. 1978) (plaintiffs may bring damages action for violation of federal antitrust laws against company claiming to be an agency of foreign state pursuant to "commercial activity" exception to FSIA).

Courts have even concluded, where choice of law rules require, that the law of a foreign state should provide the legal principles in a claim against a foreign state.  See Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1004 (9th Cir. 1987) (applying Polish law to determine damages in wrongful death action against Polish airline relating to airplane crash in Poland); Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos, 756 F. Supp. 136 (S.D.N.Y. 1991) (applying Bolivian law to action brought by American company against Bolivian government-owned purchaser for breach of contract for sale of piping to be used by Bolivian oil industry).  In fact, it appears that the only source of law not to furnish a right of action against a foreign state under the "commercial activities" and "non-commercial torts" exceptions to the FSIA is the federal common law, precisely -- it would seem -- because the federal common law so rarely supplies a cause of

action in litigation involving purely private litigants.  See, e.g., O'Melveny & Myers v. Fed. Deposit Ins. Co., 512 U.S. 79, 87, 89 (1994) (holding that the use of the federal common law is appropriate only in "extraordinary" cases); In re Aircrash Disaster, 948 F. Supp. at 758 (refusing to apply federal common law in FSIA action brought by survivors of passengers killed in airplane crash against airplane manufacturers owned by foreign states because a "bare desire to achieve an identical result in every case is insufficient to override the interest of each injured person's domiciliary state").

This was the legal landscape when section 1605(a)(7) was added to the FSIA in 1996. Through section 1606, plaintiffs were permitted to advance claims against a foreign state under state common law or statutory law, federal statutory law, or even the law of a foreign state, provided that a similar claim could be brought under that law against a private individual in like circumstances.

### B.     The Enactment of Section 1605(a)(7) and the Flatow Amendment

Congress added section 1605(a)(7) to the FSIA as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Known as the "state-sponsored terrorism" exception, section 1605(a)(7) withdraws the immunity of foreign states designated as state sponsors of terrorism in certain cases where they provide support for terrorist acts against United States nationals.  See Pub. L. 104-132, Title II, § 221(a), Apr. 24, 1996, 110 Stat. 1241 (codified at 28 U.S.C. § 1605(a)(7)).  Prior to section 1605(a)(7), courts had declined to read any of the existing provisions in section 1605 as removing the sovereign immunity of a foreign state for terrorist acts committed on foreign soil.  See, e.g., Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239, 246 (2d Cir. 1996) (holding that "implied waiver" and "noncommercial tort" exceptions

did not apply to terrorist bombing of airline); Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 166-69 (D.C. Cir. 1994) (holding that "commercial activity" and "noncommercial tort" exceptions do not apply to kidnapping of United States citizen on foreign soil).  Section 1605(a)(7) was enacted to give United States citizens for the first time "an important economic and financial weapon against these outlaw states."  H.R. Rep. No. 104-383, at 62 (1995).

As is true of the other section 1605 exceptions to immunity, section 1605(a)(7) did not create a new cause of action against foreign states.  See Cicippio-Puleo, 353 F.3d at 1031 ("Section 1605(a)(7) is merely a jurisdiction conferring provision that does not otherwise provide a cause of action against either a foreign state or its agents.").  There is no indication that Congress contemplated that actions against foreign states that lost their immunity under section 1605(a)(7) would proceed in a different fashion than actions against foreign states that lost their immunity under section 1605(a)(2), section 1605(a)(5), or any of the other pre-existing exceptions to immunity.  On the other hand, Congress clearly anticipated that the addition of section 1605(a)(7) would allow claims to proceed against foreign state sponsors of terrorism.  See H.R. Rep. No. 104-383, at 61 (1995) (emphasizing that section 1605(a)(7) will "allow[] suits in the federal courts against countries responsible for terrorist acts").

Five months after the passage of section 1605(a)(7), Congress enacted a separate provision that expressly created a private right of action against officials of foreign states for the conduct described in section 1605(a)(7).  Known as the "Flatow Amendment," this provision states in relevant part:

> An official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 . . . while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for

> personal injury or death caused by acts of that official, employee, or agent for
> which the courts of the United States may maintain jurisdiction under section
> 1605(a)(7) of title 28, United States Code . . . for money damages which may
> include economic damages, solatium, pain, and suffering, and punitive damages if
> the acts were among those described in section 1605(a)(7).

See Omnibus Consolidated Appropriations Act of 1997, Pub.L. No. 104-208, Div. A, Title I, §

101(c) [Title V, § 589], 110 Stat. 3009-172 (codified at 28 U.S.C. § 1605 note).   The House

Conference Report for this provision states simply:  "The conference agreement inserts language

expanding the scope of monetary damage awards available to American victims of international

terrorism."  H.R. Conf. Rep. No. 104-863, at 987 (1996).

### C.    Causes of Action Available Under Section 1605(a)(7)

The plain text of the Flatow Amendment authorizes a cause of action only against officials

or agents of a foreign state, and the D.C. Circuit ruled in Cicippio-Puleo that an implicit cause of

action against the state itself cannot be read into the statute.  See Cicippio-Puleo, 353 F.3d at

1032-33.  More recently, the D.C. Circuit also held that a plaintiff cannot proceed against a

foreign state under the "generic common law."  Acree, 370 F.3d at 59-60.  Beyond these broad

instructions, the D.C. Circuit has not had the opportunity to address the particular causes of action

that may be brought against a foreign state in a case proceeding under section 1605(a)(7).  This

Court takes up that question here.

The overarching principle that guides this Court's analysis is that the causes of action that

may be brought against a foreign state should not depend on whether the foreign state lost its

sovereign immunity under section 1605(a)(7) instead of one of the other provisions in section

1605.  "There is a clearly settled distinction in federal law between statutory provisions that waive

sovereign immunity and those that create a cause of action."  Cicippio-Puleo, 353 F.3d at 1032.

-20-

Section 1605(a)(7) merely lifts the sovereign immunity of a state.  The provision says nothing

about the causes of action that may be brought against the foreign state.  For the answer to that

question, a court must turn first -- as it does in section 1605(a)(2) and section 1605(a)(5) cases, as

well as all other cases under section 1605 -- to section 1606, which instructs that "the foreign state

shall be liable in the same manner and to the same extent as a private individual under like

circumstances."  28 U.S.C. § 1606.

As a consequence, a plaintiff should be able to bring a cause of action under state common

or statutory law, federal statutes (where Congress has not indicated otherwise), and even -- in rare

instances -- the law of a foreign country in a section 1605(a)(7) case, as long as the plaintiff would

be able to bring such a claim against a private individual in similar circumstances.  The general

approach should be the one courts have employed for decades in cases under the other exceptions

in section 1605.  This is not to say that a court should be insensitive to the unique concerns raised

by an action alleging that a foreign country is a sponsor of terrorism.  These concerns simply

cannot overcome the plain text of the statute, which directs the courts to allow plaintiffs to bring

any claims they would be able to bring if the defendant were a private individual charged with the

same acts of terror.  See, e.g., Flatow v. Alavi Found., No. 99-2409, 2000 WL 1012956, at *6 (4th

Cir. July 24, 2000) (rejecting plaintiff's contention that a different standard must govern the

meaning of "agency or instrumentality" in section 1605(a)(7) cases because "the equities are

different when the judgment is pursuant to subsection (a)(7)").

The text of the FSIA all but dictates this approach.  Section 1606 is unequivocal: "As  to

*any claim* for relief with respect to which a foreign state is not entitled to immunity *under section*

*1605* or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same

extent as a private individual under like circumstances."  28 U.S.C. § 1606 (emphasis added).

Congress chose to place the state-sponsored terrorism exception in section 1605 of the FSIA.

By its terms, section 1606 applies to all section 1605 cases without distinction.  For twenty years,

courts have read section 1606 as a pass-through to existing causes of action.  There is nothing in

the text of section 1605(a)(7) or section 1606 that suggests a different rule should be fashioned for

cases brought pursuant to section 1605(a)(7).

The structure of the FSIA suggests the same result.  There is a clean divide in the statute

between the section that grants sovereign immunity (section 1604), the section that withdraws it

for particular classes of cases (section 1605), and the section that defines the liability of a foreign

state that has lost its immunity (section 1606).  There is no reason to believe that when it added to

section 1605 a provision revoking immunity for another class of cases, Congress intended to alter

the rules governing liability in section 1606.  See Cicippio-Puleo, 353 F.3d at 1032 (emphasizing

the distinction between the sovereign immunity and liability provisions in the FSIA).

Furthermore, there is at least some overlap among the various exceptions of section 1605.  See,

e.g., Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 376 n.9 (7th Cir. 1985); Texas

Trading & Mill. Corp. v. Fed. Republic of Nigeria, 647 F.2d 300, 311 (2d Cir. 1981).[9]  The Court

is reluctant to endorse a rule that would allow the causes of action for a particular act to turn

entirely on which of two equally applicable immunity provisions was used in a particular case.

This result is also consistent with the legislative history of the FSIA.  Congress made clear

_____

[9]  This includes section 1605(a)(7).  Courts generally have held that acts of state-sponsored
terrorism fall outside the "noncommercial tort" and "commercial activity" exceptions to the FSIA,
but they have left open the possibility that certain terrorist acts -- such as an attack on United
States soil -- may come within these provisions.  See, e.g., Smith, 101 F.3d at 246; Cicippio, 30
F.3d at 168 n.7.

that its intent in enacting the FSIA was that the "substantive law of liability would remain unchanged." 122 Cong. Rec. 17462 (June 10, 1976). For two decades, courts incorporated existing state law, federal law, and even foreign law causes of action against foreign states. When adding section 1605(a)(7) in 1996, Congress emphasized that it expected the provision would "allow[] suits in the federal courts against countries responsible for terrorist acts" and provide "an important economic and financial weapon against these outlaw states." H.R. Rep. No. 104-383, at 62 (1995). Legislating against the backdrop of the application of existing causes of action to foreign states, Congress gave no indication that it anticipated a different rule to apply to state sponsors of terror.

Finally, reading section 1605(a)(7) and section 1606 as a pass-through to existing causes of action finds support in the courts' treatment of a similar statute. The Federal Tort Claims Act ("FTCA") removes the sovereign immunity of the United States for certain suits sounding in tort. 28 U.S.C. §§ 1346, 2671 et seq. The statute contains a liability provision that, in relevant part, tracks section 1606 of the FSIA almost word for word:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.
>
> If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof.

28 U.S.C § 2674. Section 2674 of the FTCA -- enacted in 1946 -- served as the model for section

1606 of the FSIA.  See 122 Cong. Rec. 17468 (June 10, 1976).[10]

　　　　As is true of section 1606 of the FSIA, courts have consistently read section 2674 of the

FTCA to foreclose the creation of new causes of action or the reshaping of existing causes of

action in claims against the United States.  See Dorking Genetics v. United States, 76 F.3d 1261,

1265 (2d Cir. 1996) (holding that section 2674 means that the FTCA "does not create new causes

of action"); Schwarder v. United States, 974 F.2d 1118, 1124 (9th Cir. 1992) ("[S]ection 2674 of

the FTCA . . . provides that, at a minimum, the government not be exposed to any greater liability

than a private individual.").  However, the FTCA contains an additional provision not present in

the FSIA that narrows the causes of action that may be brought against a foreign state even

further:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims
> against the United States, for money damages . . . for injury or loss of property, or
> personal injury or death caused by the negligent or wrongful act or omission of any
> employee of the Government while acting within the scope of his office or
> employment, under circumstances where the United States, if a private person,
> would be liable to the claimant *in accordance with the law of the place where the
> act or omission occurred.*

28 U.S.C. § 1346(b).  Courts have regarded this language as a specific instruction to apply the law

of the state where the tort occurred as the substantive rule of decision to the exclusion of any other

source of law in a claim under the FTCA.[11]  See, e.g., Fed. Deposit Ins. Corp. v. Meyer, 510 U.S.

471, 477-78 (1994) (explaining that "we have consistently held that § 1346(b)'s reference to the

---

[10]  The only difference of substance in the relevant portions of the two statutes is the result of minor changes made in committee to conform the FSIA to international practice.  See H.R. Rep. 94-1487, at 9 (1976).

[11]  A federal statute that creates a duty of care that "is analogous to a duty of care recognized by state law" may suffice as well under section 1346(b).  See Florida Auto Auction of Orlando, Inc. v. United States, 74 F.3d 498, 501 (4th Cir. 1996).

'law of the place' means law of the State," and therefore "federal law" may not provide the "source of liability" for a claim under the FTCA); <u>Delta Savings Bank v. United States</u>, 265 F.3d 1017, 1023 (9th Cir. 2001) (same).

The FSIA does not contain any language similar to the "law of the place" provision in section 1346(b) of the FTCA.  The logical conclusion is that section 1606 of the FSIA prohibits the creation of new causes of action in claims against foreign states (just like section 2674 of the FTCA does for claims against the United States), but the FSIA is not confined to causes of action arising out of the law of the state where the tort occurred (because it lacks the choice of law provision in section 1346(b) of the FTCA)).  <u>See Harris</u>, 820 F.2d at 1003 ("The FTCA contains an explicit choice of law provision; there is no such provision in the FSIA," which omits the "crucial language, 'in accordance with the law of the place where the act or omission occurred.'").[12]

Therefore, an examination of the plain text, the structure and the legislative history of sections 1605(a)(7) and 1606, and a comparison to the analogous statutory scheme of the FTCA, all confirm the approach courts have followed for twenty years in claims brought pursuant to the other exceptions in section 1605.  When Congress removed the sovereign immunity of state

---

[12] Notably, even though claims against the United States under the FTCA often involve sensitive issues of national importance, the courts have consistently refused to develop causes of action under the federal common law.  <u>See Devlin v. United States</u>, 352 F.3d 525, 532 (2d Cir. 2003) ("Similarly, the FTCA's basic thrust was decidedly not to create a federal common law of torts . . . .").  Again, the reasoning in the text should not be taken to suggest that cases involving international comity do not raise unique concerns that are absent in the FTCA, and that may give rise to a need for special procedures.  <u>See Montz v. Dep't of Navy</u>, 392 F.3d 147, 150 (5th Cir. 2004).  As is explained in greater detail below, the Court holds only that these concerns do not justify the creation of special federal causes of action for section 1605(a)(7) claims.  <u>See infra</u> at 41-51.

sponsors of terrorism in section 1605(a)(7), just as when it removed the sovereign immunity of a foreign state for other categories of cases elsewhere in section 1605, the causes of action that may be brought against the foreign state through section 1606 include any claims that could be brought against a private individual in like circumstances.  Those claims can include, in appropriate cases, state common and statutory law, federal statutory law, and even the law of a foreign state. Whether any of these sources of law will furnish a cause of action in a particular case will depend on several factors, including the governing choice of law analysis, see infra at 32-41, and at least in the context of federal statutory claims, a careful inquiry into congressional intent, infra at 52-57.  The crucial point, however, is that there is nothing in section 1605(a)(7) that displaces the prevailing rule that a plaintiff may bring existing causes of action through section 1606 against foreign states.

Some have argued that this approach is at odds with the Supreme Court's statement, in a discussion of section 1606, that the "language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state."  First National, 462 U.S. at 620.[13]  It is in the same decision, however, that the Supreme Court later explains that, under section 1606, "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." Id. at 621 n.11.  Whatever the Court meant precisely by its statement that the FSIA was "not

---

[13]  See, e.g., Roeder v. Islamic Republic of Iran, 195 F. Supp. 2d 140, 174 (D.D.C. 2002) (rejecting argument that plaintiffs "unambiguously have a cause of action against Iran by virtue of . . . § 1606," because "the  Supreme Court has made clear that this provision does not impact the substantive liability of a foreign government") (citations omitted).

intended to affect" the law of liability, it clearly did not intend it to mean that existing state law causes of action could not be applied against foreign states through section 1606.

In fact, the Court's language in <u>First National</u> is entirely consistent with the treatment of section 1606 as a pass-through to causes of action that would exist against private individuals. That approach maintains unaltered each of the existing rights of action against private individuals, and therefore is one of the only interpretations of section 1606 that can be said not to "affect the substantive law determining the liability of a foreign state or instrumentality." <u>Id.</u> at 620. The Supreme Court in <u>First National</u> was addressing the suggestion that the FSIA prohibited the plaintiff from setting off the value of assets that were seized by a foreign country against money owed to the defendant, a bank that was an agency of the foreign country. <u>Id.</u> The Court's conclusion that the FSIA does not create entirely new substantive rules of apportionment of liability among foreign states and their agents is hardly incompatible with the principle that section 1606 allows a plaintiff to bring pre-existing causes of action against foreign states that have lost their sovereign immunity through section 1605.

Even if section 1606 is properly understood as a vehicle for existing state and federal law claims to be brought against foreign governments, some may contend that this is not the intent of Congress for section 1605(a)(7) cases. The Flatow Amendment, the argument goes, which created a new federal cause of action for section 1605(a)(7) claims against private individuals, would have been unnecessary if state causes of action already existed by virtue of section 1606, and should be regarded as preempting state law on these claims. These arguments rest on a misconception of the Flatow Amendment. It was enacted not to create a cause of action for the first time, but rather, as the legislative history clearly states, to "*expand*[] the scope of monetary

damage awards available" for claims under section 1605(a)(7).  H.R. Conf. Rep. No. 104-863, at 987 (1996) (emphasis added).[14]  The statute was a response to the belief of many lawmakers that, in order for "the exception for immunity to have the desired deterrent effect, the potential civil liability for foreign states which commit and sponsor acts of terrorism would have to be substantial."  Flatow, 999 F. Supp. at 2.

The Flatow Amendment accomplished this goal by guaranteeing that a plaintiff will have available certain kinds of damages in claims against an official, employee, or agent of a foreign state -- such as solatium and punitives -- that might be unavailable or limited under the law of the states.  See, e.g., Bettis v. Islamic Republic of Iran, 315 F.3d 325, 332 (D.C. Cir. 2003) ("[T]he District of Columbia, which is the dedicated venue for actions against foreign states, see 28 U.S.C. § 1391(f)(4), does not recognize solatium damages in wrongful death causes of action." (quoting Br. of Amicus Curiae)); In re Air Crash Disaster at Sioux City, Iowa, No. MDL-817, 1991 WL 279265, at *1 (N.D. Ill.) (holding in case arising out of airplane crash case that there is no right to punitive damages in wrongful death actions under the governing state law).  When Congress made this choice to "expand" the measure of damages available in suits under section 1605(a)(7), it can hardly be understood to have been implying that there were no damages actions available under section 1605(a)(7) prior to the Flatow Amendment at all.

Nor can the Flatow Amendment be viewed as a preemption of state law on the topic.

---

[14]  See Bettis v. Islamic Republic of Iran, 315 F.3d 325, 330 (D.C. Cir. 2003) ("Less than six months after passage of AEDPA, Congress passed an amendment designed to enhance the penalties available in suits implicating 28 U.S.C. § 1605(a)(7)."); Flatow, 999 F. Supp. at 12-13 ("The brief explanation of the Flatow Amendment's purpose in the House Conference Report explicitly states that it was intended to increase the measure of damages available in suits under 28 U.S.C. § 1605(a)(7).").

Without an express provision for preemption (and there is none in the FSIA or the Flatow

Amendment), courts will find that a federal statute preempts state law where there is an "actual

conflict" between state law and the federal statute, or where Congress has demonstrated an intent

to "occupy the field" to the exclusion of state regulation.  See Crosby v. Nat'l Foreign Trade

Council, 530 U.S. 363, 371-72 (2000); Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 604

(1991).  Neither of those circumstances are present here.  An "actual conflict" will arise only when

"compliance with both federal and state regulations is a physical impossibility" or when a state

law "stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress."  Wisconsin Pub. Intervenor, 501 U.S. at 605.  Here, liability for foreign

nations under state law through section 1606 is not incompatible with the expansive damages

made available in claims against foreign officials pursuant to the Flatow Amendment.

Moreover, Congress will be deemed to "occupy the field" only where a scheme of federal

regulation is "so pervasive as to make reasonable the inference that Congress left no room for the

States to supplement it."  Id. at 604.  It is difficult to understand how the Flatow Amendment -- a

single, brief statute that applies only to foreign officials, does not make any mention of section

1606, and contains no language remotely suggesting a preemption of state law -- could be read to

leave no opportunity for state law claims against foreign states.  As noted earlier, the legislative

history of the Flatow Amendment contemplates that the statute would be supplementing

("expanding") existing causes of action, not displacing them.  H.R. Conf. Rep. No. 104-863, at

987 (1996).  Had Congress wished a contrary result, it could easily have written it into the statute.

However, the Flatow Amendment evinces no desire to occupy the field of claims against foreign

states.

Far from *preempting* state law in section 1605(a)(7) cases, the FSIA *invites* the application of state law through section 1606.  The FSIA no more preempts state law than the FTCA preempts state law, which is to say that it may "preempt" certain state law claims that are directly incompatible with the text of the statute, see Berkman v. United States, 957 F.2d 108, 112 (4th Cir. 1992) (state law cause of action for owner of land operated by independent contractor incompatible with independent contractor exception to FTCA), but does not preclude -- and indeed, requires -- the use of state law as the cause of action through the pass-through provision in the statute, see Meyer, 510 U.S. at 477-78 (state law provides right of action under FTCA).  The Court can find nothing in the Flatow Amendment that suggests a different result.  Therefore, any argument that Congress sub silentio intended to read section 1606 out of the FSIA for claims arising under section 1605(a)(7) must fail.

Finally, it is occasionally suggested that suits seeking damages for acts of terrorism are unique in a way that merits a more uniform approach to liability than the one suggested in section 1606.[15]  This argument is addressed in greater detail in the discussion of federal common law below.  For now, it suffices to note that if the foreign relation concerns raises by an action against a foreign state for sponsoring terrorism were so great that the application of state law would be imprudent, one would expect Congress to have taken some note of this fact.  Instead, the statute Congress wrote gives every indication that the same principles are to apply to section 1605(a)(7) claims as have applied to the other exceptions in section 1605 (and the legislative history suggests

---

[15]  See, e.g., Wagner v. The Islamic Republic of Iran, 172 F. Supp. 2d 128, 134-35 (D.D.C. 2001) (rejecting state causes of action for a section 1605(a)(7) claim because the approach would "eventually lead in other cases to divergent measures of recovery for essentially identical claims against foreign defendants guilty of terrorist crimes against U.S. citizens").

the same result).  This Court simply is not in a position to replace this approach with its own.  <u>See</u>, <u>e.g.</u>, <u>Cicippio-Puleo</u>, 353 F.3d at 1033 ("[I]t is for Congress, not the courts, to decide whether a cause of action should lie against foreign states.").

> **D.      Plaintiffs' Causes of Actions**

Hence, as a general principle, a plaintiff may assert against a foreign state under section 1605(a)(7) any cause of action that he could assert against a private individual in like circumstances.  Plaintiffs in this case propose causes of action arising out state law, federal common law, federal statutes, and international law.  Whether any of these sources of law provide a right of action in this case will require a careful examination of the claims one could allege against a private individual under that cause of action, whether they could be raised against a private individual in similar circumstances, the application of the governing choice of law principles, and at least in the context of the TVPA and the Flatow Amendment, a careful assessment of congressional intent.  Finally, the Court must always remain mindful of the unique issues raised by an action charging a foreign state with supporting terrorism.

Each of the sources of law proposed by plaintiffs is carefully addressed below.  The Court concludes that, at least in the circumstances of this case, plaintiffs may only assert causes of action under state common and statutory law.

> **1.      State law**

As a general rule, state law should provide a cause of action against a foreign nation in a section 1605(a)(7) claim.  <u>See</u> <u>First National</u>, 462 U.S. at 621 ("Where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances."); <u>Pescatore</u>, 97 F.3d at 12 ("[T]he FSIA . . . operates as a

'pass-through' to state law principles."); <u>Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova</u>
133 F. Supp. 2d 9, 14 (D.D.C. 2001) ("[A]s a general matter, state substantive law is controlling
in FSIA cases.").  State law provides the cause of action in mass disaster cases under the FSIA
where corporations owned by foreign governments are the defendants, <u>e.g.</u>, <u>In re Aircrash
Disaster</u>, 948 F. Supp. at 756, in wrongful death actions arising out of terrorist attacks where a
private corporation is the defendant, <u>e.g.</u>, <u>Pescatore</u>, 97 F.3d at 13, and in every other category of
damages actions where foreign states are the defendants, <u>First National</u>, 462 U.S. at 621.  State
law may provide the rule of decision here as well.

The only reasons state law might not apply would be if it were pre-empted or otherwise
displaced by federal law, or if the governing choice of law principles point the court in the
direction of the law of a foreign state (as sometimes happens in FSIA cases, <u>see</u> <u>supra</u> at 17).  The
Court held earlier that state law is not pre-empted by the FSIA and the Flatow Amendment, and
will explain in a moment that this is not one of the rare cases where state law should be displaced
by a federal common law remedy, <u>see</u> <u>infra</u> at 41-51.  To determine whether state law or foreign
law applies, and to determine which state's law applies (if state law is appropriate), the Court must
first undertake a choice of law analysis.

There is a division among courts on whether to apply the choice of law rules of the forum
state or the federal common law in an FSIA case.  <u>Compare</u> <u>Karaha Bodas Co., L.L.C. v.
Perusahaan Pertambangan Minyak Dan Gas Bumi Negara</u>, 313 F.3d 70, 84 (2d Cir. 2002) (forum
state), <u>with</u> <u>Harris</u>, 820 F.2d at 1003-04 (federal common law).  As the Supreme Court has
restricted the scope of the federal common law in recent years, the prevailing approach
increasingly is to use the choice of law rules of the forum state, <u>Lloyds Bank PLC v. Republic of</u>

Ecuador, No. 96-1789, 1998 WL 118170, at *6 (S.D.N.Y.), and this is the approach used in this

circuit, see Bucheit v. Palestine Liberation Organization, No. 00-1455, 2003 WL 24011414, at *5

(D.D.C.) ("Under § 1606 of the FSIA, in cases involving foreign sovereign parties, courts should

apply the choice of law rules of the forum state to all issues that might be governed by that state's

substantive law."); Virtual Def., 133 F. Supp. 2d at 15 (noting that "[t]he goal of applying

identical substantive laws to foreign states and private individuals cannot be achieved . . . unless a

federal court utilizes the same choice-of-law analysis in FSIA cases as it would if all the parties to

the action were private").  This Court will therefore look to the choice of law rules of the District

of Columbia in this case.

    In the absence of a contractual choice of law by the parties, the District of Columbia

employs a "constructive blending" of the "governmental interests" analysis and the "most

significant relationship" test.  Stephen A. Goldberg Co. v. Remsen Partners, Ltd., 170 F.3d 191,

194 (D.C. Cir. 1999); Virtual Def., 133 F. Supp. 2d at 15; Hercules & Co., Ltd. v. Shama Rest.

Corp., 566 A.2d 31, 41 n.18 (D.C. 1989).  The D.C. Court of Appeals has described the

constructive blending approach as follows:

>    In determining which law governs the dispute, this court has used the
>    'governmental interests analysis.'  In applying that analysis, we also consider the
>    factors enumerated in the Restatement, § 145, to assist in identifying the
>    jurisdiction with the "most significant relationship" to the dispute.

Hercules & Co., 566 A.2d at 40; see also Mims v. Mims, 635 A.2d 320, 323 (D.C. 1993).

    "Under the governmental interests analysis as so refined, we must evaluate the

governmental policies underlying the applicable laws and determine which jurisdiction's policy

would be most advanced by having its law applied to the facts of the case under review."

Hercules & Co., 566 A.2d at 40.  As for the "most significant relationship" component of the

analysis, the D.C. Court of Appeals directs courts to section 145 of the Restatement of the Conflict of Laws, which identifies four relevant factors:  (i) "the place where the injury occurred"; (ii) "the place where the conduct causing the injury occurred"; (iii) "the domicile, residence, nationality, place of incorporation and place of business of the parties"; and (iv) "the place where the relationship, if any, between the parties is centered."  Restatement (Second) of Conflict of Laws § 145 (1971).  Section 145 also references the factors in Section 6 of the Restatement, which include the needs of the interstate and the international systems, the relevant policies of the forum, the relevant policies of other interested states, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied.  Id.

The various factors in the "constructive blending" approach can point a court in any number of directions.  Nonetheless, certain patterns have developed in the law in similar cases that guide the inquiry.  The most important of these is the recognition that the "law of the injured person's domicile" should govern the issue of compensatory damages in wrongful death actions arising out of mass disasters because that locale "has an important and obvious interest in ensuring that its residents are fully and adequately compensated for tortious harm."  Pescatore, 97 F.3d at 13 (wrongful death action brought against airline for its negligence in failing to avert terrorist attack on airplane); In re Air Crash Disaster Near Chicago, Ill., 644 F.2d 594, 613 (7th Cir. 1981) (domiciliary states have "legitimate interests" in "assuring that the plaintiffs are adequately compensated for their injuries and that the proceeds of any award are distributed to the appropriate beneficiaries"); Burgio v. McDonnell Douglas Inc., 747 F. Supp. 865, 873 (E.D.N.Y. 1990) (applying the law of the domicile to "the plaintiff's loss of consortium claim and damage claims for wrongful death" in suit arising out of airplane crash).

There are three conceivable choices of law in this case: the law of the domicile state of the plaintiff, the law of the forum state (the District of Columbia), or the law of the place of the tort (Lebanon). The District of Columbia can lay claim to very little interest in this case. Almost all of the plaintiffs are from outside of the District of Columbia (as are the decedents), the attack occurred entirely outside of the District of Columbia, and the defendants have no particular connection with the District of Columbia. The only plausible rationale for choosing the law of the District of Columbia in an FSIA case is to adopt a single, familiar rule of decision in the interest of developing a uniform and easy to apply set of legal standards. These are undeniably relevant factors under the Restatement. However, the D.C. Court of Appeals has emphasized that concerns of uniformity and familiarity cannot prevail when another location otherwise has "a significantly greater interest than does the District" in the cause of action. Mims, 635 A.2d at 324-25; see also Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman, 491 A.2d 502, 509 n.10 (D.C. App. 1985) (efficiency concerns enter the analysis only where the interests of "both jurisdictions are equally weighty" to "tilt the balance in favor of applying the law of the forum state"). Given the strong and recognized interest of the domicile state in ensuring that its citizens are compensated for harm, and the intrinsic interest of the lex loci in deterring attacks within its jurisdiction, the law of the forum state must give way to one of these options under the choice of law rule of the District of Columbia.

That leaves the law of the domicile of the plaintiff and the law of Lebanon as possibilities. The law of a foreign country has provided the cause of action in some cases arising out of mass disasters that occurred on foreign soil. See, e.g., Harris, 820 F.2d at 1004 (applying Polish law to airplane crash occurring in Poland), Barkanic v. Gen. Admin. of Civil Aviation of the People's

Republic of China, 923 F.2d 957, 962-64 (2d Cir. 1991) (applying Chinese law to airplane crash

occurring in China).  Nonetheless, the Court believes that result would be inappropriate here, for

two reasons.  First, the cases adopting the law of the foreign state generally do so through the

application of a "most significant relationship" test or a modified law of the place of the tort

analysis instead of the "governmental interests" approach that governs in the first instance in the

District of Columbia.  Those courts using a governmental interests analysis have been more

inclined to look to the law of the domicile of the plaintiff to vindicate the jurisdiction's strong and

often paramount interest in guaranteeing redress to its citizens.  See supra at 34.

Second, the particular characteristics of this case heighten the interests of a domestic

forum and diminish the interest of the foreign state.  The injuries in this case are the result of a

state-sponsored terrorist attack on a United States embassy and diplomatic personnel.  The United

States has a unique interest in its domestic law, rather than the law of a foreign nation,

determining damages in a suit involving such an attack.  See Restatement (Third) of Foreign

Relations Law § 402(3) (1987) (recognizing that the United States has an interest in projecting its

laws overseas for "certain conduct outside its territory by persons not its nationals that is directed

against the security of the state or against a limited class of other state interests").[16]  Although the

Court concludes later in this opinion that these considerations do not justify the use of federal

common law, they do elevate the interests of the United States to nearly it highest point.  The

constructive blending analysis of the District of Columbia is a fact-specific inquiry, Mims, 635

---

[16]  See id. cmt. g (principle that country may apply law to acts "committed outside its
territory by a person not its national where the victim of the act was its national" is "increasingly
accepted as applied to terrorist and other organized attacks on a state's nationals by reason of their
nationality, or to assassination of a state's diplomatic representatives or other officials").

A.2d at 325 n.12, and this Court does not hold that there could never be a situation where the law of a foreign state might provide the rule of decision in a section 1605(a)(7) case.  In the circumstances of this case, however, domestic law, and not the law of Lebanon, should control.

Plaintiffs complain that relying on the law of the state of domicile will lead to different recoveries for each of the plaintiffs.  This is true, but there is nothing unusual or unfair about this result.  "[I]t is not uncommon for courts to apply the substantive law of several different states" in resolving mass tort cases.  See, e.g., In re Air Crash Disaster, 926 F. Supp. at 740; see also In re Air Crash Disaster at Stapleton Int'l Airport, 720 F. Supp. 1445, 1448 n.3 (D. Colo. 1988) (noting that approach of "search[ing] for the rule of law most appropriately applied within the context of a particular issue" is "widely applied" in mass tort litigation even though it "may lead to the application of the law of different jurisdictions to different issues within the same case").  Each state will choose rules of liability and damages that it thinks are best designed to protect the welfare of its citizens.  There is no injustice in a plaintiff finding herself subject to the laws of his or her state of domicile.  The injustice would be if the law governing a single plaintiff's claims were to change based on nothing more than the fortuitous presence of other plaintiffs in the suit (leading a judge to displace the various rules of decision that would otherwise apply to each plaintiff with a single rule of law applicable to them all).  See Scott Fruehwald, Individual Justice in Mass Tort Litigation, 31 Hofstra L. Rev. 323, 348-60 (2002).

Although this result might be cumbersome, it is common for mass disaster tort cases outside of the FSIA to use the plaintiff's domicile as the rule of decision even though it follows that there will be varying results for the defendants.  See, e.g., Pescatore, 97 F.3d at 11 (applying the law of the domicile state in one of the numerous consolidated cases filed against Pan Am

under the Warsaw Convention relating to terrorist bombing of airplane); In re Aircrash Disaster, 948 F. Supp. at 749-52 (applying law of domicile as rule of decision in FSIA claims brought by more than thirty plaintiffs from many different states).  Finally, as will be explained shortly, the fact that an examination of the law of the several states will be burdensome does not justify the displacement of the law of the several states with a single federal rule.  See O'Melveny, 512 U.S. at 88 ("eliminating state-by-state research and reducing uncertainty" not grounds for displacing state law with a federal common law rule).

As a consequence, the law of domicile of the plaintiff will provide the substantive rule of decision.  There are three categories of plaintiffs in this case, and identifying the law of domicile for some of them is not straightforward.  Injured victims of the bombing present the easiest task: the court will look to the law of domicile of each plaintiff, as the party claiming injury and bringing the claim.  See, e.g., O'Connor v. United States Fencing Assoc., 260 F. Supp. 2d 545, 559 (E.D.N.Y. 2003) (applying the law of domicile of plaintiff injured in sporting event, and noting that "New York obviously has a compelling interest in protecting its domiciliaries injured abroad from loss allocation rules"); In re Air Crash Disaster, 948 F. Supp. at 756 (holding that "much of the existing authority supports the application of the law of the injured person's domicile" to claims for compensatory damages).

The issue is somewhat more complicated as to the other two categories of plaintiffs:  the estates of those killed in the attack, and the survivors (family members) of individuals killed in the attack.  The claims of a decedent's estate are "traditionally governed by the laws of the decedent's domicile," because such an approach "respects the decedent's deliberate choice to make his or her home in a state and be governed by the laws of that state." In re Air Crash Disaster, 948 F. Supp.

at 758; see also Datskow v. Teledyne Cont'l Motors Aircraft Prods., 807 F. Supp. 941, 944

(W.D.N.Y. 1992) (holding that law of New York, the decedent's domicile, should apply in

wrongful death and survival action claims brought by decedents' estates, even though

administratrix of one of estates was resident of Pennsylvaia); Doetsch v. Doetsch, 312 F.2d 323,

328 (7th Cir. 1963) ("The decedent's domicile is a traditional point of reference in the solution of

many problems involving decedent's estates.").

On the other hand, in the case of survivors, the dominant rule is that the law of the state of

the survivor (rather than the decedent) should provide the rule of decision, on the theory that the

survivor is usually the injured party in these claims, asserting his or her own claims for economic

losses, loss of solatium, intentional infliction of emotional distress, and the like.  See Pescatore,

97 F.3d at 5, 13-14 (applying Ohio law to determine compensatory damages in case arising out of

airline crash in Scotland, because "the harms inflicted on the plaintiff (loss of society, loss of

financial contribution and loss of services) are harms inflicted on her in Ohio," where she was

domiciled); Patten v. Gen. Motors Corp., 699 F. Supp. 1500, 1506 (W.D. Okla. 1987) (suggesting

that state of domicile of survivors "has a strong interest in the welfare of the survivors and in

ensuring that they are fully compensated for their loss"); Stevens v. Cessna Aircraft Co., 599 F.

Supp. 481, 483 (E.D. Pa. 1984) (applying law of Pennsylvania to wrongful death action brought

on behalf of decedent with uncertain domicile, because Pennsylvania "has a strong interest in suits

brought for wrongful death where the beneficiaries are Pennsylvania citizens").

Because the domicile of the survivor and the domicile of the decedent will usually be

identical, this approach will not often lead to divergent results.  However, in those cases where the

domiciles have differed, courts seem inclined to follow the law of domicile of the plaintiff (in the

case of survivors) and the decedent (in the case of an estate).  See, e.g., In re Air Crash Diaster

Near Chicago, Ill., 480 F. Supp. 1280, 1283 (N.D. Ill. 1979) (indicating in a series of consolidated

cases that California law should govern in case where the plaintiffs are surviving relatives of

victim of crash, while Wisconsin law should apply in another case where the estate is the plaintiff

and the decedent was domiciled in Wisconsin).  This Court concludes that the general rule in

these claims should be the application of the law of the state of domicile of the plaintiff, or the

decedent in the case of an estate.

Several of the plaintiffs moved at least once since the embassy attack, and some have

moved since the filing of the Complaint.  Pl. Mot. at 91-92.  The state of domicile for these

plaintiffs should be assessed as of the date that the embassy bombing occurred.  As one court

explained:

> Although plaintiffs now reside in California, their residence and domicile at the
> time of the accident are the relevant residence and domicile.  At the time of the
> accident the plans to change the family domicile were not definite and fixed, and if
> the choice of law were made to turn on events happening after the accident, forum
> shopping would be encouraged.

Perloff v. Symmes Hosp., 487 F. Supp. 426, 428 (D. Mass. 1980); see also, e.g., Roll v. Tracor,

Inc., 140 F. Supp. 2d 1073, 1080 n.5 (D. Nev. 2001) ("It is well settled in tort cases that for the

purpose of determining domiciliary in choice-of-law analyses the relevant consideration is the

domiciliary of the plaintiff at the time of the accident.").

In addition, many of the survivors and decedents also were living overseas in Beirut at the

time the attack occurred.  The situations of these individuals varied, although most were working

at the embassy at the time at the direction of the State Department or the United States military,

had been posted in other countries previously, and would return to the United States only

intermittently.  Pl. Mot. at 91; <u>Dammarell</u>, 281 F. Supp. 2d at 113-14, 121-24, 133.  There is no

clear rule to apply to these plaintiffs, although two principles lead the Court to conclude that the

governing law should be that of their last state of domicile.  First, the Restatement of Conflict of

Laws suggests that a soldier or sailor who is "ordered to a station" does not usually become a

resident of the foreign country if he "intends, upon the termination of his service, to move to some

other place."  Restatement (Second) of Conflict of Laws §17 cmt. d (1971); <u>see</u> <u>also</u> 13B Charles

Alan Wright et al., <u>Federal Practice and Procedure</u> § 3617, at 567 (2d ed. 1984 & Supp. 2003).

Second, in the context of determining domicile for purposes of diversity jurisdiction, military and

government officials who have protracted stays away from their place of domicile in the United

States generally "retain their domicile in the state wherein they formerly resided."  Wright et al.,

<u>supra</u>, § 3620, at 573; <u>see</u> <u>Agee v. Bush</u>, No. 95-1909, 1996 WL 914110, at *4 (D.D.C.).

Although the analogy to these principles is not exact, they do suggest that an individual stationed

overseas on government business should be regarded as retaining his or her previous state of

domicile in the United States.  Although this rule may not capture the circumstance of every one

of the plaintiffs living overseas, it will be the general rule the Court will follow proceeding

forward.

    To determine the recovery of each plaintiff, the Court will ask counsel to submit for each

plaintiff:  (i) the domicile of the plaintiff as determined under the reasoning in this opinion; (ii)

any information that is necessary for the Court to resolve the issue of the domicile of the plaintiff;

and (iii) an analysis of the legal principles relating to the plaintiff's causes of action under the law

of the plaintiff's domicile, including the elements of the cause of action and any rules limiting the

allowable damages.  This information shall be provided on a schedule described in the

accompanying order.

## 2.    Federal common law

Several federal district courts have concluded that the federal common law should provide the substantive rule of decision for claims brought under section 1605(a)(7) to the exclusion of state common law or statutory principles.[17]  In its earlier decision in this case, this Court indicated -- without holding -- that federal common law could serve as an alternate source of law for a section 1605(a)(7) claim, if the Flatow Amendment and state law were unable to provide a basis for relief.  See Dammarell, 281 F. Supp. 2d at 194.  The developments in the law during the past several years, and a careful consideration of the entire area of jurisprudence, now compel the Court to find that federal common law should not serve as a rule of decision in the run of section 1605(a)(7) cases.  Several considerations lead to this conclusion.

To begin, the D.C. Circuit recently cautioned against the creation of a federal common law remedy in this context.  In Bettis v. Islamic Republic of Iran, the court was presented with the question whether nieces and nephews could obtain recovery for intentional infliction of emotional distress against Iran and the MOIS under the Flatow Amendment.[18]  Responding to the argument

---

[17]  See, e.g., Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 87 (D.D.C. 2002) ("Consistent with its approach in previous FSIA cases involving claims for personal injury or death resulting from state-sponsored terrorism, this Court will evaluate plaintiffs' claims under the federal common law."); Wagner, 172 F. Supp. 2d at 134-35 ("Specifically, in FSIA cases involving claims for personal injury or death resulting from state-sponsored terrorism, the application of federal common law will ensure the greatest level of predictability and uniformity."); Flatow, 999 F. Supp. at 14-15 ("In the interest of promoting uniformity of determinations with respect to the liability of foreign states for the terrorist acts of its officials, agents, and employees, this Court will employ interstitial federal common law to determine whether the terrorist acts were within the scope of their office, agency, or employment, as well as any other conclusions of law which typically rely upon state law.").

[18]  The D.C. Circuit in Bettis assumed (without deciding) that a claim could be asserted against a foreign state under the Flatow Amendment.  See id. at 333.  The court later concluded in

-42-

of amicus curiae that the court should look to the federal common law to determine the scope of

the intentional infliction of emotional distress claim, the court explained that the term "'federal

common law' seems to us to be a misnomer." <u>Bettis</u>, 315 F.3d at 333.  "Indeed, it is a mistake, we

think, to label actions under the FSIA and Flatow Amendment for solatium damages as 'federal

common law' cases, for these actions are based on *statutory* rights.  Without the statute, the claims

could not arise."  <u>Id.</u>

      This issue arose entirely in the context of a claim under the Flatow Amendment, and so if

<u>Bettis</u> had stopped there, the decision could be read as speaking only to the interpretation of the

terms of a federal statute, with little guidance on where to look (federal or state law) for the rule of

decision in cases that arise under the common law.  However, <u>Bettis</u> continued:

> Of course, because these claims are based on a federal statute, their 'extent and
> nature' are 'federal questions.'  <u>Burks v. Lasker</u>, 441 U.S. 471, 476 (1979).  But that
> does not, in this case, 'authorize the federal courts to fashion a complete body of
> federal law.'"  <u>Id.</u> at 477.  Rather, as we note in section II.B., <u>infra</u>, because the
> FSIA instructs that 'the foreign state shall be liable in the same manner and to the
> same extent as a private individual under like circumstances," 28 U.S.C. § 1606, it
> in effect instructs federal judges to find the relevant law, not to make it.

<u>Id.</u> (citations omitted).[19]  Later in the opinion, the court revisited these themes, quoting section

1606 and emphasizing that "we have no free-wheeling commission to construct common law as

we see fit," because the statute "instructs us to find the law, not to make it."  <u>Id.</u> at 337.  These

passages from <u>Bettis</u> send a strong signal that section 1606 of the FSIA is incompatible with the

_____

Cicippio-Puleo that such a claim was not viable.  <u>See</u> <u>Cicippio-Puleo</u>, 353 F.3d at 1032.

    [19]  <u>Burks v. Lasker</u> counsels against the creation of an entire body of federal law "out of
whole cloth" in situations where it is not shown that state laws poses a "significant threat to [an]
identifiable federal policy or interest."  441 U.S. at 479-80.

creation of a federal common law of tort.[20]

Bettis also reflects the modern rule that the federal common law should only be employed in the rarest of circumstances.  See O'Melveny, 512 U.S. at 87, 89 (noting that the "cases in which judicial creation of a special federal rule would be justified" are "few and restricted" and "extraordinary" (quotation marks omitted)); Resolution Trust Corp. v. Maplewood Invs., 31 F.3d 1276, 1294 (4th Cir. 1994) ("In the light of O'Melveny, there is a heavy presumption in favor of application of a rule of decision in accordance with Virginia law as opposed to the creation of a federal rule of decision."); Erwin Chemerinsky, Federal Jurisdiction § 6.1, at 350 (3d ed. 1999) ("There long has been a strong presumption against the federal courts fashioning common law to decide cases.").  A court should craft a federal common law rule only in cases where there are both "uniquely federal interests" and a "significant conflict between some federal policy or interest and the use of state law."  Boyle v. United Tech. Corp., 487 U.S. 500, 506 (1988); Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc., 164 F.3d 123, 127 (2d Cir. 1999).

The principal rationale for the use of federal common law in section 1605(a)(7) cases is that it promotes "predictability and uniformity" in a sensitive area of jurisprudence.[21]  But an

---

[20]  Without explanation, the D.C. Circuit has cited Bettis as precedent for the use of federal common law to determine the calculation of damages in an FSIA case.  See Hill v. Republic of Iraq, 328 F.3d 680, 683 (D.C. Cir. 2003) (consulting federal common law for conclusion that "to recover damages a FSIA plaintiff must prove that the projected consequences are "reasonably certain" (i.e., more likely than not) to occur, and must prove the amount of damages by a "reasonable estimate").  As between Bettis, which addresses the specific question of a federal common law cause of action, and Hill, which concerns only reliance on the federal common law to calculate damages, the Court finds Bettis to be more instructive authority on the question of the sources of law for causes of action.

[21]  Wagner, 172 F. Supp. 2d at 134-35; Flatow, 999 F. Supp. at 14-15 (applying federal common law in section 1605(a)(7) cases to advance "the interest of promoting uniformity of determinations").

interest in uniformity standing alone is an insufficient basis for fashioning a federal common law

remedy.  Responding to a similar argument several years ago, the Supreme Court explained that:

> Uniformity of law might facilitate the FDIC's nationwide litigation of these suits,
> eliminating state-by-state research and reducing uncertainty--but if the avoidance
> of those ordinary consequences qualified as an identifiable federal interest, we
> would be awash in 'federal common-law' rules.

O'Melveny, 512 U.S. at 88.  As a consequence, courts have consistently rejected the contention

that an interest in uniformity can support the fashioning of a federal common law rule in the

absence of a "significant conflict" between state and federal law.  See id. (interest in uniformity is

the "most generic (and lightly invoked) of alleged federal interests"); United States v. Kimbell

Foods, Inc., 440 U.S. 715, 730 (1979) ("generalized pleas for uniformity" not a basis for resort to

federal common law); B.F. Goodrich v. Betkoski, 112 F.3d 88, 90 (2d Cir. 1997) ("In conducting

this analysis, we bear in mind that absent a significant conflict between some federal policy or

interest and the use of state law, a mere federal interest in uniformity is insufficient to justify

displacing state law in favor of a federal common law rule.").

     The goal of uniformity has been rejected as a basis for the fashioning of a federal common

law rule in the specific context of mass disasters and even terrorist attacks overseas.  The question

of a federal common law remedy often arises in suits brought under Article 17 of the Warsaw

Convention, which creates a cause of action against the carrier airline for one injured or killed

during international air transportation.[22]  In Zicherman v. Korean Air Lines, relatives of a

passenger who died when a Korean Air Lines flight was shot down over the Sea of Japan sued the

---

[22]  See Convention for the Unification of Certain Rules Relating to International
Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), note following 49
U.S.C. § 40105.

airline under the Warsaw Convention.  The Second Circuit held that the goal of maintaining "a

uniform law under the Warsaw Convention" demanded application of federal common law.  43

F.3d 18, 21 (2d Cir. 1994).  The Supreme Court reversed.  516 U.S. 217 (1996).

The Supreme Court explained that the Convention "does not affect the substantive

questions of who may bring suit and what they may be compensated for.  Those questions are to

be answered by the domestic law selected by the courts of the contracting states."  Id. at 225.   The

Court described the Convention as "a pass-through, authorizing us to apply the law that would

govern in [the] absence of the Warsaw Convention."  Id. at 229.  Acknowledging that "it was a

primary function of the Warsaw Convention to foster uniformity in the law of international air

travel," the Court emphasized that the Convention "neither adopted any uniform rule of its own

nor authorized national courts to pursue uniformity in derogation of otherwise applicable law."

Id. at 230.  The Court declined to read an "implicit authorization for national courts to create

uniformity" into the Convention, explaining that the pass-through in the Convention does not

"empower us to develop some common-law rule -- under cover of general admiralty law or

otherwise -- that will supersede the normal federal disposition."  Id. at 231.

The Second Circuit several months later had occasion to apply the rule of Zicherman in a

suit arising out of the death of 243 passengers and 16 crew members in the terrorist bombing of

Pan Am flight 103 over Lockerbie, Scotland.  See Pescatore, 97 F.3d at 6.  The court examined

whether federal common law might still be appropriate under the "normal federal disposition"

contemplated by Zicherman.  The court noted that the only "significant conflict" that would

warrant the adoption of federal common law under O'Melveny  is that "between the Warsaw

Convention's goal of uniformity and the unruliness of applying multiple state laws.  As

Zicherman and O'Melveny together make clear, however, this federal concern is insufficient to justify imposition of federal common law." Id. at 11.  The Second Circuit therefore declined to invoke the federal common law, and instead looked to the law of each plaintiff's domicile as the source of law for the cause of action in the case.  See also, e.g., Piamba Cortes v. American Airlines, Inc., 177 F.3d 1272 (11th  Cir. 1999) (applying Florida law in Warsaw Convention case involving airplane crash in Colombia).

The similarities between the Warsaw Convention cases and the present dispute are striking.  Zicherman and Pescatore suggest that state law can provide an adequate rule of decision in cases arising out of terrorist incidents overseas.  They also highlight the incongruity of creating a federal common law rule under a statute demanding the "pass-through" to conventional tort principles and claims.  Perhaps most important, however, is that the Supreme Court in Zicherman "admonished lower courts to refrain from developing federal common law 'under cover' of advancing the goal of uniformity in Warsaw Convention cases."  Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1029 (2d Cir. 1996).  Under this rule, this Court does not have the license to fashion a federal common law remedy in the interest of uniformity in the very similar context of section 1605(a)(7) claims.

For similar reasons, courts have declined to fashion a federal common law rule in cases brought under the other exceptions in section 1605.  See Lord Day & Lord v. Socialist Republic of Vietnam, 134 F. Supp. 2d 549, 561 (S.D.N.Y. 2001) ("[T]he FSIA does not provide for a federal substantive law rule of decision but operates merely as a 'pass-through' to state law principles.");  In re Aircrash Disaster, 948 F. Supp. at 758 ("As for federal common law, the only reason cited in favor of creating and applying a federal common law of pre-impact fear damages is uniformity.

-47-

This bare desire to achieve an identical result in every case is insufficient to override the interest of each injured person's domiciliary state.").  Finally, courts have reached the same conclusion in the context of the FTCA, holding once again that the presence of a "pass-through" provision in the statutory scheme directs courts not to develop a new federal rule but instead to apply existing causes of action.  See, e.g., Devlin v. United States, 352 F.3d 525, 532 (2d Cir. 2003) ("[T]he FTCA's basic thrust was decidedly not to create a federal common law of torts, but rather--as expressed in the final clause of section 1346(b)(1) and in section 2674--to tie the government's liability--albeit subject to a host of qualifications--to the disparate and always evolving tort law of the several states.").  Where courts have rejected a federal common law rule under the Warsaw Convention, other section 1605 cases, and the Federal Tort Claims Act, finding each time that such a rule would be incompatible with a "pass-through" statute and cannot be justified by an interest in uniformity, this Court cannot find a compelling reason to arrive at a different conclusion here.

Plaintiffs contend, however, that a different rule is appropriate in cases involving an attack on a United States embassy.  Plaintiffs describe such an attack as tantamount to an act of war, and suggest that it therefore raises uniquely substantial federal interests.  The protection of our embassies abroad is undeniably a paramount interest of the federal government.  The law is clear, however, that a uniquely federal interest cannot support the application of a federal common law in the absence of a "significant conflict" between some federal interest and the use of state law. See O'Melveny, 512 U.S. at 87 ("Our cases uniformly require the existence of such a conflict as a precondition for recognition of a federal rule of decision"); Boyle, 487 U.S. at 504 ("That the procurement of equipment by the United States is an area of uniquely federal interest does not,

however, end the inquiry.  That merely establishes a necessary, not a sufficient, condition for the

displacement of state law.  Displacement will occur only where, as we have variously described, a

'significant conflict' exists . . . .").  Plaintiffs do not identify such a conflict, except to recite again

the refrain of "uniformity."  As discussed earlier, an interest in uniformity cannot justify the

creation of a federal common law remedy in the absence of some other significant conflict

between state law and federal interests.

The Court cannot divine any such conflict in this case.  Although the protection of our

embassies overseas is an unquestionably significant federal concern, the Court is not presented

with any reason to believe that state law is incompatible with the protection of that concern.  The

Court has heard no particular "government interest" that would be "burdened," and no "specific

objective" of the federal government that would be "frustrate[d]," by the application of state law

here.  Boyle, 487 U.S. at 506; Northrop Corp. v. AIL Systems, Inc., 959 F.2d 1424, 1429 (7th Cir.

1992).  There is no evidence that state law in this particular context limits the available causes of

action or remedies in a way that would work to the detriment of the purposes of the FSIA

generally or section 1605(a)(7) specifically.

Plaintiffs admit, as they must, that no federal common law rule has been fashioned for

embassy cases in the past.  Embassies are not regarded as part of the territorial jurisdiction of the

United States, see, e.g., Restatement (Third) of Foreign Relations Law § 466 cmt. a (1987);

Persinger v. Islamic Republic of Iran, 729 F.2d 835, 839 (D.C. Cir. 1984), and courts appear to

have assumed that foreign law generally would apply to acts committed on embassy soil, see

Poole v. Brown, 706 F. Supp. 74, 76 (D.D.C. 1989); Meredith v. United States, 30 F.2d 9, 10 (9th

Cir. 1964).  State law is applied in Warsaw Convention cases involving terrorist attacks on

airplanes; in often highly sensitive FSIA cases involving contracts and torts where a foreign state

is a defendant; and in other areas of international law, such as the enforcement of foreign

judgments, <u>Banque Libanaise Pour le Commerce v. Khreich</u>, 915 F.2d 1000, 1003 (5th Cir. 1990).

This Court cannot conclude that the application of state law to an attack on federal property

overseas creates a "significant conflict" with a federal interest in protecting the property.

Plaintiffs place heavy emphasis on the Supreme Court's recent decision in <u>Sosa v. Alvarez-

Machain</u>, 124 S. Ct. 2739 (2004), in which the Court considered whether certain causes of action

committed in violation of the law of nations are enforceable under the Alien Tort Statute, 28

U.S.C. § 1350, which establishes the jurisdiction of the district courts over "any civil action by an

alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

The Court concluded that "we are persuaded that federal courts should not recognize private

claims under federal common law for violations of any international law norm with less definite

content and acceptance among civilized nations than the historical paradigms familiar when §

1350 was enacted." <u>Id.</u> at 2765.  Earlier in the opinion, the Court had noted that "[a]n assault

against an ambassador, for example, impinged upon the sovereignty of the foreign nation and if

not adequately redressed could rise to an issue of war.  It was this narrow set of violations of the

law of nations . . . that was probably on [the] minds of the men who drafted the ATS with its

reference to tort." <u>Id.</u> at 276l.  Piecing together statements like these, plaintiffs urge that <u>Sosa</u>

recognizes a role for the federal common law in cases involving attacks on embassies.

Whether a claim may be brought for an attack on an embassy under federal common law

in cases where jurisdiction arises under the Alien Tort Statute is not before this Court.  And were

there no provision in the FSIA detailing precisely the sort of claims that a plaintiff may bring

when suing under a waiver of immunity provided by the FSIA, then the language in <u>Sosa</u> might

indeed suggest a role for the federal common law in a case such as this.  However, Congress

supplied just that statute in section 1606, setting out, albeit in general terms, the extent of liability

where the FSIA waives sovereign immunity.  As the D.C. Circuit has explained, section 1606 is

an instruction to "find the law, not to make it."  <u>Bettis</u>, 315 F.3d at 338.

Where Congress provides this sort of direction, any federal common law that might once

have existed is displaced:

> Congress has the power to override or render federal common law unnecessary by
> statute.  Insofar as one important justification for the exercise of federal common
> law is that Congress has not spoken on the matter before the court, that justification
> is removed once Congress has spoken on a particular matter.  Moreover, if the
> justification for the creation of federal common law is that it is necessary in an area
> of strong federal concern, once Congress has legislated on the subject, its decision
> prevails over the judicial lawmaking since it has primary responsibility for
> determining federal policy.

Wright & Miller, <u>supra</u>, § 4514, at 4814; <u>see</u> also <u>City of Milwaukee v. Illinois</u>, 451 U.S. 304, 312

(1981) (courts may not "develop federal common law" when Congress has "spoken to a particular

issue").  The possibility that a cause of action might be based in the federal common law in the

absence of section 1606 must give way to the instruction provided by Congress in section 1606.

Accordingly, the Court does not find this to be one of the "few and restricted" cases where it is

appropriate to fashion federal common law as the rule of decision.  The desire for uniformity

alone is not a sufficient reason to create federal common law, no other unique federal interest is

implicated, and there is no significant conflict between some important federal policy or interest

and the application of state law.

### 3.      Federal Statutes

Whether a particular federal statute gives rise to a cause of action against a foreign state

through section 1606 is an inherently delicate question, requiring a court to assess Congress's

intent across several statutes:  the federal statute giving rise to the cause of action; the relevant

waiver of sovereign immunity in section 1605; and section 1606 itself.  So, for example, the Tenth

Circuit found that the federal RICO statute was enforceable against a foreign state through the

FSIA only after it undertook a lengthy examination of the FSIA and RICO and satisfied itself that

Congress intended courts to liberally construe RICO's provisions to effectuate its remedial

purpose.  See Southway, 198 F.3d at 1215; see also, e.g., Mukaddam, 111 F. Supp. 2d at 470

(holding that Title VII applies to foreign states through section 1606 only after careful

examination of text, structure, and purpose of Title VII).

In this case, plaintiffs wish to enforce two federal statutes against defendants through

section 1606:  the Flatow Amendment and the Torture Victims Protection Act (TVPA).  Unlike

the other federal statutes that have been applied to foreign states in this manner, these are not

statutes of general application.  Instead, their very terms confine their scope to officials or agents

of foreign states.  The Court does not reach the question whether any federal causes of action can

be used to obtain damages from a foreign state through the operation of section 1606.  However, it

concludes that the two statutes plaintiffs propose cannot be expanded through section 1606 to

apply to foreign states as well as foreign officials.

### a.        The Flatow Amendment

Plaintiffs argue that the Flatow Amendment should be read to apply to foreign states

through section 1606.  The Flatow Amendment provides a cause of action against an "official,

employee, or agent of a foreign state" for "money damages which may include economic damages,

solatium, pain, and suffering, and punitive damages if the acts were among those described in

section 1605(a)(7)."  The statute was enacted only five months after – and in the same session as –

the addition of the waiver of sovereign immunity in section 1605(a)(7).  The legislative history of

the Flatow Amendment states only:  "The conference agreement inserts language expanding the

scope of monetary damage awards available to American victims of international terrorism.  The

conferees intend that this section shall apply to cases pending upon enactment of this Act."  H.R.

Conf. Rep. No. 104-863, at 987 (1996).

     The touchstone of the necessary inquiry is the intent of Congress.  See United States v.

Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989); Thompson v. Thompson, 484 U.S. 174, 179

(1988).  The Court concludes that Congress did not intend to create a cause of action under the

Flatow Amendment against foreign states through section 1606.  On its face, the statute only

applies to officials, employees, or agents of a foreign state.  There is no clue in the statute that

Congress wished – or even anticipated – that the statute would apply to foreign states as well.

Compare Mukaddam, 111 F. Supp. 2d at 470 ("From Congress' clear statement that Title VII does

not apply to foreign entities operating outside of the United States, the Court concludes the

inverse--that is, that Title VII was intended to apply to the U.S. activities of foreign employers.").

     Likewise, the legislative history does not contain "any indication that Congress intended to

take the more provocative step of creating a private right of action against foreign governments

themselves."  Cicippio-Puleo, 353 F.3d at 1031.  The legislative history certainly does not contain

any indication that Congress anticipated that the statute would encompass foreign states through

the operation of one statute it had enacted only five months earlier (section 1605(a)(7)), and

another it had enacted twenty years earlier (section 1606).  Given the proximity in time between

the enactment of the Flatow Amendment and section 1605(a)(7), one would expect some

indication that Congress expected the Flatow Amendment to apply to foreign states, and the Court would require as much before writing that result into a silent federal statute.

It is noteworthy that the Flatow Amendment does not obviously create a cause of action against a "private individual" within the meaning of section 1606.  See 28 U.S.C. § 1606 ("[T]he foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.").  Unlike RICO, Title VII, and the other statutes that clearly expose a private individual to liability, a Flatow Amendment claim can only be brought against an "official, employee, or agent" of a foreign state.  It may well be that a private individual within the meaning of section 1606 can nonetheless be an "agent" within the meaning of the Flatow Amendment.  Nonetheless, on its face, the statute is aimed at public officials rather than private individuals.  There is no reason to believe that Congress was aware at all of section 1606 and its potential for converting claims against private individuals into claims against states while it was enacting the Flatow Amendment.  Even if it was, however, it is far from obvious that Congress would have understood that the small subset of Flatow Amendment cases that could involve a private party would lead to wholesale liability for federal states through section 1606.

Finally, allowing a Flatow Amendment claim to proceed against foreign states through section 1606 is a result that is in at least some tension with Cicippio-Puleo.  That decision carefully examined the text and legislative history of section 1605(a)(7) and the Flatow Amendment and concluded that neither of those statutes, "nor the two considered in tandem, creates a private right of action against a foreign government."  Cicippio-Puleo, 353 F.3d at 1032.  Cicippio-Puleo does not completely foreclose the possibility that a cause of action might exist under the Flatow Amendment other than of its own force or through section 1605(a)(7).

Nonetheless, before reaching a result different than <u>Cicippio-Puleo</u>, the Court would require more compelling evidence of a will to create an action against foreign states in the Flatow Amendment than the mere enactment of section 1606 five months earlier.

Therefore, the Court is unpersuaded that Congress intended to allow the Flatow Amendment to be expanded to foreign states through section 1606 where:  (i) the text of the statute applies only to foreign state officials or agents but not the foreign state itself, (ii) the legislative history does not evince any intent that the statute would apply to foreign states, (iii) section 1605(a)(7) was enacted only five months before the statute, and the legislative history nonetheless does not indicate any anticipation or understanding that the statute would be applied to foreign states, and (iv) and the statute does not obviously extend to private individuals within the meaning of section 1606.  Indeed, it would be odd if, as <u>Cicippio-Puleo</u> held, the combination of section 1605(a)(7) and the Flatow Amendment did not create a private right of action against foreign states, but the combination of section 1606 and the Flatow Amendment (despite congressional silence) somehow did.  For all these reasons, the cause of action in the Flatow Amendment cannot be read to apply to foreign states through section 1606.

### b.    The Torture Victims Protection Act

A similar analysis disposes of the Torture Victims Protection Act.  The TVPA was enacted in 1992 and authorizes a federal statutory cause of action against certain individuals for acts of torture or extrajudicial killing.  The statute provides:

> An individual who, under actual or apparent authority, or color of law, of any
> foreign nation--
> (1) subjects an individual to torture shall, in a civil action, be liable for damages to
> that individual; or
> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable
> for damages to the individual's legal representative, or to any person who may be a

claimant in an action for wrongful death.

28 U.S.C. § 1350 note.  As with the Flatow Amendment, by its terms the TVPA is limited to suits

against individuals.  Plaintiff contends that the TVPA also applies to foreign states and

instrumentalities by virtue of section 1606.

Unlike the Flatow Amendment, the TVPA was enacted several years before section

1605(a)(7).  Therefore, it is at least plausible that Congress intended in enacting section

1605(a)(7) that all causes of action previously confined to individuals (and relating to the subject

of section 1605(a)(7)) would be widened to foreign states.  However, the legislative history of the

TVPA gives the Court pause.  The Senate Report is emphatic:

> The legislation uses the term "individual" to make crystal clear that foreign states
> or their entities cannot be sued under this bill under any circumstances:  only
> individuals may be sued.  Consequently, the TVPA is not meant to override the
> Foreign Sovereign Immunities Act (FSIA) of 1976, which renders foreign
> governments immune from suits in U.S. courts, except in certain instances.

S. Rep. No. 102-249, at 7 (1991).  The House Report contains similar language.  See H.R. Rep.

No. 102-367, at 87 (1992) ("Only 'individuals,' not foreign states, can be sued under the

[TVPA].").

These represent clear manifestations of the intent of Congress that the TVPA should apply

only to individuals and not to foreign states.  The Court is reluctant to override this compelling

evidence of congressional intent in the absence of some later, equally strong evidence of an intent

to the contrary.  Once again, plaintiffs offer only the enactment of section 1605(a)(7).  As the

Court held earlier, this provision -- together with section 1606 -- as a general rule will expose

foreign states to the causes of action available in a suit against a private individual.  However, the

relevant question here is whether section 1605(a)(7) reflects a specific desire to reverse its earlier

clearly expressed intent to create a cause of question for torture victims only as private individuals.

Congress' plain intent in enacting the TVPA -- as reflected in the text (which specifies only individuals) and the legislative history (which could not be clearer) -- was to confine liability for acts of torture and extrajudicial killing to private individuals.  To overcome this strong evidence of intent, the Court would require something more than the textual gymnastics of reading a 1996 statute (section 1605(a)(7)) as operating through a 1976 statute (section 1606) to expand a 1992 cause of action (the TVPA) to the states.  Therefore, the Court concludes in this instance that Congress's clearly expressed intent in 1992 should prevail over any speculative intent to the contrary in 1996.[23]

### 4.       Foreign Law

Plaintiffs also suggest that foreign law can be applied to their section 1605(a)(7) claims. The Court need not tarry long on this point.  To the extent plaintiffs are proposing that the Court adopt Lebanon law specifically (as the law of the place of the tort), this argument is addressed by the Court's reasoning in the choice of law discussion in Section II.D.1.  See supra at 32-41.  To the extent plaintiffs are arguing for the adoption of stand-alone norms of international law as the rule of decision in this case, the argument is addressed in the discussion of Sosa v. Alvarez-Machain and the federal common law in Section II.D.2.  See supra at 49-51.  In either case, foreign law does not supply the rule of decision in the circumstances of this case.

---

[23]  It is noteworthy again that Congress understood in enacting the TVPA that it would not apply in the main to "private individuals."  See, e.g., H.R. Rep. No. 102-367, at 4-5 (1991) ("The bill would apply only to those acts undertaken under color of official authority. . . .  The bill does not attempt to deal with torture or killing by purely private groups.").

### III.    Pleading Deficiencies

Although plaintiffs suggested a variety of different sources of law for their claims in their briefs, none of these appear in their complaint.  There, plaintiffs only reference the generic torts of wrongful death, solatium, battery, and intentional infliction of emotional distress, but does not explain if these are common law or statutory claims, or identify a specific source of law for any of their claims.  See Second Am. Compl. at pp. 53, 61, 67.  This was also the situation in Acree, where the plaintiffs "alluded to the traditional torts of assault, battery and intentional infliction of emotional distress in their generic form," without identifying any "specific source in state, federal, or foreign law for their cause of action" other than the Flatow Amendment.  Acree, 370 F.3d at 59.  The district court held a trial on plaintiffs' claims and entered judgment in favor of the plaintiffs.  The D.C. Circuit in Acree reversed and ordered dismissal of the complaint.  Id. at 44-45, 58.

The court explained that it had previously held in Cicippio-Puleo that the Flatow Amendment does not authorize a right of action against a foreign state.  It noted that in response to its order to the plaintiffs to "consider this issue in preparation for oral argument, appellees did not advance any alternative causes of action"; instead, the plaintiffs "gestured again towards generic common law torts," as in their complaint.  Id. at 59.  The court held that "there is no support for the proposition that generic common law itself may furnish the cause of action," and instead, "as in any case, a plaintiff proceeding under the FSIA must identify a particular cause of action arising out of a specific source of law."  Id.  Because plaintiffs "offered no coherent alternative" when pressed at oral arguments, we "find no cause to remand this case to the District Court in order to allow appellees to amend their complaint to state a cause of action under some other source of law."  Id.

Plaintiffs in this case also allege only generic common law torts, without any "specific source in state, federal, or foreign law for their cause of action."  However, they have offered a number of  "coherent alternatives," and today this Court concludes that one of them (state common and statutory law) is viable.[24]  Therefore, the Court will take the step that the D.C. Circuit has indicated should be taken if the plaintiffs are prepared to provide greater specificity, even if (as in Acree) a hearing has already been held on plaintiffs' claims:  allow plaintiffs to amend their complaint to "identify a particular cause of action arising out of a specific source of law."[25]  See, e.g., Cicippio-Puleo, 353 F.3d at 1036 (holding in light of evolving state of law that "[w]e will therefore remand the case to allow plaintiffs an opportunity to amend their complaint to state a cause of action under some other source of law, including state law, as the Kilburn amici have suggested"); Simpson v. Socialist People's Libyan Arab Jamahiriya, No. 00-1722, 2005 WL 517850, at *1 (D.D.C.) ("In their amended complaint, the plaintiffs primarily reference general tort law. . . .  Accordingly, the court grants the plaintiffs leave to amend their complaint with a statement of which law they seek this court to apply."); Welch v. The Islamic Republic of Iran, No. 01-863, 2004 WL 2216534, at *4 (D.D.C.) (Kay, M.J.) ("Unlike the plaintiff in Acree, the plaintiff in the instant case has expressed her desire to amend the complaint to state specific causes of action and has stated possible causes of action that the plaintiff would use if given the opportunity to do so.").

---

[24]  The Court notes that the plaintiff in the related case of Salazar v. Islamic Republic of Iran took steps to amend and re-serve her complaint to allege specific torts in light of Acree. Acree was decided a month before plaintiffs in this action submitted their brief for final judgment to the court.

[25]  Once viable state law causes of action are specified, the Court does not anticipate that new trial proceedings will be required.

IV.     **Proceedings**

This action will proceed as follows:

1.      Plaintiffs shall amend their complaint in a manner consistent with the
        reasoning of this Memorandum Opinion by not later than May 9, 2005, and
        effectuate service on defendants in accordance with the procedures set out
        in the FSIA.

2.      Not later than 45 days after service of an amended complaint, plaintiffs shall
        submit to the Court briefing on the proper choice of law determination and
        causes of action for each of the plaintiffs consistent with this Memorandum
        Opinion, and a proposed schedule for further proceedings in this Court and
        before Magistrate Judge Facciola, for the entry of final judgment.

3.      A status call is set for April 18, 2005, at 9:15 a.m.

## CONCLUSION

For the foregoing reasons, the Court concludes that plaintiffs have stated valid causes of

action under state law, but that the Complaint must be amended to provide greater specificity on

those claims.  A separate order will accompany this motion.


                                    /s/ John D. Bates
                                    JOHN D. BATES
                              United States District Judge

Dated:    March 29, 2005

Copy to:

Stuart Henry Newberger
Crowell & Moring, L. L. P.
1001 Pennsylvania Avenue, Northwest
Washington, D. C.  2004-2595
202-624-2649 (telephone)
202-628-5116 (fax)
Attorney for Plaintiffs