UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANNE DAMMARELL, et al.,

Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN, et al.,

Defendants.

Civil Action No.  01-2224 (JDB)

MEMORANDUM OPINION
(REVISED FINDINGS & CONCLUSIONS)

This case has been in the vanguard of mass-tort lawsuits brought by victims of terrorism against foreign states, as permitted by a 1996 amendment to the Foreign Sovereign Immunities Act ("FSIA") that revoked jurisdictional protection for terrorist-sponsoring governments.  During the more than four years that have passed since the eighty-three plaintiffs in this action first filed suit against the Islamic Republic of Iran ("Iran") and its Ministry of Intelligence and Security ("MOIS") for their involvement in the 1983 bombing of the United States Embassy in Beirut, Lebanon, several court rulings have altered the relevant legal landscape.  Two decisions by the United States Court of Appeals for the District of Columbia Circuit -- Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024 (D.C. Cir. 2004), and Acree v. Republic of Iraq, 370 F.3d 41 (D.C. Cir. 2004) -- presented potential ramifications for the conclusions of law (and corresponding damage awards) that this Court issued on September 8, 2003, with respect to the

claims of twenty-nine of the plaintiffs ("the Phase I litigants").[1] See Dammarell v. Islamic Republic of Iran, 281 F.Supp. 2d 105 (D.D.C. 2003) (hereinafter "Dammarell I").  Consistent with the D.C. Circuit's rulings, this Court subsequently affirmed that plaintiffs could allege cognizable claims against the defendants based on the FSIA's terrorism exceptions to sovereign immunity, but determined that plaintiffs needed to amend their complaint to plead specific causes of action under the common law or statutes of their respective home states.[2] See Dammarell v. Islamic Republic of Iran, 370 F.Supp. 2d 218, 220-21 (D.D.C. 2005) (opinion on plaintiffs' motion for clarification and reconsideration of the Court's March 29, 2005, order) (hereinafter "Dammarell III").  The Court granted plaintiffs leave to file an amended complaint and required them to submit a supplemental brief addressing the proper choice-of-law determination for each individual or estate.  Id.  All of that has happened, and the Court now renders revised findings of fact and conclusions of law, enters judgment for the Phase I litigants, and awards compensatory damages totaling $126,061,657.

## BACKGROUND

On April 18, 1983, at approximately 1:05 p.m., an unidentified driver crashed a vehicle

---

[1] On September 6, 2002, the Court ordered an entry of default against defendants.  The Court subsequently conducted a six-day hearing -- from April 7 through April 16, 2003 -- to receive evidence relating to plaintiffs' rights to default judgment.  For purposes of case management, the Court limited the presentation of evidence to a group of twenty-nine plaintiffs (consisting of seven victims of the bombing and the relatives and estates of four victims who were killed in the Embassy attack).  The claims of the remaining victims and families ("the Phase II litigants") were referred to Magistrate Judge John Facciola for the purpose of receiving evidence of their damages and issuing factual findings with respect to their claims.

[2] The Court held that the substantive rules of decision would be provided by the laws of each plaintiff's state of domicile as of the date of the embassy bombing (April 18, 1983).  See Dammarell v. Islamic Republic of Iran, 2005 WL 756090 at *21-23 (D.D.C.) (hereinafter "Dammarell II").

laden with hundreds of pounds of explosives into the main entrance of the United States Embassy

in Beirut.  See generally Exs. 2-10; Ex. 11.  Upon crashing into the Embassy, the vehicle exploded

with a force so powerful that seven floors in the center section of the crescent-shaped building

collapsed, or "pancaked."  See Ex. 17 at 3-4.  Portions of the Embassy, including the Marine

security guard post, the cafeteria, the United States Information Service library, the personnel

section, and the consular section, were completely destroyed by the blast.  Other parts of the

building were severely damaged.  See Tr. Vol. I at 131, 133; see also Ex. 16 at 6-17; see generally

Exs. 2-11.[3]  As a result of the blast, sixty-three people, including seventeen U.S. citizens, were

killed.  Over one hundred others were injured.  See, e.g., Tr. Vol. I at 117, 135; see also Exs. 2-11.

The bombing was the first large-scale attack against a U.S. Embassy anywhere in the

world.  See Ex. 19 (Oakley Dep. Tr.) at 22; see also Tr. Vol. I at 121-22; Ex. 35 at 13.  At the

time, it was not immediately clear who was responsible for the bombing.  See, e.g., Tr. Vol. II at

27-28; Tr. Vol. I at 121.  But by 1984, the U.S. State Department, in its annual publication

"Patterns of Global Terrorism: 1983," noted that "radical Lebanese Shi'a using the nom-de-guerre

Islamic Jihad" and "operat[ing] with Iranian support and encouragement"  were "responsible for

the suicide attack[s] against the U.S. Embassy."  See Ex. 20 at 11 (also at Oakley Dep. Ex. 1); Ex.

22 (discussing Islamic Jihad terrorist activities, including, *inter alia*, the 1983 Beirut Embassy

bombing, as "part of a major terrorist campaign aimed at the elimination of U.S. and western

influence in Lebanon"); Oakley Dep. Tr. at 23-25.  The terrorist group Islamic Jihad has been

known by various names, including Right Against Wrong, the Revolutionary Justice Organization,

---

[3] Transcript ("Tr. Vol. __ at __") and exhibit ("Ex. __") references are to the evidence at
the April 2003 hearing.

and, perhaps most commonly, Hizbollah.[4]  See Ex. 19 (Oakley Depo. Tr.) at 46; see also Oakley

Dep. Ex. 10 (also at Ex. 29) at 304.  In connection with the evidentiary hearing in this matter,

Ambassador Robert Oakley -- who, as the coordinator of the State Department's counterterrorism

efforts, was tasked with assessing who was behind the 1983 Beirut Embassy bombing, see Ex. 19

(Oakley Dep. Tr.) at 9 -- testified that it ultimately became "very clear that Islamic Jihad

[Hizbollah] was behind the bombing in 1983."  Id. at 21.  Ambassador Oakley further expressed

"confiden[ce] that the government of Iran was involved directly in the Hisballah organization,

which was created, armed, trained, protected, provided technical assistance by the Iranian

Revolutionary Guards."  Id. at 21.

Among other things, the complexity of the attack upon the U.S. Embassy in Beirut

evidenced Iran's central role in the attack.  Dr. Patrick Clawson, Deputy Director of the

Washington Institute for Near East Policy, see Tr. Vol. II at 3, and an expert in Iranian politics, the

Iranian economy, and Iranian sponsorship of terrorism, testified:

> [T]here's no question that Iran was responsible for the selection of the target, provided
> much of the information for how to carry out the bombing, the expertise for how to build
> the bomb, the political direction that said that this was an important target to bomb,
> provided financial support for the bombers.  It has the Iranians' fingerprints all over it. . . .

> [T]his was quite a sophisticated and large bomb against a well-guarded target.  And at the
> time, the people from the Shi'a community who claimed responsibility for this were just
> getting into the business of having a militia and having -- and engaging in some kinds of
> bombings.  They hadn't done a whole lot.  They didn't have established expertise; they
> didn't have a group of people locally whom they could draw upon to do this.

> And furthermore, at this time they were so dependant upon financial support from Iran,
> they had no independent means of financial support, and furthermore, they were so

---

[4] Transliteration of the organization's name has produced various spellings, including
"Hizbollah," "Hizballah," and "Hezbollah."  For ease of reference, Hizbollah is used herein,
except where an alternate spelling is reflected in exhibits or the official transcript of proceedings.

dependant upon political guidance from Iran, Iran was quite directly ordering what targets to do, what not to do.

Tr. Vol. II at 20-21.

The bombing of the U.S. Embassy in Beirut in April 1983 represented a turning point with respect to Iran-sponsored terrorism conducted in Lebanon by Hizbollah.  As Ambassador Oakley testified:

> I think it was a seminal event in anti-U.S. terrorism[,] and Lebanon seems to be the easiest place for the Iranians to operate.  As I've said before, they had several purposes, one was to drive the United States out of Lebanon, its military forces and also ... cultural influence.  Same thing is true of the French who were supporting universities there and also had military forces there as part of the Multinational Force.  The Iranians wanted to drive us out so they could put in an Iranian Shiia revolutionary state.  The second thing they wanted to do is to punish the United States for its support of Iraq, against Iran in the Iraq/Iran war, which at that stage was at its peak and the Iranians were at the losing end of it at that stage so they wanted to make it very, very clear they were going after us.  The third thing they wanted to do was -- all of these were helped by blowing up our embassy, was to show the power which Iran and its supporters could generate.  And here you have something that's not quite as powerful, but almost as the removal of the Shah as supported by the United States and indirectly by Israel.  And finally they wanted to cement their relationship within the entire Middle East by showing what they could do against us, which made them a force throughout the [Muslim] world, if you will....  So it serve[d] several different purposes for the government of Iran and did so with a degree of success.  [Although] we stood our ground, we weren't driven out of Lebanon at this stage.  It was only later on when they blew up the [Marine] barracks, which was a huge shock to the American people that finally public and political pressure convinced the Reagan administration they should pull the U.S. forces out of Lebanon.

Ex. 19 (Oakley Dep. Tr.) at 50-52.

Iran provided Hizbollah with military arms, training, and other supplies, and issued propaganda to encourage Lebanese Shi'ites to join the organization.  Ex. 34(5) at 2; see also Ex. 34(1) at 2 (CIA analysis finding that Iran provided "training and military support to the radical Shi'a groups based in the Bekka Valley").  In fact, soldiers from Iran's elite military unit, the Revolutionary Guard, set up headquarters in Lebanon's Bekka Valley to train Hizbollah recruits.

Oakley Dep. Ex. 9 (also at Ex. 28); Ex. 10 (also Ex. 29) at 304;  Ex. 34(5) at 2.  By early 1985, the

United States had "fresh and convincing evidence that radical elements highly placed within ... the

government of Iran [were] giving operational policy advice to terrorists in Lebanon, specifically

terrorists operating under the name 'Islamic Jihad' or Hizbollah."  Ex. 27 at 1; (also at Oakley

Depo. Ex. 8).

Iran also provided Hizbollah with financial support.  Indeed, while support of Hizbollah

was not specifically provided for in Iran's annual budget, "the supreme religious leader and the

president openly acknowledged that Iran was providing financial support, in fact proudly

acknowledged that Iran was providing the financial support" for Hizbollah.  Tr. Vol. II at 30.  Dr.

Clawson estimated that in 1983, the year of the Beirut Embassy bombing, Iran spent in the range

of $50 million to $150 million on its terrorist efforts.  Tr. Vol. II at 31.

Hizbollah accomplished its terrorist acts not just with the support of the Iranian

government generally, but with the specific assistance of MOIS.  An Iranian government ministry,

MOIS was formally established by law in 1983 or 1984, although it had previously existed as an

offshoot of the secret police under the regime of the former Shah of Iran.  See Tr. Vol. II at 32-33.

As part of its operations, MOIS acted, and continues to act, as "a prime conduit to terrorist and

extremist groups."  Ex. 34 (8) at 2.  See also Ex. 19 (Oakley Dep. Tr.) at 47; Oakley Dep. Ex. 10

(also at Ex. 34).  In Lebanon in particular, MOIS supported Hizbollah, nurturing it with "financial

assistance, arms and training."  Oakley Dep. Attach. 10 at 304 (also at Ex. 29); see also Tr. Vol. II

at 12; Ex. 34 (8) at 1-2.  With this support, Hizbollah evolved into "one of the most capable and

professional terrorist organizations in the world."  Ex. 34 (8) at 2.

On January 19, 1984, President Reagan designated Iran a state sponsor of terrorism.  See

Ex. 32.  This designation was in response to Iran's role in sponsoring a number of terrorist acts in Lebanon, including the April 18, 1983, Embassy bombing at issue here.  See Tr. Vol. II at 28. Iran has ever since remained on the State Department list of state sponsors of terrorism.  See 22 C.F.R. § 126.1(d) (2005); 31 C.F.R. § 596.201 (2005).  In fact, according to the Department of Defense, "[f]or over two decades, Iran's involvement in international terrorism has been unmatched by any other state.  Iran remains the world's most capable and persistent state sponsor of terrorism."  Ex. 34(8) at 1.  See also Ex. 29 at 304 ("Iran is currently one of the world's most active states supporting international terrorism and subversion against other countries."); Tr. Vol. II at 34 (Dr. Clawson responding, when asked whether Iran and MOIS continue to sponsor terrorism, "[o]h yes sir.  No question about that.").

This action commenced on October 29, 2001, when plaintiffs filed a complaint seeking damages from Iran and the MOIS for their material support of Hizbollah in the embassy bombing. Each plaintiff is a United States citizen or the estate of a United States citizen.  The plaintiffs fall into three categories: (1) individuals injured in the bombing, (2) family members of individuals killed in the bombing, and (3) the estates of individuals killed in the bombing.  The complaint alleges that each of the plaintiffs was injured as "a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Hizbollah members, whose acts were funded and directed by the Islamic Republic of Iran through its agent MOIS."  See, e.g., Third Am. Compl. ¶ 190.  As noted above, the claims are based on the common law and/or statutes of the jurisdiction where each plaintiff was legally domiciled as of April 18, 1983, the date of the embassy bombing.

## ANALYSIS

At the outset of the analysis, three points warrant emphasis.  First, although the

conclusions of law that follow supersede any contrary conclusions contained in the Court's

September 8, 2003, memorandum opinion, the findings of *fact* in that opinion should be

considered incorporated into this opinion in their entirety.  In other words, any factual

determinations in this opinion supplement, rather than supplant, those contained in the earlier

opinion.  Second, even though this decision is governed by state substantive law, and although

state statutes of limitations usually apply when federal courts adjudicate state-law claims, see

Guaranty Trust Co. v. York, 326 U.S. 99, 108-10 (1945), any statutory time bars on state causes of

action are irrelevant to these claims because Congress, through the FSIA, has pre-empted them for

purposes of lawsuits brought against foreign states pursuant to the immunity exception for

sponsors of terrorism.  See 28 U.S.C.  §1605(f) ("No action shall be maintained under subsection

(a)(7) unless the action is commenced not later than 10 years after the date on which the cause of

action arose.  All principles of equitable tolling, including the period during which the foreign

state was immune from suit, shall apply in calculating this limitation period.").  Third, although

many states permit recovery of punitive damages for torts in certain circumstances -- such as when

the plaintiff establishes by clear and convincing evidence that the defendant acted maliciously --

punitive damages are not available to any of the plaintiffs in this case, irrespective of otherwise-

governing state law, because the FSIA's revocation of sovereign immunity is narrowly drawn to

authorize claims for punitive damages only against an "agency or instrumentality" of a terrorist-

sponsoring state, but not against the foreign state itself.  This Court previously concluded that the

MOIS does not fall within the statutory definition of an "agency or instrumentality," see

Dammarell I, 281 F.Supp. 2d at 200-02, and it hereby reaffirms that conclusion.  See also Roeder

v. Islamic Republic of Iran, 333 F.3d 28, 234 (D.C. Cir. 2003) (Iran's Ministry of Foreign Affairs

"must be treated as the state of Iran itself rather than as its agent").

The claims of the twenty-nine Phase I litigants are governed by the laws of seven separate jurisdictions, including the District of Columbia.  To avoid repetition of the relevant law, this opinion is organized by applicable jurisdiction, rather than by plaintiff.  For each jurisdiction, the Court will (1) provide a statement of the controlling legal principles, (2) identify the Phase I litigants who were domiciled in that jurisdiction as of April 18, 1983, (3) apply the law of that jurisdiction to the facts surrounding those plaintiffs' claims, and (4) award appropriate compensatory damages for the claims.

## I.    Claims Under District of Columbia Law

### A.    District of Columbia Law of Battery and IIED

To establish liability for the tort of battery in the District of Columbia, a plaintiff must plead and prove "an intentional, unpermitted, harmful or offensive contact with his person or something attached to it."  Marshall v. Dist. of Columbia, 391 A.2d 1374, 1380 (D.C. 1978). "Once liability is established for [an] intentional tort[] such as ... battery, a plaintiff is entitled to at least to nominal damages, as well as to compensation for 'mental suffering, including fright, shame and mortification ....'"  Id. (citations omitted); see also Huber v. Teuber, 10 D.C. (3 MacArth.) 484 (1879) ("Compensatory damages include such as the jury may award for injuries done to the person, for all the expenses immediately resulting from such injuries, for loss of time, for disabilities, for loss of health, for bodily pain and for mental sufferings, including allowance on these accounts for the future.").

To the extent that a battery plaintiff suffered emotional distress that might be seen as caused by something other than the battery itself -- for example, the more general trauma

associated with being the target of a terrorist bombing -- and assuming that such events are dissociable, D.C. law provides plaintiffs with an additional route to recovery for psychological injuries: intentional infliction of emotional distress ("IIED").  The tort of IIED requires a showing of "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  See Howard University v. Best, 484 A.2d 958, 985 (D.C. 1984) (citations and internal quotations omitted).  Intent or recklessness can be inferred from the outrageousness of the acts, and the plaintiff need not prove accompanying physical injury.  Id.  An IIED claimant, however, must "establish that the defendant proximately caused an emotional disturbance 'of so acute a nature that harmful physical consequences might not be unlikely to result.'"  Ridgewells Caterer, Inc. v. Nelson, 688 F.Supp. 760, 764 (D.D.C. 1988) (citations omitted).  Courts applying D.C. law have determined that various emotional conditions can support an award of compensatory damages for IIED.  See, e.g., Estate of Underwood v. Nat'l Credit Union Admin., 665 A.2d 621, 642 (D.C. 1995) (upholding IIED verdict where plaintiff suffered from, among other things, depression and stress as a result of defendant's tortious conduct); Robinson v. Sarisky, 535 A.2d 901, 906 (D.C. 1988) (plaintiffs' "feelings of violation, anxiety, and helplessness" and personality changes constituted compensable emotional distress).

**B.    Plaintiff Anne Dammarell**

Anne Dammarell was born on January 2, 1938, in Cincinnati, Ohio.  She is a United States citizen and presently resides in Washington, D.C.  See Tr. Vol. I at 12.  On the date of the bombing, Ms. Dammarell was working at the U.S. Embassy in Beirut as a General Development Officer with the U.S. Agency for International Development ("AID").  See id. at 14-15; see also

Ex. 12.  As a federal government employee stationed overseas, Ms. Dammarell retained as her

domicile in 1983 the state in which she last resided.  See Dammarell II, 2005 WL 756090 at *22.

Although she had a number of postings abroad during her service to AID, Ms. Dammarell had

been domiciled in the District of Columbia since 1965.  See Pls.' Mem. in Supp. of State Law

Claims at 5.  The law of the District of Columbia, therefore, applies to her claims.

Ms. Dammarell was in the Embassy cafeteria at the time of the bombing.  See Tr. Vol. I at

33.  As a result of the explosion, she suffered nineteen broken bones: her left foot was broken in

three places; her left ribs were broken; her pelvic bone was broken; both arms were broken; two

fingers in her left hand were broken; her collar bone was broken and her scapula was broken.  See

id. at 45.  In addition to three surgeries, she required extensive physical and occupational therapy

to recover her ability to walk and write.  See id. at 55-56.  Ms. Dammarell experienced anxiety

attacks and feared that someone would attack and kill her.  See id. at 60-61.  She also endured

recurrent nightmares about various tragedies that would result in her death.  See id. at 61.  To

address her emotional distress, Ms. Dammarell sought treatment from a psychiatrist.  See id.

Based on the pleadings and the evidence presented to the Court, Ms. Dammarell has stated

a valid claim of battery under the law of the District of Columbia and is entitled to recover

compensatory damages from defendants for "injuries done to [her] person, for all the expenses

immediately resulting from such injuries, for loss of time, for disabilities, for loss of health, for

bodily pain and for mental sufferings, including allowance on these accounts for the future."  See

Huber, 10 D.C. (3 MacArth.) at 484.  The expert economic analysis presented to the Court

demonstrated that, as a result of the Embassy bombing, Ms. Dammarell suffered $1,774,602 in

economic losses.  See Ex. 39 at Tab 5.  The Court further values the loss associated with her

physical pain and suffering and mental anguish caused by the battery at $5 million.[5]  She will,

therefore, be awarded a total of $6,774,602 in damages on this default judgment.

## II.     Claims Under Georgia Law

### A.     Georgia Law of Wrongful Death, Survival of Claims, and IIED

#### 1.     Wrongful Death

Georgia's wrongful-death statute creates a cause of action in tort for the surviving spouse

or children of any person who is the victim of homicide (defined as "death ... result[ing] from a

crime, from criminal or other negligence, or from property which has been defectively

manufactured").  See Ga. Code Ann. § 51-4-1 (definitions); § 51-4-2 (right of recovery for

homicide of spouse or parent).  Where the decedent does not leave either a spouse or issue,

Georgia law provides a right of recovery for the "homicide of a child."  See Ga. Code Ann.  § 51-

4-4.  The latter provision incorporates by reference a subsection of Georgia's domestic-relations

code which declares that "[i]n every case of the homicide of a child, minor or *sui juris*, there shall

be some party entitled to recover the full value of the life of the child" -- either the decedent's

parents (one or both, depending on the circumstances), or, if there is no right of action in a parent

or parents, the decedent's personal representative (acting for the benefit of the decedent's "next of

kin").  See Ga. Code Ann. § 19-7-1(c)(1); § 51-4-5(a).[6]

The right of action accrues to the statutory beneficiaries at the time of the decedent's death.

---

[5] The Court does not believe a separate award for IIED is warranted, given that Ms. Dammarell's psychological injuries can be treated as proximately caused by the battery itself.

[6] In Georgia, a decedent's sibling can never maintain a wrongful-death action, unless the sibling happens to be the decedent's personal representative.  See Walden v. John D. Archibald Mem'l Hosp., 398 S.E.2d 271, 276-77 (Ga. Ct. App. 1990).

See Miles v. Ashland Chemical Co., 410 S.E.2d 290, 291 (Ga. 1991).  Georgia law further

provides that no "action or cause of action for the recovery of damages for homicide ... [shall]

abate by the death of either party," Ga. Code Ann.  § 9-2-41, and Georgia courts have interpreted

that statute as conferring the right of action to the estate of the person who had possessed the right

prior to death -- even if that person did not file suit during his or her lifetime, see Complete Auto

Transit, Inc. v. Floyd, 104 S.E.2d 208, 213 (Ga. 1958) (construing the effect of a 1952 amendment

adding "cause of action" to the non-abatement statute).  Nevertheless, the non-abatement statute,

by its own terms, applies only if "there is no right of survivorship in any other person."  Ga. Code

Ann. § 9-2-41; see also West v. Mathews, 121 S.E.2d 41, 43 (Ga. Ct. App. 1961) ("[I]t was the

clear intention of the legislature that ... a cause of action would survive to the personal

representative where there was no right of survivorship in any other person.").

        Although the statute offers no explanation of the meaning of a "right of survivorship," the

phrase clearly encompasses the right of a child of a homicide victim in the event that the victim's

surviving spouse -- who possesses the right of action in the first instance -- dies before obtaining a

recovery (or the right of a grandchild where the victim left no surviving spouse and the victim's

child dies prior to recovery).  See Ga. Code Ann. § 51-4-2(b) ("survival of action" provisions); see

also Kennan Welding Supplies Co. v. Bronner, 111 S.E.2d 140, 142 (Ga. Ct. App. 1959)

("Surviving children have a cause of action for the negligent homicide of their father, after the

death of the widow, who after the homicide died without instituting suit for the damages.

Therefore, the cause of action survived to the children and not to the administrator of the widow's

estate.") (citation omitted).  In Hosley v. Davidson, 439 S.E.2d 742 (Ga. Ct. App. 1993), the

Georgia Court of Appeals interpreted the non-abatement statute's "right of suvivorship" exception

-13-

to apply with equal force when the wrongful-death action belonged to the parents of the homicide victim (i.e., where the victim left no spouse or issue) and one parent later died before filing suit. The court's conclusion appears to have been based on the language of survivorship contained in Ga. Code Ann. § 19-7-1(c)(2)(B) ("If either parent is deceased, the right shall be in the surviving parent.").[7]  Thus, the court of appeals held, where a parent is living at the time of the child's death but dies prior to instituting a wrongful-death suit, that parent's right to bring a wrongful-death action will not survive to his or her estate "if there is a surviving parent or other person entitled to bring it."  Id. at 745.[8]

No reported Georgia decision has addressed the unusual situation where both parents of the victim are alive at the time of the homicide and subsequently both parents die before instituting a wrongful-death action.  Applying the rule of Hosley, the death of the first parent would vest the right of action exclusively in the second parent.  Upon the death of the second parent, two possibilities exist: (1) the right of action passes to another individual by "right of survivorship" or (2) if there is no right of survivorship in any other person, the right of action "survives to the personal representative" of the second parent, by operation of the non-abatement statute.  Beyond the reference in § 19-7-1(c)(2)(B) regarding the effect of the death of one parent

---

[7] The Hosley court disapproved of its earlier conclusions in Caylor v. Potts, 358 S.E.2d 291, 292 (Ga. Ct. App. 1987), that the non-abatement statute permits "an existing right of action by a parent to recover for the homicide of a child [to] survive to the representative of the parent's estate regardless of whether the action was filed during the parent's lifetime" because § 19-7-1(c)(2)(B) merely "set[s] forth the rights of parents as they exist on the date of the child's death." See 439 S.E.2d at 745.

[8] The case does not address whether a different result would obtain (i.e., whether the action would survive to the personal representative of the homicide victim's deceased parent) if the homicide victim's parent died *after* instituting a wrongful-death action.

of a homicide victim when another parent survives, the statutes governing the child-homicide tort
do not contain any additional obvious survivorship language.  But § 19-7-1(c)(3) does provide that
"[i]f, in any case, there is no right of action in a parent or parents under the above rules, the right
of recovery shall be determined by Code Section 51-4-5," which in turn vests the right of action in
the "administrator or executor of the decedent" (who brings it "for the benefit of the [decedent's]
next of kin").[9]  Thus, in a contest for the right to pursue a "homicide of a child" cause of action
between the personal representative of the *decedent* and the personal representative of the
decedent's *last-deceased parent* (who survived the decedent but did not file suit prior to his or her
own death), the outcome turns on whether § 19-7-1(c)(3) creates a "right of survivorship" in the
administrator or executor of the decedent, and thereby prevents operation of the non-abatement
statute, which otherwise would allow the parent's right of action to succeed to the parent's estate.
In light of the Hosley court's indication that some "other person" besides a surviving parent might
be "entitled to bring" a wrongful-death suit by right of survivorship, 439 S.E.2d  at 745, and the
fact that the child-homicide statute refers to no other proper plaintiff besides the personal
representative of the decedent, the Court is compelled to conclude that the right of action passes
by "survivorship" to the personal representative of the decedent, pursuant to Ga. Code Ann. § 19-
7-1(c)(3), when the decedent leaves neither a spouse nor issue and both parents die prior to

---

[9] Plaintiffs urge the Court to interpret the phrase "right of survivorship" in the non-
abatement statute as describing those persons who are the would-be plaintiff's heirs-at-law under
the intestate-succession statute -- that is, to declare that a would-be plaintiff's nearest kin possess a
"right of survivorship" within the meaning of § 9-2-41.  See Pls.' Mem. in Supp. of State Law
Claims at 147-48.  That, of course, cannot be a proper reading of the non-abatement statute
because it would cause the statute's exception to swallow its rule, given that intestacy statutes by
their nature always vest inheritance rights in some person or entity.

instituting the action.[10]

The measure of damages for a claim of wrongful death in Georgia is the "full value of the life" of the decedent, as shown by the evidence.  See Ga. Code Ann. § 51-4-2(a); § 19-7-1(c)(1). That is further defined as "the full value of the life of the decedent without deducting for any of the necessary or personal expenses of the decedent had he lived."  Ga. Code Ann. § 51-4-1.[11] "Georgia is unique in its measure of damages for a wrongful death action, because it uses the value of the decedent's life _to him_," as opposed to the value of the decedent's life to his survivors. Robert E. Cleary, Jr., Georgia Wrongful Death Actions § 6-1 (3d ed. 2005) (emphasis added). Thus, "the measure of damages is the same as [it would be] for a person who survives a tortious injury but is totally and permanently disabled."  Id.  "[O]ther elements of damages, which are not associated with the decedent but are associated with a statutory beneficiary," such as mental anguish or grief over the relative's death, "are prohibited."  Id.; see also Southwestern R.R. Co. v. Paulk, 24 Ga. 356 (1858) (jury in a wrongful-death action "cannot take into consideration the mental sufferings occasioned to survivors, by the death"); Elsberry v. Lewis, 231 S.E.2d 789, 791 (Ga. Ct. App. 1976) ("It is well settled that there can be no recovery for solatium" in a wrongful-death action.).  A calculation of the "full value of life," however, is not limited to estimates of the

_____

[10] The Court's expresses no opinion about whether the right would pass to the personal representative of the last-deceased parent, by operation of the non-abatement statute, if that parent instituted the action during his or her lifetime.

[11] Technically the statutory definition applies only to the term "full value of the life of the decedent, as shown by the evidence" as it is used in Chapter 4 of Title 51 of the Georgia Code. See Ga. Code Ann. § 51-4-1.  The Court, however, sees no reason to conclude that the same meaning should not apply to the term "full value of the life of the child," as it is used in Ga. Code Ann. § 19-7-1(c)(1), given that § 51-4-4 specifically incorporates "Code Section 19-7-1" and that there is no apparent justification for attaching significance to the variation between the use of the word "decedent" in § 51-4-2(a) and the use of the word "child" in § 19-7-1(c)(1).

present value of the decedent's projected monetary income; it also permits jurors to assign a cash

value to the services that the decedent would have provided to others without cash compensation.

In other words, wrongful-death damages in Georgia take account of the non-pecuniary value

(sometimes referred to as "psychic value"[12]) *to the decedent* of activities she would have engaged

in during her lifetime.  As the Georgia Court of Appeals has explained:

> [D]amages [for wrongful death] may be categorized as: (1) those items having a proven
> monetary value, such as lost potential lifetime earnings, income, or services, reduced to
> present cash value or (2) lost intangible items whose value cannot be precisely quantified,
> such as a parent's 'society, advice, example and counsel ...' as determined by the
> enlightened conscience of the jury.

Consol. Freightways Corp. of Del. v. Futrell, 410 S.E.2d 751, 752 (Ga. Ct. App. 1991) (citations

omitted);[13] see also Bulloch County Hosp. Auth., 183 S.E.2d 586, 590 (Ga. Ct. App. 1971) ("jury

is not bound to find that lifetime earnings reduced to present value is the 'full value of the life of

the decedent'"); Southern Ry. Co. v. Turner, 81 S.E.2d 291, 294 (Ga. Ct. App. 1954) (value of the

deceased's guidance and assistance to his daughter in furtherance of her education "may be

considered ... on the question of the value of the life of the deceased").

### 2.    Survival of Claims

Although a wrongful-death action under Georgia law provides for a recovery for the "full

value of the life of the decedent," that amount does not include damages for pain and suffering *by*

---

[12] Tax law scholars use this term to describe the untaxed value of non-income-producing
activities.  See, e.g., Edward J. McCaffery, The Uneasy Case for Wealth Transfer Taxation, 104
Yale L.J. 283, 341 (1994) (noting that certain tax schemes might encourage a wealthy individual
to forgo "productive work effort" in favor of "leisure of equivalent psychic value").

[13] Notwithstanding the use of the disjunctive "or," these two categories are not "alternative
methods of calculating the full value of life," but rather are distinct elements of a total valuation.
See Childs v. United States, 923 F.Supp. 1570, 1582 (S.D. Ga. 1996).

*the decedent*, if any, during the time period between the fatal injury and death.  See Complete Auto Transit, Inc., 104 S.E.2d at 212 ("The cause of action for wrongful death is a separate and distinct cause of action from that of the [decedent] for her pain and suffering.").  Such *inter vivos* pain-and-suffering damages are recoverable through a separate action -- such as battery -- under Georgia's common law of torts.  See Hendricks v. Southern Bell Tel. & Tel. Co., 387 S.E.2d 593, 594-95 (Ga. Ct. App. 1989) ("Any act of physical violence ... inflicted on the person of another, which is not necessary, is not privileged, and which constitutes a harmful or offensive contact, constitutes an assault and battery.").

The distinction between a wrongful-death action and a battery action is not limited to the variation in the measure of damages.  The identity of the plaintiff often will be different, as well.  Unlike wrongful-death claims, which belong to statutorily designated individuals, personal-injury claims such as battery are vested in the victim -- and, by operation of the non-abatement statute, they survive to the victim's personal representative upon the victim's death.  See Ga. Code Ann. § 9-2-41; Smith v. Mem'l Med. Ctr., 430 S.E.2d 57, 59 (Ga. Ct. App. 1993) ("[A]n individual's claim for wrongful death and an estate's claim for the decedent's pain and suffering are distinct causes of action."); In re Ray, 545 S.E.2d 617, 620 (Ga. Ct. App. 2001) ("[T]he right to recover damages for pain and suffering vests in the child, not the parent," though the parent may have a proper claim for homicide of the child and for medical and funeral expenses.).  As noted above, the personal-injury action need not have commenced prior to the victim's death for the right of action to survive to the decedent's estate administrator or probate executor.  See Complete Auto Transit, Inc., 104 S.E.2d at 212-13.

### 3.    IIED

Independent of a wrongful-death claim or a battery claim that survives a plaintiff's death, Georgia law also provides a civil remedy for individuals who suffer emotional distress due to the negligent or malicious act of another.

Whenever emotional distress is an actual and foreseeable consequence of a tortious act that *also causes physical harm* (or actual injury to tangible property), the victim of the tortious act is free to prove the existence of psychological injury as part of a broader claim for damages. <u>See, e.g.</u>, <u>Westview Cemetery, Inc. v. Blanchard</u>, 216 S.E.2d 776, 779 (Ga. 1975) ("Where there is a physical injury or a pecuniary loss, compensatory damages include recovery for accompanying 'mental pain and suffering' ...."); <u>Lee v. State Farm Mutual Ins. Co.</u>, 533 S.E.2d 82, 84 (Ga. 2000) ("So far as mental suffering originating in physical injury is concerned, it is rightly treated as undistinguishable from the physical pain.") (quoting <u>Chapman v. Western Union Tel. Co.</u>, 15 S.E. 901 (1892)); Ga. Code Ann. § 50-21-22(3) (defining "loss" under the Georgia Tort Claims Act to include "mental anguish").

Where, however, the plaintiff's mental suffering did not "originat[e] in physical injury," and the actions of the defendant that caused the suffering were merely negligent, Georgia adheres to the so-called "impact rule" and denies recovery. <u>See Lee</u>, 533 S.E.2d at 85-86. Absent physical impact, the only way a plaintiff can recover for purely psychological injury is by establishing that the defendant's conduct was malicious, willful, or wanton. <u>See Westview Cemetery, Inc.</u>, 216 S.E.2d at 779 (noting that "recovery where the only injury is to peace, feelings or happiness was disfavored at common law"); <u>Pike Nurseries, Inc. v. Allen</u>, 558 S.E.2d 834, 836 (Ga. Ct. App. 2002). In short, for a Georgia plaintiff to recover for *negligent* infliction of emotional distress, there must be some accompanying physical harm, but emotional distress standing alone is

compensable if it is *intentionally* inflicted, regardless of whether there was any physical impact on the plaintiff.

To sustain a claim of intentional infliction of emotional distress, the plaintiff must prove the following four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe." See Everett v. Goodloe, 602 S.E.2d 284, 292 (Ga. Ct. App. 2004).  Georgia courts also require that the act complained of be "directed towards the plaintiff." See Strickland v. Hodges, 216 S.E.2d 706, 709 (Ga. Ct. App. 1975) ("It was the absence of this element of being 'directed towards the individual plaintiff' which was the basis of other decisions holding that without a showing of physical injury there was no cause of action for emotional harm."); Ryckeley v. Callaway, 412 S.E.2d 826, 827 (Ga. 1992) ("[E]ven malicious, willful or wanton conduct will not warrant a recovery for the infliction of emotional distress if the conduct was not directed toward the plaintiff."). Generally speaking, this rule restricts the availability of claim of IIED that is based purely on the psychological trauma associated with learning about physical harm inflicted on a loved one. Under those circumstances, the plaintiff must show that the malicious act was directed not only toward the physical well-being of the person who was immediately targeted, but also that it was directed toward the emotional well-being of that victim's family.

B.     **Plaintiffs**

1.     **Estate of Janet Lee Stevens, by Jo Ann Stevens, Administrator**

Janet Lee Stevens was working in Beirut in April of 1983 as a freelance journalist for the Japanese newspaper Asahi and the English-language periodical Monday Morning.  See Tr. Vol. V

at 104, 125, 144-45; Ex. 50 at 2.  Ms. Stevens was born December 1, 1950, in Michigan.  She was

a United States citizen and was raised in the state of Georgia.  Tr. Vol. V at 89-90.  Ms. Stevens

began living and working in the Middle East in the mid-1970s.  She first went to the American

University in Cairo, where she studied and taught Arabic.  Id. at 97.  From Cairo she moved to

Tunisia, where she lived for almost two years and was married to a Tunisian playwright.  That

marriage, however, ended in divorce.  Id. at 149.  While she was living abroad, most of Ms.

Stevens's immediate family continued to reside in Georgia.  See Pls.' Mem. in Supp. of State Law

Claims at 102.  Ms. Stevens was interviewing U.S. AID personnel in the Embassy cafeteria at the

time of the bombing, and she sustained fatal injuries as a result of the attack.  She was survived by

her parents, Jean Hadley Stevens and Hazen Henry Stevens (though both later died; her mother in

1995 and her father in 1997); by her twin sister, Jo Ann Stevens; and by her two brothers, Hazen

Hadley Stevens and Scott Stevens.  See Ex. 49.  Jo Ann Stevens is the Administrator of the estate

of Janet Lee Stevens.  See id.; Tr. Vol. V at 91.  The estate was probated in Georgia.  See Ex. 49.

For the reasons explained above, see § II-A-1, supra, Jo Ann Stevens, as Administrator of

her sister's estate, is the proper plaintiff to maintain an action under Georgia law for the wrongful

death of Janet Lee Stevens because the decedent left no spouse or issue and both of her parents

died prior to instituting the action.  Pursuant to Section 51-4-5(a) of the Georgia Code, any

recovery by the estate's administrator is for the benefit of Ms. Stevens's "next of kin" -- here, her

brothers and sisters.  Based on the pleadings and the evidence presented to the Court, Jo Ann

Stevens has made out a valid claim for "homicide of a child," within the meaning of the Georgia

wrongful-death statutory scheme, see Ga. Code Ann. § 51-4-4, and therefore is entitled to recover

the "full value of the life of the decedent," including "lost potential lifetime earnings, income, or

services, reduced to present cash value [and] lost intangible items whose value cannot be precisely quantified," as determined by this Court, see Futrell, 410 S.E.2d at 752.  The expert economic analysis presented to the Court demonstrated that, were it not for Ms. Stevens's untimely and wrongful death, she would have earned wages, benefits, and retirement pay amounting to $1,949,000.  See Ex. 39 at Tab 1; see also Dammarell I, 281 F.Supp. 2d at 195 (explaining the methodology used by the expert to calculate economic damages for victims who were killed in the Embassy bombing).  As for the "intangible" aspect of the value of Ms. Stevens's life, the Court concludes that there is evidence in the record to support such an award -- specifically, for the value to Ms. Stevens of the personal support she would have provided to her family during her lifetime.  But the Court nonetheless will decline to award such damages in this case because the beneficiaries of the wrongful-death recovery also are plaintiffs in their own right for IIED, based on the same event that caused Ms. Stevens's death, and an assessment of the non-pecuniary value of the life of the decedent would be, for all intents and purposes, wholly duplicated in any calculation of the IIED damages to her siblings and her late father.  In other words, the Court will take full account of the intangible losses occasioned by this homicide in the context of the claims of IIED brought by her next of kin, which are discussed below.

Plaintiffs' brief suggests that the estate of Janet Lee Stevens also can maintain a cause of action that is "separate and distinct" from the wrongful-death claim, see Pls.' Mem. in Supp. of State Law Claims at 149 (citing Complete Auto Transit, Inc., 104 S.E.2d at 212), based on the Georgia law that permits a tort claim to survive the death of the plaintiff, see Ga. Code. Ann. § 9-2-41.  But, as explained above, see § II-A-2, supra, that statute is relevant only if the decedent suffered damages during the time period between the fatal injury and death (e.g., medical

expenses or pain and suffering).  In this case, there is no factual support for such a claim by the estate of Janet Lee Stevens.

Accordingly, the Court will award the estate of Janet Lee Stevens, by Jo Ann Stevens as Administrator, a total of $1,949,000 in damages, for the benefit of Janet Lee Stevens's next of kin, on this default judgment.

### 2.     Jo Ann Stevens

Plaintiff Jo Ann Stevens is the identical twin sister of Janet Lee Stevens.  See Tr. Vol. V at 90; Ex. 50 at 3-9.  Jo Ann Stevens is a United States citizen and was domiciled in Georgia on April 18, 1983. See Tr. Vol. V at 89-90.  At that time she was working at CNN headquarters in Atlanta, and she learned of the Embassy attack through information transmitted to CNN by various news wires.  See id. at 103.  She did not, at this point, think that her sister had been at the Embassy, though she was concerned that she might have been in the general area.  Ms. Stevens returned to her apartment that evening, and went to sleep.  Sometime later, she received a phone call from her sister's boss at Asahi, who reported that Janet Stevens had been in the bombing. After the passage of a period of time, Jo Ann Stevens "gathered enough courage" to call her father, Hazen Stevens, and tell him that Janet Stevens had been killed.  Id.  Ms. Stevens testified that she spent the next six months of her life consumed by grief, thinking only about her sister and the memories of "everything that we did together and wanted to do." Id. at 111.  While Ms. Stevens recognized that her sister "would be mad at [her] for, you know, being sort of like a victim," getting over her sister's death proved to be "easier said than done."  Id.

Jo Ann Stevens has asserted a personal claim against defendants for IIED, which is governed by the law of Georgia.  Based on the pleadings and the evidence presented, the Court

has no hesitance in concluding that defendants' actions in facilitating the Embassy bombing were
intentional, malicious, extreme, and outrageous, and that their conduct was the proximate cause of
severe emotional distress experienced by Jo Ann Stevens following the murder of her twin sister.
See Everett, 602 S.E.2d at 292 (outlining the elements of an IIED claim in Georgia).
Furthermore, the Court finds that the acts of defendants were "directed towards the plaintiff." See
Ryckeley, 412 S.E.2d at 827.  As this Court has previously observed, in a case arising out of the
same Embassy bombing: "[A] terrorist attack -- by its nature -- is directed not only at the victims
but also at the victims' families.  In this case, the evidence demonstrates that defendant's campaign
of attacks against Westerners was intended not only to harm the victims, but to instill terror in
their loved ones and others in the United States."  See Salazar v. Islamic Republic of Iran, 370
F.Supp. 2d 105, 115 n.12 (D.D.C. 2005) (citations omitted).  The Court, therefore, will enter a
judgment by default against defendants on the IIED claim of Jo Ann Stevens and award her
compensatory damages totaling $3 million.

### 3.      Hazen Hadley Stevens

Plaintiff Hazen Hadley Stevens is the oldest brother of Janet Lee Stevens.  See Tr. Vol. V
at 117-18; Ex. 50 at 3-11.  Mr. Stevens is a United States citizen.  See Tr. Vol. V at 117.  At the
time of the Embassy bombing, he was living in a hotel in Washington, D.C., on a temporary basis.
See Pls.' Mem. in Supp. of State Law Claims at 103.  Although he subsequently moved to New
York for a work assignment before returning to Georgia, at all times relevant to this litigation
Georgia remained his place of domicile.  Georgia law, therefore, governs his personal claim
against defendants for IIED.

On April 19, 1983, the day after the Embassy attack, Mr. Stevens saw an article about the

bombing in The Washington Times.  See Tr. Vol. V at 126.  The article, which was accompanied by a picture of Janet Lee Stevens, indicated that his sister was believed to have been killed in the attack.  See id.  This was the first indication to Mr. Stevens that his sister had been at the Embassy on April 18.  See id.  In the aftermath of his sister's death, Mr. Stevens, as the oldest of the Stevens siblings, "[t]ried to be a little stronger and tried to be protective to some degree, and helpful."  Id. at 130.  At the family funeral service held for his sister in Atlanta, Mr. Stevens was in charge of escorting his mother, who was mentally ill.  He indicated that the entire situation was "extremely difficult for her," and that she "would refuse to go to the funeral and really refused to go to the graveside ceremony."  Id. at 129.  In terms of his own grieving process, Mr. Stevens stated, "I think that I tried to block a lot of things out."  Id. at 131.  From his observations, his sister Jo Ann Stevens went through a prolonged period of grief; as he testified, "I think it took her a number of years [before] she came back to some kind of really feeling of confidence and reality."  Id. at 130.  He does not think that his father ever recovered from the loss.  See id.

Like Jo Ann Stevens, Hazen Hadley Stevens has asserted a personal claim against defendants for IIED, which also is governed by the law of Georgia.  Based on the pleadings and the evidence presented, Mr. Stevens has stated a valid claim of IIED under the law of Georgia and is entitled to recover from defendants for his own severe emotional distress.  The Court, therefore, will enter a judgment by default against defendants on the IIED claim of Hazen Hadley Stevens and award him compensatory damages totaling $2.5 million.

**4.    Scott Stevens**

Plaintiff Scott Stevens is the brother of Janet Lee Stevens.  See Tr. Vol. V at 134; Ex. 50 at 2-6, 12-18.  At the time of the Embassy bombing, Mr. Stevens -- who is a United States citizen --

resided in Georgia.  The last time that Scott Stevens saw his sister Janet was in December 1981, when Janet came to visit her family for the Christmas holidays.  See id. at 142.  As he recalled, "[s]he was homesick for us, and we were certainly homesick for her."  Id. at 143.  According to Mr. Stevens, he, his brother, and his father made "comments" to Janet Stevens along the lines of "hey, Janet, it's time to come home.  It's time to get out of harm's way."  Id.  Indeed, Mr. Stevens felt that the circumstances in the Middle East were such that his sister was in danger.  See id.  Janet Stevens considered her family's concerns, but opted to return to the Middle East.  See id. at 144.

Scott Stevens heard news reports about the Embassy attack on April 18, 1983, but "[n]ever even made a connection that Janet would be at the embassy because of her position."  He recalled that when he heard the news of Janet's death from their father, he was "very angry" that "anybody ... could take innocent life."  Id. at 146.  Mr. Stevens, who was married with three children at the time, said he avoided dealing with his grief for some time.  "[W]hat I ended up doing is I ended up avoiding, I guess for several years, the impact by concentrating on trying to advance my own personal career and make more money, and you know, take the children to soccer games every Saturday....  So there was a lot of opportunity for me to -- there was a lot of opportunity for me to bury myself in my own family."  Tr. Vol. V at 149.  Despite these efforts, none of these activities took away Mr. Stevens's grief, or his feeling that "our family got cheated, cheated [out] of the times and the future memories."  Id.

Scott Stevens has asserted a personal claim against defendants for IIED, which is governed by the law of Georgia, his state of domicile in 1983.  Based on the pleadings and the evidence presented, Mr. Stevens has stated a valid claim of IIED under the law of Georgia and is entitled to

recover from defendants for his own severe emotional distress.  The Court, therefore, will enter a

judgment by default against defendants on the IIED claim of Scott Stevens and award him

compensatory damages totaling $2.5 million.

## III.    Claims Under Florida Law

### A.       Florida Law of IIED

The Florida Supreme Court has "explicitly recognized the independent tort called

intentional infliction of emotional distress (as contrasted with emotional distress as an element of

damages caused by another tort)."  Williams v. City of Minneola, 575 So. 2d 683, 690 (Fla. Dist.

Ct. App. 1991).  Florida's definition of the tort tracks Section 46 of the Restatement (Second) of

Torts, which provides that "[o]ne who by extreme and outrageous conduct intentionally or

recklessly causes severe emotional distress to another is subject to liability for such emotional

distress."  See id.  Based on that description, Florida courts have established the following

necessary elements for an IIED cause of action: "(a) deliberate or reckless infliction of mental

suffering; (b) outrageous conduct; (c) the conduct must have caused the emotional distress; and

(d) the distress must be severe."  Id.  An IIED claim does not require that the plaintiff demonstrate

that he or she suffered any "impact" or physical injury from the defendant's conduct.  See id. at

693.  The causation prong of the tort, however, does demand that the plaintiff establish that the

alleged tortfeasor either intended his conduct to cause the plaintiff's emotional distress or acted in

deliberate disregard of a substantial probability that the plaintiff's mental suffering would follow

from his conduct.  See id. at 692.  In other words, the plaintiff must be a foreseeable victim.

"Several Florida cases have held that even where the requisite outrageousness occurred in the

defendant's acts toward the original victim, the emotional distress felt by close relatives of that

victim when they learned of the acts was not actionable if the relatives were not present during the acts and the defendant's conduct was not directed at the relatives." Id. at 694 (citing cases). But, in the Williams case, the District Court of Appeal made clear that presence by the plaintiff is not a prerequisite for IIED recovery. See id. at 690. In holding that a plaintiff could maintain an action for IIED based on the outrageous display of pictures of the dead body of a spouse, child, sibling, or parent, regardless of whether the plaintiff witnessed the outrageous conduct, see id., the appeals court tacitly acknowledged that some forms of outrageous behavior, though directed in the most immediate sense at one person, can be directed at others who are not present.

By statute in Florida, "[n]o cause of action dies with the person." See Fla. Stat. Ann. § 46.021 (West 2005). Rather, "[a]ll causes of action survive and may be commenced, prosecuted, and defended in the name of the person prescribed by law." Id. Therefore, any claim for personal injury, which includes IIED, can be maintained by the personal representative of the claimant once the claimant dies -- unless the personal injury was the *cause* of the claimant's death, in which case the only proper cause of action is for wrongful death. See ACandS, Inc. v. Redd, 703 So. 2d 492, 493 (Fla. Dist. Ct. App. 1997); Fla. Stat. Ann. § 768.20 ("When a personal injury to the decedent results in death, no action for the personal injury shall survive, and any such action pending at the time of death shall abate.").

### B.    Plaintiff Estate of Hazen Stevens, by Scott Stevens, Administrator

Hazen Stevens was the father of Janet Lee Stevens. See Tr. Vol. V at 151; Ex. 50. Mr. Stevens, who was alive at the time that his daughter was killed in the Beirut Embassy bombing and was a U.S. citizen, died in 1997 in Sarasota County, Florida. See Ex. 49. On April 18, 1983, Hazen Stevens was domiciled in Florida, and his estate was probated in that state. See Pls.' Mem.

in Supp. of State Law Claims at 104.  The estate of Hazen Stevens is represented by Scott

Stevens, as administrator, for purposes of this litigation.  See Tr. Vol. V at 151; Ex. 49A.

Jo Ann Stevens, Hazen Hadley Stevens, and Scott Stevens each presented testimony

regarding the effect that the loss of his daughter Janet had on Hazen Stevens.  From the

perspective of Hazen Hadley Stevens, the oldest of the Stevens siblings, Hazen Stevens never got

over the loss of his daughter Janet in the Beirut Embassy bombing.  As Mr. Stevens testified:

> My father never recovered, and he just -- he was very -- it was a very difficult time for him
> for the rest of his life, which was about 15 years.  And I mean, he would break into tears
> from time to time when you go visit him, just out of nowhere.  For a great man, he wasn't
> acting so great.  Of course, I've never lost a child.

Tr. Vol. V at 130.  This grief affected every aspect of Mr. Stevens' life.  As Scott Stevens testified:

> He made very poor decisions economically, retreated.  I think he had a very difficult time.
> I think he tried to overcome it.  I think his experience with our mother, who was mentally
> ill, I think it probably kept him from seeking professional help himself because that was a
> hard experience for him to go through.  So he did the best he could.  He just made a lot of
> mistakes.  Made a lot of mistakes economically, made some very -- took his retirement
> money and made some investments in oil, which was very speculative, you know, instead
> of looking out for his economics and those kind of things.

Id. at 148-49.  As a result of these decisions, Mr. Stevens "lost his condominium" and "went from

owning a condominium on the ocean to living five miles inland struggling to pay rent."  Id. at 149.

The estate of Hazen Stevens has asserted a personal claim against defendants for IIED,

which is governed by Florida law.  Based on the pleadings and the evidence presented -- and

consistent with the Florida District Court of Appeal decision in Williams, 575 So. 2d at 690, and

with this Court's conclusion that the attack on the Embassy was directed not only at those

individuals who were present, but also was directed at their families, see § II-B-2, supra --  the

Court finds that Mr. Stevens has stated a valid claim of IIED under the law of Florida.

Furthermore, that claim survived Mr. Stevens's death, pursuant to Section 46.021 of the Florida

Statutes, and his estate is, therefore, entitled to recover from defendants for Mr. Stevens's severe

emotional distress.  The Court will enter a judgment by default against defendants on the IIED

claim of the estate of Hazen Stevens and will award Scott Stevens, as Administrator,

compensatory damages totaling $3.5 million.

## IV.     Claims Under North Carolina Law

### A.     North Carolina Law of Battery and IIED

In North Carolina, "[t]he elements of battery are intent, harmful or offensive contact,

causation, and lack of privilege."  Hawkins v. Hawkins, 400 S.E.2d 472, 475 (N.C. Ct. App.

1991).[14]  "Under North Carolina law, a plaintiff may recover the present worth of all damages that

naturally flow from the defendant's conduct."  In re Air Crash Disaster at Charlotte, N.C., 982

F.Supp. 1101, 1111 (D.S.C. 1997) (citing King v. Britt, 148 S.E.2d 594, 597 (N.C. 1966)).

"Specifically, under North Carolina law, a personal injury plaintiff may recover damages for

pecuniary loss and expenses, loss or diminution of earnings during incapacity, impairment of

future earning capacity, and pain and suffering, including mental suffering."  Id.

Where a battery claim is based on outrageous and malicious conduct by the defendant and

the plaintiff suffers emotional trauma, there frequently will be more than one route to recovery in

tort; that is, the plaintiff can seek damages for battery and for intentional infliction of emotional

distress.  See Holloway v. Wachovia Bank & Trust Co., 452 S.E.2d 233, 240-41 (N.C. 1993) (A

battery "may amount to extreme and outrageous conduct which is intended to cause and which

---

[14] A subsequent decision by the same court made clear that "lack of privilege" is not an element of the tort that the plaintiff must prove; it is more precisely described as an affirmative defense, for which the defendant bears the burden of production and persuasion.  See Redding v. Shelton's Harley Davidson, Inc., 534 S.E.2d 656, 658-59 (N.C. Ct. App. 2000).

does cause severe emotional distress.  If so, then [it] satisf[ies] the elements of an IIED claim and all damages proximately flowing from plaintiff's severe emotional distress caused in turn by this conduct are recoverable.").  "The essential elements of a claim for intentional infliction of emotional distress are '1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress.'"  Id. at 240 (citing Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981)).  A battery claim, however, typically will allow a more complete recovery than an IIED claim, because any recovery for IIED would not include "damages resulting from ... physical injuries inflicted by the battery," see id. at 242, whereas the damages recoverable for the battery usually would encompass any mental suffering that followed (assuming there is a sufficient causal link between the battery and the subsequent emotional distress), see Iadanza v. Harper, 611 S.E.2d 217, 221 (N.C. Ct. App. 2005) ("Compensatory damages provide recovery for, *inter alia*, mental or physical pain and suffering, lost wages and medical expenses.").  Although a plaintiff is free to advance multiple theories of liability and to obtain full recovery for his damages, he is "not entitled to 'double recovery' for the same loss or injury."  See Markham v. Nationwide Mut. Fire Ins. Co., 481 S.E.2d 349, 357 (N.C. Ct. App. 1997).

### B.    Plaintiff Charles Light

In 1983, plaintiff Charles Light was a Sergeant in the Marine Security Guard contingent assigned to protect the Beirut Embassy.  See Tr. Vol. IV at 7-8; see also Ex. 44.  Mr. Light was born January 26, 1950, in Hobbs, New Mexico, and is a United States citizen.  See Tr. Vol. IV at 3.  At the time of the Embassy bombing, Mr. Light maintained his legal domicile in North Carolina.  See Pls.' Mem. in Supp. of State Law Claims at 10-11.  The law of the state of North Carolina, therefore, applies to his claims.

On the morning of April 18, 1983, Mr. Light was preparing his troops for an inspection.

See Tr. Vol. IV at 10-11.  When the bombing took place, Mr. Light was shining his boots in his

office, which was on the front of the Embassy and approximately forty feet away from Marine

Security Guard Post 1.  See id. at 11-12.  As Mr. Light testified:

> Well, [the blast] knocked me out.  The blast.  As you can see, that embassy is sort of a half
> moon shape, and on the back of the embassy was a V-shaped retaining wall.  It was very
> tall in places.  The blast evidently had gone through and hit that retaining wall and then
> came through a window that was next to me, picked me up and blew me through a cinder
> block wall into the next office.  And then the cinder block ceiling fell on top of me, and I
> woke up in that situation, probably six, seven minutes after the initial blast....
>
> There was probably a million tons of debris floating in the air; and I took a breath and it
> coated my throat, and I thought I was choking to death.  In fact -- but luckily, as I was
> going to my knees, my head went below the strata of the debris, and I took a breath; and
> that's the first time I looked around and noticed that the building was no longer the one I
> thought I was in a few minutes ago, you know.
>
> The RSO, regional security officer's armory had gone up in smoke, and all the CSCN, all
> the gas was cooking off and it was burning, you know.  A few days later, in fact, all the
> skin on my eyeballs peeled off like a sunburn.  Rounds were popping off, were cooking
> off, what we call in the Marine Corps cooking off, and rounds were going off everywhere
> you looked.

Id.  at 12-13.  A breeze then blew through the bombed Embassy, blowing away the dust and

chemicals.  See id. at 13.  When Mr. Light stood up, he realized that his shoes had been blown off.

See id.  He also realized that the desk where he had been sitting -- and which had taken seven men

to move into his office -- had been reduced to splinters.  See id.  The next thing that Mr. Light

recalled was the chaos of the situation:

> And I'm standing in the rubble anywhere from sofa size to grain particles.  There's
> reinforcement bar everywhere.  The place is on fire, the gases as I described before, and
> rounds popping off.  And then my hearing came back to me, because it just about deafened
> me.  And I started hearing screams and moans and pleas for help, and then I heard the
> Lebanese sirens and all that kind of business going on all at one time.  It was absolute
> chaos.  It was crazy.

Id. at 14.  Mr. Light was also in "serious pain" at this point.  "I suppose the window that was next to me had sort of vaporized into tiny, tiny particles of, you know, like hair filaments of glass, and it had penetrated through this arm and across this [part of my] face.  And I had a serious problem with my neck, and it crushed this thumb here; and then part of my hip and then my feet, of course, were bleeding by now."  Id. at 14-15.  Despite his own injuries, Mr. Light worked twenty-two straight days, in twenty-hour shifts, on the "digging detail," meaning the rescue and recovery effort.  Id. at 23.

Mr. Light first sought treatment for the injuries he had suffered in the Embassy bombing in late June, about two months after the attack.  See id. at 24-25.  He went to the headquarters of the Battalion Landing Team  ("BLT") -- the same Marine detachment at the Beirut Airport that would be bombed later that year, and was sent from there on a small boat to an amphibious warship anchored off the shore of Lebanon, where an orthopedic surgeon examined Mr. Light and found that he had crushed the C4 and C5 vertebrae in his neck.  See id. at 25.  Soon thereafter, in late July, Mr. Light left Beirut.  See id.

After leaving Beirut, Mr. Light reported to Bethesda, Maryland, where he was put on physical therapy for approximately one month before his crushed vertebrae were operated on.  See id. at 26.  In October 1983, a C4-C5 fusion was performed on Mr. Light, using a bone harvested from Mr. Light's right hip and titanium wire to fuse the vertebrae.  See id. at 26-27.  Mr. Light remained in the hospital for only two days following this operation because "the BLT was destroyed; and they were bringing in a lot of patients, and they needed the space for them."  Id. at 27.  After Mr. Light was released from Bethesda, he was placed in a neck brace, put on six months limited duty, and transferred to the Medical [Hold] platoon at Quantico, Virginia.  See id. at 27.

He was thereafter sent to an interrogator/translator platoon at Camp Lejeune, North Carolina, and, in early 1984, to the Defense Language Institute to study Arabic.  See id. at 27-28.  After a year and six weeks of Arab language study, Mr. Light was sent on two "floats" with Marine Amphibious Readiness Groups, the first with the 24th Marine Expeditionary Unit, and the second with the 26th Marine Expeditionary Unit.  See id. at 28.  Mr. Light returned from the second tour in the spring of 1989.  See id.

During the six years between the Beirut Embassy bombing and the end of his second "float," Mr. Light had been experiencing "serious pain."  Id. at 29.  He turned to various substances for relief, testifying, "I did crawl into a bottle.  I believe it was Southern Comfort for about three years.  I drank myself silly for about three years."  Id. at 29.  When asked why, Mr. Light responded:

> First off, it did have an effect.  It did help the pain.  And second of all, I was trying to -- I guess I was feeling sorry for myself, actually.  I was thinking about Beirut and the things that I'd seen.  There were several people in that embassy that I actually loved....
>
> You know, just things like that will eat on you after a while.  So I took the easy way out, I suppose.  I drank myself into oblivion for a few years.

Id. at 29.  Mr. Light's wife Fadia, whom he had met in Beirut, convinced him to stop drinking by threatening to leave him.  See id. at 30.

After completing his "floats," in 1989 Mr. Light reported to Cairo, where he still experienced pain from the injuries he had suffered in Beirut.  See id. at 30.  In Cairo, the United States Embassy doctor was "shooting [him] up with steroids," and Mr. Light found a Yugoslavian acupuncturist to administer treatment when the Embassy doctor reached the legal limit on the amount of steroids that he could administer.  Id. at 30-31.  While the acupuncture helped, Mr. Light stopped the treatments after three sessions when the government refused to pay for any

more.  See id. at 31.

After three years in Cairo, Mr. Light spent the next five years as the noncommissioned officer in charge of the interrogator/translator platoon at Camp Lejeune, North Carolina.  See id. at 31.  In 1997, he received orders to go to Okinawa as the intelligence chief of the 3rd Marine Expeditionary Force, where he was in charge of intelligence operations encompassing some 4,000 men.  See id.  While in Okinawa, he continued to experience pain from his Beirut injuries.  Id. at 32.  Neurosurgeons in Okinawa did another procedure on Mr. Light to repair the original fusion, which had collapsed.  See id.  Mr. Light's pain did not diminish and, after testing revealed that this second fusion had collapsed, doctors did a third fusion, this time harvesting bone from Mr. Light's left hip.  See id.  The neurosurgeons in Okinawa then decided that Mr. Light needed specialized care, and arranged for him to be transported to the Bethesda Naval Hospital to have yet another operation, during which titanium plates were installed on the inside of Mr. Light's neck.  See id. at 32-33.  As a result, Mr. Light testified, "[m]y spine was sandwiched in titanium plates bolted to my spine."  Id.  at 33.  Only two days after this surgery, Mr. Light was put on a commercial flight back to Okinawa.  See id. at 33.  When he arrived in Okinawa, Mr. Light testified that he "was in so much pain that [he] couldn't stand it."  Id.  Further tests revealed that the doctor who had put the plates in Mr. Light's neck had put in screws that were twice too long, and had screwed them into the nerves of Mr. Light's spine.  See id.  Mr. Light was placed on a commercial flight back to Bethesda where his wound was reopened, the original screws taken out, and new screws put in.  This time, Mr. Light was permitted to recuperate for 10 days.  See id.  As was the case with his previous surgeries, following this last operation, Mr. Light had to wear a neck brace for the next ninety days.  See id. at 34.

Mr. Light continues to suffer pain from the injuries suffered in the 1983 Beirut Embassy

bombing, and he described the pain as:

> [A] sharp, stabbing pain in my neck.  It radiates through my shoulders.  It still continues to
> cause migraine headaches, serious migraine headaches, and it's constant.  And the
> Veterans Administration has rated me at an 80 percent disability and has determined that
> there's never going to be any more operations on me.  So they've got me into pain
> management, and they're prescribing drugs for me for the pain.

Id. at 33-34.  He takes a variety of medications to control the pain.  "I take six [oxycontin], maybe

12 tramadols, six or eight amocrystalline.  There's six or seven tenzanadine, and there's several

more that I quit taking because of the side effects.  But I take 25 to 30 pills a day."  Id. at 34.

Mr. Light rotated from Okinawa back to the United States in 2000 as a Master Gunnery

Sergeant, E-9.  See id. at 34-35.  While this is the highest rank attainable as an enlisted man in the

Marine Corps, Mr. Light feels that he would have achieved that rank earlier were it not for his

injuries, noting that "the Marine Corps is very stringent on physical fitness."  Id. at 35.  In July

2001, Mr. Light retired from the Marine Corps.  See id.  After spending a year working for a

defense contractor, Mr. Light joined the U.S. State Department as a GS-13 level security

specialist.  See id. at 35-36.  Mr. Light's current career is not the one that he anticipated, and was,

in his opinion, directly affected by the injuries suffered in the Beirut Embassy bombing.  See id. at

37.  As Mr. Light testified:

> I wanted to be a carpenter, I wanted to be -- I wanted to restore antique vehicles and things
> of that nature, but I can't do anything that's very physical anymore.  So I have to rely on
> jobs where I can use my mind and use a computer and use, you know, that kind of thing.
> So I can't work physical labor very well.

Id. at 37.  He had also anticipated going back to the oil industry after his second enlistment in the

Marines ended in 1983, noting that he made more money in 1970 as an oil field worker than he

was making when he retired from the Marine Corps as a Master Gunnery Sergeant.  See id.

In the years since the Embassy bombing, Mr. Light never sought counseling, noting "I just never -- was just raised that -- I just don't believe in counseling.  I think a man should be able to do it himself, even though I'm probably wrong."  Id. at 36.  Certain terrorist acts, such as the Oklahoma City bombing and the World Trade Center attacks, "shock" him "back to 1983, just like that," id., as do certain loud noises and smells.  Id. at 36-37; see also Tr. Vol. II at 54 (Dr. Larry Pastor testifying that "a sound or a smell or a certain cue may make a victim [of trauma] suddenly re-experience [the underlying event] as much as to sort of remember it in the past, but to feel as if they are there and reliving it again").  The 1983 Beirut Embassy bombing affected Mr. Light's overall view of the world.  As Mr. Light testified:

> I don't trust anybody anymore.  When I go overseas -- and I travel a lot; last year I was in 14 countries -- and everybody I see, I'm thinking that this guy wants to hurt me because I'm American.  He wants to kill me or he wants to cause me problems.
>
> So I've got this real cynical view of this world, and every single time something happens, it just reinforces my idea that because I'm an American, everybody wants to shoot me full of holes, you know.  So I'm distrustful of everything and everybody, just about.

Tr. Vol. IV at 38; see also Tr. Vol. II at 51 (expert psychiatric testimony indicating that anxiety, "being on edge," and hypervigilence are typical symptoms exhibited by victims of trauma).

Based on the pleadings and the evidence presented to the Court, Mr. Light has stated a valid claim of battery under the law of North Carolina and is entitled to recover compensatory damages from defendants for "the present worth of all damages that naturally flow from the defendant[s'] conduct," including "damages for pecuniary loss and expenses, loss or diminution of earnings during incapacity, impairment of future earning capacity, and pain and suffering, including mental suffering."  See In re Air Crash Disaster at Charlotte, N.C., 982 F.Supp. at 1111.  The expert economic analysis presented to the Court demonstrated that, as a result of the Embassy

bombing, Mr. Light suffered $894,869 in economic losses.  See Ex. 39 at Tab 6.  The Court

further values the loss associated with his physical pain and suffering and mental anguish at $5

million.  He will, therefore, be awarded a total of $5,894,869 in damages on this default judgment.

## V.      Claims Under New York Law

### A.      New York Law of Battery and IIED

Battery in New York is defined as "a wrongful physical contact with another through

intentional contact by the tortfeasor and without the consent of the victim."  Yanez v. City of New

York, 29 F.Supp. 2d 100, 116 (E.D.N.Y. 1998).  Whereas a battery is actionable upon even "the

slightest unlawful touching of the person of another" if some injury results, see United Nat'l Ins.

Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993), the tort of IIED, by

contrast, imposes liability only for substantially egregious behavior that causes significant

psychological harm (though no physical contact is required), see Howell v. N.Y. Post Co., Inc.,

612 N.E.2d 699, 702 (N.Y. 1993).  New York defines IIED as having four elements: "(I) extreme

and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing,

severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe

emotional distress."  Id.  Because the tort of IIED does not proscribe specific conduct, it is "as

limitless as the human capacity for cruelty."  Id.  In cases of extreme violence that causes both

physical pain and intense mental suffering -- as was the case here -- the victim of such violence

can recover fully under either theory of liability: battery or IIED.[15]  "[C]ompensatory damages

_____

[15] Although a plaintiff may pursue either theory of tort liability, "[a] plaintiff seeking
compensation for the same injury under different legal theories is of course only entitled to one
recovery."  See Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995) (applying New
York law).

recoverable for ... battery and intentional infliction of emotional distress include compensation for

the injury itself [and for] conscious pain and suffering[,] including mental and emotional anxiety."

Deborah S. v. Diorio, 153 Misc.2d 708, 715 (N.Y. Civ. Ct. 1992).  "[A] plaintiff's subjective

testimony of pain may be sufficient to establish an injury for which he or she is entitled to some

compensation," so long as that testimony demonstrates that the injury is more than minimal.

Laurie Marie M. v. Jeffrey T.M., 159 A.D.2d 52, 56 (N.Y. App. Div. 1990).

### B.      Plaintiff Daniel Pellegrino

Plaintiff Daniel Pellegrino served as a Naval Intelligence Specialist in the Defense

Attaché's Office at the U.S. Embassy in Beirut.  See Tr. Vol. II at 111-112.; see also Ex. 40; Ex.

14 at 213.  Mr. Pellegrino was born November 28, 1950, in Cambridge, New York, and is a

United States citizen.  See Tr. Vol. II at 109.  Before joining the Navy in 1976, Mr. Pellegrino

lived and worked in the state of New York.  After retiring from the military in 1993, he returned

to New York.  Thus, at the time of the Embassy bombing, New York was his legal domicile, and

New York law will govern his claims.

On April 18, 1983, Mr. Pellegrino went to work in his office on the sixth floor of the

Embassy.  See id. at 115.  He broke for lunch around noon and ate in the cafeteria with friends.

See id.  Mr. Pellegrino left the cafeteria around 1:00 p.m.  See id.  He returned to his office, spoke

with his supervisor briefly, and then made a phone call to cancel a flight.  See id. at 115-16.  At

that moment, the bomb exploded.  See id.  As Mr. Pellegrino testified, he heard:

> [A] tremendous explosion, and I thought I had blinked.  The office looked normal, and
> then when I opened my eyes, which I thought was a blink away, it was completely
> changed.  It was just completely devastated.  The ceiling had come down, the windows
> were gone, the air conditioner came out, the door was off its hinges, the walls were all
> sprayed with shrapnel or glass or debris, and lots of smoke, tear gas.

Id. at 117.  Mr. Pellegrino, who had been sitting in his chair, was thrown out of his chair and up against the wall behind him.  See id.

He was puzzled because he saw a "fair amount of blood," but "felt no pain."  Id. at 117-18. Mr. Pellegrino put his hands up to his ears, and when he brought them down, saw blood all over them and his shirt.  See id. at 118.  He then realized that he had been cut on his head, nose, side of his face, neck, and hands, and had glass embedded in his skin.  See id. at 118, 122.  After finding his way out of the building, Mr. Pellegrino eventually was taken to AUB Hospital by ambulance. See id. at 121.  A doctor ordered that Mr. Pellegrino be given two tetanus shots.  Id.  Mr. Pellegrino testified that "the shots hurt.  And at that point, then I think my wounds started hurting. I really didn't feel anything up until that time.  Those two shots sort of made my pain come up." Id.  After that, Mr. Pellegrino was examined and received stitches.  See id. at 122.

The following day, Mr. Pellegrino returned to the Embassy, and eventually returned to his duties.  See id. at 124-26.  Mr. Pellegrino remained in Beirut until October, 1983.  See id. at 126. In the following years, Mr. Pellegrino was posted to bases in the United States, Diego Garcia, Korea, and Japan.  See id. at 127-28.  He retired from the military in October 1993.  See id. at 128.  Mr. Pellegrino's retirement was prompted by lack of promotions.  See id. at 136.  Prior to Beirut, Mr. Pellegrino had been regularly promoted; subsequent to Beirut, the promotions stopped.  See id.; see also id. at 75 (psychiatric expert Larry Pastor testifying that "one could predict overall lower occupational achievement and more difficulties along the way" among those with Post-Traumatic Stress Disorder ("PTSD") and similar trauma-related disorders stemming from the Embassy bombing).  Mr. Pellegrino testified that he stopped receiving promotions because, after the bombing, "I wasn't the same person I was when I got [to Beirut].  I think just

overall I was a different kind of person, completely changed." Id. at 136; see also id. at 55 (Dr. Larry Pastor testifying that deterioration of performance in major life areas, including in the workplace, is one of ten symptom clusters often seen in the aftermath of trauma).

Mr. Pellegrino also has experienced psychological changes that he attributes to the bombing:

> I know my temper was very short most of the time. Little things would make me very angry. We were advised ... to keep a weapon in our apartments, and I -- instead of just keeping it unloaded in the chamber, I kept it loaded all of the time. I was always hyper-aware of where I was going or what I was doing. Kept a low profile.... I think I had problems with concentration at times. I never slept well. I've really never slept well since Beirut.... I know I didn't sleep well, and when I did, things were bothering me ... [like s]afety, physical safety, and someone may come crashing through the door. Kidnapping was -- the whole time I was [in Beirut], kidnapping was a threat.

Tr. Vol. II at 129-130, 131, 133; see generally id. at 53-56 (Dr. Larry Pastor discussing symptom clusters involved in PTSD, with specific symptoms including, *inter alia*, sleeplessness; nightmares; fearfulness; avoidance of sights, smells and other stimuli that might trigger a re-experiencing of traumatic event; difficulty in emotionally connecting with others; moodiness and irritability; hypervigilence; and preoccupation with the underlying trauma). Mr. Pellegrino never sought counseling to treat these issues, because he feared that he would lose his security clearance. Id. at 132. In retrospect, Mr. Pellegrino believes that he would have benefitted from counseling. See id. at 133.

Based on the pleadings and the evidence presented to the Court, Mr. Pellegrino has stated a valid claim of battery under the law of New York and is entitled to recover compensatory damages from defendants for "the injury itself [and for] conscious pain and suffering[,] including mental and emotional anxiety." See Diorio, 153 Misc.2d at 715. The expert economic analysis presented to the Court demonstrated that, as a result of the Embassy bombing, Mr. Pellegrino

suffered $296,039 in economic losses.  See Ex. 39 at Tab 8.  The Court further values the loss

associated with his physical pain and suffering and mental anguish at $750,000.  He will,

therefore, be awarded a total of $1,046,039 in damages on this default judgment.

## VI.    Claims Under Texas Law

### A.    Texas Law of Battery and IIED

Under Texas law, a defendant is liable for the tort of battery "if he intentionally or

knowingly causes physical contact with another when he knows or should reasonably believe the

other person will regard the contact as offensive or provocative."  Bailey v. C.S., 12 S.W.3d 159,

162 (Tex. App. 2000).  A successful battery plaintiff may recover damages for, among other

things, "physical pain and mental anguish, medical expenses, disfigurement, and loss of earnings

and earning capacity."  See Baribeau v. Gustafson, 107 S.W.3d 52, 61 (Tex. App. 2003).  Texas

also recognizes the tort of IIED where a plaintiff can establish that "1) the defendant acted

intentionally or recklessly, 2) the conduct was 'extreme and outrageous,' 3) the actions of the

defendant caused the plaintiff emotional distress, and 4) the resulting emotional distress was

severe."  Standard Fruit & Vegetable Co. v. Johnson, 985 S.W.2d 62, 65 (Tex. 1998).  The Texas

Supreme Court, however, has greatly limited the availability of such a cause of action, holding

that "a claim for intentional infliction of emotional distress cannot be maintained when the risk

that emotional distress will result is merely incidental to the commission of some other tort."  Id.

at 68 (denying recovery under an IIED theory because the defendant's conduct "involved a primary

risk of physical injury or death" rather than a primary risk of emotional distress).  "Where

emotional distress is solely derivative of or incidental to the intended or most likely consequence

of the actor's conduct, recovery for such distress must be had, if at all, under some other tort

doctrine."  Id. at 67.  In short, a battery victim in Texas may not pursue a claim for IIED that arose

out of the same conduct as the battery claim.[16]

### B.    Plaintiff Rayford Byers

Plaintiff Rayford Byers was assigned to the U.S. Embassy in Beirut as a Chief Warrant

Officer 3 with the U.S. Army's Mobility Training Team.  See Tr. Vol. III at 38-39; see also Ex. 42.

Mr. Byers was born September 9, 1944, in Crobyston, Texas, and is a United States citizen.  See

Tr. Vol. III at 33.  At the time of the Embassy bombing, Mr. Byers was stationed at -- and was a

resident of -- Fort Hood, Texas.  See Pls.' Mem. in Supp. of State Law Claims at 6.  He was

deployed to Beirut in the early spring of 1983 for a temporary duty assignment with the Mobility

Training Team.  See Tr. Vol. III at 40, 41.  Thus, for purposes of this complaint, he was domiciled

in Texas, and the Court will apply Texas law to his claims.

On the morning of April 18, 1983, Mr. Byers and his team went on maneuvers with the

Lebanese Army.  See id. at 42-43.  The team returned to the Embassy at approximately 11:00 a.m.

for their scheduled lunch hour.  See id. at 43.  Mr. Byers asked a team member to order him a ham

sandwich from the cafeteria while he went to an office on the Embassy's fifth floor to make

preparations for the team's return to the United States.  Id.  at 43-44.  He was in that office when

the car bomb detonated.  After hearing a "large explosion," he ran out of the office and was

thereafter blown out of a fifth story window by a second explosion.  See id. at 44.  He landed on a

pile of debris, including a metal fence with arrow-shaped stakes designed to prevent intruders

---

[16] Even if a plaintiff could simultaneously assert claims of battery and IIED stemming from
the same event, Texas's "one satisfaction" rule would, in any event, "prevent [the] plaintiff from
obtaining more than one recovery for the same injury," including where "defendants commit
technically differing acts which result in a single injury."  See Stewart Title Guar. Co. v. Sterling,
822 S.W.2d 1, 7 (Tex. 1991).

from scaling the Embassy.  See id. at 45.  One of the stakes pierced Mr. Byers's left eye, exiting

out the back of his skull.  Another stake pierced his hand.  See id. at 45-46.  After being blown out

of the window, Mr. Byers remembers very little, as he fell in and out of consciousness.  See Tr.

Vol. III at 45-47.  He recalls "hollering and screaming" for help.  Id.  at 45-46.  A young Lebanese

boy heard his cries and brought rescue workers to his aid.  See id.  The rescue workers extricated

Mr. Byers from the rubble and transported him to the AUB Hospital.  See id.  After Mr. Byers's

injuries were assessed, he was taken into surgery.  During surgery, Mr. Byers was twice

pronounced dead.  See id. at 49-50.  He fell into a coma after surgery and did not wake up until

four or five days later.  See id.

    When Mr. Byers awoke from his coma, he was in a great deal of pain from his injuries,

which included:  a crushed skull; the loss of his left eye; two broken collar bones; fourteen broken

ribs; two broken arms; a twisted back; injuries to his legs and knees; internal bleeding; nerve

damage in his hands and hips; broken fingers; and a puncture wound to his left hand from the

fence spike.  See id. at 47-50.  While at AUB, Mr. Byers feared for his safety. See id. at 51-52.

He believed that the persons responsible for the Embassy bombing would "come back and finish

the job" -- that is, kill him.  Id.  at 52.  See Tr. Vol. II at 58-59 (Dr. Larry Pastor testifying that

fears and anxieties are among first symptoms of trauma among those severely injured in an

attack).

    Approximately ten days after the bombing, Mr. Byers was transported from AUB Hospital

to the U.S. military hospital at Wiesbaden, Germany.  See Tr. Vol. III at 54-55.  While at

Wiesbaden, Mr. Byers received dental work and some other minor treatment.  See id. at 54.

Because Mr. Byers had not yet been able to move his legs, he believed he was paralyzed.  See id.

at 54-55.  That possibility made Mr. Byers "wan[t] to die."  Id. at 55.  As Mr. Byers explained, "I

didn't want to be where someone would have to take care of me the rest of my life, so I'd have

been better off being dead."  Id.  Mr. Byers was transported from Wiesbaden to Andrews Air

Force Base, and from there to Darnell Army Hospital in Fort Hood, Texas.  See id. at 56.  He

received in-patient care at Fort Hood for approximately two weeks, and then received outpatient

care for approximately two and a half years.  See id.  During this time, Mr. Byers continued to

suffer pain from his injuries.  See id.  At Fort Hood, Mr. Byers underwent surgery to repair

injuries to his arms, hands, and collar bone.  See id. at 57.  Mr. Byers underwent therapy to relearn

how to walk, think, and write.  See id.  He did not begin walking again until early 1984, and did

not begin writing again until approximately six months later.  See id. at 59-60.  He also underwent

psychiatric counseling for approximately a year.  See id. at 57.

Mr. Byers returned to active duty at Fort Sill, Oklahoma, in 1984.  See id. at 58.  He

retired from the military on August 5, 1984, after serving over twenty-one years.  See id.  Mr.

Byers had originally planned to retire from the military after thirty years of service, in order to see

his children through college.  See id. at 59.  He retired early because he felt that he was

"physically unfit for the military."  Id.  Mr. Byers remained in the Fort Sill area upon retirement,

but was unable to secure immediate employment due to his injuries.  See id. at 59.  He ultimately

obtained a civilian job at Fort Sill.

The Embassy bombing continues to affect Mr. Byers's life.  He is still under a doctor's care

for the injuries he received in the Embassy bombing.  See id. at 61-62.  Mr. Byers recently

underwent a procedure that restructured his left eye socket, and received a new prosthesis for the

eye.  See id. at 62.  The loss of Mr. Byers's left eye in the Embassy bombing, combined with

diabetes-related deterioration of vision in his right eye, prevents Mr. Byers from driving at night.

See id.  Mr. Byers continues to suffer pain from his injuries, including pain associated with

rheumatoid arthritis and recurrent headaches.  See id. at 56, 62, 63.  In total, Mr. Byers takes

eighteen pills a day for various bombing-related ailments, including Dilantin (to prevent seizures),

Motrin (to control pain), and Naprelan (for arthritis).  See id. at 56, 63.  In addition to his physical

symptoms, Mr. Byers continues to suffer from nightmares, which began shortly after the Embassy

bombing.  See id. at 64.  In his nightmares, Mr. Byers re-lives the experience of the Embassy

bombing.  See id. at 64-65.  Events such as the Oklahoma City bombing, the 9/11 terrorist attacks,

and the war in Iraq contribute to his psychological trauma.  See id.; see also Tr. Vol. II at 64-65

(Dr. Larry Pastor testifying that events such as Oklahoma City bombing and events of September

11, 2001, may trigger memories of a trauma and bring onset or recurrence of psychological

symptoms of trauma or PTSD).  In part because of the nightmares, Mr. Byers currently is receiving

psychiatric treatment.  See Tr. Vol. III at 65.

Based on the pleadings and the evidence presented to the Court, Mr. Byers has stated a

valid claim of battery under the law of Texas and is entitled to recover compensatory damages

from defendants for "physical pain and mental anguish, medical expenses, disfigurement, and loss

of earnings and earning capacity."  See Baribeau, 107 S.W.3d at 61.  The expert economic

analysis presented to the Court demonstrated that, as a result of the Embassy bombing, Mr. Byers

suffered $345,580 in economic losses.  See Ex. 39 at Tab 7.  The Court further values the loss

associated with his physical pain and suffering and mental anguish at $7 million.  He will,

therefore, be awarded a total of $7,345,580 in damages on this default judgment.

VII.    **Claims Under Virginia Law**

A.    **Virginia Law of Battery and IIED**

In Virginia, "[t]he tort of battery is an unwanted touching which is neither consented to, excused, nor justified." Koffman v. Garnett, 574 S.E.2d 258, 261 (Va. 2003).  "[T]he slightest touching of another ... if done in a rude, insolent or angry manner, constitutes a battery for which the law affords redress ...." Pugsley v. Privette, 263 S.E.2d 69, 74 (Va. 1980) (quoting Crosswhite v. Barnes, 124 S.E.2d 242, 244 (Va. 1924)).  Upon finding that a defendant committed battery, a jury (or, if jury trial is waived, a court) can award damages for any "injuries received and ill effects sustained by the plaintiff [that] were proximately caused by the battery." See id. at 76. Damages can include compensation not only for physical pain and suffering, but also for mental or emotional harm.  See, e.g., Norfolk Beverage Co. v. Cho, 525 S.E.2d 287, 291 (Va. 2000) (holding that jury was entitled to consider in assessing damages for battery "any shame, humiliation, embarrassment or indignity to [plaintiffs'] feelings").

Damages also are available to a plaintiff who can make out an IIED claim.  Since 1974, Virginia courts have "explicitly recognized the existence of an independent tort referred to as 'the intentional infliction of emotional distress,' sometimes called the tort of 'outrage.'" See Russo v. White, 400 S.E.2d 160, 162 (Va. 1991) (citing Womack v. Eldridge, 210 S.E.2d 145 (Va. 1974)). "[E]motional distress resulting from a non-tactile tort may be compensated if the plaintiff alleges, and proves by clear and convincing evidence, that: the wrongdoer's conduct is intentional or reckless; the conduct is outrageous and intolerable; the alleged wrongful conduct and emotional distress are causally connected; and the distress is severe." Id.  The kinds of distress for which

recovery is permitted under the tort of IIED include: "all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." Id. at 163 (quoting the Restatement (2d) of Torts § 46, Comment j (1965)).

**B.      Virginia Wrongful-Death Actions**

By statute, Virginia permits the personal representative of a deceased individual to bring an action against any person or persons (including corporations or other legal entities) whose wrongful conduct caused the decedent's death. See Va. Code § 8.01-50. In an action for death by wrongful act, "the personal representative of the deceased sues primarily as trustee for certain statutory beneficiaries" rather than for the general benefit of the estate. Wilson v. Whittaker, 154 S.E.2d 124, 128 (Va. 1967). The eligibility of beneficiaries is determined by reference to the wrongful-death statute's system of preferred classes, see Va. Code § 8.01-53(A), which operates in much the same way as the order of distribution in an intestacy statute. For present purposes, only the first two of the five classes are relevant, as all the Phase I litigants whose damages will be determined by Virginia law fall within one of those two groups: "(I) the surviving spouse, children of the deceased and children of any deceased child of the deceased or (ii) if there be none such, then ... the parents, brothers and sisters of the deceased." See id.[17] The statute provides that "[t]he verdict or judgment of the court trying the case without a jury shall include ... damages for the following:

(1)      Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent;

(2)      Compensation for reasonably expected loss of (I) income of the decedent and (ii)

---

[17] Also eligible in each of those classes would be "any other relative who [was] primarily dependent on the decedent for support or services and [was] also a member of the same household as the decedent," but none of the decedents in this phase of the case had any such other relatives.

services, protection, care and assistance provided by the decedent. ..."

See Va. Code § 8.01-52; see also Wilson, 154 S.E.2d at 128 ("damages may be awarded not only

for the pecuniary loss sustained by the statutory beneficiaries (including the probable earnings of

the deceased for the duration of his life expectancy in view of his health, age, business capacity,

and experience) but also for loss of the deceased's care, attention and society, as well as such sum

as the [court] may deem fair and just as a solatium to the beneficiaries for their sorrow and mental

anguish caused by the death").  The statute further requires the judgment of the court to "specify

the amount or the proportion to be received by each of the beneficiaries."  Va. Code § 8.01-54(A).

Virginia law also allows a decedent's estate to maintain any cause of action that the

decedent would have been able to assert during his or her life (e.g., battery or IIED).  See Va.

Code § 8.01-25.  Such a claim is said to survive the plaintiff's death.  If, however, the surviving

cause of action would seek recovery for injuries caused by the same conduct that ultimately led to

death, the estate must elect whether to pursue that claim or, alternatively, a wrongful-death action.

In other words, the claims are mutually exclusive.  See Hendrix v. Daugherty, 457 S.E.2d 71, 75

(Va. 1995) ("a person may not recover for the same injury under the survival statute and the

wrongful death statute. There can be but one recovery.").  Here, the plaintiffs have clearly chosen

to seek recovery under the wrongful-death statute; they reference the Virginia survival statute only

as an alternative theory of liability.  See Pls.' Mem. in Supp. of State Law Claims at 110-11.

Plaintiffs suggest a third theory of liability based on Virginia law, asserting that family

members of the decedents can use the tort of IIED to recover directly -- as opposed to recovering

as a beneficiary under the wrongful-death statute -- for their own mental anguish and emotional

suffering.  Virginia recognizes a cause of action for emotional distress inflicted as a result of

intentional or reckless conduct even where the distress is unaccompanied by physical injury.  See Womack, 210 S.E.2d at 148.  Furthermore, courts applying Virginia law have, in a few circumstances, acknowledged that an IIED recovery might be sustainable when the plaintiff was neither an immediate target of nor a first-hand witness to the outrageous conduct that caused the emotional distress.  See Ferrell v. Chesapeake & Ohio Ry. Employees Hosp. Ass'n, 336 F.Supp. 833, 836 (W.D. Va. 1971) ("[O]ne factor which must exist [for an IIED claim to be viable] is a close relationship between the person suffering the emotional distress and the [third] person against whom the wilful and wanton act is directed.  Perhaps these possible plaintiffs would only include members of the third person's immediate family.");  Boyd v. Bulala, 647 F.Supp. 781, 791 (W.D. Va. 1986) ("with regard to [outrageous] conduct directed at a third person, ... limiting [recovery] to plaintiffs who are present during the tortious act may be necessary for ... practical reasons ..., but [there may be] situations in which presence at the time may not be required"), rev'd on other grounds, 905 F.2d 764 (4th Cir. 1990).  But, in other contexts, Virginia courts have described once-removed IIED claims as "wholly derivative" of a claim by the directly injured party.  See Speet v. Bacaj, 377 S.E.2d 397, 401 (Va. 1989) (parents' claim for emotional distress as the result of injury to their child was derivative of the child's claim).  In any event, the Court need not decide whether the Virginia Supreme Court would extend IIED liability to provide for recovery by an individual who was not an immediate witness to the outrageous conduct but nonetheless was affected directly by virtue of a close familial relationship with the primary target of the conduct.  That is because the wrongful-death claims in this case permit full recovery by all decedents for their emotional distress, and the Virginia legislature has evinced an intention to make wrongful-death claims an exclusive remedy.  To allow a recovery by a *decedent's survivors*

for both IIED and wrongful-death solatium based on the same tortious conduct would contravene the spirit, if not the precise language, of the state's wrongful-death statute, which forbids double recovery for a *decedent's* injuries and for his death where the injuries and death were caused by the same tortious act or omission.  See Va. Code § 8.01-56 ("there shall be but one recovery for the same injury").  Indeed, even the plaintiffs appear to advance their IIED theory only as an alternative, "in the event that the Court declines to award solatium under Virginia's wrongful death provisions."  See Pls.' Mem. in Supp. of State Law Claims at 111.  Hence, the Court will treat the claims of decedents' survivors under Virginia law as claims for compensatory damages under the wrongful-death statute and not as claims for IIED.

### C.    Plaintiffs

#### 1.    Estate and family of Robert Ames

##### (I)    Estate of Robert Ames, by Yvonne Ames, Administrator

Robert Ames was born March 6, 1934, in Philadelphia, Pennsylvania.  See Tr. Vol. V at 7. He was a United States citizen.  See id. at 6-7.  Mr. Ames graduated from LaSalle University in 1956.  See id. at 5.  Soon thereafter, Mr. Ames was drafted into the Army, where he spent two years.  See id.  After leaving the Army, he began working for the Government, spending a significant portion of the next two decades on various overseas postings.  See id. at 7.  In April of 1983, Mr. Ames was employed with the Central Intelligence Agency ("CIA") as the Director of Near East and South Asian Analysis.  See id. at 8-9.  On April 16, 1983, he departed for an assignment in Beirut, Lebanon, that was to last for approximately two weeks.  See id. at 9.  Mr. Ames was killed in the Embassy bombing.  See Exs. 3-4.  He was survived by his wife, Yvonne Ames, and his children, Adrienne (Ames) Opdyke, Kristen (Ames) Brown, Karen (Ames) Hale,

Andrew Ames, and Kevin Ames.  See Tr. Vol. V at 4-6; Ex. 48.

Robert Ames's estate was probated in Virginia, where he lived with his family at the time of his death.  See Pls.' Mem. in Supp. of State Law Claims at 83.  The estate of Robert Ames -- which is represented by Yvonne Ames, as Administrator, for purposes of this litigation, see Tr. Vol. V at 4; Ex. 47 -- is the proper plaintiff to bring a wrongful-death action under Virginia law. See Va. Code  § 8.01-53(A).  Pursuant to Section 8.01-53(A) of the Virginia Code, any recovery is for the benefit of Robert Ames's surviving spouse and children.  See id.  The precise distribution of an award among the statutory beneficiaries is left to the discretion of the Court. See Va. Code § 8.01-54(A).

Based on the pleadings and the evidence presented to the Court, the estate of Robert Ames has made out a valid claim for wrongful death under Virginia law, and therefore is entitled to recover "[c]ompensation for reasonably expected loss of ... income of the decedent" as well as an amount that reflects the value of "services, protection, care and assistance provided by the decedent" and that accounts for the "[s]orrow, mental anguish, and solace" of his survivors.  See Va. Code § 8.01-52.  The expert economic analysis presented to the Court demonstrated that, were it not for Mr. Ames's untimely and wrongful death, he would have earned wages, benefits, and retirement pay amounting to $3,249,000.  See Ex. 39 at Tab 2; see also Dammarell I, 281 F.Supp. 2d at 195 (explaining the methodology used by the expert to calculate economic damages for victims who were killed in the Embassy bombing).  The Court, therefore, will award the estate of Robert Ames, by Yvonne Ames as Administrator, $3,249,000 in economic damages, for the

benefit of his surviving spouse, Yvonne Ames.[18]  As for the intangible aspect of the estate's

wrongful-death recovery, the Court will address those awards below, beneficiary-by-beneficiary.

### (ii)    Yvonne Ames

Yvonne Ames is the widow of Robert Ames and the mother of Adrienne (Ames) Opdyke,

Kristen (Ames) Brown, Karen (Ames) Hale, Andrew Ames, and Kevin Ames.  See Tr. Vol. V at

5-6; Ex. 48.  Robert and Yvonne Ames met in 1959 and were married in 1960.  See Tr. Vol. V at

5.  After Mr. Ames began working for the government, Mrs. Ames accompanied him on a number

of overseas postings, including postings in the Middle East and Africa.  See id. at 7.  The couple

had six children, with three children born overseas and three born in the United States.  See id.

By the early 1980s, the Ames family had taken up residence in Reston, Virginia.  See id.  Mrs.

Ames described her late husband as:

> [A] family man, very involved in the children's activities.  He coached their basketball
> teams, always went to the soccer games....  [H]e left at the same time every morning; and
> he was always home for dinner, and he was always there on the weekends.
>
> And what we -- what I came to understand is that it wasn't my strength that held the family
> together; it was Bob.  He was the cornerstone of the family, and when we traveled abroad,
> it was just we traveled as a unit.

Id. at 10.

--------

[18] The Court awards this amount solely for the benefit of Yvonne Ames because she would
have been the principal beneficiary of Robert Ames's income over the remainder of his natural
life.  The Court takes note of the fact that Kristen (Ames) Brown, Karen (Ames) Hale, Andrew
Ames, and Kevin Ames were dependent minors at the time of their father's death.  But the Court
lacks any evidence in the record by which it could accurately estimate the proportion of Robert
Ames's lifetime income that would have been used for the benefit of his children, and therefore it
awards all tangible economic damages to his wife, who is also the mother of his children.  This
award also is consistent with Virginia's law of intestate succession.  See Va. Code § 64.1-1
(describing the first level of descent and distribution as "the surviving spouse of the intestate,
unless the intestate is survived by children or their descendants, one or more of whom are not
children or their descendants of the surviving spouse").

Following the Embassy bombing, the remains of Robert Ames, along with those of most of the other Americans killed in the Beirut Embassy attack, were brought back to Andrews Air Force Base.  See generally Tr. Vol. V at 15-17.  Mrs. Ames and the Ames children attended a ceremony at the base, during which the flag-draped caskets of the bombing victims were on display but were unmarked.  Id. at 16.  No one in the Ames family knew which casket belonged to Robert Ames.  As Mrs. Ames recalled, "[w]e just had to walk by and assume that one of them was Bob.  We had no knowledge of which one, so there was no way to reach out and even touch the casket."  Id. at 16.  As a result, "there's not been any closure for that," and that has had a devastating effect on the Ames family:

> I think if we had been able to see Bob or at least a family member had been able to see Bob, we could have had closure.  I know I have spent these 20 years thinking, well, perhaps he was involved in something and for the safety of the family -- I feel ridiculous saying this, but it is truth -- that he was alive somewhere.  And I have spent all these years looking:  television, news programs.  And I think that's true for all of us.

Id. at 21-22.  Within days of the service, Mrs. Ames began to grasp how much her life had been altered as a result of her husband's death:

> I was overcome by the responsibility of having still five children at home; and until then I had always thought that I was very strong, but that's when I realized that the strength of the family came from Bob's presence.  He was dependable, he was reliable.  He was someone you could turn to, you could lean on, and whatever children's problems there were, I could go to get help.  And that was gone, and it became my responsibility.  It was frightening.

Id. at 18.  Mrs. Ames went back to work almost immediately after her husband's death.  See id. at 20.  After about a month, she realized that "it was just too much," and started to work part-time.

Id.  Within a year and a half of her husband's death, she remarried.  See id.

Even though Mrs. Ames and her family appeared to be handling the loss of Robert Ames with a "stiff upper lip," see id., in reality:

Bob's death fractured our family.  It's like when you take a photograph and you rip it or it's ripped.  You can try to piece it back together, but it's never the same.  And that is what I think the stiff upper lip was doing, was trying to piece a family back together, and it was never complete and it was never whole.  I made decisions and choices that affected my life and my family's life, which at the time I thought was good, but it turned out to be disastrous.

People would look at me and say, "I can't believe your strength."  But I'm here to tell you now, they weren't seeing strength.  They were seeing a result of fear, and it was fear that propelled me forward, fear of feeling pain, fear of facing reality.

Id.  at 19.

Based on the evidence presented to the Court, including the testimony of Mrs. Ames, the Court will award the estate of Robert Ames, by Yvonne Ames as Administrator, $10 million for the benefit of his surviving spouse, Yvonne Ames, to compensate for the loss of "services, protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Mrs. Ames.  See Va. Code § 8.01-52.

### (ii)   Adrienne (Ames) Opdyke

Adrienne Opdyke is the daughter and second-oldest child of Robert and Yvonne Ames. See Tr. Vol. V at 24-25; Ex. 48.  Ms. Opdyke remembers having "a good childhood" with her family.  Tr. Vol. V at 26.  When the family returned to Virginia from overseas, she recalled that her father:

[W]as involved in every aspect of what we did in the morning and school.  Academics was really important to him.  He really stressed that.  And having structure, eating dinner together was real important to him, even talking about it, when I was older and I was interested in boys, even, you know, watching them on the basketball court and giving me information, you know, about their character and what type of person they were. He was -- that was real important to him.

Id.  The last time that Ms. Opdyke saw her father was in December 1982, while she was at home on Christmas break during her freshman year at Concordia Lutheran College.  See id. at 27.  The

last time that Ms. Opdyke spoke with her father was in April of 1983, approximately one week

before Robert Ames left for Beirut.  See id. at 28.  She knew that he was about to depart on an

overseas trip, but she was not aware that he worked for the CIA; she believed that he worked for

the State Department.  Ms. Opdyke first learned of her father's true occupation when her mother

telephoned her to tell her that her father had been killed in the Embassy bombing.  When she came

home for her father's funeral, the scene at her family's house was chaotic:

> I came in and I didn't know the people that were in my house and couldn't answer the door;
> I couldn't answer the phone.  Didn't really have that much contact with my mom because
> there was just so much going on.  My brothers and sisters were crying.  It was real
> confusing, just trying to figure out how you fit back into this place.  It was hard.

Tr. Vol. V at 30-31.  Like her mother Yvonne Ames, Ms. Opdyke felt a lack of closure due to her

inability to view her father's remains or touch his casket at the Andrews ceremony:

> Like my mom, it feels a bit uncomfortable to say this out loud outside the family, but
> because of what my dad did, you thought, well, maybe he's really not dead.  Maybe he was
> just so important that he had to go undercover, and there was just, maybe he was in that
> casket, maybe he wasn't.  And that's -- I don't think that's a good thing to think about.

Id. at 33.  Ms. Opdyke described the private burial service for Robert Ames, held at Arlington

National Cemetery a few days after the Andrews Air Force Base service, as "a surreal experience,"

as the Ames family was still "just kind of finding out who my dad was and learning about his

responsibility and his impact on our country and his beliefs, other than what I knew of him as just

being a dad." Id. at 34.

Ms. Opdyke returned to Concordia to finish her freshman year.  Although she did not seek

counseling upon her return, she ultimately did do so, and it had "a big impact" on her.  Id. at 36,

39.  After her freshman year, Ms. Opdyke returned to Virginia to spend the summer with her

family.  See id. at 36.  It was, in Ms. Opdyke's words "a tough summer."  Id.  As Ms. Opdyke put

it, "[w]e were all struggling pretty bad." Id.  Ms. Opdyke had originally planned not to go back to

school in the fall, but her mother indicated the she needed to go back.  See id. at 36-37.  Once she

went back to college, Ms. Opdyke "kind of kept the same pattern that we did as a family, I kept

trying to move every two years, it seemed like, even in my academics," ultimately leaving

Concordia to enroll in the nursing program at Valparaiso. Id. at 37.  But after her first nursing

rotation, Ms. Opdyke, still recovering from the loss of her father, realized that she "couldn't deal

with death" and switched the focus of her studies to social work.  Id.  Around this time, Ms.

Opdyke got married and moved to Denver.  See id. at 38.  Ms. Opdyke subsequently remarried,

see id., and is now the mother of a young daughter.  See id.  The loss of her father has made her

very protective of her daughter, as she does not want her daughter "to experience anything like"

Ms. Opdyke's loss of her father.  Id. at 39.

Based on the evidence presented to the Court, including the testimony of Ms. Opdyke, the

Court will award the estate of Robert Ames, by Yvonne Ames as Administrator, $5 million for the

benefit of Adrienne Opdyke to compensate for the loss of "services, protection, care and

assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Ms.

Opdyke.  See Va. Code § 8.01-52.

### (iii)   Kristen (Ames) Brown

Kristen Brown is the daughter and third child of Robert and Yvonne Ames.  See Tr. Vol.

V at 42; Ex. 48.  In April of 1983, Ms. Brown was an eighteen-year-old high-school senior, and

was the oldest of the Ames children still living at home.  Id. at 42, 45.  She last saw her father on

April 16, 1983, as he departed for Beirut.  Although Ms. Brown was generally aware that he was

headed overseas, she did not know precisely where he was going and also was not aware that her

father worked for the CIA.  See id. at 44-45.

On the evening of April 18, 1983, Ms. Brown was watching television in her parents' bedroom.  Id. at 45.  Her mother was not at home at the time.  See id. at 46.  She saw television news reports of the Embassy bombing, thought "that's interesting," but did not connect the attack with her father.  Id. at 45.  Later that evening, the doorbell rang and two people, a man and a woman whom Ms. Brown did not recognize, were standing at the door.  See id. at 45.  When the visitors indicated that Robert Ames had been in the U.S. Embassy when it was attacked and might have been killed, Kristen responded that Robert Ames had not been there and had not been killed.  See id. at 45-46.  At this point, the gentleman responded that Robert Ames had been there, and was dead.  See id.  When Ms. Brown again stated that they must be mistaken, the women replied "we don't think. We know."  Id. at 46.  Ms. Brown screamed and then collapsed.  She does not remember anything else from that night.  See id. at 46.

At Robert Ames's burial at Arlington National Cemetery, the family was not permitted to touch his casket.  Id. at 48.  As Ms. Brown recalled, "at some point, we had asked if we could leave a flower or just touch the casket, just to touch it, and we were told we couldn't do that."  Id.  This, combined with the recently learned knowledge that her father had worked for the CIA, raised in her mind the prospect that perhaps her father had not actually been killed: "I guess the way we put it in our mind was ... he's not really in there; he's just protecting us from whoever's trying to get him ...."  Id. at 48-49.  Ms. Brown has continued to have these feelings over the past two decades, and she testified that she still believes "[t]here's a hope" that her father is "alive somewhere."  Id. at 49.

Ms. Brown graduated from high school less than two months after her father's death.  Id.

She greatly missed having her father at the ceremony, recalling that "[h]e wasn't there to see it. Schooling was very important for him, that we tried our best and did as best we could.  And you know, graduation was just one of those things where your dad, who was proud of what you had done, should be there to see that."  Id. at 50-51.

Based on the evidence presented to the Court, including the testimony of Ms. Brown, the Court will award the estate of Robert Ames, by Yvonne Ames as Administrator, $5 million for the benefit of Kristen Brown to compensate for the loss of "services, protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Ms. Brown.  See Va. Code § 8.01-52.

### (iv)    Karen (Ames) Hale

Karen Hale is the daughter and fourth child of Robert and Yvonne Ames.  See Tr. Vol. V at 54; Ex. 48.  Ms. Hale testified that she has "great memories" of her childhood generally, and her relationship with her father Robert Ames specifically.  See Tr. Vol. V at 54.  She has particular memories of family life in Reston, Virginia:

> We would ride our bikes up and down our hill during the warm weather and slide down it in the winter.  And I loved my dad.  We had a great relationship.  He was a lot of fun.  I looked up to him.  I looked forwards to every day he came home from work, and we'd greet him and hug him.  He smoked a pipe sometimes.  He'd have a great smell on him.

Id.  Ms. Hale was a fifteen-year-old high-school sophomore at the time of the Embassy bombing. Id. at 55-56.

At the Andrews Air Force Base ceremony, Ms. Hale recalled, she overheard several people discussing how they had found her father, Robert Ames, in Beirut:

> I overheard them saying ... that he was in a stairwell and he looked like he had just probably been leaving the cafeteria, heading up to a meeting, that he was face-down, that his eyes were already closed, and that he was killed by the impact of the explosion, not that

anything had fallen on him, and that there was just a small cut on his neck.

Id. at 58-59.  When Ms. Hale heard this, she "just kind of collapsed, just started crying."  Id. at 59.

Soon thereafter, Ms. Hale and the rest of her family were ushered into an aircraft hangar at

Andrews for the ceremony.  Id. at 59.  Ms. Hale remembered "just seeing the coffins all lined up

and wondering which one was my dad, and I remember specifically thinking, oh, but he can't be

here, because they just look too small.  My dad was six-four.  I'm like, he's not here."  Id.  Like

other family members, Ms. Hale felt that, given the nature of her father's job, perhaps he had not

been killed, but rather had gone undercover and might "still be out there thinking about us,

protecting us in some way, watching over us, being able to see us grow and see our children."  Id.

at 62.

    After the burial of Robert Ames, Ms. Hale and her family tried to return to normal, but

"[i]t was really hard."  Id.  Although Ms. Hale had at first thought that there were too many people

at the Ames home following her father's death, when they all left it was "just too quiet" and she

found herself wanting them back.  Id.  She also, for the first time in her life, felt a sense of fear:

> [A]fter my dad was killed, I had so much fear.  I'd be afraid.  I'd want our doors locked.  I
> wouldn't want my mom not to be home; I wouldn't want to be left alone.  So there was a
> lot of fear.

Id. at 62-63.  In the years since her father's death Ms. Hale, like her other siblings, has made an

effort to learn "every bit of information about my dad, trying to learn as much as I can about his

life.  I just think it's amazing that he was able to be the kind of father and man that he was and

hold the kind of position that he held, and we had no idea."  Id.

    Based on the evidence presented to the Court, including the testimony of Ms. Hale, the

Court will award the estate of Robert Ames, by Yvonne Ames as Administrator, $5 million for the

benefit of Karen Hale to compensate for the loss of "services, protection, care and assistance

provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Ms. Hale.  See

Va. Code § 8.01-52.

### (v)   Andrew Ames

Andrew Ames is the fifth child and oldest son of Robert and Yvonne Ames.  See Tr. Vol.

V at 67; Ex. 48.  He described having an "unbelievable relationship" with his father:

> Growing up, him being into sports his whole life, he brought me up into sports.  He was
> my coach, my mentor, my summer league coach.  He was my basketball camp.  He was --
> he taught me how to do -- work on cars.  He would have me watch him do it.
>
> You know, he taught me everything about growing up,  about being a kid, having fun, how
> to learn.  He helped me with my homework.  Anytime I had any problems, he was always
> there for me.

Id. at 68.  Andrew Ames was fourteen years old and in the eighth grade in April 1983.  Id.  The

day that Robert Ames left for Beirut, he and his son Andrew had an argument.  As Andrew Ames

testified:

> [I] can't remember what the argument was about, but I was a little mad at him, so I decided
> that I wasn't going to speak with him before he left.  His comments were to me always
> before he left was, you know, "take care of your mom" and "bye."  And I just -- I
> remember I was downstairs, and I just -- I looked up and turned away, never having the
> opportunity to tell him bye before he left.  And that's the last that I saw him.

Id. at 70.  This final exchange with his father haunted Andrew Ames for years:

> Well, being fourteen, you know, I blamed myself.  My idea was, God took my father away
> from me because, you know, I -- because we were in a fight.  And I guess -- again, I can't
> remember what I did; but he took him away from me because we weren't getting along,
> and I took complete blame for the longest time.

Id. at 70-71.

A year and a half after the death of Robert Ames, Yvonne Ames remarried.  The

remarriage hit Andrew Ames particularly hard, as his relationship with his stepfather was difficult.

Id. at 74-75.  The summer after Andrew Ames finished the eighth grade, his mother and stepfather

moved to Georgia.  Id. at 75.  Andrew Ames remained in Virginia with his uncle that summer to

go to summer school, as his grades had dropped because he "just wasn't ready to go back to

school."  Id.  The next school year in Georgia, he "failed miserably."  Id. at 76.  Indeed, for the

next two years, Andrew Ames "didn't know a soul.  I didn't want to know anybody, didn't care to

know anybody.  I always thought of myself as an outgoing person, but I wasn't being one.  I was

kind of the loner in school the first couple of years."  Id.

       While he had played a lot of organized sports with his father, Andrew Ames did not

continue his involvement in organized sports once the family moved to Georgia.  Id.  Instead, he

testified that he:

> Made some poor choices.  I developed a pretty bad drug habit throughout high school,
> dropped all sports, and just kind of mellowed my way through life.  I didn't -- at that point,
> I even dropped sports altogether.  I really didn't go out and play.  I had no interest in it
> whatsoever.

Id.  In describing the effect that his father's death had on his life, Andrew Ames testified:

> I travel with my job, and I'm gone a week at a time.  The hardest thing to do is to leave my
> boys.  Going through what I went through, I make it an absolute point to pick them up, hug
> them, kiss them, and say good-bye every time I leave.
>
> I don't want my boys to go through what I went through.  The loss was enough, but never
> having the chance to say good-bye or -- there's never a good time, and you should never
> leave a place that you're not going to see someone for a while, doesn't matter how mad you
> are to them, not to say good-bye.
>
> And I think that's the biggest impact it's had on me, and it kills me still today.  That's one
> thing I will never get over.  There's nothing that can be said or done for me to ever get over
> that situation.

Id. at 78.

       Based on the evidence presented to the Court, including the testimony of Andrew Ames,

the Court will award the estate of Robert Ames, by Yvonne Ames as Administrator, $5 million for the benefit of Andrew Ames to compensate for the loss of "services, protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Andrew Ames.  <u>See</u> Va. Code § 8.01-52.

**(vi)    Kevin Ames**

Kevin Ames is the son and youngest child of Robert and Yvonne Ames.  <u>See</u> Tr. Vol. V at 80; Ex. 48.  He described his childhood as "a pretty typical one.  I was involved in community sports, my dad being one who was always present for those, being basketball and soccer for me, and at one point he was even my basketball coach."  <u>Id.</u>  Kevin Ames was eleven years old at the time of the Embassy bombing.  <u>Id.</u> at 80, 82.

As a result of his father's death, Kevin Ames does not feel that he got the fatherly guidance he needed -- although he maintained a "cordial" relationship with his stepfather following the remarriage of Yvonne Ames -- and that this "led to very, very poor decision-making on my part, which I believe I'm still feeling the ramifications of today."  <u>Id.</u> at 86.  Although he "did do a little counseling" following his father's death, he did not find it helpful, and did it "more to appease everybody else" than for himself.  <u>Id.</u>  Kevin Ames described the loss of his father Robert Ames in the Beirut Embassy bombing as:

> [A] major turning point.  It changed the path that everybody was going down.  I believe -- I sincerely believe that if my father was here today, you know, I would be in a totally different position than where I am today.
>
> I believe I missed out on learning from a very intelligent man, for one thing, someone I know could have guided me to where I needed to be.  And I mean, that's a huge thing to think about.  I mean, I think about that all the time.  I wonder what kind of man I could have become today if he was there.  I wonder if he would be proud of what I became; and all I can do is wonder and hope I have, but I'll never know for certain.

Id. at 87.  He also testified that, in other personal relationships, he has "maintained a distance not to get too close, just for fear of losing" loved ones, and that this has affected every relationship that he has developed since the death of his father.  Id. at 88.

Based on the evidence presented to the Court, including the testimony of Kevin Ames, the Court will award the estate of Robert Ames, by Yvonne Ames as Administrator, $5 million for the benefit of Kevin Ames to compensate for the loss of "services, protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Kevin Ames.  See Va. Code § 8.01-52.

### 2.    Robert Essington, Sr.

Plaintiff Robert Essington, Sr. was posted to the U.S. Embassy in Beirut in 1983 as the General Services Officer with the U.S. Department of State.  See Tr. Vol. III at 77; see also Ex. 43.  Mr. Essington was born May 28, 1945, in Wausau, Wisconsin.  See id. at 68.  He is a United States citizen.  See id. at 69.  During his entire tenure with the State Department, which began in 1976 and ended with his retirement in 2001, Mr. Essington maintained his primary residence in the Virginia suburbs of Washington, D.C.  See id. at 70, 99.  Therefore, Virginia law will apply to his claims against defendants.

On the morning of April 18, 1983, Mr. Essington arrived at the Embassy at 6:30 a.m.  See id. at 75.  He worked in his office most of the morning, finalizing purchasing contracts and travel and hotel arrangements for various individuals.  See id.  When the bomb exploded, Mr. Essington was in his office, which was located above Marine Post 1.  See id.  He was standing behind his desk, with his back to the windows, while speaking to his secretary, Huda Shweri.  See id. at 75-76.  He heard a loud noise, like a "clap of thunder," and the "next thing [he] knew ... [he] was on

the other side of his desk."  Id. at 76.  Mr. Essington testified:

> I bent backwards [over the desk] because my thighs caught the desk.  So [I] was sort of
> [in] a reversed U [position when I was blown over the desk].  So it put a lot of pressure on
> my back, but I landed on my face after I had gotten blown over.  And my glasses had
> gotten blown off.  And as I was lying there, it was a hard time breathing because I think [I]
> probably had the wind knocked out of me or something when I hit the floor.  And then the
> only thing I remember -- the next thing was Huda screaming and yelling, "Mr. Essington,
> Mr. Essington ... here's your ear!"  And she was holding my ear in her hand.  My ear had
> gotten severed, and I really hadn't noticed it.  So I picked myself up off the floor, [and]
> basically took my ear....

Id. at 76-77.  In addition to his severed ear, Mr. Essington noticed that he was bleeding, and felt

pain in the back of his neck and head from embedded glass.  See id. at 77-78.

After exiting the Embassy, Mr. Essington took a taxicab to AUB Hospital.  See Tr. Vol. III

at 79.  A doctor sewed his ear back on, without anesthesia, and removed some of the glass from

his body.  See id. at 79-80.  He received over 400 stitches.  See id. at 80; see also, e.g., Ex. 43 at 2.

At this time, Mr. Essington was in "tremendous pain [and also] had a tremendous ringing in [his]

ears."  Tr. Vol. III at 80.

The next month, Mr. Essington returned to the United States for leave.  See id. at 85.

Because he was experiencing back pain, hearing loss, and difficulty swallowing, Mr. Essington

underwent a physical examination.  See id.  Testing indicated that Mr. Essington had herniated the

L3, L4, L5 and S1 disks in his back and that there was glass embedded in his back, neck and head.

See id.  Further examinations showed that his hearing loss was caused by tinnitus (incurable,

persistent ringing in the ears), and his difficulty swallowing was caused by a hiatal hernia.  See id.

at 85-86.  From 1983 until the present, Mr. Essington has suffered from the physical and

psychological injuries caused by the Embassy bombing, and received extensive treatment for

those injuries.  These include:  (1) tinnitus; (2) the continued effects of some 500-600 pieces of

embedded glass, approximately 200 pieces of which have either worked their way out of Mr.

Essington's body or required periodic removal; (3) a hiatal hernia (which causes acid reflux and

requires Mr. Essington to sleep on his back in an elevated position); (4) herniated disks; and (5)

psychological trauma.  See generally id. at 86-89.

    The pain related to herniated disks has been quite severe.  From 1983 to 1989, Mr.

Essington attended approximately 80 chiropractic sessions to relieve this pain.  See id. at 89-90.

In August 1989, testing determined that the herniated disks were close to rupturing, and doctors

prescribed an epidural injection to relieve pain.  See id. at 90.  Immediately thereafter, Mr.

Essington was posted to the United States Embassy in Abu Dhabi.  While in Abu Dhabi, the pain

worsened, atrophy set in to Mr. Essington's right leg because of trauma to his sciatic nerve, and

Mr. Essington was forced to use a cane to walk.  See id.  Doctors prescribed extensive physical

therapy and another epidural injection to relieve pain.  See id.  In March 1990, when Mr.

Essington returned to the United States for treatment, tests showed that the herniated disks had

completely ruptured, and Mr. Essington underwent surgery to fuse his L3, L4, L5 and S1

vertebrae.  See id. at 91.  By April 1990, the pain had not subsided, and doctors prescribed

additional pain medication and physical therapy.  See id.  The pain never subsided, and a second

fusion surgery was conducted in July 1990.  See id.  From that point until 1992, Mr. Essington

took Percoset to control his pain, although it did not completely relieve it.  See id.  By December

1992, the pain again became severe.  In April 1993 Mr. Essington underwent a third surgery,

wherein several of his vertebrae were replaced with artificial disks, his spine was fused at the L3,

L4, L5 and S1 vertebrae, and steel rods were placed in his back.  See id. at 92.  In 2000, the pain

worsened, and tests indicated that Mr. Essington's sciatic nerve had begun to grow into the steel

rods placed in his back.  Doctors prescribed methadone and oxycontin, which Mr. Essington became addicted to.  See id. at 91-92.  In February 2002, Mr. Essington underwent a fourth surgery, during which a dorsal column stimulator was implanted in his back.  See id.  The stimulator is an electronic device which controls pain; Mr. Essington will live with the device for the remainder of his life.  See id. at 93-94; Ex. 43 at 3.

Mr. Essington's psychological injuries also have been pronounced.  In 1993, while posted to South Africa, Mr. Essington experienced a "breakdown" in response to the Oklahoma City bombing.  See Tr. Vol. III at 97-98.  Mr. Essington stated that, upon seeing the images, he "cried right there.  Didn't want to go to work, didn't want to do anything" and experienced nightmares in which he re-lived the Embassy bombing.  Id.  As a result, Mr. Essington received psychiatric counseling.  See id. at 98.

Based on the pleadings and the evidence presented to the Court, Mr. Essington has stated a valid claim of battery under the law of Virginia and is entitled to recover compensatory damages from defendants for all "injuries received and ill effects [he] sustained ... [that] were proximately caused by the battery," see Pugsley, 263 S.E.2d at 76, including his physical pain and suffering and mental anguish, see Cho, 525 S.E.2d at 291.  The expert economic analysis presented to the Court demonstrated that, as a result of the Embassy bombing, Mr. Essington suffered $48,567 in economic losses.  See Ex. 39 at Tab 9.  The Court further values the loss associated with his physical pain and suffering and mental anguish at $5 million.  He will, therefore, be awarded a total of $5,048,567 in damages on this default judgment.

### 3. Estate and family of William McIntyre

#### (I) Estate of William McIntyre, by Mary Lee McIntyre, Executrix

William McIntyre was born March 15, 1931, in Detroit, Michigan, and was a United

States citizen.  See Tr. Vol. VI at 9.  At the time of the Embassy bombing, he was working as

Deputy Director of U.S. AID in Beirut.  See id. at 10; Ex. 13; Ex. 54.  Mr. McIntyre had joined

AID in April 1963 as a journalist and, in that capacity, he produced two award-winning films for

the agency.  See Tr. Vol. VI at 8-9; Ex. 54A (Preface).  Mr. McIntyre was first posted overseas for

AID in 1967, working on the Food for Peace Program in India.  See Tr. Vol. VI at 10.  On that

assignment, he was accompanied by his wife, Mary Lee McIntyre, and their three children, who at

the time ranged in age from 11 months to five years.  See id.  The McIntyre family left India in

1971 and thereafter went to Islamabad, Pakistan.  See id. at 12.  Mr. McIntyre had added

responsibilities in Pakistan; in addition to the Food for Peace program, he worked on family

planning for what was then the largest development project that AID had ever had.  See id. at 13.

The McIntyre family moved back to the United States in 1977 and settled in McLean, Virginia.

Id. at 14-16.  William McIntyre was assigned to work in AID's office of legislative affairs.  In the

fall of 1980, William McIntyre learned that his next posting would be in Beirut.  Mrs. McIntyre

testified that when he learned of this, her husband "was thrilled because he was going to run the

mission," and he "relished the responsibility of directing a whole program."  Id. at 18-19.

Although the entire McIntyre family had accompanied William McIntyre on his previous overseas

postings, Beirut was considered too dangerous.  See id. at 19.  So, while Mary Lee McIntyre made

arrangements to join him in Beirut, the McIntyre children were enrolled in schools in the United

States.  See id.  William McIntyre left for Beirut in March 1981, with Mary Lee McIntyre arriving

in September.  See id. at 19, 21.

On April 18, 1983, William McIntyre was in the Embassy cafeteria when the car bomb

detonated.  See Ex. 54.  Mr. McIntyre sustained fatal injuries as a result of the Embassy attack.

He was survived by his wife of twenty-four years, Mary Lee McIntyre, and their three children,

Julie McIntyre (then age 20), Andrew McIntyre (then age 17), and Margaret (McIntyre) Matteucci

(then age 16).  William McIntyre's estate was probated in Virginia, where the McIntyre family had

been legally domiciled since 1977.  See Pls.' Mem. in Supp. of State Law Claims at 95.  The estate

of William McIntyre -- which is represented by Mary Lee McIntyre, as Executrix, for purposes of

this litigation, see Tr. Vol. VI at 4; Ex. 53 -- is the proper plaintiff to bring a wrongful-death

action under Virginia law.  See Va. Code  § 8.01-53(A).  Pursuant to Section 8.01-53(A) of the

Virginia Code, any recovery is for the benefit of William McIntyre's surviving spouse and

children.  See id.  The precise distribution of an award among the statutory beneficiaries is left to

the discretion of the Court.  See Va. Code § 8.01-54(A).

Based on the pleadings and the evidence presented to the Court, the estate of William

McIntyre has made out a valid claim for wrongful death under Virginia law, and therefore is

entitled to recover "[c]ompensation for reasonably expected loss of ... income of the decedent" as

well as an amount that reflects the value of "services, protection, care and assistance provided by

the decedent" and that accounts for the "[s]orrow, mental anguish, and solace" of his survivors.

See Va. Code § 8.01-52.  The expert economic analysis presented to the Court demonstrated that,

were it not for Mr. McIntyre's untimely and wrongful death, he would have earned wages,

benefits, and retirement pay amounting to $3,101,000.  See Ex. 39 at Tab 3; see also Dammarell I,

281 F.Supp. 2d at 195 (explaining the methodology used by the expert to calculate economic

damages for victims who were killed in the Embassy bombing).  The Court, therefore, will award

the estate of William McIntyre, by Mary Lee McIntyre as Executrix, $3,101,000 in economic

damages, for the benefit of his surviving spouse, Mary Lee McIntyre.[19]  As for the intangible aspect of the estate's wrongful-death recovery, the Court will address those awards below, beneficiary-by-beneficiary.

### (ii)   Mary Lee McIntyre

Mary Lee McIntyre, a United States citizen and domiciliary of Virginia, is the widow of William McIntyre.  See Tr. Vol. VI at 3-4; Ex. 54.  The couple were married in 1959.  See Tr. Vol. VI at 7-8; Ex. 54A (Preface).  She also is the mother of Julie McIntyre, Andrew McIntyre, and  Margaret (McIntyre) Matteucci.  See Ex. 54.

Mrs. McIntyre was born in Paoli, Pennsylvania, received a Bachelors Degree in History from Washington College in 1954, and a Masters Degree in Political Science and International Relations from the Johns Hopkins University School of Advanced International Studies in 1959. See id. at 4-5.  In the 1960s, she began work towards a doctoral degree in American Studies but had to drop her studies because she was teaching, had two children, and became pregnant with her third.  Id. at 5.  After the birth of her first child and continuing until the family's move to India in 1967, Mrs. McIntyre taught at several institutions, including George Washington University and

---

[19] The Court awards this amount solely for the benefit of Mary Lee McIntyre because she would have been the principal beneficiary of William McIntyre's income over the remainder of his natural life.  The Court takes note of the fact that Margaret (McIntyre) Matteucci was a dependent minor at the time of her father's death, that Andrew McIntyre was still a month away from his eighteenth birthday, and that Julie McIntyre, then age 20, was in her third year of college.  But the Court lacks any evidence in the record by which it could accurately estimate the proportion of William McIntyre's lifetime income that would have been used for the benefit of his children, and therefore it awards all tangible economic damages to his wife, who is also the mother of his children.  This award also is consistent with Virginia's law of intestate succession.  See Va. Code § 64.1-1 (describing the first level of descent and distribution as "the surviving spouse of the intestate, unless the intestate is survived by children or their descendants, one or more of whom are not children or their descendants of the surviving spouse").

the D.C. Teachers' College, on a part-time basis.  See id. at 5.  During William McIntyre's

overseas postings in India and Pakistan, Mrs. McIntyre taught at various schools and also worked

for AID for two years.  See id. at 12-13.  After the McIntyre family returned to the United States

in 1977, Mrs. McIntyre worked intermittently.  See id. at 15-16.  When she joined her husband in

Beirut in September 1981, she resumed her teaching career, eventually taking teaching positions at

the American University of Beirut, al-Maqasa (also a school), and Hagassian, an Armenian

college.  See id. at 21-24.

When asked to describe the lasting effect of the loss of her husband William McIntyre on

her life, Mrs. McIntyre testified:

> Oh, God.  Well, I lost my best friend, my best guide, his wit, his charm, his support.  It was
> devastating.  I felt I'd had the insides knocked out of me, and it was so hard to go on.  At
> times I bemoaned the fact that I survived, because my children were at an age where they
> needed their father.  He was so wise in the ways of the world, whereas I was not.
> He was sophisticated.  He used to -- he always had answers for everything that were
> workable.  He was so bright, and they needed him more than they needed me.  I couldn't
> match him for what he could earn, and I just quailed at the thought that I would let him
> down.  And I just had to be strong.  I just had to stuff those feelings.
>
> It wasn't until many years later that I finally sought grief counseling, because I was coming
> apart.  I felt I had to be strong for my children.  And at one point, one of them said, "Mom,
> you never cry.  Don't you feel the loss?"  And I said, "Yes, but I can't cry because I would
> let you down."...
>
> It was pretty awful.  There's no tougher job than being a single parent.  None.  And to be
> the sole support.
>
> And I just had to keep at it, and I always felt I was struggling to get my footing.  He would
> have made light of it with his wit and his charm and his powerful intellect and his great
> charm, his love.

Id. at 51-52.

Based on the evidence presented to the Court, including the testimony of Mrs. McIntyre,

the Court will award the estate of William McIntyre, by Mary Lee McIntyre as Executrix, $10

million for the benefit of his surviving spouse, Mary Lee McIntyre, to compensate for the loss of "services, protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Mrs. McIntyre.  See Va. Code § 8.01-52.

Mrs. McIntyre also was present at the Embassy during the attack and was injured herself. Because she was domiciled in Virginia in 1983, the law of that state will govern her personal claim of battery against defendants.  Mrs. McIntyre drove to the Embassy on April 18, 1983.  Id. at 28-29.  When she arrived, it was close to 1:00 p.m.  See id. at 29.  On her way to her husband's office, Mrs. McIntyre stopped at a restroom and, in her words:

> [A]ll of a sudden, I saw a flash that was so brilliant;  and it was tinged in lavender and then yellow, and I turned and I thought, what was that?  And I was concerned because I don't recall if I ever heard the roar, but I saw the window just disintegrate and the glass, in sort of slow motion, start to come for me.
>
> I saw screws spin out and a whole window frame start to come for me, and I raised my arm and glass hit it here.  I had stuff embedded here and in my shoulder; and it just came at me, and I didn't know what it was.
>
> And I just knew I was taking a lot of stuff in my face and it, you know, tore across my -- I never felt anything, no pain, nothing, but just tore across my neck.  And I suddenly was blinded in one eye; and I started to scream, and I ran for the door.  I unlocked it and got the handle open; and I pushed it open, and I was screaming the entire time.
>
> And I -- because I thought it was just my window that had exploded.  I didn't know what else it could be because I had heard about a week or so before that the bathroom glass had wire mesh in it, and it had taken an electric charge and it exploded.  And I thought that's what had happened, and I wanted to rush out and report that.
>
> But then when I saw -- I could barely see, but I was crunching on plaster that had fallen, and I looked to my right.  [A] secretary ... was on the floor, and her Lebanese companion was also on the floor.  And here were the draperies billowing in and everywhere -- and then I looked -- one of the drivers, I heard a voice say, "Silva, stop screaming;" and that was the secretary who was on the floor, and I realized I had been screaming.  So many thoughts came all at once.  You know, panic is not working here, and I've just got to pray.

Id. at 30-31.  At that point, Mrs. McIntyre made her way to a stairwell, recalling that "I looked

down, and every time I looked down, I was just getting bloodier.  My clothes were just getting

sopped in it.  I just held on, and I said, 'God is, God is.'  I just felt I had to reach out to something

that was bigger than I was, and I remembered a line from my hymn that we used to sing 'not what

I am, Lord, but what thou art.'  And I said that. And then another line came to me: 'I have nothing

but love to meet and nothing but love to meet it with.'"  Id. at 31.  Two Embassy drivers saw Mrs.

McIntyre, and one of them carried her downstairs.  See id. at 31-32.  Mrs. McIntyre climbed down

a ladder out of the Embassy and, accompanied by Tish Butler, the wife of the AID director, got

into an ambulance and was taken to AUB Hospital.  See id. at 33.

At the hospital, Mrs. McIntyre was taken into surgery.  When Mrs. McIntyre woke up she

was on a respirator; as she recalled, she "would hear the machine click, and I would exhale; and

then suddenly it would be back at me, and I would have to go -- and then it would click, and I

would exhale.  And then I lapsed into unconsciousness again."  Id. at 38.  Upon being removed

from the respirator, she was wheeled into a room in the maternity ward, because there was no

room anywhere else in the hospital.  She awoke to find that "my head was wrapped.  I sustained

injuries to my ear.  This eye was totally covered.  There was a space for my nose and my moth,

one eye, and this ear; and my neck was swaddled and my shoulders, and I was propped up."  Id.

Soon after she had been taken into the room, the doctor who had initially interceded for

her after her arrival at AUB Hospital came in.  At this point, as Mrs. McIntyre testified:

> [H]e said, "I have news of your husband," and then he said he didn't make it.  And I lost it.
> And I said, "Oh, my God, I never got to say good-bye."  And I said, "Oh, my poor
> children."  And I was -- I was in despair.  And he said, "Do you want to be alone?"  And I
> said, "No, not particularly."

Id. at 38; see also Ex. 54.  After spending approximately a week in the hospital, a plastic surgeon

removed the stitches used to reconnect the nerves and blood vessels in Mrs. McIntyre's face, and

she was discharged from AUB.  See id. at 43-44.

Mrs. McIntyre's daughter Margaret Matteucci testified that, in late 1991, she received a

call from her mother indicating that she was not doing very well, and had missed work because

her eye injury was bothering her.  Id. at 122.  Concerned because her "mom never misses work,"

and by her mother's revelation that a nurse had been coming and helping her in the evenings, Ms.

Matteucci arranged to go home.  Id.  As she testified:

> When I got there, I was really shocked at the -- at what I saw.  And my mom's eye that had
> been injured in the explosion was extremely painful.  I don't know if it was scar tissue or if
> it was ever medically diagnosed....
>
> But it was just extremely painful, and I just remember her -- there were times when I'd be
> in bed or something and I would hear screaming, like blood-curdling screaming.  And I
> would go into her room and she's holding her head in her hands and just rocking and
> screaming.  And she was just in so much pain....
>
> And I stayed -- and I read to her a lot, and did her meals and did her bills.  I don't know
> how long it was, maybe three or four weeks, but by the time I left, she was -- she could see
> out of that eye and she was driving, and so I felt like I could leave.

Id. at 122-23.  Ms. Matteucci similarly helped her mother in 1996, when Mary Lee McIntyre

indicated that she was again having trouble with her eye.  See id. at 124.  As Ms. Matteucci

testified:

> Again, she was in excruciating pain.  I think it was the other eye this time.  And I was --
> we were there, gosh, maybe six weeks or something?  A long time.  A long time before she
> could, you know, function on her own and drive and that kind of thing, and all this time
> she's working with a practitioner and slowly being able to see a little bit better.
>
> The condition she was in both times was pretty alarming.  She was in a lot of pain, and she
> was -- it was just really hard to see someone you love in that much pain. It's really hard.

Id. at 124-25.

Although Mrs. McIntyre received support and counseling from her Christian Science

practitioner, she did not seek grief counseling until "many years" after the Beirut Embassy

bombing, when she reached a point where she felt that she "was coming apart."  Id. at 50-51; see

Tr. Vol. II at 68-69 (Dr. Larry Pastor testifying that late onset or delayed PTSD may not occur for

up to twenty years after a traumatic event).

Based on the pleadings and the evidence presented to the Court, Mary Lee McIntyre has

stated a valid claim of battery under the law of Virginia and is entitled to recover compensatory

damages from defendants for all "injuries received and ill effects [she] sustained ... [that] were

proximately caused by the battery," see Pugsley, 263 S.E.2d at 76, including her physical pain and

suffering and mental anguish, see Cho, 525 S.E.2d at 291.  The Court values the loss associated

with Mrs. McIntyre's physical pain and suffering (as well as the mental anguish caused by the

battery) at $2 million and she will be awarded that amount in personal damages -- separate and

apart from the awards for her benefit under the wrongful-death statute -- on this default judgment.

### (iii)    Julie McIntyre

Julie McIntyre is the daughter and oldest child of William and Mary Lee McIntyre.  Tr.

Vol. VI at 59, 64; Ex. 54.  Ms. McIntyre described her father as:

> Very entertaining, very -- probably the smartest person I've ever encountered, one of them
> for sure.  Just had a very strong spirit, had kind of leadership qualities.

> Very interactive, would draw people out right away, was familiar with all of my friends,
> and every day would question me, you know, "what did you do?  Who were you with?
> What's going on?"  Very in touch, very knowledgeable, just -- I don't think there was ever
> a question that I asked that he didn't have an answer for, some kind of answer....

> [A]lways kind of strategizing and finding solutions to problems.  He was physically pretty
> fit and energetic; and we were both night people, so we would -- he was a night person.
> We would hang out at night, have private times.

Tr. Vol. VI at 60-61.

In 1977, when Ms. McIntyre was fifteen years old, the McIntyre family moved back to the

United States.  Id. at 63.  Her father helped her make the transition to life in the United States:

"He was always helpful, yeah.  We would meet in the kitchen and have midnight snacks,

especially chocolate.  We had a lot of chocolate, dark chocolate, and we would talk about different

problems....  We had -- we were very connected.  We had a very similar approach to life."  Id. at

64.  Once William McIntyre arrived in Beirut, he sent family members tapes, which often

reflected sounds from the civil war then raging in the city.  As Ms. McIntyre recalls, "I listened to

one, and it was kind of too much for me.  I didn't like it.  So we wrote, and I would call him on the

phone and talk."  Id. at 66.

The last time that Ms. McIntyre saw her father was over the Christmas holidays in 1982,

and the last time that she spoke with him was in March 1983.  Id. at 71.  This last phone call in

particular stands out for Ms. McIntyre, as "I guess we were one of those families that -- God --

never said I love you.  And it was the first time that I ever said 'love you' to my dad ... unlike my

mom, who didn't get to say good-bye, that was one of the regrets that I didn't have out of all the

regrets that I did have.  Everyone should say that."  Id. at 71-72.

On April 18, 1983, Ms. McIntyre was a junior at the University of Virginia.  She had not

heard anything about the bombing, as she "kind of reveled in my lack of contact with a lot of

mainstream media."  Id. at 72.  Later in the day, she was pulled from class by a dean, who

indicated that her "Aunt Boog" (Margaret Powell) was on the phone, and needed to talk with her

"about something in Lebanon."  Id. at 72-73.  When Ms. McIntyre picked up the phone, her aunt

asked her whether someone was with her, at which point Ms. McIntyre "started to kind of get that

weird feeling like when you know that something is not normal."  Id.  Her aunt, who is in fact her

mother's cousin, told her that the U.S. Embassy in Beirut had been bombed, and that her father

had been killed and her mother "significantly injured." Id. at 73-74.  As Ms. McIntyre testified:

> [I]t's one of those moments that you just never forget what you were doing and where you are and that flood of emotions that come in.  And my whole body went weak, and I kind of just fell to the floor.  And I was still holding the phone, because I was just in shock, I think, and just letting this information kind of permeate my being.
>
> And I said, well, you know, "Are you sure?"  And she said yeah.  And I just started -- I totally broke down, like I do so easily, and I just started crying.  I cried for days.  I just was a crier.

Id. at 74.  A day or two later, Ms. McIntyre joined her family, which had congregated in Pennsylvania.  See id. at 75.

When Ms. McIntyre eventually returned to the University of Virginia, the rest of the semester "didn't go that well."  Id. at 77.  She dropped some classes and got some "incompletes" in others.  It ultimately took Ms. McIntyre nine years to finish her college degree.  See id. at 81-82.  In the summer of 1983, Ms. McIntyre took a job with the American Political Science Association in Washington, D.C.  Id. at 78-79.  Although she "tried to lead a normal life," looking back she recalls, "I really couldn't do much.  I was so preoccupied; and I would just take long walks all the time, and I didn't socialize....  It was kind of a heavy thing to happen when you're twenty....  I kind of hibernated."  Id. at 79.  In terms of seeking counseling in connection with the loss of her father, Ms. McIntyre testified that she likes to solve her own problems, but she did seek counseling once.  She found, however, that she "had more life experience" than the counselor, and overall "just found it pretty useless, so I never went back."  Id. at 80.

Ms. McIntyre testified that she has missed her father's presence at a number of life events, such as the births of her two children, and "just celebrating.  I think that's really important to celebrate things together, and that's what I wish he could be here for."  Id. at 80-81.  When asked how the loss of her father in the Beirut Embassy bombing has affected her life, Ms. McIntyre

testified:

> Well, that's a big question.  I would say that he was my biggest kind of support system, emotionally and energetically, and I felt like the rug was taken out from under me for a long time.  And I didn't realize it, of course until it happened, but -- and I think I floundered a lot academically.  I proceeded to get a lot of incompletes that turned to F's, and I didn't have the energy to complete them.  And it took me nine years to finish my undergraduate work, because I always worked on the side with school anyway, which was something my dad taught me to do.  When I was sixteen, he said "Go get a job," and I always worked in high school and college.  But I've missed his advice, you know, when you need that trusted advice from somebody who knows you, and I feel like I would just love to share my life with him.  That's all.  It's just been just a hole that's never been filled.  I mean, I've filled it with a lot of other things in life that are rich and diverse and a great life, full of a lot of love, but there's just --  there's something that nothing else will ever take that place.  That's all.

Id. at 81.

Based on the evidence presented to the Court, including the testimony of Julie McIntyre, the Court will award the estate of William McIntyre, by Mary Lee McIntyre as Executrix, $5 million for the benefit of Julie McIntyre to compensate for the loss of "services, protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Julie McIntyre.  See Va. Code § 8.01-52.

### (iv)   Andrew McIntyre

Andrew McIntyre is the son and second child of William and Mary Lee McIntyre. Tr. Vol. VI at 83-84; Ex. 54.  He spent most of the early years of his life living with his family overseas, and when the McIntyre family moved back to the United States in 1977, Andrew McIntyre, then twelve years old, "wasn't that thrilled, quite frankly." Id. at 85-86.  His father attempted to help him make this transition.  For instance, Andrew McIntyre testified, William McIntyre

> tried to encourage me to do various activities.  He tried to get me involved with things like little league; and I had done a lot of that, actually, in Pakistan under his guidance, and it was a lot of fun there.  And he helped me actually get involved with starting a business, just a lawn mowing business with a friend.  And we'd do that of course during the

summers and earn some money that way.  So he would help in that regard, yeah

Id. at 86-87.  When his parents moved to Beirut, Andrew McIntyre was enrolled in boarding

school at Westtown School, outside of Philadelphia.  Id. at 89.  The last time that Andrew

McIntyre saw his father was over the Christmas holidays in 1982, when his father presented him

with a "beautiful watch."  Id. at 91.  The last time that he spoke with his father was a couple of

weeks before April 18, when he called his parents to tell them that he had been accepted into

Swarthmore College.  His father was "very pleased."  Id. at 91.

When Andrew McIntyre returned to school following funeral services for his father,

"basically [he] just wanted to sleep a lot.  You know, you want the world to stop, and it doesn't."

Id. at 97.  He had made the varsity baseball team for the first time, but simply did not "want to do

it.  I want[ed] to sleep."  Id.  He also turned to various substances to help him deal with his

emotional pain:

> Unfortunately, I had been experimenting obviously with a lot of substances and whatnot,
> and just went through the roof, unfortunately.  I drank a lot and did basically any substance
> I could find to escape and to get out of reality.  I mean, you know, reality was blowing up
> my parents, so it seemed to be a pretty good thing to avoid, escape.  So I did that for,
> unfortunately, a long time on and off.

Id.  Andrew McIntyre had hoped to spend the summer of 1983, following graduation from

Westtown, with a friend doing painting, but his mother requested that he come home and spend

the summer with her and his sister Margaret.  Id. at 98.  He "barely even remember[s] much

about" the summer, other than the fact that he "was doing acid, LSD, whatever.  Anything I could

find, frankly, just to get away."  Id.

Andrew McIntyre saw a counselor "off and on" at Westtown, but "didn't like him and

didn't see him at all during the summer or anything like that."  Id. at 99.  Once he enrolled in

Swarthmore the next fall, he testified that he did "seek someone out, mainly because I recognized

things were getting completely out of control.  I was drinking probably a six pack every night."

Id. at 99.  He "squeaked" by his first semester at Swarthmore, but by the spring semester he was

able "to pull off decent enough grades to ultimately transfer to Harvard."  Id.  Andrew McIntyre

testified that he missed his father's presence throughout his college years:

> I missed the discussions that I would have had with him, I mean, he was an intellectual,
> and I was, you know, experiencing the honeymoon that anybody does when they first
> really get exposed to a lot of the great thinkers, historically....  And it would have been
> great to have discussions about that kind of thing.  We were both debaters and
> argumentative and just to sort of have fun, you know, sparring matches around issues like
> that just would have been very neat.

Id. at 100.

Based on the evidence presented to the Court, including the testimony of Andrew

McIntyre, the Court will award the estate of William McIntyre, by Mary Lee McIntyre as

Executrix, $5 million for the benefit of Andrew McIntyre to compensate for the loss of "services,

protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish,

and solace" of Andrew McIntyre.  See Va. Code § 8.01-52.

### (v)   Margaret (McIntyre) Matteucci

Margaret Matteucci is the daughter and youngest child of William and Mary Lee McIntyre.

See Tr. Vol. VI at 102-03; Ex. 54.  Ms. Matteucci testified about fond memories she had of

growing up with her family:

> We had this routine before, but we'd always eat dinner together.  We did that in India and
> Pakistan, and that continued in Virginia.  And my dad was really good at kind of taking a
> pulse of where we were, you know.  He'd ask, "Margy, what did you learn today?"  And,
> "how was your day?"  And he kind of, you know, would do that with Andy and Julie, too.
>
> We also watched the news together every single night as a family, and you know, if we
> had questions about something that was on the news, we'd talk about it.  But the dinner

hour or hours, that was something that was rarely -- we very rarely did not eat together and spend that time together.

Tr. Vol. VI at 107.

Ms. Matteucci was a junior-high school student when she learned that her father had been posted to Beirut.  Id.  In September of 1981, as her mother prepared to join her father, who had departed earlier, Ms. Matteucci was enrolled in Principia Upper School in St. Louis, Missouri.  Id. at 108.  The last time that Ms. Matteucci spoke with her father was over Christmas 1982, but she wrote to her parents after that time.  Id. at 111.  As she testified:

> We weren't a very touchy-feely emotive family; and one of the last letters I wrote, I told my parents that I loved them, and I'm just so grateful that I did.  So I don't specifically remember the content of the last letter.  I do remember in one of the last letters that I did say that, not just love Margy, but I love you guys, you know, that kind of thing.

Id. at 111-12.

When she returned to Principia after her father's funeral, she was "ready to just continue burying stuff.  I just didn't want to feel anything.  It's too hard."  Id. at 119.  That was difficult to do, however, because the school had held an assembly to inform her classmates of what had happened.  "So there was no anonymity coming back.  Everybody knew everything."  Id.  In addition, she felt that she had no real guidance in dealing with her grief:

> I had never really seen a Christian Scientist grieve, and so I assumed the position of, I'm done.  I've grieved.  Even like weeks later, I actually even stood up in church and gave a testimony that I had been healed of grief.  I was that convinced that -- I guess we had immense respect for my father, and I don't think I was doing it out of disrespect; I just honestly -- I think my psyche couldn't go there, and I really wanted to believe that.

Id. at 119-20.

Ms. Matteucci had planned to spend the summer of 1983 working as a camp counselor in Missouri, but she felt so guilty about her mother spending the summer alone that she went home

and spent the summer with her mother.  Id. at 121.  During this time, she began to find people

who cried "very threatening."  Id.  at 126.  She recalls her sister Julie crying that summer, and

testified, "I would hear her crying, and I wouldn't do anything to comfort her because it was -- you

know, I think I didn't have a whole lot of patience for it.  I was like, 'Hello, have a healing like

me.'  You know, this is how it's done.  I didn't have a lot of compassion for it."  Id.  She also

remembers that, when her mother received freight containing family belongings from Beirut, she

left the room as her mother began crying.  As she now recalls, "I think I knew on some level that if

and when the dam broke, it was going to be big.  And so I just avoided feeling."  Id.  Ms.

Matteucci returned to Principia in the fall.  She graduated from Principia Upper School in 1984

and Principia College in 1988.  See id. at 125.

California's North Ridge earthquake in 1994, which destroyed Ms. Matteucci's home,

triggered a sort of emotional release for Ms. Matteucci and, in her words, "just knocked me off my

rocker....  I felt totally out of control of the situation.  I felt -- I started to feel, and that was a scary

thing."  Id. at 126.  After talking with a friend from boarding school and college who had

experienced similar family loss, Ms. Matteucci began a grieving and healing process:

> And I think I just avoided it because grief takes a lot of courage, and grief is messy.  And I
> didn't want  it to be messy.  And so I did -- I kind of resisted it until I couldn't resist it
> anymore; and I think the earthquake had rattled me....
>
> Later on, that -- the whole year was process for me, ... it was actually January....  I
> remember writing my mom a letter; and it was in late January, and the dam did break one
> night.  I don't know what set me off.
>
> But I was up all night long and went through several rolls of toilet paper and just cried.
> Just finally released.  So it was about twelve years later, and I wrote my mom a letter.  And
> I told her I had not had a healing in Christian Science, and I was beginning to look at it
> honestly.  And I remember making it through that.
>
> April 18 came, and I finally, you know, I didn't do any major memorializing ... I guess I

thought I only had that day to grieve.  So I just felt like in previous years, but I had been grieving all of '94, really.

So on that day, on that particular day, April 18th of '95, I just felt really raw, but it was a good thing.  But it was just a really hard day.  And the next day was the Oklahoma City bombing, and that just knocked me off my butt.  Just really -- I had just made it through a really difficult day, and then just seeing the images and seeing the panic on people's faces and the terror in people's eyes.  I thought that must have been what everybody who's testified and who was in the bombing, that must have been what they went through, and I just felt just such -- I felt.

And it was messy, but it was good.  And I remember that evening going to church, and the readings were -- I don't even remember what they were on, but the testimonies were just really hard to hear.  They were just, you know, isn't God wonderful and good, and I just got up and I just stormed out.

And an usher followed me, and a good friend of mine, and said, "Are you okay?"  And I just started yelling.  And I was  like, "People's lives are shattered today!  These people's lives are never going to be the same, and we're here, people are standing up and testifying about how good God is."  And God is good, but at that moment I just felt it was a platitude that was just really -- it just pissed me off.  I couldn't go back into the service, I was so angry.

Id. at 127-29.  Ms. Matteucci eventually sought counseling when she started graduate school.

Because she was working towards a master's degree in counseling, she felt that if she were going

to be a therapist, she first needed to "wear the other hat."  Id. at 129-30.  Indeed, Ms. Matteucci

feels that the loss of her father has had a "huge" effect on her career choice, as she saw "through

[her] own healing and [her] own process how valuable and how it just makes you a more honest

person, to feel."  Id. at 130.

Based on the evidence presented to the Court, including the testimony of Ms. Matteucci,

the Court will award the estate of William McIntyre, by Mary Lee McIntyre as Executrix, $5

million for the benefit of Margaret Matteucci to compensate for the loss of "services, protection,

care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace"

of Ms. Matteucci.  See Va. Code § 8.01-52.

### 5.      Estate and family of Robert McMaugh

### (I)      Estate of Robert McMaugh, by Earl McMaugh and Annie Mullins, Co-administrators

Marine Lance Corporal Robert "Bobby" McMaugh was born February 22, 1962, in Fort Meade, Maryland, and was a United States citizen.  See Tr. Vol. IV at 42-43.  He graduated from Osbourn High School in Manassas, Virginia, in June 1980.  See id. at 40, 48.  Shortly thereafter, he reported for Marine Corps basic training at Parris Island, South Carolina.  See id. at 48; Ex. 46 at 2.  Following basic training, Corporal McMaugh was assigned to the Marine Corps Air Ground Combat Center in Twenty-nine Palms, California, where he trained in aircraft capture.  See Tr. Vol. IV at 48.  He was selected to attend Marine Security Guard ("MSG") school at Quantico, Virginia, see id. at 49, and he graduated from MSG school in the fall of 1982.  See id. at 53. Corporal McMaugh volunteered for assignment at the United States Embassy in Beirut, and was transferred there immediately upon graduation from MSG school.  See id. 51, 52.

Corporal McMaugh was stationed at Guard Post 1 in the Embassy's main lobby, near the center of the blast, at the time of the bombing.  See Tr. Vol. II at 115-16; Tr. Vol. III at 13, 75.  As a result of the blast, he was buried beneath the Embassy's collapsed center floors and sustained fatal injuries.  See Tr. Vol. IV at 11.  He was twenty-one years old.  See id. at 52.  He was survived by his parents, Earl McMaugh and Annie Mullins, his sisters, Teresa Younts and Cherie Jones, and his brother, Michael McMaugh.  See Tr. Vol. IV at 18, 73, 56; Ex. 46 at 3-4.  His estate was probated in Virginia, where he had been legally domiciled prior to enlisting in the Marines. See Pls.' Mem. in Supp. of State Law Claims at 96.[20]  The estate of Robert McMaugh -- which is

---

[20] See also 13B Charles Alan Wright et al., Federal Practice & Procedure § 3620, at 573 (2d ed. 1984 & Supp. 2003) (military personnel who have protracted stays away from their place

represented by Earl McMaugh and Annie Mullins, as co-administrators, for purposes of this litigation, see Tr. Vol. IV at 43-44, 55-56; Ex. 45 -- is the proper plaintiff to bring a wrongful-death action under Virginia law.  See Va. Code  § 8.01-53(A).  Pursuant to Section 8.01-53(A) of the Virginia Code, any recovery is for the benefit of Robert McMaugh's surviving parents and siblings.  See id.  The precise distribution of an award among the statutory beneficiaries is left to the discretion of the Court.  See Va. Code § 8.01-54(A).

Based on the pleadings and the evidence presented to the Court, the estate of Robert McMaugh has made out a valid claim for wrongful death under Virginia law, and therefore is entitled to recover "[c]ompensation for reasonably expected loss of ... income of the decedent" as well as an amount that reflects the value of "services, protection, care and assistance provided by the decedent" and that accounts for the "[s]orrow, mental anguish, and solace" of his survivors. See Va. Code § 8.01-52.  The expert economic analysis presented to the Court demonstrated that, were it not for Corporal McMaugh's untimely and wrongful death, he would have earned wages, benefits, and retirement pay amounting to $2,903,000.  See Ex. 39 at Tab 4; see also Dammarell I, 281 F.Supp. 2d at 195 (explaining the methodology used by the expert to calculate economic damages for victims who were killed in the Embassy bombing).  The Court, therefore, will award the estate of Robert McMaugh, by Earl McMaugh and Annie Mullins, as co-administrators, $2,903,000 in economic damages, for the benefit of his parents, Earl McMaugh and Annie Mullins, in equal shares.[21]  As for the intangible aspect of the estate's wrongful-death recovery, the

---

of domicile in the United States, as a result of their military service, generally "retain their domicile in the state wherein they formerly resided").

[21]  The Court awards this amount solely for the benefit of Robert McMaugh's parents, in equal shares, based on Virginia's law of intestate succession.  See Va. Code § 64.1-1 (stating that

Court will address those awards below, beneficiary-by-beneficiary.

### (ii)   Earl McMaugh

Earl McMaugh is the father of Robert McMaugh.  See Tr. Vol. IV at 42; Ex. 46.  Mr.

McMaugh described his son as a "first-class person." Tr. Vol. IV at 50, 83.  As a teenager,

Corporal McMaugh was a "very good kid.  He was energetic, very competitive, light-hearted, free

spirit[ed] . . . [and] an excellent athlete." Id. at 44.  Mr. McMaugh knew that his son was "going

to do something with his life." Id.  Mr. McMaugh testified that he "lived through" his son's

athletic successes in football, soccer, basketball and other sports.  Id.  He instilled in his son a

drive to win at competitive sports, teaching Corporal McMaugh that "whatever you do, you do it

well." Id. at 46.

Mr. McMaugh encouraged his son to attend college immediately after high school, but

Corporal McMaugh surprised his father by enlisting in the Marine Corps.  See id. at 48.  Mr.

McMaugh supported the decision, counseling his son to be the best Marine he could be, see id.,

but he also advised Corporal McMaugh to set aside funds for his college education.  See id. at 49.

Mr. McMaugh was concerned about Corporal McMaugh's decision to volunteer for the Beirut

posting, because he did not believe that his son -- at age twenty -- fully understood the danger he

faced.  See id. at 52.

On the morning of April 18, 1983, upon his arrival at work with the Defense Intelligence

Agency, a co-worker informed Mr. McMaugh that the Embassy in Beirut had been bombed.  See

id. at 63.  Mr. McMaugh telephoned the Embassy directly:

---

when a person dies intestate without leaving a spouse or issue "then [the whole of his estate shall
go] to his or her father and mother or the survivor").

I got a busy signal....  And the strangest thing happened to me at that time; and I never had it before, and I've never had it since.  And I believe it was the understanding at that time that Bobby had been killed....  The sense was my knees almost fell out from under me.  I felt this weak-legged thing.  I was standing there, and all of a sudden, my knees and my legs wanted to give out.  That's the only reaction I had.  Now, I didn't know anything at that time, but I kept calling back.  I must have made ten phone calls to the embassy.

Id.  at 64.  Earl McMaugh did not receive definitive word of his son's death for a few days.  A Navy captain and commander came to the McMaugh home in Manassas and informed the family that Corporal McMaugh had been killed in the bombing.  See id. at 67-68.

Based on the evidence presented to the Court, including the testimony of Earl McMaugh, the Court will award the estate of Robert McMaugh, by Earl McMaugh and Annie Mullins, as co-administrators, $3.5 million for the benefit of Earl McMaugh to compensate for the loss of "services, protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Earl McMaugh.  See Va. Code § 8.01-52.

### (iii)   Annie Mullins

Annie Mullins is the mother of Robert McMaugh.  See Tr. Vol. IV at 91; Ex. 46.  She described her son as "great" and "special" to her.  Id.  at 92.  Ms. Mullins testified that she would tell Corporal McMaugh, the oldest of her three children, that they were "learning partners."  Id.  at 93.  Her son "always tried to make me laugh," particularly when he was trying to convince Ms. Mullins to agree with a request he had made that she initially refused.  Id.  Ms. Mullins testified that Corporal McMaugh was "lovable, not just because he's my son.  That's just the personality that he had.  I think he touched a lot of people, and I think that that was evident when we had his funeral."  Id.  at 104.

Corporal McMaugh wrote letters to his mother while in basic training.  See id. at 97.  He wrote one letter home as a Mother's Day gift, telling Ms. Mullins that "boot camp is great and I'm

doing well because you are the greatest mom and you had prepared me for all this yes, sir; no sir."

Id.  Ms. Mullins testified that, as a result of Corporal McMaugh's death,

> I was hurt.  I was angry.  I was mad.  I was beside myself.  And I went to Father Kelly at our church, and he told me that I could handle it, and that I would get through this part of my life, and I said I can't because Bobby was planning on coming home and finding a place for us all to be together, and that wasn't going to happen.  And I just didn't see how I could handle all the other problems that was happening.  Teresa was in the hospital ... and she had a miscarriage, and that would have been my first grandchild, and it was gone.  Cherie was so ... sad.  And I hid my tears from her so bad, because I knew if I cried she would cry right with me....  I had nightmares ... and so did she....  I saw Father Kelly, I bet, every other day.  I kept telling him, it's so hard for me, because [my children] hurt so much that there wasn't anything that I could say or anything that I could do but hug them.  And if I hugged them, then it made me want to cry, and I felt like I wasn't allowed that luxury.

Id. at 114-15.

Based on the evidence presented to the Court, including the testimony of Ms. Mullins, the Court will award the estate of Robert McMaugh, by Earl McMaugh and Annie Mullins, as co-administrators, $3.5 million for the benefit of Annie Mullins to compensate for the loss of "services, protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Ms. Mullins.  See Va. Code § 8.01-52.

### (iv)    Teresa (McMaugh) Younts

Teresa Younts is the sister of Robert McMaugh.  See Tr. Vol. IV at 122; Ex. 46.  Ms. Younts, who is two years younger than Corporal McMaugh, described her brother as her "protector."  Id. at 123.  She testified that Corporal McMaugh "helped me through my high school years; he gave me advice.  He was always there whenever I needed him....  He was very strong, and we just relied on each other because we were so close."  Id.  Corporal McMaugh did not mind when his little sister "tagg[ed] along."  Id. at 124.  Ms. Younts testified that her brother escorted her to her first dance "because he didn't think anybody was ... good enough to take me."  Id.  at

125.  Ms. Younts said she was very proud of her brother's decision to join the Marine Corps.  <u>See</u> <u>id.</u> at 126.  When Corporal McMaugh was at MSG school, Ms. Younts enjoyed their frequent contact, particularly when he brought his fellow Marines home for dinner.  <u>See id.</u> at 127.  He was even able to attend Ms. Younts's high-school graduation.  <u>See id.</u>  She recalls that life overall with her brother was "fun and happiness."  <u>Id.</u>  at 128.

After Corporal McMaugh was transferred to the Embassy in Beirut, he frequently called his sister, who by that time was living in her own apartment.  <u>Id.</u> at 129.  On the night of April 17, 1983, Ms. Younts spoke to her brother on the telephone.  <u>Id.</u> at 130.  She was the last person that Corporal McMaugh had contact with in his family.  <u>Id.</u>  Ms. Younts testified that, as a result of the bombing,

> [l]ife from that day has changed my entire being.  My entire family was ripped apart in many different facets, not just by losing my brother....  I lost a brother, I lost my mom and dad as a family unit, all in a matter of a very short period of time.  And I wanted, like my dad says, to crawl away, go away.  I wanted to go away, far away and never come back.  I thought that was the cure, and I did go away....  And I went away for several months.  I lost my job; I lost my apartment.  And then you kind of grab it and pull it together, and I guess that's what we all have done.

<u>Id.</u> at 138.

Based on the evidence presented to the Court, including the testimony of Ms. Younts, the Court will award the estate of Robert McMaugh, by Earl McMaugh and Annie Mullins, as co-administrators, $2.5 million for the benefit of Teresa Younts to compensate for the loss of "services, protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish, and solace" of Ms. Younts.  <u>See</u> Va. Code § 8.01-52.

### (v)    Michael McMaugh

Michael McMaugh is the brother of Robert McMaugh.  <u>See</u> Tr. Vol. IV at 142; Ex. 46.

Michael McMaugh, who is four years younger than Corporal McMaugh, enjoyed a good-natured athletic rivalry with his brother.  See Tr. Vol. IV at 143.  The two would wrestle every day after school, fight with wooden swords, race against each other, and play football, baseball and soccer together.  See id. at 143-44.  Michael McMaugh testified that he looked up to his older brother who "made everybody laugh, he kept everybody happy, and he kept everybody safe."  Id. at 150  He added that Corporal McMaugh "looked after us, looked after me, and that was nice to have."  Id. at 151.

On the night of April 17, 1983, Michael McMaugh had a dream involving "[w]hat it would be like if something happened to [my brother]."  Id. at 149.  The dream "terrified" him, and he spent the rest of the night trying to get the images out of his mind.  Id.  On the morning of April 18, Michael McMaugh awoke to his radio alarm, and the first thing he heard was a news report regarding the Embassy bombing.  See id.  He went downstairs and told his mother.  See id.  His mother assured Michael McMaugh that his brother was safe, and he proceeded to watch television for news of the bombing.  See id. at 150.  The feeling that his brother was dead never left him.  See id.  The next several days involved "a lot of waiting, a lot of not knowing, and a lot of praying.  And a lot of guilt.  I thought that -- I was sixteen, geez -- you shouldn't dream, even think about things like that.  They could come true."  Id.

Michael McMaugh testified that he joined the Marine Corps after his graduation from high school because "I wanted to fight.  I wanted to try and live up to his -- to what he had done."  Id. at 152.  Michael McMaugh testified that a death such as his brother's

> changes your life.  It changes who you are, it changes what you look forward to and
> accomplishments that you make in your life.  You have nothing to gauge.  I had everything
> up until that point.  My brother did everything so well, and I was always number two.  And
> I didn't mind being number two because number two meant that I was ninety-nine percent

better than everybody else because [my brother] was really good at what he did.  And the
accomplishments that I made in my life, and the things that I did, I had no one to share it
with, like a brother....  And advice.  People to turn to when I always needed something or I
needed to know ... what direction should I lean towards....  I miss the excitement that he
brought, because he was the center of attention, and he was such a fun person to be around
that I'm sure -- and everybody said that he was easy to love; and it's not easy to get over,
and I don't think that anybody in my family has.

Id. at 152-153.

Based on the evidence presented to the Court, including the testimony of Michael

McMaugh, the Court will award the estate of Robert McMaugh, by Earl McMaugh and Annie

Mullins, as co-administrators, $2.5 million for the benefit of Michael McMaugh to compensate for

the loss of "services, protection, care and assistance provided by the decedent" and for the

"[s]orrow, mental anguish, and solace" of Michael McMaugh.  See Va. Code § 8.01-52.

### (vi)   Cherie (McMaugh) Jones

Cherie Jones is the sister of Robert McMaugh.  See Tr. Vol. IV at 156; Ex. 46.  Ms. Jones

was fourteen years younger that her brother Bobby, and seven years old at the time of his death.

See id. at 158.  She testified that her brother "was very much like a parent to me because of his

age.  Our relationship was solid.  We were always together."  Id. at 156-57.  He often brought Ms.

Jones presents.  See id.  Although she was very young when Corporal McMaugh died, Ms. Jones

testified that she remembers her brother's personality:  "He was a big character.  He was a big

comedian."  See id. at 157.

Ms. Jones remembers that on the day the military informed the McMaugh family that

Corporal McMaugh had been killed, her family took her upstairs to a bedroom and told her that

her brother was dead.  See id.  Ms. Jones testified that she "felt hurt. Anger. Disbelief.  I was very

upset....  I felt like a huge part of me was gone."  Id.  Ms. Jones explained that her grief over her

brother's death was compounded because her parents were going through a divorce at that time.

See id. at 160.  Ms. Jones stated that she was "okay" with the divorce only because she had an

"ulterior plan" to live with her brother when he came home from the military.  Id.

Based on the evidence presented to the Court, including the testimony of Ms. Jones, the

Court will award the estate of Robert McMaugh, by Earl McMaugh and Annie Mullins, as co-

administrators, $2.5 million for the benefit of Cherie Jones to compensate for the loss of "services,

protection, care and assistance provided by the decedent" and for the "[s]orrow, mental anguish,

and solace" of Ms. Jones.  See Va. Code § 8.01-52.

### 4.    Dorothy Pech

Plaintiff Dorothy Pech was assigned to the U.S. Embassy in Beirut as secretary to the

Deputy Chief of Mission.  See Tr. Vol. III at 9-10; see also Ex. 41; Ex. 14 at 206.  She was born

November 6, 1929, in Portsmouth, Ohio, and is a United States citizen.  See Tr. Vol. III at 6.

Prior to assuming her post in Lebanon, she was domiciled in Northern Virginia, and she returned

there after retiring from the State Department in 1992.  See Pls. Mem. in Supp. of State Law

Claims at 17.  Thus, Virginia law will govern her claims in this case.

On April 18, 1983, Ms. Pech spent the morning in her office at the Embassy working and

also attempting to make travel arrangements for her son to visit Beirut.  See Tr. Vol. III at 13-14.

She took lunch at 12:00 p.m. in the Embassy cafeteria with colleagues.  See id. at 14.  Ms. Pech

left the cafeteria at about 12:55 p.m., and went to the Embassy's budget and fiscal section to cash a

check.  See id. at 14-15.  Ms. Pech testified that she had:

> [J]ust finished writing the check when everything -- I thought [it] was an earthquake....
> And the checkbook fell, and I fell down and something -- we'll never know, I guess a piece
> of the wall -- hit me, a big large gap across the forehead, and [I started] bleeding a lot.  But
> very oddly, very calm ... [the cashier] helped me up....  Of course, he was spared, being in

that little box of his ... and we went out in the hall and just kind of stood there.  And somebody said, sit down, I think you've lost your eye.

Id. at 15.  Along with several other Embassy personnel, Ms. Pech made her way out of the building.  Once outside, she was immediately "hustled . . . into [a] taxi" for transport to AUB Hospital.  See id. at 17.  As a result of her injury, Ms. Pech temporarily lost sight in her left eye, regaining it three weeks after the Embassy bombing.  See Tr. Vol. III at 23.  The injury may have permanently harmed her eyesight in that eye.  See id. at 25.  In addition to her physical injuries, Ms. Pech lost a number of friends in the bombing.  One friend, Mrs. Amal, had planned a party for the Saturday following the bombing.  Instead of a party, Ms. Pech attended Mrs. Amal's funeral.  See id. at 28-29.  Although Ms. Pech initially believed that she coped well with the Embassy bombing, she now realizes she was "quite a basket case when [she] came back" to the United States from Beirut, and was "sharp with people."  Id. at 25.  Ms. Pech did not seek professional counseling because she believed it would harm her career if people at the State Department learned of her treatment.  See id. at 26.

Based on the pleadings and the evidence presented to the Court, Ms. Pech has stated a valid claim of battery under the law of Virginia and is entitled to recover compensatory damages from defendants for all "injuries received and ill effects [she] sustained ... [that] were proximately caused by the battery," see Pugsley, 263 S.E.2d at 76, including her physical pain and suffering and mental anguish, see Cho, 525 S.E.2d at 291.  The Court values the loss associated with Ms. Pech's physical pain and suffering and mental anguish at $750,000 and she will be awarded that amount in damages on this default judgment.

## CONCLUSION

For the foregoing reasons, final judgment will be entered against defendants by way of a

separate Judgment Order in the amounts set forth above, plus any post-judgment interest allowed

by law.[22]  The claims of the remaining plaintiffs are hereby referred to Magistrate Judge Facciola,

who will receive evidence and prepare proposed findings and recommendations for the disposition

of those claims in a manner consistent with this opinion.


                                          /s/ John D. Bates
                                        JOHN D. BATES
                                  United States District Judge



        Dated:     December 14, 2005


Copies to:

Stuart Henry Newberger
Michael Lee Martinez
Monica Glynn Parham
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595
Email: snewberger@crowell.com
Email: mmartinez@crowell.com
Email: mparham@crowell.com

        *Counsel for plaintiffs*

---

[22] All awards are based on cash value as of March 1, 2003, and any interest thereon should accrue from that date rather than the date of this opinion.