## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANNE DAMMARELL,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **THE ISLAMIC REPUBLIC OF IRAN,** *et al.*, <br><br> **Defendants.** | **Civil Action No. 01-2224 (JDB/JMF)** |

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was referred to me, pursuant to Rule 53 of the Federal Rules of Civil Procedure and Local Rule 72.1(b)(5), to receive evidence, serving as a special master, and to prepare proposed findings and recommendations for the disposition the claims of the Phase II[1] plaintiffs.

### BACKGROUND

Plaintiffs brought this action against the Islamic Republic of Iran ("Iran") and its Ministry of Intelligence and Security ("MOIS"), pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*,[2] to recover for damages they sustained as a result of the April 18, 1983 car bombing of the United States Embassy in Beirut, Lebanon. Sixty-three people were killed, including seventeen United States citizens, and over one hundred others were injured in that bombing.

---

[1] As will be explained, *supra*, the damages stage of this case was tried in two phases, the first before Judge Bates and the second before this magistrate.

[2] All references to the Untied States Code or to state statutes are to the electronic versions available though Westlaw and Lexis.

After the bombing, it was determined that a radical Lebanese group known by various names, including Hizbollah, was responsible for the attack on the United States Embassy. <u>See</u> <u>Dammarell v. Islamic Republic of Iran</u>, 404 F. Supp. 2d 261, 271-72 (D.D.C. 2005) (Judge Bates opinion regarding the Phase I plaintiffs' claims, hereinafter "<u>Dammarell IV</u>").  Moreover, it was discovered that Iran, through its MOIS, materially supported Hizbollah by providing assistance such as money, military arms, training, and recruitment. <u>See</u> <u>id.</u> at 272-73.  Indeed, on January 19, 1984, President Reagan designated Iran as a state sponsor of terrorism, a designation that has remained to this date. <u>See</u> <u>id.</u> at 273-74.  Based on this information, plaintiffs, consisting of various individuals who were injured in the bombing or the family members or estates of individuals killed in the bombing, brought this complaint alleging that they were injured as "a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Hizbollah members, whose acts were funded and directed by the Islamic Republic of Iran through its agent MOIS." <u>Third Amended Complaint</u> at ¶ 190.  A more detailed discussion of the events underlying plaintiffs' claims was provided in Judge Bates' December 14, 2005 opinion regarding the Phase I plaintiffs' claims and, in the following discussion, I will assume familiarity with that opinion. <u>See</u> <u>Dammarell IV</u>, 404 F. Supp. 2d at 271.

Defendants failed to appear in this action, and a default judgment was entered against them on September 6, 2002.  The subsequent determination of damages recoverable from the defendants on that default judgment has been conducted in two phases.  First, in Phase I, which consisted of twenty-nine of the eighty-two plaintiffs, a trial was held before Judge Bates in April 2003 and, on September 8, 2003, he issued extensive findings of fact and conclusions law. <u>See</u> <u>Dammarell v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 105 (D.D.C. 2003) (hereinafter

"Dammarell I").  Second, in Phase II, which consists of the remaining fifty-two plaintiffs, a trial

was held before this magistrate judge in January and February of 2004.  However, due to two

decisions issued by the court of appeals, Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d

1024 (D.C. Cir. 2004) and Acree v. Republic of Iraq, 370 F.3d 41 (D.C. Cir. 2004),[3] the

determination of proposed findings and conclusions of law for the Phase II plaintiffs was stayed

pending Judge Bates' determined how to proceed in light of those decisions.

        After briefing from the plaintiffs, Judge Bates held that in order to succeed on their

claims after Cicippio-Puleo and Acree, the plaintiffs must identify the specific state law claims

which form the basis of each individual plaintiff's claims. See Dammarell v. Islamic Republic of

Iran, No. 01-2224, 2005 WL 756090, at *17 (D.D.C. Mar. 29, 2005) (hereinafter "Dammarell

II").  With regard to which state's law to apply to individual plaintiff's claims, Judge Bates

determined that the law of the each plaintiff's domicile at the time of the bombing would provide

the substantive rule of decision. Id. at *21.  Specifically, for the estates of plaintiffs killed in the

bombing, the law of the decedent's residence at the time of his death shall apply. Id. at *21-22.

For plaintiffs who were injured in the bombing and plaintiffs who are surviving family members

of plaintiffs killed in the bombing, the law of the state of the domicile of the individual plaintiff

shall apply. Id.  In circumstances where a plaintiff has changed his or her domicile since the

embassy attack, the state of domicile will be assessed as of the date of the attack. Id. at *22.  To

---

        [3]  In Cicippio-Puleo, the court of appeals held that the FSIA does not create a private
right of action against a foreign government. Cicippio-Puleo, 353 F.3d at 1033.  In Acree, the
court of appeals held that a plaintiff asserting claims pursuant to FSIA "cannot state a right of
action under the 'generic common law' or merely 'allude [ ] to the traditional torts . . . in their
generic form' but instead 'must identify a particular cause of action arising out of a specific
source of law.'" Dammarell v. Islamic Republic of Iran, No. 01-2224, 2005 WL 756090, at
*1 (quoting Acree, 379 F.3d at 58-59).

that end, plaintiffs were ordered to amend their complaint and submit further briefing regarding the proper choice-of-law determination for each individual plaintiff. See Dammarell v. Islamic Republic of Iran, 370 F. Supp. 2d 218 (D.D. C. 2005) (hereinafter "Dammarell III").

On May 23, 2005, plaintiffs filed their Third Amended Complaint and, on August 3, 2005, they filed a memorandum of law explaining which state's law applies to each plaintiff's claims and the specific claims they were raising under such state's common and statutory law. Plaintiffs' Memorandum in Support of State Law Claims ("Pls. Mem. in Supp. of State Law Claims"). Based on these updated submissions, on December 14, 2005, Judge Bates issued revised findings of fact and conclusions law for the Phase I plaintiffs, which supplemented the findings of fact as stated in his earlier opinion, but superseded his legal conclusions. Judgment was entered in the Phase I plaintiffs' favor, and they were awarded compensatory damages totaling $126,061,657. Dammarell VI, 404 F. Supp. 2d at 271, 274. Now, based on the principles set for in Dammarell VI, I propose the following findings of fact, conclusions of law, and damage awards.

## SPECIFIC FINDINGS AND CONCLUSIONS

The Phase II plaintiffs' claims involve consideration of the law of eleven different states. Plaintiffs who were injured in the bombing have asserted battery and intentional infliction of emotional distress claims. The estates and surviving family members of persons killed in the bombing have asserted wrongful death claims and, in some circumstances, intentional infliction of emotional distress claims and claims under survival statutes. In order to avoid repetition, the following discussion is organized by state, first providing an overview of that state's law and then discussing the claims of each plaintiff who is asserting claims under those laws.

I.      **CALIFORNIA**

  A.      **Causes of Action**

   1.      **Battery**

Under California law, "[a] battery is any intentional, unlawful and harmful contact by one person with the person of another." Fluharty v. Fluharty, 69 Cal. Rptr. 2d 244, 497 (Ct. App. 1997) (quoting Ashcraft v. King, 228 Cal. App. 3d 604, 611 (1991)).  Specifically, the tort of civil battery consists of the following three elements: (1) the defendant intentionally did an act that resulted in a harmful or offensive contact with the plaintiff; (2) the plaintiff did not consent to the contact; (3) the contact caused injury, damage, loss or harm to the plaintiff. Id. (quoting Barouth v. Haberman, 26 Cal. App. 4th 40, 46 n.4 (1994)).  "Under California law, when a person is injured by the tortious acts of another, she is entitled to recover from the tortfeasor an amount that will compensate for all the detriment proximately caused by the tortious acts." Priest v. Rotary, 634 F. Supp. 571, 584 (N.D. Cal. 1986).  Damages recoverable by the victim of a tortious act are not limited to damages resulting from physical injury, but may also include recovery for "the grief, anxiety, worry, mortification, and humiliation which one suffers by reason of physical injuries." Merrill v. Los Angeles Gas & Elec. Co., 158 Cal. 499, 512 (1910).

   2.      **Intentional Infliction of Emotional Distress**

To state a claim for intentional infliction of emotional distress under California law, a plaintiff must show "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress." Agarwal v. Johnson, 25 Cal. App. 3d 932, 946 (1979), overruled on other grounds in White v. Ultrimar, 21 Cal. App. 4th 563, 574 n.4

(1999)).  In order for defendant's conduct to be considered outrageous it "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." Cervantez v. J.C. Penny Co., 24 Cal. App. 3d 579, 593 (1979) (citing Restatement (Second) of Torts § 46 cmt. d). Damages for intentional infliction of emotional distress may be recovered for both economic losses, which include "[r]easonable compensation for any financial loss suffered by the plaintiff which was proximately caused by emotional distress," and non-economic losses, such as damages for "humiliation, anxiety, and mental anguish." Agarwal, 25 Cal. App. 3d at 953 (citations omitted).

### B.    Plaintiffs

#### 1.    Dundas McCullough

Plaintiff Dundas McCullough ("Mr. McCullough") was assigned to the United States Embassy in Beirut as a Consular/Political Officer with the Department of State. Phase II Exh. 20 at 3 (Declaration of Dundas McCullough).  Mr. McCullough was born on December 30, 1957 in Berkeley, California, and is a United States citizen. Id. at 1.  He is married to plaintiff Rebecca McCullough, and, at the time of the Phase II testimony, resided in Bangladesh. Id. at 4, 16.

Mr. McCullough was raised in Japan and California. Id. at 1.  He "developed a strong interest in politics and international affairs by the time [he] entered high school," and became interested in serving in the Foreign Service. Id. at 1-2.  After graduating from high school in 1976, Mr. McCullough entered the University of California at Berkeley. Id.  He received a Bachelor of Arts in History from Berkeley in June 1980. Id. at 2.  During his senior year at Berkeley, Mr. McCullough passed the written and oral portions of the Foreign Service entrance exam. Id.

While awaiting a Foreign Service position, Mr. McCullough enrolled in a graduate program at American University, in Washington, D.C. Id.  He joined the Foreign Service in March 1981, one semester short of obtaining a Masters from American University. Id. at 3. Shortly after he joined the Foreign service he was posted to Beirut, arriving in February 1982. Id.

In March 1982, Mr. McCullough received a visit from his then-girlfriend, Rebecca Jaramillo. Id. at 4. They decided to marry and did so at the United States Embassy in Beirut on April 4, 1982. Id.  After returning to the United States to attend to personal matters, Ms. McCullough re-joined her husband in Beirut. Id.

In June 1982, the Israelis invaded Lebanon, and quickly descended upon Beirut. Id.  The McCulloughs and their colleagues were evacuated from the city. Id.  Mr. McCullough was evacuated first to Cyprus and then to Dubai, while his wife was evacuated to Cyprus and then the United States. Id. at 5.  Mr. McCullough received a Meritorious Honor Award for his work at the Embassy in Cyprus. Id.  The McCulloughs returned to Beirut in the fall of 1982. Id.

On April 18, 1983, Mr. McCullough was in the Consular Section of the Embassy. Id. at 6. Remembering that morning, he stated:

> I was running late in my interviews of non-immigrant visa applicants.  I was seated on a stool at an interviewing counter, with a plexiglass partition between me and the applicant.  There was a cinder block wall behind me separating the interview area/waiting room from the second-floor consular filing room that overlooked the street.  There were no windows in this area, just a staircase down to the visa entrance on the street.  At . . . 1:06 in the afternoon, I became aware of a tremendously loud noise.  First, I thought it was more of the thunder we'd had earlier that day, and then I realized my chin was pressed down hard on the countertop.  I knew at that point that it was an explosion, but had no sense of imminent doom.  However, after the blast, and the loss of power, my darkened area filled with smoke, and I became alarmed that I would suffocate.  But the smoke cleared, and I was able to pull my

> petite translator from underneath the cinder blocks that had fallen
> on top of us.  I climbed over the debris into the file room, and
> managed to pull a filing cabinet off of an injured Lebanese
> employee, who ended up losing an eye to the attack.  I discovered
> that the smoke had cleared from my area because the whole
> streetside of the office had been blown away, leaving a gaping hole
> between us and the street.  Five employees died in that filing room.
> The survivors were able to climb down the building debris to the
> street.  My office, adjacent to the filing room and where I almost
> always was at that time of the day, was destroyed.

Id. at 6-7.  See also Trial Transcript Volume VI at 86-87 (hereinafter "Tr. Vol.") (testimony of

Rebecca McCullough describing how she could not enter her husband's work area after the

bombing because it appeared to be "completely destroyed").

When he left the Embassy, the scene out front was "chaotic," but security forces and

rescue workers were quickly on the scene. Id. at 7.  Mr. McCullough was placed in an ambulance

and taken to the American University of Beirut Hospital, where he received treatment. Id.  He

had multiple lacerations on his face, back, and hands from flying glass and other debris; he had

glass embedded in his skin, some of which was removed and some of which worked its way out

on its own; and a hematoma on his ear. Id.; Phase II Exh. 19 at 3 (photograph of Mr. McCullough

after bombing).  See also Tr. Vol. VI at 89-91 (Rebecca McCullough's description of husband's

injuries).  Mr. McCullough was met by his wife at the hospital. Phase II Exh. 20 at 8.  See also

Tr. Vol. VI at 92-93 (Rebecca McCullough's description of finding husband at hospital).  After

spending over four hours at the hospital, Mr. McCullough and his wife returned to their

apartment and contacted their families. Phase II Exh. 20 at 8.

The following day, Mr. McCullough went back to the Embassy, helping to relocate the

consular section to a nearby building and resuming his consular duties. Id.  He was not aware of

the full extent of the blast until that day, when he saw that the "entire mid-section of the building

had collapsed," and realized that he "was very lucky to be alive." Id.  He spent the next several

weeks identifying the remains of persons killed in the bombing, meeting with relatives of

deceased Lebanese employees, attending memorial services and funerals, and even scattering the

cremated remains of a colleague. Id.  It "never occurred" to Mr. McCullough not to return to

work. Id.  While a State Department psychiatrist came for several days to debrief the survivors,

beyond that and a memorial service there was "no other attention paid to 'looking back.'" Id.

Mr. McCullough recalls that, three days before the bombing, an Embassy security officer

had complained to Mr. McCullough regarding the State Department's desire to install vehicle

access barriers on the Embassy's periphery. Id. at 8-9.  Because the situation in Beirut was seen

as stabilizing, the Embassy "had even stopped parking motor pool vehicles across the Embassy

driveway entrance, so the vehicle carrying the bomb . . . had a clear, unobstructed path to the

Embassy." Id. at 9.  Mr. McCullough explained that he "felt frustrated by what I perceived to be a

lack of accountability for this situation." Id.

In the "immediate aftermath of the bombing," Mr. McCullough was informed by his

career development officer in Washington, D.C. that his assignment in Beirut was being

curtailed. Id.  He did not want to leave the city, particularly because he was about to begin his

rotation as a political officer, which was the reason he had accepted the assignment to begin with.

Id.  He expressed his desire to stay in Beirut to a visiting senior official in the State Department,

and was allowed to remain at post. Id.  However, Mr. McCullough explained that this incident

"triggered what became an uncomfortable relationship between me and the career development

officer, whose first words to me when I walked into his office in Washington several months

later were, 'I hope you don't expect special treatment just because you were in Beirut.'" Id. at 9-10.

Mr. McCullough's relationship with his immediate supervisor in Beirut also deteriorated after the bombing. Id. at 10.  Because his supervisor was not at the Embassy during the bombing, Mr. McCullough felt "caught in the middle" between her and the Lebanese employees who had survived the bombing, with his sympathies leaning toward the Lebanese survivors. Id.  Mr. McCullough stated that he had received "outstanding" reviews in his prior performance evaluation, but, in his review after the bombing, his supervisor "damned me with faint praise," and:

> concluded that I required further evaluation before being
> recommended for tenure, or permanent status, in the Foreign
> Service.  The after effects of this review have reverberated through
> my career, causing me to receive tenure a year later than most of
> my peers, and pushing back my first promotion two to three years.

Id.

After the bombing, the "situation in Beirut continued to deteriorate." Id.  Mr. McCullough noted that the "Embassy bombing was a psychological turning point for Beirut, which afterwards saw mounting violence and instability," including increased attacks on foreigners. Id. at 9.  These attacks included the October 1983 bombing of the United States Marine barracks and French military barracks; the January 1984 assassination of Malcolm Kerr, the President of American University of Beirut, and various attacks against diplomats and, on occasion, their spouses. Id. at 10.  Mr. McCullough's wife left Beirut in January 1984, and, shortly thereafter, Mr. McCullough was evacuated because the "situation deteriorated further and a general uprising occurred against government forces." Id. at 10-11.  By this time, Mr. McCullough felt that he was "fully ready to leave" Beirut. Id. at 11.  In retrospect, he described the posting as "both one of the best and worst

experiences of my life." Id.  "It was challenging and, at least at the outset, exciting, but it also distorted my sense of proportion about people and events, and left me jaundiced about the capabilities and integrity of the State Department bureaucracy." Id.

Mr. McCullough was posted to Haiti in May 1984. Id.  As it was another hardship assignment, Mr. McCullough "tried to get out of" it. Id.  The Embassy agreed to release him, but Mr. McCullough's career development officer did not. Id.  During this tour, Mr. McCullough received his Foreign Service tenure and outstanding performance evaluations. Id. at 12.

After leaving Haiti in December 1985, Mr. McCullough studied Arabic, a prestige language in the Foreign Service, for eighteen months at a language school in Tunisia. Id.  In the summer of 1987, Mr. McCullough, his wife, and their newborn son moved to Yemen, where he served as the Chief Political Officer at the Embassy. Id.  However, prior to leaving Tunisia, Mr. McCullough failed to get an expected promotion due to the "ripple of my Beirut experience." Id.  Mr. McCullough stated that "[i]t was at that point that I felt I was beginning to fall behind my peers in terms of career advancement." Id.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony that "one could predict overall lower occupational achievement and more difficulties along the way" among those with Post-Traumatic Stress Disorder and similar trauma-related disorders stemming from the Embassy bombing).  Yemen proved to be a "conservative Islamic society without any of the trappings of modern or cosmopolitan life." Phase II Exh. 20 at 12.  The post was a "hardship" on his family, especially his wife, who spent long periods of time in the United States. Id.  Mr. McCullough finally received his promotion after his first year at the post. Id.

Mr. McCullough left Yemen in the summer of 1989, when he transferred back to the

United States for a tour in the Intelligence and Research Bureau, which was not what Mr.

McCullough desired. Id. at 13.  As he explained:

> I was disappointed not to receive a job offer in the Middle East
> Affairs Bureau, which would have been normal for a political
> officer who had served with distinction in the trenches.  The job I
> wanted, on the Saudi desk, went to another officer who had also
> been in Beirut but who was an administrative, not a political,
> officer.  At this point my former career development officer was a
> Deputy Assistant Secretary of State in the Middle East Affairs
> Bureau.

Id.  In September 1990 Mr. McCullough accepted an unexpected vacancy at the Embassy in New

Delhi, India, serving in that country for four years. Id.  Mr. McCullough expected to be promoted

during his fourth year in India, but was again disappointed. Id.  The Inspector General's office,

which reviewed the post that year, "took the highly unusual step of writing a memorandum to my

personnel file stating that my promotion record was not commensurate with my observed level of

performance" in New Delhi. Id.  In addition, the Deputy Chief of Mission, who was not Mr.

McCullough's supervisor, wrote a letter to his file "recommending my immediate promotion,

which duly came through the following year." Id.

In 1994, Mr. McCullough returned to Washington, D.C., and served with the Bureau of

Political and Military Affairs. Id.  Again, Mr. McCullough was not assigned his first choice, the

Middle Eastern Affairs Bureau. Id. at 13-14.  In 1996, Mr. McCullough became the Nigerian

desk officer. Id. at 14.  In late 1997, the Ambassador to Nigeria asked Mr. McCullough to come

to Nigeria as his economic counsel, a position "two grades above my rank." Id.  He remained in

Nigeria for 30 months. Id.  Mr. McCullough was not promoted at the end of this tour, as

expected, but was promoted the following year. Id.  The late promotions placed Mr. McCullough

at a disadvantage when bidding on new assignments, because he had to do so at a less senior rank. Id.

After leaving Nigeria in the summer of 2000, Mr. McCullough was transferred to Pakistan as the Deputy Political Counselor. Id. On September 11, 2001, Mr. McCullough was at work "when the first plane struck the World Trade Center." Id. Mr. McCullough watched the rest of the attack unfold in the Ambassador's office. Id. The attack itself "brought back vivid memories of Beirut, particularly the largely fruitless search for survivors, the arbitrariness of those who lived and who died, and the limits of people trying to cope with the aftermath of an attack of this dimension." Id. at 14-15. See Dammarell I, 281 F. Supp. 2d at 191 (discussing expert testimony that events such as September 11, 2001 attacks may "'precipitate reexperiencing' the trauma of the Embassy bombing").

Shortly thereafter, all dependents, including Mr. McCullough's wife and children, were evacuated from Pakistan. Phase II Exh. 20 at 15. The separation "was a great hardship and disappointment since we had hoped Islamabad would provide some family stability." Id. While Mr. McCullough asked to have his assignment curtailed due to family reasons, he agreed to remain in Pakistan after the Ambassador, citing his long experience in Indo-Pakistani affairs, strongly urged him to remain. Id. Mr. McCullough finally left Pakistan in June 2003. Id. As of the date of the Phase II testimony, he was stationed in Bangladesh. Id. at 16. While Mr. McCullough had considered taking early retirement out of frustration with his career and the "quality and direction of State Department leadership," he opted to remain, "almost exclusively for financial reasons," and announced his intent, in September 2002, to compete for promotion

into the ranks of the Senior Foreign Service. Id. at 15-16.  From that point, Mr. McCullough has

seven years to either be promoted or retire. Id. at 16.

Mr. McCullough explained that he decided to participate in this lawsuit "out of a desire

both to seek a formal reckoning of accountability of the Beirut bombing and to seek

compensation of what in hindsight I have come to recognize was a life-changing experience that

negatively affected my career and the well being of my family." Id.

The substantive rule of decision is to be governed by the law of the individual plaintiff's

domicile as of the date of the bombing. Dammarell II, 2005 WL 756090, at *21.  As a federal

government employee stationed overseas, Mr. McCullough retained as his domicile the state in

which he was last domiciled. Id. at *22.  On the date of the bombing, his last state of domicile

was California.  Although he briefly lived in Washington, D.C. before going to Beirut, he was

merely a student there and the last state in which he lived with any sense of permanency was

California.  Therefore, the law of California applies to Mr. McCullough's claims.

Based on the pleadings and the evidence presented to the Court, Mr. McCullough has

stated a valid claim for battery under the law of California and is entitled to recover

compensatory damages from defendants "for all the detriment proximately caused by the tortious

acts." Priest, 634 F. Supp. at 584.  The expert economic analysis presented to the Court

demonstrated that, as a result of the Embassy bombing, Mr. McCullough suffered $710,000 in

economic losses, specifically in lost earning capacity. Phase II Exh. 1 at 24-26.  The Court further

values the loss associated with his physical pain and suffering and mental anguish caused by the

14

battery at $750,000.[4]  Because, under California law, Mr. McCullough can recover for his mental

anguish via his battery claim, there is no need for the Court to consider his intentional infliction

of emotional distress claim, which could result in a double recovery.  Accordingly, Mr.

McCullough should be awarded a total of $1,460,000 on this default judgment.

### 2.      Rebecca McCullough

Plaintiff Rebecca McCullough ("Ms. McCullough") accompanied her husband Dundas

McCullough to Beirut, and worked at the United States Embassy as an administrative assistant in

the Office of Military Cooperation. Tr. Vol. VI at 78.  She and Mr. McCullough have two

children. Id. at 58.  At the time of the Phase II testimony, Ms. McCullough was living in

Bethesda, Maryland. Id. at 59.

Ms. McCullough was born May 27, 1958 in McAllen, Texas, and is a United States

citizen. Id. at 58.  After graduating from high school, she worked and attended community

college for two years. Id. at 59-60.  In 1979, Ms. McCullough enrolled at the University of

California at Berkeley, and graduated in 1981 with a Bachelor of Arts in Diplomatic History. Id.

at 60.  She met her husband during her junior year at Berkeley. Id. at 61.

After graduating from Berkeley, Ms. McCullough worked for several months to save

money, and then moved to Washington, D.C., where she began working as a clerk/typist for the

Department of Commerce. Id. at 62-63.  During this time, she was still in contact with Mr.

McCullough, who teased her that the two would marry. Id. at 64.  In early 1982, Ms. McCullough

obtained a position with a consulting firm in Washington, D.C. Id.  During a week off between

---

[4] In valuing the loss associated with the physical pain and suffering and mental anguish of
the plaintiffs who where injured in the bombing, I followed the pattern of valuation established
by Judge Bates in Dammarell IV.

her position with the Department of Commerce and her position with the consulting firm, Ms.

McCullough flew to Beirut, where Mr. McCullough was posted with the State Department at the

United States Embassy. Id. at 64-66.  Ms. McCullough testified that she had intended to "come

back with a ring on my finger, or I would then be free." Id. at 66.  Remembering that trip to

Beirut, she testified:

> We went out that night to a Lebanese restaurant.  We drank wine . .
> . we had wonderful food.  It just – he had a beautiful apartment
> overlooking the Mediterranean.  It was just absolutely fabulous,
> and we just had a wonderful time.  We never thought about safety.
> We were young and stupid and in love, and within three days he
> had proposed.

Id. at 67.  The couple were married on April 4, 1982, at the United States Embassy, and had their

wedding reception at a Marine Security Guard barbecue. Id. at 68-69.  See Phase II Exh. 19 at 1-2

(photographs of Ms. and Mr. McCullough's wedding in Beirut).  After getting married, Ms.

McCullough decided to remain in Beirut and obtained a position at the United States Embassy in

the Consular Section as an assistant. Id. at 69-71.

In June 1982, the Israelis invaded Lebanon and soon began bombing Beirut. Id.  Because

her husband was deemed non-essential, plans were made to evacuate the McCulloughs (along

with other Embassy personnel) from Beirut. Id. at 73.  Ms. McCullough, her husband, and other

Embassy personnel were evacuated from Beirut, flown to safety in Cyprus, and then on to other

points. Id. at 74-76.  Mr. McCullough returned to Beirut a few months later, and Ms.

McCullough joined him around Thanksgiving. Id. at 76-77.  Upon her return, Ms. McCullough

began working at the Embassy in the Office of Military Cooperation as an administrative

assistant. Id. at 78.

Ms. McCullough remembers that April 18, 1983 was a "weird morning" because the weather had started to get warm, but winter was not yet over. Id. at 79.  Ms. McCullough and her husband, who was dressed in his wedding suit, decided to walk to work along the Corniche, which is the road that ran along the sea. Id.  Once at work, Ms. McCullough ordered breakfast from her favorite waiter and inquired about the lunch menu. Id.  Upon hearing that it was her favorite food, beef with artichoke hearts, she made a note to eat lunch in the cafeteria. Id. at 79-80.  She then went to work on a large cable, ordering materials for the Lebanese Army. Id. at 80.  At some point she escorted a reporter, David Ignatius, into the office for an interview with her boss. Id.  Because she was hungry, Ms. McCullough ordered lunch at her desk at around 11:00 a.m., prompting the waiter to joke with her about the possibility of being pregnant. Id. at 80-81.  At about 1:00 p.m., Ms. McCullough escorted the reporter out of the Embassy. Id. at 81.  Ms. McCullough would have normally accompanied her husband to lunch at that time, but, because she needed to finish writing the cable, she returned to her office on the sixth floor. Id. at 81-82.  Just as she was putting a form into her typewriter, the bomb exploded. Id. at 82.  Describing the explosion, Ms. McCullough testified:

> at that moment I looked and I saw glass coming in, and it came in
> at a level, level, level, and then it dropped down onto the floor.
> And I thought that was the oddest thing I had ever seen in my life,
> and then all of a sudden I heard horrible noises, and it dawned on
> me that there was a horrible explosion.  But it didn't – I didn't hear
> anything at first.

Id.

Ms. McCullough initially thought that the Embassy had been hit by a rocket propelled grenade. Id. at 84-85.  She did not realize that it was something more serious until she turned around and saw that the oversized, solid wood doors leading to her office were blown off their

hinges. Id. at 85.  She picked up the telephone, but her line was dead; she then waited for the

public announcement system to issue instructions, but it failed to do so. Id.  When Ms.

McCullough and her colleagues began to smell smoke and tear gas and heard bullets firing, they

decided to leave the area. Id. at 85-86.  A Marine found them and motioned for them to leave the

building. Id. at 86.  They followed the Marine down a stairwell, which was "covered in glass and

blood." Id.  Ms. McCullough testified that after reaching the second floor:

> I sort of think of myself as a coward, and I've never really quite
> forgiven myself, but I looked down the hallway, and the place
> where I would have entered my husband's office area was
> completely destroyed.  I mean it was just – everything was
> completely down, but I thought for a minute of going in there and
> trying to find my husband, but I thought I just couldn't stand the
> idea of seeing his crushed body.

Id. at 86-87.

Ms. McCullough followed others outside of the Embassy, and was taken to an apartment

building next to the Embassy where there were other wives for whom their husbands were

unaccounted. Id. at 87-88.  Ms. McCullough waited there for three hours before receiving word

that her husband was alive. Id. at 88.  She then learned that her husband had helped survivors

from his area out of the Embassy, and had gone to the hospital. Id. at 90.

After learning that her husband was at the hospital, Ms. McCullough left the apartment to

find him. Id. at 91.  As she passed by the Embassy on the way to the hospital, Ms. McCullough

saw the front of the building for the first time. Id. at 92.  She testified that "it was the first suicide

bomb, and to have gone to this building every day for a year . . . still to this day I can't imagine

how somebody could have destroyed a building like that with just . . . chemicals.  So it was just

horrible." Id.

18

When Ms. McCullough arrived at the hospital she saw a colleague who was in the process of "doing morgue duty right out" in the corridor. Id.  Ms. McCullough "averted" her eyes and continued into the emergency room. Id. at 92-93.  Ms. McCullough testified that she then saw her husband who was:

> sort of just standing there in the corner, and he's got a big bandage
> around him, and he's got his tie cut off, and he's wearing his suit,
> and it's all covered with blood, and he's just standing there without
> his glasses . . . it's like he's just waiting for a bus or something,
> and he didn't even think about calling me or telling me.  He was
> just sort of standing there patiently waiting for them to finish up
> with him, and all this stuff was going, there were bodies, there
> were people getting worked on in surgery, and he's just sort of
> standing there as if none of it's existing.  And I went up to him and
> I gave him a big hug.

Id. at 93.  See Phase II Exh. 19 at 3 (photograph of Mr. McCullough after the bombing).  Mr. McCullough expressed no surprise at seeing his wife, as it did not occur to him that she could have been injured, a belief that upset Ms. McCullough. Tr. Vol. VI at 93.

Over the next several days, Ms. McCullough drafted press releases listing the names of those killed in the bombing, and gathered and transmitted to the family members the personal effects of the dead. Id. at 96-97.  Mr. McCullough was assigned to the morgue, where he was responsible for identifying remains and arranging for their transport back to the United States. Id. at 96-97.  Ms. McCullough stated that neither she nor her husband "had any background in this. I was 24 years old, my husband was 24 years old.  We had never done any of this stuff.  We had never had any grief counseling, but there was nobody else to do it." Id. at 97.  Ms. McCullough spent days "gathering up the shoes and the earrings of these people who are our friends and colleagues, and smelling the dead flesh, and the burnt flesh, and doing this as a labor of love." Id. at 100.

The McCulloughs stayed in Beirut into 1984. Id.  The State Department tried to convince Mr. McCullough to leave Beirut and take a position in Africa, but the McCulloughs felt that they had too much "emotional investment" in Beirut to leave. Id.  After the assassination of Malcolm Kerr, the President of the American University of Beirut, in January 1984, Ms. McCullough "had finally had enough" and decided to leave Beirut. Id. at 101-03.

In May 1984, Mr. McCullough was assigned to the United States Embassy in Haiti. Id. at 103-04; Phase II Exh. 20 at 11.  Thereafter, Mr. McCullough was posted to Yemen, did a one-year tour in the United States, received a posting to India, returned to the United States from 1994-1997, took a position in Nigeria in 1997, where he remained until 2000, and was transferred to Pakistan in 2001. Phase II Exh. 20 at 12-15.  Ms. McCullough and her children were evacuated from Pakistan to the United States after the September 11, 2001 attacks, and Mr. McCullough left Pakistan in June 2003. Id. at 14-15.

During these various postings, Ms. McCullough was "anxious and unhappy." Tr. Vol. VI at 107.  Some of her symptoms included agoraphobia, suicidal thoughts, mania, and weight gain. Id. at 106-14.  She testified that, at time, she was "non functioning." Id. at 106.  As a result, the McCulloughs experienced marital problems and Ms. McCullough's ability to parent was negatively effected. Id. at 106, 117.  Ms. McCullough was diagnosed with depression, ran up $40,000 worth of debt, separated from her husband for one year, and was then diagnosed with bi-polar disorder. Id. at 106, 113.  Ms. McCullough found it difficult to maintain employment, even though she had passed the Foreign Service exam. Id. at 110, 116.  For example, Ms. McCullough was offered a position with the State Department helping coordinate the evacuation of personnel from Pakistan after the September 11, 2001 attacks, but, because of her mental health, she was

unable to accept the job. Id. at 115.  As such positions often lead to more work, Ms. McCullough

believes that she might, but for her illness, still be employed by the State Department today. Id.

Ms. McCullough began searching for relief in such things as "yoga, therapists, exercise,

diet, everything I could think of." Id. at 106, 110.  Ultimately, after the family was evacuated

from Pakistan back to the United States in 2001, she was diagnosed with Post-Traumatic Stress

Disorder. Id. at 107.  Ms. McCullough stated that her psychiatrist informed her that her "brain

chemistry was changed in the trauma of the bombing and the aftermath of the bombing." Id. at

112.  Ms. McCullough began taking medication to treat the disorder and felt an "immediate

change." Id. at 107.  She no longer "think[s] about suicide anymore," which had been a familiar

thought for twenty years. Id. at 114.  While it is "humiliating to take psychotropic drugs" and

they have some unpleasant side effects, Ms. McCullough intends to remain on the medication. Id.

at 108, 114.  She feels like she is finally "on the right path after 20 years . . . .  I feel as if now I'm

living the life that I should have been living before." Id. at 109, 111, 114.

At the time of her Phase II testimony, Ms. McCullough was residing in Bethesda,

Maryland, and her husband was posted to Bangladesh. Id. at 120.  Ms. McCullough is unable to

accompany her husband to that country because the State Department revoked her medical

clearance without examination, because she was "unstable." Id. at 120-22.  Consequently, the

McCulloughs are supporting two households, causing extra financial burden. Id. at 122-23.

Explaining why she decided to participate in this lawsuit, Ms. McCullough testified:

> I think that if Iran wants to rejoin or really be a part of the family of
> states, it needs to account for this period in its life when it did these
> horrible things against officials of another state, and it needs to
> make amends, and it needs to apologize, and it needs to promise to
> never do it again.  Because they intended to kill every one of us in
> that building.  They intended to kill the diplomats of a fellow

> country.  And then on a personal basis, I want personal justice
> because they killed so many friends of mine . . . and they almost
> killed me, and they hurt me and they hurt my husband, and so I
> would like to see some semblance of justice.

Id. at 125.

As a federal government employee stationed overseas, Ms. McCullough retained as her domicile the state in which she last resided. See Dammarell II, 2005 WL 756090, at *22.  As of April 1983, Ms. McCullough had not changed her domicile from California. See Pls. Mem. in Supp. of State Law Claims at 16.  The law of California, therefore, applies to her claims.

Based on the pleadings and the evidence presented to the Court, Ms. McCullough has stated a valid claim for battery under the law of California and is entitled to recover compensatory damages from defendants "for all the detriment proximately caused by the tortious acts." Priest, 634 F. Supp. at 584.  Although, based on the evidence presented to the Court, it is not clear whether she was directly physically harmed in the bombing (i.e. lacerations or broken bones), there was unquestionably a harmful or offensive contact with the Ms. McCullough to which she did not consent (i.e., the destruction of a building while she was in it, causing her to breathe concrete dust and tear gas), and caused her injury (i.e., Post-Traumatic Stress Disorder). The expert economic analysis presented to the Court demonstrated that, as a result of the Embassy bombing, Ms. McCullough suffered $966,000 in economic losses, specifically in medical expenses for her mental health treatment and lost earning capacity. Phase II Exh. 1 at 26-28.  The Court further values the loss associated with her mental anguish caused by the battery at $750,000.  Because, under California law, Ms. McCullough can recover for her mental anguish via her battery claim, there is no need for the Court to consider her intentional infliction of

emotional distress claim, which could result in an impermissible double recovery.  Accordingly, Ms. McCullough should be awarded a total of $1,716,000 on this default judgment.

### 3.    Catherine Nylund

Plaintiff Catherine Nylund ("Ms. Nylund") was posted at the Embassy in Beirut as a secretary with the United States Department of State. Phase II Exh. 13A at 3 (Declaration of Catherine Nylund).  At the time of the Phase II testimony, she was residing in Torrance, California, with her husband. Id. at 1.

Ms. Nylund was born on October 28, 1926 in Ingram, Pennsylvania, and is a United States citizen. Id. at 1.  She graduated from high school in June 1944 and then worked for the Pennsylvania Railroad. Id.  Several years after high school, she moved to California and began working as a secretary, first at Douglas Aircraft and later for the Veterans Administration. Id. She also took medical-related classes at the University of California, Los Angeles ("UCLA") and, subsequently, began working as a medical secretary at the UCLA School of Public Health. Id.

Eventually, Ms. Nylund joined the United States Department of State as a Foreign Service secretary. Id. at 2.  She was posted to Caracas, Venezuela, for two years. Id.  After that posting, she was married and left the foreign service, relocating to California and working as a secretary. Id.  After the death of her first husband, Ms. Nylund rejoined the Foreign Service. Id.

Ms. Nylund married her present husband, Don Nylund ("Mr. Nylund"), in 1973. Id. Mr. Nylund subsequently accompanied Ms. Nylund overseas, as a dependent. Id.  After her marriage, Ms. Nylund was posted to Chad for eighteen months, and thereafter to Greece for two years. Id.  After Greece, the Nylunds returned to the United States. Id.  Mr. Nylund applied for a

position with the State Department, and he was accepted as a Communicator.  Id. at 2-3.  Once

they were both members of the Foreign Service, they were posted as a "tandem" team on their

overseas assignments.  Id.  After several more postings, in June 1982, Ms. Nylund and her

husband were posted to the United States Embassy in Beirut.  Id. at 3.

On April 18, 1983, Ms. Nylund was at the Embassy when she decided to take an early

lunch with her husband in the Embassy cafeteria at about 11:30 a.m. Id. at 4.  After lunch, she

returned to the Political Section of the Embassy, and her husband returned to the

Communications Section.  Id. at 5.  A little after 1:00 p.m., the bomb exploded.  Id.  Describing

the explosion, Ms. Nylund stated:

> I recall this time well, as the clock on the wall near my desk
> stopped at 1:07 p.m.  From my vantage point, the blast blew out the
> entire first floor of the Embassy, with the center of the Embassy
> being nothing but blue sky.  Immediately after the blast, broken
> pipes began spewing water.  All of my friends who occupied
> offices a short distance down the corridor from me were killed in
> the blast, probably instantly.  After the bomb exploded, a dust of
> fine glass and debris hit me.  I was saved from death, or at a
> minimum from much more severe injures, by my desk and a
> magazine that I was holding in front of my face.  When the dust
> and debris finally settled, every surface around me was covered
> with fine pieces of broken glass and other debris.  A political
> officer then came walking through the office, yelling at everyone to
> get under their desks as there might be a second blast.  We waited,
> huddled under our desks, for what seemed like hours.

Id.

"After what seemed like an eternity," Ms. Nylund and others from her section crawled out

from under their desks and walked into the hallway.  Id.  An Embassy Security Officer gathered

survivors and instructed them to "'stay together, walk in a single file line, follow me, and we'll

get out safely.'"  Id.  As Ms. Nylund began to walk, a woman appeared, "bloody from head to

24

foot." <u>Id.</u>  Ms. Nylund took the woman's arm, and asked another colleague to assist the injured

woman out of the building. <u>Id.</u> at 5-6.  Ms. Nylund and other personnel then began "walking" and

"stumbling" to the exit. <u>Id.</u> at 6.  She crawled down a ladder and over a steel fence to reach the

ground. <u>Id.</u>  Ms. Nylund noted how "great it was to breathe fresh air, and to be free." <u>Id.</u>  She also

felt a "great sense of fear that terrorists could have gotten to the Embassy so easily." <u>Id.</u>  <u>See</u>

<u>Dammarell I</u>, 281 F. Supp. 2d at 189-91 (discussing expert testimony that fears and anxieties are

among first symptoms of trauma among those severely injured in an attack).

Ms. Nylund and some colleagues proceeded to the American University of Beirut

Hospital for treatment. Phase II Exh. 13A at 6.  She received stitches in her ear, was "bandaged

from ear to ear, and over my head," and was treated for lacerations on her knee. <u>Id.</u>  In the years

since the bombing, Ms. Nylund has "suffered from recurring ear-related problems, including

hearing loss and tinnitus." <u>Id.</u>

After leaving Beirut, Ms. Nylund and her husband were posted to the United States

Embassy in Lima, Peru. <u>Id.</u> at 8.  Ms. Nylund began to have a series of health problems,

including a diagnosis of endometrial carcinoma, and a bout of severe chest pain, for which she

was airlifted out of Lima for treatment. <u>Id.</u>  Mr. Nylund was also in poor health at this time. <u>Id.</u>

She also believes that her chest pains were caused by her worry over her husband's health

problems. <u>Id.</u>

In early 1987, Ms. Nylund and her husband were posted to Oslo, Norway. <u>Id.</u>  They were

thereafter posted to Washington, D.C. <u>Id.</u>  During their medical clearance exams for their next

posting, Mr. Nylund was denied clearance to work overseas due to his health problems. <u>Id.</u> at 8-

9.  This effectively ended his State Department career, and he retired. <u>Id.</u> at 9.  Ms. Nylund was

then transferred to Belgium, and her husband joined her as a dependent. Id.  After her posting in

Belgium ended in 1989, she retired from the Foreign Service. Id.  Ms. Nylund had planned to

work until age 65 or longer, but felt that she could no longer do so, especially given her

husband's medical condition. Id.  She had also planned to remain in the Foreign Service until she

obtained a position as an Ambassador's secretary, but felt that, because of her bombing-related

hearing loss, she was prevented from doing so. Id.

> Testifying about the impact the bombing had on her life, Ms. Nylund stated:

> > Over the past twenty years, I have largely put the Beirut Embassy
> > bombing behind me, and have gone on with my life.  Today, I have
> > more pressing concerns, such as my husband's health.  Yet, the
> > Beirut bombing definitely had an impact on me.  After the
> > bombing I continued to work overseas, but seemed to have lost
> > some of my enthusiasm for the Foreign Service.  I was not as social
> > as before – I kind of hung back, and was less active.  Since the
> > bombing, it has also been hard for me to understanding [sic] how
> > anyone could want to kill such a large number of people at one
> > time. There are times when this thought comes rushing back, as it
> > did on September 11, 2001.

Id. at 9-10.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony that events

such as Oklahoma City bombing and events of September 11, 2001, may trigger memories of a

trauma and bring onset or recurrence of psychological symptoms of trauma or Post-Traumatic

Stress Disorder).

> Ms. Nylund testified that she decided to participate in this lawsuit:

> > because I think that the victims of the 1983 attack on the U.S.
> > Embassy in Beirut should get compensation for the horror we went
> > through. I have, for the past twenty years, suffered from a partial
> > loss of hearing in my right ear due to injuries received in the attack.
> > This, in turn, ultimately affected my career.  Some of my husband's
> > health problems I believe resulted from the attack.  When I heard

about the chance to participate in a lawsuit about the Embassy
attack, I just felt that I should do something.

Phase II Exh. 13A at 10.

On the date of the bombing, Ms. Nylund was working as a secretary at the Embassy in

Beirut. Id. at 3. As a federal government employee stationed overseas, Ms. Nylund retained as

her domicile in 1983 the state in which she last resided. See Dammarell II, 2005 WL 756090,

*22. Immediately before she joined the Foreign Service, Ms. Nylund lived and worked in

California. The law of California, therefore, applies to her claims.

Based on the pleadings and the evidence presented to the Court, Ms. Nylund has stated a

valid claim for battery under the law of California and is entitled to recover compensatory

damages from defendants "for all the detriment proximately caused by the tortious acts." Priest,

634 F. Supp. at 584. No evidence was presented to the Court regarding any economic losses

suffered by Ms. Nylund as a result of the bombing upon which to based an award damages.

However, the Court values the loss associated with his physical pain and suffering and mental

anguish caused by the battery at $750,000. Because, under California law, Ms. Nylund can

recover for her mental anguish via her battery claim, there is no need for the Court to consider

her intentional infliction of emotional distress claim, which would result in an impermissible

double recovery. Accordingly, Ms. Nylund should be awarded a total of $750,000 on this default

judgment.

## II.      COLORADO

### A.      Causes of Action

#### 1.      Survival Statute

Section 13-20-10 of Colorado Revised Statutes provides, "[a]ll causes of action . . . shall survive and may be brought or continued notwithstanding the death of the person in favor of or against whom such action has accrued." Colo. Rev. Stat. § 13-20-10.  In personal injury actions, however, the potential recovery is limited to the "loss of earnings and expenses sustained or incurred prior to death" and cannot include damages for "pain, suffering, or disfigurement, not prospective profits or earnings after death." Id.

## 2.   Wrongful Death Statute

Colorado's wrongful death statute provides:

> When the death of a person is caused by a wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable, if death had not ensued, shall be liable in an action notwithstanding the death of the party injured.

Colo. Rev. Stat. § 13-21-202.  A wrongful death action under the Colorado statute is not brought by the estate's representative, but rather, is brought by the decedent's surviving heirs, most commonly the surviving spouse and any surviving children. Colo. Rev. Stat. §§ 13-21-201, 203. A wrongful death action may be brought by the decedent's parents only if there is no surviving spouse or any surviving children. Colo. Rev. Stat. §§ 13-21-201(c).

Damages recoverable under Colorado's wrongful death statute include both economic losses and noneconomic losses.  Economic losses are measured as the "net pecuniary benefit which plaintiff might reasonably have expected to receive from the deceased in case his life had not been terminated by the wrongful act . . . of the defendant." Landsberg v. Hutsell, 837 P.2d 205, 208 (Colo. Ct. App. 1992) (quoting Pierce v. Connors, 37 P.2d 721 (Colo. 1894)).  In

determining such net pecuniary benefit, Colorado courts consider the "age, health, condition in life, habits of industry or otherwise, [and] ability to earn money, on the part of the deceased, including his or her disposition to aid or assist the plaintiff." Id.  Noneconomic losses and injuries may include the plaintiff's "grief, loss of companionship, pain and suffering, and emotional stress." Colo. Rev. Stat. § 13-21-102.5.

Although Colorado generally limits noneconomic damages to $250,000, there is no such limitation where the "wrongful act . . . constitutes a felonious killing, as defined in section 15-11-803(1)(b), C.R.S., and as determined in the manner described in section 15-11-803(7) C.R.S. . . . ." Colo. Rev. Stat. § 13-21-203(1)(a).  "To prove a felonious killing for purposes of § 15-11-803, it need only be shown that the conduct of the person who caused death meet the elements of first or second degree murder or manslaughter." Estate of Wright v. United Servs. Auto. Ass'n, 53 P.2d 683, 686 (Colo. Ct. App. 2002).  Under section 15-11-803(7), "'[n]ot withstanding the status or disposition of a criminal proceeding,' a court may independently determine whether, under a preponderance of the evidence standard, the elements of a felonious killing have been met." Estate of Wright, 53 P.2d at 685 (quoting Colo. Rev. Stat. § 15-11-803(7)).  "The language [of section 15-11-803(7)] is broad enough to allow such a determination even where the person was acquitted or was convicted of a lesser offense, or where no criminal proceeding was ever initiated." Id. at 686.

**B.      Plaintiffs**

**1.      The Estate and Surviving Family Members of Thomas Blacka**

*a.      Estate of Thomas Blacka*

Thomas Blacka ("Mr. Blacka"), the husband of Plaintiff Beryl Blacka ("Mrs. Blacka") and the father of Plaintiffs Thomas Blacka, Jr. and Jane Blacka ("Ms. Blacka"), was assigned to the United State Embassy in Beirut as the Controller of the Agency for International Development ("US AID"). Tr. Vol. V at 26.  Mr. Blacka sustained fatal injuries as a result of the Embassy bombing. Id. at 4.  For purposes of this litigation, his estate, which was probated in Colorado, is represented by his widow, Beryl Blacka, as personal representative. Id. at 4-5; Phase II Exh. 14 (estate papers appointing Beryl Blacka personal representative of Estate of Thomas Blacka).

Mr. Blacka was described by his daughter, Jane, as "being very tall and broad shoulder[ed]" even though he was only about five-eight. Tr. Vol. V at 38.  She explained that she believed he was so tall because of the way that "he shouldered problems.  He was responsible for any problems that were in the family, which really made a big difference for me when my brother became ill." Id.  While he would "share the joys and the good things in the family . . . he would take care of the problems." Id.  Ms. Blacka stated that although her father was the family disciplinarian, he was also "very supportive" and had a "good sense of humor." Id. at 38-39.  Her father "liked people.  He was very well liked in his job . . . as a family, we were very close, and I just grew up and I loved him very much." Id. at 39.  Mr. Blacka was described by his son Thomas, as "a proud American" who was "knowledgeable and loving." Phase II Exh. 16 at 3, 8. He added that his father was "diligent and successful, both in terms of his career and in terms of being there for his family.  He was an experienced Foreign Service officer who had his feet on the ground, and provided his family with love, guidance, and wisdom.  I was proud of him and his accomplishments, and loved him very much." Id. at 8.  Mr. Blacka was born December 8,

1923 in Connellsville, Pennsylvania, and was a United States citizen. Tr. Vol. V at 8.  Mr. Blacka

graduated from the University of Miami with a Bachelor of Arts in Accounting and Economics in

1949. Id. at 12.  He received a Master's from the University of Denver in Economics and Public

Administration in the mid-1950's. Id. at 13.

Mr. Blacka met his wife, Beryl, in early 1945 when he was serving with the United States

military in England during World War II. Id. at 9-11.  They were married in November 1945, and

shortly thereafter moved to the United States. Id. at 11.  Over the next several years, Mr. and

Mrs. Blacka lived in, among other places, Miami, Florida, and Denver, Colorado, while Mr.

Blacka worked and attended school. Id. at 12-13.

In the mid-1950's, Mr. Blacka joined US AID. Id. at 14.  During his career, Mr. Blacka,

accompanied by his wife and children, was posted both in the United States and abroad. Id.  Mr.

Blacka was posted to Ceylon (now Sri Lanka) around 1956, as an Assistant Controller with US

AID. Id. at 15.  After two and a half years in Ceylon, Mr. Blacka was posted to Reykevick,

Iceland. Id.  He thereafter had postings in Spain, Cyprus, the United States, Pakistan, and Laos.

Id. at 15-20.  After Laos, Mr. Blacka was transferred back to Washington, D.C., where he was

appointed as the Controller for the entire agency. Id. at 21.  The family remained in the

Washington area for about three years, after which Mr. Blacka was transferred to Thailand in

1982. Id.  While in Thailand, Mr. Blacka retired from US AID at the age of sixty. Id. at 23, 24.

Motivated in part by financial obligations related to the health of his son, who had been

diagnosed with paranoid schizophrenia, Mr. Blacka accepted several contract positions in

Thailand after he retired. Id. at 23-24, 26.  In late 1982, he returned to US AID, accepting a

Controller position at the United States Embassy in Beirut, Lebanon. Id. at 26.  He arrived in

31

Beirut in January, 1983. Id. at 27.  Just a few months later, he was killed in the Embassy

bombing. Id. at 4.

For purposes of this lawsuit, the domicile of the estate is that of Mr. Blacka on the date of

the bombing. See Dammarell II, 2005 WL 756090, at *22.  As a federal government employee

stationed oversees, Mr. Blacka retained as his domicile in 1983 the state in which he had last

resided. See id.  Prior to his employment with US AID, Mr. Blacka and his wife lived in

Colorado and, from the time that he first starting working for US AID through the date of the

bombing, the Blacka family was primarily posted overseas, with only brief stays in the

Washington, D.C. area.  Plaintiffs argue that the law of Colorado should govern the claims of

Mr. Blacka's estate because Colorado had functioned as a "home-base of sorts," both of his

children were born there, and his estate was probated there. See Pls. Mem. in Supp. of State Law

Claims at 87-88.  The Court agrees, and, therefore, the law of Colorado applies to the claims of

the Estate of Thomas Blacka.

The Estate of Thomas Blacka, through his surviving heirs, has asserted claims under

Colorado's wrongful death statute. Pls. Mem. in Supp. of State Law Claims at 117-18.  Based on

the pleadings and the evidence presented to the Court, the Estate of Thomas Blacka has made out

a valid claim for wrongful death under Colorado law and is entitled to recover the "net pecuniary

benefit which [each beneficiary] might reasonably have expected to receive from the deceased in

case his life had not been terminated by the wrongful act . . . of the defendant." See Landsberg,

837 P.2d at 208.  The expert economic analysis presented to the Court demonstrated that, were it

not for Mr. Blacka's untimely and wrongful death, he would have earned wages, benefits, and

retirement pay amounting to $1,440,000.  See Phase II Exh. 1 at 10-12; see also Dammarell I,

281 F. Supp. 2d at 195 (explaining the methodology used by the expert to calculate economic damages for victims who were killed in the Embassy bombing).  The Court should award 75% of the $1,440,000 to Mr. Blacka's surviving spouse, Beryl Blacka because she would have been the principal beneficiary of his income over the remainder of his natural life, and 25% of the $1,440,000 to his son Thomas Blacka Jr., who due to his mental illness would likely have remained substantially dependent on his father.  As for the intangible aspect of the wrongful-death recovery, the Court will address those awards below, beneficiary-by-beneficiary.

### b.    *Beryl Blacka*

Plaintiff Beryl Blacka is the widow of Thomas Blacka, who was killed in the Embassy bombing, and the mother of Plaintiffs Jane Blacka and Thomas Blacka, Jr. Tr. Vol. V at 4-6.

Mrs. Blacka was born in Surrey, England, but became a United States citizen in the 1950's. Id. at 4.  She met Thomas Blacka in early 1945, while Mr. Blacka was stationed in England with the United States military during World War II. Id. at 11.  The two began dating, and married in November 1945. Id.  Shortly thereafter, the couple moved to the United States. Id.

While her husband attended university in Florida and Colorado, Mrs. Blacka worked in the Registrar's Office at the University of Miami, and in the Admission's Office at the University of Colorado. Id. at 12, 14.  Mrs. Blacka stopped working upon the birth of her son, Thomas, in 1955. Id. at 14.  Mrs. Blacka and her children accompanied Mr. Blacka on his postings with US AID, both in the United States and abroad. Id. at 15-23.  During several of these postings, Mrs. Blacka performed either volunteer or paid work, but Mr. Blacka remained, at all times, the family's primary wage earner. Id. at 15-23, 33.  When her husband took a position at the United States Embassy in Beirut, Mrs. Blacka and their children did not accompany him. Id. at 27.  In

33

January 1983, Mrs. Blacka saw her husband off to Beirut at the airport in Bangkok, Thailand, where the couple was then living. Id.  It was the last time that Mrs. Blacka saw her husband alive. Id.  After Mr. Blacka left for Beirut, Mrs. Blacka packed-up their belongings in Bangkok and flew to Denver, Colorado, to live near their daughter, Jane. Id.  While in Denver, Mrs. Blacka received numerous letters from her husband. Id. at 27-28.

On April 18, 1983, Mrs. Blacka was at a friend's house in Denver, Colorado. Id. at 28. The friend told Mrs. Blacka that she had heard that "there had been trouble in Beirut." Id.  At about the same time, the telephone rang. Id. at 29.  The government official on the line "didn't say anything about death.  They said there'd been a bomb explosion." Id.  Sometime later, the government called Mrs. Blacka again, and confirmed that her husband had been killed in the bombing. Id.  Mrs. Blacka stated that the rest of the day is a "blur." Id.  Mrs. Blacka recalls calling her daughter, Jane, to tell her the news. Id.  Of that conversation, Mrs. Blacka testified that she "wished there had been some way to soften – soften it, to say it.  I felt like I had been abrupt saying it." Id. at 29-30.  Mrs. Blacka did not have any contact with her son, Thomas, that day, or in the days following, as the family did not know his whereabouts at the time. Id. at 30.

Several days after the bombing, Mrs. Blacka traveled to Washington, D.C. Id.  She attended the ceremony at Andrews Air Force Base where the remains of the Americans killed in the bombing were returned to the United States. Id.  Mrs. Blacka "appreciated" when President and Mrs. Reagan greeted each family member personally. Id. at 30-31.  She believed the ceremony was "very solemn," but "handled beautifully." Id. at 31.  Mrs. Blacka also attended a ceremony for the victims of the bombing held at the National Cathedral. Id.   Mr. Blacka was buried at Arlington National Cemetery. Id. at 31-32.

Mrs. Blacka testified that she misses her husband's presence: "He was always there.  He was the center of the family, the core of the family.  He was a strong – when I say strong, I don't mean – I just mean we counted on him.  He was – he was there for all of us, the best he could be." Id. at 35.  As a result of her husband's death, Mrs. Blacka had to shoulder responsibilities that had previously been her husband's, such as family finances. Id. at 34.  In addition, Mr. Blacka's death left only Mrs. Blacka and her daughter to care for her son, Thomas, who had become mentally ill. Id. at 34-35.

She decided to participate in the lawsuit "[f]or the future.  For my children. And the responsibility my daughter has faced since she was young, the full responsibility she will face" regarding the care of Thomas H. Blacka. Id. at 36.

Although Colorado generally limits noneconomic damages under its wrongful death statute to $250,000, that limitation is inapplicable in this case because, plaintiffs have shown by a preponderance of the evidence, that defendants' wrongful acts constitute a felonious killing. See Colo. Rev. Stat. § 13-21-203(1)(a); Estate of Wright, 53 P.2d at 685.  Based on the findings of fact in Dammarell I and Dammarell IV, it is clear that defendants, at the very least, "recklessly cause[d] the death of another person." See Colo. Rev. Stat. § 18-3-102 (statute defining manslaughter); Dammarell I, 218 F. Supp. 2d at 109-13; Dammarell IV, 404 F. Supp. 2d at 271-73.  Without this limitation, based on the pleadings and the evidence presented, the Court values the loss associated with Mrs. Blacka's "grief, loss of companionship, pain and suffering, and emotional stress" resulting from the her husband's death at $10 million. See Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

> ### c.      *Jane Blacka*

Plaintiff Jane Blacka is the daughter of Thomas Blacka. Tr. Vol. V at 37.  She was born October 27, 1959 in Denver, Colorado, and is a United States citizen. Id.

Ms. Blacka's first memories of her father were from when the family was living in Washington, D.C. when she was five or six years old. Id. at 39.  At that time, the Blackas lived a "very suburban lifestyle . . . and American existence." Id. at 39-40.  The family often had "barbecues out in the yard" and took "trips around the area." Id. at 40.  As Ms. Blacka testified, "I was a little girl then, so he was my daddy and I loved him." Id.

In 1967, when Ms. Blacka was eight-years-old, the Blackas moved to Pakistan, where they remained until she was twelve. Id.  Ms. Blacka stated that living in Pakistan "was a very happy time" for her family. Id. at 40-41.  Her father insisted that the family always eat dinner together – "sometimes he would make a big show and we'd have candles and things like that." Id. at 41.  The family "took a lot of trips together" in her father's "old Chevy Nova that would overheat all the time." Id.  Ms. Blacka testified that she was "always very close to my father, and I always felt very, very comfortable with" him, as he was the "center of the family" and "always very approachable, very supportive." Id. at 42.

After leaving Pakistan, the family spent nine months in Washington, D.C.  During this "transitional period" Ms. Blacka suffered a great deal of "homesickness" for Pakistan. Id. at 42-43.  She stated that "I remember crying, and [my father] would come into my room at night and he'd comfort me." Id. at 43.

The family then moved to Vientiane, Laos, for two years. Id.  Ms. Blacka testified that as she got older, she could:

> really appreciate [her father] more, more as an adult – well, I
> wasn't quite an adult, but – and he was encouraging.  I got to

> understand more why, you know, he chose to work for AID . . . .
> [O]ne thing that was very different about the way my father treated
> me than my friends' fathers sometimes treated them was he would
> listen to you.  He was very – he treated both my brother and I with
> quite a bit of respect.  He listened to what we had to say, and he
> never disparaged us, our ideas.  He let us talk.  He was – it was
> very encouraging.

Id. at 45.

When Ms. Blacka was in her mid-teens, her family returned to Washington, D.C. Id.  She experienced some "culture shock" in returning to the United States after living abroad. Id. at 46.  Even though her father worked "much longer hours" than he had previously worked and the family members were all beginning to "get more busy with" their "own lives," Ms. Blacka testified that "my relationship with my father was great during that time." Id. at 46, 47.

After she graduated from high school in 1977, Ms. Blacka enrolled at Allegheny College, in Pennsylvania. Id. at 47-48.  As a result, when Mr. and Mrs. Blacka moved to Thailand, Ms. Blacka did not accompany them. Id. at 47.  After a year at Allegheny, she joined her parents and brother in Thailand. Id. at 48.  Living with her family in Bangkok "was wonderful." Id.  Ms. Blacka "got a job working in my dad's office . . . .  My dad and my brother and I learned to scuba dive during that year.  We did lots of trips." Id.  A year later, Ms. Blacka returned to the United States to attend Colorado College in Colorado Springs. Id. at 49.  While at Colorado College, Ms. Blacka was in regular contact with her parents through letters, phone calls, and visits. Id.

Ms. Blacka learned in late 1982, while finishing her college education, that her father had been posted to Beirut. Id. at 49-50.  When she voiced her concerns to her father regarding the posting, he "didn't totally dismiss [her fear], but his response was . . . I think it's pretty safe." Id. at 50.  He then reminded his daughter of all the places the family had lived where there was war

or conflict. Id.  Ms. Blacka last saw her father in January 1983, while he was still living in

Thailand. Id. at 52.

On April 18, 1983, Ms. Blacka was in her apartment in Colorado Springs. Id.  Ms. Blacka

testified that:

> [T]he telephone rang, and I picked it up and it was my mother's
> friend on the phone saying, oh, I have some tragic – some terrible
> news for you, or whatever, and I just thought why is she calling
> me.  She never calls me.  And then my mother took the phone from
> her, and she told me, "Jane, your father – you know, your dad has
> been killed in Beirut."  And it was a real shock.  But I'm glad she
> told me because her friend was just – it just made it worse.  It was
> just – but it was a terrible shock.

Id. at 52-53.  Ms. Blacka had a friend drive her to Denver to be at her mother's side. Id. at 53.

Seeing her mother for the first time was "pure shock." Id.  Ms. Blacka was also worried for her

brother, stating:

> Tom doesn't know about this, my brother, and where is he.  And so
> those two events . . . were very very intertwined . . . for me and for
> my mom, because there was my father's death and then there was
> also the fact that my brother was somewhere out there.  He wasn't
> on medicine, and he didn't know about my father.

Id.

Ms. Blacka accompanied her mother to Washington, D.C. Id. at 53-54.  She attended the

ceremony at Andrews Air Force Base where her father's remains were returned to the United

States. Id. at 54.  Of that ceremony, Ms. Blacka testified:

> I was young, I was 23.  I had been following the situation in Beirut.
> I was very much opposed to what the U.S. government there – the
> way they were handling the situation in Beirut.  So part of my
> response then was I was angry.  I was very, very angry, and the
> representatives of the government, I felt they were partially if not –
> they were partially responsible for my father's death.

So – and they were going through all this ritual and I looked at it as being – you know, this is all politics.  They're doing this because they – they really messed up, and this is their way of taking care of it.

So when I was at Andrews Air Force Base, you know, my mother remembers it as being a beautiful ceremony, and it soothed her.  To me, it made me angry.  And I saw the press there, and the Secret Service agents, and both the President and the wife came around supposedly to comfort us, but I didn't – to me, it wasn't a positive – but I think at my age now, I would look at it differently than I did then when I was 23.

Id. at 54-55.  Ms. Blacka also attended the ceremony at the National Cathedral. Id. at 55.  While "a lot of [the ceremony] was a blur," Ms. Blacka recalls "a lot of anger, too." Id.

Of her father's funeral service and burial at Arlington National Cemetery, Ms. Blacka testified that the person who conducted the service "didn't really know my father" which "bothered" her, although the "room was filled" with people who knew her father. Id. at 56-57. The days and weeks after her father's death were "very, very hard" because she and her mother were "worried about" her brother, Thomas. Id. at 58.  They "didn't know where he was.  He was also delusional to a certain extent." Id.  After the funeral, Ms. Blacka and her mother returned to Colorado Springs. Id.  Shortly thereafter, they rented a house in Denver. Id. at 59.  When contact was re-established with her brother, he too moved to Denver. Id. at 59-60.

The death of Ms. Blacka's father was especially difficult, because of the additional burdens that were placed on her. Id. at 61-62.  Ms. Blacka had always been close to her brother, as they had "had the same experiences." Id. at 61.  Ms. Blacka "felt very responsible towards my family when my father died . . . .  And so my father's death . . . made me much [more] responsible for my brother than I probably otherwise would have been.  And also responsible for my mother." Id. at 62-63.  In addition, Ms. Blacka lost her father's guidance. Id. at 63.  "[W]hen

my father died, I was young, I was in my 20s.  I was getting ready to start my own career . . . .  I

was up in the air and I really think that I missed having him guiding me careerwise . . . .  I just

think if my father had lived, I may have been more confident in my choices." Id.

Ms. Blacka eventually sought therapy to deal with her father's death, which helped her

realize that she had never ever properly grieved for him. Id. at 63-64.  Life events such as her

attainment of a graduate degree in applied linguistics were "hard" to celebrate without her father

because he "always encouraged education." Id. at 65.  Ms. Blacka testified that she misses:

> [T]he fact that I didn't have a father there all these years, and I
> don't have a father here now to share lots of different things with.
> Not just problems, but happy things, too.
>
> I miss his sense of humor.  I miss the fact that he wouldn't take
> things that weren't important too seriously.
>
> I miss the fact that he was just a solid strong force and the center of
> the family that was there, that you could trust . . . .
>
> I looked to him – you know, he would make things right.  He
> would make things okay.
>
> I miss the fact that he's just not there to talk to.  I miss the fact that
> I can't tell him I love him.  I miss the fact that he's not going to be
> there, he's not going to grow old.
>
> There are just so many things in my life that I just miss . . . .  It's
> like I never learned to do my taxes properly.  If my father had
> lived, I would have been able to do my taxes . . .
>
> I also think, I mean it's been my choice, but I took a lot of added
> responsibility with my mother and brother, and we all took a lot of
> that responsibility for each other . . . .  I think if he [my father] had
> been there, we would have just felt more safe as a group, and we . .
> . would have done more.  I would have done more.  I would have
> felt less like I needed somehow to replace him in the family.

Id. at 67-68.

Ms. Blacka decided to participate in this lawsuit to find "security for the future:

> The worst thing would be is if my . . . brother ended up in a state
> mental institution . . . .  And I'm eventually going to be the
> sole support for my brother, and . . . if he knows he has that security,
> that will benefit him because he feels very, very, very insecure
> about his future . . . he's terribly afraid that he's going to be
> abandoned and left.

Id. at 69.

Based on the pleadings and the evidence presented, the Court values of the loss associated

with Jane Blacka's "grief, loss of companionship, pain and suffering, and emotional stress"

resulting from the her father's untimely death at $5 million. See Dammarell I, 281 F. Supp. 2d at

196-98 (explaining typical damage awards for solatium claims).

### d.      Thomas Blacka, Jr.

Plaintiff Thomas Blacka, Jr. ("Mr. Blacka") is the son of Thomas Blacka. Phase II Exh.

16 at 1 (Declaration of Thomas H. Blacka).  He was born September 13, 1955 in Denver,

Colorado, and is a United States citizen. Id.

Mr. Blacka's first memories of his father was from when the family was living in Madrid,

Spain in the early 1960's. Id.  He remembers that his family lived in a "beautiful house" with a

"wonderful yard" that he "enjoyed playing in." Id.  He has firmer memories from when the

family lived in Nicosia, Cyprus. Id. at 2.  Mr. Blacka recalled that his father suspended a

parachute in the yard for him and his sister to play with, which he "enjoyed . . . immensely." Id.

The family traveled throughout Cyprus, often to a "hidden sea cove on the coast in Kyrenia." Id.

Mr. Blacka remembers when he was evacuated from Cyprus to Beirut with his mother and sister

for several months. Id.  During this time, his father would visit every two weeks, and the family

would "take outings to the Phoenicia Hotel, located near the sea, and spend the day swimming

and relaxing." Id.

In 1965, the family moved to Washington, D.C. Id.  He remembers that, while in Washington, the family spent a great deal of time together, often visiting grandparents in both the United States and England. Id. at 3.  Mr. Blacka remembers spending time alone with his father, for instance, when his father taught him to fish and crab. Id.

In 1967, the Blacka family moved to Pakistan. Id.  Mr. Blacka remembers that, while in Pakistan, his father collected stamps with him, helping him to "research and expand" the collection, until he had "hundreds of thousands" of stamps. Id.  The family often traveled together, visiting Afghanistan, India, and Bangladesh. Id. at 4.  During this time, his father also taught him how to drive. Id.  Mr. Blacka remembers that the years he spent in Pakistan "were happy ones," and his father "continued to be there" for him and his sister. Id.

When his parents and his sister returned to Washington, D.C. in 1972, Mr. Blacka did not accompany them, because his parents had enrolled him in a Swiss boarding school called Ecolint. Id. at 5.  He attended for the eleventh and twelfth grades. Id.  In April 1974, he re-joined his family in Laos, his father's new posting. Id.  He spent that spring researching an "extensive report on Laos," which he completed in lieu of concluding his studies on campus at Ecolint. Id. His father was instrumental in helping him with the report, providing an "invaluable international perspective" and assistance in typing and delivering the paper to Switzerland. Id.

In the fall of 1974, Mr. Blacka enrolled in college in Washington, D.C. Id.  But after a period of time, he left school, and returned to Laos to be with his family. Id. at 5-6.  The family was later evacuated from Laos and returned to Washington, D.C., where his father became the Controller of US AID. Id. at 6.  After three years in Washington, in late 1977, the Blacka family moved to Thailand. Id.  Mr. Blacka was pleased to be back in Asia because he "knew and liked"

the area. Id.  Thailand proved a "pleasant experience" for the family, and Mr. Blacka spent time

with his father scuba diving and enjoying the Thai culture. Id.  Mr. Blacka later enrolled in the

University of Colorado, but eventually withdrew and returned to Thailand. Id.

His father accepted a posting in Beirut in early 1983, but Mr. Blacka and his mother and

sister did not accompany him. Id. at 7.  At the time, the family was living in Thailand. Id.  In late

March of that year, his mother left Bangkok to return to the United States and, several weeks

later, Mr. Blacka began traveling back to the United States on his own. Id.  During this time, he

had very little contact with his family, and thus, did not learn of the Embassy bombing. Id.  Mr.

Blacka, therefore, did not attend any of the ceremonies held in Washington, D.C. to honor the

bombing victims, nor did he attend his father's funeral. See Tr. Vol. V at 30, 32-33, 53, 58-61.

Mr. Blacka first learned of the bombing when he tried to telephone his father from

Hawaii and a government official told him that his father had been killed in the Embassy

bombing. Phase II Exh. 16 at 7.  He explained that he "did not want to believe" the news. Id.  He

flew to San Francisco, and contacted his mother, who joined him in California. Id.  About a

month later, he returned to Denver to be with his mother and sister. Id.  Except for a period of

time in the late 1980's and early 1990's, Mr. Blacka has since lived with his mother and sister in

Washington, D.C. Id.

Explaining how the loss of his father has effected his life, Mr. Blacka stated:  "My

father's death left a hole in my life.  Had he not been killed, I feel that his love and guidance

would have motivated me to complete my education, among other things." Id. at 8.  He stated

that agreed to participate in this lawsuit because "I desire a sense of closure, which I have never

gotten, and the knowledge of future security created through directly dealing with the sort of terrorism that led to my father's death." Id.

Based on the pleadings and the evidence presented, the Court values of the loss associated with Thomas Blacka, Jr.'s "grief, loss of companionship, pain and suffering, and emotional stress" resulting from the his father's untimely death at $5 million. See Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

## III.   DISTRICT OF COLUMBIA

### A.   Causes of Action

#### 1.   Battery

To establish liability for the tort of battery in the District of Columbia, a plaintiff must plead and establish that the defendant caused "an intentional, unpermitted, harmful or offensive contact with his person or something attached to it." Marshall v. District of Columbia, 391 A.2d 1374, 1380 (D.C. 1978).  A successful battery plaintiff "is entitled at least to nominal damages, as well as to compensation for 'mental suffering, including fright, shame and mortification . . . .'" Id. (citations omitted).

#### 2.   Intentional Infliction of Emotional Distress

Under the law of the District of Columbia, a claim for intentional infliction of emotional distress requires a plaintiff to establish that there was "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." See Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984) (citations and internal quotations omitted).  To prevail on an intentional infliction of emotional distress claim, the plaintiff must "establish that the defendant proximately caused an emotional disturbance 'of

so acute a nature that harmful physical consequences might not be unlikely to result.'"

Ridgewells Caterer, Inc. v. Nelson, 688 F.Supp. 760, 764 (D.D.C. 1988) (citations omitted).

District of Columbia courts have awarded compensatory damages under intentional infliction of

emotional distress claims for a variety mental health related consequences of the tortious

conduct. See, e.g., Estate of Underwood v. Nat'l Credit Union Admin., 665 A.2d 621, 642 (D.C.

1995) (upholding intentional infliction of emotional distress verdict where plaintiff suffered

from, among other things, depression and stress as a result of defendant's tortious conduct);

Robinson v. Sarisky, 535 A.2d 901, 906 (D.C. 1988) (plaintiffs' "feelings of violation, anxiety,

and helplessness" and personality changes constituted compensable emotional distress).

### B.      Plaintiffs

#### 1.      Beth Samuel

Plaintiff Beth Samuel ("Ms. Samuel") was assigned to the United States Embassy in

Beirut as a secretary with the United States Information Agency ("USIA"). Tr. Vol. I at 69-70.

She is married, but has no children. Id. at 61.

Ms. Samuel was born in Bayside, Texas, and is a United States citizen. Id.  She graduated

from high school in Corpus Christi, Texas in 1952. Id.  After graduation, she took a job

overseeing export shipments for a local manufacturing company. Id. at 62  After three years, she

moved to Kansas City, Missouri, where she met and married her first husband. Id.  From Kansas

City, the couple moved to Los Angeles, California. Id. Ms. Samuel and her husband divorced in

1958, at which point she began working as a secretary for the Kaiser Group. Id.  She left this

position after a year to work as a flight attendant with a charter airline. Id. at 62-63.

As a flight attendant, she had the opportunity to fly to Europe and decided that she wanted to live there. Id. at 63.  To that end, she applied for a position as a secretary with the Foreign Service. Id.  She was accepted and joined the Foreign Service in August 1962. Id. at 63-64.  When she joined the Foreign Service she did not intend to make it a career, planning instead "to go live in Europe and ski two or three years and go back to the beach in Southern California." Id. at 64.  Once in the Foreign Service, Ms. Samuel was assigned to work for USIA. Id.

Ms. Samuel first position was as the secretary of the Deputy Director of USIA in Washington, D.C. Id. at 64-65.  The Deputy Director subsequently resigned to return to a position with Time Life in New York, and Ms. Samuel briefly left the Foreign Service to go work for him. Id. at 65-66.  Ms. Samuel testified, "I loved living in New York, but it wasn't what I had come there to do, I wanted to go live overseas, I wanted to be in the Foreign Service." Id. at 66.  Her boss contacted the Director of Human Resources at USIA, who in turn found a position for Ms Samuel as a regional Foreign Service secretary based in Bonn, West Germany. Id. at 66.

After rejoining the Foreign Service, Ms. Samuel had a number of overseas postings, including assignments in Paris; Hong Kong; Bangkok; Caracas; and Taipei. Id. at 67.  While posted in Bangkok she met her current husband, whom she married in 1976. Id.

In 1981, Ms. Samuel returned to the United States, and worked as a personnel officer making overseas assignments for Foreign Service secretaries and administrative assistants. Id. at 68.  While making assignments, Ms Samuel heard about an opening for a Foreign Service secretary in Beirut, Lebanon. Id.  She had previously visited Beirut in the early 1970's, recalling that at the time, Beirut "was glorious, it was truly the Paris of the Middle East it was called, it was a wonderful city, and I had a great time." Id. at 70.  So, Ms. Samuel and her husband moved

to Beirut in February 1982. Id.

Ms. Samuel testified that April 18, 1983 began as "a normal Monday morning." Id. at 79.

After finishing lunch at approximately 1:00 p.m., Ms. Samuel returned to her office on the sixth

floor of the Embassy. Id. at 79-80.  Ms. Samuel was standing at her desk, going through cables,

when the Embassy was bombed, as she remembers:

> I heard a thud, and it never occurred to me that it was happening to us, I just thought for a fleeting second that was pretty close.
>
> And then I found myself on the floor covered up with debris and  . . . there was smoke and chaos and noise everywhere.
>
> And I – finally I got up off the floor and I shouted to John Reed [sic] who was my supervisor in the next office, I said, John, are you all right, and he said, no, I'm not.
>
> And by that time I had finally gotten myself up from under the debris that was on top of me.
>
> And so the military people from the military assistance group came running in the office calling my name.
>
> And I said I think I'm okay, but John is not, so they proceeded to his office, and by that time he had gotten himself out from under the boards that were on top of him, and he came staggering out.
>
> And they took each of us by the arm and led us out to the hallway. There was lots of confusion, lots of screaming and crying, and smoke everywhere.  And at one point I thought I felt so sticky and I looked down and my sweater was stuck to me, it was all blood, and I'm thinking, oh, I must be hurt, but I had no idea where or how badly I was hurt.
>
> So they took us out to the hallway, and I was bleeding so profusely, they said just sit down here, we don't want you to – they sat me down on the floor.  And there were lots of other people also injured in various ways, running and screaming and crying.  And they left us there for several minutes because they wanted to make sure that the stairways were safe and that there were no more bombs or something.

> They came back to get us, they had us all hold hands, and they led us out, I can't remember exactly whether it was the back entrance, there was a courtyard.  And I remember there was a lock that had rusted shut, and they couldn't get it open, and one of the young marines was there, and he said, shoot the bastard off.  And I thought, oh, please, don't, and he didn't, of course. And then they turned us around and took us to another exit, and there were a lot of people there, all injured.
>
> And at that point I heard sirens coming, . . . and I saw the ambulances coming in, and they pulled me over a wall and put me in an ambulance, we were taken to AUH, American University Hospital.

Id. at 80-82.

Ms. Samuel remembers that, once she and the others arrived at the hospital, "the doctors and nurses were standing outside waiting for us.  And they were wonderful, I mean, they just grabbed us, and they took us up to the ER, and looked at everybody, and got a place for us all to lie down." Id. at 83.  Ms. Samuel testified that she was treated for:

> [g]lass, cuts in my face, I had 18 stitches in my face, and I had a large cut right here somewhere along the collarbone.  And I had a big hematoma that developed on the side of my face, it had gotten bigger and uglier everyday for a while.  But it was all glass, small cuts, that were not life-threatening, but they were just messy.

Id. at 84.  After being treated Ms. Samuel left the hospital with John Reid and went to the apartment of a friend who had a phone with an international line, so that they could contact their families. Id. at 85-86.

After making her calls Ms. Samuel headed back to her apartment, but found she couldn't stay by herself. Id. at 88.  As she explained:

> there was a lady there who was on temporary duty in the communications unit, and she said, I don't want to be alone, either, why don't I stay with you.  So she kind of moved into my

> apartment, stayed for about a week until we both felt better, then
> she moved back to her own place.

Id.

The morning after the bombing, the Embassy's Deputy Chief of Mission asked everyone who could to report to his apartment so that he could "see who all was still there and how badly people were injured and account for everyone." Id. at 90.  Ms. Samuel recalls that this first day back was:

> probably the most emotional day because we didn't know who was
> where, we kept hearing lots of rumors of people who had been
> killed, and people who were injured, and we didn't know.  So there
> was great relief and great joy when you would see one of your
> colleagues, and then, of course, you would see how badly they
> were injured.  And there were lots of tears, but they were probably
> joyful tears more than anything else that day.

Id. at 90-91.

From this point forward, Ms. Samuel was "absolutely inundated with the media from all over the world." Id. at 91.  In between her regular work responsibilities, she attended memorial services for those killed in the bombing, including services for three Lebanese employees that had worked in her office. Id. at 92.  She also attended a memorial service at the Beirut Airport for the Americans killed in the Embassy attack as there were transported back to the United States. Id. at 92-93.

Several days after the bombing, Ms. Samuel was permitted to go inside the bombed-out Embassy. Id. at 93-94.  Her colleague John Reid's desk, in the office next to hers, had "gone down in the hole" where the center of the Embassy had collapsed. Id. at 94.  As she testified, "I think at that point it really hit both of us how close we had come to death. . . ." Id.

Ms. Samuel ended her tour in Beirut in October 1983. Id. at 99.  Her transition back to the

United States was "a little bit difficult." Id.   Ms. Samuel stated:

> [W]hen I came back to Washington, it was sort of like, everybody
> was so carefree, nobody – they would say, oh, how was Beirut.
> And I felt that their attitude was a little bit frivolous, that they
> didn't take things that were going on seriously.  So it was a little
> bit hard for me to get used to that carefree attitude after we had
> been so serious and so under strain for such a long time, it took me
> a while to adjust to it.

Id. at 99-100.  While Ms. Samuel was glad to be back, she felt that "some part of me, I almost

wanted to be back with my colleagues who were still there." Id. at 100.

After her return from Beirut, Ms. Samuel was permitted to select any post she wanted for

her next assignment, and chose Madrid, Spain. Id. at 100-01.  After several further postings, she

retired from the Foreign Service in 1991 and returned to the United States to care for her elderly

parents. Id. at 101.

In the twenty years since the bombing, certain events have triggered emotional memories

of the Beirut bombing.  As Ms. Samuel explained:

> [F]or a long time my reaction was if a car would backfire or
> something, I would jump and get teary and things like that.
>
> Yes, things do happen, sometimes on the news, and you just all of
> a sudden think back to that day.  And when the Oklahoma bombing
> took place, it was very difficult to look at that building because it
> looked so much like the embassy building when it was bombed.
> And, of course, that brought back a lot of bad memories, the
> Oklahoma bombing.

Id. at 102.  See Dammarell I, 281 F. Supp. 2d at 191 (discussing expert testimony that survivors

of Embassy bombing may be "affected by terrorist events such as the 1995 Oklahoma City

bombing . . . .   These events serve as reminders that may 'precipitate reexperiencing' the trauma of the Embassy bombing").

Ms. Samuel explained to the Court why she decided to participate in this litigation:

> Maybe this will acknowledge the fact that this happened to us, that people lost their lives, families were torn apart, all of us were traumatized for the rest of our lives in certain ways.  And maybe, perhaps, if we hit them in their pocketbook enough they can't continue to keep sponsoring terrorists, we hope.

Tr. Vol. I at 104.

As a federal government employee stationed overseas, Ms. Samuel retained as her domicile in 1983 the state in which she last resided.  See Dammarell II, 2005 WL 756090, at *22. Plaintiffs assert that Texas law should apply to Ms. Samuel's claims. Pls. Mem. in Supp. of State Law Claims at 49.  However, according to the evidence presented to the Court, Ms. Samuel has lived in several other states after living in Texas and prior to her posting to Beirut.  First, she moved to Missouri, then to California, then to the District of Columbia, then to New York, and then back to the District of Columbia.  There is no evidence on the record that these were intended to be temporary domiciles and that she actually intended to return to Texas.  In fact, she testified that, at one point, her plan was to take a position with the Foreign Service so that she could live in Europe for a few years and then return to Los Angeles. Tr. Vol. 1 at 64.  Based on Ms. Samuel's testimony, I find that her last domicile prior to her posting in Beirut was the District of Columbia.  In fact, for much of the time that she was in Beirut, her husband lived in the District, and the District is where she chose to take her leave shortly after the bombing. Accordingly, the law of the District of Columbia applies to Ms. Samuel's claims.

Based on the pleadings and the evidence presented to the Court, Ms. Samuel has stated a valid claim for battery under District of Columbia law and is entitled to recover compensatory damages from defendants. See Marshall, 391 A.2d at 1380. No evidence has been provided to the Court upon which to base an award for economic damages, such as lost income or medical expenses. However, the Court values the loss associated with her pain and suffering and mental anguish resulting from the battery at $750,000. Because Ms. Samuel can recover for her mental anguish under her battery claim, it is not necessary for the Court to consider her intentional infliction of emotional distress claim, which would result in an impermissible double recovery. Accordingly, the Court should award Ms. Samuel $750,000 on this default judgment.

## IV.   ILLINOIS

### A.   Causes of Action

#### 1.   Battery

Under Illinois law, "an actor commits a battery if: '(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.'" Cohen v. Smith, 648 N.E.2d 329, 332 (Ill. App. Ct. 1995) (citing Restatement (Second) of Torts § 13). In other words, "a battery must include an intentional act on the part of the defendants and a resulting offensive contact with the plaintiff's person." McNeil v. Carter, 742 N.E.2d 1277, 1281 (Ill. App. Ct. 2001) (citing McNeil v. Brewer, 710 N.E.2d 1285 (Ill. App. Ct. 1999)). Recoverable damages may be based on "the loss of earnings reasonably certain to be received in the future, the nature, extent and duration of the injuries

received, the pain and suffering experienced and reasonably certain to be experienced in the future, and the reasonable expense of medical care and disability resulting from the injuries." Kren v. Payne, 401 N.E.2d 19, 22 (Ill. App. Ct. 1980) (quoting Izzo v. Zera, 205 N.E.2d 644, 647 (Ill. App. Ct. 1965)).

### 2.      Intentional Infliction of Emotional Distress

To state a cause of action for intentional infliction of emotional distress under Illinois law, a plaintiff must show "(1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress." Kolegas v. Heftel Broad. Corp., 607 N.E.2d 201, 211 (Ill. 1992) (citing McGrath v. Fahey, 533 N.E.2d 806, 809 (Ill. 1988)).  In order to recover under an intentional infliction of emotional distress claim, "the conduct must be so extreme in degree as to go beyond all possible bounds of decency, and the distress suffered must be such that no reasonable man could be expected to endure it." Heying v. Simonaitis, 466 N.E.2d 1137, 1143 (Ill. App. Ct. 1984) (citing Pub. Fin. Corp. v. Davis, 360 N.E.2d 765, 767 (1976)).

It is important to note that "[i]t is well established that for one injury there should only be one recovery irrespective of the availability of multiple remedies and actions." Robinson v. Toyota Motor Credit Corp., 775 N.E.2d 951, 963 (Ill. 2002) (citing Wilson v. The Hoffman Group, Inc., 546 N.E.2d 524 (Ill. 1989)).  Therefore, to the extent that a plaintiff who was injured in the embassy bombing can recover for mental distress under a battery claim, that plaintiff could not recover for the same mental distress under an intentional infliction of emotional distress claim.

**B.      Plaintiffs**

**1.      Faith Lee**

Plaintiff Faith Lee ("Ms. Lee") was posted to the United States Embassy in Beirut as a Communicator with the United States Department of State. Tr. Vol. IV at 39-40.  She presently resides in Chicago, Illinois. Id. at 31.  Ms. Lee is divorced, and has two children. Id.

Ms. Lee was born January 23, 1933, and is a United States citizen. Id. at 31.  She graduated from high school in 1950 and, thereafter, attended Roosevelt University for two years. Id. at 32.  After leaving school, Ms. Lee was employed in a variety of positions, including as a clerk at A&P; a long-lines operator with Illinois Bell; a switchboard operator with Paramount Plastic; a teletype operator with the Federal Aviation Administration and later the United States Army Aerial Support Command; a reservationist with United Airlines; and a teletype operator with the Community Services Administration. Id. at 32-36.

In 1978, Ms. Lee joined the United States Department of State as a Communicator. Id. at 37-38.  By this time, Ms. Lee was divorced and her two children were adults. Id. at 38.  Her first posting was to East Berlin, Germany, in March 1979. Id. at 38-39.  She remained in Germany until 1981, when she volunteered for a posting at the United States Embassy in Beirut as a Communicator. Id. at 39-40.

On April 18, 1983, Ms. Lee reported to work around 7:30 a.m. Id. at 43.  Upon entering the Embassy, she passed by Marine Post One, where Corporal Robert McMaugh was on duty. Id. Corporal McMaugh, who often gave female Embassy personnel flowers, gave Ms. Lee a rose. Id. She went to her office and proceeded to distribute the morning's communications. Id.  Around 12:30 p.m., she went to the cafeteria with a colleague for lunch. Id. at 43-44.  After lunch, she

returned to her office. Id.  Shortly thereafter, as she was handing communications over to a

member of the Embassy staff, the Embassy was bombed. Id.

Remembering the explosion, Ms. Lee testified:

> [A]ll I could say was what was that?  I had heard bombs before.  In
> fact, maybe a couple weeks before, an [Rocket Propelled Grenade]
> had come through one of the military offices on the fourth floor . . .
> .  And so [the bomb] shook the building so that we had a lot of dust
> from the cement, from the ceiling, and it shook our air
> conditioners, and across the hallway from us was a little storage
> room that we kept . . . tear gas [in], and it disrupted the whole
> office, the room, and the tear gas canisters were exploding.

Id. at 44-45.

Ms. Lee instructed her co-workers to place wet paper towels over their faces to protect

them from the tear gas. Id. at 45.  Ms. Lee testified, "[w]hen I came out of the office, there was

nothing there.  You could see the sea.  It had just been all blown away.  I mean it was just

nothing.  And I thought, oh, my God, how are we going to get out of here." Id. at 46.  Ms. Lee

started down some back stairs with other personnel. Id.  She testified that she could hear

"mumbling, but it wasn't loud crying or shouting or anything.  The people were walking like they

were in a trance, like they were zombies.  Of course, everybody was traumatized." Id.  People

were covered in blood. Id.  Ms. Lee was guided to an area with a large window and from there

climbed onto a rooftop. Id. at 47.  As there was no ladder, she was forced to jump, and in the

process broke her toe. Id.

Ms. Lee and one of her colleagues went directly to Ms. Lee's apartment and called their

families. Id. at 48.  After her colleague left, Ms. Lee returned to the Embassy and saw that the

"area was filled with emergency vehicles." Id. at 48-49.  After gaining access, she saw plaintiff

John Reid, whose head was bandaged, and he told her "that so many people had been killed" and

she remembers that,

> [T]here was a guy that was injured that was between the slabs on
> the embassy that crunched down like that, pancaked him in.  And
> he pointed to where the man was hanging.  That man hung there
> three days before they could get equipment to lift the slabs up to
> remove him.

Id.

Ms. Lee left the Embassy and went to the hospital to have her broken toe tended to, but

was told that there was nothing the staff could do for it. Id. at 49.  The rest of that day and in the

following days, Ms. Lee visited each injured person who was at the hospital and she went back to

work at the Embassy, which had been relocated to the Deputy Chief of Mission's house. Id. at

49-52.

Ms. Lee left Beirut on June 6, 1983. Id. at 53.  Her next posting was to Tokyo, Japan. Id.

While in Japan, a State Department psychiatrist visited her to discuss the bombing, and as Ms.

Lee testified, "of course I started crying." Id.  Ms. Lee told the psychiatrist that the one way she

could heal from the trauma of the bombing would be to return to Beirut. Id.  The psychiatrist

advised against it, but she returned to Beirut in April 1984 for a temporary duty assignment. Id. at

53-54.  Ms. Lee explained that this was a "healing trip" for her, as she had the opportunity to

visit many of the injured Lebanese personnel. Id. at 54.  She also got to see the Embassy

operational again. Id.

Ms. Lee was posted to Tokyo until July 1985, and thereafter was posted to Cairo, Egypt.

Id. at 57.  She left Egypt after a four-year tour, retired from the Foreign Service, and returned to

the United States to take care of her ailing mother. Id. at 57-58.  In 1992, Ms. Lee returned to

work part-time with an agency called Operation Able, where, as of the date of the Phase II testimony, she continues to work. Id. at 58.

After the bombing, Ms. Lee experienced nightmares and found that she was easily startled by loud noises. Id.  These symptoms lasted for approximately one year. Id. at 58-59.  See Dammarell I, 281 F. Supp. 2d at 189-90 (discussing expert testimony explaining that a characteristic symptom associated with Post-Traumatic Stress Disorder is an "exaggerated startle response").  Ms. Lee has also developed arthritis in the toe that she broke when escaping from the Embassy. Tr. Vol. IV at 59.

When asked why she decided to participate in this lawsuit, Ms. Lee testified, "I thought that it would bring out perhaps more details of what had happened if various people were able to tell their own personal stories of what had happened so long ago in '83, you know.  But I thought it was good." Id. at 60.

On the date of the bombing, Ms. Lee was working in Beirut.  As a federal government employee stationed overseas, Ms. Lee retained as her domicile in 1983 the state in which she last resided. See Dammarell II, 2005 WL 756090, at *22.  At all times prior to her employment with the United States Department of State, Ms. Lee lived in Illinois.  The law of Illinois, therefore, applies to her claims.

Based on the pleadings and the evidence presented to the Court, Ms. Lee has stated a valid claim for battery under the law of Illinois and is entitled to recover compensatory damages for any "loss of earnings reasonably certain to be received in the future, . . . the pain and suffering experienced and reasonably certain to be experienced in the future, and the reasonable expense of medical care and disability resulting from the injuries." See Kren, 401 N.E.2d at 22.  No

evidence was presented to the Court upon which to base an award of damages for economic

losses, such as lost income or medical expenses, suffered by Ms. Lee.  However, the Court values

the loss associated with her physical pain and suffering and mental anguish resulting from the

battery at $750,000.  Because Ms. Lee can recover for her mental anguish under her battery

claim, there is no need for the Court to consider to intentional infliction of emotional distress

claim.  Accordingly, the Court should award Ms. Lee $750,000 on this default judgment.

## IV.   INDIANA

### A.   Causes of Action

#### 1.   Battery

Under Indiana law, battery is defined as "'[a] harmful or offensive contact with a person,

resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or

apprehension that such a contact is imminent.'" Fields v. Cummins Employees Fed. Credit

Union, 540 N.E.2d 631, 640 (Ind. Ct. App. 1989) (quoting W. Keeton, Prosser and Keeton on

The Law of Tort, § 9 (5th ed. 1984)).  The victim of a battery may recover damages equivalent to

"such sum as would reasonably compensate the victim both for bodily injuries and for pain and

suffering" as well as "past, present, and future expenses reasonably necessary to the plaintiff's

treatment and all financial losses suffered, or to be suffered, as a result of the inability to engage

in his usual occupation." Zambrana v. Armenta, 819 N.E.2d 881, 890-91 (Ind. Ct. App. 2004).

#### 2.   Intentional Infliction of Emotional Distress

Under Indiana law, to establish an claim for intentional infliction of emotional distress,

the plaintiff must show that the defendant engaged in extreme and outrageous conduct that

intentionally or recklessly caused severe emotional distress to the plaintiff. Branham v. Celadon

Trucking Servs., Inc., 744 N.E.2d 514, 523 (Ind. Ct. App. 2001) (citing Bradley v. Hall, 720

N.E.2d 747, 752 (Ind. Ct. App. 1999)).  Intentional infliction of emotional distress can be

established only "where conduct exceeds all bounds usually tolerated by a decent society and

causes mental distress of a very serious kind." Id. (citing Ledbetter v. Ross, 725 N.E.2d 120, 124

(Ind. Ct. App. 2000)).

Although a plaintiff may assert claims for both battery and intentional infliction of

emotional distress, "elementary principles of tort law command that a plaintiff is entitled to only

one recovery for a wrong." Myers v. State, 848 N.E.2d 1108, 1110 (Ind. Ct. App. 2006).

Accordingly, to prevent a double recovery, a plaintiff who recovers damages for emotional

distress arising out of the physical injury on the basis of a battery claim, would only be entitled to

recover damages under an intentional infliction of emotional distress claim to the extent that

those damages did not arise out of the battery.

### B.    Plaintiffs

#### 1.    Brian Korn

Plaintiff Brian Korn ("Mr. Korn") was posted to the United States Embassy in Beirut as a

Marine Security Guard. Tr. Vol. I at 126-27.  He is married, but does not have any children. Id. at

116.

Brian Korn was born on April 1, 1961 in Evansville, Indiana, and is a United States

citizen. Id.  He grew up in Evansville, and graduated from high school in 1979. Id. at 117.

Shortly thereafter he joined the Marine Corps and reported to basic training at Parris Island in

January 1980. Id. at 118-19.  At the time, he intended to make the military a full twenty to thirty

year career. Id.  After basic training, Mr. Korn went to Fort McClellan, Alabama, for military police training and, thereafter, went to Camp Pendleton, California. Id. at 119-20.

Mr. Korn testified that, while at Camp Pendleton, he "[s]tarted thinking about putting in for marine security guard duty" because he "wanted to do a little bit of traveling, go overseas and meet different kinds of people, different cultures." Id. at 121.  Mr. Korn applied for Marine Security Guard ("MSG") School, was accepted, and went to Quantico, Virginia for training in the summer of 1981. Id. at 121-22.  After six weeks of training, he was posted to the consul-general's offices in Casablanca, Morocco, where he reported in the fall of 1981. Id. at 122-23. Mr. Korn's second posting was to Beirut, where he arrived around December 1982. Id. at 126-27.

On April 17, 1983, the day before the Embassy was bombed, Mr. Korn worked Marine Post One, which was located at the main entrance of the Embassy, until 11:00 p.m. Id. at 131-133.  He then went to the Marine house, which is located on an upper floor of the Embassy, where he joined Corporal Robert McMaugh for a few beers in the "Marine bar," until Corporal McMaugh indicated that he needed to get to bed, because he had to stand duty at Post One later that day. Id. at 131-32.  Corporal McMaugh was standing duty at Post One at the time that the Embassy was bombed, and died in the attack.  Mr. Korn went back to his room, and went to bed sometime between 4:00 and 4:30 a.m., setting his alarm for a meeting scheduled to take place immediately behind Post One at 1:00 in the afternoon of April 18. Id. at 128-29, 132-33.

The alarm clock did not wake Mr. Korn up. Id. at 134.  Instead, as he testified, "I got a very rude wake-up call, I got blown out of my bed" as the Embassy was bombed. Id.  After being thrown out of bed Mr. Korn recalled, "I was sitting in my – I remember I was sitting in my wall locker and just trying to clear my head, very disoriented at the time . . . .  So I get up, put my

camouflage utilities on, put my boots on, grab my helmet, and make my way to the weapons

vault to receive a weapon." Id.  After grabbing his weapon, Mr. Korn and another Marine,

Charles Pearson,[5] made their way to the Ambassador's suite make sure that everyone was safe,

and to assist them in exiting the building. Id. at 135.  As Mr. Korn testified:

> After that point, we worked our way down the stairway to the first
> floor, but we were going floor by floor, so it took a while.
>
> We were carrying people out that was hurt and injured down
> different stairwells, and they had ladders set up from different
> floors to ambulances that was pulled up around the back of the
> embassy.
>
> So we were carrying people across ladders, lowered down, and
> putting them in the ambulances.

Id.  Describing what he and Mr. Pearson saw as they went through the Embassy, Mr. Korn

testified:

> We seen it's bad, there was a bunch of people just blown to
> kingdom come.
>
> People with – you ran across people that you knew were dead,
> there was nothing you could do for them.
>
> You ran across people like that was cut from their ear all the way
> down their neck, just, I mean, it's just hard to imagine unless you
> were there.
>
> There was blood everywhere.

Id. at 138.

After working his way through the Embassy, Mr. Korn helped his Gunnery Sergeant set

up a perimeter around the front of the Embassy helping people to safety. Id. at 136, 139.  A

---

[5] Mr. Pearson, who is not a litigant in this action, is not related to Plaintiff Robert Pearson.

perimeter was necessary because, "there was a bunch of the local people riding up to the embassy, some were trying to help, and some were actually trying to go into the embassy, and they were looting, stealing things or whatever." Id. at 139.  Within ten to fifteen minutes after the Embassy Marines had established a perimeter around the bombed Embassy, Marines from the Marine Amphibious Unit ("MAU") arrived to help. Id.  Once the MAU was in place, Embassy Marines, including Mr. Korn, were told "to more or less go around policing up there and things of this nature," which involved helping people who were injured, looking for survivors in the wreckage, and recovering the bodies of people who had not survived. Id. at 143-44.

Mr. Korn finally had an opportunity to rest around 1:00 or 2:00 a.m. on the morning of April 19. Id. at 144.  He testified that, when he arrived at the temporary accommodations that had been designated for the Marines' use, "[a]ll I remember is sitting down and getting ready to lie down, I took off my boots and someone had said something to me that my foot was – or my sock was full of blood." Id.  When Mr. Korn removed his sock, he discovered that one of his toes had been partially torn off. Id. at 144-45.  He testified that he did not receive any treatment for his toe: "I just more or less cleaned it up the best that I could or whatever, I went about, found some gauze, or whatever, put something on there, I don't remember exactly, or a Band-Aid or whatever." Id. at 145.

Around 5:00 a.m. on the morning of April 19, Mr. Korn returned to the Embassy site to assist in the recovery efforts. Id. at 146.  At some point, he went past what had been Post One where Corporal McMaugh had been working at the time of the bombing. Id. at 147.  As Mr. Korn testified:

> I told Charles Light, I said, here's where post one used to be, and I
> said, it's nothing but rubble now, and I said, Robert's there.

. . . I told Sergeant Light, Robert's here, I said, we need to get him
out of here.

. . .

And probably about 45 minutes sooner or later after we had dug
through a bunch of rubble, we found him.

He was standing straight up, bent over, his head was smashed like
a pancake, real flat, real long, both his legs were broke, from what
they had told us, both arms or shoulders, or whatever, and had a
steel rod going through the back of his chest into his back.

Sergeant Light went out and he got the medical people, they
backed up an ambulance, they came in there and proceeded to –
they got him the rest of the way out, put him in a body bag, put him
in an ambulance, and drove off.

But I wasn't going to – I wasn't going to leave him there.

Id. at 146-48.

About seven to nine days after the bombing, Mr. Korn contacted his family for the first

time. Id. at 148-49.  When Mr. Korn spoke with his parents, and they responded, "Thank God

you're alive." Id. at 149.  For the next week or two, Mr. Korn and other Marines continued to

work on clearing the Embassy site. Id. at 146.

Mr. Korn was still posted in Beirut in the fall of 1983, when the Marine barracks at the

Beirut Airport, housing the MAU, were bombed. Id. at 153.  He testified that, around 6:00 a.m.

on the morning of the attack, he was lying in bed "about ready to get up and I hear this big – like

woom, woom.  And I was thinking, well, something else has been hit somewhere." Id. at 152.

Mr. Korn left Beirut around December 1983 and was sent to a Marine Security Guard

posting in Rabat, Morocco, where he remained until around March 1984, when he processed out

of the Marines Corps. Id. at 156-57.  Explaining that his decision to leave the military was

related in part to the bombing of the Embassy, Mr. Korn testified:

> I didn't mind serving my country and serving on embassy duty and
> different things like that, but something like that, as I said, it stays
> with you the rest of your life, and things like that.
>
> And you never know what's going to happen in any situation,
> anytime, anywhere, where you go, I don't care where you're at. In
> the military, it doesn't even have to be in the military, but you're
> more or less putting yourself in a situation like that.  When you're
> in the military, you're more high profile for something like that, for
> something like that to happen, anyway.
>
> But another big part of it was my father, like I said, when he heard
> that the embassy had been bombed that morning, he had dropped
> my mother off at work, and he crossed the highway, when he heard
> it on the radio, he sat there for 45 minutes holding his chest, he
> made it home.
>
> And, like I said, for another seven or eight days until we were able
> to make – everybody had been able to make the call, they didn't
> know if we were dead or alive just like everybody else's families
> did.
>
> So and I guess it was probably, it was the same year, a few months
> after I got out of the Marine Corps and I got home my father had a
> heart attack.  So, but that was one of the big reasons, he wanted me
> out, he was – he more or less – he won't admit it to this day
> because, I guess, pride and everything else, but he was on the – he
> said, son, please come home, he said, you did enough.

Id. at 157-59.  Mr. Korn received a Purple Heart and a Navy Achievement Medal for his service

in Beirut. Id. at 159.  At the time that he processed out, Mr. Korn had served four years and four

months – not the full military career he had envisioned upon enlisting.

Shortly after his return to Indiana, Mr. Korn joined the Vanderburgh County Indiana

Sheriff's Department, and started his 20th year there on January 1, 2004. Id. at 161.

Mr. Korn has experienced "a lot of sleepless nights" since the April 1983 Beirut Embassy

bombing and thinks, almost on a daily basis, about people, such as Robert McMaugh, who were

killed in the attack. Id. at 161-62.  As Mr. Korn explained:

> [T]he really big thing that really brought me down and hurt me
> again so far as mental-wise and psychological-wise is when 911 hit
> again.
>
> So I would go to my doctor and he had to prescribe different
> anxiety medications and stronger ones for me, and told me if I
> needed to talk to someone, he would set it up for me.
>
> . . . I don't get very much sleep at all anymore, a lot of rest, but not
> much sleep.

Id. at 162.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony regarding

symptoms of traumas such as Beirut Embassy bombing, including anxiety, depression,

sleeplessness, and increased sensitivity to subsequent terrorist attacks such as the events of

September 11, 2001).

When asked why he elected to participate in this lawsuit, Mr. Korn replied:

> Because the Iranian government has been doing terroristic –
> terroristic acts and attacks and different things for years.  And
> they've been getting by with it, no one did nothing to them, they
> froze their assets years back ago, but nothing ever happened with
> them, or anything else.
>
> I think it's about time that someone put their foot down, put a stop
> to it.  And I think the only way that I guess that you're going to do
> anything to them because they're not scared of anything else, I
> guess, they just think Allah's going to save them when they do acts
> like that and terrorist attacks I guess is to get in their pockets.
>
> Something needs to be done to them, I mean, because you're taking
> people's lives and screwing people's lives up, and they're killing
> people and everything else, and something needs to happen.

Tr. Vol. I at 164-65.

As a member of the United States military stationed overseas, Mr. Korn retained as his domicile in 1983 the state in which he last resided. See Dammarell II, 2006 WL 756090, at *22. Prior to his military career, Mr. Korn lived in Indiana and, therefore, the law of Indiana applies to his claims.

Based on the pleadings and the evidence presented to the Court, Mr. Korn has stated a valid claim for battery under the law of Indiana and, therefore, he is entitled to recover compensatory damages from defendants for "past, present, and future expenses reasonably necessary to plaintiff's treatment and all financial losses suffered, or to be suffered as a result of the inability to engage in his usual occupation." See Zambrana, 819 N.E.2d at 890-91.  The expert economic analysis presented to the Court demonstrated that, as a result of the Embassy bombing, Mr. Korn suffered $1,448,000 in economic losses, comprised of the greater income that he would have earned had he continued he career with the Marines. Phase II Exh. 1 at 22-24. The Court further values the loss associated with the mental anguish caused by the battery at $750,000.  Because Mr. Korn can recover for his mental anguish via his battery claim, there is no need for the Court to consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  Accordingly, the Court should award Mr. Korn $2,198,000 on this default judgment.

## V.     MARYLAND

### A.     Causes of Action

#### 1.     Intentional Infliction of Emotional Distress

To impose liability for intentional infliction of emotional distress under Maryland law, a court must find that (1) the conduct was intentional or reckless; (2) the conduct was extreme and

outrageous; (3) there was a causal connection between the wrongful conduct and the emotional

distress; and (4) the resulting emotional distress was severe. Caldor, Inc. v. Bowden, 625 A.2d

959, 963 (Md. 1993) (quoting Harris v. Jones, 380 A.2d 611, 614 (Md. 1977)).  Maryland courts

impose liability for intentional infliction of emotional distress sparingly – "its balm reserved for

those wounds that are truly severe and incapable of healing themselves." Figueiredo-Torres v.

Nickel, 584 A.2d 69, 75 (Md. 1991) (quoting Hamilton v. Ford Motor Credit Co., 502 A.2d

1057, 1065 (Md. 1986)).  "[E]motional distress may form the basis for the recovery of actual

damages where the emotional distress arises from an intentional tort." Laubach v. Franklin

Square Hosp., 556 A.2d 682, 689 (Md. 1989).

Ordinarily, for a plaintiff to recover for extreme and outrageous conduct directed

principally at another, the plaintiff must be present to witness the conduct. Homer v. Long, 599

A.2d 1193, 1198-99 (Md. Ct. Spec. App. 1992).  However, the requirement of presence has been

relaxed in particularly compelling circumstances. Id. at 1199.  Although it appears that Maryland

courts have not had the opportunity to consider the applicability of the presence requirement

where the plaintiff is a surviving family member of a victim of terrorist activities, the courts that

have addressed the issue have repeatedly held that terrorists' act are "directed at" the victims

family members. See, e.g., Prevatt v. Islamic Republic of Iran, 421 F. Supp. 2d 152, 160 (D.D.C.

2006) (applying Georgia law, the court found that terrorist bombing of Marine barracks was

directed towards the emotional well-being of the victim's family members); Salazar v. Islamic

Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) ("Courts have uniformly held that

a terrorist attack – by its nature – is directed not only at the victims but also at the victims;

families").  Indeed, the Court in this case has already held that the attack on the embassy was

directed at the victims' family members. Dammarell VI, 404 F. Supp. 2d at 283.  Therefore, even though the attack on the United States Embassy in Beirut was primarily directed at the individuals in the Embassy at the time, I find that it was also directed at those individuals' family members and that this is the type of compelling situation where Maryland would likely relax the presence requirement.

### B.     Plaintiffs

#### 1.     Gregory Votaw

Plaintiff Gregory Votaw ("Mr. Votaw") is the younger brother of Albert Votaw, who was killed in the April 18, 1983 bombing of the United States Embassy in Beirut. Tr. Vol. IX (afternoon) at 2.[6]  A more detailed discussion of Albert Votaw and his family will be provided later in this opinion, in section X(B)(1).

Mr. Votaw was born in April 1928 in Chester, Pennsylvania, and is a United States citizen. Id.  He is married with three grown children, and presently resides in Bethesda, Maryland. Id. at 2, 15, 32.  Mr. Votaw stated that growing up with his brother was "very exciting. I guess it is always an advantage to have an older brother . . . because he knows so much more than you do and you can learn a lot from him." Id. at 3.  For instance, Mr. Votaw remembers that:

> Al was a very venturesome person.  I was inclined to be afraid of taking risks . . . but he would jump off the high loft in a hay barn . . . and I was barely able to crawl up into it.  He had as a result a lot of injuries.  He lost part of a tooth playing baseball and things like that.  I found that very instructive for my non-risk taking temperament.

Id.

---

[6] The afternoon reporting for Day 9 of the Phase II hearing began numbering at page 1.

Although the two brothers were a few years apart in age, they spent time together at various schools, such as a boarding school called Westtown, Deep Springs College in California, and ultimately the University of Chicago. Id. at 7-8, 11.  Following a few years behind his brother in school was beneficial to Mr. Votaw because his brother was "known to be extraordinarily gifted intellectually, high achiever, very universal in his interests . . .  Fortunately my teachers gave me the benefit of the doubt because they would say, his brother was pretty smart, he can't be as stupid as he seems to be." Id. at 3, 7-8.  Remembering their time together at Deep Springs College, Mr. Votaw testified that, "[w]e didn't see a whole lot of each other, but it was nice to know that if I got into really big trouble he would be there to pull me out." Id. at 8.  Remembering spending time together in Chicago, Mr. Votaw testified that he saw his brother "often," and particularly "enjoyed" watching his brother bartend at a jazz club, as the two had grown up in a "straight-laced Quaker household." Id.

Mr. Votaw and his brother both earned Master's degrees from the University of Chicago in 1950. Id. at 11-12.  Mr. Votaw thereafter went to England, where he studied at Oxford University, and obtained a second Master's Degree in 1952. Id. at 12.  After a period of time serving as a conscientious objector and holding a number of private and public sector positions in the economic development field, Mr. Votaw joined the World Bank around 1962. Id. at 14-15.  Joking about the similarities of their ultimate international development careers, the brothers joked that "Al took the Southern Hemisphere" in his work for various organizations and Gregory Votaw "had to deal with the Northern Hemisphere." Id. at 15-16.  When Mr. Votaw's work overlapped with his brother's, Mr. Votaw's colleagues:

> always spoke very highly of the quality of his [brother's] work and
> understanding and depth of appreciation of the places where he

69

> was working.  They always gave me the impression that whenever
> they have a chance say to visit Azerbaijan [sic, Abidjan] they
> looked for an early opportunity to consult with him and get advice
> on what their project should be.

Id. at 16.  During this time period, from the mid 1950's through the 1970's, Mr. Votaw visited

his brother Albert as often as he could, which was, according to Mr. Votaw, unfortunately not

very often. Id. at 15, 17.  The two often kept informed of each other through mutual friends and

acquaintances and correspondence. Id. at 17.

Mr. Votaw last saw his brother in January 1983, when Albert was in the United States for

the US AID's annual meeting. Id.  He remembers that his brother had just been informed that he

was being reassigned to Beirut and, when the they went out to dinner, he was unusually quite. Id.

Gregory Votaw was doing some work in the Middle East at the time, and learned from friends

that the decision to "mount a major reconstruction effort in Lebanon had come from the White

House . . . .  The people at AID were instructed, as I understand it, to find the best people in each

sector . . . [and] assign them to Beirut whether they wanted to go there or not." Id. at 18.

Coincidentally, Mr. Votaw was offered a position in Beirut at the same time as his brother  Id. at

18-19.  He "considered that very briefly with the thought that it would kind of be amusing.  It

would be the first time that Al and I ever had an opportunity to work together." Id. at 19.  Despite

this, Mr. Votaw believed that there was "too much chaos . . . intrigue . . . [and] violence" in

Beirut to do anything useful, and declined the position. Id.

On April 18, 1983, Mr. Votaw was working in Cairo, Egypt. Id. at 20-21.  He spent the

day rewriting a report and then went to a reception at the Israeli Embassy. Id.  On the way to the

reception, Mr. Votaw and his friend stopped to pick up his friend's girlfriend, who asked the men

whether they had heard about the bombing in Beirut. Id. at 21-22.   When he arrived at the

reception, he looked for the American ambassador and asked him if he had a list of people who had been injured in the bombing. Id. at 22. The ambassador did not, but promised to let Mr. Votaw know as soon as he had any information. Id. Mr. Votaw returned to his hotel after the reception, where he received several phone calls, including one from his niece Claire Votaw and one from the American Embassy in Cairo, confirming his brother's death. Id. at 22-23. During the next several days Mr. Votaw made arrangements to return to the United States. Id. at 23.

When he returned the United States, he spent some time with his family in Bethesda and with his niece, Claire Votaw, before driving to Philadelphia to be with his parents. Id. Mr. Votaw described the service at the National Cathedral as "as good as any such service could be." Id. at 24. Mr. Votaw recalls two things about the ceremony at the National Cathedral "very clearly." Id. The first was that Mr. Votaw introduced his mother to a friend, Bishop Walker, who was "the only person in these weeks that gave her any comfort," a fact that Mr. Votaw's mother spoke of in later years. Id. at 25. The second was that, when Mr. Votaw hugged his niece's mother-in-law, whom he barely knew. Id. As he explained,  it was "the first time that I could really break down. There was really nobody else I would, how should I say, take comfort with. Everybody else's grief seemed so much more immediate than mine that somehow or other that embrace allowed me to let go of it." Id.

The death of his brother changed Mr. Votaw's responsibilities with respect to his family members and the relationships he enjoyed with them. As the only remaining son, Mr. Votaw's choice of work assignments was restricted because he wanted to be near his parents as they grew older. Id. at 25-26. He has had to look after his parents' finances as they aged, and find care for them when they both began to suffer from dementia. Id. at 31-32. Mr. Votaw has also had a lot

of involvement with his nieces, he was even asked to walk his niece Marianne down the aisle at

her wedding, but testified that "[i]t is a very very poor substitute clearly for the real person." Id.

at 31.

With respect to the impact that his brother's death had on him, Mr. Votaw stated:

> I am not sure I can put it into words like that.  There is the sense of
> certain injustice.  If somebody had to go why did it have to be him?
> I thought the whole adventure in Lebanon frankly was a good
> showing off for the Reagan White House which was very-ill
> conceived . . . .  I was outraged in the immediate aftermath . . . that
> the whole thing seemed to be passed over as . . . and . . . I wanted
> to frankly raise hell about it.

Id. at 28.  Mr. Votaw even discussed the matter with his Congressman, Michael Barnes, in

September 1983, asking him why Congress had not investigated the destruction of the Embassy.

Id. at 28-29.  Mr. Votaw feared that if the terrorists made "a noise and nobody pays any

attention" they would "find an opportunity to make a louder noise." Id. at 29.  Three weeks later,

in October 1983, the Marine Corps barracks were destroyed in Beirut. Id. at 30.  The

Congressman called Mr. Votaw that day and both started to "cry on each others shoulders . . .

that we hadn't done anything." Id. at 30.

Mr. Votaw decided to participate in this lawsuit for several reasons:

> I think it is shocking that this particular episode was so easily
> forgotten, as if it were swept under the carpet.  I find it astonishing
> that this case should be, may I say, resisted as near as I can tell by
> successive administrations of my government and no interest at all,
> so far as I can figure out, of the Congress.  I feel very strongly that
> if we had paid more attention to what was happening in 1983, we
> might have saved ourselves a great deal of grief that has happened
> since.

Id. at 34.

Gregory Votaw has asserted a personal claim against defendants for intentional infliction of emotional distress, which, based on his domicile at the time of the bombing, is governed by Maryland law. See Pls. Mem. in Supp. of State Law Claims at 110, 155. Based on the pleadings and the evidence presented to the Court, Mr. Votaw has stated a valid claim for intentional infliction of emotional distress under the law of Maryland and is entitled to recover compensatory damages from the defendants for the mental anguish that he suffered as a result of his brother's death in the bombing. See Caldor, 625 A.2d at 963; Laubach, 556 A.2d at 689. I do not hesitate in concluding that defendants' actions in facilitating the Embassy bombing were intentional, malicious, extreme, and outrageous, and that their conduct was the proximate cause of the severe emotional distress experienced by Mr. Votaw after the death of his brother. See Caldor, 625 A.2d at 963. Accordingly, the Court values the loss associated with Gregory Votaw's mental anguish at $2.5 million. See Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### 2.      Philip Faraci

Plaintiff Philip Faraci, Jr. ("Mr. Faraci") was born on October 2, 1936 in Monessen, Pennsylvania, and is a United States citizen. Tr. Vol. XI at 4. Mr. Faraci is the brother of Nancy Phyllis Faraci ("Ms. Faraci"), who was killed in the April 18, 1983 bombing of the United States Embassy in Beirut. Id. Mr. Faraci is participating in the litigation both individually, and as the Administrator of the Estate of Phyllis Faraci. Id. at 5-6; Phase II Exh. 43 (Estate papers of Phyllis Faraci). The claims of the Estate of Phyllis Faraci will be discussed later in this opinion.

Philip Faraci and his sister were two years apart in age, though only one year apart in school. Tr. Vol. XI at 4, 7. The entire Faraci family was very close. Id. at 9, 12. As Mr. Faraci

noted, "when we had birthdays or baptisms and all, everybody shows up, make an appearance." Id. at 9. When asked what it was like growing up with his sister, Mr. Faraci testified, "It was very good. I loved her." Id. at 8. He testified that "[s]he used to dance; ballroom dancing, tap dancing. She was a majorette. She belonged to Socals of Monessen Gymnastic Team, and they traveled all over the country." Id. He remembers that when his sister went to various dance-related activities, "I used to go sometime, and that's where I learned to dance, with her and the girls." Id.

Sometime in late 1981 or early 1982, Mr. Faraci learned that his sister had been assigned to go to Beirut, Lebanon. Id. at 12. He talked with his sister about taking the assignment, testifying, "I tried to tell her, 'Well, you've got to make sure that that's where you want to go. If not, then don't go.' She said, 'I'm going because,' she said, 'it's real nice like Hawaii.'" Id. She did not express any particular concerns about her safety before heading for Beirut. Id. at 12-13. The last time that Mr. Faraci spoke with his sister was before she left for Beirut. Id. at 13.

Remembering the morning of April 18, 1983, Mr. Faraci testified, "I got up late for work. I turned on the T.V. in the back room and all I seen was the picture on T.V. that said they blew up the Beirut embassy. I says, 'Well, I don't know if she was inside or outside for lunch.' I went to work because I was late." Id. at 14. He further testified:

> I got dressed and went to work. I had to do what I had to do. I had a job to do, so I went to work. Maybe like three or four hours later somebody came from the Federal Government, two gentlemen. I sat down and talked with them with my boss, and they told me I should leave to go home . . .
>
> They said they hadn't found her yet, but they were in the process. When I got to Pennsylvania, they said they found her in the night.

Id. at 15.  Mr. Faraci, who had driven to Pennsylvania to be with his mother, learned that she had already been notified of his sister's death. Id.  In learning that his sister had been killed, Mr. Faraci "was shocked in a way, because, you know, if they wanted to go overseas, you never know what's going to happen." Id. at 16.

After Phyllis Faraci's death was confirmed, the Faraci family was contacted regarding the memorial service that was to take place at Andrews Air Force Base. Id. at 17.  The family attended and Mr. Faraci recalls that "[i]t was a very nice ceremony for all the deceased members of the Federal Government.  We talked to Mr. Reagan – talked to President Reagan and a few other dignitaries, and that was it." Id.  The family also attended the memorial service held at National Cathedral and, as Mr. Faraci testified, "my mother was there, and my aunts and uncles and the godchildren.  They all showed, and we went there with the rest of the people from the Federal Government." Id.  His sister's body was transferred to Pennsylvania, where the family held a funeral that was well attended by friends and family. Id. at 19.  Ms. Faraci was buried in Monessen, Pennsylvania. Id.

Mr. Faraci testified that in the aftermath of his sister's death, "it took me like about eight or nine months" to even been to feel normal again. Id. at 19-20.  He said that it was particularly difficult because she had stayed with him whenever she was in the United States between postings. Id. at 19.  He explained that "[s]ometime I was down in the dumps, but the summer was coming and I was ready to play golf and ball and everything else, so every day it like eased up." Id. at 20.  He never sought counseling to deal with the loss of his sister, stating:

> I figured I had friends.  I stayed with them and talked with them.
> They says, "You've got to go on.'  I am working.  So I figured each
> day it helped me out going to work.

> The only problem is I missed her in the apartment, because she
> would always be there sometime when she'd come in.

Id. at 21.

Certain things trigger memories of his sister and her untimely death in Beirut, as Mr.

Faraci explained, "I see pictures every once in a while, when they show it on TV or come back

with something.  When something else happens, they always reflect to the bombing." Id. at 20-

21.

Mr. Faraci has asserted a personal claim against defendants for intentional infliction of

emotional distress, which, based on his domicile at the time of the bombing, is governed by

Maryland law. See Pls. Mem. in Supp. of State Law Claims at 91, 124-25.  Based on the

pleadings and the evidence presented to the Court, Mr. Faraci has stated a valid claim for

intentional infliction of emotional distress under Maryland law and is entitled to recover

compensatory damages from the defendants for the mental anguish that suffered as a result of his

sister's death in the bombing. See Caldor, 625 A.2d at 963; Laubach, 556 A.2d at 689.  I do not

hesitate in concluding that defendants' actions in facilitating the Embassy bombing were

intentional, malicious, extreme, and outrageous, and that their conduct was the proximate cause

of the severe emotional distress experienced by Mr. Faraci after the death of his sister. See

Caldor, 625 A.2d at 963.  Accordingly, the Court values the loss associated with Mr. Faraci's

mental anguish at $2.5 million. See Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical

damage awards for solatium claims).

## VI.     NORTH CAROLINA

### A.     Causes of Action

#### 1.     Battery

Under North Carolina law, "[t]he elements of battery are intent, harmful or offensive contact, causation, and lack of privilege." Dammarell IV, 404 F. Supp. 2d at 286-87 (quoting Hawkins v. Hawkins, 400 S.E.2d 472, 475 (N.C. Ct. App. 1991)).  A successful plaintiff "may recover the present worth of all damages that naturally flow from the defendant's conduct." Id. at 287 (quoting In re Air Crash Disaster at Charlotte, N.C., 982 F.Supp. 1101, 1111 (D.S.C. 1997) (citing King v. Britt, 148 S.E.2d 594, 597 (N.C. 1966))).  "Specifically, under North Carolina law, a personal injury plaintiff may recover damages for pecuniary loss and expenses, loss or diminution of earnings during incapacity, impairment of future earning capacity, and pain and suffering, including mental suffering." Id. (quoting In re Air Crash, 982 F.Supp. at 1111.)

### 2.   Intentional Infliction of Emotional Distress

Under North Carolina law, "[t]he essential elements of a claim for intentional infliction of emotional distress are '1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress.'" Holloway v. Wachovia Bank & Trust Co., S.E.2d 233, 240 (N.C. 1993) (quoting Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981)).  A successful plaintiff may recover damages for his or her "mental or physical pain and suffering, inconvenience, or loss of enjoyment which cannot be definitively measured in monetary terms," as well as for pecuniary damages, such as medical expenses and loss of earnings. Iadanza v. Harper, 611 S.E.2d 217, 221 (N.C. Ct. App. 2005).

"Where a battery claim is based on outrageous and malicious conduct by the defendant, and plaintiff suffers emotional trauma, there frequently will be more than one route to recovery in tort; that is the plaintiff can seek damages from battery and for intentional infliction of emotional distress." Dammarell, 404 F. Supp. 2d at 287 (citing Holloway v. Wachovia Bank & Trust Co.,

452 S.E.2d 233, 240-41 (N.C. 1993)).  "Although a plaintiff is free to advance multiple theories

of recovery for his damages, he is 'not entitled to 'double recovery' for the same loss or injury.'"

Id. (quoting Markham v. Nationwide Mut. Fire Ins. Co., 481 S.E.2d 349, 357 (N.C. Ct. App.

1997)).

### B.     Plaintiffs

#### 1.     Dennis Foster

Plaintiff Dennis Foster ("Mr. Foster") was assigned to the United States Embassy in

Beirut as a Political Officer with the United States Department of State. Tr. Vol. IV at 9-10.  He

presently resides in Rockville, Maryland and is married with two children. Id. at 4-5.

Mr. Foster was born on August 24, 1949 in Iron Station, North Carolina, and is a United

States citizen. Id. at 4.  He graduated from high school in June 1967 and then attended the

University of North Carolina at Chapel Hill, graduating in 1971 with a Bachelor of Arts in

History, Political Science, and French. Id. at 5.  During his senior year at the university, Mr.

Foster passed both the written and oral portions of the Foreign Service exam. Id. at 5-6.

Immediately after graduating, Mr. Foster was drafted into the United States Army, where

he served from 1971 to 1974. Id. at 6-7.  While in the Army he studied Russian at the National

Language Institute in Monterey, California, and earned the Pushkin Award as the top student in

his class. Id.  After training, he was posted to various bases in Germany, where he worked in

intelligence and psychological operations. Id. at 7.

In 1974, after leaving the Army, Mr. Foster entered Stanford Law School, graduating in

1977. Id.  Following law school, he worked for the Department of Commerce for one year. Id.

After that year, Mr. Foster attended the University of London School of Oriental and African

Studies, where he earned a Master of Arts in Middle East studies, with a specialty in

Developmental Economics, in 1981.  Id. at 7-8.  Upon graduating from the University of London,

Mr. Foster joined the Foreign Service.  Id. at 8.  His first posting was to the United States

Embassy in Beirut as a Political Officer.  Id. at 9.  He arrived in the fall of 1981.  Id.

_____On April 18, 1983, Mr. Foster was in his office "reading cable material, writing reports

for Washington, reading newspapers, things like that."  Id. at 14.  Remembering the explosion, he

testified that, around 1:00 p.m., he was listening to the BBC News when he heard:

> a loud deep noise that at first made me think the local Lebanese
> fishermen were fishing with dynamite, which they often did . . .
> and I also remember thinking, well, this is too loud and too long to
> be a dynamite explosion under water.  Perhaps it's a sudden
> thunderstorm, in a clear blue sky.  That didn't seem right.  And
> then I could sense heat and I could sense a lack of oxygen, and the
> whole building was swaying, and I wanted to get away from the
> heat, and then light that I could see going up my window, but I
> could not run.  The building – the movement of the building
> prevented me from running, and then I remember being around the
> corner of my desk and then I lost consciousness, and when I woke
> up, I was on the floor.

Id. at 15.  When Mr. Foster awoke, he saw:

> thick white dust, concrete dust everywhere, and I could hear the
> sound of my blood falling on all the paper that was on the floor,
> and I remember hearing voices saying stay down, stay down, and
> then I got up and I – the first person I met was my boss, Ryan
> Crocker . . . and he didn't have a scratch on him.  But he looked at
> me and pushed open the wounds here and there and said you're
> okay.

Id. at 15-16.  As Mr. Foster recalled: "[I] had blood up and down my arms, and there was blood

falling around my face, but there was no longer a lot of blood."  Id. at 16.  See Phase II Exh. 10

(photographs of Mr. Foster's injuries suffered in the bombing and wreckage of Mr. Foster's

office).  The cuts that Mr. Foster had received "came from the shattered glass from the windows

in my office.  I had a large window behind me, and then I had a window half that size on the side

of the building.  And all the glass from those windows was blown in on me." Tr. Vol. IV at 16.

Mr. Foster left his office with some colleagues and walked down a staircase. Id. at 17.  He

testified that most of the people from his area did not appear to be seriously injured, however:

> [A]s we walked down the staircase, we could see that the people
> were much more seriously injured, and many of them were
> bleeding severely, or covered in blood already. . . . To me, it
> looked like they also had been injured by the blowing glass, but
> they had been injured much more severely, so you could see that
> the force of the explosion had been much closer to them than it had
> been to the rest of us up on my floor.

Id.  He left the Embassy through a back exit and over a retaining wall. Id. at 17-18.  He then

made his way home and visited friends, who cleaned his wounds, which at that point Mr. Foster

determined to be cuts on his face and arms from glass and an exploded blood vessel in his hand.

Id. at 18-19.  See Phase II Exh. 10 (photograph of Mr. Foster's injuries).  He subsequently

learned during a State Department physical that the bombing had also caused internal bleeding,

but the doctors concluded that the internal injuries would heal themselves without further

treatment. Tr. Vol. IV at 20.  In addition, subcutaneous glass was embedded in his face, ears, and

neck. Id. at 21.  Doctors determined that there was too much glass to remove surgically, and

decided to allow it to surface from Mr. Foster's skin on its own, which it did for several years

following the bombing. Id.

In the days following the bombing, Mr. Foster participated in the clean-up effort at the

Embassy site, attempting to secure sensitive documents. Id. at 23.  When his clean-up efforts

were complete, he went to work in office space that the British Embassy had made available. Id.

at 24.

Mr. Foster lost several friends in the bombing. Id.  In the days after the bombing, he attended a ceremony at the Beirut airport where the bodies of the United States citizens killed in the bombing were returned home. Id. at 25.  The ceremony was a "solemn and dignified occasion." Id.

Mr. Foster left Beirut in July 1983. Id. at 26.  In subsequent years, he was posted to Genoa, Italy and Abu Dhabi, United Arab Emirates. Id. at 26-27.  He left the Foreign Service in 1991. Id. at 27.  After leaving the Foreign Service, he moved to Milan, Italy, where he practiced law until 2000. Id.  He returned to the United States that year, and has lived and worked in the greater Washington, D.C. area since that time. Id.

The Oklahoma City bombing and the September 11, 2001 attack on the World Trade Towers brought back memories of the Embassy bombing. Id. at 27-28.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony that events such as Oklahoma City bombing and events of September 11, 2001, may trigger memories of a trauma and bring onset or recurrence of psychological symptoms of trauma or Post-Traumatic Stress Disorder).  The Oklahoma City bombing, in particular, "seemed to me directly comparable," and Mr. Foster "felt a lot of empathy" with the victims. Tr. Vol. IV at 28.  When Mr. Foster thinks back on the bombing, he thinks:

> I should have been killed in that explosion because I think the odds were better than even that one would have been killed.  For whatever reason, my wing of the building stood up, and the corresponding wing on the other side collapsed, and the center collapsed, and so in that sense I think the life I have lived since then has been an additional gift.  It's borrowed time.

Id. at 29.

81

Mr. Foster testified that he agreed to participate in this lawsuit because:

> I do believe that countries such as Iran, such as Syria, that sponsor terrorism, that sponsor the nonobservance, the trampling down of basic international law, order, and morality, should somehow be called to account in every possible forum, including this one.

Id. at 29-30.

As a federal government employee stationed overseas, Mr. Foster retained as his domicile in 1983 the state in which he last resided. See Dammarell II, 2005 WL 756090, at *22. From the time that Mr. Foster graduated from the University of North Carolina through the date of the Embassy bombing, he had no consistent contacts with any particular state; however, he maintained his residency in North Carolina. See Pls. Mem. in Supp. of State Law Claims at 10-11. Accordingly, the law of North Carolina applies to Mr. Foster's claims.

Based on the pleadings and the evidence presented to the Court, Mr. Foster has stated a valid claim for battery under the law of North Carolina and is entitled to recover compensatory damages from defendants "for pecuniary losses and expenses . . and pain and suffering, including mental suffering." See Dammarell IV, 404 F. Supp. 2d at 287 (quoting In re Air Crash, 982 S. Supp. at 1111). No evidence was presented to the Court upon which to award Mr. Foster damages for economic losses, such as loss of income or medical expenses. However, the Court values the loss associated with his pain and suffering and mental anguish at $1,500,000. Because he can recover for his mental anguish via his battery claim, there is no need for the Court to consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery. Accordingly, the Court should award Mr. Foster $1,500,000 on this default judgment.

## 2.   James Massengill

Plaintiff Jacques Massengill ("Mr. Massengill") was posted to the United States Embassy in Beirut as a Marine Security Guard. Tr. Vol. I. at 171, 176.  He is married, and has two children. Id. at 167.

Mr. Massengill was born on January 3, 1962 in Chapel Hill, North Carolina, and is a United States citizen. Id.  He received his high school diploma in 1980. Id.  Prior to graduating, he had already joined the Marine Corps, having enlisted the day after he turned seventeen and arranging with his high school to allow him to leave school a year early. Id. at 167-68.  At the time that he enlisted, Mr. Massengill planned to make the Marine Corps a full career. Id. at 169.

In October 1979, Mr. Massengill entered boot camp at Parris Island, South Carolina. Id.  After basic training he was posted to Okinawa, Japan. Id. at 170.  While on Okinawa, Mr. Massengill was approached by one of his senior supervisors, who told Mr. Massengill that if he wanted to progress in the Marine Corps and there was not a war, there were three other types of "special duties" that he should do – drill instructor duty, recruiting duty, or marine security guard duty. Id.  Mr. Massengill decided to apply for the Marine Security Guard ("MSG") program. Id. at 171.  He was accepted into MSG school, and his training class began in March 1981 in Quantico, Virginia. Id.  After his training, his first posting was to Khartoum, Sudan. Id. at 173. His second posting was to Beirut. Id. at 175.  Before departing for Beirut, Mr. Massengill was promoted to corporal. Id.  Mr. Massengill arrived at the United States Embassy in Beirut in May 1982. Id. at 176.

On the morning of April 18, 1983, Mr. Massengill was standing post outside the Embassy's consular section from approximately 8:00 a.m. until noon. Id. at 196-97.  At noon, he relieved Robert McMaugh, who was assigned to Post One, for lunch. Id. at 198.  Mr. Massengill

left Post One just before 1:00, when Corporal McMaugh returned from lunch. Id. at 199.

Corporal McMaugh, who was not feeling well, tried to talk Mr. Massengill into taking his duty

for the rest of the day, but Mr. Massengill, who was at the end of a six-day cycle of standing post

and who was about to start three days off, was too tired. Id.  Mr. Massengill then went to his

room on the sixth floor of the Embassy. Id. at 200.  Shortly thereafter, the Embassy was bombed.

Describing the explosion, Mr. Massengill testified:

> So I went into my room at about 1 o'clock and then started
> changing to get ready – I think I was going out somewhere that
> afternoon at 2 o'clock.  And all of a sudden, the windows cave in
> and shredded the glass curtains, and naturally I hold up my hands,
> and I got cut on my arms, a little bit on my face, and on my feet.
> And it just ripped through the glass curtains.
>
> Now, these curtains are pretty heavy-duty, we had lost the majority
> of our windows in the summer of 1982.  They came back in and
> replaced them again, but, of course, we taped them up to minimize
> the glass shards if something like that happened.  Well, this time it
> didn't work too well, the glass came through and it ripped these
> curtains that were very heavy-duty, they were supposed to catch the
> rest of the glass, but that didn't work, either.
>
> Initially, I had thought that somebody had shot some RPGs down
> from the back of the building and hit that side of the building
> where we were at . . . .
>
> So I grabbed my reaction gear which we kept in our bedrooms on
> the sixth floor which consisted of flap jackets, helmets, a rifle,
> submachine gun, pistol, radios, first-aid kits, gas masks, everything
> we needed . . . .
>
> So I grab my gear and I start calling on the radio down to post one,
> I said, we've been hit, we've been hit.
>
> Again, I thought it was an RPG attack, and having been there for
> 11 months and experienced that before, I was a little bit excited, I
> was real excited because I got cut, I had never been cut up or
> anything before 11 months prior, this is like wow, this is – this is
> interesting.

> So I'm on the radio, but nothing's coming back, so I keep going, post one, post one, we've been hit, we've been hit.  Silence, silence, silence, post one, we've been hit, we've been hit, still nothing.
>
> And that's very abnormal because usually that marine, he would command all the other marines, he would be like a command post, sending us through the building.
>
> So I grab my gear and I start to move out into the common lounge area, and people from D[efense] A[ttache's] O[ffice] started streaming into our area.

Id. at 201-03.  The first people that he encountered were from the Defense Attache's office, located near the front of the building. Id. at 203-04.  He helped treat their wounds, which were severe. Id. at 204.

The hallways of the Embassy were filled with smoke and tear gas escaping from ruptured canisters. Id. at 204-05.  Mr. Massengill initially put on his gas mask, but discovered that it did not keep out the smoke. Id. at 205.  He testified that, as he walked down the hall toward the middle of the building:

> [A]ll of a sudden like this breeze blows, and the smoke clears out a little bit and I look off to my left, which I was going that way, I look off to my left, which is out this way, to the front of the building, and I could see the Mediterranean.
>
> And at that point I knew that we had a serious problem, because again there used to be 40 feet worth of offices between that stairwell and the front of the building.  Now I'm standing right on the edge of it looking out, seeing the Mediterranean, and we've got a serious problem.
>
> At that point I knew something was terribly wrong.

Id. at 205-06.

Mr. Massengill's first instinct was to head down to Marine Post One, because no one was coming on the radio and the Embassy's air horns, which were supposed to sound in the event of

85

an attack, were not going off as they should have been. Id. at 206.  When he reached where Post

One had been, "it was uneven gaps, there was lots of debris, there was fire falling off of it, it was

very dark, lots of smoke.  It was sort of scary, looking in there, it just didn't look like it did 15

minutes earlier when I had been down there." Id. at 207.  While he wanted "to go in there and get

McMaugh," who had been standing duty at Post One, because "marines, they don't leave their

own," he realized that Corporal McMaugh must have been killed. Id. at 207-08.  He was told that

he should move on to help the injured, which he realized in hindsight "was a real good decision."

Id. at 208.

Mr. Massengill testified that "the destruction was so catastrophic, that we were just trying

to help the people that were still alive." Id. at 210.  As he explained:

> [T]he injuries that were sustained by the people that were in that
> car bombing were very, very traumatic injuries.  And we're talking
> amputations, lacerations that were deep, gouges, blinded, people
> were blinded by glass, couldn't see.
>
> And, obviously, these people were very, very upset about what was
> going on.  One of our jobs that we try to do is you try to be the
> calming factor, you try to help these people anyway you can.
>
> . . .
>
> And so this went on, I don't know, for a couple of hours, we would
> try to take those people and get them out of there.
>
> . . .
>
> So there was – I mean, I think the vast majority of people that were
> in the building that day were hurt.  And the vast majority of those,
> at least two thirds, having these really traumatic injuries that I had
> never seen before.  And to top all that off, as I had mentioned,
> when the building collapsed on itself, it broke up, we had a vault
> with a lot of weapons and CS gas.  And then you have all the CS or
> tear gas floating through the air as you're trying to do this.

Id. at 210-14.  In addition to helping the wounded, Mr. Massengill and other Marines were responsible for securing classified information that had been in safes blown open by the force of the blast. Id. at 216.  As he summed up the first three hours in the aftermath of the attack, he explained that, "[w]ithout a doubt it was a very bad day, to put it mildly, it wasn't a good situation." Id. at 214-15.

At 2:00 a.m. the day after the blast, Mr. Massengill and others were finally sent to get sleep, but as he testified, "that's just not going to happen after something like that.  The adrenalin is flowing, the excitement, the fear, I don't think anybody got any sleep." Id. at 218.  For the first time since the bombing, Mr. Massengill had an opportunity to examine injuries that he had sustained in the attack, which included "cuts from the glass that came in, cuts on my arms, one on the face, and the bottoms of my legs, . . . because I was changing out of my uniform" at the time of the blast, as well as a cut lip. Id. at 219, 225.  See also Phase II Exh. 5 (photo of Mr. Massengill at Embassy shortly after attack, partially showing injuries sustained by Mr. Massengill in bombing).  Mr. Massengill never received medical treatment for his injuries. Tr. Vol. I at 218.

At 5:00 a.m. the day after the blast, Mr. Massengill was back at the Embassy site. Id.  By that time, Embassy operations had shifted from rescue to recovery, after "it became obvious that whoever was alive had been removed from the rubble and moved on." Id. at 219.  He added that recovering bodies at this stage was difficult emotionally because, "the vast majority of these people you knew, and their families all the time were located over outside of the picture waiting for some type of news about where's my father, where's my son, where's my wife, where's my

husband." Id. at 222.  He remembers that when they located the body of Robert McMaugh, "I was just throwing up, because it was that bad." Id. at 222-23.

Mr. Massengill was not able to contact his family until over a week after the Embassy bombing. Id. at 227.  His mother had, however, seen him "running in and out of the building" in news reports of the attack, so she knew that he was alive. Id.

Mr. Massengill left Beirut in June 1983, and went to Luxembourg for a twelve month posting. Id. at 228-29.  The tour was shortened to eight months, after he began to experience some difficulties, as he explained:

> [I]t seemed like a quiet place, and it certainly was, it's actually a
> nice place, but it seemed too quiet at the time.  But I was also
> experiencing some problems with, I was drinking too much,
> fighting too much.  And it looked like there was a chance that I
> would probably be relieved from duty if I stayed out there much
> longer.  So I offered to come back to the fleet.

Id. at 229.  When asked whether these difficulties were related to his experiences in Beirut, Mr. Massengill responded:

> Without a doubt, at the time it lasted about four years, it wasn't
> only Luxemburg, I think I had a drinking problem probably from
> '83 on out to '86 or '87, and a lot of fighting.
>
> And at that time I rationalized that's what young marines do, you
> drink and you fight, that's what we're supposed to do, that's what
> we're paid to do.
>
> Time has a way of letting you look back at things, and with a little
> distance to it, it's obvious that that behavior was abnormal . . . .
>
> Luckily, I was working with some people who had been in
> Vietnam who I think that they sort of recognized some of the
> behaviors that I was experiencing or that I was displaying.
>
> So they were able to take an incident that may have been more
> serious and able to make it not so serious and help me to get past

that point in my life.

Id. at 229-30.  See Dammarell I, 281 F. Supp. 2d at 190 (discussing expert testimony regarding

responses to traumas such as Beirut Embassy bombing, including deterioration of performance in

major life areas and personality changes).

After leaving Luxembourg, Mr. Massengill returned to the "fleet" in the Marine Corps

and was assigned to an interrogator/translator position at Camp Pendleton. Tr. Vol. I at 230-31.

From there he entered the Marine's Defense Language Institute, where he studied Korean, and

subsequently spent two years in South Korea working with the Korean Marines. Id. at 231-32.

He then returned to San Diego and, over the next four years, began taking college courses, along

with his wife, and working as a "survival, evasion, resistance, escape" instructor. Id. at 232-33.

He then left the Marine Corps and went to the University of California at San Diego full-time,

double majoring in Political Science and Economics and earning a Bachelor of Arts in 1993. Id.

at 233.  After finishing his undergraduate degrees, Mr. Massengill decided to go to graduate

school at Georgetown University, where he received Master of Science in Foreign Service. Id. at

234.  He subsequently passed the Foreign Service exam, received a Presidential Management

Intern position at the Pentagon, and was hired by the State Department. Id. at 234-35.  After

joining the State Department, he had postings in Seoul, Korea and Croatia. Id. at 235.  He is

currently on a leave of absence from the State Department while working for the Department of

Defense. Id.  Combining his years of military and civilian service Mr. Massengill, at the age of

forty-two, now has twenty-five years of total service with the federal government. Id. at 235-36.

The Beirut Embassy bombing has had a continuing impact on Mr. Massengill's life.  For

example, every April 18, he sends emails to Ryan Crocker and Charles Light, both of whom were

at the Embassy in Beirut the day of the bombing, "just to touch base with them, see how they're

doing." Id. at 236.  He has not slept for more than two hours in a row for over twenty years,

explaining that "[t]he sleep's just not there anymore, you go to sleep, wake up, go to sleep, wake

up." Id. at 237.  He recalls that while working at the United States Embassy in Croatia for the

State Department, he felt that the Embassy "was very vulnerable to attack," explaining:

> [Y]ou sit at meetings down on the ground floor, you have a
> meeting, the ambassador, everybody in it, of course, you got to
> attend.
>
> But you don't want to attend because any time somebody could hit
> that building, so you're sitting at these meetings, and they're
> talking about whatever issues going on.
>
> And you're daydreaming about what are you guys going to look
> like when the whole bottom floor gets wiped out just like Beirut.

Id. at 237-38.  See Dammarell I, 281 F. Supp. 2d at 189 (discussing expert testimony that victims

of traumas, such as the Beirut Embassy bombing, that involve destruction of a building are likely

to have concerns about structural integrity of, and seek escape routes from, any building they

enter).  He also testified that certain events still trigger memories of Beirut:

> [a]nything that happens on TV, you see it, whether it's in the Gaza
> Strip, Israel, 911, Afghanistan, Iraq, you see the images . . . you see
> it, you smell it, you taste it, you feel it.  You know what these
> people are going through, and so, in a sense, you relive it any time
> you turn on the TV.

Tr. Vol. I at 237.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony

regarding common responses to traumas such as Beirut Embassy bombing, such as sleeplessness,

hypervigilence and a constant scanning of one's environment, and sensitivity to terrorist events

such as the 1995 Oklahoma City bombing, and attacks of September 11, 2001 that serve as

reminders of experienced attack).

When asked why he elected to participate in this litigation Mr. Massengill testified:

> Charlie Light called me and told me that Anne [Dammarell] was starting this off.  Initially, I was doing it in support of Charlie, we sort of joke a little bit, what better way to get back at terrorists than with six American lawyers on them, what better nightmare is that, these lawyers.
>
> . . . Some times it's better to hit them in the wallet than it is to hit them in the face, you can get behavior adjusted the way that you want it.
>
> And so that's how I view this lawsuit, who knows, maybe it will help adjust the behavior of the Government of Iran.
> You never know, it's worth trying.

Tr. Vol. I at 240-41.

As a member of the United States Marines stationed overseas, Mr. Massengill retained as his domicile in 1983 the state in which he last resided. See Dammarell II, 2005 WL 756090, at *22.  Mr. Massengill was born and raised in North Carolina and joined the Marines before he even graduated from high school.  After basic training and MSG training, his second posting was to Beirut.  The law of North Carolina, therefore, applies to his claims.

Based on the pleadings and the evidence submitted to the Court, Mr. Massengill has stated a valid claim for battery under North Carolina law and is entitled to recover compensatory damages from defendants for "all damages that naturally flow from the defendant's conduct." Dammarell IV, 404 F. Supp. 2d at 287 (quoting In re Air Crash Distaster at Charlotte, N.C., 982 F. Supp. at 1111).  Although, under North Carolina law, successful battery plaintiffs can recover for economic losses, no evidence has been provided to the Court regarding any economic loss to Mr. Massengill.  However, the Court values the loss associated with his pain and suffering and mental anguish caused by the battery at $750,000.  Because Mr. Massengill can recover for his

91

mental anguish under his battery claim, there is no need for the Court to consider his intentional

infliction of emotional distress claim, which would result in an impermissible double recovery.

Accordingly, the Court should award Mr. Massengill $750,000 on this default judgment.

## VII.   OHIO

### A.   Causes of Action

#### 1.   Battery

Under Ohio law, "[a] person is subject to liability for battery when he acts intending to

cause a harmful or offensive contact, and when a harmful contact results." Love v. City of Port

Clinton, 524 N.E.2d 166, 167 (Ohio 1988) (citing Restatement (Second) of Torts § 13).

Offensive contact is contact which would be offensive to a reasonable sense of personal dignity.

Id.  A successful plaintiff may receive compensatory damages "for the real injury received,

including the physical and mental pain as well as the direct loss in earning capacity." Lake Shore

Elec. Ry. v. Mills, 31 Ohio Cir. Dec. 146, 1911 WL 1631, at *2 (Ohio Cir. Ct. 1911).  With

regard to non-economic losses, "[t]here is no specific yardstick for determining the amount of

damages to be awarded for pain and suffering," which includes not only compensation for

"physical discomfort and stress, but also . . . the mental and emotional trauma that are

recoverable as elements of compensatory damages." Volz v. Hudson, 761 N.E.2d 711, 714 (Ohio

Mun. Ct. 2001).

#### 2.   Intentional Infliction of Emotional Distress

Under Ohio law, "[i]n order to recover for intentional infliction of emotional distress, a

plaintiff must show that (1) the defendant intended to cause emotional distress or knew or should

have known that its conduct would result in serious emotional distress to the plaintiff; (2)

defendant's conduct was outrageous and extreme beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it." Ekunsumi v. Cincinnati Restoration, Inc., 698 N.E.2d 503, 506 (Ohio App. Ct. 1997) (citations omitted).  However, where a plaintiff seeks damages under both battery and intentional infliction of emotional distress claims, damages for emotional distress that resulted from the battery can only be obtained via the battery claim. See Manin v. Diloreti, 641 N.E.2d 826, 827 (Ohio Ct. App. 1994) ("Any emotional distress plaintiff suffered was caused by the alleged battery and compensatory  damages for that distress would be recoverable as part of the damages recoverable for the alleged battery.").

### 3.    Wrongful Death Statute

Ohio's wrongful death statute provides:

> When the death of a person is caused by wrongful act, neglect, or
> default which would have entitled the party injured to maintain an
> action and recover damages if death had not ensued, the person
> who would have been liable if death had not ensued . . . shall be
> liable to an action for damages, notwithstanding the death of the
> person injured.

Ohio Rev. Code § 2125.01.  Wrongful death actions must be brought by the personal representative of the decedent's estate and damages recovered are "for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death." Ohio Rev. Code § 2125.02(A)(1).

93

Compensatory damages recoverable under Ohio's wrongful death statute include loss of support from the reasonably expected earning capacity of the decedent, loss of services and society of the decedent, loss of prospective inheritance, and mental anguish. Ohio Rev. Code § 2125.02(A)(1).  The distribution of an award under a wrongful death statute is to be determined by an Ohio probate court, specifically,

> The amount received by a personal representative in an action for wrongful death under sections . . . shall be distributed to the beneficiaries or any one or more of them.  The court that appointed the personal representative . . . shall adjust the share of each beneficiary in a manner that is equitable, having due regard for the injury and loss to each beneficiary resulting from the death and for the age and condition of the beneficiaries.  If all of the beneficiaries are on an equal degree of consanguinity to the deceased person, the beneficiaries may adjust the share of each beneficiary among themselves.  If the beneficiaries do not adjust their shares among themselves, the court shall adjust the share of each beneficiary in the same manner as the court adjusts the shares of beneficiaries who are not on an equal degree of consanguinity to the deceased person.

Ohio Rev. Code § 2125.03(A)(1).

**B.      Plaintiffs**

**1.      Ronnie Tumolo**

Plaintiff Ronnie Victor Tumolo ("Mr. Tumolo") was posted to the United States Embassy in Beirut as a Marine Security Guard. Tr. Vol. VIII at 79-81.  He is married and has two sons. Id. at 120.

Mr. Tumolo was born on May 22, 1963 in Cleveland, Ohio, and is a United States citizen. Id. at 75.  He graduated from Valley Forge High School near Cleveland, Ohio in June 1981, and testified, "I had plans and already knew pretty much the middle of my senior year that I wanted to go in the military, and I talked a friend of mine into joining together, and that's what we did." Id.

94

at 75-76.  Shortly after graduation, he went to boot camp at Parris Island, South Carolina,

arriving as a private first class. Id. at 76-77.  At that point, he envisioned a twenty to thirty year

career in the military, thinking that it "would be really great to be able to retire some day and not

even be 40 yet." Id. at 76.

After completing basic training, Mr. Tumolo was assigned to military occupational school

for logistics training. Id. at 77.  In the fall of 1981, he was sent to Okinawa, Japan. Id. at 78.

Once on Okinawa, he grew dissatisfied with his occupational specialty, explaining:

> I always had this itch to do something else in the military, and, you
> know, I had these grandiose notions that everybody in the Marine
> Corps had polished boots and had starch in their uniforms, and I
> didn't really see that in Okinawa.  So I was looking for something
> else to do.

Id. at 78-79.  His career planning officer told him about the different types of "special duties"

available in the Marine Corps, and he chose Marine security guard duty because, as he testified,

"I wanted to see the world . . . .  So I thought if I go on embassy duty, I'd [be] able to travel and

see other places." Id. at 79.  He applied for and was accepted into Marine Security Guard School.

Id. at 80.  At the end of his training course in Quantico, Virginia, he selected Beirut for his first

posting. Id.  He arrived in Beirut in early February 1983. Id. at 81.

On the evening of April 17, Mr. Tumolo began his scheduled duty at Post One. Id. at 85.

He remembered that "[i]t was one of the quietest nights I think I had ever stood." Id.  Between

6:30 a.m. and 7:00 a.m. on April 18, Robert McMaugh, who was Mr. Tumolo's "relief" on Post

One, came downstairs and, as Mr. Tumolo testified, "I'll never forget what he said.  He said to

me, Tumolo, I'll give you 300 Lebanese lira if you stand my duty today, because I can't; I'm so

sick." Id. at 86-87.  He further testified:

> I actually thought about it, because I was fresh out of MSG school
> and had spent most of my money upgrading my uniforms, but I
> didn't want to wake our gunny up and ask him at 6:30 in the
> morning if I could stay on post for Bob.  So I said, Well, I don't
> think that's going to happen but we'll see how things go later in the
> day.

Id. at 87.  At the end of his duty Mr. Tumolo left Post One, and went up to his room in the

Embassy to get some sleep. Id.

At approximately 12:45 p.m., Mr. Tumolo received a call from Mr. Tony, the Marines'

cook, telling him that the MSG battalion's gunnery sergeant, or gunny, was looking for him, and

that he needed to come downstairs and eat before the dining facility closed. Id. at 88.  He arrived

downstairs to Post One just as the gunnery sergeant was walking out of the Embassy. Id. at 89.

The gunnery sergeant indicated that he wanted to speak with Mr. Tumolo when he returned and,

as Mr. Tumolo testified:

> [B]ehind him, I could see Bob McMaugh, Corporal McMaugh,
> looking at me with this huge grin on his face because he knew that
> the gunny was probably going to chew me out, and it would be a
> break for him because he wouldn't be getting chewed out, because
> I was the youngest Marine at post, and before I got there, Bob was
> the youngest Marine at post.

Id.  He looked at Corporal McMaugh and thought, "Man, you're not sick; there's nothing wrong

with you." Id.  Less than fifteen minutes later, Corporal McMaugh was killed in the Embassy

bombing.

After speaking with his gunnery sergeant, Mr. Tumolo went to the Marine's mess hall to

eat lunch. Id. at 89-90.  Remembering the explosion and the moments immediately proceeding it,

he testified:

> Mr. Tony brought me over what was on his menu for the day,
> which was rice with chili, and he put it in front of me, and he

turned around to walk away, and about that time, there was this enormous, enormous explosion.  There was chards of glass and metal and plaster that just came off the walls, kind of swept behind me.  It landed in my food.  It landed on the table.  It landed on the other Marines that were at the table.

And they looked at me and I looked back at them, and they said, Do you know what to do?  And I said, Yes, I know what to do, and they said you better do it.  They stood up. They took off.  I went out to check on Mr. Tony, and he was standing in the kitchen.  I told him to do what he could, leave the building, get out as soon as you can, because the kitchen was behind the wall, and there was no damage behind that wall.  That wall protected him.

[A]t that point . . . that entire day went very much downhill.  I immediately – I had my radio on, and over the radio was another marine, Charles Pearson, and he said, Holy shit, we've been hit big time.  And he started shouting the word "react," "react," which was a sign that we had – when we heard that, we had to go to our rooms, get our gear, get our weapons, and meet in the center point.

Id. at 89-91.  As he ran to get his gear Mr. Tumolo noticed that:

On the way, there was just people pouring out of their offices that still had offices intact, bleeding from the face and hands, and somebody must have been shopping in the PX or the commissary that we had in the embassy.  There was a roll of paper towels laying in the hallway.  So I picked it up and started unrolling the paper towels to form a compress just to hold on your face.  There were a lot of open cuts and deep cuts in people's faces.

So I kept working my way.  Eventually I got to the top floor where my bedroom was, and I went to my room and I went to open the door and it wouldn't open.  So I stood back and I ran at my bedroom door full speed and it still wouldn't open.  So then I stood back and kicked the door handle.

When I kicked the door handle, my bedroom door flung open, and all I could see was the Mediterranean.  It was almost like riding in an [airplane] and looking out the back of it.  All I could see was smoke, flames.  There were 55 gallon drums on the roof of sodium nitrate, which we used in an emergency to destroy paper.  That was on fire.  Our riot gas was on fire, the smell of the explosion itself, and there was nothing but water from the burst pipes that were

> shooting down, and it was just something I had never seen
> anything like before in my life.

Id. at 91-92.  Mr. Tumolo's room had been in the part of the Embassy that was sheared off in the

explosion: "Everything from my room down was gone." Id. at 92.

Mr. Tumolo then made his way back downstairs:

> [T]he majority of people that I saw were wounded, and they were
> hurt very badly, and some of them were not injured at all, but they
> were panicking and screaming.  They were crying and didn't know
> what was going on, and there were people, one or two people, that
> were actually missing eyes.  I could tell they were missing eyes
> because of the indentation of their eyelids and they had their hands
> over their eyes and blood was coming from their hands.  I didn't
> know what else to do but suggest they take off a piece of clothing,
> use it to put direct pressure.  I tried to lead people down out of the
> building.

Id. at 93.  He got out of the building using a ladder setup at the rear of the embassy, recalling:

> [A]t that point, I still had not realized what it [the Embassy] looked
> like, because all I could see was this tunnel vision view of the
> ocean and the debris that laid down below me.  Once I got outside
> and I'd seen fire, I didn't know what to think.  There was still
> remnants of the ambassador's motorcade that was in front.  I could
> see the bodyguards in the vehicle still trapped, obviously dead.

Id. at 94.

The Marine gunnery sergeant gathered the Marines and started assigning various details,

or tasks.  Id.  Soon thereafter, Marines from the Marine Amphibious Unit, headquartered at the

Beirut airport, arrived to help.  Id. at 95.  He was familiar with the Embassy, so Mr. Tumolo took

a group of Marines inside to make sure that all of the Americans were out of the building.  Id.  He

testified that, while back in the building they "noticed that there was reams and reams of

classified documents laying in the debris.  There was actual safes, four-door heavy safes that

weigh thousands of pounds that had actually blown out of the building." Id.

98

Mr. Tumolo remembers, "that entire day was just pretty much a search and recovery-type activity." Id. at 95-96.  His gunnery sergeant did not place him on the "digging detail," which involved the recovery of remains of people killed in the attack. Id. at 96.  As Mr. Tumolo noted, "I don't know if that was his way of saying, you know, you're the youngest one here, I don't want you to have to get involved with some of this stuff if you don't have to." Id.  Instead, he was tasked with "some of the search for classified material and some of the evacuation procedures that were going on." Id.  As evening fell, heavy equipment was brought in to help with recovery efforts. Id.

Mr. Tumolo and another Marine were dispatched to the AUB Hospital. Id. at 97.  He remembers that, "[i]t was like time stood still.  We walked down the middle of Beirut carrying M-16s and radios, and nobody challenged us.  Nobody said anything to us.  We walked, or ran, when it was possible, to the hospital." Id.  Remembering his initial reaction when he arrived at the hospital, Mr. Tumolo testified:

> [W]hen we arrived, they had already had several caskets sealed, and I can remember looking at them and seeing tall [sic] these American names and thinking, My God, this really is that bad.  At that time, I hadn't realized the impact of lost life.

Id. at 97-98.

When Mr. Tumolo returned to the Embassy site he had an opportunity to assess, for the first time, the injuries that he had received in the bombing:

> I had a lot of cuts and embedded glass in my back and back of my skull.  The gunny actually realized I was injured when we were standing out in front of the embassy, and he called my name. When I turned, he could see blood running down the back of my head, and he said get over here.  He called over one of the corpsmen, and he lifted up my shirt . . . and seen that I had a bunch of gouges and cuts and bruises and whatnot, . . . .  So the corpsman

> treated me with some antibiotic or some antiseptic creams.  He
> gave me some bandages, and we went back to work.

Id. at 100-01.

That evening, Mr. Tumolo and other Marines went to a residence that had been

established as a "safe haven" to try to get some rest.  Id. at 101.  Describing the mood that

evening, he stated:

> It was unusual.  We were just mad as hell because we didn't know
> what to do, and all we were going to be doing – we didn't know.  I
> don't know what to explain.  It was a sick feeling of fear inside.
> You know that feeling of when somebody scares you and you get
> that feeling in your heart?  That's how it went that whole night.

Id.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony that fears and

anxieties are among first symptoms of trauma among those severely injured in an attack).  Over

the next two to three days, Mr. Tumolo and others engaged in continuing recovery efforts. Tr.

Vol. VIII at 102.  As Mr. Tumolo testified:

> We went back into the building.  We tried to salvage clothes,
> something we could wear.  I had pretty much lost everything
> because my entire room went down in the rubble, and that day was
> pretty much being on site, lending any assistance we could,
> organizing working parties or details with the Marines from the
> amphibious unit and just basically doing whatever we were told to
> do.

Id. at 102-03.

Mr. Tumolo testified that, in the course of recovery efforts, he experienced what, for him,

became one of the defining moments of his Beirut experience:

> [I]t was a beautiful warm sunny day, and I was there.  The DCMQ
> was there.  Sergeant Light was there and perhaps two or three other
> Marines and some other Americans, and we found under the rocks
> and whatever else we pulled away, we finally found our flag pole,
> because I don't believe it was blown over by the blast.  I believe it

> may have been pushed over when the cranes and other things, other
> rescue-type equipment came to the scene.  Well, we found the flag
> pole, and the DCMQ happened to be present when we found it, and
> he told somebody to go find a flag.  And that day, we attached a
> flag to the top of the flag pole, and we raised it, and it was just like
> the Iwo Jima raising, although we didn't plan that.  That's really
> the only way you can raise a flag, a hundred and some pound flag
> pole when you've got only seven or eight guys, and to me that was
> next to the birth of my first child probably the proudest moment of
> my life, and that was really the symbol of what we were there for,
> what we were doing in Beirut.

Id. at 106-07.

In the spring of 1983, Mr. Tumolo had a chance to return to the United States for a brief

vacation.  Id. at 108-09.  He testified that, before heading home to Ohio, he went to MSG

Battalion headquarters in Quantico, Virginia and:

> [P]urely by coincidence, Bob McMaugh's mother happened to be
> there, and she wanted to meet me.  So I got a chance to go and see
> her, and before I left, I also got a chance to go to Arlington
> National Cemetery, which everybody wanted us to do when you
> came back, and visit the graves of as many [as] you could while
> you were there and, of course, see Bob's grave.  I did manage to do
> that as well.

Id. at 109.  When asked how he felt about visiting these graves Mr. Tumolo testified:

> It's really hard to explain, but if you've ever had your heart broken,
> which most of us have, it's that feeling inside that kind of never
> leaves.  I remember borrowing somebody's car to go to Arlington
> National Cemetery.  That night, it was a down pour . . . and I had
> the map where he [Robert McMaugh] was buried, and I drove out
> there in this pouring rain.  I must have walked around the cemetery
> for a half an hour.  I finally said out loud – luckily there was
> nobody there to see this – Bob, where in the hell are you?  And I
> happened to look down between my feet, and there is this little
> plastic three-by-five grave marker.  I was standing right on top of
> his grave.  It was eerie, but it made me feel like I had done
> something for him. I think, you know, up there he's looking down,
> and it was just a matter of I had to do it.

101

Id. at 109-10.  After leaving Quantico, Mr. Tumolo went home to Ohio, where his family held a small celebration upon his return. Id. at 110.

Mr. Tumolo was also in Beirut in October 1983, when the Marine barracks at the airport were bombed, testifying that he and a group of Marines were playing softball at AUB "when a specific call sign came over the radio, which was red dog, and red dog meant that something really, really bad had happened." Id. at 113.  The Marines raced back to the Embassy, "and reports started coming in about what had happened, and they anticipated a very high casualty rate, and once again we were back to – it was very reminiscent of that day, the day of April 18, because we knew there was going to be a lot of loss of life." Id. at 114.

Mr. Tumolo left Beirut in March 1984. Id. at 119.  He received a Purple Heart and a Navy Commendation and Navy Achievement Award, medals awarded "by the Department of Navy for actions and your performance in a hazardous type of environment," for his service in Beirut. Id. at 118-19.  After leaving Beirut, he reported for MSG duty in Rome. Id. at 119.  He remained in Rome for eighteen months and, after leaving Rome, requested and was approved for a discharge from the Marine Corps. Id.  Upon his return to the United States, he, after living with his mother for a short period of time while his fiancée finished her posting in Rome, sought and obtained employment with the federal government, and has been so employed ever since. Id. at 121.

Mr. Tumolo never sought any psychiatric treatment in connection with his experiences in Beirut, stating that:

> There was a mental health professional, if you will – I don't know
> if she was a psychologist or a psychiatrist – that came out.  The
> State Department sent somebody out to kind of talk to everybody,
> and they talked to the Marines that were there, and we spoke, but I
> had no issues.  I have never been seen professionally after that for
> any type of treatment.

102

Id. at 120-21.  He added that:

> [A] lot of the events are so fresh in my mind . . . I'll come across –
> I'm [sic] be doing something at home, and I'll get a whiff of
> concrete powder out in the yard, and that brings back something . .
> . I have sort of hardened.  I think like I have this ice shell.  You
> know, you see things or witness terrible events.  The Oklahoma
> City bombing, we talked about it, the September 11 attacks.  I was
> more angry than sad when I had seen those things.  Perhaps I
> should have been more sad, but I just couldn't find it.  I was just
> angry.

Id. at 121-22.  See Dammarell I, 281 F. Supp. 2d at 190 (discussing expert testimony that "a

sound or a smell or a certain cue may make a victim [of trauma] suddenly re-experience [the

underlying event] as much as to sort of remember it in the past, but to feel as if they are there and

reliving it again" and, similarly, events such as Oklahoma City bombing and September 11, 2001

attacks may trigger memories of a trauma and bring onset or recurrence of psychological

symptoms of trauma).

Mr. Tumolo explained that the bombing has had a continuing impact on his life:

> [I]t's made me appreciate everything I have.  I take nothing for
> granted, and every day I wake up is a bonus.  I don't know how
> else to put it.  Again, it's made me a little perhaps more cynical
> about certain things, but it's changed me.  I think I went from being
> 19 years old that day to being 30 years old, on the inside at least.  I
> would say that's what it did.  It changed me on the inside.  It makes
> you grow up a little bit faster.

Tr. Vol. VIII at 124.

When asked why he elected to participate in this litigation, Mr. Tumolo responded:

> Well, I was home on Saturday when I got the letter from Ms.
> Dammarell, and when I first opened it up, you know, had all those
> memories again and felt inside that sick scary feeling that you get.
> But, to me, to not participate in this process would be simply
> unpatriotic.  That day was an attack on our country and an attack

> on us as individuals.  It was my duty.  So that's why I am
> participating.

Id.

As a member of the United States Marines stationed overseas, Mr. Tumolo retained as his

domicile in 1983 the state in which he last resided.  See Dammarell II, 2005 WL 756090, at *22.

He was born and raised in Ohio and enlisted in the Marines immediately after graduating from

high school.  While in the Marines, he was only in the United States for various trainings.

Therefore, the law of Ohio applies to Mr. Tumolo's claims.

Based on the pleadings and the evidence presented to the Court, Mr. Tumolo has stated a

valid claim for battery under Ohio law and is entitled to recover compensatory damages from

defendants "for the real injury received, including the physical and mental pain as well as the

direct loss in earning capacity."  See Lakeshore Elec. Ry., 1911 WL 1631, at *2.  The expert

economic analysis presented to the Court demonstrated that, as a result of the Embassy bombing,

Mr. Tumolo suffered $107,000 in economic losses, specifically in lost income. Phase II Exh. 1 at

30-32.  The Court further values the loss associated with his physical pain and suffering and

mental anguish at $750,000.  Because Mr. Tumolo can recover for his mental anguish under his

battery claim, it is not necessary to consider his intentional infliction of emotional distress claim,

which would result in an impermissible double recovery.  Accordingly, the Court should award

Mr. Tumolo $857,000 on this default judgment.

### 2.     Estate and Surviving Family Members of Kenneth Haas

#### a.     Estate of Kenneth Haas

Kenneth Haas ("Mr. Haas"), the son of Plaintiff Gene Haas, husband of Plaintiff Alison

Haas, and father of Plaintiff Alexander Haas, was a federal government employee assigned to the

United States Embassy in Beirut, Lebanon. Tr. Vol. VII at 30-31 (testimony of Alison Haas); Phase II Exh. 25 at 8 (Declaration of Gene Haas).  Mr. Haas was killed in the bombing of the Embassy on April 18, 1983. Tr. Vol. VII at 29-30.  The Estate of Kenneth Haas is represented by his father Gene Haas, as Executor, for purposes of this litigation. Tr. Vol. VII at 47; Phase II Exh. 25 at 1; Phase II Exh. 23 (probate papers for the Estate of Kenneth Haas).

Mr. Haas was born on June 17, 1944 in Akron, Ohio, and was an only child. Phase II Exh. 25 at 1; Tr. Vol. VII at 30.  He was a United States citizen. Tr. Vol. VII at 30.  Mr. Haas graduated from Brecksville High School in suburban Cleveland, Ohio. Phase II Exh. 25 at 3.  At the urging of his high school football coach, he attended Morningside College in Sioux City, Iowa. Id. at 4.  In 1964, while a junior at Morningside, Mr. Haas married his first wife, Claudia. Id.  In 1967, he graduated with honors. Id. at 5.

Mr. Haas' mentor in the Philosophy Department, Dr. Joe Umera, encouraged him to consider graduate studies, and helped him secure a grant-in-aid to attend Syracuse University. Id. at 4-5.  Mr. Haas earned his Ph.D. in Philosophy from Syracuse in June 1969, just two years after he graduated from Morningside. Id. at 5.  At the time, he was the youngest male graduate ever to receive a doctorate in Philosophy from Syracuse. Id.

While Mr. Haas was at Syracuse, his mentor Dr. Umera had become head of the Philosophy Department of Hamline University in St. Paul, Minnesota. Id. at 6.  Dr. Umera encouraged him to apply for a position at Hamline, and, in the fall after graduating from Syracuse, he joined the Hamline faculty as an assistant professor of Philosophy and Logic. Id.

After four and a half years at Hamline, Mr. Haas took a position with the federal government. Id. at 7.  Though he initially relocated to Washington, D.C., Mr. Haas and his wife

Claudia subsequently moved around "a good deal." Id. at 7-8.  In April 1975, his son Alexander

Haas was born. Id. at 8.  Mr. Haas and his wife Claudia subsequently separated, and ultimately,

were divorced. Id.

While in Saudi Arabia on a business trip, Mr. Haas first met his second wife, Alison

Haas, who was living there as a dependant of another federal government employee. Tr. Vol. VII

at 31-32.  They were married in July 1982. Id. at 32.  Immediately after their wedding, Mr. Haas

moved to Beirut in July 1982, and his new wife joined him shortly thereafter in October. Id. at

33-34.  Mr. Haas was at work at the Embassy on April 18, 1983, when it was bombed. Id. at 37-

38.  He sustained fatal injuries in the attack. Id. at 29-30.

Plaintiffs assert that either the law of Ohio, where Mr. Haas was raised and where his

estate was probated, or the law of Virginia, where Mr. Haas last lived and where he had the most

significant professional contacts while living overseas, should apply to the claims of his estate.

Pls. Mem. in Supp. of State Law Claims at 93-94.  Under the general rule applied in this case,

that the domicile of the estate shall be the same as the domicile of the decedent on the date of the

bombing, see Dammarell II, 2004 WL 756090, at *22, the law of Virginia would apply to the

Estate of Kenneth Haas' claims.  However, for the reasons discussed below, the Court will

deviate from the general rule in this case and apply the law of Ohio to the claims of his estate.

Based on the evidence before the Court, there is no one who has standing to bring a

wrongful death claim under Viriginia's wrongful death statute on behalf of Mr. Haas'

beneficiaries.  Under the Virginia statute, a wrongful death claim may only be brought by the

personal representative of the estate, see Va. Code § 8.01-50, and state and federal courts in

Virginia have held that foreign administrators do not have standing within the meaning of the

wrongful death statute, unless they have been qualified pursuant to Virginia Code § 26-59.[7] See Fowler v. Winchester Med. Ctr., Inc., 580 S.E.2d 816, 817 (Va. 2003) (a foreign administrator does not have standing to bring a claim under Virginia's wrongful death statute unless they have been properly qualified pursuant to Va. Code § 26-59); Holt v. Middlebrook, 214 F.2d 187, 190-91 (4th Cir. 1954).

Kenneth Haas' estate was probated in Ohio, where his father was appointed as Administrator. See Phase II Exh. 23. There is no evidence before the Court that his father, or anyone else, has ever been qualified in Virginia to function as a personal representative of Mr. Haas' estate. As a result, there is no one who has standing to bring a wrongful death action under the Virginia statute on behalf of the estate's beneficiaries. In contrast, Gene Haas, as Administrator, unquestionably has standing to bring a wrongful death claim under Ohio's statute.

The choice of law determination in this case is governed by the law of the District of Columbia. Dammarell II, 2005 WL 756090, at *18. "The District of Columbia employs a 'constructive blending' of the 'governmental interests' analysis and the 'most significant relationship' test." Id. (citations omitted). Applying this approach, Judge Bates determined that "*the general* rule in these claims should be the application of the law of the state of domicile of . .

---

[7] Virginia Code § 26-59 provides, in essence, that a person that resides outside of Virginia, who would otherwise be qualified as a personal representative under Virginia law, can become qualified by providing written consent to the clerk of the court "that service of process in any action or proceeding against him as personal representative . . . or any other notice with respect to the administration of the estate, trust, or person in his charge in [Virginia] may be by service upon the clerk of the court in which he is qualified or appointed, or upon such resident of [Virginia] and at such address as he may appoint in the written instrument. Va. Code. § 26-59. The statute further provides that "where any nonresident qualifies . . . pursuant to this subsection, bond with surety shall be required in every case, unless a resident personal representative, trustee, or fiduciary qualifies at the same time or the court or clerk making the appointment waives surety . . . ." Id.

. the decedent in the case of an estate." Id. at *22 (emphasis added).  Judge Bates pointed out that,

although the various factors in the "constructive blending" approach can point a court in any

number of directions, the "law of the injured person's domicile" typically governs the issue of

compensatory damages in wrongful death actions arising out of mass disasters because that state

"has an important and obvious interest in ensuring that its residents are fully and adequately

compensated for tortious harm." Id. at *19 (citations omitted).  Although it appears that Mr. Haas

and his second wife briefly lived in Virginia before moving to Beirut and that Virginia is where he

had the most significant professional contacts while living overseas, it also appears that Mr. Haas

had sufficient contacts with Ohio on the date of his death for Ohio to apply to the claims of his

estate.  Specifically, although there is no specific evidence before the Court, Mr. Haas would have

had to have had sufficient connections to Ohio at the time of his death for Ohio to have asserted

jurisdiction over his estate.  Accordingly, it is appropriate under the circumstances for the law of

Ohio to apply to the claims of the Estate of Kenneth Haas.

Based on the pleadings and the evidence presented to the Court, the Estate of Kenneth

Haas has made out a valid claim for wrongful death under Ohio law and is entitled to recover

compensatory damages, for the benefit of his surviving wife, son, and father, for their loss of

support from his reasonably expected earning capacity, loss of his services and society, loss of

prospective inheritance, and their mental anguish. See Ohio Rev. Code § 2125.02(A)(1).  The

expert economic analysis presented to the Court demonstrated that, were it not for Mr. Haas'

untimely and wrongful death, he would have earned wages, benefits, and retirement pay

amounting to $2,193,000. See Phase II Exh. 1 at 16-18.  The Court, therefore, should award the

Estate of Kenneth Haas, by Gene Haas as administrator, $2,193,000 for the benefit of his

108

surviving wife, son, and father.  The precise distribution of this award is for the probate court in

Ohio to determine, see Ohio Rev. Code § 2125.03(A)(1), but this Court recommends that 75% of

the award be distributed to Mr. Haas' surviving wife, Allison Haas, because she would have been

the primary beneficiary of her husband's income had he survived, and 25% to Mr. Haas' surviving

son, Alexander Haas, because, as a young child as the time his father's death, he would have been

one of the primary beneficiaries of his father's income had he survived.  In contrast, there is no

evidence before the Court that Gene Haas would have received any financial support from his son.

As for the intangible aspect of the estate's wrongful death recovery, the Court will address those

awards below, beneficiary by beneficiary.  In recommending the following awards, the Court

recognizes that they are to be added to the total amount awarded to the estate and that it is for the

probate court in Ohio to determine the precise distribution of the award.

### b.     *Allison Haas*

Plaintiff Anne Alison Haas ("Ms. Haas") was born on November 24, 1953 in Fairfax,

Virginia and is a United States citizen. Tr. Vol. VII at 29.  She currently resides in Columbia,

South Carolina. Id.  Ms. Haas is the widow of Kenneth Haas, who was killed in the April 18, 1983

bombing of the United States Embassy in Beirut. Id. at 29-30.

Ms. Haas first met her husband around 1978, when she was living in Saudi Arabia as a

dependant of a federal government employee, and Mr. Haas had come to Saudi Arabia on

business. Id. at 31.  Explaining how they met, Ms. Haas testified that the government was "putting

people up in other people's houses, and Ken ended up in my house" and there was an "instant

rapport" between the two. Id. at 31-32.  Mr. Haas eventually left Saudi Arabia to return to his

posting and Ms. Haas came back to the United States. Id. at 32.  The only contact between them

for the next couple of years were a couple of letters. Id.  But in December 1981, Ms. Haas

received a call from Mr. Haas stating that he was coming back to the United States. Id.  As Ms.

Haas testified:

> I got a call from him saying he was coming back to the United
> States, could I pick him up at the airport.  I said, Yeah, sure.  So we
> began dating that night and moved in with each other about a month
> and a half later and were together until we got married in July of
> '82, and it was – I think you have to be young and – we were totally
> in love.  It was a wonderful time.

Id.

According to Ms. Haas, at the time they were married, her husband "was considered a

rising star" in the government. Id. at 30.  As Ms. Haas testified:

> He had had several assignments and they were all extremely
> important in the Government.  They didn't always start out to be
> that way, but because of political events and him being in the right
> place and having the abilities that he had, he really was almost
> having a charmed life as far as his career was going, and he was
> offered a very important job at the embassy at Beirut actually a
> couple of years before he took it because there was some training,
> French language and so forth, that he had to go through.

Id. at 30-31.  After his marriage, he had some new reservations about taking the Beirut

assignment, as Ms. Haas testified:

> [H]e said that . . . if he had known that he and I would get together
> and be married, he would not have accepted that assignment
> because it was very dangerous, and he had a premonition that he
> wasn't going to live through it, but, you now, he said he was going
> to go ahead, but he did regret it.  It was a very prestigious post, and
> as a single person, that was one thing.  As a married person, it was
> something else.

Id. at 32-33.

Mr. Haas left for Beirut in mid-July 1982. Id. at 33.  Because dependants had been

evacuated from Beirut, Ms. Haas was not able to join her husband until late October. Id. at 34.

Ms. Haas testified that Mr. Haas had premonitions that he would not return from Beirut alive, as

Ms. Haas explained:

> He just said he didn't think he was going to live through it, although about three weeks before the bombing, one night in the kitchen, he was kind of smiling and said, I think I'm going to live; I think I'm going to make it through this.  And so that was totally wrong, but you know, he couldn't explain it, . . . he had spoken to me several times about what I should do as a young widow, and I kept telling him stop it, he was being ridiculous.  And he said, No, no, six months after I'm gone, you won't even remember me.

Id. at 33.  Ms. Haas told her husband that if he ever died, she would never remarry. Id.

Remembering the morning of April 18, 1983, Ms. Haas testified:

> That morning as a little different than usual because the American school needed a substitute teacher for about the last six weeks of the school year . . . So I said I was going to go apply for this teacher position, and I went there and got back to the embassy at about 10:00 or 10:30 that morning, and I went around and talked to all the people in the office.
>
> . . .
>
> I always took lunch to Ken.  I always made sandwiches and we ate at the office every day between 12:30 and one, but because there had been a very contentious meeting that morning, he called me and said let's eat now, eat early.
>
> So we ate. I pulled out the apple that I always brought to peel it at about a quarter to one, and he no, he was too upset, to put the apple away.  And so [sic] I okay.  I picked up a magazine and sat down next to the window and said I'll wait.  He said no; I've got one more cable to write.  He said, I don't know how I'm going to do it; you go ahead and go home and take a nap and I'll be home when I finish. So I went over, and he took my head in both of his hands, and he gave me a great big dramatic kiss, and I said, See you later.

Id. at 37-38.  However, Ms. Haas did not want to leave the Embassy yet, so she went to the travel

section, the nurse's office, and the commissary to take care of errands, but they were all closed. Id.

at 38.  Ms. Haas testified that, with nothing left do, she "very reluctantly left the embassy a very

few minutes before one o'clock and got in the car and drove home." Id.

> Ms. Haas had just gotten home when the bomb exploded:

> I had just gotten to the apartment and was bending over to change
> my shoes, and this enormous explosion happened, and there were
> two giant concussions.  I stood up and said, Well, that was a big
> one, but the attitude that everybody had was, you know, they
> weren't after us, nobody was after us . . .

> So . . . I just stood up and said, Well, that was a big one.  But again,
> it never entered my mind that the Americans had been the target.
> So I ran around the corner to Smith's Grocery and got Ken some
> cigarettes, and I was walking back, and as I was, crowds had
> gathered and you could see a great big just cloud, plume of smoke
> and ashes and things falling, and I heard the little green grocer on
> the side say [speaks in Arabic].  I turned to her, and said [speaks in
> Arabic], and that means American Embassy.  And she nodded.

> So I got the cigarettes and went running home and immediately
> started trying to call the embassy, but I just got a busy single [sic],
> and I thought, Well, you know, it's okay, because there were some
> news reports coming over the radio in French saying it was the visa
> section and that maybe two or three people had been killed.  So I
> thought Ken is just trying to work and help to get everything
> organized and settled.  So I didn't expect to hear from him for a
> while.

Id. at 38-40.  Around 3:00 or 3:30 p.m., Ms. Haas received a call from the defense attaché's wife,

who indicated that she had, by this point, heard from her husband. Id. at 40.  Realizing that her

husband could be hurt, Ms. Haas testified that she:

> went running out the door and got in a car and went down to the
> embassy.  You couldn't get very close to the embassy at all because
> the Marines were there and there were helicopters overhead and

people just swarming.  I got out of the car and started running toward the embassy, and I was coming up on one of the blind sides on one of the wings, and several Marines tried to stop me with weapon and stuff.  I wasn't going to be stopped.

I just kept running and running, and finally I got right up next to the embassy, but I never got around to see the damage.  They stopped me . . . .

And then I was getting a little bit hysterical.  There was a story that Ken and I had like a lot, "The Hound and [sic] the Baskervilles," and the clue was the dog didn't bark.  So all of a sudden, I started saying, Murray, the dog didn't bark, The dog didn't bark.  I hadn't heard from Ken, and that's how I knew something was wrong.  So they took me – they wouldn't let me go around the corner, so I never saw the damage, and I think we ended up in the ambassador's residence . . . I'm not sure, but we were all in a room, and I remember the ambassador coming and kneeling in front of me and saying the office took the direct force of the blow, and I said they could be in an air pocket, they could be trapped.  And so you just keep hoping and keep hoping.

Id. at 40-42.  At some point, Ms. Haas with some others, ended up back at her house. Id. at 42.

She remembers that, all night, she kept "looking out the window all night long, just waiting." Id.

When the sun came up, Ms. Haas remembers thinking, "the sun came up, and I still can't

understand how that happened, such devastation and the sun came up." Id.

For the next two or three days, she waited to hear word about her husband. Id.  She

testified that:

There was always somebody sitting with me there, and they brought the Marine doctor in at one point because I wasn't eating and I wasn't sleeping.  They gave me some codeine.  Then they gave me some more.  And I remember Ruth Craig looking at the doctor, saying, Can't you do something?  He said, She ought to be flat on her back.  It just never had any affect on me.

Id.  By this time, government officials had arrived from Washington to try to organize the

situation. Id. at 42-43.  Ms. Haas recalled that, early on the Wednesday or Thursday morning after

the bombing:

> Murray [McCann] came to the house and said they found him.
> They had broken into the space that was his office, and they found
> Ken.  And I said, Is he alive?  He said no.
>
> And it looked instantaneous . . . .

Id. at 43.  After her husband was confirmed dead, government personnel packed the Haas'

belongings and helped Ms. Haas return to the United States. Id. at 43-44.

Ms. Haas attended the memorial service held at Andrews Air Force Base:

> I remember very clearly President Reagan coming down and
> shaking everyone's hand, and he seemed truly distressed.  He really
> did seem very weak, and I remember it was the first time I had seen
> the coffin.  I hadn't wanted to see it, hadn't wanted – I never was
> sure which one was Ken's.  You know, I remember talking and
> crying, but I don't remember – I just remember being there, just
> being there, and I remember going back to [the] hotel where they
> kept us and the flags were all half-mast all along the road.  I
> remember seeing that.  I remember all the families in the hotel
> where they put us, and I remember going around and talking to all
> of them and, you know, being able to tell what their loved ones had
> been doing up until the end when it happened.

Id. at 44-45.  She also vividly remembers the funeral later held for her husband:

> It was in Arlington.  Just before we left – before we had gone to
> Beirut, we had had Alex, his son, and his parents were up here – I
> think it was the summer of `82 – and had gone to Arlington, and a
> general or somebody very high ranking was being buried at the time
> we were there, and they had a fly-over with some jets in the
> missing-man formation, and it had just touched us all very deeply.
> And Ken had said, If I died, nobody would come to the funeral.  He
> was quite wrong.  There were a lot of people, a lot of people there.
>
> And it had been raining all that day, and I remember they opened
> the hearse, and you could smell the body, but just as the ceremony
> was starting, the clouds parted and sun came through.  It was a little
> bit of sun through some clouds, and it was emotional.  I remember

114

> just turning to everybody, not knowing what to do or anything.  I
> just thanked them all very much for coming, and I said Ken didn't
> think anybody would come to his funeral.  We had a lot of friends,
> and I do remember Senator Thurmond came.  I had worked for
> Senator Thurmond for a couple of years, and he came to the funeral,
> and I was very impressed with that.

Id. at 45-46.

After her husband's death, Ms. Haas went to South Carolina to be with her parents. Id. at

50.  Looking back on this period in her life, Ms. Haas testified:

> I just remember being totally devastated, and people use that word
> very lightly, but to be truly not knowing where you were, what you
> were supposed to do, I was completely lost.  I tried to kill myself by
> not eating and I lost about 30 or 35 pounds, but my mom said as
> soon as you get too weak and can't fight back, we'll give it to you
> intravenously and you will live.
>
> I prayed for death every night, because clearly, clearly a mistake had
> been made, because every day I was in his office.  I would have
> been there that day, and I tried three different things to stay at the
> embassy, and I just did walk out minutes before it happened.  So I
> figured God had made a mistake.  So I was just going to correct
> that, and that wouldn't be a wrong thing because clearly a mistake
> had been made and I should have been there.
>
> I remember crying and screaming, screaming and yelling, no, no,
> no, just all the time, and my parents wouldn't leave me alone
> because they were afraid I would do something, and, that went on
> for months, I guess.  It just was the same thing.
>
> And then, I mean, I prayed for death for a good couple of years, two
> and a half, three years, wondering why in the world I had to live and
> why I shouldn't have.  I shouldn't have.  And after about six
> months, though, in October, I decided I was going to go to the
> Federal – to take a job with the Federal Government.  I had more of
> a chance of getting into harm's way outside of my family's home
> because they were taking such good care of me.
>
> But that didn't happen.  So eventually you realize you've got to go
> on and live and you've got to do something.  So I had the job with
> the Government, and that did give me something to focus on and

115

> something to think about, you know, and try to put layers of
> experience and feeling on top of the hurt.

Id. at 50-51.

When asked if that pain diminished over time, Ms. Haas testified:

> Well, the way I dealt with it was to suppress it, to put things on top
> of it and get as much experience and get as much focus somewhere
> else, and I learned to talk about it pretty good . . . But it's just you
> live with it.  It's part of you.  You've got no choice, and so, you
> know, you just keep going.  You have to.

Id. at 51-52.  Yet, despite this pain, Ms. Haas explained: "I'm very glad that I knew Ken.  I would

never have not wanted to have that.  Most people don't have that kind of happiness and that kind

of feeling and that kind of experience in life." Id. at 52.

Ms. Haas did not seek psychological counseling because she felt that loss such as hers is

"something that everybody has to deal with themselves, and I didn't see where somebody talking

to me was going to make a bit of difference." Id.

Ms. Haas has never remarried, explaining:

> I have taken great pains, in fact, to not even be able to be considered
> common law.  I have paid for everything, continue to consider
> myself Alison Haas.  The kids don't quite understand it, but that's
> okay, and in the south, you know, some feathers are being ruffled
> because it's an unusual position to take; but, no, I have not, never
> been close.
>
> Yeah. I mean, I'm married to him, and I wouldn't have believed it
> before, but in my – for me, we are truly married, and death actually
> doesn't part that.  If you feel connected at the soul and you know
> you're going to see them again, you're still married, but you have to
> go on living and you have to go on forming other relationships
> because that's what life is about, like it or not.

Id. at 53-54.

When asked why she decided to participate in this litigation, Ms. Haas stated:

116

> I really felt like the embassy in Beirut bombing was kind of swept
> under the rug after it happened.  There was never any – at the time,
> there was no blame.  Nobody tried to get to the bottom of it . . . six
> months later the exact same thing happened at the Marine barracks,
> and over 200 Americans were killed.  So people focused on that as
> kind of the beginning of the targeting of Americans in a big way,
> but, in fact, it started with the Beirut Embassy.
>
> . . . I feel like we were the beginning, and I would like to have those
> people remembered.

Id. at 54-55.

Based on the evidence presented to the Court, including the testimony of Allison Haas, the

Court should award the Estate of Kenneth Haas, by Gene Haas as Administrator, $10 million to

compensate for Allison Haas' loss of her husband's services and society, as well as the mental

anguish that she suffered as a result of her husband's untimely death.  See Ohio Rev. Code §

2125.02(A)(1); Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for

solatium claims).

### c.     Alexander Haas

Plaintiff Alexander Haas ("Mr. Haas") is the son and only child of Kenneth Haas, who was

killed in the bombing of the United States Embassy in Beirut. Tr. Vol. VII at 57, 59.  Mr. Haas

was born on April 6, 1975 in Falls Church, Virginia, and is a United States citizen. Id. at 56.

His parents separated and then divorced when he was still very young. Id. at 58.  Mr. Haas

testified that he only remembers "bits and pieces" of his father prior to his parents' divorce, such

as, "I remember riding in a car with him.  I remember playing Legos on the carpet, things like

that." Id.  He has clearer memories from the period after his parents' divorce, at which time he and

his mother had moved to a small town in Wisconsin. Id. at 58-59.  Mr. Haas remembers that, even

though his father "was overseas quite a bit," he "received a lot of letters from [his father]," and

generally saw him when he was in the United States "for any significant period." <u>Id.</u> at 59.

Mr. Haas last saw his father in the summer of 1982, prior to his father's departure for

Beirut. <u>Id.</u>  Mr. Haas had turned eight on April 6, 1983, the week before the Embassy bombing.

<u>Id.</u> at 59-61.  The last time that he spoke with his father was in a telephone call from Beirut, which

he thinks was a call from his father to wish him a happy birthday in early April. <u>Id.</u> at 59-60.

Remembering that call, Mr. Haas testified:

> I told him that I was afraid that something would happen to him,
> and, you know, as I recall it, . . . he promised me that nothing would
> happen to him, that he would be fine, and it wasn't two weeks later
> that the bombing happened.

<u>Id.</u> at 60.

When asked how he learned that his father had been killed in the Beirut Embassy

bombing, Mr. Haas testified:

> Well, a lot of that period is kind of hazy.  I don't really remember it
> particularly well, but I remember seeing it on TV or hearing it on
> the radio, and I knew my dad was at the embassy, and I just
> remember there was this long period of waiting after we had heard it
> had happened, and at some point, I think it was my grandfather
> Gene Haas who called, and as soon as the phone rang, I kind of
> knew.  I just said, He's dead, isn't he?  I just ran to my bed and tried
> to hide, and that's how.

<u>Id.</u> at 60.  Shortly after his father's death, Mr. Haas's mother received a phone call from then-Vice

President George Bush offering his condolences. <u>Id.</u> at 60-61.  Mr. Haas did not have a chance to

speak with Vice-President Bush, testifying, "I remember that the phone rang and she was talking

to somebody, and at some point, she said, Well, he's right there; you can tell him yourself if you

want.  But then later she told me he didn't really want to talk to me." <u>Id.</u>

118

Mr. Haas did not attend any of the official ceremonies held in Washington for the victims of the Beirut Embassy bombing. Id. at 61.  As he explained, "I didn't want to go to any of those things. I don't know if an eight-year-old is competent to make that kind of decision.  In retrospect, I feel very bad that I didn't go." Id.  In the aftermath of his father's death, Mr. Haas "didn't want to talk to anybody about it.  There was all this stuff on the TV.  There was coverage of the memorial service.  I refused to watch any of it." Id. at 62.

Although Mr. Haas had not gone to Washington for the ceremonies, later that summer, he went with his mother and father's grandmother to visit his father's grave at Arlington Cemetery. Id.  Mr. Haas testified that, once they arrived, "I wouldn't get out of the car, I remember, and my great-grandmother and my mom tried to convince me for a long time, and I just laid down in the back seat." Id.  When asked why he did so Mr. Haas responded, "[w]ell, I was so used to my dad being gone that I think I just didn't want to accept that he was dead." Id.  Mr. Haas's mother brought a dogwood tree to the cemetery, and planted it at the grave site and Mr. Haas testified that "[w]e didn't ask anyone whether we could do it.  So we just did it.  But it's still there." Id. at 63.

When asked how he has dealt with the loss of his father in the ensuing years, Mr. Haas answered:

> Mostly through repression, not thinking about it and trying to ignore it.  You know, it's like there's this gaping wound underneath, deep inside of me that I don't think will ever go away, but most of the time, if I'm just dispassionate and don't think about it and focus on my work or my family, then it doesn't come to the surface, but whenever I think about it, when I read the opinion in the case, I get very emotional.  It was very hard for me living in such a small town, because everybody in a town that size knows everybody else, and so everybody knew.  I stayed out of school for a couple of weeks, but everybody knew when I came back what happened, and I just pretended that I was okay.  And so there's been this – all these years that I've been fine when I really haven't.

> But it made me very isolated, withdrawn. I'm not very
> communicative about my feelings. It's been very difficult to have
> close relationships with other people. My mom never remarried, so
> it was just her and I. I was very isolated. My father didn't have any
> siblings. It was an isolating experience.

Id. at 63-64.

Mr. Haas testified that he has missed his father's presence at the many joyous occasions in life, such as his wedding and the birth of his two children, explaining that "[t]here are all these happy points in my life where I'm nearly in tears because I can't share them with my dad. I remember at my wedding, I nearly lost it because – when I was hugging my grandfather, and the same with my kids." Id. at 65. He further testified "you know, I'm 28 years old and I feel like an old man already, that half my life is gone, but I have this irrational belief that I won't see my kids grow up, and it just terrifies me." Id. Mr. Haas has not sought any individual counseling to help him deal with the loss of his father, although his mother occasionally tried to get him to go, but he and his wife have sought and are getting marriage counseling and have "talked about the incident in there." Id. at 65-66. Mr. Haas testified that the loss of his father continues to have an impact on him, stating "I've always heard what a wonderful person he is, but I have never been able to meet him or get to know him, learn for myself who he was. It's like this continuing weight on me. It's like a wound that will never heal." Id. at 66.

Mr. Haas attended the University of California at Berkeley, earning a Bachelor's Degree in Philosophy and Molecular Biology in 1997. Id. at 56-57. He subsequently earned his Juris Doctorate in 2002 from Berkeley's Boalt Hall School of Law. Id. In considering his various career options after law school, Mr. Haas stated that, because of his father death, he has chosen to

work in an office at the Department of Justice that "does a lot of terrorism cases, terrorism asset cases." Id. at 66-67.

When asked why he elected to participate in this litigation Mr. Haas testified, "I'd like my father to be remembered and I'd like the people who did this to be held accountable, but the eight-year-old part of me just wants revenge." Id. at 67.

Based on the evidence presented to the Court, including the testimony of Alexander Haas, the Court should award the Estate of Kenneth Haas, by Gene Haas as Administrator, $5 million to compensate for Alexander Haas' loss of his father's services and society, as well as the mental anguish that he suffered as a result of his father's untimely death. See Ohio Rev. Code § 2125.02(A)(1); Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### d.    Gene Haas

Plaintiff Gene Haas ("Mr. Haas") was born on September 17, 1922 in Huron County, Ohio, and is a United States citizen. Phase II Exh. 25 at 1 (Declaration of Gene Haas).  He is the father of Kenneth Haas, who was killed in the April 18, 1983 bombing of the United States Embassy in Beirut, Lebanon. Id.  Mr. Haas is participating in this lawsuit on his own behalf, as well as on behalf of the Estate of Kenneth Haas, as Administrator. Id.; Phase II Exh. 23 (papers for Estate of Kenneth Haas).

Ken Haas was the Haas' only child. Phase II Exh. 25 at 1.  Until his son was about eight-years-old, Mr. Haas was an over-the-road truck driver, and, therefore, was often away from home. Id.  His job also required the Haas family to move several times. Id. at 2.  While he and his wife were concerned about the disruption that this caused in their son's life, in later years his son told

him that he viewed the moves as an asset, "as every move meant making new friends and acquaintances, getting used to new rules, and learning new local cultures and customs." Id.

From the time that his son was very little, Mr. Haas "wanted to teach him to live without fear – fear of storms or ogres or ghosts in the closets or under the beds." Id.  As a result, he felt that his son "grew up without fear of anything or anyone." Id.  However, as Mr. Haas testified, he sometimes wonders if "[m]aybe this contributed to his request for the Beirut assignment that led to his untimely death.  I have thought about this many times over the last twenty years." Id.

One of Mr. Haas's proudest moments came when his son, then in his early teens, was asked, as part of a class assignment, to write about a man that he most admired. Id. at 3.  While the other students wrote about various historical figures, his son's paper was entitled, "Dad, the man I most admire and want to be like." Id.

Although they were both busy when his son was in high school, with his son working in the evenings and Mr. Haas working 55-70 hour weeks, they still found time to go fishing together whenever they had the chance. Id. at 3-4.  Indeed, fishing was something that the two shared up to the year of his son's premature death. Id. at 4.

At the encouragement of his high school football coach, Ken Haas went to Morningside College in Sioux City, Iowa. Id.  Although his son was "really too small for college football," Morningside granted him a "conditional" scholarship, to be renewed every semester if he maintained a certain grade point average. Id.  As Mr. Haas recalled, "[o]f course, Ken made the GPA requirement with plenty to spare, and the extra grants that he received, plus extra monies he earned working while in college, made it possible for us to pay the rest of his college costs." Id.

His son graduated from Morningside in June 1967, with special honors. Id. at 5. Remembering

the graduation ceremony, Mr. Haas testified:

> At some point during the ceremony, the Dean came to the
> microphone and started talking about the "male student" with the
> highest number of credit hours and other accomplishments. I paid
> little attention to what he was saying until he said 'Ken, will you
> come up here please?'
>
> Of course, my wife and I were stunned, having no knowledge
> whatsoever that our son would receive this honor. Ken was so low
> key about it. He never, either before or after, made much ado about
> the awards and commendations that he received, both in school and
> in his work life.

Id.

Remembering his son's subsequent graduation from Syracuse, where he was the youngest

male student to ever receive a Doctorate of Philosophy from Syracuse, Mr. Haas testified:

> When Ken was growing up, I had picked up the poor habit of
> calling him a "dumb ass" whenever he did something stupid. As the
> years passed I got out of that habit, and completely forgot about it.
> When Ken came off the stage after receiving his doctorate from
> Syracuse, he put his arm around me, kissed me, and said, "Dad,
> from now on you will have to call me Dr. Dumb Ass." I was
> stunned beyond words, but I don't think that to this day I have ever
> called anyone a dumb ass.

Id. at 6.

Explaining his reaction when he learned that his son was going to be a professor at

Hamline, Mr. Haas testified:

> I was delighted. With my son now a college professor at a
> wonderful school like Hamline, I no longer had any concern
> whatsoever about his future. My desire for him to join me in the
> trucking business, where we worked long hours all the time,
> disappeared as I saw him working on a campus with ivy covered
> buildings, tree-shaded walks, and lots of grass. I thought that this

> vision was much more than we could have ever hoped or dreamed
> for.

Id.  During this time, Mr. Haas had been transferred from Cleveland to Detroit, and then from

Detroit to Chicago, which was only 400 miles away from Hamline, so he visited his son on

several occasions. Id. at 7.

It came as a "surprise" to Mr. Haas when his son, after four and a half years at Hamline,

told him that he had accepted a government position, as Mr. Haas explained:

> I was disappointed – in just six more months Ken would have been
> made tenure as a full professor with all the attendant benefits and
> pleasures – but I tried not to let it show.  Trying to be a good Dad, I
> listened and told my son that if that was what he wanted to do then
> do so, but just make sure to give [his mentor] plenty of notice.

Id.  Once in government service, his son moved around a good deal. Id. at 8.  His

grandson Alex was born in April 1975. Id.  Mr. Haas noted that his son "was an excellent

father, who taught with both discipline and love." Id.

In the summer of 1982, his son was posted to Beirut. Id.  He heard from his son "only

infrequently once he arrived in Beirut, though when we did have contact, he repeatedly told us

that he personally feared relatively little." Id.

Remembering the morning of April 18, 1983, Mr. Haas testified:

> The morning of April 18, 1983 began with me going to work at 7:00
> am, as usual.  I met one of the other officers at the trucking
> company for coffee and he said, "Is your son ok?  They have
> bombed the hell out of us in Beirut."  I replied that Ken would be
> ok, because he was a tough kid and a survivor.
>
> At 9:00 the Chairman of the trucking company came in and said that
> I needed to call home.  I called, and my wife answered in tears.  The
> chairman then told me to go home, and not worry about work,
> stating "it will be here when you get back."

> From that point until Thursday morning, I lived off of cigarettes, coffee and booze. They were the longest days in my life. On Thursday came official word that my son's body had been located in the rubble of the Beirut Embassy. A colleague of Ken's from Beirut called, and said that death had been instantaneous, and that my son had not suffered. He had been in Beirut nine months at the time of his death.

Id. at 8-9. The next several days "ran together – it was a terrible time," as news crews from various television stations in Cleveland converged on the Haas home, and Mr. Haas and his wife made plans to travel to Washington, D.C. Id. at 9. As Mr. Haas explained, "I am not sure that I can properly assess what losing my son was doing to me at the time, but I do know that others around me thought that I was losing it. A Navy nurse spent quite a bit of time talking to me, and gave me medication." Id. He credits his wife for being his "strength" during this period. Id.

His trip to Washington, including the ceremony at Andrews Air Force Base and his son's burial at Arlington National Cemetery, "remain something of a mystery" to Mr. Haas. Id. But he remembers one moment from the burial service clearly: "it had rained all morning the day of Ken's burial at Arlington. Just as Ken's casket was lowered into the ground, the sun came out for ten minutes. My wife tapped me and said, 'See, God is watching.'" Id. at 9-10.

Describing the loss of his son, Mr. Haas stated:

> Losing a son is devastating and indescribable. There is an emptiness. I think about my son often, and about what might have been. I had looked forward to retirement, and being able to do things with Ken at that time. I had even thought, after Ken retired from government service, about buying a little trucking line and letting Ken run it.

Id. at 10.

When asked why he had elected to participate in this lawsuit, Mr. Haas stated:

I never in my wildest dreams thought that I would be part of any lawsuit of any kind.  I always believed that if I was right I would win my own battle, and if it looked to be a necessity I would go at it tooth and nail . . . .

And it is a shame, a terrible shame, that people such as those sued in this suit cannot personally be put through the same horrors, the same loss of loved ones, that they put us through.  And they laugh in our faces.  That is why I became part of this pursuit of justice.  I am 81 years of age and my hope has nothing to do with money.  My hope is to see the world know what beasts those people really are.

Id. at 10-11.

Based on the evidence presented to the Court, including the declaration of Gene Haas, see Phase II Exh. 25, the Court should award the Estate of Kenneth Haas, by Gene Haas as Administrator, $3.5 million to compensate for Gene Haas' loss of his son's services and society, as well as the mental anguish that he suffered as a result of his son's untimely death. See Ohio Rev. Code § 2125.02(A)(1); Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

## VIII.   PENNSYLVANIA

### A.      Causes of Action

#### 1.      Battery

Under Pennsylvania law, "the elements of the tort of battery are 'a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent.'" Levinson v. Souser, 557 A.2d 1081, 1088 (Pa. Super. Ct. 1989) (quoting Prosser & Keeton, Law of Torts, at 39 (5th ed. 1984).  "A bodily contact is offensive if it offends a reasonable sense of personal dignity." Herr v. Booten, 580 A.2d 1115, 1117 (Pa. Super. Ct. 1990) (quoting Restatement (Second) of Torts § 19).

A successful plaintiff in a battery action may recover compensatory damages, but the battery must have been the cause of the complained-of injury. See Gill v. Wentz, 173 A.2d 403, 403 (Pa. 1950).  Compensable damages may include actual costs resulting from the injury, such as medical expenses, as well as pain and suffering, disfigurement, and loss of bodily function. See Dommes v. Zuroski, 38 A.2d 73, 75 (Pa. 1944) (court properly instructed jury that they could award damages to compensate the plaintiff "for that pain and suffering and for that permanent injury such a sum as will fairly, as will reasonably, as will justly and equitably compensate the plaintiff for the pain and suffering that he has undergone and that he may undergo, and for the permanent injury that is his.").

### 2.      Intentional Infliction of Emotional Distress

Under Pennsylvania law, a plaintiff must demonstrate four elements in order state a claim for intentional infliction of emotional distress: (1) the conduct of the defendant must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) the conduct must cause emotional distress; and (4) the distress must be severe. Hoy v. Angelone, 720 A.2d 476, 482 (Pa. 1998) (citing Hooten v. Pa. Coll. Optometry, 601 F.Supp. 1151, 1155 (E.D. Pa. 1984)).  A successful plaintiff may recover compensatory damages for the emotional distress that resulted from the defendant's extreme and outrageous conduct, even if the distress did not result in any monetary loss. Pierce v. Penman, 515 A.2d 948, 953 (Pa. Super. Ct. 1986) (citing Reist v. Manwiller, 332 A.2d 518 (Pa. Super. Ct. 1975)).

### 3.      Survival Statute

Pennsylvania's survival statute provides: "All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more

127

joint parties or defendants." 42 Pa. Cons. Stat. § 8302. A survival action is brought by the personal representative of the decedent and is an action that the decedent himself could have instituted had he survived. In re Pozzuolo's Estate, 249 A.2d 540, 544 (Pa. 1969). "The measure of damages awarded in a survival action include the decedent's pain and suffering, the loss of gross earning power from the date of injury until death, and the loss of his earning power-less personal maintenance expenses, from the time of death through his estimated working life span." Kiser v. Schulte, 648 A.2d 1, 4 (Pa. 1994) (citations omitted).

### B.    Plaintiffs

#### 1.    Estate of Robert Pearson

Robert Pearson ("Mr. Pearson") was assigned to the United States Embassy in Beirut as a Program Officer with the US AID. Tr. Vol. VI at 15.

Mr. Pearson was born February 3, 1954, and was a United States citizen. Id. at 8. He died in 1991 from illnesses unrelated to the Beirut Embassy bombing. Id. at 5. The Estate of Robert Pearson is represented by George Saunders ("Mr. Saunders") for purposes of this litigation. Id. at 6; Phase II Exh. 17 (papers designating George Saunders as representative of Mr. Pearson's estate). Mr. Saunders and Mr. Pearson's mother, Lois Pearson ("Ms. Pearson"), testified on behalf of Mr. Pearson's estate.

Mr. Saunders and Mr. Pearson met at college, in 1972. Tr. Vol. VI at 6. According to Mr. Saunders, Mr. Pearson was a "tall, handsome, strong guy, . . . charming, outgoing . . . loved people, loved life." Id. at 7. Similarly, Ms. Pearson testified that her son was:

> [an exceptional] young man . . . very handsome and very personable and outgoing; loved people, just loved people. He was very caring and compassionate. . . . He was an independent thinker, and he was

an excellent student, and he did set a lot of goals, and he was
persistent about reaching them.

Id. at 34-35.

Mr. Pearson was raised in Devon, Pennsylvania. Id. at 8, 35.  He graduated from high

school in 1972, and thereafter attended Ohio Wesleyan University. Id.  During his junior year at

Ohio Wesleyan, he studied abroad in Dijon, France, where he first became interested in the Arab

world. Id. at 9, 36.  Sometime thereafter, he began studying Arabic and volunteering to help Arab

students with their English skills. Id. at 9.  By the time he graduated college, he was "totally

enthralled" with the Middle East and Arabic-speaking nations. Id. at 9-10.  As that part of the

world was also "very chaotic" and "needed a lot of help," he decided to seek a career in that area.

Id. at 10, 37.  In 1976, Mr. Pearson received a Bachelor of Arts in International Relations, with a

concentration on the Middle East. Id. at 8-9, 35-36.

Mr. Pearson intended to enter a graduate program in International Relations immediately

after college, but lacked the required course work. Id. at 10, 37.  He, therefore, moved to

Philadelphia, Pennsylvania and undertook further study. Id. at 10-11.  He also traveled during this

time, to France and the Middle East, and studied Islam and the Koran at a mosque. Id. at 37-38.

About a year after graduating from college, he was awarded a Rotary International Fellowship to

study in Cairo, Egypt. Id. at 11, 37-38.

In 1979, Mr. Pearson returned to the United States and enrolled in the Johns Hopkins

School for Advanced International Studies, graduating in 1981 with a Master of Arts. Id. at 12-13.

He then worked briefly for a consulting firm and accepted a short-term contract position with US

AID. Id. at 13-14; Phase II Exh. 18 (Mr. Pearson's resume).  Mr. Pearson joined US AID on a

full-time basis in 1982. Tr. Vol. VI at 14; Phase II Exh. 18.  His first posting with US AID was to

the United States Embassy in Beirut, where he arrived in 1982, and was tasked with improving

water and sewage treatment programs in Beirut. Tr. Vol. VI at 14-15; Phase II Exh. 18.

Mr. Pearson discussed his experiences in the April 18, 1983 bombing of the Embassy with

both Mr. Saunders and his mother. Tr. Vol. VI at 17-19, 45-46.  Based on what Mr. Pearson had

told him, Mr. Saunders testified that Mr. Pearson had been in the cafeteria at the time of the

bombing, eating lunch with a friend, plaintiff Anne Dammarell. Id. at 18.  Mr. Pearson told Mr.

Saunders that he had heard:

> a loud boom.  The room sort of just collapsed, exploded into fire
> and heat and everything, and somehow he got out of the building.  It
> [Embassy] was right across from the water, and he went to the
> water thinking that he would jump in because he was feeling hot –
> heat, intense heat.  Somebody grabbed him, put him in a cab, sent
> him to the hospital.  He had blood pouring out of his head.

Id. at 19.  To Mr. Saunders' knowledge, Mr. Pearson and Ms. Dammarell were the only two

people who were in the cafeteria at the time of the bombing to survive. Id. at 18.

Just a few days after the bombing, Mr. Pearson had memorialized the experience in a letter

to friends and family, writing:

> I am so glad to be alive.  For the first time in my life I thought that I
> would die: Surrounded by fire and light and smoke and sound I
> thought: 'Now I die Lord . . . I am ready'.  And in a flash of thought
> change I screamed inside no, and struggled to my feet, headed for
> the exit, or the direction that I thought was the exit, struck rubble
> which I could now see, turned towards the new source of light and
> fled through a huge opening in the wall for the sea.  I ran 100 yards
> or so to the seawall thinking to jump in and cool down or put the
> fire out that I thought to be covering my body and stopped.
>
> Fortunately, I realized jumping in the ocean was not a good idea.
> Then I wondered what I could do with my melted body, an eye I
> thought I had lost, hands I couldn't move, and a face so distorted.  I
> thought of my parents and a girl friend, how would they accept it,
> and then thought of my friend with whom I was just finishing lunch

> and turned back to the embassy, now a cloud of black smoke and
> rubble . . . .  Only one lone Lebanese soldiers [sic] was in sight,
> shooting into the air to chase off traffic . . . I walked back dazed and
> hurting towards the embassy.  The soldier looked at me with such
> complete fright in his eyes and motioned frantically 'to the
> hospital.'

Phase II Exh. 18 (Apr. 22, 1983 letter from Mr. Pearson).

Mr. Pearson's injuries included cuts from glass that became embedded in his face and

head, a detached retina, damage to his eardrum, and two displaced vertebrae. Tr. Vol. VI at 20, 24,

45-46, 49-51.  He described his injuries in a letter to the State Department about two years after

the bombing:

> I have been through a traumatic experience.  On April 18, 1983 at
> 1:05 PM a large projectile split open my scalp, my face was
> embedded with glass, cornea partially detached, and two vertebrae
> wrenched as I was thrown about 10 meters in the ball of fire that
> blew through the Embassy cafeteria in Beirut. . . .
>
> As much as I like to think all that is past, I am reminded often
> enough that aspects of that trauma are still with me.
>
> After some initial patch-up work in Beirut I returned to the States
> for a series of medical exams and plastic surgery.  By the end of two
> months all of the glass had been removed from my face and eye
> socket, my retina reattached and ear drum healed over with almost
> perfect restoration of both senses, and my other wounds and burns
> were no longer visible. . . .
>
> When I returned to Beirut in the summer of '83, aside from a few
> other annoyances, only my back still seriously bothered me.  I
> noticed a numbness in my left arm accompanied by pain in my
> upper back, shoulder and neck.  Some days my back would spasm.
> Some days I couldn't walk.  Everyday I was uncomfortable.

Phase II Exh. 18 (Feb. 20, 1985 Memorandum from Mr. Pearson regarding his Request for

Medical Leave).

Mr. Pearson's back problems have continued to cause him discomfort until his death in 1991. Tr. Vol. VI at 21-23.  He found some, but not full, relief for his back pain in Yoga, acupuncture, and other alternative therapies. Id. at 22, 51.

Ms. Pearson testified about the emotional toll the bombing had on her son, stating that "the whole trauma of the bombing" and "losing so many people.  He had to bury his boss at sea, lost the whole office staff that he was working with, to think everyone in the lunch room that they had seen minutes before were just gone." Id. at 50.  She felt that the experience "sobered him," but "there was no way [he] could make this any different than what it was." Id. at 52-53.  Mr. Saunders testified that Mr. Pearson also suffered from nightmares related to the bombing. Id. at 25.

Mr. Pearson left Beirut a few months after the bombing. Id. at 26.  After a period of time in the United States, he was posted to the United States Embassy in Cairo, Egypt, where he again worked on water treatment and sewage projects. Id. at 26-27.  He was stationed in Egypt until 1985, when he returned to the United States for medical testing. Id. at 27-28.  Ms. Pearson testified that her son could no longer work full days, in part because of the pain of his injuries suffered in Beirut. Id. at 53-54.  Around 1988, he left US AID on medical leave, which he had requested due to the lasting effects of the bombing on his health. Id. at 28-29; Phase II Exh. 18. While on leave, Mr. Pearson traveled in the Middle East, went to India to study Yoga (to help his back injuries), and started a non-profit organization in Philadelphia to help individuals who had been diagnosed with HIV/AIDS. Tr. Vol. VI at 31-30, 52.

For purposes of this litigation, the law governing the claims of Mr. Pearson's estate is the law of the state where he was domiciled at the time of the bombing. See Dammarell II, 2005 WL

756090, at *22.  As a federal government employee stationed overseas, Mr. Pearson retained as

his domicile in 1983 the last state in which he resided.  See id.  Plaintiffs argue that the law of

Pennsylvania should apply to the claims of Mr. Pearson's estate because he was raised in

Pennsylvania, went to college in Pennsylvania, and, after leaving US AID in 1988, returned to

Pennsylvania. Pls. Mem. in Supp. of State Law Claims at 18.  Moreover, Mr. Pearson's parents

live in Pennsylvania and his estate was probated there. Id.  Immediately prior to being posted to

Beirut, however, Mr. Pearson lived in the Washington, D.C. area, where he was a student at Johns

Hopkins, briefly worked for Booz Allen & Hamilton, and then was an intern with US AID. See

Phase II Exh. 18 (Mr. Pearson's resume).  Based on the evidence before the Court, it appears that

Mr. Pearson intended to spend all, or a least a significant portion of his career overseas and that he

did not intend for any of his brief stays in states other than Pennsylvania to be long-term, and

certainly not permanent.  Therefore, I find that the law of Pennsylvania applies to the claims of the

Estate of Robert Pearson.

Based on the pleadings and the evidence presented to the Court, the Estate of Robert

Pearson has stated a valid claim for battery under Pennsylvania law.  Although Mr. Pearson

passed away in 1991, under Pennsylvania's survival statute, his claims survived his death and

were properly brought by Mr. Saunders, as the personal representative of his estate. See 42 Pa.

Cons. Stat. § 8302; In re Pozzuolo's Estate, 249 A.2d at 544.  Via the survival statute, Mr.

Pearson's estate may recover damages for his "pain and suffering, the loss of gross earning power

- less personal expenses, from the date of his death through his estimated working life span." See

Kiser, 648 A.2d at 4.  The expert economic analysis presented to the Court demonstrated that, as a

result of the Embassy bombing, Mr. Pearson suffered $280,000 economic damages between the

date of the bombing and his death. Phase II Supp. Exh. 1 at 12-13.  No further information was presented to the Court regarding further economic losses.

With regard to Mr. Pearson's non-economic losses associated with the bombing of the Embassy, the Court values his physical pain and suffering and mental anguish at $5 million. Because the estate can recover for Mr. Pearson's mental anguish under the battery claim, there is no need for the Court to consider the estate's intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  Accordingly, the Court should award the Estate of Robert Pearson $5,208,000 on this default judgment.

### 2.      Estate of Phyllis Faraci

Nancy Phyllis Faraci ("Ms. Faraci") was born in Monessen, Pennsylvania. Tr. Vol. XI at 5. She was a United States citizen. Id.  Ms. Faraci was among the Americans killed in the April 18, 1983 bombing of the United States Embassy in Beirut, Lebanon. Id. at 4-5.  The Estate of Phyllis Faraci is represented by Ms. Faraci's brother, Philip Faraci, as Administrator, for purposes of this litigation. Id. at 6; Phase II Exh. 43 (papers for the Estate of Phyllis Faraci).

Ms. Faraci graduated from high school in Monessen, Pennsylvania in 1957. Tr. Vol. XI at 7.  After graduating from high school Ms. Faraci entered Douglas Business School in Pittsburgh, Pennsylvania, for secretarial and accounting studies. Id.  After graduating from business school in 1959, Ms. Faraci obtained a job with the federal government, where she worked continuously for the federal government until her death in 1983. Id. at 9-11.

After obtaining her initial government position, Ms. Faraci moved from Pennsylvania to Washington, D.C., moving into what was then known as the Mayflower Hotel for Women on Connecticut Avenue in the District. Id. at 10.  She lived there "for a while," until she moved into

an apartment over by Andrews Air Force Base in Suitland with some of her girlfriends from home. Id.

Phyllis Faraci never married. Id. at 5, 10.  She was however, very close to her extended family, which consisted of approximately "40 cousins, aunts, and uncles, all included with the kids." Id. at 11.  Ms. Faraci also had three godchildren. Id.

Ms. Faraci eventually began to travel in connection with her position, and had a number of domestic and international postings. Id. at 10.  Once she began receiving her overseas postings, she would temporarily live with her brother in his apartment outside of Washington, D.C. whenever she came back to the United States. Id. at 16.  Around the end of 1981 or the beginning of 1982, Ms. Faraci was assigned to a position at the United States Embassy in Beirut, Lebanon. Id. at 12.  On April 18, 1983, Ms. Faraci was killed in the bombing of that embassy. Id. at 4.

According to her brother, Ms. Faraci's plan, had her life not been untimely ended by the bombing, was to retire three years later and to move to Niagara Falls, New York to live near her extended family. Id. at 21.

For purposes of this litigation, the law governing the claims of Ms. Faraci's estate is the law of the state where she was domiciled at the time of her death. See Dammarell II, 2005 WL 756090, at *22.  As a federal government employee stationed overseas, Ms. Faraci retained as her domicile in 1983 the state in which she last resided. See id.  Plaintiffs argue that either the law of Pennsylvania, where Ms. Faraci was raised and where her will was probated, or the law of Virginia, where she had the most significant employment contacts during the years that she lived overseas, should apply to the claims of her estate. Pls. Mem. in Supp. of State Law Claims at 90-91.  Because there is no evidence that Ms. Faraci ever lived in Virginia, I find that her domicile in

135

1983 could not have been Virginia.[8]  While there is some limited evidence that she briefly lived in Washington, D.C. and then Suitland, Maryland before moving overseas, it appears that the last place that she lived with any sense of permanency was Pennsylvania.  Moreover, Pennsylvania is where her estate was probated.  Accordingly, the law of Pennsylvania shall apply to the claims of the Estate of Phyllis Faraci.

Plaintiffs assert that the Estate of Phyllis Faraci can recover economic damages under Pennsylvania's survival statute. Pls. Mem. in Supp. of State Law Claims at 121-22.  Plaintiffs discussed the possibility of recovery under Pennsylvania's wrongful death statute, see 42 Pa. Cons. Stat. § 8301, but recognized that the beneficiaries under that statute are limited to the spouse, children, parents, or dependants of the deceased and that Ms. Faraci's nearest surviving relative is her brother and, therefore, the estate cannot recover under Pennsylvania's wrongful death statute. See id. at 122-23.  However, damage awards pursuant to Pennsylvania's survival statute, which provides that "[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff," 42 Pa. Cons. Stat. § 8302, are for the benefit of decedent's estate in general and is not limited to certain beneficiaries, see Kiser, 648 A.2d at 4.  Had Ms. Faraci survived the bombing, she would have had a claim for battery.

---

[8] Were the law of Virginia to govern the claims of the Estate of Phyllis Faraci, the estate could not successfully recover under its wrongful death claim because, as the estate was probated in Pennsylvania and there is no evidence that Mr. Faraci, or anyone else, that has been qualified as a personal representative in Virginia, no one would have standing to bring a wrongful death claim under Virginia's statute on behalf of the estate. See, e.g., Fowler v. Winchester Med. Ctr., Inc., 580 S.E.2d 816, 817 (Va. 2003) (a foreign administrator does not have standing to bring a claim under Virginia's wrongful death statute unless they have been properly qualified pursuant to Va. Code § 26-59); Holt v. Middlebrook, 214 F.2d 187, 190-91 (4th Cir. 1954).

Based on the pleadings and the evidence presented to the Court, the personal representative of Ms. Faraci's estate, Mr. Faraci, has successfully stated a claim for battery on behalf of the estate under the law of Pennsylvania. "The measure of damages awarded in a survival action include the decedent's pain and suffering, the loss of gross earning power from the date of injury until death, and the loss of his earning power-less personal maintenance expenses, from the time of death through his estimated working life span." Kiser, 648 A.2d at 4 (citations omitted). As plaintiffs admit, because it appears that Ms. Faraci died in the explosion, there is no evidence of any pain and suffering or lost income between the injury and her death. However, the expert economic analysis presented to the Court demonstrated that the loss of Ms. Faraci's earning power from the time of death through her estimated working life span was approximately $1,894,000. Phase II Exh. 1 at 12-13.

Plaintiffs' expert analysis, however, does not take into account personal maintenance expenses, which under Pennsylvania's survival statute, must be deducted from the estimated lost income. Personal maintenance expenses are, in essence, what Ms. Faraci's living expenses would have been had she survived. See McClinton v. White, 444 A.2d 85, 87-89 (Pa. 1982); Murray v. Phila. Transp. Co., 58 A.2d 323, 326 (Pa. 1948). There is not enough information before the Court for me to estimate what Ms. Faraci's maintenance expenses would have been. Accordingly, I recommend that, at this time, no economic damages be awarded to the Estate of Phyllis Faraci. Instead, if plaintiffs wish to pursue economic damages on behalf of Ms. Faraci's estate, I invite them to submit additional briefing, within 14 days of the date of entry of these proposed findings of fact and conclusions of law, providing the necessary expert economic analysis to enable me to deduct the necessary maintenance expenses. After receipt of the additional briefing, I will make

supplemental proposed findings of fact and conclusions of law.

## X.    VIRGINIA

### A.    Causes of Action

#### 1.    Battery

Under Virginia law, "battery is an unwarranted touching which is neither consented to, excused, nor justified." <u>Koffman v. Garnett</u>, 574 S.E.2d 258, 261 (Va. 2003). "[T]he slightest touching on another . . . if done in a rude, insolent or angry manner, constitutes a battery for which the law affords redress . . . ." <u>Pugsley v. Privette</u>, 263 S.E.2d 69, 74 (Va. 1980) (quoting <u>Crosswhite v. Barnes</u>, 124 S.E.2d 242, 244 (Va. 1924)). "Upon a finding that a defendant committed battery, a jury (or, if jury trial is waived, a court) can award damages for any 'injuries received and ill effects sustained by the plaintiff [that] were proximately caused by the battery.'" <u>Dammarell IV</u>, 404 F. Supp. 2d at 297 (quoting <u>Pugsley</u>, 263 S.E.2d at 76). "Damages can include compensation not only for physical pain and suffering, but also for mental and emotional harm." <u>Id.</u> (citing <u>Norfolk Beverage Co. v. Cho</u>, 525 S.E.2d 287, 291 (Va. 2000)).

#### 2.    Intentional Infliction of Emotional Distress

"Since 1974, Virginia courts have 'explicitly recognized the existence of an independent tort referred to as 'the intentional infliction of emotional distress,' sometimes called the tort of 'outrage.'" <u>Dammarell IV</u>, 404 F. Supp. 2d at 296 (quoting <u>Russo v. White</u>, 400 S.E.2d 160, 162 (Va. 1991)). "'[E]motional distress resulting from a non-tactile tort may be compensated if the plaintiff alleges, and proves by clear and convincing evidence, that: the wrongdoer's conduct is intentional or reckless; the conduct is outrageous and intolerable; the alleged wrongful conduct and emotional distress are causally connected; and the distress is severe.'" <u>Id.</u> at 296-97 (quoting

Russo, 400 S.E.2d at 162)).  "The kinds of distress for which recovery is permitted include: 'all

highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation,

embarrassment, anger, chagrin, disappointment, worry, and nausea.'"  Id. at 297 (quoting Russo,

400 S.E.2d at 163).

### 3.      Wrongful Death Statute

Under Virginia's wrongful death statute, only the personal representative of the deceased

may bring an action for wrongful death. Va. Code § 8.01-50.  "In an action for wrongful death,

'the personal representative of the deceased sues primarily as trustee for certain statutory

beneficiaries,' rather than for the general benefit of the estate." Dammarell IV, 404 F. Supp. 2d at

297 (quoting Wilson v. Whittaker, 154 S.E.2d 124, 128 (Va. 1967)).  The eligibility of

beneficiaries is determined by reference to the wrongful death statute's system of preferred

beneficiary classes.  See Va. Code § 8.01-53(A).  Specifically,

> The damages awarded pursuant to [Virginia's wrongful death
> statute] shall be distributed . . . to (I) the surviving spouse, children
> of the deceased and children of any deceased child of the deceased
> or (ii) if there be none such, then to the parents, brothers and sisters
> of the deceased, and to any other relative who is primarily
> dependent on the decedent for support or services and is also a
> member of the same household as the decedent or (iii) if the
> decedent has left both surviving spouse and parent or parents, but
> no child or grandchild, the award shall be distributed to the
> surviving spouse and such parent or parents or (iv) if there are
> survivors under clause (I) or clause (iii), the award shall be
> distributed to those beneficiaries and to any other relative who is
> primarily dependent on the decedent for support or services and is
> also a member of the same household as the decedent or (v) if no
> survivors exist under clause (I), (ii), (iii), or (iv), the award shall be
> distributed in the course of descents as provided for in § 64.1-1.

Id.  Under Section 64.1-1, if the decedent was married, but has no surviving spouse, issue, or

kindred on either the maternal or paternal side, then the estates' assets are distributed "as if such

husband or wife had died entitled to the estate." Va. Code § 64.1-1.

With regard to recoverable damages, Virginia's wrongful death statute allows recovery for "(1) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent; (2) Compensation for reasonably expected loss of (I) income of the decedent and (ii) services, protection, care and assistance provided by decedent . . . ." Va. Code § 8.01-52.  In other words, "damages may be awarded not only for the pecuniary loss sustained by the statutory beneficiaries (including the probable earnings of the deceased for the duration of his life expectancy in view of his health, age, business capacity, and experience) but also for loss of the deceased's care, attention and society, as well as such sum as the [court] may deem fair and just as a solatium to the beneficiaries for their sorrow and mental anguish caused by the death." Wilson, 154 S.E.2d at 128.  In determining the amount of damages recoverable, Virginia's wrongful death statute requires the court to "specify the amount or the proportion to be received by each of the beneficiaries." Va. Code § 8.01-54(A).

### 4.      Survival Statute

Under Virginia's survival statute, a decedent's estate may maintain any cause of action that the decedent would have been able to assert during her or her lifetime. Va. Code § 8.01-25. "If, however, the surviving cause of action would seek recovery for injuries caused by the same conduct that ultimately led to the decedent's death, then the estate must elect whether to pursue that claim or, alternatively, a wrongful death action." Dammarell IV, 404 F. Supp. 2d at 297-98 (citing Hendrix v. Daugherty, 457 S.E.2d 71, 75 (Va. 1995) ("a person may not recover for the same injury under the survival statute and the wrongful death statute.  There can be but one recovery.")).

140

B.      **Plaintiffs**

1.      **Estate and Surviving Family Members of Albert Votaw**

a.      *Estate of Albert Votaw*

Albert Votaw ("Mr. Votaw") was assigned to the United States Embassy in Beirut, Lebanon with US AID. Tr. Vol. IX at 25.  Mr. Votaw was killed in the April 18, 1983 bombing of the Embassy. Id. at 5.  He was survived by his wife, Estera Votaw ("Mrs. Votaw"), and his four daughters, Claire Votaw, Catherine Votaw, Susan West, and Marianne Votaw. Id. at 4-6.  The Estate of Albert Votaw is represented by Mrs. Votaw, as Administrator, for purposes of this lawsuit. Phase II Exh. 35 at 1 (Declaration of Estera Votaw); Phase II Exh. 34 (Estate papers for Estate of Albert Votaw).

Mr. Votaw was born August 16, 1925 in Chester, Pennsylvania, and was a United States citizen. Phase II Exh. 35 at 1; Tr. Vol. IX at 4.  Mr. Votaw graduated from the Westtown School, a Quaker high school outside of Philadelphia, Pennsylvania. Phase II Exh. 35 at 1; Tr. Vol. IX at 10.  After high school, he attended Deep Springs College, in Deep Springs, California, for a two-year college program. Phase II Exh. 35 at 1-2.

While at Deep Springs, Mr. Votaw was drafted to fight in World War II, but, as a Quaker, was a conscientious objector. Id. at 2.  He therefore volunteered as a "study subject" or, as Mrs. Votaw put it, "essentially a human guinea pig, for various medical studies at Yale University." Id. Following the end of World War II, Mr. Votaw moved to Chicago, where he entered the University of Chicago's Divisional Master's Degree Program, working towards an interdisciplinary degree related to Economics and Anthropology. Id.  During this time, Mr. Votaw married to his first wife. Id.

141

Albert Votaw met his second wife, Estera, in the late 1940's in Paris, France, where they were introduced by mutual friends. Id. at 2-3; Tr. Vol. IX at 8. Mr. Votaw was in Paris to interview author John Paul Sartre and Estera Votaw was living in Paris with her brother. Tr. Vol. IX at 8. After completing his project, Mr. Votaw returned to the United States, subsequently received his Master's Degree from the University of Chicago, and began working for the *City News Bureau* in Chicago. Phase II Exh. 35 at 3. He later became a reporter for the *Chicago Sun Times*. Id. In 1950, Mrs. Votaw moved to Chicago, she and Mr. Votaw became reacquainted, and the couple married in 1953. Id.

Estera and Albert Votaw had four daughters – Claire, born in 1954; Catherine, born in 1955; Susan, born in 1956; and Marianne, born in 1961. Tr. Vol. IX at 9; Phase II Exh. 35 at 3-4. Mr. Votaw left the *Chicago Sun Times* soon after the birth of his daughter Claire because, as Mrs. Votaw noted, "his salary from the newspaper was simply not enough to support our family." Phase II Exh. 35 at 3. At about this time, he switched his professional focus from journalism to housing, obtaining a position with the Uptown Chicago Commission. Id. at 4; Tr. Vol. IX at 9-10.

In 1960, the Votaw family moved to St. Louis, Missouri, where Mr. Votaw worked for the Land Clearance and Housing Authority. Phase II Exh. 35 at 4; Tr. Vol. IX at 12. Eventually, he became the Director. Phase II Exh. 35 at 4. Mrs. Votaw was not, however, very happy in St. Louis, and Mr. Votaw began to consider other career opportunities. Id.

In 1966, Mr. Votaw accepted a position as a contractor working on rural housing projects and moved his family to Abidjan, in the Ivory Coast. Id. at 4-5; Tr. Vol. IX at 12-13, 16. Mr. Votaw was technically employed by the United States Department of Housing and Urban Development ("HUD"), though he worked directly through a local agency. Phase II Exh. 35 at 5.

In 1969, when his contract with HUD ended, he was hired by the National League of Insured Savings and Loan Associations ("Association") on a private contractor, and was posted to Tunis, Tunisia for the next year. Id.

In 1970, following the expiration of his contract in Tunisia, Mr. Votaw was transferred back to the United States to continue his work with the Association. Id. at 5-6. The family rented a home in Alexandria, Virginia and remained in the United States until the fall of 1972, when Mr. Votaw was transferred back to Africa. Id. at 7. Mr. Votaw returned to Abidjan with his wife and two youngest daughters, Susan and Marianne, while his two oldest daughters remained in the United States to attend college. Id. at 6-7; Tr. Vol. IX at 17-18.

After a few years in Abidjan, Mr. Votaw's contract with the Association ended. Phase II Exh. 35 at 7. In order for the family to stay in Abidjan, Mr. Votaw needed to get another job, and so applied to join US AID. Id. Mr. Votaw was accepted and remained in Abidjan, doing housing work with US AID until 1981. Id. at 7-8.

In 1981, Mr. Votaw was transferred to Bangkok, Thailand, where he continued to do housing work for US AID. Tr. Vol. IX at 24; Phase II Exh. 35 at 8. The move "was considered a promotion of sorts, not so much dollar-wise, but definitely in terms of prestige, as a posting in Asia was seen, by AID in Washington, as more prestigious than a posting in Africa." Phase II Exh. 35 at 8.

In early 1983, Mr. Votaw learned, during US AID's annual conference in Washington, D.C., that he was being posted to the United States Embassy in Beirut. Id. at 9; Tr. Vol. IX at 25. He arrived in Beirut in early April 1983, eleven days before the Embassy bombing. Tr. Vol. IX at 26; Phase II Exh. 37 at 9. Mr. Votaw was killed in the explosion. He was 57-years-old when he

died and, according to Mrs. Votaw, he had planned to work for another 5-7 years with US AID, at which time he intended to retire from the government, but continue to work as a consultant. Phase II Exh. 35 at 13.

On the date of the Embassy bombing, Mr. Votaw was stationed in Beirut.  As a federal government employee stationed oversees, he retained as his domicile in 1983 the state in which he had last resided. See Dammarell II, 2005 WL 756090, at *22.  For the decade prior to April 1983, Mr. Votaw had not lived in the United States, having been in the Ivory Coast, Thailand, and then Beirut. Pls. Mem. in Supp. of State Law Claims at 107.  Prior to returning to the Ivory Coast in 1972, the Votaw family had lived in Alexandria, Virginia. Id.  For purposes of this lawsuit, the domicile of Mr. Votaw's estate is that of Mr. Votaw as of the date of the bombing. See Dammarell II, 2005 WL 756090, at *22.  Therefore, the law of Virginia applies to the claim of Mr. Votaw's estate.

Mr. Votaw's estate was probated in Virginia and his widow, Mrs. Votaw, was appointed as the administrator. Phase II Exh. 34 (Estate papers for Estate of Albert Votaw).  Mr. Votaw's estate has asserted claims under Virginia's wrongful death statute. Pls. Mem. in Supp. of State Law Claims at 154.  As the administrator of the estate, Mrs. Votaw is the proper plaintiff to bring a wrongful death action under Virginia law. See Va. Code § 8.01-53(A).  Pursuant to Section 8.01-53(A) of the Virginia Code, any recovery is for the benefit of Mr. Votaw's surviving spouse and children.  The precise distribution of an award among the statutory beneficiaries is left to the discretion of the Court. See Va. Code § 8.01-54(A).

Based on the pleadings and the evidence presented to the Court, the Estate of Mr. Votaw has made out a valid claim for wrongful death under Virginia law and is entitled to recover

"[c]ompensation for reasonably expected loss of . . . income of the decent" as well as an amount

that reflects the value of the "services, protection, care and assistance provided by the decedent"

and that accounts for the "[s]orrow, mental anguish, and solace" of his survivors. See Va. Code §

8.01-52.  No evidence was presented to the Court upon which to base an award of economic

damages, such as evidence of Mr. Votaw's salary prior to his death and the value of his expected

retirement benefits.  However, the Court will award damages for the intangible aspect of the

estate's wrongful death recovery, which will be addressed below, beneficiary by beneficiary.

### b.    *Estera Votaw*

Plaintiff Estera Votaw was born on April 16, 1929 in Yugoslavia. Phase II Exh. 35 at 1.

She currently resides in Washington, D.C., and has been a United States citizen since 1956. Id.

Mrs. Votaw is the widow of Albert Votaw. Id.  She is participating in this lawsuit on her own

behalf, as well as on behalf of Mr. Votaw's estate, as Administrator. Id.

As previously discussed, Mrs. Votaw first met her husband in 1948, when she living in

Paris, France with her brother. Id. at 2-3. In August 1950, Mrs. Votaw and her brother moved to

the United States, where she became reacquainted with Mr. Votaw and, in 1953, they were

married. Id. at 3.  When their first daughter, Claire, was born the following year, Mrs. Votaw

stopped working. Id.  In the next two and a half years, the couple had two more children –

Catherine and Susan. Id.

As previously discussed, due to Mr. Votaw's various career changes, the family lived in

several different places, such as Chicago, St. Louis, Virginia, the Ivory Coast, Tunisia, and

Thailand. Id. 3-8.  When discussing the family's return to the United States in 1970, Mrs. Votaw

explained that Mr. Votaw thought that his three oldest daughters should finish high school in the

United States and that, because she did not does not drive, they "decided to settle in Alexandria, Virginia, because Old Town Alexandria was much more pedestrian-friendly." Id. at 6.  The three oldest Votaw daughters graduated from T.C. Williams High School, in Alexandria, in the spring of 1972. Id.  The two oldest, Catherine and Claire, entered college, while the Votaws concluded that Susan, who had graduated from high school at the same time as her two older sisters, was not yet ready for college and should accompany her parents and younger sister Marianne on Mr. Votaw's next posting. Id. at 6-7.

In describing her experience in the Ivory Coast, in particular after they returned in 1972, Mrs. Votaw stated that:

> [W]e were particularly well-received on our return.  Most Westerners, particularly White Westerners, would come to the Ivory Coast, work on and complete a project, and leave.  People knew us, and saw us as unique, because we had come to Abidjan, gone away, and then returned.  We were very happy to be back.  We entertained a lot in Abidjan, though we did not socialize much with other Americans from the Embassy, and we befriended a large number of graduate students and Peace Corps personnel.  According to my husband, all of the Hungarians in Abidjan gravitated to me and to our household.  The Yugoslav Ambassador moved in next door.  I speak French, English, Hungarian, Serbian and German, and was thrilled to be in a cosmopolitan environment.

Id. at 7.  The Votaws came back to the United States on a number of occasions including their daughter Catherine's graduation from Swarthmore and their daughter Claire's graduation from the University of Pennsylvania, both of which took place in 1976, and later, their daughter Susan's graduation from Middlebury College in 1978. Id. at 8.

In describing her impressions of their time in Thailand, Mrs. Votaw recalled, "I am not sure how my husband selected Bangkok, and was not particularly thrilled with the choice . . . .

My husband was very pleased with Bangkok.  I was not.  I did not like the chaos, and the traffic was incredible." Id.

In January 1983, when Mr. Votaw informed his wife that he had been assigned to Beirut, Lebanon for his next posting, Mrs. Votaw "asked him whether there was any danger involved, and he responded 'how many housing officers do you know who have died in the line of fire?'" Id. Mr. Votaw was scheduled to leave Bangkok for Beirut in early April, 1983. Id.  Mrs. Votaw explained that, before leaving for Beirut, she "had to make arrangements to go to India, because I at the time had an Israeli visa in my passport, and could not get into Lebanon.  India had the closest consular office where I could get the visa I needed." Id.  Her daughter Susan joined her on the trip to India. Id.  The last time that Mrs. Votaw saw her husband alive was at the airport in Bangkok, as she and her daughter Susan left for India. Id.

Mrs. Votaw and her daughter remained in India for several weeks, during which time Mr. Votaw moved to Beirut. Id.  From India, Mrs. Votaw returned to Bangkok "to pack out" for her move to Beirut. Id.  Susan remained in New Delhi to catch a direct flight back to the United States. Id.  Mrs. Votaw stated that:

> About 9:00 on the morning of April 19, 1983 (Bangkok time), the head of AID in Bangkok and several other people came to the apartment that I had shared with my husband.  I had just about finished packing out, and thought that they had come to look at the apartment itself, which would soon be vacant.  Instead, the head of AID told me that there had been an "accident" in Beirut, and that it was bad.  He then added that there had not been any news regarding my husband.  I asked whether no news was good news, and he responded that no news was not good news.  Later Bill Turley, a friend of ours in Thailand, used his connections with the media in Bangkok to confirm that my husband had in fact been killed.  My daughter Claire later called from the United States, and relayed the same news.

Id. at 10.  At that time, no one had been able to locate Susan, who was still in New Delhi.  Id.  She

was eventually located, and was flown to Bangkok that evening.  Id.  Mrs. Votaw told her daughter

at the airport of her father's death.  Id.

Phil Gary, a colleague of Mr. Votaw, flew in from Colombo, Sri Lanka to Bangkok to

assist the Votaws, and to accompany Mrs. Votaw and daughter Susan back to the United States.

Id.  As Mrs. Votaw recalled:

> My daughter Claire had called, and said that CBS News was
> waiting, with cameras, at the San Francisco airport for our return.  I
> wanted nothing to do with the media.  Phil Gary used his
> connections to arrange for an alternate return route and protection
> from the media, so we ended up leaving Bangkok and flying
> through Copenhagen and Frankfurt on our way back to the United
> States.

Id. at 10-11.  Once back in the United States, the Votaws gathered at Claire Votaw's home in

Arlington, Virginia.  Id. at 11.

Before leaving Thailand, Mrs. Votaw had informed the United States Department of State

that, based on her husband's wishes, she did not want Mr. Votaw's body flown back to the United

States, but rather, that he had wanted to be cremated and his ashes scattered over a body of water

near wherever he died.  Id.  Mrs. Votaw noted that, "[t]he State Department did not initially agree

with this request, to the point of sending a psychiatrist to my Bangkok apartment to talk to me

about the situation."  Id.  After showing the psychiatrist her husband's letter setting forth his

wishes, "the government relented," and Mr. Votaw was cremated in Lebanon, and his ashes

scattered in the Mediterranean by a fellow Quaker from Pennsylvania.  Id.

Mrs. Votaw and her family did not to attend the ceremony at Andrews Air Force Base,

where the remains of sixteen Americans killed in the Beirut Embassy bombing were brought back

to the United States, because Albert Votaw's remains were not among them. Id.  She also "initially had no intention of attending a subsequent public ceremony at the National Cathedral in Washington," but was convinced by her daughters to attend. Id.  Mrs. Votaw noted that "[a]t the ceremony, my mother-in-law, who by then was quite elderly, told then-Vice President George Bush how nice it was for him to come to the ceremony, and he replied, 'Heck, I wouldn't miss it for the world.'  I was livid, and my daughter Claire's husband had to restrain me." Id.  The family subsequently held a private service for Mr. Votaw at the Quaker Meeting House in Washington, D.C. Id. at 12.  The family chose former Ambassador Robert Smith to supervise the service and selected a few speakers, including friends of Mr. Votaw's from Deep Springs, St. Louis, and Abidjan. Id.  Mrs. Votaw added, however, that "[n]o one . . . said what I really felt was the essence of being around my husband, that living with Albert was fun.  My husband was physically a very big man – over 6'2 tall – and had big arms and shoulders.  He was always fun, and had something of Errol Flynn in him.  This is what I remember." Id.

Mrs. Votaw stated that "[a]fter the services, the reality hit that I had nowhere to live." Id. She considered, but decided against, New York and Paris, ultimately deciding to live in Washington, D.C. Id.  She was told that she "should buy something because it would be more economical in the long run" and, "[a]fter a long search," found the apartment in which, as of the Phase II testimony, she continued to reside. Id.  At the time of Mr. Votaw's death, he had been the sole wage earner, and Mrs. Votaw had not worked since the birth of the couple's first daughter in 1954. Id. at 13.  In the aftermath of her husband's death, she let her daughter Catherine handle all of the paper work associated with her husband's estate. Id.  The family ran into some issues, particularly with Mr. Votaw's private insurance company, which decided that the Beirut Embassy

bombing had been an "act of war," and initially declined coverage. Id.  The family fought this

determination and prevailed. Id.

Mrs. Votaw explained why she decided to participate in this lawsuit:

> I decided to participate in the lawsuit as part of a consensus – if one
> member of the Votaw family participated, the entire family would
> participate.  My daughter Marianne, without anyone else in the
> family knowing about it, had been in touch with Anne Dammarell
> for a number of years, and she is the one who told the family about
> the suit and pushed us to participate in it.  I feel no sense of revenge,
> and do not expect to feel satisfaction.  It is hard to define exactly
> what I expect of the suit, other than the notion that somebody
> should be held responsible for the bombing.

Id.

Based on the evidence presented to the Court, including the declaration of Mrs. Votaw, see

Phase II Exh. 35, the Court should award the estate of Albert Votaw, by Estera Votaw as

Administrator, $10 million for the benefit of his surviving spouse, Estera Votaw, to compensate

for the loss of "services, protection, care and assistance provided by the decedent" and the

"[s]orrow, mental anguish, and solace" that she suffered. See Va. Code § 8.01-52; Dammarell I,

281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### c.    Catherine Votaw

Plaintiff Catherine Votaw is the daughter of Albert Votaw.  Ms. Votaw was born in 1955

in Chicago, Illinois, and is a United States citizen. Tr. Vol. IX at 58.  She graduated from

Swarthmore College with a degree in medieval studies in 1976, and subsequently obtained a law

degree from the University of Pennsylvania in 1981. Id. at 61-62.

Ms. Votaw testified that her family was "very close," recalling that "[w]hen you live

overseas, you are close to your family because they are the only people that hang with you

throughout." Id. at 58.  Ms. Votaw described her father as:

> [R]eally a fun father to have.  He would – well, I remember one of
> my sisters' birthday parties, we went to the movies, and he laughed
> so hard that he fell out of his seat into the aisle, which was a sort of
> tremendous mortification for all of us, and he would do things to
> make you laugh or smile.  I remember once he – he really enjoyed
> having four girls, and he had a bit of vanity to him, and he always
> wore bow ties . . . [a]nd he liked to have us sort of comment on, you
> know, what he – whether he was wearing the right tie, or how he
> looked.  And he was tall, he was over six feet tall, and a very nice,
> you know, thin build, big shoulders.  He was very handsome, but he
> knew it, and he made kind of a dashing figure.  He had long hair
> and a big handlebar mustache, and a bit of flamboyance in his
> appearance.  And he liked to sort of doing things, like I said, to
> make us laugh.

Id. at 59-60.  Ms. Votaw added that her father "was very bright, extremely smart, and very funny.

He was a . . . terrific representative of our country overseas because he was creative, and public

service-oriented." Id. at 60.  He "did everything with a lot of verve and élan, and we just loved

him to death.  And he was . . . very happily married to my mother . . . .  They made a nice couple

because my mother is pretty outrageous in her own way." Id. at 61.

Ms. Votaw married in 1982. Id. at 66.  While at the time Ms. Votaw's parents did not

understand why she chose to have a traditional wedding, as her parents had not had one, Ms.

Votaw's mother has told her repeatedly in the years since how glad she was that her daughter

decided to have such an event, as it marked the last time that the Votaw family gathered in its

entirety. Id. at 66-67.

Ms. Votaw last saw her father in January 1983, when her father was in the United States

for a meeting. Id. at 67.  Ms. Votaw learned at that time that her father was being posted to Beirut.

Id. at 68.  While she and her father had a pleasant time together during that visit to the United

States, she noted that "he seemed to me under more stress than usual" due to the new assignment.

151

Id.  When Ms. Votaw and her father went to visit her father's parents, who lived in the

Philadelphia area, she recalled that her grandmother said to her son, "oh, Albert, do you think it's

safe." Id. at 69.  He replied, "Mom, they wouldn't send me anywhere that wasn't safe." Id.  Ms.

Votaw last spoke to her father on February 27, 1983, when she called her parents to wish them a

happy anniversary. Id.

On April 18, 1983, Ms. Votaw went to work and had one of "the busiest professional

day[s] I've ever had," second chairing a case for an important hearing in federal court. Id. at 69.

She first heard about the bombing on the radio, so she called her sister Claire throughout the day

from a pay phone to find out more information, but her sister had no news. Id. at 69-70.  When

she arrived at home, her phone was "ringing off the hook" with concerned family and friends. Id.

at 70.  Ms. Votaw spoke to her sister Claire again, who told her that their father was "missing." Id.

Being the closest grandchild to her father's parents, she called them to conveyed this news. Id.

She then called her mother in Bangkok, and remembers that she and her mother "were both

immediately convinced that he was dead, and [my mother] was very concerned about finances

because at the time they lived on his salary . . . [a]nd I had their power of attorney, so I kept saying

to her it's going to be fine, it's going to be fine." Id. at 70-71.

Ms. Votaw received a telephone call from her sister Claire around 5:00 a.m on April 19,

and learned that their father's body had been identified. Id. at 71.  Explaining her reaction to the

news, Ms. Votaw testified:

> He was dead.  And my husband and I both spent a lot of time crying
> . . . .  And around 8 in the morning, when I thought it was late
> enough, I went over to my grandparents to tell them, and my
> grandmother opened the door and said he's gone, and I said yes.
> She knew what I was there for.  And it was really a terrible time.
> It's the only time I saw my grandfather cry.  So I immediately went

> down to Washington to be with the family . . . and we camped out
> there for it seemed like weeks.

Id.  After a few days, Ms. Votaw's mother and sister Susan arrived in Washington from Bangkok.

Id. at 73.  Ms. Votaw stated that "[i]t was hard waiting for [her mother] because, you know, she

was sort of the chief mourner, and she was our mom, and she wasn't around.  So she finally got

there . . . and . . . proceeded to be a basket case." Id.

Ms. Votaw attended the service held at the National Cathedral to honor the victims of the

bombing.  Id.  While she thought the service was "very nice" and she "felt proud walking in that

my father was being honored in this way," Ms. Votaw, like her mother, was upset by then Vice

President Bush's interaction with her family and wrote his office a "scathing letter." Id. at 73-74.

Ms. Votaw also attended the service at a Quaker Meeting House held in honor of her father. Id. at

74.  The family had asked people from "various parts" of her father's life to speak, so the service

"was kind of a chronology, very warm, wonderful, you know, remembrances of his work and his

person." Id.  After the ceremonies ended, Ms. Votaw returned home and, as she stated, "started to

resume life as usual," although she spent some time settling her father's estate. Id.

Ms. Votaw stated that the death of her father was:

> [A] huge shock.  We were completely shell shocked, and it affected
> everything about us.  It's . . . one of the most important things about
> me, even though I'm . . . almost 50 and have a lot of other things
> going on, it's still a huge part of my makeup.  And it was a long
> time before we could even talk about him, even share memories of
> him without being completely overwhelmed.

Id. at 75.  See Dammarell I, 281 F. Supp. 2d at 189 (discussing expert testimony that, in the

immediate aftermath of traumatic event such as Beirut Embassy bombing, "the affected person

generally experiences a sense of shock and a feeling of being overwhelmed").  While Ms. Votaw

153

was pregnant with her first children, a twin boy and girl, she would cry en route to work every

morning when she reached a certain spot in her commute, although she does not know why that

particular place affected her in such a manner. Tr. Vol. IX at 80.  Ms. Votaw eventually sought

therapy to deal with her father's death after the birth of her youngest son, whom she named after

her father. Id. at 75-76.  Ms. Votaw testified that, after the birth of her son, she:

> had a visitation from my father one night, and he appeared as a, you
> know, sort of a ghost which was very unnerving.  And after that, in
> the winter, I started basically becoming depressed to the point where
> I was suicidal.  And when I realized that I was thinking about killing
> myself, I went to a therapist.  And we spent a lot of time talking,
> and she said it's, in effect, a delayed grief reaction that you have
> been trying to hold yourself together, and you should just, you
> know, if you're sad, be sad.  Let yourself fall apart, and then, you
> know, get through it.

Id. at 76.  Ms. Votaw has continued to go to therapy from time to time in the years since. Id.  It

particularly upsets that her father did not live to see her children:

> It's a source of tremendous sadness that he didn't get to know his
> grandchildren.  His brother, my Uncle Greg, is wonderful with
> children . . . and my father had similar ways about him . . . . [M]y
> father was a person who always – small children always were
> attracted to him, and he would always profess bemusement . . . .
> And, in fact . . . he would do things to amuse them . . . .  And he
> would have been a wonderful, wonderful grandfather.  And I think
> it – part of the trauma that – of the way he died is . . . I would say it
> was 10 years before I could even remember a good time [with my
> father] to my children without being too upset to go through with it.

Id. at 78-79.

Ms. Votaw testified that on April 18 of every year she "pretty much take[s] the day off"

and is "not a lot of fun to be around" as she "just want[s] to . . . be by myself and remember and

cry a lot." Id. at 80.  She stated that terrorist events, such as the September 11, 2001 attacks and

the Oklahoma City bombing, affect her as if she's "on a . . . train, and you're just shuttled back in

time.  You know, your wounds are reopened, and you feel the trauma again." Id. at 80-81.  See

Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony that events such as

Oklahoma City bombing and events of September 11, 2001, may trigger memories of a trauma

and bring onset or recurrence of psychological symptoms of trauma or Post-Traumatic Stress

Disorder).

Ms. Votaw decided to participate in this litigation:

> [I]n part because I wanted to stand with the other families and
> present a united front, and it was very important to me that my
> whole family participate . . . .  My mother was actually very
> reluctant to join because, as I heard her say . . . I didn't let the
> Germans pay me for killing my parents, I'm not going to let the
> Iranians pay me for killing my husband . . . .  But we convinced her
> that we wanted to stand together on this, and she talked to her
> lawyer and actually figured out a way that she wouldn't get the
> money, that it would go into a trust . . . .  So I joined in part to sort
> of stand with the other families who had suffered similarly, and in
> part because . . . I'm a lawyer and . . . we can't go out and shoot
> them.  This is what we do.  You know, this is how you do justice is .
> . . you file a lawsuit.  So it's what we had available.  And I thought
> it was important that we use it.

Tr. Vol. IX at 81-82.

Based on the evidence presented to the Court, including the testimony of Ms. Votaw, the

Court should award the Estate of Albert Votaw, by Estera Votaw as Administrator, $5 million for

the benefit of his surviving daughter, Catherine Votaw, to compensate for the loss of "services,

protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and

solace" that she suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at 196-98

(explaining typical damage awards for solatium claims).

### d.    Claire Votaw

Plaintiff Claire Votaw is the daughter of Albert Votaw. Tr. Vol. IX at 4-5.  She is the oldest of the four Votaw daughters. Id. at 4, 9.  Ms. Votaw was born April 27, 1954 in Chicago, Illinois, and is a United States citizen. Id. at 3-4.  She presently resides in Fairfax, Virginia. Id. at 3.

Ms. Votaw attended grade school in St. Louis, where life "was fine" and she was "close" to her parents. Id. at 10-11.  On the weekends, the Votaw daughters spent time alone with their father, who took the girls on all his errands and to various fun activities, such as art lessons at the museum, ice skating, or swimming. Id. at 11-12.  In 1966, the Votaws moved to Abidjan, in the Ivory Coast. Id. at 12.  Ms. Votaw testified that Abidjan was a "wonderful place.  It was calm and quiet, and the Africans were wonderful." Id.  The Votaw daughters continued the weekend tradition of spending time alone with their father, with Ms. Votaw recalling that "[e]very Sunday . . . my father would take us out without my mother.  We went to the beach . . . . unless it was pouring rain." Id. at 14-15.

After she graduated from high school in Virginia, Ms. Votaw's parents and sisters Marianne and Susan moved back to Abidjan, but Ms. Votaw and her sister Catherine remained in the United States to attend college. Id. at 18.  While attending college, Ms. Votaw spent every Christmas and summer with her parents in Abidjan. Id. at 20.  She regularly received two or three letters a month from her mother and one letter a month from her father. Id. at 20-21.  She graduated from University of Pennsylvania in 1976 and subsequently earned a Master of Arts in Urban Anthropology and African studies from Indiana University in 1978. Id. at 18-19.  Ms. Votaw testified that she "studied anthropology and African studies because I basically wanted to

grow up to be my father.  I wanted to work in development work and public service and that sort

of thing.  I wanted to work for USAID." Id. at 22.

In 1978, Ms. Votaw obtained a summer internship with the United States Department of

State in Libreville, Gabon, during which she was able to visit her parents often, who were still

living in the Ivory Coast. Id. at 21-22.  Around this time, Ms. Votaw meet her future husband,

whom she wed in 1979. Id. at 22-23.  Ms. Votaw's husband was employed by the State

Department in the Foreign Service, and so the couple moved to Madras, India, where her new

husband was posted. Id. at 23.  In 1981, Ms. Votaw's parents were transferred from Africa to

Bangkok, Thailand. Id. at 23-24.  Ms. Votaw saw her parents "more often" after the move, both

when her parents traveled to India as tourists and when Mr. Votaw individually traveled to India

for work. Id.

In 1982, Ms. Votaw's husband was transferred to the United States, and the couple moved

to Arlington, Virginia. Id. at 24-25.  Ms. Votaw last saw her father in early 1983 while he was in

Washington, D.C. for US AID's annual conference, when he told her that he was being transferred

to the United States Embassy in Beirut. Id. at 25.

April 18, 1983 was Ms. Votaw's first day at a new job in Falls Church, Virginia. Id. at 27.

She did not turn on either the television or the radio that morning, as she "was just busy getting

ready for work." Id.  A friend called mid-morning to ask whether she had heard about the

bombing. Id.  As Ms. Votaw recalled, she responded "no, I hadn't heard, but I'll be home in a

couple of hours.  I'll, you know, worry about it then.  I was just very wrapped up in a new job." Id.

When she arrived home around 3:00 p.m., she checked the television and radio, but heard nothing

about the bombing. Id.  She then called the State Department, which, at that point, did not have

any news regarding her father. Id. at 28.  Ms. Votaw called her mother and sister to relay that

information, and then continued to call the State Department throughout the rest of the day for

updates. Id.

Around midnight, Ms. Votaw called the State Department a final time. Id. at 29.  The

government again had no news and she asked the official whether she could "assume that no news

is good news?  And the man at the other end of the phone sort of hesitated for a moment and then

just said no." Id.  At approximately 5:00 a.m. on April 19, the State Department phoned Ms.

Votaw and informed her that her father's body had been identified. Id.  Ms. Votaw "said a few

unmentionable words to them" and then hung up and called her sisters and her mother. Id. at 29-

30.

As the oldest child in the family, Ms. Votaw assumed particular responsibilities with

respect to her father's death, testifying that her:

> role . . . was the organizer, the person who . . . knew what
> everybody was doing and organized people's lives, and took care of
> things.  And I had been doing that for many, many years.  It was a
> role that my mother was happy to have me do, and so it was
> something that I did on a regular basis.  So I – it just went without
> saying that everybody would come to my house, and that I would be
> the one that would host everybody, and that people would all
> congregate around me, and that we would take care of things.  I
> dealt with the State Department on all the different issues that came
> up, and getting his effects back.  I remember Cathy and I went and
> picked up his effects from diplomatic security when they came in.
> But basically I was the one that everybody within the family turned
> to, and I had also made it very clear to the State Department . . . and
> to USAID . . . that my mother didn't want to talk to anybody from
> State, that everything should come through me.

Id. at 32-33.

Ms. Votaw and her family attended the ceremony that was held at the National Cathedral to honor victims of the bombing. Id. at 35.  The family also held a memorial service for Mr. Votaw the next day, which was coincidentally Ms. Votaw's birthday, at a Quaker meeting house. Id. at 37.

In July 1984, Ms. Votaw gave birth to her first child, a daughter. Id. at 40.  Immediately thereafter, Ms. Votaw's husband was posted to Hong Kong. Id.  Ms. Votaw opted to remain in Washington with her mother for the summer because she "didn't feel ready yet to leave my family and go overseas." Id.  Ms. Votaw joined her husband in Hong Kong in September 1984, and gave birth to a second daughter in April 1986. Id. at 41.  They lived in Hong Kong for three years, thereafter moved to Lome, Togo, and then to Morocco. Id. at 42-45.

When Ms. Votaw arrived in Morocco, she secured a position at the United States Embassy as a secretary. Id. at 45.  She was shocked when she saw the American flag that had flown at the Beirut Embassy on April 18, 1983 hanging on a wall at the Morocco Embassy. Id. at 46.  The flag had been taken to Morocco by Marines in honor of fellow Marine Robert McMaugh, who had also died in the Embassy bombing. Id.  Ms. Votaw testified that the presence of the flag caused her to be:

> shocked at first, and surprised, and for the first few weeks, quite upset.  I mean I would tear up every time I went up the stairs to work, and I went to work every day.  But after a while I kind of got used to it, and I would just walk right by it without – I mean without crying.  I think about my father every day, so it's not that I didn't think about him, I just didn't cry each time.

Id. at 46-47.  Ms. Votaw and her family remained in Morocco for a year, and then returned to the United States. Id. at 48.

Ms. Votaw testified that terrorist attacks, such as those of September 11, 2001 or Oklahoma City, are "very emotional for me" because "[t]hey just bring it all back.  I empathize with the families whose family members have been killed.  I know exactly what they're going through . . . .  I know that as soon as anything like that happens, we are all on the phone with each other talking to each other." Id. at 50.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony that events such as Oklahoma City bombing and events of September 11, 2001, may trigger memories of a trauma and bring onset or recurrence of psychological symptoms of trauma or Post-Traumatic Stress Disorder).

Ms. Votaw did not seek any therapy or counseling to deal with her father's death, stating that she thought that she "could handle it on my own, and actually took pride in the fact that I could handle things on my own." Tr. Vol. IX at 47.  However, while she may have dealt with her father's death "to some extent," she testified that, "I don't think I'll ever get over it, but I don't think – I don't think therapy would have changed that . . . .  I think about it at some point every day, but I don't think therapy would change that." Id.

Ms. Votaw decided to participate in this litigation for several reasons:

> One, the family as a whole decided to participate, and I wanted to be part of that consensus . . . .  I also want some recognition and some remembrance that it happened.  I'm at the State Department all the time every day, and whenever the State Department has some kind of function about various bombings or people that were killed at work or doing State Department work, they don't talk about the Beirut bombing.  They just – it's sort of so far away that it's not mentioned.  I'm forever calling offices or writing letters and saying, you know, you had a big article about bombings.  Why didn't you talk about Beirut?  So I'd like just to continue to keep it in people's minds and remember that it happened, and it was horrible.

Id. at 56-57.

Based on the evidence presented to the Court, including the testimony of Ms. Votaw, the Court should award the Estate of Albert Votaw, by Estera Votaw as Administrator, $5 million for the benefit of his surviving daughter, Clarie Votaw, to compensate for the loss of "services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and solace" that she suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### e.    Marianne Votaw

Plaintiff Marianne Votaw is the daughter of Albert Votaw. Tr. Vol. IX at 89.  She was born in 1961 in St. Louis, Missouri, and is a United States citizen. Id.  She presently resides in Charlottesville, Virginia. Id.

Ms. Votaw was five years old when she left St. Louis with her family to move to Abidjan, in the Ivory Coast. Id. at 90.  She recalls that living in Africa during the 1960's was "wonderful" and "a great place to be" as "a little kid." Id.  Ms. Votaw was "thrilled" to learn that the family was returning to Abidjan in 1972. Id. at 91.  Ms. Votaw's older sisters, Catherine and Claire, did not accompany the family, because they had started college in the United States. Id.  Two years after returning to Abidjan, Ms. Votaw's sister, Susan, left for college as well. Id.  Ms. Votaw thereafter enjoyed "five years of being an only child at home." Id.  She testified that during these years she "developed a very, very close relationship with my father that I think had to be unique in the family because none of my sisters had a chance to be an only child." Id.  Ms. Votaw and her father "would do a lot of things together, not just on the weekends, when we would leave Mom and go off and have fun," but also during times that the United States Embassy held events, which Ms. Votaw's mother declined to attend. Id. at 92-93.

Ms. Votaw left Abidjan in 1979 to attend Tufts University in Boston, Massachusetts. Id. at 94.  She was "very, very homesick freshman year," particularly because she could not easily contact her parents, who were still living abroad. Id.  While Ms. Votaw received regular letters and postcards from her parents, she wrote few letters herself, as she did not write when she was unhappy. Id. at 95.  Ms. Votaw, however, saw her parents each year, usually during Christmas or summer break. Id.

After Ms. Votaw finished classes in 1982 she went to visit her sister, Claire, who was then living in India. Id. at 96.  As Ms. Votaw's parents had been posted to Thailand by that time, they also traveled to India for Christmas. Id.  After the holiday, Ms. Votaw returned to Thailand with her parents. Id.  In January 1983, while she was still in Thailand, her father traveled to the United States for a conference. Id.  She remembers that her father called to tell her mother that he had been posted to Beirut and that her mother "seemed very frightened" upon hearing the news. Id.  She does not recall the last time she spoke to her father, although she believes it was during this telephone call. Id. at 98.

Ms. Votaw returned to Boston to prepare for her college graduation ceremony. Id.  On April 18, 1983, she awoke fairly early and went to a local gathering point to make origami cranes for an upcoming peace festival. Id. at 98-99.  She did not hear anything about the bombing until after she returned home at 11:00 p.m. and received a telephone call from her sister, Claire. Id. at 99.  Ms. Votaw testified that "Claire called me and said that – she made me sit down, which was very strange, and then she said that there had been a bombing at the embassy and that they couldn't find Daddy," which Ms. Votaw took to mean that her father was not at the Embassy. Id.  While Claire repeated the government's warning that there was "little hope" of finding their father

162

alive, Ms. Votaw was not aware that her father had already moved to Beirut, and so she "just

thought, you know, it won't have hurt him because he won't have been there." Id.

Approximately six hours later, early on the morning of April 19, Ms. Votaw received

another telephone call from Claire and learned that her father's body had been identified. Id. at

100.  Ms. Votaw testified that she said "oh and hung up the phone and went back to sleep.  And I

did not believe it, I did not feel it, I went very numb.  I remember going through the next day

trying to make plane reservations and get down to Claire's and just doing everything on automatic

pilot as if I were not there, and somebody was doing it for me." Id.  She flew to Washington, D.C.

to join her sisters Catherine and Claire and wait for the arrival of her mother and sister Susan, who

were traveling en route from Thailand. Id. at 100-01.  Upon arriving at her sister's house, Ms.

Votaw did "automatic pilot things" like going grocery shopping. Id. at 101.  While she "was

crying" the reality of her father's death "hadn't penetrated.  It wasn't in my core.  It was still very

surface." Id.  Regarding her mother's arrival, Ms. Votaw testified that it:

> was awful.  It was just horrible, seeing her so shattered.  It was
> extremely difficult, and I think it was more difficult for Mom to
> have me around.  I was the baby.  She had to be strong for me, and
> it was more difficult for me to be around Mom because she had lost
> her husband, you  know, her whole life kind of thing, and I had only
> lost my father, which you are supposed to do at some point, anyway,
> and it just –  it made for a huge amount of stress, which I went
> through on . . . automatic pilot and refused to feel.  It was all very
> surface.

Id. at 101-02.

Ms. Votaw accompanied her family to the service held at the National Cathedral in

remembrance of the victims of the bombing. Id. at 102.  She recalls that they put the family

members of the victims in two cars and that "in each car somehow with like four boxes of

Kleenex.  It was very nice, there was Kleenex everywhere." Id.  Ms. Votaw attended her father's private memorial service the following day. Id. at 104.

Ms. Votaw's college graduation ceremony was held in May 1983. Id.  She stated that:

> Graduation itself was awful . . . it was cold and it was raining, and Daddy was very dead, and you know, all of my sisters have a picture of themselves in cap and gown with Daddy looking proud.  You know, Mom came and she was just so – it was unimaginably awful. People were – nobody knew about the bombing.  It wasn't in the news.  People were coming up to me who been my friends in college and congratulating me on graduating with no idea that my father had just been killed.  And if I'd told them about it, half of them didn't even know about the bombing.  It was bizarre that this huge event could have happened and people not know about it.

Id. at 104-05.

Following graduation, Ms. Votaw did "as little as possible for as long as possible." Id. at 105.  See Dammarell I, 281 F. Supp. 2d at 190 (discussing expert testimony that emotional isolation, withdrawal, and passivity are common in the aftermath of a traumatic event such as Beirut Embassy bombing).  She often went down to Washington, D.C. to be with her family, but testified that "every time we were all together, there was this huge gaping hole in the family.  I mean Daddy had really been kind of the hub of the wheel with all of us . . . at the end of spokes and really relating to him and relating to each other through him, and it was exceedingly difficult for us to be together and have him not be there." Tr. Vol. IX at 105-06.  Her relationship with her mother in the months after the bombing was "extremely strained." Id. at 107.  Ms. Votaw stated that:

> [I]t was awful to me that he be dead and not her.  I had not been prepared at all for him being killed.  I had been braced for something to happen to her.  And I had also been a psychology major so I kind of refused to feel guilty about the fact that I was sorry that it was him and not her, but it made for just a tremendous

164

> strain, and it never occurred to me to stop going to see the family. . .
> . I was down there all the time . . . [and] Mom and I would just
> scream at each other about nothing.

Id.

In the years following the bombing, Ms. Votaw's relationship with her mother eventually improved, particularly after the two spent several weeks traveling together in France and learned that they both "had absolutely identical tastes in stuff." Id. at 111-12.  Although Ms. Votaw's relationship with her mother improved, she still sank into a depression which lasted for several years. Id. at 112.  The depression initially manifested itself physically, with cramps, hives, headaches, and lack of appetite. Id.  See Dammarell I, 281 F. Supp. 2d at 190 (discussing expert testimony that pain and physical discomfort, along with depression and psychic pain, may occur in persons who have experienced traumatic loss).  By the fall of 1987, Ms. Votaw was so depressed that she:

> stopped doing anything.  I went to class, but I didn't do any work.  I
> went to the courses I taught, but I never graded any papers.  I
> stopped paying bills, I stopped doing anything at all because I was
> just so running away from how unhappy I was.  It wasn't the kind of
> depression where you can't get out of bed.  It was the kind of
> depression where you can't sit still . . . .  I just couldn't get anything
> accomplished.  And I got very stupid.  Driving one day, I saw the
> flashing red lights and the bells at the level railroad crossing, and I
> didn't understand what they meant, and I started to drive onto the
> tracks.  And when the train went by and missed me, I was
> immediately very – even more unhappy that I hadn't died, that if I
> were dead, I wouldn't be feeling this bad anymore, and that that
> made me even more unhappy.

Tr. Vol. IX at 112-13.  Ms. Votaw realized that she was suicidal, and immediately called a suicide hotline for help. Id. at 113.  The following day she sought formal psychiatric counseling. Id. at

165

114. During this counseling she learned that she was suffering from a "delayed grief reaction."

Id.  While she:

> would complain about Mom . . . it would always turn into Daddy
> being dead . . . every morning I would wake up and I would have to
> remember – when I first woke up, there was always that moment
> before I remembered that he was still dead.  And it was always a
> fresh shock every morning that he was still dead.  And I remember
> going – I mean I would be okay during the day when I was doing
> stuff, and then I would lie down to go to sleep and just start crying
> because there was nothing to distract me anymore.  And then I
> would go to sleep and I would dream that he was alive and then I
> would wake up and he would be dead again, kind of.  It was every
> day, he died again.

Id. at 114-15.  Due to depression, she was eventually prescribed antidepressants and anti-

psychotic medications, which she still takes today. Id. at 121.

Ms. Votaw has had strong responses to terrorist attacks in the years since the 1983 Embassy

bombing. Id. at 122.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony that

events such as Oklahoma City bombing and events of September 11, 2001, may trigger memories

of a trauma and bring onset or recurrence of psychological symptoms of trauma or Post-Traumatic

Stress Disorder).  For example, Ms. Votaw was "extremely distressed" by the Oklahoma City

bombing, because of its resemblance to the Beirut Embassy bombing. Tr. Vol. IX at 122-23.

Similarly, the 1998 Embassy bombings in Kenya and Tanzania caused Ms. Votaw to become

"very, very upset, much more so than, you know, oh, gee, they bombed another one of our

embassies.  I remember having a hard time working." Id. at 123.  Ms. Votaw was at work when the

September 11, 2001 attacks occurred. Id. at 123-24.  Once she realized that the attacks were

intentional, she "had to leave work." Id. at 125.  She suppressed the urge to pick her children up at

school and instead went to a friend's house and "freaked out." Id.  Ms. Votaw attended a

candlelight vigil that night, where:

> tears just started streaming down my face . . . and people – one
> woman came over and when she saw, she went and she got her dog
> and brought her dog over to sit next to me so I would have, you
> know, creature comfort.  Whenever my candle burned down,
> somebody would bring me another lit candle.  I went through three or
> four candles with people just bringing me candles when mine burned
> down, and letting me cry.  And eventually somebody whom I never
> really saw clearly, because I was just sitting cross-legged on the
> ground staring at the candle with tears streaming down my cheeks,
> and somebody came and kind of knelt next to me and waited a
> second to see if I would say anything, and I didn't, and then he said
> very quietly, if you need a shoulder to cry on, I have an extra one.
> And I turned to put my head on his shoulder, and broke into heaving,
> gasping, very loud sobs, and just cried and cried and cried and cried.

Id. at 126.

Ms. Votaw testified that she decided to participate in this litigation because:

> I had just turned 22, when my father was killed.  I was still in
> college.  I was still very much my father's child and not my own
> person yet.  So in the second 20 years of my life, Daddy being dead
> is just being a huge part of it, and him being killed in this way is a
> huge part of who I am, and I've gotten over the stage, you know,
> hello, my name is Marianne, my father was killed in Beirut . . .  But
> it's still extremely important to me that people know this about me . .
> . when [Anne Dammarell] e-mailed me that, you know, have you
> heard of this possibility [of a lawsuit], . . . I immediately knew that I
> would be in it.  That if a lawsuit were going to happen, I could not
> not be in it.  That it just – it was too much a part of me for me to
> stand by and watch it happen without actually participating.

Id. at 134-36.

Based on the evidence presented to the Court, including the testimony of Ms. Votaw, the

Court should award the Estate of Albert Votaw, by Estera Votaw as Administrator, $5 million for

the benefit of his surviving daughter, Marianne Votaw, to compensate for the loss of "services,

167

protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and solace" that she suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### f.      Susan (Votaw) West

Plaintiff Susan West ("Ms. West") was born on October 22, 1956 in Chicago, Illinois, and is a United States citizen. Phase II Exh. 37 at 1.  She is the third of the four daughters of Albert Votaw. Id.

Ms. West was about three years old when the Votaws moved to St. Louis, Missouri. Id. at 1-2.  As Ms. West recalled:

> My father was very unusual for his time in that he changed diapers, pushed strollers, and actively participated in raising us – something that is fairly common today, but was not so common in the 1960s.  In part to give my mother some time for herself, my father would take all of us grocery shopping on Saturdays and then spend Sundays doing various activities with us, including sledding in the wintertime and trips to various parks and museums.  My father liked to push the envelope – when he pushed us on the swings he would push us too fast and too high, and when we went sledding he would flop down on the sled with us so that we would speed down the hill.  We loved it.

Id. at 2.

Remembering her time with her father in Abidjan, Ms. West testified that, although he was "very busy" with professional responsibilities, he was "very present" in her and her sister's lives. Id. at 3.  As Ms. West stated:

> Our school ran on a French schedule, meaning that we would have class from 7:30-11:30 in the morning and from 2:30-6:30 in the evening, with a three hour lunch-time break.  The midday break meant that we had lunch, as well as supper, with our father every day.  Continuing the tradition that he had started in St. Louis, my father would take my sisters and I to the beach every Sunday.  The seas off the Ivory Coast are notoriously rough, and a number of

>people drown each year.  Despite this, my father would happily bob
>in the rough seas, and then nap on the beach.

Id.

After Ms. West graduated from high school in Virginia, she moved with her family back to

Abidjan. Id. at 4.  Though she was also a high school graduate, she had graduated at a very young

age and her parents decided that she was "not ready emotionally" for college. Id.  Remembering

this second period of her childhood in Abidjan, Ms. West stated that she:

>had a fabulous relationship with my father during this period.  My
>father would still, as before, spend Sundays with us at the beach.
>With my older sisters in college, however, I had much more time
>with my father, and had more direct and relaxed conversations with
>him.  My parents entertained a great deal, and our house became the
>center of a cosmopolitan circle with members from the African and
>diplomatic communities.

Id. at 4-5.  In 1974, at the age of 17, Ms. West returned to United States to attend Middlebury

College in Vermont. Id. at 5.  Her father flew in from the Ivory Coast to drop her off at

Middlebury, and to generally get her "settled in." Id.  While at Middlebury, she returned to Abidjan

for the holidays and summers. Id.

Ms. West graduated from Middlebury in 1978 and she began working for the African-

American Institute in New York City, running a fellowship program that brought African students

to the United States to study in technical fields and to receive training as professors so that they

could return and teach in their home countries. Id.  Ms. West felt that her "interest in the Institute

was a direct result of having spent a large part of my childhood and young adult years in Africa,

and having observed first hand what my father did for a living in the area of international affairs.  I

never would have even considered the field but for my family's experiences in Africa." Id.

When her parents moved to Thailand in 1981, Ms. West was "devastated," because she "considered the Ivory Coast home." Id. at 6.  In January 1983, her father came to visit her in New York, where they "shopped and just sort of hung out." Id.  During the visit, he told her that his next posting would be in Beirut. Id.  She remembers that, "[w]hen I expressed some concerns about this, he responded that the United States would not send people into a country if it was too dangerous to do so, so not to worry." Id.

In mid-March, 1983, Ms. West went to visit her parents in Thailand. Id.  During this trip, she and her mother decided to go to India, planning to stay for two weeks. Id.  Ms. West had planned to fly directly home to the United States from India, and her mother was planning to return to Bangkok to "pack out" and join her husband in Beirut. Id. at 6-7.  The last time that Ms. West saw her father was when they said good-bye at the airport in Bangkok when she and her mother were leaving for India. Id. at 7.

Although Ms. West had originally planned to fly back to the United States on April 20, 1983, she decided to depart earlier and was able to get a stand-by seat on a flight scheduled to depart a day earlier. Id.  While she was at the airport waiting for her flight back to the United States, she picked up a copy of the *Hindustan Times* and saw a picture of the United States Embassy in Beirut on the front page. Id.  In response, she "started shaking," but did not follow up on the report, because she did not think that her father had been involved. Id.  The United States Embassy in India was able to find Ms. West at the airport and let her know that her father was missing. Id. 7-8.  Instead of flying home to the United states, she flew back to Thailand. Id. at 8.

Her mother was waiting for her at the airport in Bangkok and, at that point, told Ms. West that her father was dead. Id.  Ms. West stated that when "I heard the news I just started chattering,

and could not stop.  Someone handed me some grapes which I ate, and then promptly threw up.  I was completely in shock and grief." Id.  After leaving the airport, she began to cry and, "[f]or the next several days I would drift to sleep and wake up, then realize that my father was dead and begin to cry again." Id.  She and her mother remained in Bangkok for a few days, while her mother finished packing, and then flew with a family friend back to the United States. Id.  Ms. West recalled that during this trip, "[m]y mother was like a cornered animal, lashing out in her grief.  Sitting on the plane, I wrote over and over again 'Daddy is dead, Daddy is dead' – I just couldn't get my head around the fact." Id.

Once in the United States, they joined other family members at her sister Claire's house in Arlington, Virginia, with Ms. West remarking that "[i]t was a huge relief to get back to the United States and share my grief with my sisters." Id. at 8-9.

Ms. West attended the memorial service at the Washington National Cathedral with her family. Id. at 9.  Ms. West remembers that members of her family "alternated between laughing and crying." Id.  The Votaw family later held a private memorial service for Mr. Votaw at a Quaker meeting house in Washington, D.C., which Ms. West felt "allowed a community of family and friends to grieve with us, and permitted us to reach some form of closure." Id.

Ms. West stated that, "[t]he impact of my father's death on my family was unimaginable.  My father was central to all of us." Id. at 10.  She explained that her mother, although she "was and is an extremely intelligent woman . . . had never had to manage household affairs and, before my father's death, had never written a check.  Now, she faced the prospect of doing all of these things plus finding a place to live." Id.  Describing the impact of her father's death on her personally, Ms. West stated:

> My father's death left me frozen for a number of years, and I
> couldn't seem to make any personal decisions. While I was dating a
> gentleman at the time of my father's death, the relationship was not
> going well, and I had planned to end it. After my father's death,
> however, I couldn't deal with any more loss, so I stayed in the
> relationship for another five years because I basically felt inert. I
> also remember hallucinating, and 'seeing' my father. One day, in the
> summer of 1983, I had gone down by the East River in New York to
> eat lunch. I looked up, and saw my father floating in the water,
> wearing the shirt that he had had on when he said good-bye to my
> mother and I at the airport in Bangkok. I then saw him climbing on
> the rocks. I ran away. I thought that I was going insane. I also
> checked the inside of every passing taxi to see if my father was
> inside.

Id. at 10-11. See Dammarell I, 281 F. Supp. 2d at 189-90 (discussing expert testimony that

"numbing or avoidance," and "a sense of inefficacy" about controlling one's fate are commonly

experienced symptoms in aftermath of a traumatic or "stressor" event).

During a visit to Abidjan, Ms. West "picked up a book of honor, which had been made

available at the Embassy in the weeks following my father's death and in which people who had

known my family had written their condolences. I cried non-stop, because receiving and looking

through the book ripped the scab off the open wound that to me represented the loss of my father."

Phase II Exh. 37 at 11.

In 1986, Ms. West applied to graduate school and, in 1988, she entered a graduate program

in Public Policy at the Kennedy School at Harvard University. Id. at 12. She noted, "I am sure that

my father would have been very proud of me." Id. She added that:

> At the time, I wore the Beirut Embassy bombing on my sleeve. I
> would tell everyone I met what had happened to my father, because
> the experience was so defining to me and so present in my heart and
> mind, and because I simply could not keep the experience to myself.
> Immediately after telling people what had happened grief would
> wash over me, and I would start sobbing.

172

Id.  She "finally began to heal and really move on" with her life about five years after her father's

death.  Id.  She attributes this in part to her husband Jonathan, who she met at Harvard.  Id.  He had

lost his mother to cancer when he was twelve-years-old and, as Ms. West stated, "[a]t one point, he

flatly told me, 'it's over, he's dead.  Move on.'  While the process was long, painful, and difficult, I

knew he was right, and that I had to move on with my life."  Id.

Ms. West knew personally one of the passengers that was on the American Airlines flight

that struck one of the World Trade Center towers.  Id. at 13.  She stated that, "[w]hen I heard what

had happened, I wondered how terrorism could have managed to personally hit me twice."  Id.

When asked to describe the impact of her father's death on her life Ms. West responded:

> Even today, the impact of my father's death is enormous.  At every
> family gathering, people talk about and cry over his loss.  My mother
> has had to spend the second half of her life alone, which is the
> second time of such loneliness in her life as she, as a young woman,
> lost her family in concentration camps.  I couldn't take any
> constructive steps with respect to my future for the five years
> following my father's death.  This, in turn, had an impact on the next
> ten years of my life.  I do not think that I will ever completely get
> over the loss of my father in the Beirut Embassy bombing.

Id.

Ms. West explained why she decided to participate in this litigation:

> I felt that it would be an opportunity finally to blame someone and
> make someone pay for the bombing of the U.S. Embassy in Beirut.  I
> am uncomfortable with the monetary aspect of the case, but want
> formal recognition of who planned and carried out the attack.  So far
> there has been no trial, and no closure.  I discussed participating in
> the lawsuit with my family and ultimately did it out of family
> solidarity – we decided that we were either all in, or none of us
> would participate.

Id. at 14.

Based on the evidence presented to the Court, including the declaration of Ms. West, <u>see</u> Phase II Exh. 37, the Court should award the Estate of Albert Votaw, by Estera Votaw as Administrator, $5 million for the benefit of his surviving daughter, Susan West, to compensate for the loss of "services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and solace" that she suffered. <u>See</u> Va. Code § 8.01-52; <u>Dammarell I</u>, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### 2. Estate and Surviving Family Members of Frank Johnston

#### a. Estate of Frank Johnston

Plaintiff Frank Johnston ("Mr. Johnston") was born on February 20, 1936 in New York and was a United States citizen. Phase II Supp. Exh. 1 at 10. <u>See</u> also Tr. Vol. VII at 21.

Mr. Johnston began working for the federal government in 1958. Phase II Supp. Exh. 1 at 10. While employed with the federal government, Mr. Johnston took courses at Georgetown University, from where he earned a Bachelor of Science in International Affairs in 1966. <u>Id.</u> In 1982, while on an overseas posting in Germany, Mr. Johnston met his future wife, Arlette. Tr. Vol. VII at 4. The couple returned to the United States, where they were married and lived in Virginia. <u>Id.</u> at 6-7. <u>See</u> also Pls. Mem. in Supp. of State Law Claims at 95.

Shortly after the couple moved to the United States, Mr. Johnston was assigned to the United States Embassy in Beirut. Tr. Vol. VII at 7. The Johnstons arrived in Beirut in January 1983. <u>Id.</u> On April 18, 1983, Mr. Johnston was killed in the Embassy bombing. Phase II Supp. Exh. 1 at 10. <u>See</u> also Tr. Vol. VII at 16-17. Mr. Johnston's estate was probated in Virginia and, for purposes of this litigation, his estate is represented by Arlette Johnston, as Administrator. <u>See</u> Phase II Exh. 21 (Estate papers of Frank Johnston).

The Estate of Frank Johnston has asserted claims under Virginia's wrongful death statute. Pls. Mem. in Supp. of State Law Claims at 137-38.  As the administrator of her late husband's estate, Arlette Johnston is the proper plaintiff to bring a wrongful death action under Virginia law. See Va. Code § 8.01-53(A).  Because it appears that Mr. Johnston had no children, pursuant to Section 8.01-53(A) of the Virginia Code, any recovery is for the benefit of Mr. Johnston's surviving spouse. See id.

Based on the pleadings and the evidence presented to the Court, the Estate of Frank Johnston has made out a valid claim for wrongful death under Virginia law and is entitled to recover "[c]ompensation for reasonably expected loss of . . . income of the decent" as well as an amount that reflects the value of the "services, protection, care and assistance provided by the decedent" and that accounts for the "[s]orrow, mental anguish, and solace" of his survivors. See Va. Code § 8.01-52.  The expert economic analysis presented to the Court demonstrated that, were it not for Mr. Johnston's untimely and wrongful death, he would have earned wages, benefits, and retirement pay amounting to $1,008,000. See Phase II Supp. Exh. 1 at 10-12.  The Court, therefore, should award the Estate of Frank Johnston, by Arelette Johnston as administrator, $1,008,000 in economic damages for the benefit of his surviving spouse, Arlette Johnston.  As for the intangible aspect of the estate's wrongful death recovery, the Court will address those awards below, in a more individualized discussion of Arlette Johnston's claims.

### b.        *Arlette Johnston*

Plaintiff Arlette Johnston ("Ms. Johnston") was born in 1959 in Nazareth, Israel. Tr. Vol. VII at 3.  She became a United States citizen in 1982, when she married Frank Johnston. Id. at 3-4. Her husband, Frank Johnston, was among the Americans killed in the April 18, 1983 bombing of

the United States Embassy in Beirut and is appearing in this matter both individually, and in her

capacity as Administrator of the Estate of Frank Johnston. <u>See</u> Phase II Exh. 21 (Estate papers of

Frank Johnston); Tr. Vol. VII at 21.

When Ms. Johnston was in her early twenties, her father got a job in Bonn, West Germany,

doing construction work with the United States Embassy and the General Services Administration.

Tr. Vol. VII at 4. Accordingly, Ms. Johnston's family moved to Bonn, where she had significant

contact with the American community there. <u>Id.</u> Frank Johnston worked as a federal government

employee and resided in Bonn at the time. <u>Id.</u> As Ms. Johnston testified, "[t]here was like a club

and sports area that my sister and I were going bowling, you know, one evening, and he was with a

friend of his bowling at the same time, and that's how we met." <u>Id.</u> Despite the difference in their

ages, they immediately hit it off, as Ms. Johnston explained:

> he was so happy. He was jumping everywhere on the bowling place and very
> happy, and I guess he liked me a lot, maybe love at first sight, and he wanted to take
> me for a first date to go visit our – first we were supposed to go to church, actually,
> and I said, Yes, but I cannot date because I come from a family – I'm Persian; you
> know, I have to ask permission – although I was in my twenties – so if you want to
> date me, I have to get engaged, so you have to go meet my
> parents and get engaged. And then he did and then he came to my parents.

<u>Id.</u> at 5. While Ms. Johnston's parents were concerned about the age and cultural differences, they

ultimately agreed to the engagement. <u>Id.</u>

When Mr. Johnston's posting in Germany ended and he was to return to the United States,

the couple decided that Ms. Johnston should go with him and that they should get married. <u>Id.</u> at 6.

Ms. Johnston recalled that "at that time, I remember it was very difficult because we had to make

like a run-away plan in case my parents won't let me go with him in the plane." <u>Id.</u> Her parents

relented, Ms. Johnston moved to the United States, and the couple was married in Washington,

D.C. in October 1982. Id. at 6-7.

After remaining in the United States for several months, Mr. Johnston learned that his next

posting would be Beirut, Lebanon. Id. at 7.  The couple moved to Beirut in January 1983. Id.

Remembering the first few months of her marriage, Ms. Johnston testified:

> [I]t was great.  It was a lot of fun.  We had a great time because I was
> very excited.  It was my first time I'm married, and of course he was
> a very intelligent man, a lot of fun.  We were trying to get our house
> set up, and it was the first time I have a house and I have to furnish
> it, and I remember I was in the final stages of finishing the house,
> putting the drapes up, and so it was exciting to be with him in a
> different place, a place that I knew also the language, which made it
> seem easier.  And we started planning for the future, of course, and,
> you know, he started to get ready for his job, and I was trying to start
> school, you know, to go – I wanted to go to [the American University
> of Beirut].  So I went there and I started the application, and I was
> accepted, which was a good thing.

Id. at 8-9.  Ms. Johnston testified that she and her husband "toured around.  We went everywhere.

We danced and we drank, and we went everywhere in Lebanon." Id. at 9-10.

Ms. Johnston remembers the conversation that she had with her husband the night before

the bombing:

> Frank was getting ready for bed, and then he was talking to himself,
> and I said what are you talking about, and he said I'm talking to him,
> I said who.  He said I'm talking to God.  I said what.  He said that
> just when I'm going to die, I'm going to talk to him and tell him –
> I'm just going to have to talk to him.  I said, Stop talking like that;
> don't say that.  He said, Don't worry; you will be nice beautiful rich
> widow.  And I don't know why he said that, but that evening, I
> couldn't sleep very well.  I had little cramps, and then you know,
> oddly, I heard also an owl.  An owl in your country is okay, but in
> our country, it was like what is this noise.  For our tradition, it was
> like not very good, like bad luck, and then in the morning, we went
> to sleep.

177

Id. at 12.  The next morning, April 18, 1983, Ms. Johnston was not feeling well, and decided to

skip her classes at the university.  Id. at 12-13.  She watched as her husband got ready for work,

noting "[h]e was very enthusiastic.  He had an important meeting to go to, and I told him I wasn't

going to school."  Id. at 13.  Mr. Johnston teased his wife about being "lazy" and just wanting "to

skip school" that day.  Id.  She suggested that they meet for lunch after Mr. Johnston finished his

meeting and, "he said okay.  You know, he gave me a kiss and he left.  Then I called him back and

said, Frank, come back and give me one more kiss for some reason.  I don't know.  And I said I

hope I see you at lunch, and he was gone."  Id.  This was the last time that Ms. Johnston saw her

husband.

In the early afternoon, Ms. Johnston's landlord knocked on the door and asked whether

everything was okay.  Id.  Ms. Johnston responded, "yes," but wondered why her neighbor was

asking.  Id. at 13-14.  Shortly thereafter:

> a waiter from that restaurant that we knew, he came and he was
> knocking on the door, and he said, Are you okay; Sam sent me – you
> know, the owner of that restaurant – are you okay?  I said yes, I'm
> fine; everything is okay.  And he said the embassy was bombed, and
> I said – I couldn't – I said what, and he said yes, and he said Sam
> sent me to fetch you to see if you were okay.  And then I just
> remember putting my sneakers on very quickly and rushing down
> towards the restaurant.  You know, our house was kind of close to
> that restaurant area and the embassy.

Id. at 14.  She remembers running to the Embassy:

> It was just very dark and very rainy, and it wasn't a very good day,
> and we went to the restaurant and Sam saw me and we ran to the
> embassy side, which is all – you know, it was all shattered and
> everything, and we were looking for the place where they were – he
> said, Come see where the people who maybe got injured or
> something.  They had the list of the people who were, I guess, going
> to the hospital, and there were tons of people calling – you know,

178

> he's calling for me, you know, is Frank Johnston's name there, and
> he was not on the list.
>
> While all this commotion was happening, somebody saw me, and
> they say you come with us, and they took us to a place, and I
> gathered later that was the place where all the people, the personnel,
> that were supposed to go to that area to wait there so they will gather
> all the personnel, the American personnel.

Id. at 14-15.  Ms. Johnston waited, but "nobody came, and then it was getting later and darker." Id.

at 16.  At one point, someone indicated that everyone who had survived would be brought to the

room. Id. at 18.  Ms. Johnston grew concerned: "I said he should have been here by now, because I

know he wouldn't leave me alone.  So I think then I realized that something was really wrong,

because he would have rushed to see me." Id.

That evening, Ms. Johnston was taken to wait at Alison Haas' house. Id. at 16.  Ms.

Johnston testified that someone came to the house with some of her husband's personal effects:

> Somebody came with Frank's stuff to Alison's house, and he had his
> wallet and his watch and a couple of things, some of his effects, and,
> you know, somebody came to me to verify that it was his stuff, and it
> was, of course, his wallet with his picture and everything was in
> there.  And I remember just they gave me a pill or something, and I,
> you know, fell asleep, and then its like I regret it so much because I
> always thought – [pause].  I don't know.  I always thought that I
> didn't give him justice by not going there and looking for him.  I felt
> like I was trapped and I couldn't go look for him and then that I
> remember I never got to see him because I really wanted to see him.

Id. at 16-17.

Ms. Johnston testified that she woke up the following morning, and "wanted to go home

because I wanted to see my dog.  It was Frank's dog, and he told me if something happens, the only

thing he has – to take care of that dog.  So I wanted to go back home to get him out for a walk and

stuff." Id. at 17.

Ms. Johnston went back to the apartment, in part to take care of the dog and in part because news of the attack had spread, and "everybody wanted to see where was I. Of course, my parents, they were so worried, and, you know, they were in Germany, and my sisters didn't know, maybe I was dead, and you can imagine all the agony that they were going through thinking maybe I was dead." Id. Once back home, she contacted her family, and told them that she had not been injured in the attack. Id.

Three or four days after the bombing, Ms. Johnston returned to the United States. Id. at 18. She attended the service at Andrews Air Force Base, as well as a subsequent memorial service at the National Cathedral. Id. at 19-20. To give her support, Ms. Johnston's parents flew in from Germany to accompany her to the various memorial services in Washington. Id. at 20.

Remembering her husband's funeral, Ms. Johnston testified:

> It was different. It was different than back home. You know, death is different here than back home. Over there, we've always been scared. Like if you see a coffin passing by, you have to run away and just like hide.
>
> So it was very – I remember I was very scared, because when I first went to the funeral home, I had to run out of there, and they had to bring me back. Dick Santos, Frank's best friend, was there, and he had to actually take my hand to the area.

Id. Remembering the burial at Arlington National Cemetery, Ms. Johnston testified, "[i]t was a big honor. It was very, very, very nice, a very nice funeral and very nice resting place for him." Id. at 21.

Ms. Johnston testified that after her husband's death:

> I did not know what to do at that point because my life completely had changed course, and I was like – had no focus whatsoever what to do. So my parents told me to come back with them to Germany.

> So I flew back with my parents to Germany.  You know, a couple of
> my sisters were there.  Everybody was there.

Id. at 22.  Over the next several years she attended classes at a university in Bonn, traveled to Israel

where she did some modeling, and then traveled back to Germany.  Id. at 22-23.

In about 1986, Ms. Johnston decided to move to the United States, settling in Texas. Id. at

23.  Ms. Johnston has never remarried, explaining that Mr. Johnston:

> was my first love, and he was my first everything, and I looked up to
> him for everything.  So you could imagine I have – I guess my life
> was surrounded with him because I felt secure with him.  I felt like
> he was leading me and we were going to have a life together,
> children together, everything.  So you can imagine that affected me
> tremendously after his death . . . .

Id. at 25-27.

Testifying about how the death of her husband effected her, Ms. Johnston explained:

> For many years, I would talk to myself, thinking he's behind me or I
> would talk to him and stuff like that.  I remember one thing, that one
> time I was talking to somebody, because I would always think he
> was behind me and I'm talking to him, and one person told me – I
> told spoke to one person, and he said to me, I read sometimes they
> get stuck, when people get killed like that, they're stuck in this kind
> of thing; so every time you see him and you talk to him, just tell him
> to lead him – to go to the light, and I remember I did that for a couple
> of times, and thank God it got better, but that was like for the
> beginning of many years that I had that.
>
> He affected me, you know, until now, it's already 21 years, and when
> you go back that far, you know, it's like you could feel like it's a part
> of your life that will never go away.  It's there, and I will never forget
> him ever, ever, and I have his picture all the time.  And I want to go
> on with my life.  It's not that, but he is a part of my life I don't want
> to forget, because he was a good part.  He brought me here.  He
> brought me to the United States.  He gave me a better life, and you
> know, an honorable life, and, you know, since he was also – you
> know, he had so much charisma and so much fun and working for
> the Federal Government and very, very intelligent.  He gave me a lot

> of things to look forward to.  I think it was a very, very good thing
> that changed my life totally.

Id. at 26-27.  Ms. Johnston has never sought any psychiatric help to deal with the loss of her

husband, noting that "prayers," along with "family and friends and coworkers" have been "the

biggest support." Id. at 27.

When asked why she elected to participate in this litigation Ms. Johnston testified:

> It's justice.  It's very important, I think, for every individual and
> every state in that case, the State of Iran to know, individual or state,
> that there's nothing that goes unpunished; there is always – for every
> action, there's consequences and things have to get justice.

Id. at 27-28.

Based on the evidence presented to the Court, including the testimony of Ms. Johnston, the

Court should award the Estate of Frank Johnston, by Arlette Johnston as Administrator, $10

million for the benefit of his surviving spouse, Arlette Johnston, to compensate for the loss of

"services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental

anguish, and solace" that she suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at

196-98 (explaining typical damage awards for solatium claims).

### 3. Estate and Surviving Family Members of James and Monique Lewis

#### a. Estate of James Lewis

James Lewis ("Mr. Lewis") was assigned to the United States Embassy in Beirut with the

federal government. Tr. Vol. VIII at 65.  He was killed in the April 18, 1983 bombing of the

Embassy. Id. at 56.  Mr. Lewis was married to Monique Lewis, who was also killed in the

bombing. Id.  The Estate of James Lewis is represented by his mother Antoinette Lewis ("Mrs.

Lewis"), as Co-administrator, for purposes of this litigation. Id. at 56-57. See Phase II Exh. 29

(Estate papers for the Estate of James Lewis).

Mr. Lewis was born on February 29, 1944 in Chicago, Illinois, and was a United States

citizen. Tr. Vol. VIII at 58.  Mrs. Lewis described her son as a "very determined young man.  He

set goals for himself and usually achieved what he went after and wanted to excel in everything he

attempted to do." Id.  Mr. Lewis graduated from Hoover High School in San Diego, California in

1962. Id. at 59.  Although he was only an "average student," he was an "avid reader." Id.  Among

his many interests in high school was the military. Id. at 58-59.  During his early years of high

school, he expressed an interest in joining the military, and did in fact join the Army immediately

after his graduation. Id. at 60.

Mr. Lewis entered the Army as a Private. Id.  Having a very successful military career from

the beginning, he was selected to be a member of the Green Berets, an elite Special Forces unit. Id.

He also successfully completed Officer Candidate School, and earned the rank of Captain. Id.

During his time in the military Mr. Lewis served in Vietnam. Id.  He earned many medals and

commendations for his service, including the Purple Heart and the Bronze Star. Id. at 60-61. See

Phase II Exh. 31 at 2-3 (Mr. Lewis' Purple Heart and Bronze Star citations).

Mr. Lewis also returned to school while in the military, earning a Bachelor of Arts in

Political Science from St. Benedict's College and a Bachelor of Arts in French and French

Literature from George Washington University. Id. at 61.  In 1970, Mr. Lewis left the military and

obtained a position with the federal government. Id. at 61-62.

Mr. Lewis first met his future wife, Monique Lewis, while he was living in the Washington,

D.C. area. Id. at 64.  However, the couple did not begin dating until they were later reacquainted

while living near Fort Bragg, in North Carolina. Id.  They were married in 1980. Id.  Mrs. Lewis

testified that the couple "complemented each other.  She was very easy going.  He was a little more

rigid about accomplishing things and so on.  They were very happy.  You never heard [a] cross

word.  They were very much in love." Id. at 64-65.

In December 1982, Mr. Lewis was assigned to a position at the United States Embassy in

Beirut. Id. at 65.  His wife joined him shortly thereafter. Id.  Mr. Lewis and his wife were both

killed in the April 18, 1983 bombing. Id. at 56.

As a federal government employee stationed oversees, Mr. Lewis retained as his domicile

in 1983 the state in which he had last resided. See Dammarell II, 2005 WL 756090, at *22.

Immediately proceeding his move to Beirut, Mr. Lewis and his wife lived in Arlington, Virginia.

See Tr. Vol. VIII at 66; Phase II Exh. 31 (photograph of James and Monique Lewis in front of their

home in Arlington); Pls. Mem. in Supp. of State Law Claims at 96.  For purposes of this lawsuit,

the domicile of the estate is that of Mr. Lewis on the date of the bombing. See Dammarell II, 2005

WL 756090, at *22.  Accordingly, the law of Virginia applies to the claims of Mr. Lewis' estate.

Mr. Lewis' estate was probated in Virginia and his mother was appointed as a co-

administrator. Phase II Exh. 29.  Mr. Lewis' estate has asserted claims under Virginia's wrongful

death statute. Pls. Mem. in Supp. of State Law Claims at 138.  As the administrator of the estate,

Mrs. Lewis is the proper plaintiff to bring a wrongful death action under Virginia law. See Va.

Code § 8.01-53(A).  Pursuant to Section 8.01-53(A) of the Virginia Code, any recovery is for the

benefit of Mr. Lewis' surviving parent, brothers and sisters, and any dependants who shared his

household. See id.  The precise distribution of an award among the statutory beneficiaries is left to

the discretion of the Court. See Va. Code § 8.01-54(A).

184

Based on the pleadings and the evidence presented to the Court, the Estate of James Lewis has made out a valid claim for wrongful death under Virginia law and is entitled to recover "[c]ompensation for reasonably expected loss of . . . income of the decent" as well as an amount that reflects the value of the "services, protection, care and assistance provided by the decedent" and that accounts for the "[s]orrow, mental anguish, and solace" of his survivors. See Va. Code § 8.01-52. The expert economic analysis presented to the Court demonstrated that, were it not for Mr. Lewis's untimely and wrongful death, he would have earned wages, benefits, and retirement pay amounting to $3,879,000. See Phase II Exh. 1 at 18-20. The Court, therefore, should award the Estate of James Lewis, by Antoinette Lewis as administrator, $3,879,000 in economic damages for the benefit of his mother Antoinette Lewis. Although there was reference to possible surviving brothers and sisters in Mrs. Lewis' testimony, see Tr. Vol. VIII at 55, no such siblings have appeared in this action and there has been no argument or evidence presented to the Court that they would be entitled to any portion of the damages awarded to their brother's estate as a result of defendants' tortious conduct. Accordingly, using its discretion in distributing the damages between the class of beneficiaries, the Court should award the entire amount of the economic damages to his surviving mother. As for the intangible aspect of the estate's wrongful death recovery, the Court will address those awards below, in a more individualized discussion below of Mrs. Lewis' claims.

### b.      Estate of Monique Lewis

Monique Lewis ("Ms. Lewis")  accompanied her husband James Lewis to Lebanon, and subsequently obtained a position with the State Department at the United States Embassy in Beirut as well. Tr. Vol. VIII at 65, 69. Ms. Lewis and her husband were both killed in the April 18, 1983

185

bombing of the Embassy. Id. at 56.   The Estate of Monique Lewis is a plaintiff in this case and is represented by Ms. Lewis' mother-in-law Antoinette Lewis, as Co-administrator. Id. at 56-57. See also Phase II Exh. 30 (Estate papers for the Estate of Monique Lewis).

Ms. Lewis' birth name was Le Minh Nguyet and she was born on October 29, 1946 in Vietnam. Tr. Vol. VIII at 62.   She became a United States citizen in 1980. Id.   Mrs. Lewis described her daughter-in-law as "charming, easy going, non-affected, just so natural, really a lovely girl." Id. at 63.   She graduated from high school in Vietnam, and attended the University of Montpelier in France, where she earned the equivalent of a Bachelor of Science in Pharmacology in 1973. Id.   Ms. Lewis moved to the United States in 1973. Id.   After her arrival, she worked for a time at a hospital and completed the requirements that she needed to practice as a pharmacist in the United States. Id.   Ms. Lewis first meet husband in Washington, D.C. and, after the couple became reacquainted North Carolina, they married in 1980. Id. at 64.

In December 1982, Mr. Lewis, who worked for the federal government, was posted to the United States Embassy in Beirut. Id. at 65.   Ms. Lewis joined her husband in Beirut shortly thereafter, and also obtained a position at the Embassy. Id.   Her first day of work was April 18, 1983. Id. at 69.   Ms. Lewis and her husband were killed in the April 18, 1983 bombing of the Embassy. Id. at 56.

As a federal government employee stationed oversees, Ms. Lewis retained as her domicile in 1983 the state in which she had last resided. See Dammarell II, 2005 WL 756090, at *22. Immediately proceeding her move to Beirut, Ms. Lewis and her husband lived in Arlington, Virginia. See Tr. Vol. VIII at 66; Phase II Exh. 31 (photograph of James and Monique Lewis in front of their home in Arlington); Pls. Mem. in Supp. of State Law Claims at 96.   For purposes of

this lawsuit, the domicile of the estate is that of Ms. Lewis on the date of the bombing. See
Dammarell II, 2005 WL 756090, at *22.  Accordingly, the law of Virginia applies to the claims of
Ms. Lewis' estate.

Ms. Lewis' estate was probated in Virginia and her mother-in-law was appointed as a co-
administrator. Phase II Exh. 30.  Ms. Lewis' estate has asserted claims under Virginia's wrongful
death statute. Pls. Mem. in Supp. of State Law Claims at 138.  As the administrator of the estate,
Mrs. Lewis is the proper plaintiff to bring a wrongful death action under Virginia law. See Va.
Code § 8.01-53(A).  Because Ms. Lewis has no surviving spouse or issue, and there is no evidence
of any surviving kindred on either her mother's or father's side, pursuant to Sections 8.01-53(A)
and 64.1-1 of the Virginia Code, any recovery is for the benefit of her late husband's parents. See
id.; Va. Code § 64.1-1.

Based on the pleadings and the evidence presented to the Court, the Estate of Monique
Lewis has made out a valid claim for wrongful death under Virginia law and is entitled to recover
"[c]ompensation for reasonably expected loss of . . . income of the decent" as well as an amount
that reflects the value of the "services, protection, care and assistance provided by the decedent"
and that accounts for the "[s]orrow, mental anguish, and solace" of her survivors. See Va. Code §
8.01-52.  The expert economic analysis presented to the Court demonstrated that, were it not for
Ms. Lewis's untimely and wrongful death, she would have earned wages, benefits, and retirement
pay amounting to $1,180,000. See Phase II Exh. 1 at 20-22.  The Court, therefore, should award
the Estate of Monique Lewis, by Antoinette Lewis as administrator, $1,180,000 in economic
damages for the benefit of her mother-in-law Antoinette Lewis.  As for the intangible aspect of the

estate's wrongful death recovery, the Court will address those awards below, in a more individualized discussion below of Mrs. Lewis' claims.

### c.      Antoinette Lewis

Plaintiff Antoinette Lewis is the mother of James Lewis and the mother-in-law of Monique Lewis, both of whom were killed in the April 18, 1983 bombing of the United States Embassy in Beirut. Tr. Vol. VIII at 55-56.  Mrs. Lewis is participating in this lawsuit on her own behalf, and also as the Co-administrator of the Estates of James and Monique Lewis. Id. at 56-58.

Mrs. Lewis was born in Cincinnati, Ohio, and is a United States citizen. Id. at 55.  She presently resides in San Diego, California. Id.  Mrs. Lewis is widowed and has six children, including James Lewis. Id.  She testified that she had "a very nice relationship" with her son and that she "had a lot of respect for his judgment." Id. at 59.  The two had shared interests, including reading, a passion which prompted Mrs. Lewis to obtain her degree in English, which she received in 1985 from San Diego State University. Id. at 56, 59.

Mrs. Lewis' son informed her that he and his wife were going to move to Beirut in a card. Id. at 65.  In response to this news, Mrs. Lewis was "somewhat" concerned for the couple's safety, but felt reassured by various letters that she received from the couple while they were in Beirut, wherein they "declared their liking for the place very much, said it was beautiful . . . and Jimmy enjoyed going out and shopping for his spices and things like [that] which were readily available." Id. at 66.  The last contact that Mrs. Lewis had with her son and daughter-in-law was a post card that they sent while on a trip outside of Beirut. Id. at 67.

On April 18, 1983, Mrs. Lewis was at home in San Diego, California. Id.  Her daughter called at about 6:30 a.m. and "asked if I was worried." Id. at 67-68.  Describing this telephone

188

conversation, Mrs. Lewis testified:  "I said, Worried about what.  She said, Well, the embassy was

bombed.  And I said, Well, Susan they're not there; they're on a trip; they're someplace else.  Of

course it was partly denial, I guess, but this was my understanding of what I told myself." Id. at 68.

Later that day, Mrs. Lewis received a phone call from the State Department, and she remembers

"not even believing that they were at the embassy" and that "the rest of the day was quite a blur."

Id.  The next day, she received another call in which the State Department:

> cleared it up for me and said yes, they were there, both at the office.
> So that's when I realized, when I had no word from them, that this
> was very serious.  That night, oh, very late at night, a gentleman
> came to the house and said they still had no definite word, and then
> about a half an hour later he came back and said that it was
> confirmed, that the bodies had been located.

Id.  Describing her reaction to the news, Mrs. Lewis testified, "I was sort of half prepared for it, but

it was stunning.  The world just turns upside down.  Everything is different, but you just go on." Id.

at 69.

Over the next several days arrangements were made for Mrs. Lewis and her family to travel

to Washington, D.C. Id.  Mrs. Lewis received a telephone call from then Vice President George

Bush, during which she asked that James and Monique be buried at Arlington National Cemetery.

Id.  Mrs. Lewis and her family attended the ceremony at Andrews Air Force Base and remembers:

> Well, it was very well attended.  There were many, many rows of
> family members present.  The coffins were all lined up in front of the
> podium where various speakers talked, and then afterwards the
> President and Mrs. Reagan came and traveled up and down all the
> rows and greeted each person and expressed their sympathy and gave
> everyone a hug.

Id. at 69-70.  Mrs. Lewis and her family also attended a ceremony at the National Cathedral for the

victims, but she remembers little about it. Id.  James and Monique Lewis were buried side-by-side

at Arlington National Cemetery and Mrs. Lewis described the ceremony as "just a relatively simple

military funeral, but very moving." Id. at 71.  She testified that the experience of burying James

and Monique was "[v]ery bad.  It shouldn't happen.  It's very, very difficult to talk about it." Id.

Explaining what she misses about her son, Mrs. Lewis testified:

> I miss his sense of humor.  He was a little off the wall sometimes and
> just the common interests that we had, and he was a very clear-
> thinking person.  I think if there had been any kind of a problem, he
> wouldn't have come to me.  I would have gone to him.  He was just a
> – it's a hole in the family structure that we always – it's in the back
> of our minds always.

Id. at 72-73.  With respect to what she misses about her daughter-in-law, Mrs. Lewis testified that

"[s]he was so easy to be with and so thoughtful, kind, very lovely." Id.

Explaining why she decided to participate in this lawsuit, on her own behalf and on behalf

of the Estates of James and Monique Lewis, Mrs. Lewis stated, "mainly for the recognition.  I feel

like they sort of were the lost ones.  You very seldom ever see anything about the Beirut victims,

and of course accountability, maybe a little blow towards something against terrorism if they're

found accountable." Id.

Based on the evidence presented to the Court, including the testimony of Mrs. Lewis, the

Court shall award the Estate of James Lewis, by Antoinette Lewis as Co-administrator, $3.5

million for the benefit of his surviving mother, Antoinette Lewis, to compensate for the loss of

"services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental

anguish, and solace" that she suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at

196-98 (explaining typical damage awards for solatium claims).  Further, based on the evidence

presented to the Court, including the testimony of Mrs. Lewis, the Court shall award the Estate of

Monique Lewis, by Antoinette Lewis as Co-administrator, $1.5 million for the benefit of her

surviving mother-in-law, Antoinette Lewis, to compensate her for the loss of "services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and solace" that she suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### 4. Estate and Surviving Family Members of William Sheil

#### a. *Estate of William Sheil*

William Sheil ("Mr. Sheil") was born on March 26, 1924 in Chicago, Illinois. Phase II Exh. 39 at 1 (Declaration of John Sheil). He was a United States citizen. Id. Mr. Sheil was the father of plaintiffs William Sheil Jr., Carole Person, Cheryl Pienkowski, James Sheil, Judith Taft, Laura Monday, Elizabeth Sheil, and John Sheil. Id. Mr. Sheil's wife, who is also the mother of all eight of his children, died of a heart attack in 1979. Id. at 3. Mr. Sheil was in Beirut on a temporary duty posting, or TDY, and was killed in the April 18, 1983 Embassy bombing. Id. at 6. For purposes of this litigation, the Estate of William Sheil is represented by his youngest son, John Sheil, as Administrator. Id. at 1; Phase II Exh. 38 (Estate papers of William Sheil).

William Sheil entered the Army during World War II at the age of seventeen. Phase II Exh. 39 at 1-2. He served with distinction in that war, fighting in North Africa, Italy and France. Id. at 2. He later served in both the Korean and Vietnam Wars. Phase II Exh. 39 at 2; Tr. Vol. X at 41. While in the Army, Mr. Sheil was accepted into the Special Forces. Tr. Vol. X at 7-8. Once he was married, his wife and his children accompanied him to his various military postings, including Fort Riley, Kansas; Fort Bragg, North Carolina; Augsburg, Germany; and Okinawa, Japan. Phase II Exh. 40(B) at 1. Mr. Sheil often had to spend weeks at a time away from his family while he was sent out on assignments. See id. at 2. Over the course of his military career, Mr. Sheil earned a

number of commendations, including a Silver Star, a Bronze Star, several Purple Hearts, and a Combat Infantry Badge. Phase II Exh. 39 at 2; Tr. Vol. X at 41.

In 1964, Mr. Sheil retired from the Army. Tr. Vol. X at 12.  After retiring, he had several jobs in the Chicago area, including working for a bank and as the general manager of a warehouse. Id. at 42.  After a few years, he re-joined the federal government as a civilian employee and he moved with his wife and the children that still lived at home to Virginia. Id. at 14, 42.  In this new government position, Mr. Sheil again was again sent oversees. See id. at 15-16.  In 1970, Mr. Sheil, his wife, and the younger Sheil children moved back to Okinawa. Id. at 47.  From Okinawa, they moved to Thailand, where they remained until in 1974. Id. at 47-48.  In 1974, the family returned to Northern Virginia, after which Mr. Sheil only had short-term oversees posting, so the family remained in Virginia. Id. at 48-49.  In 1979, Mr. Sheil's wife died of a heart attack. Id. at 49.

Carole Person, the oldest of the eight Sheil children, described her father as "very loving and very caring." Id. at 6.  John Sheil, the youngest of the Sheil children, echoed this sentiment, describing his father as "a very well-liked individual, as his personality was one of wanting to help others and doing what was best for his family." Phase II Exh. 39 at 3.  Each of the Sheil children noted that their father, who had joined the military while still in high school, was very insistent regarding education. Tr. Vol. X at 9, 43, 78-79, 141-42.  Indeed, after William Sheil's death, his children "found out that in his will, [their father] had set aside, for his four youngest children, separate amounts for each child to continue their education and complete a degree program if they had not already done so." Phase II Exh. 42 at 8.

On the date of the Embassy bombing, Mr. Sheil was in Beirut on a short-term, temporary assignment and maintained his permanent residence in Virginia.  Accordingly, his domicile at the

time of his death was Virginia.  Therefore, for purposes of this lawsuit, the law of Virginia applies

to the claims of his estate.  See Dammarell II, 2005 WL 756090, at *22.

Mr. Sheil's estate was probated in Virginia and his son, John Sheil, was appointed as a Co-

administrator.  Phase II Exh. 38 (Estate papers of William Sheil).  Mr. Sheil's estate has asserted

claims under Virginia's wrongful death statute.  Pls. Mem. in Supp. of State Law Claims at 146-48.

As the administrator of the estate, John Sheil is the proper plaintiff to bring a wrongful death action

under Virginia law.  See Va. Code § 8.01-53(A).  Pursuant to Section 8.01-53(A) of the Virginia

Code, any recovery is for the benefit of William Sheil's surviving children.  See id.  The precise

distribution of an award among the statutory beneficiaries is left to the discretion of the Court.  See

Va. Code § 8.01-54(A).

Based on the pleadings and the evidence presented to the Court, the Estate of William Sheil

has made out a valid claim for wrongful death under Virginia law and is entitled to recover

"[c]ompensation for reasonably expected loss of . . . income of the decent" as well as an amount

that reflects the value of the "services, protection, care and assistance provided by the decedent"

and that accounts for the "[s]orrow, mental anguish, and solace" of his survivors.  See Va. Code §

8.01-52.  The expert economic analysis presented to the Court demonstrated that, were it not for

Mr. Sheil's untimely and wrongful death, he would have earned wages, benefits, and retirement

pay amounting to $1,669,000.  See Phase II Supp. Exh. 1 at 13-15.  The Court, therefore, should

award the Estate of William Sheil, by John Sheil as Co-administrator, $1,669,000 for the benefit of

his surviving children.  As for the intangible aspect of the estate's wrongful death recovery, the

Court will address those awards below, beneficiary by beneficiary.

### b.      John Sheil

Plaintiff John Sheil is the son, and youngest child, of William Sheil. Phase II Exh. 39 at 1, 2 (Declaration of John Sheil). He was born on August 22, 1962 in Fort Bragg, North Carolina, and is a United States citizen. Id. at 1. He is participating in this lawsuit as both the representative of his father's estate and as an individual plaintiff.

Describing his memories of living with his family in Okinawa and Thailand between 1970 and 1974, when Mr. Sheil was eight to twelve years old, Mr. Sheil stated:

> My older siblings had left home by this point, and only the four youngest children went overseas with my parents. Even though we were overseas due to my father's service in various war zones, we actually lived in safe haven areas. We did not see my father everyday, but rather every few weeks or months, depending on where he was specifically assigned. While my father was in sometimes dangerous areas, we focused primarily on his pending return trips. Each return was a very special occasion, and generally involved catching up from both sides, *i.e.*, him with us and us with him. We were disappointed when he had to leave, but realized later that he was doing what he knew best.

Id. at 2. Mr. Sheil added that when his father was at home, "he seemed intent on helping his children as best he could and ensuring that the family was set for any crises that might arise while he was gone." Id. at 3.

Mr. Sheil also remembers when his family moved back to the United States in 1974, living in Northern Virginia for a time, and then in Williamsburg. Id. During this period, he started high school and he remembers that his father "rarely traveled," and that he saw his father "virtually every day." Id. Like his siblings, Mr. Sheil was struck by his father's emphasis on education, stating:

> While he had not himself completed college he was a big advocate of education, and was instrumental in helping me realize that high school was a very important time, not least of which was in terms of preparation for college, and setting me up for opportunities in the

> future.  The further I proceeded in high school, the more my father
> impressed upon me that I needed to focus on those things (grades,
> extracurricular activities) that could assist my getting into a good
> college.

Id.

In 1979, Mr. Sheil and his parents moved to Maryland. Id.  By this time, Mr. Sheil was the

only of the eight Sheil children still living at home. Id.  In August, shortly after the move to

Maryland, his mother died of a heart attack. Id.  John Sheil recalled that her death "was quite

difficult, particularly as it came when my father was approaching retirement.  Her death meant that

all of his plans for post-retirement had changed significantly." Id.  Following Mrs. Sheil's death,

Mr. Sheil and his father continued to live together until Mr. Sheil finished high school in 1980. Id.

As Mr. Sheil testified:

> Suddenly it was just me and my father, living alone, though my
> siblings would often come and visit.  In a short period of time, life
> had gone from one of being part of a very large family to being part
> of a much smaller and more compact one.  In the process of trying to
> figure out how to live together, my father and I became much closer.
> This was a big change for my father because, given his travels over
> the years, he had never been the one at home with the kids.  My
> father and I ate out a lot, because neither one of us wanted to cook.
> At the same time, my father also developed his own social life,
> seeing his friends and playing golf when not working.

Id. at 3-4.  In 1980, Mr. Sheil graduated from high school, recalling that:

> My father was naturally very pleased upon my graduation from high
> school, and the fact that I had gotten into a quality university –
> Virginia Polytechnic and State University (Virginia Tech).  My
> father always stood behind my desire to attend college and
> specifically my choice of major, engineering, for which Virginia
> Tech was quite suitable.

Id. at 4.  While Mr. Sheil was at Virginia Tech, he saw his father every six weeks or so, who, at

time, had moved back to Virginia. Id.

In March 1983, Mr. Sheil spent spring break visiting his father, who told him that he was going to Beirut for a few weeks. Id. at 5.  He recalled that his father, who usually did not tell him where he was traveling, decided that this time his son "needed to know where he was going because the trip would be a 'little hairy.'" Id.  Mr. Sheil recalled thinking that his father "had been to many 'hairy' places, including combat during World War II, Korea and Vietnam, and hadn't had a problem, so I was not terribly worried." Id.  This visit was the last time that Mr. Sheil saw his father alive. Id.  He last spoke with his father in April 1983, the weekend his father left for Lebanon, simply to wish him a good trip. Id.

Mr. Sheil learned of the Beirut Embassy bombing on the afternoon of April 18, 1983 from a television news report. Id.  Remembering his reaction to the bombing, Mr. Sheil stated:

> One of my friends knew that my father was in Beirut, and asked me whether I thought there was any chance that he had been injured.  At the time I responded probably not, but the level of concern in my mind was growing very quickly.  After classes ended that day I went home, and began to watch television coverage of the bombing.  Later that evening, I heard additional details about the bombing on various news accounts.  This increased my concerns about my father's safety. I then received a phone call from my sister Carole, who told me that she had been contacted by U.S. government officials and informed that our father was believed to have been at the Embassy at the time of the bombing.  At that point, he was officially listed as missing.

Id. at 5-6.  Although his sister, Carole, and his friends suggested that he go to Washington, D.C. to be with other family members, he disagreed, recalling:

> I . . . had mid-term exams later in the week, so I was reluctant to go to Washington just to, in my mind, sit around indefinitely wondering about my father's fate.  I also wanted to take and do well on the exams so that I could pull my GPA up.  I decided to stay at school, took my mid-terms exams (not the best results ever), and made plans to join my family in the Washington area that Friday.

Id. at 6.  He did, however, speak with one or more of his sisters each evening for updates.  Id.  One

of his sisters called on Thursday evening, which was April 21, and confirmed that their father's

body had been found in the rubble of the Embassy.  Id.  Mr. Sheil traveled to Washington the next

day.  Id.

Mr. Sheil described the next several days as "a whirlwind."  Id.  He attended the official

ceremony at Andrews Air Force Base, where he was "struck by a lot of things, including the press

lights" that were constantly on the families of those who had been killed.  Id.  He also attended a

subsequent memorial service held at the National Cathedral in Washington.  Id.  Mr. Sheil recalled

that "[t]hroughout our stay in Washington, we traveled in convoys and were always surrounded by

security, because the government did not know whether surviving family members would be seen

by terrorists as targets."  Id. at 6-7.  Over the course of the week, Mr. Sheil and his family met

"several senior U.S. Government officials, including President Reagan," but overall "the whole

time was a blur."  Id. at 7.  After his father's burial at Arlington National Cemetery, Mr. Sheil, who

had been the last of the Sheil children to live with his father, spent "a few days closing accounts,"

cleaning his father's apartment and distributing his father's personal effects.  Id.

In his will, William Sheil had named another relative as executor.  Id.  However, it was

suggested that John Sheil and the family's attorney serve as co-executors.  Id.  Accordingly, at the

age of twenty-one, John Sheil became the co-executor of his father's estate.  Id.  Remembering that

responsibility, Mr. Sheil stated:

> For the next few months, I frequently drove from Virginia Tech to
> Northern Virginia, a trip that was about 4 ½ -5 hours each way, to
> meet with our family attorney and address issues related to my
> father's estate.  Since my mother had passed away in 1979 and since
> I had been the last of my siblings to live at home with my father, he
> had previously added my name to most of his bank accounts and

other holdings, which made my task somewhat easier.  This period of
time was still, however, very difficult for me.  I felt that I had lost my
anchor, as my father had been the center of the family circle.  I
needed time alone, but had to spend most of my time rushing about
to get things in order.

Id. at 7-8.

When the school year ended in June 1983, Mr. Sheil was on academic probation. Id. at 8.

Even with summer school he could not sufficiently raise his grades, and he had to sit out of school

the next academic year. Id.  He had been a participant in the Army ROTC program, but because he

was no longer a full-time student, the Army also "tore up" Mr. Sheil's contract with  them. Id.  Mr.

Sheil recalled that "[t]he only bright side to the situation was that I now had more time to complete

the necessary work with respect to my father's estate, which I closed out in 1984-1985." Id.

During his year on probation, Mr. Sheil lived with a sister in Northern Virginia, enrolled in

community college, and retook certain classes in order to bring up his grades and simply to "get out

of the house." Id.  After a few months he, however, was dropped from his classes, lost his

dependant status, and had to use money from the trust fund that his father had set up for him. Id.

Mr. Sheil then applied for a government position, which he received in February 1984 and which

provided some income. Id.

Mr. Sheil returned to Virginia Tech in the summer of 1984, but transferred to American

University shortly thereafter. Id.  After just a year at American, he transferred to George Mason

University, from where he ultimately graduated in the summer of 1989. Id. at 8-9.

Mr. Sheil stated that:

The loss of my father is something that is felt each day, and
especially at major life events related to personal life, work and
related activities.  His absence has been the most difficult at
particularly poignant times, when one would normally celebrate or

198

> commiserate with a parent, or during anniversaries of the attack, or even with other attacks of a similar nature that have taken place and bring back memories of the tragedy.  Being as young as I was when the tragedy occurred, I was also forced to take on responsibilities regarding my father's estate and other matters that I would not have done otherwise.  His advice and guidance are most particularly missed, even today.  It is also difficult knowing that my father worked very hard for his goal of a peaceful retirement, yet passed away only shortly before reaching this point in his life.

Id. at 9.

Mr. Sheil elected to participate in this lawsuit "to help make the point to past, present and future terrorists that the United States will not forget the use of terrorism against its citizens and interest, and will seek to ensure those who sponsor such violent acts are held accountable." Id. at 10.

Based on the evidence presented to the Court, including the declaration of John Sheil, see Phase II Exh. 39, the Court should award the Estate of William Sheil, by John Sheil as Co-administrator, $5 million for the benefit of his surviving son, John Sheil, to compensate for the loss of "services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and solace" that he suffered. See Va. Code § 8.01-52; Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### c.  *Laura Monday*

Plaintiff Laura Monday ("Ms. Monday") was born on April 14, 1958 in Augsburg, Germany, where her father William Sheil was posted at the time with the United States Army. Tr. Vol. X at 182.  She is a United States citizen. Id.  Ms. Monday is the sixth of the eight Sheil children. Id.

Ms. Monday described her father as "a little strict, very loving.  He loved doing things with his family when he was home.  He was a real family man." <u>Id.</u> at 183.  Ms. Monday remembers that, when she was about eight-years-old, her family moved to Northern Virginia, afer which her father "was home a lot more often . . . ." <u>Id.</u> at 183-84.  After several years in Northern Virginia the family moved to Okinawa, where they lived on a military base. <u>Id.</u> at 185.  Ms. Taft recalled that her father would "take us swimming whenever he was home.  And he had these lovely plaid swim trunks that we always made fun of.  So he made it quality time when he was around." <u>Id.</u>

Ms. Monday was entering high school when the Sheil family moved from Okinawa to Thailand. <u>Id.</u> at 185-86.  She testified that, while in Thailand, "I had a good relationship with my father.  I started, you know, getting into trouble a little bit here and there, you know, at the age of like 14, but nothing major, and he always – he just told us, you know, whatever you do reflects back on the whole family and on me.  So we were careful in what we did." <u>Id.</u> at 187.  Ms. Monday stated that her father encouraged his children to take risks because "he wanted to build our independence and our confidence in ourselves early on.  You know, it was still his house and his rules, but he didn't want us dependent on staying at home like that." <u>Id.</u> at 188.

When Ms. Monday was almost sixteen-years-old, the Sheil family moved back to Northern Virginia. <u>Id.</u>  Her father helped to ease the transition, as Ms. Sheil testified:

> He helped a lot.  You know, we – he stuck around after we first got there, and he showed us around, and I think just tried to kind of help us, you know, boost our confidence and saying you can do this and – because it was hard for me because I was just overwhelmed by so many people, you know, different things that had come about while we were gone overseas.

<u>Id.</u> at 189.  She remembers her father teaching her how to drive, affectionately nicknaming her "Lead Foot." <u>Id.</u> at 189-90.

After Ms. Monday completed high school, her father encouraged her to attend college, so she enrolled at Thomas Nelson Community College, despite her initial desire to "take a year off of school." Id. at 190-91.  After attending the community college for a year, Ms. Monday, along with her sister Judith Taft, applied for admission into the College of William and Mary. Id.  Ms. Monday was admitted and enrolled but "[p]retty much . . . hated every minute of it." Id. at 192.  At the end of her first school year there she left college, moving in with a friend despite her father's caution that the move "was a bad idea." Id. at 193.  Ms. Monday soon came to agree, but testified that "when I decided to move back in the house, he came up and picked up my stuff and actually did not tell me 'I told you so.'" Id.  Ms. Monday moved to Florida in 1978, but she still spoke with her parents at least once a week. Id. at 193-95.

Remembering when her father called her to tell her that her mother had died, Ms. Monday testified:

> He called one night when I was at work and left a message that I was
> to call him immediately when I got home from work.  But when I got
> home, it was really late, and my boy friend at the time said just call
> your dad, and I thought, oh, I'll just call him in the morning, it's too
> late to call him now.  And when I did call him in the morning, all he
> could say was your mom didn't make it.  And I didn't really know
> she had had a heart attack, but I knew what he meant, and he cried
> and I cried, and my landlady came over and cried.

Id. at 197.  That was the first time Ms. Monday had ever heard her father cry, and, as she stated "[i]t just made me cry.  And I just felt so bad for him because, you know, it's like the other half of him was gone." Id. at 197-98.  Ms. Monday explained that, when the family gathered to attend the funeral, "[h]e was acting like he was really strong, but you could see, there were like cracks in that veneer." Id. at 198.  She also noticed that "he didn't look like he was feeling up to par either." Id. Mr. Sheil wound up in the hospital on the day of his wife's funeral. Id.

Once Ms. Monday returned to Florida, she and her father talked frequently, as Ms. Monday explained, "if I was feeling bad about something or just kind of frustrated with life in general, he just seemed to know and he'd say, oh, you about ready for a visit yet?  And he's make arrangements and I'd go visit him for a couple of weeks or he'd come down and visit me for a week or so." Id. at 200.

During this period of time, her father continued to travel in connection with his government position. Id. at 202.  In early April 1983, Ms. Monday received a call from her father in which he indicated that he "was going to be going out of town in the next few days." Id.  As usual, he did not say where he was going and Ms. Monday did not ask. Id. at 202-04.  This was the last conversation that Ms. Monday ever had with her father. Id. at 202.

Ms. Monday described April 18, 1983 as follows:

> [T]he night before I had worked really late, and got home really late, and I was asleep, and I can't even remember what time it was.  It was probably, I'd say, after noon, got a phone call and walked next door, and Cheryl was on the phone, and she said Dad was in Beirut, and I was still probably half asleep and I went and?  Because I hadn't seen the news.  I hadn't seen anything.  And she said didn't you watch the news?  And I said no, and she said, well, you know, told me . . . everything, and she said do not go buy the paper.  And then she was going to, you know, call me.  She said he was missing, he hadn't reported in, and you know, she'd let me know more as she heard.
>
> So I hung up and I walked out of my landlady's apartment and I walked across the street to the newspaper machine and bought the paper, and the picture on the front page was the man hanging off the balcony, and I remember just looking at it really close to see if I could see if it was my dad.

Id. at 204-05.  After that Ms. Monday went back to her apartment:

> and cried.  I just – I was just in shock, and I prayed a lot.  I thought of all kinds of odd scenarios where he might be, where he didn't call in, and you know, just hoping he wasn't suffering, and wishing he was

> okay, but kind of knowing that he wasn't because he hadn't
> contacted anybody.  And I knew that would be the first thing he
> would do if he was okay.

Id. at 205.  Ms. Monday testified that:

> I don't even know what I did.  I didn't want to sit at home and watch
> the news.  I didn't want to go to anybody's house and talk, so I just
> kind of drove around, tried to stay by myself.  My husband was
> working and stuff, and I talked to him a little bit, but I just felt this
> big emptiness inside like my lifeline has been cut or something.  I
> just felt kind of alone.  I just waited.

Id. at 205-06.

The Thursday after the bombing, Ms. Monday received a call from her sister Cheryl

confirming that their father's body had been located at the Embassy site.  Id.  A government

employee called and made arrangements for Ms. Monday to join her family in Washington, D.C.

Id. at 206.  Ms. Monday was met at the airport by her sister Cheryl, went to the hotel where the rest

of the family was being housed.  Id. at 206.  Ms. Monday remembered that:

> It was just so hard to believe that he could be gone, and I had a lot of
> anger.
>
> I remember I was really, really sad.  I was really, really angry because
> everywhere we turned there were press people yelling at us, you
> know, taking pictures, and I just wanted them all to leave me alone.
> I just tried to get through each day as it went by.  Each hour as it
> went by.

Id.

The first ceremony that Ms. Monday attended was at Andrews Air Force Base.  Ms Monday

testified:

> I remember they gave me a military escort, there was this young guy,
> and he was to stay with me because my husband couldn't be there
> yet, and we walked in and all the caskets were lined up on the left,
> and I remember looking and just wondering which one my dad was

> in, and still just wishing this wasn't happening and it was a dream.
> And, you know, we filed to our seats, and I was looking at the press
> and I looked at him, and I said I thought there wasn't going to be any
> press here.  And he said they're not allowed to take pictures.  They
> have to turn their cameras off, and I'm looking at the lights on the
> cameras, thinking but they haven't.

> And like I said, I was really angry.  I was 25, and kind of feisty, and I
> remember the – my escort had to keep telling me to keep my hands
> in my pockets so I wouldn't use creative sign language towards the
> press, and we had to file past the caskets, and I looked at each one,
> just wondering . . . .

> You know, President Reagan and Nancy Reagan came by and spoke
> to each of us, you know, as we were seated, but at the time I just was
> not impressed with government at all.  I was still too angry about
> what had happened and why couldn't someone have prevented it.

Id. at 208-09.

Ms. Monday stated that another ceremony was held at Washington National Cathedral:  "It

honored all the victims, and I just thought it was really appropriate, and a nice thing." Id. at 209-10.

Ms. Monday has particular memories of her father's burial at Arlington National Cemetery,

testifying:

> I remember the caisson.  I knew my dad wanted to have that as part
> of the ceremony and the horse with the empty boots, and we were all
> riding in a limo, and I was holding it together really well, I thought,
> and at the service at the gravesite I was doing incredibly well for me
> until they played Taps, and every time I hear Taps now, it just brings
> it back a little bit.  I know Taps makes a lot of people cry.

> You know, I just felt it was what my father wanted, that kind of
> ceremony, it was what he deserved, and I was just really proud that,
> you know, that I could be that proud of my father, and he had died
> [doing] something he loved, and he wanted to do.  And I think if he
> had to die, he would have wanted to die doing something protecting
> his country.

Id. at 210-11.

After her father's death, Ms. Monday returned to Florida and quit her job: "I just took off, worked for a couple months, and really didn't know what to do with myself. I couldn't really deal with it." Id. at 214. While she eventually told herself that she had "to get over this," she described this period of her life as "very hard," adding that she "felt like I was drifting, my lifeline was gone." Id. She never sought therapy, but testified, "I think if I had gone and gotten counseling, I would have avoided a lot of problems later on." Id. at 214-15. When asked to describe these problems, Ms. Monday testified:

> A lot of alcohol problems. I drank a lot to kind of, I don't know, compensate for – to kind of help cover up how much I was hurting, and you know, just keeping too much inside. But the alcohol was the biggest problem I had.

Id. Ms. Monday ultimately developed liver problems and, in April, 2002, had a liver transplant. Id. at 215-16. While Ms. Monday does not attribute all of her alcohol problems to the loss of her father, she does feel that "if my dad had been around, I think things would have gone a lot differently." Id. at 216.

When asked to describe the impact of her father's death on her life Ms. Monday testified:

> Being so far away from the rest of the family, like I said, I think it made me feel more alone. It felt like I had to – all of a sudden I was the only one taking care of myself, and later when I had children and all, I think I was the one who – you know, I decided I had to do everything, I had to pay the bills, I had to make sure everything was done right, and I think my ex-husband and I had some problems because of that. I felt like I just had to take care of everything. And he would work and he'd bring me his paycheck and I'd pay bills, and if he needed money, I'd give him money, and it just – I think it caused problems in the long run. I didn't talk to him a lot about my dad or anything.

Id. at 216-17. Ms. Monday also feels that her father's death affected her professional career, stating that "I think I didn't have anybody urging me on. I didn't have any, you know – as much

205

support as he would have given me, and I got to the point where, you know, I'd find a job I liked,

and I'd just stay there, because it was easier to stay in a job where I was making good money and –

than to take that risk to go on to do something different." Id. at 217.

Ms. Monday also testified that subsequent terrorist attacks have brought back memories of

the Beirut Embassy bombing. Id. at 217-18.  Remembering her reaction to the September 11, 2001

attacks on the World Trade Center, Ms. Monday testified:

> I was watching the news, and they said something about the terrorist
> attack, and tears just started running down my face and I said they
> did it again, and it's all I could think of.  I just watched them replay
> that footage over and over, and all I could think of was those poor
> families of those people, and I said prayers for, you know, the people
> left behind who have to wonder, you know.  And as long as they had
> to wait for any word, I couldn't imagine – I mean I waited three days,
> and it was horrible.

Id.

Ms. Monday explained why she decided to participate in this lawsuit:

> [Y]ou can try to find these three or four or five individuals and
> punish them, but what about the people who made this possible.
> And when I was called about this lawsuit, you know, that is who
> needs to be held accountable are the people providing the funding for
> these terrorist attacks, and nothing happens to them, and they sit back
> and somewhere in their master plan they have succeeded in
> something, and I think they need to be stopped.  I think you need to
> get them where it hurts, and I think someone needs to be held
> accountable, and the people ultimately are the ones funding them that
> needed to be held responsible.  And I think I need a sense of closure
> on this, and I think just somebody being punished or held
> accountable will help that.

Id. at 219-20.

Based on the evidence presented to the Court, including the testimony of Ms. Monday, the

Court should award the Estate of William Sheil, by John Sheil as co-administrator, $5 million for

the benefit of his surviving daughter, Laura Monday, to compensate for the loss of "services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and solace" that she suffered. See Va. Code § 8.01-52; Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### d.      Carole Person

Plaintiff Carole Person ("Ms. Person") was born on August 8, 1946 in Chicago, Illinois, and current resides in Loudon County, Virginia. Tr. Vol. X at 3-4.  She is a United States citizen. Id. at 4. Ms. Person was the first born of William Sheil's children. Id. at 4, 9.

When Ms. Person was growing up, her father was in the Army and the family moved with each of his postings. See generally Id. at 5-12.  Ms. Person's first real memories are from when her family was living in Germany in 1955. Id. at 5.  Ms. Person remembers that, "[m]y dad took us to cathedrals and he even took us to a concentration camp.  He was always teaching us about history." Id.

After Germany, the family moved to Fort Rucker, Alabama, and then to Fort Bragg, North Carolina. Id. at 6-7.  Ms. Person testified that when her father was selected for membership in the Special Forces, she felt he was like "John Wayne," and remembered that the family was "so proud of him." Id. at 8.  While they were at Fort Bragg, her father was home "most of the time." Id.  Ms. Person, who was the oldest of the eight Sheil children, entered high school while the family lived at Fort Bragg, and recalled that her father offered her special words of encouragement because "he was very strong on education." Id. at 9.

Ms. Person was between her junior and senior years in high school when her family moved to Okinawa. Id. at 10.  She stated that whenever the family was about to be uprooted again, "[m]y

dad would tell us of a new assignment by bringing us boxes of Kleenex, and he didn't really have to say anything, he just, okay, here's the tissue, we have to move again." Id.  Once the family arrived on Okinawa, to Ms. Person's surprise, "it turned out to be a lot of fun, and a nice place to live." Id.  Ms. Person testified that, while posted on Okinawa, her father "was gone for months at a time, and he would come home maybe for a weekend now and then.  He wasn't there a lot.  He had to spend some time in Vietnam with the Green Berets." Id. at 11.  During her father's absences, her mother "carried on," and kept her children in line by telling them "just wait till your father gets home." Id.  When Mr. Sheil returned, Ms. Person testified that "it was fun, it was great.  He always did family things with us.  He took us out to dinner.  He would take us to sightseeing places.  We would – we did a lot of things as family.  We liked staying home and hanging out with him when he was home." Id. at 11-12.

The Sheil family left Okinawa in the summer of 1964, and moved to Chicago, Illinois. Id. at 12.  Ms. Person married in February 1965, making her the first of the Sheil children to leave home. Id. at 12-13.  After traveling to various posts with her husband, who was a helicopter pilot in the military, Ms. Person settled in Loudoun County, Virginia in 1972. Id. at 13.  Though her father still traveled frequently for work, Ms. Person testified that:

> When he was in country, he made a point of spending quality time
> and visiting with every one of us, no matter where we were living, all
> over the place, all over the United States by then.  But he always
> made a point of flying to wherever.  He always made a point to visit.

Id.

When her parents moved to Northern Virginia in the mid-1970's, Ms. Person visited them every weekend, stating "I went because we never knew when he was going to move away again." Id. at 14.  Ms. Person's daughter, who was born in April 1966, was the first grandchild, and Ms.

Person remarked that her father "liked to brag a little bit.  He was great.  He was very happy and so was my mom." Id. at 15.

When her parents moved back to Okinawa and then to Thailand, her father "always made a point to write to each [of his children who no longer lived at home] personally, so we would have a letter from him besides my mother with all the family news." Id. at 15.

Ms. Person testified that her father was always very supportive. Id. at 20.  She explained that, when she was going through some difficult times, "[h]e was always slipping me money and trying to help me out." Id.  She added:

> [W]hen it came time to buy my equity in my home from my ex-husband, my dad gave me the money to do that because I didn't go to college, as he would have preferred, and he said I'm going to pay your husband to get out of your life and to – I didn't send you to college, so this – I'm going to do this for you.

Id.  Eventually he convinced Ms. Person to attend college, and she began taking courses at Northern Virginia Community College, recalling "it was kind of fun, and bringing home my As to show him, and he was pretty happy that I was doing that.  And he was paying for it." Id. at 21.  She stopped attending classes when her father was killed in Beirut. Id.

After her mother died, Ms. Person was her father's "first point of contact for emergencies" when he was away on short-term assignments, so he normally told her where he was going. Id. at 21-22.  In late March – early April 1983, her father visited her, took her out to dinner on a Sunday afternoon, and said that he was going to Beirut, adding that the trip "was going to be a rough one." Id. at 22.  This was Ms. Person's last conversation with her father. Id. at 22-23.

Ms. Person testified that on April 18, 1983:

> I woke up early because I drove the school bus, and when I wake up,
> I turn the news on, the television, right away, and the first thing I

> heard was about the embassy being bombed, and I just had this gut-
> wrenching feeling – I didn't know if he was in the embassy or
> elsewhere around Beirut, or what, but I just had this horrible sick
> feeling that maybe he was somehow involved in that.

Id. at 23.  Several hours later, Ms. Person saw her father's picture on television as among those

missing in the attack.  Id.  Ms. Person called the emergency contact number that her father had left

with her, testifying that when she got through, "the only thing they could tell me was that there

were no communication because lines were down, and that he was missing . . . ." Id.  She did not

immediately contact any of her brothers and sisters because they did not, at the time, even know

that their father had been in Beirut and she did not want "to make them worry," but they soon

"figured it out" and began calling her. Id. at 23-24.  Ms. Person and her family spent the next

several days "[j]ust waiting, waiting, waiting to hear something . . . .  Just feeling sick all the time,

just – it was awful." Id. at 24.  Towards the end of the week, the government "sent some people"

out to Ms. Person's house to confirm that her father had been killed in the Embassy bombing. Id. at

25.  When asked to describe her reaction to this news, Ms. Person testified:

> I think I felt it all along, I just had a horrible feeling inside of me, and
> I think I already knew it.  My reaction was devastation, just
> confirming what I felt, because they tried to keep us – they tried to
> make us have hope by telling us that people can actually live for this
> many days without food or water, and they just have to wait to be
> rescued, and we were hoping that he would be rescued.  But for some
> reason, I just had this horrible feeling inside of me that maybe he was
> gone.

Id.

       After their father's death, all of the Sheil children flew to Washington, D.C., where they

"tried to just be there for each other and do what all had to be done at that time." Id. at 25-26.  Ms.

210

Person, along with other family members, attended the official memorial ceremony for victims of

the bombing at Andrews Air Force Base, testifying that:

> It was very sad.  We didn't know which coffin was his.  We – it was
> very sad and just to see 16 caskets lined up in the hangar there, and
> they all had flags on them and it was – and the President of the
> United States was there, so it was very important and honorable.  It
> was also very sad.

Id. at 26.  She also attended a later service held at the Washington National Cathedral, where she

met then-Vice President George Bush, who she recalled as "really nice" and "very comforting to us

as a family." Id.  She particularly recalls how nice he was to her father's mother, who at that time

was over eighty-years-old, lived in a nursing home, and had made her first airplane trip ever to

attend her son's funeral. Id. at 26-27.  A burial service was held at Arlington National Cemetery, at

which Ms. Person recalled, "being so proud to be his daughter.  And trying to be strong for my

younger siblings.  Because I was always told that I had to set an example, and I had to be strong for

the younger ones, and there was a lot of people there." Id. at 28.  At the conclusion of the burial

ceremony at Arlington Ms. Person, as the oldest of the Sheil children, was handed the flag that had

been draped on her father's coffin, which she testified is still "on my fireplace mantel in a case.

I've never put it away, and I won't." Id.

In the weeks and months that followed she:

> was pretty depressed because I had horrible feelings about not being
> anybody's mother, not being anybody's wife, I'm nobody's daughter.
> The only thing I am is a sister, and I really felt like I didn't have any
> purpose for anything, and I would just go to work, come home and
> sleep, go back to work, come home and sleep.  I just – I think I slept
> for a year and a half.  I had no social life.  I just didn't have energy to
> go, to do, I don't know.  It was weird.  I could stay busy at home
> because I have nine acres and summertime you can mow grass and
> forget about things, and stuff like that.

Id. at 29-30.  See Dammarell I, 281 F. Supp. 2d at 189-90 (discussing expert testimony that

depression, "a sense of inefficacy about controlling" one's fate, and fatigue are symptoms often

associated with the impact of a traumatic event such as the Beirut Embassy bombing).  In about

1985, Ms. Person "turned it around," obtaining a job at Dulles Airport that she has held for almost

twenty years. Tr. Vol. X at 30.

Even in the midst of her depression, Ms. Person never sought therapy or counseling to deal

with the loss of her father, as she explained:

> I didn't seek counseling.  I didn't go to church anymore because I
> just kind of gave up on that.  I didn't have a lot of faith.  I would go
> to the local physician and get medication for – to calm me down
> because I'd get hyper and just keep me settled down . . . .
>
> Oh, sometimes I took tranquilizers, and I always thought I had pain,
> so I would take pain medicine, and once I got to working at the
> airport, though, I didn't do that anymore.

Id.  See Dammarell I, 281 F. Supp. 2d at 190 (discussing expert testimony that pain and physical

discomfort are often associated with impact of a traumatic event, and that "[e]motional factors may

stimulate this physical pain").

Christmas and birthdays in particular trigger Ms. Person's sense of loss. Tr. Vol. X at 30.

In fact, she works most holidays at Dulles Airport "so that I don't have to do holidays." Id.  Ms.

Person also testified that subsequent terrorist attacks have also triggered memories of the Beirut

bombing:

> The Oklahoma thing, the building looked so similar to the embassy
> building.  The towers, when that happened, I felt close because I
> knew some of the people on the American Airlines flight, because
> where I work, I get to know a lot of the flight attendants and people,
> staff people . . . so I'm involved in all of the airlines, and I knew
> some of the people that were on the American flight 77, which – it

> really hit home.  It hit home big time for me.  I didn't go to work for
> a couple of days.

Id. at 32.

Ms. Person explained why she decided to participate in this lawsuit, specifically:

> To hold them accountable.  I really, really want to live in a peaceful
> world, and I want it to be good for our children.  I mean my life has –
> I've already gone through all of that.  I don't want the children, our
> grandchildren – I want them to have a much more safe world.  I want
> people to get along.

Id. at 32-33.

Based on the evidence presented to the Court, including the testimony of Ms. Person, the

Court should award the Estate of William Sheil, by John Sheil as Administrator, $5 million for the

benefit of his surviving daughter, Carole Person, to compensate for the loss of "services,

protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and

solace" that she suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at 196-98

(explaining typical damage awards for solatium claims).

### e.    *Cheryl Pienkowski*

Cheryl Pienkowski ("Pienkowski") was born on September 7, 1949 at Fort Bragg, North

Carolina. Tr. Vol. X at 35-36.  She is a United States citizen. Id. at 36.  Ms. Pienkowsi is the third

of the eight children of William Sheil. Id.

Ms. Pienkowski remembers moving around the World for her father's various military

postings, testifying that she:

> loved it.  I still like moving around.  It was always a new adventure,
> somewhere new to go, new people to meet, and even though it was
> always a new situation, we still had a family.  There were so many of
> us, we always had a little family group that was close, so we had
> each other.

Id. at 36-37.  She remembers that her father "was always very strong, very protective, took care of us." Id. at 37.  She added:

> [O]ne of my earliest memories is that we all tried to get attention from my dad because he wasn't – he was gone so much, and I knew if I fell asleep in the back seat of the car when we were going somewhere, he would carry me in the house, so I'd pretend to be sleeping when we got home, so he always carried me in.  But I felt safe, protected.

Id.

Remembering when her family lived in Germany, Ms. Pienkowski testified:

> [W]e did a lot of sightseeing, saw a lot of castles.  We went to different areas of the German countryside.  We used to be able to walk to the little German candy store that was near our house, and just have fun.  Went to school there.  I had first, second and third grade in Germany.  I know every week we had a German class.  I can still remember some of my numbers and letters, but not a whole lot.

Id. at 37-38.

With regard to the period of her childhood when the family lived in Okinawa, Ms. Pienkowski testified that her father would be "gone away for a month or so" at a time, but  his homecomings as "very joyous," with all of the Sheil children "hoping we had been good enough that my mother didn't have something to tell him [w]hat we did while he was gone." Id. at 40-41.

In 1964, when Ms. Pienkowski was fifteen-years-old, the Sheil family left Okinawa and moved to Chicago, which she remembers as a "home base" for the family. Id. at 41-42.  Once back in Chicago, her father retired from the military and worked several jobs before obtaining a civilian government position. Id. at 42.  Ms. Pienkowski's father helped her transition from military to civilian schools by giving her advice and listening to her concerns. Id. at 42-43.  She graduated

from high school in 1967 and continued to live with her parents until 1968, when they moved to

Virginia and she remained in Chicago. Id. at 44-45.

After her parents moved to Virginia, Ms. Pienkowski spoke with her father "at least every

other week." Id. at 46.  Over the next several years, Ms. Pienkowski married and had two children.

Id. at 46, 48.  Her father "would come to visit often" and would always "come to the door with a

box of Dunkin Donuts." Id. at 46-47.  Her children "looked up to" their grandfather. Id. at 46.

When her parents moved back to Okinawa and then to Thailand, Ms. Pienkowski would

write her parents once a week, and her father wrote back, "giving me encouragement, you know.

Giving me advice about raising children.  Just different things." Id. at 47.   And when her parents

returned from oversees and lived in Virginia, she was frequently in contact with her parents

because she wanted her children "to get to know their grandparents in a personal sense." Id. at 48.

Ms. Pienkowski last saw her father in 1982, over Christmas, when he came to Chicago to

visit. Id. at 53.  The last time that she spoke to him was the night before he left for Beirut. Id.

Ms. Pienkowski testified that on the morning of April 18, 1983:

> I had [seen] news of the bombing and pictures, and I just had a
> horrible feeling that – I can only describe it that it felt like somebody
> had punched me in the stomach really hard, and it was just hard to
> even catch my breath, and I said to myself, I said oh, no, I said Dad's
> there.  I didn't know he was there, but I just had this really bad
> feeling that he was there.  And my sister Betsey [sic] was living in
> Chicago at the time, and she was friends with the son of one of the
> gentlemen my dad worked with, and I called her up at work and I
> said, Betsey [sic], I said, do me a favor.  I said call and see if you can
> find out where Dad is at.  She said why?  And I said, well, I saw this
> on the news about this embassy being bombed, and I'm worried that
> Dad's there.  And she's like, oh, no, he never goes there, don't worry
> about it.
>
> I said, well, can you just call and find out.  She's like, well, wait until
> I come home from work, you know.  It will be okay.  Just watch the

> news.  I'm sure everything will be fine.  And I was still nervous.  I
> kept watching the news.  I was watching them bring out dead bodies
> and bringing out people that were severely injured, and I remember
> there was one gentleman hanging over a balcony, and it kept
> showing him again and again, and I said, well, gee, somebody go get
> that guy.  And it was worse because he was wearing a jacket that
> looked like one that my dad had bought when he was in Chicago
> visiting at Christmastime.  I said, oh, I hope that's not Dad, you
> know.
>
> And finally Betsey [sic] came home from work, and she called up the
> family, and she explained, Hi, I just wanted to give you a call, you
> know, you heard the news.  Cheryl is really worried that my dad is
> there, and I just want to appease her, you know, and let her know it's
> okay.  And the wife of this gentleman, she said, I'm sorry, she says
> your dad is there.  He hasn't called in yet, and he's missing.

Id. at 54-55.  After the call, Ms. Pienkowski "just sat and watched the news and hoped to hear

something good." Id. at 55.

The next day, Ms. Pienkowski received a call from a government official who confirmed

that her father was missing, and had failed to check in. Id. at 56.  This made Ms. Pienkowski

"worry more, because I knew if he was anywhere near a phone or – somehow he would have

contacted somebody.  He was just very organized, very good that way, where he would follow the

rules and do what he should." Id.  Subsequently, she received another phone call indicating that her

father would be classified as missing and presumed dead due to the passage of time. Id. at 56-57.

On the Wednesday following the bombing, Ms. Pienkowski received yet another phone call

from a government official, who indicated that the government was "making arrangements for

ceremonies in Washington, D.C.," and needed Ms. Pienkowski's assistance in making

arrangements for the Sheil family. Id. at 57.  Ms. Pienkowski testified that:

> I was upset because I'm still very, very optimistic that my dad was
> going to be found.  He had survived World War II, Korea, several
> tours in Vietnam, several TDYs to not-so-good locations, and he

216

> always came back.  So I was sure he was going to come back.  And
> the gentleman told me, he said, well, it was a really massive truck
> bomb.  He said, people were injured, he said you have to face the
> possibility there might not have been anything to find, and I said, you
> know, my father is there, you're going to show me something to
> prove that you found his body, you know, an arm, a leg, a fingerprint
> of his fingers or something.  And he said, he goes, you know, there
> was a tank sitting in front of the building and it was blown across the
> street and into the water.  That's how devastating it was.  He said you
> just might not have anything to find.

Id. at 57-58.  The next day, Ms. Pienkowski received a phone call saying that her father's body had

been found. Id. at 58.  At that point, she agreed to contact family members and make the necessary

arrangements. Id.  Ms. Pienkowski testified about her reaction to learning of her father's death:

> I felt kind of – like somebody had just pulled the rug out from under
> my life.  My mom was gone and my dad was gone.  At that point my
> husband and I were having marital problems, and we were
> separating.  I knew I had to keep it all together for my kids, take care
> of them.  Kind of lost.

Id.

Ms. Pienkowski and other family members flew to Washington, D.C. to attend official

ceremonies for the persons killed in the Beirut Embassy bombing. Id. at 58-59.  Ms. Pienkowski

described the ceremony at Andrews Air Force Base to the Court:

> It was very sad.  We walked into an airport hangar where the coffins
> were lined up with flags on them.  I remember immediately thinking
> which one is Dad.  I just wanted to go touch it.  But there were no
> names or anything on them, which I think they should have done,
> because it's – other families have said that, too.  It's like, well, which
> one is my relative.  They wanted to know.
>
> And then President Reagan gave a speech, and him and his wife
> came around to shake hands with everybody and it was just kind of
> in shock or not remembering what was going on.  I noticed there was
> a group of reporters, large group of reporters on one side, and I
> thought they were very intrusive, just being there, because I thought
> it was more of a private moment.

> . . . You know, they're doing these ceremonies and all the flags were
> flying at half mast, and the whole country mourned them. The whole
> world, which was a good honor for my dad. He had spent most of
> his adult life in the military, and Federal government, very patriotic,
> and he gave his life to serve his country. And I just think he
> deserved all the honors that they gave him.

Id. at 60-61. Ms. Pienkowski's most distinctive memory from the memorial service held at

National Cathedral was of then Vice-President George Bush talking with her father's mother,

taking her by the hand and telling her that her son "was a very good man." Id. at 61. Ms.

Pienkowski also described her father's burial service at Arlington National Cemetery:

> [H]e had always told us he wanted to be buried there, that he was a
> soldier first, and he always wanted the headstone like all the other
> ones that were there. And he had even told us, I want a headstone
> just like everybody else. I'm a soldier, I'm one of them, and if you
> try to get a bigger headstone after I die, I'll come back and haunt you.
> He said I'm just a soldier, I want to be just like everybody else. And
> he wanted the full honors ceremony.
>
> And I remember somebody was talking to us, saying that they
> weren't sure if the caisson would be available that day for his
> funeral, and I said, well, it has to be. He gave his entire life to serve
> his country. You can do this for him, even if you have to change the
> day of the funeral. I want him to have the caisson, the riderless
> horse, boots in the stirrups, and he deserved this. And they managed
> to get it.

Id. at 62-63. The full honors ceremony included the playing of Taps and a twenty-one gun salute,

which "was [a] very, very sad moment, but also a very proud moment." Id. at 63.

Ms. Pienkowski described how she felt in the months after her father died:

> I felt really lost. I had my kids and I knew I had to be strong for
> them and keep going, but I missed being around family, and within
> six months or so I ended up moving back to the Northern Virginia
> area, and going to work there. And just wanted to be around family.

Id. at 64.  She remained in Northern Virginia until 1985, when she, having reconciled with her

husband, moved back to Chicago.  Id.  When asked to describe the lasting impact of her father's

death on her family Ms. Pienkowski testified:

> [I]t was – kind of left us all lost and looking for some way to carry
> on because we always had Mom.  She was always there, even when
> my dad was traveling.  Mom was just there.  She was our lifeline.
> And when my mom died, we still had Dad, so it was still okay.  We
> still have somebody that loves you no matter what.  And then he was
> gone, and we knew we had to rely on ourselves and each other.  But
> we miss him on birthdays and holidays.  Can't get together with, you
> know, Mom and Dad.  And when the anniversary of the bombing
> comes around, they always replay it on TV.  It seems some channels
> get a – you know, this is the anniversary, we're going to see it all
> over again, we're going to see all those people being brought out,
> and every time there's a terrorist act or some kind of bombing, it just
> brings it all back again.
>
> September 11th happened, and I was working downtown Chicago
> near the Sears Tower, and the news report were saying there's a
> plane coming for the Sears Tower, you know.  Mayor Daley had
> even said evacuate the downtown area, and my kids had called,
> naturally, to see if I was okay.  I received this call from my son, and
> he's like you've got to get out of there . . . .  He was very upset.  I
> said no, I'll be okay, don't worry. I'll just get some stuff done here at
> work and then I'll leave.  He said, no, please leave now, and he
> started crying.  He was in tears.  And I asked him, I said, well, what's
> the matter.  And he said I don't want what happened to Grandpa to
> happen to you.

Id. at 65-66.  Ms. Pienkowski has never received any counseling or therapy in connection with the

loss of her father in the Beirut Embassy bombing, stating "I'm a very private person, and keep my

feelings to myself, and I assume I'm strong like my dad and can deal with whatever happens to me

alone or work through it myself." Id. at 68.

Ms. Pienkowski elected to participate in this litigation because:

> when I speak about my parents and the subject of their deaths come
> up, I can say my mother died.  She had health problems.  We had her

> an extra 13 years.  But when I talk about my dad, he was killed.  If he
> had been killed on the streets of the United States, we would have
> tracked down who did it, held them responsible, imprisoned or
> whatever, but nobody is being held responsible for what happened to
> him.  And he was killed.  And I think somebody should be held
> accountable, and if Iran supported these people, we should take away
> their means to support them.  Perhaps by taking away the funding for
> terrorists, we'll stop their actions and save lives.

Id. at 68-69.

Based on the evidence presented to the Court, including the testimony of Ms. Pienkowski,

the Court should award the Estate of William Sheil, by John Sheil as Co-administrator, $5 million

for the benefit of his surviving daughter, Cheryl Pienkowski, to compensate for the loss of

"services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental

anguish, and solace" that she suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at

196-98 (explaining typical damage awards for solatium claims).

### f.    Elizabeth Sheil

Plaintiff Elizabeth Sheil ("Ms. Sheil") was born on March 10, 1960 in Fort Rucker,

Alabama, and is a United States citizen. Phase II Exh. 42 at 1.  Ms. Sheil is the daughter of

William Sheil, and is the seventh of the eight Sheil children. Tr. Vol. X at 220.

When she was young, Ms. Sheil, along with various siblings, accompanied her father on

several overseas postings. Phase II Exh. 42 at 1.  As she recalled fondly:

> [W]henever we traveled overseas, whether in connection with a
> posting or on vacation, my father would try to teach us things about
> the place that we were visiting – he always taught us about the
> customs, and sometimes about the language.  I was always impressed
> by the way that he handled all of our arrangements – he always
> seemed so confident, and knew exactly what to do.  Traveling with
> my father and my family was always a lot of fun.  It was a great
> childhood.  I wouldn't trade the way I grew up for anything.

Id. at 2.  She remembers that, when the family in Okinawa, her father taught her how to swim at

the base pool.  Id.  Ms. Sheil testified about numerous occasions when her father took care of her

and made her feel safe.  For example, she remembers one incident in which she wrecked her bike

and was knocked unconscious:

> When I came to, I was being loaded into an ambulance, and my
> father was standing next to the stretcher as it was lifted up.  I reached
> out and grabbed the front of his shirt, and a bunch of buttons came
> flying off.  I was sort of going in and out of consciousness at the
> time, so the next thing I remember was being in the ambulance, and
> my father saying something about how he was going to let my
> brother Bill, who had returned from Vietnam and was living with us
> at the time, have it for running red lights to keep up with the
> ambulance.  At that point I felt very safe, knowing that my Dad was
> with me.

Id. at 3.  Ms. Sheil also remembers a time in Thailand when she almost drowned:

> I felt someone grab my wrist and lift me straight up and out of the
> water and over the railing, setting me down at poolside.  It was my
> dad.  I was later told by friends that when I came to the top of the
> water, my dad was on his way in to get me, suit and all.

Id. at 5-6.

When they were living in Thailand, Ms. Sheil's father taught his daughter how to play golf

and they golfed together almost every weekend, as Ms. Sheil testified, "I think that I enjoyed these

times with him the most because it was one of the few times I could be one-on-one with him."  Id.

at 5.  Ms. Sheil also remembers when her father taught her to drive:

> I remember his patience as he explained everything that I needed to
> know.  He, of course, didn't start me out on a nice sunny day – my
> very first day driving was on snowy roads through our neighborhood.
> I was scared to death, but my dad kept me calm and the lesson
> unfolded without incident.

Id. at 7.  In 1976, the family relocated to Williamsburg, Virginia, where they went to the Officer's Club every Friday night for dinner. Id.  Ms. Sheil also testified about the fondness for animals that she shared with her father:

> The one thing that he did that I vividly recall was the day he came home from work at lunchtime wearing his winter coat, which had these big pockets.  He came in and told me that he had a project for me for the rest of the spring and summer.  Being a kid, of course I groaned and said that I wanted no part of it.  He then reached into his pockets and brought out two baby raccoons and said, 'ok, if you don't want to take care of these two, I guess I'll just go put them back in the woods and hope they don't die.'  My father and I both shared a love of animals, and I jumped up and grabbed them and they became my project.  My father told me what to do to take care of them and stayed very interested and involved as they grew.  Without a doubt, I got my love of animals from my father.

Id. at 7-8.

Ms. Sheil graduated from high school in 1978. Id. at 8.  After graduating from high school, she enrolled at Christopher Newport College. Id.  After a year there, Ms. Sheil moved to Vienna, Virginia, where she lived with her sister Judith and both worked and attended Northern Virginia Community College. Id. at 8-9.

After her mother's death Ms. Sheil "initially drifted away from" her father. Id. at 10.  However, as Ms. Sheil explained, her father did not let her "drift too far," and the two "finally talked about a year later and resolved the issue.  I'm glad that we did – I think that he and I grew even closer than before as a result." Id.  During this time, Ms. Sheil and her father lived in the same area, so the saw one another at least once a week, and spoke on the phone several times a week. Id. at 10-11.

In 1982, Ms. Sheil moved to Chicago. Id. at 11.  Shortly after she moved, her father came to visit her, both in September and then again over the Christmas holidays. Id.  During the later visit, Ms. Sheil learned that she had gotten a position as a phlebotomist at a lab in Chicago, and was able to share the news with her father "in person," stating, "I think that he was proud of me then." Id.  That Christmas was the last time that Ms. Sheil ever saw her father. Id.

On April 18, 1983, Ms. Sheil was at work when a special bulletin appeared on the lab's television set regarding the bombing of the United States Embassy in Beirut, Lebanon. Id. at 12.  At the time, Ms. Sheil did not know that her father was in Beirut, but, shortly after seeing the report, she received a call from her sister Cheryl, who said that she "had a bad feeling about the bombing," and asked Ms. Sheil to find out where their father had been traveling. Id.  She tried to reassure her sister, "pointing out that Beirut was not an area that my father would in all likelihood be traveling to," but her sister "insisted" that she "find out more." Id.  Ms. Sheil made some calls and later that evening learned that her father had in fact been in Beirut, and was listed as "unofficially" missing. Id.  Explaining her reaction, Ms. Sheil stated, "I knew then that something was really wrong, because my father did everything by the book and would have checked in immediately if it had been possible to do so." Id.  She called her sister Carole in Virginia to let her know what was going on, and found that someone had already contacted her. Id.  Ms. Sheil and her sister Cheryl then contacted the rest of their brothers and sisters "to get them in the loop," and turned the television to CNN, "where it stayed for the rest of the week." Id.  Ms. Sheil remembers that, during this time, she:

> was trying to tell myself that he had not checked in because he was
> there helping with the recovery efforts, but I never really believed
> that.  I remember watching them help the living victims and bring
> out the bodies of the dead – just watching for anything that would be

> my dad.  It was easily the most difficult week of my life, waiting to
> hear – or see, in this case – whether my father was dead or alive.

Id. at 12-13.

The Friday after the bombing, Ms. Sheil received a call at work from her sister Cheryl confirming that their father's body had been found. Id. at 13.  Ms. Sheil hung up the telephone, told her coworker/supervisor that her father's body had been found and that she needed to leave, and then walked out of the lab to the parking lot. Id.  Remembering her reaction, Ms. Sheil stated that:

> I walked over to my car, and kicked a dent into the driver's side
> door.  I was *so angry*!  All I could think was that those bastards had
> killed my dad.  And then I was angry at him for going there.  And
> then I was so incredibly sad because I realized that I would never see
> him again.  And I couldn't drive home immediately because I was
> crying too hard, and couldn't see to drive.  Then I remembered I had
> told Cheryl that I would come straight home, so I pulled it together
> and drove home.

Id.

Soon after her father's death was confirmed, Ms. Sheil flew to Washington, D.C. to meet the rest of her family, and to attend a series of public and private services. Id.  Ms. Sheil attended the ceremony for victims of the Beirut bombing at Andrews Air Force Base. Id. at 14.  She does not remember any of the remarks made by President Reagan and others at the ceremony, stating, "all I could do was look at the caskets and wonder which one my father was in." Id.  She also remembers "little" about the next official ceremony, held at the National Cathedral, other than that it "was very dignified and sad." Id. at 14-15.

The Sheil family also had a private wake and funeral for their father. Id. at 15.  Ms. Sheil described the funeral mass as "a very, very moving ceremony, with a military honor guard as pallbearers." Id.  She remembers thinking at the time "that Dad deserved this honor after all the

years that he had put in with the Army, and all the wars that he had fought in." Id.  After the

service, the family followed the caisson to the grave site at Arlington National Cemetery, where

her father was buried with military honors and a twenty-one gun salute. Id.  Ms. Sheil recalls the

day of her father's funeral as "the saddest I've ever felt in my life." Id.

Ms. Sheil stated that, when she returned to Chicago something "never really felt right again.

I just kept having this feeling of wanting to go 'home.'" Id. at 16.  Ms. Sheil decided to move to

Virginia to be closer to her family. Id.  Of that period, she remembers, "I was still angry all the

time, and I could never point to a specific reason for it.  The slightest little thing would set me off.

I really had no social life to speak of, and I isolated myself from everyone except family." Id.  Her

anger ultimately led her to lose her job after she had "words" with her employer. Id. at 16-17.  Ms.

Sheil moved to Charlottesville and "started socializing again." Id. at 17.  While in Charlottesville,

she began attending nursing school, finishing the first year with honors. Id.  Ultimately, Ms. Sheil

dropped out of nursing school, and starting using drugs, which helped her to "stop feeling sad for

the first time since [her] father was killed. Id.  When she realized that her drug use was becoming a

habit, she decided to move back to Chicago to get her life back on track. Id.

In terms of the lasting impact of the Beirut bombing on her life, Ms. Sheil stated:

> I still miss my father terribly.  I have great difficulty visiting the
> gravesite in Arlington where he and my mother are buried.
> Revisiting the whole Embassy bombing through this law suit has
> brought up profoundly sad memories that I thought I had dealt with
> and resolved.  I am astounded at the depth of the emotions that
> reliving this has brought up, especially considering this happened
> twenty years ago.  I had no idea how hard this would be. It feels so
> much fresher than I thought it would – not like it is twenty years old,
> more like it happened sometime within the last six to twelve months.

Id.

225

Ms. Sheil explained why she decided to participate in this lawsuit:

> My motivation for joining this lawsuit is to see a judgment rendered
> against Iran and its intelligence agency, and with that judgment hope
> to effect a change in our diplomatic relations with Iran.  If enough
> pressure is put on Iran and other countries supporting terrorists, as
> well as our government in their dealings with these countries,
> perhaps we can help the people of those countries see that what their
> governments are doing is wrong and that they can and should do
> what is necessary to remove the people from power responsible for
> these acts and get decent, moral people in power. And removing
> funding for the terrorists from the people getting it to them will be a
> first, small step in slowing these horrible actions of terrorism.

Id. at 18-20.

Based on the evidence presented to the Court, including the declaration of Elizabeth Sheil,

see Phase II Exh. 42, the Court should award the Estate of William Sheil, by John Sheil as Co-

administrator, $5 million for the benefit of his surviving daughter, Elizabeth Sheil, to compensate

for the loss of "services, protection, care and assistance provided by the decedent" and the

"[s]orrow, mental anguish, and solace" that she suffered. See Va. Code § 8.01-52; Dammarell I,

281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### g.      *James Sheil*

Plaintiff James Sheil was born on November 5, 1950, and is a United States citizen. Tr.

Vol. X at 72.  He is the fourth of the eight children of William Sheil, who was killed in the 1983

bombing of the United States Embassy in Beirut, Lebanon. Id.

Remembering when he was a young boy and his family was living in Germany, Mr. Sheil

testified, "I remember it being sort of a very pleasant time.  I remember – that's probably the

earliest I remember kind of my parents' role in terms of our faith." Id. at 73.  Remembering the

period of his life when his family lived in Okinawa, Mr. Sheil testified:

> Dad wasn't really there very much.  He was actually – he was
> stationed over in the Far East at a different place, so we kind of lived
> on Okinawa while he was in the south, the southeast.  I remember
> him coming back a couple of times, but yet he always seemed to be a
> part of the family even if he wasn't physically present with us.

Id. at 76.

Mr. Sheil started high school in Chicago, noting that while his transition was "a little bit

awkward," his father, who was also in transition, made it easier:

> I think in some ways I felt sort of because he was undergoing a very
> similar change himself, because now he had left the military, and
> was a civilian, same as I was in a sense, and so I felt sort of a
> closeness in that sense with him.

Id. at 77-78.  His father encouraged all of his children to pursue further education after high school,

as Mr. Sheil noted:

> I remember at one point him telling me that he wanted all of us to go
> to college, because it was something that he had not had the
> opportunity to really do . . . he had actually left high school and
> during World War II and joined the Army, and it was only later that
> he went back and finished high school and then actually finished, I
> guess the equivalent of two years of college.  And so that was
> something that was very foremost in his mind was that his children
> have the opportunities affordable by, you know, going to college.
>
> And so the other thing was that he also – he was very strong on as if
> he wanted me to try to attend one of the military academies.  And so
> he was a very strong influence in my making application to attend
> the Air Force Academy.

Id. at 78-79.  Mr. Sheil obtained the required nominations to attend the Air Force Academy, but,

due to a minor eye problem, he was not accepted. Id. at 79.  Instead, he enrolled at the University

of Illinois in the fall of 1968. Id. at 80.  But, when his parents announced that they were moving to

Northern Virginia, he decided to transfer to Northern Virginia Community College. Id. at 80-81.

While attending school, Mr. Sheil also had a full-time job as a grocery store stock clerk.  As he

testified:

> [B]ecause I was working full time and living at home, Dad told me
> that I needed – that I had to pay rent, and I pointed out to him that I
> was paying for my own school and I was attending school full time,
> even though I was also working full time, and I was pretty angry that
> he made me pay rent at this point, but because I really didn't feel I
> had any other options, I did that.

Id. at 81-82.  In January 1970, when he transferred to Virginia Tech, he remembers that:

> [D]ad called me into the living room and he handed me a check, and
> when I looked at the check, I realized immediately it was for the
> entire amount of rent I had paid over the past year, and so in his own
> way, although he never said anything directly to me, he was sort of
> forcing me to save, and he was actually saving of the rent that I was
> paying.
>
> And so then things sort of started to click, and I realized, you know,
> that what he was doing, and why he was doing it, sort of to make
> sure that I was going to be taken care of.

Id. at 83-84.

After his parents moved back overseas, Mr. Sheil communicated with them primarily

through letters, with his father's letters, often tucked inside his mother's, offering encouragement

and "trying to . . . make sure that I was hanging in there and, you know, doing well with my studies

and that." Id. at 85-86.

When Mr. Sheil graduated from Virginia Tech in 1972, he was the first of the Sheil

children to graduate from college. Id. at 86.  His parents made "a special point of coming back" to

the United States for his graduation. Id.  He recalls that his father was very proud. Id. at 87.

After graduating, Mr. Sheil moved to Washington, D.C. and got a job as a lab technician with a

medical supply company. Id. at 88.  After three years working as a lab technician, Mr. Sheil

realized that "the only thing really holding [him] back" was the fact that he did not have a

doctorate. Id. at 92.  So he decided to go to graduate school, and he remembers that his father "was

very pleased that I decided to go to graduate school." Id. at 92-93.  In September 1978, Mr. Sheil

entered a Master's Degree Program in medical microbiology at the University of Kentucky. Id. at

93.

Once in graduate school, Mr. Sheil was in contact with his parents "fairly often, primarily

by phone." Id. at 94.  And after his mother died, his father "started calling . . . more often.  He

started keeping in touch, making efforts to come down to visit." Id. at 97.  He remembers that,

during this time, his father encouraged him to continue beyond a masters degree and to get his

doctorate, testifying:

> I wasn't sure that I wanted to continue on for the Ph.D., although that
> was my original intention, and I remember one phone conversation
> with him where he really emphasized trying to make me feel better,
> to get me through the master's program, and also at the same time
> encouraging me to rethink the Ph.D.  That, you know, that it was
> worth doing.  And at that point really was when he started calling me
> almost every weekend.  And so, in fact, I did wind up going on to
> enter the Ph.D. program after I finished the master's in August of
> 1980.

Id. at 98.

By the spring of 1983, Mr. Sheil had finished his dissertation, but still needed to complete

his final oral exam in order to receive his doctorate. Id. at 100.  He remembers that the first thing

he did when he found out that he had passed his exam, was call his father:

> [T]he first thing I did after I finished and found out that I had passed
> was I called him at work, and told him that I had passed.  And so –
> because really he was, you know in a very large way over those – the
> last several years kind of kept me going and I knew, you know, he
> was very keen on, you know, me finishing.  So that was my first
> thought was to call him at work, and he told me he had another trip

229

> he was going to be going on, but then he would be back in time for -
> I think commencement was scheduled in, you know, early May.

Id. at 101.  This was the last conversation that Mr. Sheil had with his father. Id.

Mr. Sheil testified that, on the morning of April 18, 1983:

> I had come into the lab, just like any other day, you know, with my
> whole schedule planned out, really, and I remember walking into the
> building, into the hospital, and there was a news stand outside the
> door that I always came in.  And I remember seeing a big headline
> indicating that the embassy in Beirut had been bombed.

> I didn't really give it too much thought, except I remember thinking,
> oh, you know, that's the first time I've heard of anything like that
> happening to a U.S. embassy.  And then I went into the building, and
> just kind of went about my day, and I was at a seminar at the end of
> the day, a normally scheduled seminar, and I came back from it about
> 5 o'clock in the evening, and there was a message that my older
> sister Cheryl had called and that I should call her right back.

> I thought it was very odd, because, you know, normally I didn't get
> calls from them, especially at the lab.  So I called her, called Cheryl
> back, and that was when she explained to me that Dad had in fact
> been over in Beirut.  They weren't sure whether he was in the
> embassy or not, but that in fact he hadn't called in when he should
> have, and so they were tentatively putting him as missing in action,
> or missing.

Id. at 102-03.  Mr. Sheil further testified that his sister:

> also told me not to watch the news that night because they had
> shown where – she indicated when she talked a little while ago that
> there was one – one of the pictures they were showing on the news
> was of a man dangling from the balcony of one of the floors, and she
> thought it might be Dad, and so that she didn't want me to see that.

> They had a room down the hall from my lab where there was a
> television and, of course, once she told me not to watch the news, the
> first thing I did was go down to watch the news.

Id. at 103.  Mr. Sheil did not find out that his father had died in the Embassy bombing until three

days later, on Thursday evening. Id. at 104.  The days between Monday and Thursday had been, for

230

Mr. Sheil, "sort of like being in a fog . . . .  I was going through the motions." Id.  Mr. Sheil

testified that, once his father's death was confirmed, he:

> kind of kept trying to keep going with, you know, what I had going
> on at the time, because, you know, this was sort of – it was – I
> remember thinking it was a real irony because here [was] one of the
> greatest accomplishments that I had made, you know, had finally
> come through, and it was something Dad had encouraged for these
> past several years, and it was something that, you know, he was very
> proud of, I could tell the last time I talked to him.  And yet he
> wouldn't be able to, you know, come to the commencement.
>
> And then I remember thinking in terms of, you know, here was
> supposed to be one of the proudest moments for me, but yet it was
> still mixed with one of the saddest moments, I think, that anyone
> could experience.
>
> And so I remember coming in the day after I found out, and getting
> off the elevators and starting down the hall to the lab, and I saw my
> Ph.D. mentor, and immediately it registered that he was going to ask
> me again if I had heard anything, and so this time I'd have to tell him
> yes.  And so I did, and when I told him, I broke down in the hall, and
> he took me in his office, and just, you know, told me that I needed to
> get that out, and just to take as much, and he really encouraged me.
>
> So it was a real mixed bag of feelings and emotions, you know,
> having to deal with it all at once.

Id. at 105-06.

At some point, the State Department contacted Mr. Sheil regarding arrangements to fly to

Washington, D.C. Id. at 106.  Mr. Sheil had mixed feelings about going to the public memorial

services in Washington, while trying to deal with his "own private feelings . . . in a private way."

Id. at 106-07.  Mr. Sheil testified:

> I remember probably one of the strongest feelings I had at that time,
> during those next days after finding out, was I remember walking
> into the medical center and seeing the flag at half staff and the
> impact that it made on me, that part of that was for Dad and, you
> know, how not only was I proud, you know, that Dad had given

> really sort of the ultimate sacrifice for his country, which is what he
> would have wanted to do, but also the fact, you know, all of these
> other people.  And I think the true meaning of what – why we fly the
> flag at half staff.  And I think that it sort of put, for me it helped to
> put, you know, Dad's death into context of a much greater good.

Id. at 107.

Mr. Sheil decided to go to Washington, where he met the rest of his family at a hotel. Id. at

107.  Remembering the ceremony at Andrews Air Force Base, Mr. Sheil testified:

> I remember was seeing all of the 17 caskets lined up with – and they
> were all flag-draped up in the front of the building, and just thinking
> about those 17 people and Dad being one of them, that was really
> kind of, you know – this was – it was a very honorable thing that
> they did, something – and I think, not really thinking so much of the
> impact on me, but just kind of the fact that, you know, Dad was – as
> a part of a – he was a part of something that he really and truly
> believed in, and the fact that he gave his life doing it was a part of
> what he took on when he decided to go to work at this job, and that
> everybody else, all of the other caskets lined up there, those people
> were of the – must have been of the same mindset.
>
> It didn't – I remember not feeling so much the sadness over losing
> him as just kind of being in an odd sort of way kind of happy that he
> was able to live the life he wanted to and to die the kind of death that
> he was willing to die if he needed to.

Id. at 108-09.  Mr. Sheil "vaguely" remembered the subsequent memorial service at National

Cathedral, primarily because it reminded him of the "real connectedness to our faith" that his

parents had instilled. Id. at 110.  Indeed, Mr. Sheil testified that he felt that his faith "was sort of

what kind of kept me strong throughout this period . . . that there was some – there was that

connection to my faith." Id. at 111.  Remembering his father's wake and then his burial at

Arlington National Cemetery, Mr. Sheil testified:

> I remember during the wake, the private wake that we had, just being
> vaguely aware of just, you know, one person after another just
> coming up and expressing their condolences, and just not really

> knowing who these people were, but being amazed at the impact that
> one person's life can have on so many other people.  And on the
> funeral as well, you know.
>
> I think that was the thing that impressed me probably the most
> throughout all of this, you know, from the – recognizing the meaning
> of the flags being at half mast to everybody being present for comfort
> and as well as, you know, just through the whole – the public process
> of this, you know, with all of the different ceremonies and the wake
> and the funeral was the impact that his life had on so many other
> people.

Id. at 112-13.

    After the funeral, the Sheil family went to their father's apartment in Northern Virginia to

go through his belongings. Id. at 113.  Mr. Sheil testified that, "at this point, I was already starting

to disconnect.  I was beginning to disconnect from the family.  I was realizing that, you know, I

still have an unfinished job to do back at graduate school." Id.  The Dean of the graduate school,

had refused to grant Mr. Sheil an extension of time by which to make corrections to his Ph.D.

dissertation. Id. at 113-14.  Mr. Sheil was also in the midst of plans to move to California for post-

doctoral training. Id. at 114.  Given these pressures, Mr. Sheil testified that he felt:

> like I had taken myself out of my life and what had been going on,
> and I needed to go back and get back into that, mainly because of the
> deadlines, the pressure I was under, the, you know, future plans
> coming up in the near future.  I needed to kind of try to make sure
> that my - what I had going on at that time in my life did not become
> derailed, and that, you know, the process that I was undergoing in my
> own life, I really felt very strongly about needing to keep that on
> track.

Id. at 115.

    Mr. Sheil returned to Kentucky, and remembering his commencement ceremony without

his father, testified that it did not feel right to participate in the ceremony without his father:

233

[I]t still just kind of didn't feel right to be going through with it, you know, because . . . the only reason I originally planned to do it was because Dad wanted to come down and see me get my Ph.D.  I remember him telling me on the phone that last time I talked to him, he – his – he had frequently mentioned about, you know, you're going to be the first doctor in the Sheil family.  And so he was very proud of that.  But the fact that he wasn't around anymore kind of took a lot of the meaning out of it for me.  But I did go through with it.  And I was glad that I did.

Id. at 116-17.

Following graduation he moved to California:

I think for me it was actually good.  I think I needed to be away from the family.  I needed to deal with this on my own terms.  I needed to find some way of, you know, putting some meaning to it all in the context of everything else I had . . .  Dad had gotten me ready for this point all through my life by constantly making sure that I was making the right choices, and that basically, you know, you need to take care of yourself in life, and you need to make sure that you got your goals set, your priorities straight.  That was something that was, you know, very strongly came through from him, especially as I got older.

And so I felt like, well, you know, now he's really gone and I need to kind of make my own way.  So in some ways I felt isolated, but yet I was also beginning sort of a new phase in my life, you know, and so there was that kind of excitement.

Id. at 117-18.

Mr. Sheil remembers that, when he saw the news coverage of the bombing of the United States Marine barracks in Beirut, he was "completely enveloped in the coverage because it was seemingly bringing back everything that I had seen on the news about the April 18, 1983 bombing." Id. at 120-21.  Mr. Sheil added that:

[W]hat struck me particularly that evening was that in fact I hadn't dealt with my dad's death over all this time, and so I sat up the entire night and was just overcome by the news, and I think that that was

234

> sort of a breakthrough for me in terms of dealing with my dad's
> death earlier.

Id. at 121.  Mr. Sheil has never sought therapy to deal with the loss of his father, stating, "I think in

the fall of [1983] I really just kind of dealt with it on my own, and it was sort of – kind of put

everything – put everything in perspective for me, and I just never really felt the need." Id. at 121-

22.

In terms of the lasting impact of his father's death, Mr. Sheil testified:

> I sort of lost touch with my faith, and it just sort of happened.  I
> really didn't – I wasn't consciously aware of it until about 1990,
> when I kind of started getting back in touch with my faith, and I
> think that perhaps in an odd sort of way, my dad's death and my
> ability to deal with it helped me kind of put that into context of my
> faith, and was able to draw strength from my faith and, you know,
> circumstances, I think, that led me back to it.
>
> Over the years, especially the past 10 years or so, I have grown
> stronger in terms of being connected with my faith, and have become
> much more active in the Catholic church.  In 1999 I was ordained a
> deacon with the Catholic church, and that's become a very prominent
> part of my life.

Id. at 122-23.

When asked why he elected to participate in this litigation Mr. Sheil responded:

> I think probably on two different levels.  On a personal level, I felt
> the need to hopefully find out more about exactly what happened, the
> impact on the other people involved, particularly other family
> members.  But then also, too, I think that just the need to – in some
> way I think we need to deal with the whole issue of terrorism on a
> personal level in that I think too often the impact of terrorism is
> overlooked in terms of its effect on the survivors, meaning those who
> were either injured as well as family members of those that have
> been killed.

Id. at 124-25.

Based on the evidence presented to the Court, including the testimony of James Sheil, the Court should award the Estate of William Sheil, by John Sheil as Co-administrator, $5 million for the benefit of his surviving son, James Sheil, to compensate for the loss of "services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and solace" that he suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

> **h.      Estate of William Sheil Jr.**

Plaintiff William Sheil Jr. was born March 2, 1948 in Fort Riley, Kansas, and was a United States citizen. Phase II Exh. 40B at 1 (Declaration of William Sheil, Jr.).  Mr. Sheil was second-oldest child, of William Sheil, who was killed in the 1983 bombing of the United States Embassy in Beirut, Lebanon. Id.  Mr. Sheil passed away on November 29, 2003, but, prior to his death, he executed a declaration for submission in Phase II of these proceedings and his estate has replaced him as a plaintiff in this litigation. See Phase II Exh. 40A (Letters of Administration for the Estate of William R. Sheil, Jr.).

As a child, Mr. Sheil and his family accompanied their father to his various postings with the United States Army, residing in, among other places, Fort Riley, Kansas; Fort Bragg, North Carolina; Augsburg, Germany; and Okinawa. Phase II Exh. 40(b) at 1.  Mr. Sheil noted that while his father "was often busy with work and training obligations, he nonetheless made time to come home and eat lunch with the family every day." Id. at 1-2.  Mr. Sheil saw his father as his "protector and safety net, and nothing could go wrong as long as he was there." Id. at 2.  Mr. Sheil had special memories of Okinawa, where he began high school. Id.  While his father was often sent

236

out on assignments, largely to Vietnam, that took him away from Okinawa for months at a time, he

"still somehow made time to spend with the family." Id.  Mr. Sheil in particular remembered that:

> [A]s he left for each trip my father would tell me, as the eldest son in
> the family, to take care of my mother, brothers and sisters while he
> was gone, as I was 'the man of the house' in his absence.  I think that
> he did this, in part, to allay the fears that I had whenever he left for
> another assignment.

Id.

The Sheil family moved to Chicago when Mr. Sheil was a sophomore in high school. Id. at

2.  He recalled that he "did not have a difficult time making the transition back to the United

States," largely due to the efforts of his father, who "talked with us individually in an effort to ease

the impact of the move." Id.  Mr. Sheil graduated from high school in the spring of 1966 and, while

his father had hoped that he would go to college immediately after high school graduation, Mr.

Sheil instead "bummed around for a few years, and finally decided to have a discussion with [his]

father about enlisting in the Army." Id. at 2-3.  As Mr. Sheil recalled, "[a]t that point he sat me

down, and explained the realities of military life." Id. at 3.  While his father ultimately supported

his son's decision to enter the military, Mr. Sheil "still felt that I had disappointed him by not going

to college." Id.

In 1968, Mr. Sheil joined the United States Army and, from 1969-1970, was stationed in

Vietnam. Id.  One memory of his father in particular stands out from his tour in Vietnam:

> I recall that one day, when I was about half-way through my tour in
> Vietnam, I landed by helicopter at a remote airstrip, and was shocked
> to see my father, who had had various assignments in Vietnam,
> waiting for me on the tarmac as the helicopter touched down.  What
> struck me most was the fact that despite the conditions, my father
> was dressed in pressed fatigues, and stood ramrod straight.  While
> we had to maintain a military bearing and follow military protocol, I
> could sense my father's support for me, and knew that the visit was

237

> his way of checking up on me and letting me know that he cared.  I
> also remember that my colleagues, who were all 19-20 years old like
> I was, were impressed with the collection of medals on my father's
> uniform.  The visit meant a tremendous amount to me.

Id.  He also remembers that, when he returned to the United States, "my father, who had fought in

World War II, Korea and Vietnam, 'debriefed me' to make sure that I was 'okay in the head'

following my experiences in Vietnam.  I vividly recall that we talked for about two hours, one-on-

one, before he took me home to greet the rest of the family." Id. at 3-4.

After Vietnam, Mr. Sheil felt that he had a "different outlook on the world," and began

having nightmares. Id. at 4.  He felt that his father understood his feelings, explaining that,

"[b]ecause my father had seen combat, he understood more of what I was going through, and we

remained close." Id.

After living with his parents for a time, in 1971, Mr. Sheil moved to Chicago in 1971,

married, and had three children. Id.  However, he had developed a drug habit in Vietnam that lasted

for more than fifteen years and, in Mr. Sheil's words, "ultimately ended my marriage, and created

distance between myself and my siblings, who I think were disturbed by the fact that I was not the

same person that I had been prior to going to Vietnam." Id.  His father, however, remained "very

supportive," visiting him several times and "counseling" him over the phone. Id. at 4-5.

In 1975, Mr. Sheil moved his family from Illinois to Virginia to be closer to his parents. Id.

at 5.  In 1976, at his father's urging, Mr. Sheil re-enlisted in the Army. Id.  After a year in the

service Mr. Sheil was released, and moved back to Chicago. Id.  Immediately upon his release from

the military, Mr. Sheil again began using drugs, noting "[e]ven though I felt that my father was

disappointed at my release and subsequent move back to Chicago, he was nonetheless supportive

of me." Id.  Mr. Sheil was divorced in 1978, and, while he was going through the divorce, his

father would come to Chicago to visit, and generally offer encouragement and support. Id.

  In the Spring of 1983, Mr. Sheil learned that his father had received a temporary

assignment to Beirut, Lebanon. Id. at 6.  On April 18, 1983, Mr. Sheil turned on the television, saw

reports of the Beirut Embassy bombing and, knowing that his father was in Beirut, became very

worried. Id.  Later that day, he received a phone call from his sister Cheryl, and he recalls that,

"[e]ven before I picked up the phone, I had a feeling that something bad had happened to my

father." Id.  He asked his sister "how bad is he?" Id.  When she responded that he was missing, Mr.

Sheil "immediately assumed that he had been killed." Id.  After the call, he "went to a bar and got

drunk." Id. at 6-7.  A few days after the initial call, his sister called back, who confirmed that

authorities had found their father's remains. Id. at 7.  His reaction to this phone call was similar to

his reaction to the initial call: "I headed to a bar where I drank too much, got into a fight, and ended

up in jail.  I spent the next couple of days in a daze." Id.

  Through the efforts of a family friend and his sister Cheryl, Mr. Sheil arrived in

Washington D.C. to be with his family and attend the various memorial services. Id.  He felt, as the

oldest son in the family, "pressure to support everyone." Id.  Over the next several days, a number

of people remarked how much Mr. Sheil looked like his father, something that Mr. Sheil found

"very emotionally painful." Id.  At the official ceremony at Andrews Air Force Base, he was

"struck by the fact that the coffins of the Americans killed in the Embassy attack remained closed

and flag-draped," and remembers thinking "that I wanted to open my father's casket as a way of

saying good-bye and reaching closure." Id. at 8.  But the most difficult ceremony for him was the

burial service at Arlington Cemetery, as Mr. Sheil explained:

> My emotions broke loose at my father's burial at Arlington National
> Cemetery . . .   My entire family initially just stood there, numb.  I
> lost it when the honor guard began playing "Taps," and it sank in that
> I would never see my father again.  I remember standing at the burial
> site and crying, feeling nothing but pain.

Id.

After his father's death, Mr. Sheil wanted "[m]ore than anything" to do something that

would have made his father proud, so he decided to stop using drugs, explaining that he "wish[ed]

that [his] father had been there to share the moment with [him]." Id. at 8-9.  In the following

months, he also repaired his relationships with his siblings, and his contacts with them became

more frequent. Id. at 9.  As he explained:

> [T]oday my relationship with my siblings is very good.  I also regularly
> speak with my ex-wife, see my children, and have two grandchildren.  I
> believe that my father's death motivated me to get back in touch with my
> family and to stay in touch with them, despite the many years during
> which I had essentially lost contact with everyone.

Id. at 10.  Nonetheless, the death of his father in the Beirut Embassy bombing continued to have an

impact on him:

> [M]y father's death left a big hole in my life.  There is and always
> will be something missing that can never be put back.  The loss upset
> my life and plans quite a bit, and any progress that I had made or
> might make suddenly did not seem worth all the effort.

Id.

Mr. Sheil elected to participate in the litigation:

> because someone has to be held accountable for the 1983 bombing of
> the U.S. Embassy in Beirut that killed my father and numerous
> others.  As my sister Cheryl Pienkowski and I have discussed, it is
> necessary to see that justice is done, and this suit is one way of doing
> that.

Id.

Based on the pleadings and the evidence presented to the Court, it appears that the Estate of William Sheil, Jr. is not a proper beneficiary under Virginia's wrongful death statute. However, as will be explained below, it not necessary for the Court to determine whether the estate is a proper beneficiary because the estate is nonetheless entitled to recovery under its intentional infliction of emotional distress claim.

Damages awarded under the Virginia wrongful death statute are first distributed to "the surviving spouse, children of the deceased and children of any deceased child of the deceased." Va. Code § 8.01-53(a). The determination of who falls within this class of beneficiaries is "fixed . . . at the time the judgment is rendered if the court specifies the distribution." Va. Code § 8.01-53(b). Interpreting these provisions, Virginia courts have held that the precise class of beneficiaries is determined, not as of the date of the decedent's death, but rather, on the date that the jury's verdict is entered. See, e.g., Mann v. Hinton, 457 S.E.2d 22, 27 (Va. 1995); Knodel v. Dickerman, 431 S.E.2d 323, 325-26 (Va. 1993). Although a default judgment was entered in this case on September 6, 2002, over a year before William Sheil, Jr. passed away, that judgment did not "specif[y] the distribution" as required in the statute so as to "fix" the class of beneficiaries at that time. Based on the language of the statute, it appears that the class of beneficiaries to William Sheil's estate's wrongful death claim will not be fixed until the final judgment specifying the distribution of the damages is entered. Because Mr. Sheil is no longer a "surviving" child, it appears that he would not be a part of that class.

However, the Court does not need to determine whether the Estate of William Sheil, Jr. is a proper plaintiff under Virginia's wrongful death statute because it has stated a valid claim for intentional infliction of emotional distress under the law of Illinois, the state in which William

241

Sheil, Jr. was domiciled on the date of the Embassy bombing.  Under Illinois' Survival Act, see

755 Ill. Comp. Stat. 5/27-6, his intentional infliction of emotional distress claim survived his death

and could properly be continued via the personal representatives of his estates. See Wilmere v.

Stilolt, 504 N.E.2d 916, 918 (Ill. App. 1987) ("only the administrator or executor of a decedent's

estate, and not the decedent's survivors, can maintain an action on behalf of the decedent under the

Survival Act.").

 To state a cause of action for intentional infliction of emotional distress under Illinois law,

a plaintiff must show "(1) that the defendant's conduct was extreme and outrageous; (2) that the

defendant knew that there was a high probability that his conduct would cause severe emotional

distress; and (3) that the conduct in fact caused severe emotional distress." Kolegas v. Heftel

Broadcasting Corp., 607 N.E.2d 201, 211 (Ill. 1992).  Courts that have addressed the applicability

of the tort of intentional infliction of emotional distress to surviving family members of victims of

terrorist activities have repeatedly held that terrorists' act are directed at the victims family

members. See, e.g., Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C.

2005) ("Courts have uniformly held that a terrorist attack – by its nature – is directed not only at

the victims but also at the victims' families").  Indeed, the Court in this case has already held that

the attack on the embassy was directed at the victims' family members. Dammarell VI, 404 F.

Supp. 2d at 283.  The defendants to this action clearly knew that there was a high probability that

their conduct would cause severe emotional distress to the family members of those killed in the

bombing.  Accordingly, the Court finds that the Estate of William Sheil, Jr. is entitled to recover

damages for the loss associated with his mental anguish resulting from his father's untimely death

in the Embassy bombing.  The Court values William Sheil, Jr. loss associated with his mental

anguish at $5 million.  See Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).  Accordingly, the Court should award the Estate of William Sheil Jr. $5 million on this default judgment.

### I.     Judith Taft

Plaintiff Judith Taft ("Ms. Taft") was born on February 14, 1957 in Augsberg, Germany. Tr. Vol. X at 126.  She is a United States citizen. Id.  Ms. Taft is the fifth of William Sheil's eight children. Id.

Ms. Taft's first real memories are from when the family lived at Fort Bragg, North Carolina, when she was about five-years-old. Id. at 127.  As she recalled, "we would go watch him jump.  They'd be jumping from the planes, and you'd see all these guys coming down in parachutes.  It was just really, really neat, to think that's my dad.  That's my dad up there." Id.  The family next moved to Okinawa, where Ms. Taft entered first grade. Id. at 128.  She recalls that she "used to get in trouble a lot for talking in class," and that her father came to address the situation:

> [W]hen he came into the classroom, he was in his fatigues with his
> Green Beret tucked in his belt, and he said something to the teacher,
> and I left with him, and after that I sat up front, and she stopped
> giving me such a hard time.  And he was just right there.  You know,
> he took care of it.

Id.

Ms. Taft was seven when the family moved back to the United States, where they lived in Chicago and then Falls Church, Virginia. Id. at 129, 133.  Ms. Taft remembers that, during this period, her father was home almost every night. Id.  She testified that her father was strict, explaining that:

> He had his expectations, and there were rules that we followed.  I
> didn't really feel like it was unreasonable.  The expectations were

243

> laid out.  We knew what was expected, and we knew what the
> consequences would be if we didn't – if we, you know, did what we
> weren't supposed to be doing.  It was – and it wasn't just us, it was
> anything we did reflected on the family.

Id. at 130.

In 1970, when Ms. Taft was thirteen-years-old, the family moved back to Okinawa.  Id. at

135.  Once on Okinawa, her father was on a rotational schedule, and "would be gone for six weeks

and then home for a week."  Id.  Despite Mr. Sheil's absences, life on Okinawa was "good," and, as

Ms. Taft testified:

> whenever he came home, it was always – it was always a lot of fun.
> It was – everyone – we were always glad to see him.  If we did
> anything that we got in trouble, my mom would – she would ground
> us until my dad got home.  She would just say, okay, you're
> grounded until your father gets home.  And sometimes that was for
> six weeks.  So you learned to be careful.

Id. at 135-36.  At the end of two years on Okinawa, her father was transferred to Thailand.  Id. at

136-37.  Ms. Taft described Thailand as "wonderful."  Id. at 137.  While they were in Thailand, her

father was home much more frequently, generally coming home on Friday night and leaving the

following Sunday.  Id. at 138.  Ms. Taft testified that having her father around more often "was

good.  It was nice having him home."  Id.

When Ms. Taft was seventeen-years-old and in the middle of her junior year in high school,

the family moved from Thailand to Northern Virginia, a transition she described as "culture

shock."  Id. at 140-41.  She graduated from high school in 1975, recalling that her father "was real

proud.  He was always proud of us and especially education accomplishments and all.  He went to

graduation and all, and it was – I just remember I was proud that he was proud."  Id. at 142.  After

high school graduation her father encouraged her to continue her education, as Ms. Taft explained:

> I didn't really want to go [to college] because I was -- I had had it
> with school, and I just -- I wanted to work.  I had been working part
> time during high school and I wanted to go out and work full time.
> And he encouraged me to, okay, at least try one quarter at the
> community college, see how you like it.  So I did that, and my grades
> were pretty good with that, and he said, well, why don't you just
> finish out the year and see how you feel about it then.  And so I did,
> and once the year was done, he said, well, why don't you go for your
> associate's degree?  It's only another year.  And he kind of talked me
> into and through college that year until I ended up getting my four-
> year degree.

Id. at 142-43.  Ms. Taft was able to live at home while she was enrolled at the College of William

and Mary because her parents had moved to the Williamsburg area.  Id. at 143.  She described her

father as "very encouraging with school, especially with William and Mary.  Being a transfer

student, a lot of my courses didn't transfer or I had to kind of argue the case to make them transfer,

and he was real encouraging when I got discouraged."  Id. at 144.  At one point, her father

accompanied her to the office of the Dean of the Business School to help her receive the final

credits that she needed to graduate and Ms. Taft testified that, "if he hadn't done that, I wouldn't

have finished.  I wouldn't have finished with a degree."  Id. at 145-46.

    After her mother's death in 1979, Ms. Taft, who continued to reside in Virginia, spoke with

her father frequently, and would see him almost every weekend.  Id. at 152.  During those visits, she

and her father "talked a lot about religion," particularly in connection with her upcoming wedding.

Id. at 152-53.  Ms. Taft got married in May 1980, and her father "pretty well took care of

everything," as she explained:

> [H]e set up for us to have the officers' club for our reception.  The
> chef there was a friend of his, and he set up for, you know, all the
> food to be made and everything.  He made Irish bread for the
> reception and brought it down from Maryland, which is – that was
> like a family recipe.  It was his mother's recipe and my mom used to
> make it, and it was a family favorite that we used to – we used to

> love it when she made Irish bread, and he made it for the reception
> and brought it down.

Id. at 154.  After the wedding, Ms. Taft continued to reside in Northern Virginia while her

husband, who was in the Coast Guard, went to sea for six to eight months, and noted that "it was

rare" for her not to visit, or at least call, her father on a weekly basis. Id. at 155-56.  About six

months after her husband's return, he was transferred to Hawaii. Id. at 156-57.

Although Ms. Taft described her subsequent move to Hawaii as initially "really hard," her

father had "encouraged" her and her husband to pursue the opportunity, and she ultimately decided

that "it was really, really good advice." Id. at 157.  On one occasion, her father stopped in Hawaii

on his way back from a temporary duty assignment in Southeast Asia, telling her that he planned to

retire from his civil service position in September 1983, at which time he would come back to

Hawaii "with his golf clubs." Id. at 158.

In January 1983, Ms. Taft had her first child, a son who was named William after his

grandfather. Id. at 159-60.  While her father never got to see his namesake, as Ms. Taft testified:

> We had had pictures taken when William was six weeks, or four to
> six weeks old, and we had just gotten them back, and I had called
> and told him about it, and he asked if I would – I told him I was
> going to be sending some to him, and he asked if I would send them
> express mail.  And he never asked for anything like that.  And he
> said that he wanted to get them before he went on this – he had
> another TDY coming up, and he wanted to get them – wanted to see
> them before he left.  So we sent them express mail, and he got them
> before he left for Beirut.

Id. at 159-60.

The day before he left for Beirut, her father had called her to let her know that he was

leaving on another temporary duty assignment though, as usual, he did not indicate where he was

going. Id. at 160.  Ms. Taft always asked her father "which direction he was going" in to get a

better sense of his destination. Id.  When, in the spring of 1983, her father responded that he was

heading "east," Ms. Taft "figured east meant Europe." Id.  Remembering this last conversation

with her father, Ms. Taft testified:

> [W]e stayed on, we were talking for a good 45 minutes, easily, and I
> ended up – I had to cut the conversation short because I needed to go
> get my son and take care of him.  And he said, you know, well, I'll
> talk to you when I get back.  And he thanked me for sending the
> pictures.

Id. at 161.

Ms. Taft testified that early on the morning of April 19, 1983:

> I had turned on the news and saw the news about the bombing and
> all.  I though how horrific it was and awful, and just – it was
> incomprehensible to me that someone would do that.  And I thought,
> but Dad's in Europe, so I don't need to worry.  And I don't know
> how I got this idea in my head that he was in Europe.  I guess
> because he had been there before and he had never gone to Beirut
> before.
>
> And I had gone outside – I had been smoking . . . after William was
> born, I had managed to cut down to having just one or two cigarettes
> a day . . . .  And at 7 o'clock the phone rang and Cheryl had called to
> tell me that my Dad was in Beirut, and I think that day I smoked two
> packs of cigarettes, and I was pretty upset and all.
>
> She talked to me and calmed me down, and told me to call [my
> husband], have him come home, and I called him at work, and he
> told his lieutenant, his commanding officer, that – what had
> happened, and he had ridden his motorcycle to work that day, and the
> lieutenant brought him home.  He wouldn't let him drive his
> motorcycle.  And he said stay home with your family.  Just keep in
> touch.  Let us know what's going on.  And they were really
> understanding about it all.  And about my need to have him home.

Id. at 161-63.  Ms. Taft and her husband watched the news "just trying to find out any idea of what

happened, if he was there, if anyone found him." Id. at 163.  She was still having "a hard time"

accepting the fact that her father had even been in Beirut, testifying:

> The idea that after having – him having gone through World War II,
> Korea, and Vietnam, and coming home in one piece after all of
> those, when from what he had said, he had gotten into some pretty
> tight situations, it was like there's no way some guy in a pick-up
> truck full of dynamite is going to get him.  There is just no way.
> He's been through too much already, and it was like – he had gotten
> to the – I guess in my mind – to where he was kind of invincible,
> because he always came home.

Id.  Ms. Taft had to make preparations for the worse, though she had no idea whether her father

was dead or alive, recalling, "I had to go out and – you know, I had to buy clothes at – to take back

and be ready for a funeral and all, but I wasn't convinced there was going to be one, and so it was

just, well, okay, I'll buy the dress, but I'm saving the receipt and I'm not cutting the tags off

because I'm going to return it.  I'm not going to have a need for it kind of a thing." Id. at 163-64.

As Ms. Taft began making plans to join her family in Washington, D.C., she still did not

know whether her father was dead or alive, and did not learn that he had been confirmed dead until

her arrival in Washington. Id. at 164.  She described her reaction when she learned that her father's

body had been found:

> just shock.  I was just – I couldn't believe it, that something  like that
> could happen to him,  It's – you know, he had always come home,
> and this time he wasn't.  A lot of it just kind of – a lot if [sic] it
> passed in a blur.  It was just – still trying to absorb all that.

Id. at 165.

Ms. Taft remembers attending the ceremony at Andrews Air Force Base, testifying:

> we had been driven up to the hangar because it was raining, . . . on
> the right-hand side was all the press right there . . . [a]nd on the left-
> hand side were the 16 caskets lined up with the flags draped over
> them, and I just had this feeling of wanting to know which one was

> my dad, because there was no way of knowing, and we were escorted to our seats . . . .
>
> After everyone had spoken, President and Mrs. Reagan came through the audience to just offer their condolences individually to the family members, and I remember the President and his wife exclaiming over William and being a cute baby and so good because he was sleeping through the whole thing, and then on the – at the end of all of it we were to file past the caskets and the caskets were on the left, and we were to file past and come around the end of the building, and then in front of the press, and wait at a doorway there for the honor guards to pick us up at that point.
>
> I remember when we got up to go walk past the caskets, my husband was on one side of me and my brother Bill was on the other, and I just felt my knees give out, and they each had me by one arm, and my brother said you have to do this for Dad.  He said you got to do it for Dad.  You can do it.  And they each just kept ahold of one arm and kind of walked me past them.  It wasn't really under my own power very much.

Id. at 166-68.  Ms. Taft also attended the official service at National Cathedral, but recalled it as "another ceremony to get through kind of a thing," and does not remember many details of the event. Id. at 169.  The family also had a wake for their father, which was attended by many of his friends and colleagues from various postings. Id.  Ms. Taft remembers that one of her father's co-workers would not leave her alone and kept staying things to her that she found very upsetting. Id. at 169.  In fact, the experience was so upsetting that she ultimately had to take a couple of Valium to calm down. Id. at 170.

Around the time of the wake, her father's wallet, keys, and a ring were returned to the family. Id.  Remembering her reaction to seeing these personal effect, Ms. Taft testified:

> [W]hen we opened the wallet, the cement dust that came out of it, it was just full of cement dust, and I would guess from the blast.  But it's – I had never seen anything like it.  I don't think it's anything I will ever forget.  Because you open it up, and all this dust comes out, the cement dust.  And his ring was very bent, bent up.  It was

> misshapen and all, and it was definitely his ring.  It was a very
> distinctive ring, but it was – I hated to think what hit his hand to do
> that to the ring.  It makes you wonder how much pain he was in
> before he died, if he was in any pain.  But, you know, that kind of –
> it just kind of makes you think about that.

Id. at 170-71.

After all of the services were over, the family went to their father's apartment. Id. at 171.

Ms. Taft remembered that, when she walked into her father's apartment, one of the first things she

saw was an 8 x 10 framed picture of her son William. Id. at 172.  She testified that this made her

"really happy that we had sent the pictures express, and I was really happy that it was important

enough to him to put it there.  Right there where he would see it every day." Id. at 173.

Ms. Taft testified that after her return to Hawaii, "I felt like I wanted to just kind of hide

from everything that needed to be dealt with." Id. at 174.  She had originally planned to go back to

work after the birth of her son William, but stated that:

> when my dad was killed, I just felt like all control was gone.
> Everything was happening to us, and we had no control over it, and it
> was an awful, scary feeling.  It was just like the center just got
> knocked off center, and no matter what I did, nothing was putting it
> back there, and I decided the best way I could prevent anything else
> from – to do my best to prevent anything else from happening was to
> control as much as possible around me, and that meant I didn't – I
> didn't want anyone else responsible for my son.  And later when my
> daughter was born, the same thing.  I didn't want to have to rely on
> anyone else to make sure they were safe.

Id. at 174-75.  Ms. Taft sought, though she ultimately never received, counseling to help her cope

with the loss of her father, testifying:

> [I]n late 1984, when I was pregnant with my daughter, I found – I
> was finding myself getting increasingly depressed, and was
> concerned about the impact I was having on my son, the impact it
> was having on my marriage, and the impact it would have on the
> child that I was carrying.  I checked with the military hospital at

> Langley Air Force Base, but the facilities there didn't extend to
> dependents, and we would have to go out on CHAMPUS to do it.  At
> the time my husband was an E-6, and with one child already here and
> another one on the way, there was no way to afford it.  So it was just
> something that I had to put aside and deal, just kind of deal with it.

Id. at 178.  She added that, but for these financial considerations, she "absolutely" would have

followed up with counseling, noting "I think it would have been better for me as a parent, certainly,

and just being able to carry on a normal life, and maybe being able to let loose on some of those

controls." Id.

Subsequent terrorist attacks have brought back memories of the loss of her father in Beirut.

Id. at 178-79.  Ms. Taft explained how the bombing of the Marine barracks in Beirut, only six

months after the Embassy attack, impacted her:

> I felt like I was just right back with everything that had happened
> when my dad was killed, and just felt so sad for the families who
> were going to have to deal with it.  I remember thinking that I wish
> there was some way to get in touch, especially with the Marine
> families, because they were military, too, and so were we, and just
> wanting to say you're not the only one who's going through it, other
> people have been through it also.

Id. at 179.  She also was struck by the Oklahoma City bombing, because "the building looked so

similar to Beirut." Id.  She refuses to watch television on April 18 of each year "because they keep

bringing everything back up again." Id.

In terms of the lasting impact caused by her father's death, Ms. Taft stated, "I think we take

a lot less for granted, knowing that one day somebody – it could happen just as quick as a flash,

somebody's not there anymore." Id. at 180.

When asked why she decided to participate in this litigation, Ms. Taft explained:

> Well, up until now I've – we've gotten edicts from Congress saying how the whole thing was so horrific and everything, and they deplore it, but no one has really called it a crime, and it was, in my mind, it was just mass murder, and they're so – I feel like it's important to let people know just the impact that this has on families, that the terrorist attacks that are happening overseas are just as important as the ones here, that we're all Americans, whether serving overseas or here in the States, and it needs to be said that this is murder.  It's not just – it's not a political statement, it was murder, and the deaths overseas count just as much as the ones here.

Id. at 180-81.

Based on the evidence presented to the Court, including the testimony of Judith Taft, the Court should award the Estate of William Sheil, by John Sheil as Co-administrator, $5 million for the benefit of his surviving daughter, Judith Taft, to compensate for the loss of "services, protection, care and assistance provided by the decedent" and the "[s]orrow, mental anguish, and solace" that she suffered. See Va. Code § 8.01-52; Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### 5.    Don Chubb

Plaintiff Don Chubb ("Mr. Chubb") was assigned to the United States Embassy in Beirut as a Communicator. Tr. Vol. VIII at 42.  At the time of the Phase II testimony, he lived in Springfield, Virginia. Id. at 40.  He is married, and has six children. Id.

Mr. Chubb was born April 12, 1939 in Syracuse, New York, and is a United States citizen. Id.  He graduated from high school in June 1956. Id. at 40-41.  Shortly after high school he joined the Navy, in which he served for twenty years as a Communicator. Id. at 41.  After leaving the Navy, he returned to New York. Id.  In 1977, he obtained a position with the Foreign Service as a Communicator. Id. at 41-42, 53.  After several postings with the Foreign Service, he was assigned to the United States Embassy in Beirut, arriving in January 1983. Id. at 42.

On April 18, 1983, Mr. Chubb was working in a room on the sixth floor of the Embassy. Id. at 43.  He remembers that, in the adjacent room, a Lebanese national was laying carpet and being monitored by Embassy personnel. Id.  His colleague, plaintiff Leo Pezzi, relieved him from monitoring so that he could eat lunch. Id.  Mr. Chubb remembers that he took a break to smoked a cigarette, and then headed toward the elevator. Id. at 44.  He testified that, as he was walking to the elevator, there was "an explosion or a loud noise that knocked me back in my feet." Id.  He assumed that the Embassy had "gotten hit by a rocket propelled grenade." Id.  Remembering what occurred immediately after the explosion, Mr. Chubb testified:

> I walked into the room where Mr. Pezzi was and where the Lebanese
> national was to see what had happened, if they were okay, and we
> spent some time, probably just moments, but we couldn't breathe
> because of the CS, the tear gas.  The windows were open, but they
> had bars on them.  You couldn't get any air in.  We found water and
> tried to breathe through soaked rags, etc., and we couldn't breathe.
> We were tearing and couldn't breathe.

Id.

While Mr. Pezzi escorted the Lebanese national out of the Embassy, Mr. Chubb, assisted by one of his co-workers, attempted to carry out "security requirements for destruction and security storage." Id. at 44-45.  He testified that "the next thing I remember of that day, I was exiting somewhere towards the back of the embassy . . . .  I don't remember evening [sic] going down . . . . I went around to the front of the embassy, and this is when I saw all the destruction." Id. at 45. Until he was outside, he had not realized the extent of the damage to the Embassy. Id.  He explained that the floors were "pancaked." Id.  Later that day, he went with some of his colleagues to an off-site location to attempt to reestablish communications with Washington, D.C. Id. at 46

Remembering his colleagues that were killed in the bombing, Mr. Chubb testified about his

friendship with Corporal Robert McMaugh, who had been on Marine Security Guard duty at Post

One at the time of the bombing. Id. at 47.  Mr. Chubb explained, "I was a chief in the Navy, and I

had a lot of guys work for me that were just like him . . . .  I had been with him the night before.

The last happy hour [the Marines] had, I had been with him talking and drinking in the green

house." Id. at 47-48.

In the weeks following the bombing, Mr. Chubb and several of his colleagues received a

special commendation, a Superior Honor Award, for their performance in the aftermath of the

bombing. Id. at 48-49.

Mr. Chubb remained in Beirut until July 1985. Id. at 49.  Describing what work was like

after the bombing, Mr. Chubb testified, "work-wise, it was a crisis-type, working all the time.  The

hours were long.  You always had to be aware of yourself and where you were, looking over your

shoulder, use common sense in what you did." Id. at 50.  Mr. Chubb was still in Beirut when the

Marine Corps barracks were bombed in October 1983. Id.  He testified that, just that morning, he

had been at the barracks for breakfast and knew some of the Marines who were killed. Id.

Moreover, he was in the Embassy Annex when it was bombed in September 1984. Id. at 50-51.

Remembering the second bombing, Mr. Chubb testified that is was:

> very scary.  I was sitting at my teletype transposing or composing a
> message to someone, and suddenly there was a large explosion and
> large noise.  Knowing that the building was not built for an embassy
> – it was essentially an apartment building – I just sat there and I
> thought the building was going to collapse upon me.  Of course, we
> lost all communications.  Eventually I was tasked to go once again to
> the ambassador's residence and establish communications.

Id. at 51.

After leaving Beirut in July 1985, Mr. Chubb continued to work for the federal government, retiring in October 1992. Id. at 52.  After retiring from the government, he worked for Lockheed Martin for almost to ten years, fully retiring in 2001. Id. at 52-53.

Mr. Chubb testified that the Oklahoma City bombing and the September 11, 2001 attack on the World Trade towers brought back memories of the 1983 Embassy bombing. Id. at 53.  He explained that the Oklahoma City bombing was particularly difficult "because of the amazing resemblance to our building in Beirut after it was bombed." Id.  With regard to the September 11, 2001 attack, he testified that it "caused me to feel like I wanted to do something, but didn't know what to do to help them, because having been through the same thing, I knew people were helpless." Id.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert testimony that events such as Oklahoma City bombing and events of September 11, 2001, may trigger memories of a trauma and bring onset or recurrence of psychological symptoms of trauma or Post-Traumatic Stress Disorder).

Mr. Chubb explained how his experience in Beirut has affected his behavior:

> Well, as long as I stayed in the foreign service, you always maintain
> a different outlook on things. You are always trying to be aware.
> You're always looking over your shoulder.  You would make sure
> that you maintained the different security precautions to and from
> work, different avenues and different routes, and you were always
> much more aware that something could happen.  You were always
> looking for that suspect person.

Tr. Vol. VIII at 53.  See Dammarell I, 281 F. Supp. 2d at 189 (discussing expert testimony regarding symptom clusters involved in Post-Traumatic Stress Disorder, with specific symptoms including, fearfulness, hypervigilence, and preoccupation with the underlying trauma).

Mr. Chubb testified that he decided to participate in the lawsuit because he thinks that "[t]here needed to be some recognition of the fact that the United States Embassy in Beirut in 1983 was blown up.  People were killed.  If in this retribution there is some financial gain, so be it." Tr. Vol. VIII at 54.

As a federal government employee stationed overseas, Mr. Chubb retained as his domicile in 1983 the state in which he last resided.  See Dammarell II, 2005 WL 756090, at *22.  After twenty years in the Navy, Mr. Chubb joined the Foreign Service.  While in the Foreign Service, his primary domestic contacts appear to have been in Virginia. Pls. Mem. in Supp. of State Law Claims at 9.  Based on the information presently before the Court, the law of Virginia applies to his claims.

Based on the pleadings and the evidence presented to the Court, Mr. Chubb as stated valid claim for battery under Virginia law and is entitled to recover compensatory damages from defendants for "injuries received and ill effects . . . proximately caused by the battery," see Pugsley, 263 S.E.2d at 76, as well as the resulting physical pain and suffering and mental and emotional harm, see Norfolk Beverage, 525 S.E.2d at 291.  Nothing has been provided to the Court regarding any economic damages suffered by Mr. Chubb.  However, the Court values the loss associated with his pain and suffering and mental anguish resulting from the battery at $750,000.  Because Mr. Chubb can recover for his mental anguish under his battery claim, there is no need for the Court to consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  Accordingly, the Court should award Mr. Chubb $750,000 on this default judgment.

### 6.   Raymond Miller

256

Plaintiff Raymond Miller ("Mr. Miller") was assigned to the United States Embassy in Beirut as a Communicator.  Phase II Exh. 27A at 2 (Declaration of Raymond Miller).

Mr. Miller was born January 25, 1947 in Lykens, Pennsylvania, and is United States citizen. Id. at 1.  He graduated from high school in June 1964, and thereafter entered the Marine Corps. Id.  While in the military, he specialized in communications, in the hopes of turning the knowledge into a career upon entering the civilian world. Id.  During his enlistment, Mr. Miller ultimately rose to the rank of Sergeant and served a two-year tour in Vietnam. Id. at 2.  For his service, Mr. Miller was awarded a Purple Heart and a Vietnam Service Medal. Id.  After the completion of his four-year enlistment, he was honorably discharged from the Marine Corps in 1968. Id.

After leaving the Marine Corps, Mr. Miller applied for a position with the federal government as a Communicator. Id.  For the next thirteen years, Mr. Miller served in a variety of domestic and international posts as a Communicator. Id.  In November 1981, Mr. Miller was posted to the United States Embassy in Beirut. Id.

Mr. Miller described for the Court what he remembers from the day of the bombing:

> April 18, 1983 began as a typical day at the Embassy.  I exchanged greetings with the Marine Security Guard as I entered the building that morning, and had breakfast at the Embassy cafeteria, which was located in the basement of the building.  After that, I began my shift in the communications center.  A little after 1:00 in the afternoon I heard an explosion, and what I thought was an incoming artillery round.  I was later told that what I had heard was the noise of the explosion coming up the elevator shaft.  The power went off, the ceiling collapsed, the window air conditioner in my office was blown in and landed on my desk, and the entire building shook.  If I had been sitting at my desk at the time of the blast, the blown-in air conditioner would have crushed me to death.  As I tried to determine what had happened, I opened one door from my office that faced the center section of the building, and realized that the center section

257

> was no longer there.  I then noticed that there were large amounts of
> smoke, and the smell of what seemed like the aftermath of
> explosives, which caused tears to the eyes.

Id. at 3-4.  Mr. Miller stated that he "received a number of cuts and bruises from falling

equipment," but otherwise he did not appear to be seriously injured. Id. at 4.  He "found a gas

mask, slipped it on, and began to secure the communications center," and then "looked for a way

out of the building to safety." Id.  He walked down to the second floor via a rear stairwell and

climbed down a ladder to the ground floor. Id.

Once out the building, Mr. Miller "grabbed a vehicle and sped off towards the

Ambassador's residence," where he helped to reestablish communications with the United States.

Id.  He recalled that he was "so busy that I did not have time to stop and contact my family to let

them know that I had survived." Id.  They did not learn of his survival until the following day. Id.

Mr. Miller worked over the next several days "around the clock" to "determine who had been

killed, and what could be salvaged from the Embassy." Id.

Mr. Miller stated that, "in the immediate aftermath of the attack, I did not think that I had

been seriously injured." Id. at 5.  While he was never treated for the cuts and bruises he received in

the bombing, his hearing has "gradually worsened," and he believes that this may have been caused

by the percussive force of the explosion. Id.  His government retirement exit physical noted a

hearing loss which has now progressed to the point that Mr. Miller is considering a hearing aid. Id.

Mr. Miller states that that he "occasionally ha[s] flashbacks of what happened in Beirut,

especially when terrorist bombing activity takes place." Id. at 6.  He stated that he "could relate to

what the people in Oklahoma City were going through following that bombing," and that

September 11, 2001 attacks brought back memories of that tragic day in Beirut. Id.  See Dammarell

I, 281 F. Supp. 2d at 189-91 (discussing expert testimony that events such as Oklahoma City bombing and events of September 11, 2001, may trigger memories of a trauma and bring onset or recurrence of psychological symptoms of trauma or Post-Traumatic Stress Disorder).

Mr. Miller was scheduled to leave Beirut in December 1983, but he extended his tour for one month so that the government could find a replacement for him, and left in January 1984. Phase II Exh. 27A at 6.  He would have extended his tour further "[g]iven the opportunity," because, as he explained, "I believed I was making an important contribution to our mission." Id.

After leaving Beirut, Mr. Miller continued  to work for the federal government until April 1994, when he decided to take advantage of early retirement at the age of 47. Id. at 5.  In 1998, he began working as an independent government contractor on various domestic and international projects. Id. at 6.

Mr. Miller stated that he decided to participate in this litigation:

> so that I could help to expose terrorists for what they are – cowards who prey on innocent civilians and refuse to fight face to face.  If more countries were held responsible for the actions of terrorists, they may be less likely to sponsor or turn a blind eye toward terrorist activities within their borders.

Id.

As a federal government employee stationed overseas, Mr. Miller retained as his domicile in 1983 the state in which he last resided. See Dammarell II, 2005 WL 756090, at *22.  Although Mr. Miller had little consistent contact with the United States from the time that he graduated from high school through the date of the bombing, during the decade immediately preceding the bombing, Virginia functioned as a home base for him. See Pls. Mem. in Supp. of State Law Claims

259

at 17.  Therefore, based on the information presently before the Court, the law of Virginia applies to his claims.

Based on the pleadings and the evidence presented to the Court, Mr. Miller has stated valid claim for battery under Virginia law and is entitled to recover compensatory damages from defendants for "injuries received and ill effects . . . proximately caused by the battery," see Pugsley, 263 S.E.2d at 76, as well as the resulting physical pain and suffering and mental and emotional harm, see Norfolk Beverage, 525 S.E.2d at 291.  Nothing has been provided to the Court regarding any economic damages suffered by Mr. Miller.  However, the Court values the loss associated with his physical pain and suffering and mental anguish resulting from the battery at $750,000.  Because Mr. Miller can recover for his mental anguish under his battery claim, there is no need for the Court to consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  Accordingly, the Court should award Mr. Miller $750,000 on this default judgment.

### 7.    Leo Pezzi

Plaintiff Leo Pezzi ("Mr. Pezzi") was assigned to the United States Embassy in Beirut as a Communicator with the federal government. Tr. Vol. VIII at 8.  At the time of the Phase II testimony, he lived in Virginia. Id. at 4.  He is married and has two daughters. Id. at 5.

Mr. Pezzi was born on November 22, 1948 in Miami, Florida, and is a United States citizen. Id.  He graduated from high school in 1968 and then attended Miami Dade Junior College for two years, earning an Associates Degree in Arts Education. Id. at 5-6.  In 1970, Mr. Pezzi was drafted into the Navy. Id. at 6.  He served for eight years as a radioman in various postings. Id. at 6-

7.  He received a Vietnam campaign medal, the meritorious unit citation, and two good conduct medals for his service. Id. at 7.  He left the Navy in 1979. Id.

Upon leaving the military, Mr. Pezzi worked for about a year and a half for American Express in Florida. Id.  He thereafter obtained a position with the federal government as a Communicator. Id. at 8.  During his tenure as a Communicator, Mr. Pezzi was based primarily in Virginia. Pls. Mem. in Supp. of State Law Claims at 20.  In November 1981, he was posted to the United States Embassy in Beirut. Tr. Vol. VIII at 8.

Describing the events of April 18, 1983, Mr. Pezzi testified that he arrived at the Embassy around 5:30 a.m. to get the "office up and running." Id. at 13.  The Embassy had experienced several power failures that morning, as the electrical supply in Beirut was often spotty, and Mr. Pezzi had to resort to using the Embassy's emergency generator. Id. at 14.  When his colleagues, plaintiffs Don Chubb and Ray Miller, arrived at the office later that morning, they kidded Mr. Pezzi for being so far behind in his work. Id.  The three then worked to catch-up on the morning's duties. Id.  Mr. Pezzi went down to the embassy cafeteria for lunch around 12:15 p.m.  Id. at 14-15.  He ate quickly, and returned to his office around 12:55 p.m. Id. at 14-15.  At that point, Mr. Pezzi relieved Mr. Chubb, who was supervising a foreign national who was laying carpet in the office. Id.

Remembering the force of the explosion, Mr. Pezzi testified that he was standing in the office and looking out the window, when he felt:

> this implosion that threw me across the room, and the windows blew in.  It was like I was sucked into the room rather than thrown out, and I found myself laying on the floor moments later.  I thought maybe it was a – a couple of times, people had driven by our embassy and fired an [rocket propelled grenade] at the building, and I thought maybe that's what this was.

Id. at 16.

After the explosion, Mr. Chubb ran into the office and asked what had happened. Id. at 17. Mr. Pezzi told him that he "thought it was an [rocket propelled grenade] or maybe our generator exploded." Id. He further testified, "I had all these weird thoughts in my head, and then we both realized our eyes were tearing, our noses were running, and we were smelling the smell of cordite, and our eyes were burning from the smell of tear gas." Id. Mr. Pezzi, Mr. Chubb, and the foreign national made their way into a small bathroom and soaked some rags in water to protect themselves from the tear gas. Id. at 17-18. As Mr. Pezzi was helping the foreign service national out of the building, he saw that the three rooms on the other side of the hall had disappeared and that he could "look straight down into the smoke and what seemed to be fires down below, but between the smoke and the air blowing, you could see bits of the street.  It was wide open." Id. Because the first floor was engulfed in fire, they could not exit the Embassy from that floor. Id. at 19. Once on the second floor, Mr. Pezzi found himself surrounded by "chaos and people running around screaming, people injured." Id. He turned the foreign service national over to a Marine and attempted to return to his office. Id. On his way back up the stairs, his was asked to assist other injured personnel out of the building. Id. at 19-20. He testified that he decided:

> it was fruitless to go back upstairs.  I decided just to go over the fence and run around the front of the embassy and go in the front stairway, which I did.  I went over the wall.  When I ran around the side of the building, which was on the east side of the building, I came to the front and there was just total chaos.  The building, the front of the building, was totally gone.  There was the fire.  There were people running around screaming.  There were some ambulances arriving at that point.  Some Lebanese soldiers were beginning to arrive, and it seemed like everybody was just in a rush to run around and help somebody, but I don't remember what I was stepping through and stepping on. I just remember look [sic] and seeing this massive tons of rubble.

Id. at 22.  Once out of the building, he went to the Ambassador's residence to re-establish

communications with Washington, D.C. Id. at 22-23.  Mr. Pezzi testified that, shortly after the

bombing, he realized that he had cuts and bruises on his arm, but that he did not know if those

injuries where from the bombing itself or from his rescue efforts. Id. at 24.

Mr. Pezzi remained in Beirut until December 1983. Id. at 33.  He was in the city when the

Marine Corps barracks were bombed in October 1983, and had been at the barracks the evening

before the attack. Id. at 32.

Mr. Pezzi testified that, for approximately ten years after the bombing, he suffered regularly

from nightmares in which he would re-experience the attack. Id. at 24-25.  He still has these

nightmares periodically. Id.  He said that he did not seek treatment for his nightmares because the

government "really didn't . . . [know] anything about people having these stress disorders and

problems that I think some of us did incur." Id. at 26.  See Dammarell I, 281 F. Supp. 2d at 190

(noting that sleeplessness, fatigue and nightmares are a common cluster of symptoms experienced

by victims of traumas such as the Beirut Embassy bombing).  He also developed tinnitus, a

persistent ringing in his ears, which he suffers from to this day and for which there is no treatment.

Tr. Vol. VIII at 26-28.

He decided to retire in December 2001. Id. at 33.  He testified that his decision to retire was

affected by his experiences with the bombing. Id. at 33-34.

Mr. Pezzi testified that the Oklahoma City bombing and the September 11, 2001 attacks

brought back memories of the Embassy bombing. Id. at 34-35.  He explained that seeing the

pictures of Oklahoma City "sent shock waves through me," as it seemed like a "repeat" of the

Embassy bombing. Id. at 35.  See Dammarell I, 281 F. Supp. 2d at 189-91 (discussing expert

testimony that events such as Oklahoma City bombing and events of September 11, 2001, may

trigger memories of a trauma and bring onset or recurrence of psychological symptoms of trauma

or Post-Traumatic Stress Disorder).   Further explaining the lasting impact that he bombing has had

on him, Mr. Pezzi testified:

> It's made me very cautious and very secure in my movements.
> While I was still working for the government, I would not case out
> every embassy, but I would always make sure I'd be aware of where
> all the exits were at, that I knew where my oxygen mask was at.  I
> didn't trust anyone, not ever to experience that tragedy again.  It gave
> me a lot of unrest every time I had seen something like it and or saw
> focus again in the newspaper or in the news bringing it to light,
> especially with what happened in September of 2001 with the Twin
> Towers.

Tr. Vol. VIII at 36.

> When asked why he decided to participate in this lawsuit, Mr. Pezzi answered:

> Originally, like so many other of these cases I kept hearing about,
> Beirut was never mentioned, and I couldn't understand why, and I
> never thought about it.  I was still overseas, and then I heard how
> people were starting to take finances or financially benefit from these
> lawsuits, and I didn't think it was appropriate at the time, although
> being – naturally, yes, you always think about that.  Then I remember
> all the people that I had worked with and those that I didn't know,
> what had happened to them and what had happened to me and over
> the years how it changed my life and it impacted my life in a
> different way, and I thought this would be – if this is going to go
> through, I would like to be a part of finding out who these people are
> and at least pointing the blame.  There has never been a finger
> pointed.  There's been speculation, but I would like to see justice
> done to either the people or the government that has done this to our
> country.

Id. at 36-37.

> As a federal government employee stationed overseas, Mr. Pezzi retained as his domicile in

1983 the state in which he last resided.  See Dammarell II, 2005 WL 756090, at *22.  Although it

appears that, although after Mr. Pezzi started working for the federal government he had little consistent contact with the United States, he was based primarily in Virginia. See Pls. Mem. in Supp. of State Law Claims at 20.  Therefore, based on the information presently before the Court, the law of Virginia applies to his claims.

Based on the pleadings and the evidence presented to the Court, Mr. Pezzi has stated a valid claim for battery under Virginia law and is entitled to recover compensatory damages from defendants for "injuries received and ill effects . . . proximately caused by the battery," see Pugsley, 263 S.E.2d at 76, as well as the resulting physical pain and suffering and mental and emotional harm, see Norfolk Beverage, 525 S.E.2d at 291.  The expert economic analysis presented to the Court demonstrated that, as a result of the bombing, Mr. Pezzi suffered $214,000 in economic losses, specifically lost wages due to his decision to retire earlier than he had planned. Phase II Exh. 1 at 28-30.  Further, the Court values the loss associated with his physical pain and suffering and mental anguish resulting from the battery at $750,000.  Because Mr. Pezzi can recover for his mental anguish under his battery claim, there is no need for the Court to consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  Accordingly, the Court should award Mr. Pezzi $964,000 on this default judgment.

### 8.    John Reid

Plaintiff John Reid ("Mr. Reid") was assigned to the United States Embassy in Beirut as Counselor of Embassy for Public Affairs and Director of the United States Information Service. Phase II Exh. 3A at 7.

Mr. Reid was born on May 16, 1939, in Baltimore, Maryland, and is a United States citizen. Id. at 1.  He graduated from Robert E. Lee High School in Staunton, Virginia, in 1955, and thereafter attended Virginia Polytechnic Institute ("Virginia Tech"), graduating with a Bachelor of Science in Physics in 1959. Id.  After graduating from Virginia Tech, Mr. Reid was unsure what he wanted to do professionally. Id.  He had been active in the Campus YMCA as a student and ultimately applied for, and received, a one-year post-graduate fellowship at the YMCA in Hong Kong. Id. at 1-2.  As a result of his experiences in Hong Kong, Mr. Reid decided to change his professional focus to international relations. Id. at 2.

Mr. Reid returned to the United States from Hong Kong in 1960. Id.  He thereafter completed a two-year military service obligation, entering the United States Army as a second lieutenant and receiving an honorable discharge in 1962 as a first lieutenant. Id.  While in the Army, he was admitted to the Columbia University School of International Affairs. Id.

Mr. Reid entered Columbia in September 1962 and, because of his experience in Hong Kong, specialized in East Asian affairs. Id.  During his second year at Columbia, he passed the Foreign Service examination. Id.  In June 1964, Mr. Reid received a Masters in International Affairs from Columbia. Id.

Almost immediately after graduation, Mr. Reid reported to Washington for two months of training as a junior foreign service officer with USIA. Id.  His first posting was to Thailand, where he spent the next five years. Id. at 2-3.  In June 1970, he was transferred to Vietnam, where he worked as a distribution officer. Id.  In the spring of 1971, he accepted an opportunity to work in the Embassy's political section in Saigon and was put in charge of POW issues. Id. at 3-4.  After

completing this assignment he was scheduled to return to his distribution officer responsibilities, but decided to explore other options. Id. at 4.

In November 1971, Mr. Reid moved from Vietnam to Laos, where he took a position as the director of the binational center, known as the Lao-American Association. Id.  While the center was technically a local educational institution chartered with the Lao government, Mr. Reid remained a United States Foreign Service employee. Id.  He returned to Washington, D.C. in January 1974, when he was named special assistant to the Director of USIA's Press and Publications Service ("IPS"). Id.  During his IPS assignment he applied for, and was accepted into, a one-year program at the Center for International Affairs at Harvard University, with USIA paying his full salary plus the Harvard tuition. Id. at 5.  Accordingly, in the summer of 1975, he moved to Cambridge, Massachusetts, and spent the next academic year as one of eighteen fellows at the Center for International Affairs at Harvard. Id.  In the summery of 1976, he returned to Bangkok as Deputy Director of USIS[9] in Thailand, a post he held for four years. Id. at 6.

By early 1980, Mr. Reid felt that his career had stalled a bit, and decided that it was time to seek more aggressively a position as country director, or "country public affairs officer" ("PAO"). Id.  The only such position that he was able to get was as a PAO for Lebanon in Beirut. Id.  At the time, he felt that if he did not accept this PAO-ship, he might not get another opportunity, so he accepted the Beirut position. Id.

For Mr. Reid, "April 18, 1983, began as a normal working day in Beirut." Id. at 12.  He remembers:

---

[9] The overseas posts of the USIA were known as the United States Information Service or USIS. Phase II Exh. 3A at 3.

Just before 1:00 in the afternoon, I thought about going down to the Embassy cafeteria for a sandwich but then decided instead to use the lunch hour to focus on a particularly difficult problem.  I was at my desk in my office, with floor-to-ceiling windows overlooking the Corniche, the street that ran along the Mediterranean coast, to my right.  When the blast hit, I was about to turn to the right, facing the windows, to begin typing.  Suddenly, however, the room appeared to turn white and begin changing shape.  I next remember lying on the floor, face up, to the side of my desk.  Looking up, I saw the wall behind my desk begin to crumble and fall toward me.  Large fragments of the wall landed on me, but I don't remember feeling anything.  I was covered in bricks, plaster and rubble almost to my neck.  I knew that something had happened, but I didn't know what.  Blood was running from my scalp and face, I could see from only one eye, and I was pinned to the floor, so when Beth Samuel shouted from the adjacent office to ask whether I was all right, I replied, "I don't think so."  Some U.S. military officers who had been in the building came looking for Beth but, when Beth asked them to help me, they were unable to find me.  Finally, I decided I couldn't stay where I was, and I managed to work my arms free and began throwing rubble off my body.  Eventually, I was able to grab a radiator pipe behind my head and pull myself free.  When I got to my feet, I realized that I hadn't broken any major bones and that I would probably be all right.  I found my way out of the office and noticed that the hallway was unusually bright.  I didn't realize it then, but direct sunlight was coming through where the center of the building had been.  Sometime later, when I returned to my office, I saw that the fracture where the center of the building had collapsed actually ran through my office floor and that the wall which had fallen on me had been brought down by the collapse.  If the blast had not thrown me clear of my desk, which disappeared with the collapse, I probably would have been buried alive in the rubble.

As I made my way down to the second floor of the Embassy building, I encountered chaos.  Glass fragments and blood were everywhere . . . .  Injured people were lying on the floor.  Not knowing what else to do, I sat on the floor and leaned against a wall.  An Embassy janitor knelt beside me and began wiping blood from my face with a wad of brown paper towels.  One of the consular employees staggered screaming down the hallway, with the front of her body and face looking as though they had been shredded.  The Embassy security officer appeared and told us to form a single-file line so he could lead us out of the building.  I took the injured consular employee under the arms, someone else took her feet, and

268

we began carrying her.  When our group reached the end of a narrow passageway, the security officer found that the lock on the emergency gate had rusted shut, so our column had to reverse direction and seek another way out.  Eventually, we came to a wall at the north end of the Embassy.  Some of the Embassy political officers were on top of the wall, lifting people across.  We handed the injured consular employee up.  Eventually, I was pulled across the top of the wall as well.  Once I dropped down on the other side, Lebanese Red Cross workers took me by the arm and led me to a waiting ambulance.  Rescue workers then shoved me into the ambulance, which contained a stretcher with the body of a dead Lebanese woman, her face swollen and blackened by the blast.  The ambulance lurched forward, and the Lebanese woman's body, which had not been strapped in, rolled out onto the ground.  Once the body had been reloaded into the ambulance, we proceeded up the hill to the American University of Beirut ("AUB") Hospital.

Id. at 12-14.

Once he arrived at AUB Hospital, Mr. Reid found his colleague Beth Samuel, whose face had been badly cut, in the emergency room. Id. at 15.  A short time later, he saw the Lebanese Minister of Public Health, whom he knew. Id.  The Minister introduced Mr. Reid to the hospital director as the American Embassy spokesman, and the director asked for Mr. Reid's assistance in fielding calls from the United States media. Id.  He began taking calls, identifying himself as the Embassy spokesman and making a short statement saying that people were injured but that, at that point, no one knew the extent of damage or loss. Id.  After clearing the calls, Mr. Reid's facial and head injuries were treated. See Phase II Exh. 3B (photographs showing injuries sustained by Mr. Reid in Embassy bombing).  Mr. Reid thereafter located some of his Lebanese colleagues outside the hospital entrance and, in talking to them, was able to account for eight of his twelve Lebanese staff members. Phase II Exh. 3A at 15.

Because of the damage to the Embassy, certain Embassy functions were relocated to Mr. Reid's apartment the day after the bombing. Id. at 16.  Later that day, Ambassador Dillon asked

Mr. Reid to draft a statement for him to deliver to roughly 200 journalists gathered in front of the bombed Embassy. Id. at 16-17.  He had lost his eyeglasses in the bombing, had been unable to find his spare pair, and could not have worn them in any event, as the right side of his head was so swollen that his right eye had swollen shut. Id. at 17.  He "touch-typed" a statement that he could not see but that Ambassador Dillon looked at and approved. Id.  The Ambassador and Mr. Reid then walked to the Embassy, where they were greeted by an explosion of flashbulbs and television lights. Id.  Within days, his picture, with his swollen, bandaged head, had appeared on network television news and in many American and foreign newspapers. Id.

By the Wednesday following the bombing, Mr. Reid still did not know what had happened to three of his Lebanese colleagues. Id.  At 11:00 p.m. on Wednesday night, he was awakened and told that the remains of one had been recovered. Id.  He walked over to the Embassy and identified the staffer by his clothing. Id.  Shortly after 1:00 a.m. on Thursday, April 20, the remains of the second missing staff member was recovered from the rubble. Id.  Later on Thursday, before the final staffer could be accounted for, Mr. Reid was told that search-and-rescue operations would be suspended because a high-level Washington delegation was expected to visit the site on Friday morning. Id. at 17-18.  He was furious that the search for victims was being suspended because of visiting VIPs, but was told by Ambassador Dillon that "when something terrible like this happens, the American people feel they have to show something, to make a gesture, and this is what they are doing." Id. at 18.  Mr. Reid made the necessary arrangements for the event. Id.

On Saturday, after the delegation departed, recovery operations resumed and, at around 11:00 a.m., Mr. Reid was asked to go to the Embassy to identify the remains of the last missing Lebanese staffer. Id.  He remembers that "I really lost my composure when I saw this and began

screaming, 'the bastards!  The rotten bastards!'" Id. at 18-19.

In late April, Mr. Reid was offered a position as Deputy Director in USIA's Office of East Asian and Pacific Affairs. Id. at 19.  While he had previously agreed, before the bombing, to extend his stay in Beirut for another year, Ambassador Dillon agreed with his request to leave Beirut to accept the position. Id.  He left Beirut on August 3, 1983, two years to the day after his arrival. Id.  While he was very glad to be out of Lebanon, he found it very difficult to disengage from his experience there. Id.

Mr. Reid returned to Washington, D.C. to assume his new duties. Id.  While on this assignment, he was promoted into the Senior Foreign Service. Id. at 20.  He subsequently applied for and received a PAO-ship as USIS Director in Korea, where he was awarded a Presidential commendation, along with another promotion, for his work. Id.

Mr. Reid's Korea assignment was scheduled to end in June 1990 and he decided to seek the PAO-ship in China. Id. at 21.  He was subsequently informed that the Director of USIA had decided to give the job to someone else so that, after twenty-six years in the Foreign Service, he effectively did not have a job. Id.  He ultimately proposed that USIA provide him with a year-long academic sabbatical at the University of Virginia, assigning him as diplomat-in-residence to the university while paying his full salary. Id. at 22.

While at the University of Virginia, Mr. Reid received a call from USIA's personnel office urging him to take the PAO-ship in Thailand to begin in 1992. Id.  The sabbatical year ended in June 1991, and he spent an interim year in the District of Columbia before becoming USIS director in Thailand. Id. at 23.  In 1995, after completing a three-year tour, he retired from the Foreign Service. Id.  Currently, Mr. Reid divides his time between Spotsylvania, Virginia, and Bangkok,

Thailand. Id.

     In describing the impact of the 1983 Beirut Embassy bombing on his life Mr. Reid stated:

> The Embassy bombing in Beirut was one of the major events of my
> life, one that I contemplate almost daily.  For a long time after the
> bombing, I asked myself constantly why I had been spared when
> others, some better people than myself and many with families and
> responsibilities, did not.  After much reflection, I recognized that life
> is a very fragile and precious gift which can be taken away,
> illogically and without reason, at any moment, and, since each day
> could be the last, it is important to live every day as fully as possible.
> I made a personal commitment to do so.  In the years immediately
> before I retired, however, I forgot this lesson and became a very
> angry, unhappy and sometimes disagreeable person.  Sometime late
> in 1994, however, I began to recall the lesson of Beirut and decided
> it was time to retire.  I have never regretted this decision.  As I have
> distanced myself from my career, I have become a happier person,
> and I have come to recognize that not all of life's questions – even
> those about an experience like Beirut – will be answered, and not all
> the issues will be resolved.

Id. at 23-24.

     When asked why he elected to participate in this lawsuit, Mr. Reid stated:

> Sometime after I retired, Beth Samuel contacted me by e-mail and
> told me that some of the Beirut survivors and the families of some
> who did not survive were joining in a legal action.  At Beth's urging,
> I contacted Anne Dammarell, who explained what was happening
> and who was participating.  I had been very close to many of these
> people in Beirut, and I felt that, if I could support them and join
> them, I should.  Also, I have always felt uncomfortable with the
> realization that no one ever revisited what happened in Beirut.  It
> happened, no one ever explained it, and, after a while, it was
> overwhelmed by other events, and people just forgot about it.  I did
> not forget it, however, and neither, I am sure, did many of my former
> Beirut colleagues.  Whatever the outcome of this litigation, I think it
> is salutary to document and to redirect attention to the experience of
> a terrible and unjust event, an event for which some responsibility
> should be fixed and one which should have taught Americans some
> important lessons which have been ignored.

Id. at 24.

As a federal government employee stationed overseas, Mr. Reid retained as his domicile in 1983 the state in which he last resided. See Dammarell II, 2005 WL 756090, at *22.  From 1959, when Mr. Reid graduated from Virginia Tech, until his retirement to Virginia in 1995, Mr. Reid had little consistent contact with the United States.  Most of his contacts with the United States during that lengthy period appear to have been temporary in nature, such as graduate school in New York and a year of sabbatical in at the University of Virginia.  Most of his visits back the United States, however, appear to have been to the Washington, D.C. area, specifically, Virginia. Accordingly, the law of Virginia applies to the Mr. Reid's claims.

Based on the pleadings and the evidence presented to the Court, Mr. Reid has stated a valid claim for battery under Virginia law and is entitled to recover compensatory damages from defendants for the "injuries and ill effects . . . [that] were proximately caused by the battery." See Pugsley, 263 S.E.2d at 76.  Plaintiffs have not presented the Court with any evidence upon which to award damages for any economic loss to Mr. Reid, such as lost income or medical expenses. However, the Court values the loss associated with Mr. Reid's pain and suffering and mental anguish resulting from the battery at $750,000.  Because Mr. Reid can recovery for his mental anguish under his battery claim, there is no need for the Court to consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  Accordingly, the Court should award Mr. Reid $750,000 on this default judgment.

### 9.      R. Kurt Shafer

Plaintiff R. Kurt Shafer ("Mr. Shafer") was assigned to the United States Embassy in Beirut as a Program Officer with US AID. Tr. Vol. IV at 67.  As of the Phase II testimony, he was living in Chatsworth, Illinois. Id. at 61.  He is divorced, and has two children. Id. at 81.

Mr. Shafer was born November 15, 1939 in East Lansing, Michigan, and is a United States citizen. Id. at 61.  He graduated from high school in 1958. Id.  After high school, he briefly worked in the construction industry before being drafted into the Army, serving until approximately 1960. Id. at 62.  He joined the Peace Corps in the summer of 1962, pursuant to which he spent two years conducting irrigation work in Morocco. Id. at 62-63.  In 1965, Mr. Shafer enrolled at Southern Illinois University, from where he obtained a Bachelor of Arts in Geography and Political Science in 1967, and a Masters in Community Development in 1968. Id. at 63-64.  After graduate school, Mr. Shafer went to work for the War on Poverty in the Appalachia. Id. at 64-65.

In September 1969, Mr. Shafer was hired by US AID, where he generally worked as a Program Officer, disbursing and monitoring the use of federal grant money abroad. Id. at 65, 67. Mr. Shafer's first official US AID posting was to Swaziland, where he spent two and a half years. Id. at 66.  Thereafter, he returned to Washington, D.C., where he was assigned to the Cambodia Desk, and was later posted to Bangkok, Thailand, where he worked on Cambodian affairs. Id.  He left Thailand in 1975, when he was transferred to Sana, Yemen. Id.  Mr. Shafer spent three years in Yemen and was then transferred to Somalia. Id.  He returned to the United States in 1980. Id.

Because he wanted to go overseas again, in 1981, Mr. Shafer volunteered for a posting in Beirut. Id. at 66-67.  He arrived in the city in late Spring of 1982, as a Program Officer for US AID. Id. at 67.  In that position, Mr. Shafer oversaw programs with the American University of Beirut, several voluntary agencies, and the YMCA, among other organizations. Id. at 67-68.

On April 18, 1983, Mr. Shafer went to the cafeteria for lunch where he saw Anne Dammarell and Robert Pearson. Id. at 72.  After saying hello, Mr. Shafer returned to his office. Id.

274

Remembering the explosion, he testified that he was sitting at his desk eating M&Ms and going

over a list with his secretary when he heard:

> a huge explosion.  It was like a rumble and it seemed to gain in
> intensity for maybe what, two or three seconds, and the next thing I
> know, I was on the floor.  The office was pretty well shattered in.  I
> got up, tried to leave by one door.  It was buckling.  I couldn't get
> out.  Went out another door, walked down to the central area, where
> injured people were.

Id. at 74.  He saw plaintiff Mary Lee McIntyre, who was injured and bleeding, but being cared for.

Id. at 74, 76.

Mr. Shafer left his office and headed downstairs to the Consular Section in search of his

girlfriend, who also worked at the Embassy. Id. at 74.  He attempted to enter the section three

times, but the tear gas made it impossible. Id.  He later learned that his girlfriend had been killed in

the bombing. Id. at 77.  He started back upstairs when he saw one of the security chiefs leading

people out through the back of the building. Id.  at 74-75.  He followed the group out of the

building, and helped his colleagues down an eight-foot drop. Id. at 75.  Once out of the building, he

went to his apartment and called his parents. Id.  Over the next several weeks, Mr. Shafer helped

re-establish Embassy functions in a local apartment. Id. at 78.

Mr. Shafer described the summer of 1983 as "a little bit peaceful, more organized," but

tensions increased by the fall. Id. at 78-79.  In October, the Marine barracks were bombed – Mr.

Shafer had eaten breakfast there just a few hours earlier. Id.  After barracks were bombed, Mr.

Shafer and other personnel were evacuated from Beirut. Id.  He returned shortly thereafter, but

fighting broke out again and he was evacuated for a third and final time in early 1984. Id.

Mr. Shafer's next posting was to Chad. Id. at 80.  After two years in Chad, he was

transferred to Uganda, where he remained for three years. Id.  He retired in 1989. Id.  Shortly after

retiring, he took a position in Guyana running a Title I food import program, where he worked for three years and then retired fully. Id. at 81.

In the years since the bombing, Mr. Shafer has become sensitive to bright lights and loud noises. Id. at 82. See Dammarell I, 281 F. Supp. 2d at 189 (discussing expert testimony that "hyperarousal or autonomic nervous system overactivity" manifested by "exaggerated startle response," is a common symptom in those experiencing trauma such as Beirut Embassy bombing). He takes eight aspirin or aspirin-like products every day to counter the effects. Tr. Vol. IV at 82.

As a federal government employee stationed overseas, Mr. Shafer retained as his domicile in 1983 the state in which he last resided. See Dammarell II, 2005 WL 756090, at *22.  Plaintiffs argue that the law of Illinois should apply to Mr. Shafer's claims. See Pls. Mem. in Supp. of State Law Claims at 22.  However, based on the information before the Court, his only contact with Illinois prior to the Embassy bombing was during college and then graduate school. See Tr. Vol. IV at 61-85.  Although he currently resides in Illinois, and based on that fact, Illinois would have an interest in the lawsuit, Judge Bates has held that the plaintiffs' domicile is to be determined as of the date of the bombing – 1983. See Dammarell II, 2005 WL 756090, at *22.  According to the evidence before the Court, Mr. Shafer lived in Virginia immediately prior to working for US AID and, between the date that he first starting working for US AID and the date of the bombing, he returned to work in the Washington, D.C. area on multiple occasions.  There is no information, however, regarding where Mr. Shafer lived during the periods when he was working in the Washington area (i.e., Maryland, Virginia, or the District of Columbia), but there was some indication that he may have owned a home in Virginia at that time. See Tr. Vol. IV at 80.

Accordingly, because Virginia was the last place that Mr. Shafer was known to have lived prior to the bombing, that law of that state shall govern his claims.

Based on the pleadings and the evidence presented to the Court, Mr. Shafer has stated valid claim for battery under Virginia law and is entitled to recover compensatory damages from defendants for "injuries received and ill effects . . . proximately caused by the battery," see Pugsley, 263 S.E.2d at 76, as well as the resulting physical pain and suffering and mental and emotional harm, see Norfolk Beverage, 525 S.E.2d at 291.  Nothing has been provided to the Court regarding any economic damages suffered by Mr. Shafer.  However, the Court values the loss associated with his physical pain and suffering and mental anguish resulting from the battery at $750,000.  Because Mr. Shafer can recover for his mental anguish under his battery claim, there is no need for the Court to consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  Accordingly, the Court should award Mr. Shafer $750,000 on this default judgment.

### 10.   Andy Wartell

Plaintiff Andrew Wartell ("Mr. Wartell") arrived in Beirut on April 17, 1983 to attend a series of meetings, some of which where to take place at the Unites States Embassy. Tr. Vol. VIII at 129, 131.

Mr. Wartell was born on October 31, 1951 in Albuquerque, New Mexico. Id. at 125.  He is a United States citizen. Id.  He graduated from Highland High School in Albuquerque in 1969, and thereafter attended the University of New Mexico in Albuquerque, graduating in 1973 with a Bachelor of Science in Chemistry and Biology. Id. at 126.  After college graduation, Mr. Wartell began working at the Lovelace Inhalation Toxicology Research Institute as a plutonium chemist.

Id. at 127.  After a year at Lovelace, Mr. Wartell decided to attend graduate school, studying

forensic chemistry at the University of Pittsburgh. Id. at 127-28.  After graduating from the

University of Pittsburgh with a Master's in Forensic Chemistry, Mr. Wartell went to work in Lake

County, Ohio for the Lake County prosecutor's office as deputy chief of the crime lab. Id. at 128.

After a year with the Lake County prosecutor's office, in November 1976, Mr. Wartell took a

position with the federal government. Id. at 129.  Most of his initial postings were overseas, and

Mr. Wartell planned to remain overseas for his entire career. Id. at 129, 160.

Mr. Wartell, was working for the federal government based on Germany and, on April 17,

1983, he arrived in Beirut to attend a series of meetings. Id. at 129, 131, 157.  On the morning of

April 18, 1983, Mr. Wartell reported to the United States Embassy, checking in at Marine Post

One. Id. at 131.  Around 10:00 a.m., he left the Embassy for meetings to be held outside of the

Embassy and returned shortly before 1:00 pm. Id.  He had just gone into a washroom when the

bomb exploded:

> I was listening to the sounds and washing my hands and kind of
> making sure that I was properly attired.  I heard a bunch of shouts,
> and there was a very violent explosion.
>
> My memories of it are that when the blast occurred, I threw myself
> down on the floor, but I was probably thrown down on the floor as
> opposed to throwing myself on the floor, but I'd like to think I
> reacted to it.

Id. at 131-32.  He remembers that the explosion:

> was extremely violent . . .  I was immediately drenched in water
> because I was in this bathroom.  I was pinned in a fetal position
> pretty much.  I had lost my glasses.  I never lost consciousness as far
> as I know, because my immediate reaction was a grenade, as
> everyone else had thought, and that I'll get out of the situation very
> quickly as soon as someone opens the door and pulls whatever is on
> top of me off of me.  And as the water continued to pour down on

> me I started to worry about drowning.  I didn't know where the water
> was going, again, not knowing really the total situation, just thinking
> that, gee, I'm on the floor of a bathroom.

Id. at 132.  Mr. Wartell testified that, as he was lying on the bathroom floor:

> I started to hear what I thought were gunshots.  I started to worry that
> the embassy was under attack and I was pinned and there was
> nothing I could do to protect myself or to extricate myself.  The more
> I struggled, the tighter the little tiny space that I was in seemed to get.
> I started to scream for help.  You know, it was very – I couldn't
> understand why folks couldn't hear me.  I couldn't understand why
> no one was coming to my assistance.  A little bit of panic or a lot of
> panic, probably, set in.
>
> I couldn't see anything.  It was very dark.  The only thing that I had I
> could really latch onto that was real for me was my digital watch.  I
> had a digital watch on at the time, and I could get that in front of my
> face and see what time it was.  That was just my hold on reality.

Id. at 132-34.  In describing how he was pinned into the space in the bathroom, Mr. Wartell

testified:

> I was . . . in a fetal position.  I was sideways, lying on my side.  My
> legs were extended out.  It was very unusual in that my legs were
> kind of in a hollow, and it turned out there was a bathtub in this
> bathroom and it had flipped over and had pinned my legs.  It was on
> top of my legs and probably was what had broken one of my feet.
> Lying on my side, I had the concrete, whatever concrete it was.  I
> assumed it was from the ceiling.  It was pinning me down.  The thing
> that holds concrete together – they usually put metal struts in to hold
> pieces of the walls together so they don't come apart since there's
> very little strength, actually, in concrete – one of those had come
> down right behind my neck and was preventing me from moving my
> neck in any direction.
>
> So I had very little movement of the head.  My shoulders were
> pinned in this sideways position, and there was no room, really, to
> turn or anything else.  So I was kind of in a compressed fetal
> position, extremely uncomfortable and very wet.  It was a blessing
> when the water stopped flowing.  I guess it was all the water that was
> in the pipes that finally drained out.  Then I was just there for a long
> time at that point.

Id. at 134-35.  As he was lying on the bathroom floor, Mr. Wartell could hear:

> a lot of people digging and scrabbling and moving around outside.
> At some point, there was the noise of a bulldozer coming in, and I
> could hear them moving rubble, and when each time the bulldozer
> came in and moved something, the concrete that was on top of –
> there was a slab was on my shoulder.  There was also one just above
> my head that was connected to the piece of metal behind me, and
> every time that moved a certain part of the building somewhere, this
> would slip harder and harder on my head.
>
> So I figured if they didn't get me out of there pretty soon or stop with
> the bulldozer, it was going to crush my head.

Id. at 135-36.  Around 3:00 p.m., Mr. Wartell managed to get the attention of a female searcher, who asked him where he was.  Id. at 136.

Approximately forty-five minutes later, a Lebanese Red Crescent worker found him.  Id. at 138.  As he recalled, "he was calling to me and talking to me, and he could actually see my back through whatever means.  He was coming in from behind me and could reach through the rubble and touch me.  So that was such a relief at that point."  Id.  The Red Crescent worker got some Marines to help extricate him from the rubble.  Id. at 138-39.  He started to panic and had trouble breathing, so the Marines passed him an oxygen mask.  Id. at 139-40.  Finally, the Marines put a rope around the slab on top of Mr. Wartell and were able to pull him out of the space.  Id. at 140.

When he was finally pulled out, Mr. Wartell, who had lost his glasses, couldn't see very well, but could tell that he had been laid on top of one of the slabs of concrete that had pancaked downwards in the bombing, and so found himself "in this little probably ten foot–by–ten foot area at about a 45-degree angle on a slap [sic] of concrete, and I was looking up the hole where this guy had scrambled through.  It was at least ten feet above me . . .  I just had to get out of that space."  Id. at 141.  It was at that point that Mr. Wartell realized the devastation caused by the attack:

> As I looked out towards the door that I had come in or where I
> thought the door was that I had come in, there was nothing there.
> The embassy was completely gone.  The façade of the building had
> fallen away.  At that point, I just needed to get out of there, and I just
> told them pull me out, and the Marines that were there pulled me
> through that hole, got me up to the hole and then pulled me through
> it and then laid me down in what I believe was probably a stairwell
> that was adjacent to that space.

Id.  A Marine doctor gave Mr. Wartell an IV, strapped him to a backboard, and carried him out. Id.

at 142.  He was placed in an ambulance headed towards AUB Hospital. Id. at 142-43.  Once at

AUB Hospital, Mr. Wartell was taken to a triage room, where he was x-rayed and a temporary cast

was put on his foot. Id. at 143.  Medical staff tried to x-ray Mr. Wartell's back, but "[f]or some

reason the x-rays wouldn't come out.  They kept saying that there was too much air in my body and

it was interrupting the x-ray images." Id. at 144.  While the option of exploratory surgery was

discussed, doctors concluded that "they had too many other patients that were in critical need," and

put Mr. Wartell aside. Id.  As a result Mr. Wartell was moved to a hallway, still in his wet clothes

and strapped to the same backboard, with an IV line. Id.  Mr. Wartell had been put into the hallway

at about 7:00 p.m. and was left there. Id. at 144-45.  During this entire period, he was never given

any sort of pain medication. Id. at 145.

   While Mr. Wartell was lying in the hallway, an American US AID worker, who was

looking for his friend, stopped at Mr. Wartell and asked whether he was an American. Id. at 146.

Mr. Wartell responded that he was and then, after seeing the Ambassador nearby, asked the US

AID worker to have the Ambassador come over, who exclaimed, "we've been looking for you all

evening." Id.  He asked Mr. Wartell how bad his injuries were and said that he would get Mr.

Wartell out as soon as possible. Id.  Shortly thereafter, Mr. Wartell was taken up to a room in the

hospital. Id.

Around 2:00 a.m., a group of Marines came in and told Mr. Wartell, "[w]e're here to take you out of the hospital; we have a problem though; the Lebanese doctors won't release you; they have you now and they consider you their patient and they don't want to release; so we're going to kidnap you from the hospital; we'll be back." Id. at 148.  A little while later they returned with a stretcher for Mr. Wartell, covered him up with blankets, carried him down the back steps of the hospital, and placed him into a jeep with a locking stretcher carrier. Id. at 149.  As Mr. Wartell recalled, "that was the wildest ride of my life.  They literally pushed cars out of the way to – we didn't stop.  As was said before, these were mad Marines.  I felt very secure with them." Id.  While the ride was "very uncomfortable" physically, Mr. Wartell still "felt very safe." Id.

He was subsequently put on an evacuation helicopter and sent to the *Guadalcanal*, a Marine amphibious ship anchored offshore. Id. at 50.  At this point, Mr. Wartell was still wearing the same wet clothes that he had been in since the bombing: "It was cold.  It was miserable, but again, I was with the Marines, and that made me feel an awful lot better than I had for a long time." Id.

Once on-board the *Guadalcanal,* Mr. Wartell was "hoisted up" to the surgical ward, where a team of doctors and nurses determined that he did not have "any life-threatening issues." Id. at 151.  In terms of the treatment he initially received, Mr. Wartell testified:

> They took very, very good care of me.  They took x-rays of my back for whatever reason.  My foot, the big toe and the little toe of my foot were still in tact and the bones in the middle were so disrupted that they just wanted to cast it and not doing anything with it.  They couldn't set it because it was damaged so badly, and they said they'd leave it to someone to determine if they should operate.
>
> They cleaned me up.  They got the glass out of my eye and out of my scalp and finally cut all of my clothes off, which was a pleasure, and took me into the medical ward, and it was only at that point – I

> hadn't slept at all – that I felt that I could finally relax . . . .

Id. at 151-52.

After several days on the *Guadalcanal*, arrangements were made for Mr. Wartell to be

medivaced to Germany. Id. at 154.  Mr. Wartell testified that his arrival in Germany was somewhat

difficult:

> When I arrived at the airport, my management was there, and they
> made me feel very unwelcome.  It had been – it was a strange
> circumstance for them.  This was the first time they had folks injured
> like this.  I don't think they knew how to react to it.  The manager of
> the facility told everyone that I was not to be contacted and no one
> was to talk to me.  It was very difficult.  Luckily enough, my
> immediate supervisor, who was a trained psychologist didn't listen to
> that, and he stayed by my side the entire time.

Id. at 155.  Mr. Wartell was in the hospital in Germany approximately three days.  Id.  During this

time, the medical staff did do "a very, very good and thorough check-up and diagnosed most of the

problems." Id. at 156.  Mr. Wartell testified that these problems included, "[a] crushed foot.  I had

a compound fracture in my back.  I had lacerations of my eyes and just severe bruising." Id.

Because he was, at the time of his discharge, unable to care for himself, Mr. Wartell spent

the next week or so at the home of his supervisor, until he felt that he could manage on his own, at

which point he went back to his apartment in Frankfurt. Id. at 156-57.  He stated that he remained

in Frankfurt until June because:

> There were many things that were – that I was doing at the time I
> was injured that I wanted to see through, and I was concerned.  I was
> not very ambulatory.  My father at that point was in the very final
> stages of multiple sclerosis and was quadriplegic, and the last thing I
> wanted to do was be in front of him and have him see me in the same
> condition.  So I wanted to make sure I was healthy enough that he
> would not see me like that.

Id. at 157.  See Phase II Exh. 33 at 1 (photograph of Mr. Wartell in Germany, with crutches and

showing foot crushed in Embassy bombing).  In early June, Mr. Wartell was medivaced back to the

United States, where he resided with his brother from June through September 1983. Tr. Vol. VIII

at 157-58.  During this time, he was seen by several doctors in the Harrisonburg, Virginia area, one

a sports doctor and one a psychiatrist recommended by Mr. Wartell's office. Id. at 158.  Mr.

Wartell testified, with respect to his one and only visit with the psychiatrist:

> I had – the week that I had been with my supervisor coming right our
> [sic] of Wiesbaden Hospital, I had written up my experience.  He had
> felt that would be a good idea to help me get through what had
> happened, and it was.  It was very worthwhile to put it all down on
> paper.  So I had given that to the psychiatrist.  I explained to him that
> I had been – not only Beirut, but it had been a very bad year in my
> life.  My wife had left me for my best friend at the time, taking my
> two children.  So there was a lot of trauma in my life at that time.
>
> The psychiatrist looked at me and said, you know, you've got a lot of
> problems, that when you've worked out some of them, come back
> and see me.  That's the last I heard from him.

Id. at 158-59.  But, as he explained, "That's not all bad.  I didn't want them to pick up my medical

file.  Any suggestion of psychiatric problems or weakness is viewed as a career killer.  We're not

allowed to be weak." Id. at 159.

   Throughout this period, Mr. Wartell was being assessed for his ability to resume his pre-

Beirut overseas responsibilities. Id. at 161.  As Mr. Wartell testified:

> They were looking very closely at whether or not I could resume my
> duties overseas, and I came to the conclusion very quickly that I
> couldn't, and I told them that up front, that I could not do it.  I could
> not walk around overseas even where I used to live.  I couldn't walk
> by a car without wondering if it was going to blow up, and that's
> really an irrational thought and you can rationalize it to yourself and
> say this is really stupid, but you can't get around the feeling, and if
> you have anything that distracts you from what you have to do from
> every consideration you have to take while you're overseas, then you
> can get yourself hurt.  You can get your colleagues hurt and can't
> afford it.

> So I decided.  It was an easy decision for me to say I can't go
> overseas; I can't do what I used to do.

Id. at 161-62.  Mr. Wartell stated, "[i]n my specialties, overseas is your entire career.  It's your life.

It's your promotion progression.  It is what you do.  It is what you enjoy.  It's everything you've

strived for." Id. at 160.  There were financial considerations as well:

> Being overseas not only gets you promoted quicker, gets you
> promoted further, there was at that time – still is – a . . . differential
> for being overseas.  There is a, depending on where you are, cost of
> living differential.  You get cash for the difference in how strong the
> dollar is against the local economy, which it was great for a young
> family to have cash given to you every month, just here is your
> differential, here is your COLA, and that was just icing on the cake.
> I traveled 60 percent of the time when I was overseas.  That's kind of
> our job, is to travel a lot.  Traveling is very lucrative when you look
> per diem rates, you look at salary and per diem and you're renting
> your house back in Washington.  It's very lucrative to be overseas.

Id. at 160-61.

In describing why he could not return overseas, Mr. Wartell testified:

> I look back on that time, and I tell everyone I was mentally ill, and I
> was mentally ill for a couple of years.  I still may be.  I don't know.
> It was a very difficult time to be with people anywhere from I guess
> what's a classic survivor syndrome, why did I survive and no one
> else did, maybe I would be better off dead, the attitude that my
> colleagues had towards me.  I was a reminder of what bad things can
> happen to them, and they didn't want that reminder.  That was the
> feeling that I got.  It wasn't that I had done anything wrong or should
> feel guilty.  It was that they didn't want the reminder of what could
> happen to them.  So they didn't want me around.  That was the
> feeling that I got, and I couldn't shake that attitude.
>
> I was very emotional during that time.  I went through a period where
> I felt I was [invincible], which is very dangerous to your friends if
> you're walking down alleys in Washington, D.C., saying, you know,
> nothing can happen to me, lightening doesn't strike twice in the same
> place, don't worry about it, irrational thoughts like that.  It was a
> very difficult time.  You find out who your true friends are.  They
> stick with you.

Id. at 162-63.  See Dammarell I, 281 F. Supp. 2d at 189-90 (discussing expert testimony that a common response to trauma is "survivor's guilt" and its affect on a person's "mood, behavior, and life choices").  Mr. Wartell's wife "now of almost 20 years" was "the only one that saw" him "through the dark period." Tr. Vol. VIII at 163.

Due to the injury to his foot, Mr. Wartell has experienced "continuous stress fractures," a situation exacerbated when the sports medicine doctor Mr. Wartell was seeing informed him that he could "get back on" his feet and resume jogging "quicker than [he] probably should have." Id. at 163-64.  Mr. Wartell continues to be unable to do many of the activities that he enjoyed prior to the bombing:

> When I started to come up to an orthopedic surgeon here in Washington, which was probably in about October, November of `83, he admonished me from doing any sports that required twisting. So golf was no longer an option.  Tennis was no longer an option. Skiing was out of the question.  No more roller coaster rides with the kids.  I have to pay attention to those signs that if you have a bad back, don't do this.  So that's just been continuous.  You live with it. You just pay attention to your limitations.

Id. at 164.  Mr. Wartell stated that his "back has probably been the worst thing.  It's a continuous problem.  I can't sit for long periods of time.  I have to live on Excedrin." Id. at 168.  Mr. Wartell takes "probably anywhere from three to twelve" Excedrins "probably five times a week," noting that his dosage depends on the severity of pain experienced and factors such as what he is doing on a particular day:

> If I'm at an off-site [meeting] where you have to sit and listen to people talking, I can probably sit for an hour, maybe two, and then I'll stand for the rest of the time.  I was just at an off-site the last two days before this, and probably out of the 16 or 17 hours that I spent there, I probably stood 14 of those.  I just can't sit.  The pressure and the compaction just gives me severe headaches, but if I'm able to get up and stand, that relieves it.

Id. at 168-69.  In addition to these problems, Mr. Wartell testified:

> When I fly or drive long distances, I always wear a neck brace
> because the bumping over the road can cause severe pain.  The last
> time I had to go into therapy, physical therapy, which was about a
> year ago, I hit a pothole in D.C.  Imagine that.  But a pothole will do,
> just anything that – you know, a severe bump will do it, and you
> know, it's something you live with, put up with.

Id. at 169.

Mr. Wartell returned to Europe in October 1983 to close out his accounts and, after doing

so, returned to the United States in November. Id. at 165.  Though he had temporary assignments,

he was never permanently posted overseas again. Id.  Instead, he was "put in a desk position in the

office," a position that Mr. Wartell described as "a very important job, a job that has to be done,

but not a job that was one that I ever thought was in my career progression, a staff job . . . that I

saw as slowing my career almost to a halt." Id. at 165-66.  In December 2002, Mr. Wartell retired

from the federal government and, as of the Phase II testimony, served as the Director of Advanced

Programs for General Dynamics, focusing primarily on business development. Id. at 166-67.

When asked why he decided to participate in this law suit, Mr. Wartell responded:

> I don't know.  Because of Anne [Dammarell], probably.  You know,
> there are people that you meet in your life that you never forget, and I
> met Anne on that medivac airplane, and it was her courage and her
> perseverance that affected me all these years, and when she re-
> contacted me, it's whatever you want.  I'll do anything for Anne, and
> she doesn't know that, but it's absolutely true.

Id. at 170-71.

On the date of the bombing, Mr. Wartell was stationed in Germany.  As a federal

government employee stationed overseas, he retained as his domicile in 1983 the state in which he

last resided. See Dammarell II, 2005 WL 756090, at *22.  After Mr. Wartell joined the federal

287

government, most of his postings were overseas and, based on his testimony, it appears that he intended to remain overseas for the rest of his career. See Tr. Vol. VIII at 129, 160.  During the period prior to the bombing, the most significant contacts that he had in the United State were with Virginia and, indeed, that is where he has lived since returning to the United States. See Pls. Mem. in Supp. of State Law Claims at 24.  Therefore, the law of Virginia applies to his claims.

Based on the pleadings and the evidence presented to the Court, Mr. Wartell has stated a valid claim for battery under Virginia law and is entitled to recover compensatory damages from defendants for "injuries received and ill effects . . . proximately caused by the battery," see Pugsley, 263 S.E.2d at 76, as well as the resulting physical pain and suffering and mental and emotional harm, see Norfolk Beverage, 525 S.E.2d at 291.  The expert economic analysis presented to the Court demonstrated that, as a result of the bombing, Mr. Wartell suffered $1,405,000 in economic losses, specifically in lost wages and benefits. Phase II Exh. 1 at 32-34. Further, the Court values the loss associated with his physical pain and suffering and mental anguish resulting from the battery at $5 million.  Because Mr. Wartell can recover for his mental anguish under his battery claim, there is no need for the Court to consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  Accordingly, the Court should award Mr. Wartell $6,405,000 on this default judgment.

## XI.  WASHINGTON

### A.  Causes of Action

#### 1.  Wrongful Death Statute

Washington's wrongful death statute provides: "When the death of a person is caused by the wrongful act, neglect, or default of another his personal representative may maintain an action

288

for damages against the person causing the death." Wash. Rev. Code § 4.20.010.  The personal

representative may bring a wrongful death action, not for the benefit of the estate, but for the

benefit of certain statutorily defined beneficiaries. See Wash. Rev. Code § 4.20.020.

Specifically, damages awarded under a wrongful death claim are for the benefit of the "wife,

husband, child or children, including stepchildren, of the deceased." Id.  If there is no surviving

spouse or children, then the claim is for the benefit of the parents and siblings of the deceased. Id.

Damages recoverable under Washington's wrongful death statute include "the actual pecuniary

loss suffered by the surviving beneficiaries from the death of their relative, including loss of

services, love, affection, care, companionship, and consortium." Tait v. Wahl, 987 P.2d 127, 129

(Wash. Ct. App. 1999).

## 2.    Intentional Infliction of Emotional Distress

In 1975, the Supreme Court of Washington adopted the Restatement (Second) of Torts § 46

(1965)'s statement of intentional infliction of emotional distress. See Grimsby v. Samson, 530 P.2d

291 (Wash. 1975).  Accordingly, under Washington law, the tort of intentional infliction of

emotional distress, which is also known as the tort of outrage, "requires the proof of three

elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional

distress, and (3) actual result to plaintiff of severe emotional distress." Kloepfel v. Bokor, 66 P.3d

630, 632 (Wash. 2003) (citations omitted).  "[A]ny claim for intentional infliction of emotional

distress must be predicated on behavior '*so outrageous in character, and so extreme in degree, as*

*to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly*

*intolerable in a civilized community*.'" Kloepfel, 66 P.3d at 632 (quoting Grimsley, 530 P.2d at

291) (emphasis in original).

Washington courts appear to have also adopted a requirement that a plaintiff be present when the extreme and outrageous conduct occurred. See, e.g., Reid v. Pierce County, 961 P.2d 333, 337 (Wash. 1998) ("because [plaintiffs] were not present when the conduct occurred, they may not maintain tort of outrage actions."); Rich v. Fiberweb Washougal, Inc., No. 23370-3-II, 1999 WL 221562, at *7 n.4 (Wash. Ct. App. Apr. 16, 1999) (where plaintiff was not present when her co-worker made sexual allegations about her, the court noted that "a plaintiff must be present at the time of alleged tortious conduct to establish a claim for outrage."); Bakay v. Yarnes, No. C04-5803, 2006 WL 1313350, at * 6 (W.D. Wash. Jan. 3, 2006) (where plaintiffs were not present when their cats were euthanized, they could not recover for outrage); Cunningham v. City of Wenatchee, 214 F. Supp. 2d 1103, 1115 (E.D. Wash. 2002) ("A plaintiff may not sue for outrage unless he or she was present when the conduct occurred."). This presence requirement appears to have originated in Reid v. Pierce County, 961 P.2d 333, 337 (Wash. 1998), the case to which the lower state courts and the federal courts in Washington cite when applying this presence requirement.

I have reviewed Reid, and do not think that the Supreme Court of Washington intended to *always* require a plaintiff's presence for there to be a valid claim for intentional infliction of emotional distress. In discussing the requirements of the tort of outrage, the Supreme Court of Washington quoted extensively from sections of its opinion in Grimsby, which in turn cited to the Restatement (Second) of Torts § 46 (1965). Reid, 961 P.2d at 337. In Section 46 the Restatement, the presence requirement is raised in the context of whether a plaintiff can state a claim for outrage when the extreme and outrageous conduct was directed at a third-party, rather than directed at the plaintiff. Specifically, it states, "Where such conduct is directed at a third person, the actor is

subject to liability if he intentionally or recklessly causes severe emotional distress (a) to a member of such person's immediate family *who is present at the time,* whether or not such distress results in bodily harm, or (b) to any other person *who is present at the time*, if such distress results in bodily harm." Restatement (Second) of Torts § 46(2) (1965) (emphasis added).  The plaintiffs in Reid sued the defendants for outrage on the ground that employees of the defendants had displayed photographs of the corpses of plaintiffs' deceased family members. Reid, 961 P.2d at 335.  The defendants argued that the plaintiffs could not state a claim for outrage because they were not *present* when the photographs were shown. Id. at 337.  In response, the plaintiffs argued that the presence requirement was inapplicable because the extreme and outrageous conduct was directed towards them, not towards third-parties. Id.  The supreme court agreed with the defendants, focusing on the fact that the plaintiffs were not present when the conduct occurred, but the court did not address the issue of whether the defendants' allegedly extreme and outrageous conduct was *directed at* the plaintiffs. Id. at 337-38.  Accordingly, because the court heavily relied on the language of the Restatement, I find that it is more likely that the court was merely applying the articulation of the rule than that the court intended to expand the presence requirement to *all* plaintiffs asserting an outrage claim.  Moreover, the cases to which the court cited to support its conclusion that outrage required the plaintiffs' presence, were all cases in which the plaintiff was claiming emotional distress for conduct directed at a third person. See id. (citing Schurk v. Christensen, 497 P.2d 937 (Wash. 1972) and Lund v. Caple, 675 P.2d 226 (Wash. 1984)).

The only Phase II plaintiffs seeking damages for intentional infliction of emotion distress under Washington law are the surviving parents of a victim who was killed in the Embassy bombing.  Therefore, neither plaintiff was present during the extreme and outrageous conduct of

the defendants.  Although it appears that Washington courts have not had the opportunity to

consider the applicability of the tort of outrage to surviving family members of victims of terrorist

activities, courts that have addressed the issue have repeatedly held that terrorists' act are "directed

at" the victims family members.  See, e.g., Prevatt v. Islamic Republic of Iran, 421 F. Supp. 2d 152,

160 (D.D.C. 2006) (applying Georgia law, the court found that terrorist bombing of Marine

barracks was directed towards the emotional well-being of the victim's family members); Salazar

v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) ("Courts have uniformly

held that a terrorist attack – by its nature – is directed not only at the victims but also at the victims;

families").  Indeed, the Court in this case has already held that the attack on the embassy was

directed at the victims' family members.  Dammarell VI, 404 F. Supp. 2d at 283.  Accordingly,

because defendants' extreme and outrageous conduct was *directed at* the victims' family members,

I find that Washington's possible presence requirement is inapplicable.

    **B.**    **Plaintiffs**

        **1.**    **Estate and Surviving Family Members of Terry Gilden**

            *a.*    *Estate of Terry Gilden*

Terry Gilden ("Mr. Gilden") was the husband of plaintiff Mary Gilden. Tr. Vol. III at 4.  He

was also the son of plaintiffs John Gilden and Lorraine Gilden and the father of plaintiff Teresa

Gilden. Id. at 5-6, 31, 60-61, 97.  Mr. Gilden was killed in the April 18, 1983 bombing of the

United States Embassy in Beirut.  The Estate of Terry Gilden, which was probated in the State of

Washington, is represented in this litigation by his wife Mary Gilden, as executrix. Id. at 4. See

Phase II Exh. 6 (Estate papers of Terry Gilden).

Mr. Gilden was born September 15, 1957 in Chandler, Arizona, where his father was stationed at Williams Air Force Base. Id. at 31-32.  He was a United States citizen. Id. at 4.  Mr. Gilden was the second oldest of the four children in the Gilden family – he had an older brother John, a younger brother Jim, and a younger sister Jill. Id. at 31.

Mr. Gilden was also "very close" to his family. Id. at 10.  Because his father was in the Air Force, the Gildens had to move for his various postings. Id. at 32.  Before Mr. Gilden graduated from high school, the family had lived in Arizona, New Mexico, various places in Washington State, and Aviano, Italy. Id. at 32-33.  Eventually, the family returned to the United States, and settled in Washington State. Id. at 33-34.

According to his wife, Mr. Gilden was an avid outdoors man: he had a love of  "[a]nything outdoors:  hunting, fishing . . . camping, just anything that had to do with being outside.  And he liked being in the woods." Id. at 10.

While still in high school, Mr. Gilden enlisted in the military under the Army's early admissions program, explaining to his father that he wanted to go into the Army to be a Ranger. Id. at 35.  After enlisting, Mr. Gilden "was Army all the way.'' Id. at 10.  He had chosen to join the Army's Ranger battalion because it was "the elite fighting force of the Army at that time." Id. There was no doubt in the minds of the Gilden family members that he had intended to make the Army a full career lasting several decades. Id. at 10, 47.

Once in the Army, Mr. Gilden underwent extensive training, as his wife explained, "he did anything and everything that was offered." Id. at 9.  Describing some of this training, his father testified:

> He went to the SCUBA school.  He was SCUBA-qualified.  He went to HALO
> school, which is high altitude-low opening.  They would bail out at about 25,000

> feet and free-fall down to 5,000 or below before they opened their chutes.  He went
> to Pathfinder, which is where they go in ahead of a normal unit and direct them for
> drop zones and things like that.
>
> He was also – his team did a special demonstration for the FBI in clearing a
> building of hostages, and, apparently, the FBI was rather impressed with the way
> they handled it.

Id. at 40-41.

After spending several years as an Army Ranger, in 1981, Mr. Gilden went through the

Special Forces selection process. Id. at 11.  The process was rigorous and involved, as his wife

explained:

> [a] lot of physical tests.  They had a lot of rucksack marches, which
> is, you know, they'd fill up their backpacks with equipment, and they
> had to weigh a certain amount, and they had to, you know, make a
> march from – or they called it a march, but, like, a hike.  They would
> take them out to some remote area, maybe in the foothills, and they
> had no idea where they were at.  They'd give them a compass and a
> map and coordinates to the next point, and they had a certain amount
> of time to get to that next point.
>
> Then, they would get there, and they would give them some more
> coordinates.  And they had to go on, and it was basically, they had
> very little food.  They had to survive on their own and, you know,
> very physically grueling.  And at the end, I believe it was a five to
> seven day that they were out.  And at the end of it, if they made it to
> each checkpoint in the amount of time, then, they were allowed to
> enter into the Special Forces.

Id. at 11-12.  He successfully made it through the process, and was accepted into the Special

Forces. Id. at 12.  In the spring of 1982, he and his wife, Mary, moved to Fayetteville, North

Carolina, so that he could begin training with the Special Forces. Id. at 13.  As his wife testified:

> They had, as part of the unit, he had to go through all kinds of
> specialized training: shooting, covert operations, driving school.
> They taught them – I don't know if it would be defensive driving;
> what to do in situations where they had – they were trying to protect

somebody, and it possibly became under fire or being fouled [sic] or
something like that.

He had a lot of underwater SCUBA training; a lot of – they even
taught them how to dress and eat properly. Because they would be
having to be in with, like, ambassadors and, you know, important
people. And they didn't want them to stand out as military people.

Id. at 13-14. Although, other than his wife, his family members did not know this at the time,

Terry Gilden's first assignment was to Beirut, to serve as a bodyguard for the United States

Ambassador to Lebanon. Id. at 15-16.

On December 14, 1982, just a few months before Mr. Gilden left for Beirut, his daughter,

Teresa was born. Id. at 15. He departed for Beirut in early March of 1983. Id. at 16. On April 18,

1983, he was killed in the Embassy bombing.

For purposes of this litigation, the law governing the claims of the Estate of Terry Gilden is

the law of the state where he was domiciled at the time of his death. See Dammarell II, 2005 WL

756090, at *22. As member of the United States military stationed oversees, Mr. Gilden retained

as his domicile in 1983 the state in which he last resided. See id. Plaintiffs argue that either the

law of North Carolina, which they assert was Mr. Gilden's last domicile, or the law of Washington,

where his estate was probated and were he had the most longstanding contacts, should apply. Pls.

Mem. in Supp. of State Law Claims at 91-92.

Acting as personal representative of the estate, Ms. Gilden asserts a claim for wrongful

death under first North Carolina's wrongful death statute and then, in the alternative, under

Washington's wrongful death statute. Pls. Mem. in Supp. of State Law Claims at 124-26. Under

both North Carolina's and Washington's wrongful death statutes, the estate's personal

representative is the only person who has standing to bring a claim. See Wash. Rev. Code §

295

4.20.010; <u>Wood v. Dunlap</u>, 510 P.2d 260, 263 (Wash. Ct. App. 1973), *rev'd in part on other*

*grounds*, 521 P.2d 1177 (Wash. 1974); N.C. Gen. Stat. § 28A-18-2(a); <u>Burcl v. N.C. Baptist Hosp.</u>,

293 S.E.2d 85, 87 (N.C. 1982) (quoting N.C. Gen. Stat. § 28A-18-2(a)).  It appears, however, that

Ms. Gilden may not have standing under North Carolina law to bring a wrongful death action

because she was not appointed as the estate's administrator in North Carolina and she has not been

qualified as an ancillary administrator in North Carolina. <u>See</u> <u>Burcl</u>, 293 S.E.2d at 87-88 ("A

foreign administrator lacks 'capacity to sue' in a wrongful death action in North Carolina.");

<u>Janeau v. Pitman Mfg. Co., Inc.</u>, No. 90-194, 1991 WL 538679, at *8 (Oct. 25, 1991) ("As a

foreign administrator, Plaintiff must qualify locally before she has the capacity to bring a death by

wrongful act action in this State.").

 Although plaintiffs state that Mr. Gilden was last domiciled in North Carolina, it appears

from his estate papers that he had retained his residency in Washington, even though he had been

transferred to Fort Bragg as a result of his military responsibilities. <u>See</u> Phase II Exh. 6 ("TERRY

LEE GILDEN, deceased, died a resident of Pierce County, State of Washington, on April 18, 1983,

in the military service . . . .").  Because, (1) as the Administrator of her husband's estate, Ms.

Gilden has standing to bring a claim under Washington's wrongful death statute, but may not under

North Carolina's wrongful death statute, (2) it appears that Mr. Gilden was a resident of

Washington on the date of his death and, (3) other than for the brief year that he spent at Fort

Bragg, he had lived in Washington since high school, the law of the State of Washington shall

apply to the claims of his estate.

 Based on the pleadings and the evidence presented to the Court, the Estate of Terry Gilden

has made out a valid claim for wrongful death under Washington law and is entitled to recover for

"the actual pecuniary loss suffered by the surviving beneficiaries from the death of [Mr. Gilden], including loss of services, love, affection, care, companionship, and consortium." See Tait, 987 P.2d at 129.  The expert economic analysis presented to the Court demonstrated that, were it not for Mr. Gilden's untimely and wrongful death, he would have earned wages, benefits, and retirement pay amounting to $1,904,000. See Phase II Exh. 1 at 13-16.  See also Dammarell I, 281 F. Supp. 2d at 195 (explaining the methodology used by the expert to calculate economic damages for victims who were killed in the Embassy bombing).  Under Washington's wrongful death statute, any recovery is for the benefit of Mr. Gilden's wife and daughter. See Wash. Rev. Code § 4.20.020.  Accordingly, the Court should award $1,904,000 in economic damages to the Estate of Terry Gilden, by Mary Gilden as Administrator, for the benefit of Mary Gilden and Teresa Gilden. Because, as his wife, Mary Gilden would have been the primary beneficiary of his future income, the Court should award 75% of the $1,904,000 for her benefit.  And because his daughter Teresa was only four months old when her father was killed, much of her father's income, had he lived, would have been used to support her throughout her childhood and, therefore, 25% of the $1,904,000 should be awarded for the benefit of Teresa.  The Court will discuss damages for the intangible aspect of the estate's wrongful death recovery below, beneficiary-by-beneficiary.

### b.     Mary Gilden

Plaintiff Mary Gilden ("Ms. Gilden") is the widow of Terry Gilden, the daughter-in-law of litigants John and Lorraine Gilden and the mother of litigant Teresa Gilden. Tr. Vol. III at 4, 5-6, 8. As of the Phase II testimony, Ms. Gilden was still living in Fayetteville, North Carolina. Id. at 3. She is a United States citizen. Id.

297

Ms. Gilden grew up in Michigan. Id. at 3, 6.  After graduating from high school in 1979, she took a job as a waitress, but "really didn't have many plans." Id. at 6.  At the time, her brother was in the Army, stationed at Fort Lewis, Washington. Id.  She decided that she would "go out there and share [her bother's] apartment with him and get a job and live out there." Id.  So, in April 1980, she moved to Washington. Id.

Remembering how she met her future husband, Ms. Gilden testified:

> My brother, his Army buddies, they went out a lot, and one night, he took me along with them, and I met four or five of his teammates, and one of them was Terry.

Id.  Her first impression of Terry Gilden was that he "was quite a fun person . . . very easygoing, very fun." Id.  The two started dating almost immediately, and were married five months later. Id.

Describing her life as the wife of an Army Ranger Ms. Gilden testified:

> It was interesting.  He was gone a lot.  Being in the Ranger battalion, they went on maneuvers quite a bit.  So, then, my brother, also being in the Ranger battalion, and [the] three of us shared an apartment. And they were gone quite frequently.  That left me to take care of everything at home, all the finances and things like that.
>
> But when they were in town, a lot of times, even though they were working, we always – I always was able to spend time with them. And I say them, because usually, it was more than just Terry and my brother.  They were all really close, and, you know, someone didn't have a wife, they'd come to dinner, and, you know, but they were gone quite a bit.

Id. at 9.

In the spring of 1982, her husband was accepted into the Special Forces and they moved to Fayetteville, North Carolina. Id. at 13.  They did not, however, live on Fort Bragg (the Army base near Fayetteville) because, given the nature of Special Forces, Terry Gilden was "not supposed to speak of being part of the military." Id. at 14.

On December 14, 1982, they had their first and only child, their daughter Teresa. Id. at 15.
Ms. Gilden testified that, in the eyes of her husband, their daughter "was his little princess.  He was
very proud." Id.

Mr. Gilden's first Special Forces assignment was as a bodyguard to the United States
Ambassador in Beirut, for which he went under a State Department cover. Id. at 16.  He left for this
assignment in March 1983. Id.  Ms. Gilden drove with him as far as Washington, D.C., his point of
departure for Beirut, and then continued on to Michigan to visit her family. Id. at 16-17.  That was
the last time she saw her husband alive. Id. at 17.  Ms. Gilden explained that the departure was
particularly hard because it was her husband's first lengthy trip since the birth of their daughter:

> Well, what I really mostly remember is it was the first time that Terry
> had to leave, and I was leaving before he had to leave.  Because of
> the time to drive to Detroit, I had to leave earlier than what he had to
> leave out of Washington, D.C.  And he did not like that.  He said it
> was very difficult for him.  After I left the hotel with the baby, there
> was a dirty diaper in the bath, in the wastebasket, and he cried for
> quite a long time.

Id.

On April 18, Ms. Gilden was visiting with her sister in Detroit, Michigan. Id. at 18, 20.  She
remembers that:

> [T]he news came on that morning about the Beirut bombing.  And it
> – it was like, I knew that Terry was there, but, you know, I couldn't
> let myself think that anything was wrong.  And then, I went on with
> the day normally; went shopping and things like that.  And later on in
> the afternoon, after not hearing anything, I made a call back to Fort
> Bragg, or Fayetteville, to some friends, because there was a
> particular friend, her husband was in the same unit that Terry was in.
> And I thought that, you know, if anything was wrong, they would
> know.
>
> And her husband happened to answer the phone, and I remember he
> just wanted to know where I was at.  He made up a story that his

>wife wanted to write me a letter, which was kind of funny, because I
>had already gone to Washington to visit Terry's family and came
>back, and I wasn't planning on staying in Detroit that much longer.
>And, so, that kind of got me thinking that there was something
>wrong.
>
>And the next afternoon was when the gentlemen came to notify me
>that Terry had been killed.

Id. at 18-19.  At the time of her husband's death Ms. Gilden had just turned twenty-two. Id. at 20.

Ms. Gilden testified that her immediate reaction to the news of her husband's death was

"[h]ysteria; disbelief.  It couldn't have happened to Terry." Id.  Ms. Gilden and other family

members made arrangements to fly to Washington, D.C. for the official return of the bodies of the

Americans killed in the bombing. Id. at 21.  She remembers that, once arriving in Washington:

>we were met by State Department.  The men that they sent from the
>Special Forces unit stayed with me the whole time and, you know,
>escorted me to the airport and flew with us to Washington, D.C.
>And we were met at the airport and driven by limousine to the hotel
>and put in rooms.  And I think it was the following day when the
>memorial service was.

Id.  Describing the ceremony at Andrews Air Force Base, Ms. Gilden stated:  "we walked in, and

the caskets were lined up and draped with the flags.  But no one knew which one was which." Id. at

22.  She also remembers that there was "a lot of crying; a lot of people that I didn't know;

President Reagan made a speech.  We were allowed to kind of walk past the caskets.  That's really

about all I remember about it." Id.

After the ceremony at Andrews Air Force Base, Ms. Gilden flew back to her sister's in

Detroit and started making arrangements to take care of legal matters, such as her husband's will,

and to drive back down to North Carolina. Id. at 22-23.  As she drove from her sister's back home

to Fayetteville, Ms. Gilden thought, "[w]hat am I going to do?  I was young, and I had a baby, and I

just had to figure out what needed to be done to go on." Id. at 23.  Explaining her fears on moving

forward without her husband as a single mother, Ms. Gilden testified:

> [I]t was one of my biggest fears.  I had grown up – my parents
> divorced when I was really young, and my father left and left my
> mother with five children.  And I saw what that was like for her and
> knew what it was like for me, and I never wanted that for my
> children.  And that was – we – Terry and I hadn't really planned
> Teresa's birth, because I had those concerns.  Terry wanted a house
> full of children, and I was real hesitant and wasn't, especially at that
> age, I wasn't thinking that I was ready.
>
> And, of course, once the doctor said don't worry about it, because
> it's not going to happen.  That's when it happens.  And it was a
> surprise to us, but I thought, you know, well, Terry and I had been
> married for over two years, and we had gone through some
> difficulties and worked some things out, and I thought, you know,
> we're going to make it.  We'll be okay.  We'll have a family.

Id. at 23-24.

Shortly after her return to North Carolina, her husband's Special Forces unit brought her his

clothing, wallet, wedding ring, dog tags, and other personal effects. Id. at 25.

The Gilden family held a memorial service in Brewster, Washington. Id. at 25-26.  Ms.

Gilden described the ceremony for the Court:

> Brewster is a real small town, but everyone knows everyone, and
> Brewster is about halfway between Tacoma and Spokane, and so, a
> lot of the Ranger battalion came to it.  It was a very large service.  I
> remember people having to stand outside the funeral home, because
> there wasn't enough room.  And the chaplain that had married us
> performed the ceremony.

Id.  The family had to wait for a period of time after the ceremony before they could fulfill Mr.

Gilden's final wish:

> Terry wanted to be cremated like his grandfather, and when his
> grandfather died a couple of years earlier, his ashes were scattered in
> the mountains near Brewster.  And that's what Terry wanted.  And at

301

> the time of the service, the place where he wished to be was not
> accessible, and so, we had to wait until weather permitted us, and
> then, at that time, I chartered a plane and scattered the ashes.

Id. at 26.

Mr. Gilden had been the primary wage earner. Id. at 27.  Although Ms. Gilden had worked

a waitressing job after high school and at Burger King initially upon moving to Washington State,

she had not worked since her marriage. Id.  After her husband's death, she had to support herself

and her daughter. Id.  She ultimately earned an associate's degree in architectural technology and,

as of the Phase II testimony, was designing water and waste systems for the Public Works

Commission in Fayetteville, North Carolina. Id. at 29.

Ms. Gilden described the death of her husband as a "loss, a great loss for myself; his

family; my daughter, especially my daughter, having to grow up without a father." Id. at 27-28.

Ms. Gilden added, "[y]ou think about it and the tragedy and the sadness, and, you know, and then

try to slap yourself and say hey, you know, you had this great time before that happened and try and

remember that instead." Id. at 28.

When asked why she had elected to participate in this litigation, on her own behalf and on

behalf of her husband's estate, Ms. Gilden responded:

> Because I felt that there was never any justice done; nobody ever was
> really held accountable for Terry's death.  When, you know,
> someone shoots someone on the street, they get arrested.  They go to
> jail.  They pay in some way.  And we never had that.  There was
> never – in fact, for years, we never even knew that anyone took
> credit for the bombing.  And I think it's time that we had some type
> of justice.

Id.

Based on the pleadings and the evidence presented, the Court should award the Estate of Terry Gilden, by Mary Gilden as Administrator, $10 million for the benefit of his surviving spouse, Mary Gilden, for the loss of her husband's "services, love, affection, care, companionship, and consortium." See Tait, 987 P.2d at 129; Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).

### c.    *Teresa Gilden*

Plaintiff Teresa Gilden is the daughter of Terry Gilden, who was killed in the April 18, 1983 bombing of the United States Embassy in Beirut. Tr. Vol. III at 97. As of the Phase II testimony, Ms. Gilden was a student living in Washington state. Id. at 102. She is a United States citizen. Id. at 97.

Ms. Gilden was born in December 1982 and was only-four-months old when her father was killed. Id. She does not have any personal memories of her father, but family members and friends of her father have told her what he was like:

> A lot of people that I don't know who knew him have told me a lot of things about him in the military, like, he was great at what he did, and he loved it, and he was always a great, fun guy. And then, you know, my family always tell me, you know, he was a great person, and he was always outgoing, and he was very loving and kind, and he was very dedicated to the military.

Id. at 98. There are particular stories that she has heard about her father that stand out, for example, she was told that:

> He was always jumping off of things. He liked to jump off of bunk beds and trees. I know him and his brothers used to go and jump off of train bridges into the river when they were younger, and the story about him falling off of the mountain; that one stands out a lot. Those are the stories that usually stand out the most.

Id.

Ms. Gilden grew up in Fayetteville, North Carolina, where her father had completed his

Special Forces training, and where she and her mother remained after his death. Id. at 12-13.

When asked what it was like growing up in a military environment without her father, Teresa

responded:

> Kind of strange, I guess, because I know I'm supposed to be more a
> part of that military thing, but, you know, then, again, because of his
> Special Forces unit, maybe not so much a part of it.  But knowing
> that my father was in the military and then not having him there, it
> was just a constant reminder.

Id.

Ms. Gilden explained to the Court the impact that growing up without a father has had on

her life:

> I never really knew what it was like to have a father, so not having a
> father was kind of normal to me.  But then, I would go visit friends
> or, you know, go on vacation and see, you know, my cousins interact
> with their fathers.  And it was always, like, I was very different, and I
> was missing something.  And, you know, it was very hard, you
> know, because everyone always told me what a great guy he was,
> and I missed out on knowing him.
>
> And I always kind of felt it was unfair to me that I didn't have a
> chance to know him and have my own personal memories of him.

Id. at 99-100.  Although she has had male role models in her life, like her grandfather and uncles,

she explained that none are a substitute for a father. Id. at 100.

Ms. Gilden has missed her father at major events in her life, like her high school

graduation, as she explained to the Court:

> That was difficult.  I had, you know, my mother and my Mom's
> mom and my Mom's older sister there.  I had my grandparents there,
> and my father wasn't there.  I also had, you know, other family
> friends that, you know, helped my mother kind of raise me in
> Fayetteville, because we didn't have any other family in Fayetteville.

304

> But my father wasn't there, and so, that was really hard for me,
> because I was surrounded by everyone who, you know, was part of
> my life growing up then.  My father wasn't there.  That was kind of
> hard for me.

Id. at 101.

At the time of the Phase II testimony, Ms. Gilden was attending Spokane Falls Community

College in Spokane, Washington, and was living with her uncle, her father's oldest brother.  Id. at

102.  Moving to Washington to attend college gave her an opportunity to see her father's family

more frequently, as she explained:

> I really enjoy visiting with family.  When I was living in North
> Carolina, I only got to see them, like, once a year during the summer.
> I'd fly for a week or something, and now, being closer, you know,
> it's really enjoyable to be closer to them.  And I'm learning more
> about my father.

Id.

When asked why she decided to participate in this lawsuit, Ms. Gilden explained:

> I think it's important that people remember that this happened, and
> they know about it, and that we try to prevent more acts like this
> from happening again so someone else doesn't have to go through
> what I went through, and, you know, if taking money away is the
> only way to do it, then, let it be.

Id. at 104.

Based on the pleadings and the evidence presented, the Court should award the Estate of

Terry Gilden, by Mary Gilden as Administrator, $5 million for the benefit of his surviving

daughter, Teresa Gilden, for the loss of her father's "services, love, affection, care, companionship,

and consortium." See Tait, 987 P.2d at 129; Dammarell I, 281 F. Supp. 2d at 196-98 (explaining

typical damage awards for solatium claims).

### d.   John Gilden

305

Plaintiff John William Gilden is the father of Terry Gilden. Tr. Vol. III at 31.  He is a United States citizen. Id.  Mr. Gilden is retired, and, as of the date of the Phase II testimony, he spent part of the year in Southern California, and part of the year in Washington State. Id. at 30-31.

Describing his son, Mr. Gilden testified that, when he was young, he was always "busy," that he was a leader and was out spoken, and that the other kids looked up to him. Id. at 33.

Like Mr. Gilden, Terry decided to enlist in the military. Id. at 35.  Terry did not talk with his father about joining the military, but rather, as Mr. Gilden testified, one day "he came home and said he'd done it." Id.  His son's first posting as a Army Ranger was to Fort Lewis, Washington, which was about 300 miles from his parents' home. Id. at 38.  Despite the distance, Mr. Gilden saw his son often, explaining:

> [W]henever [the Army Rangers] had time off, and they had enough days, you know, two or three days off, he would bring one or two of his buddies with him, and they would come home; they would come over and sometimes go hunting, go fishing, or sometimes just hang out and eat us out of house and home.

Id.  Mr. Gilden found these visits "enjoyable," recalling:

> [H]aving been in the military, I could relate to some of the things that, you know, that they talked about, but it was always a fun time. I mean, we enjoyed, you know, having them, and it was not, you know, we'd have food cooked when they got there Friday night, and, you know, they would go bowling or hunting or just goofing off until it came time to head back to Fort Lewis.
>
> They would get into some – for awhile, we got into wrestling matches, but the last time they wrestled, well, I thought I had him, and he had picked me up by an arm and a leg and put me up next to the ceiling in the living room.  So that was the end of that wrestling.

Id. at 38-39.  Mr. Gilden testified that he was "proud" that his son was in "the elite force of the Army." Id. at 40.

After a period of time in the Army Rangers, Terry informed his father that he was applying to be part of a Special Forces unit. Id. at 42.  Even though Terry told his father that "it wasn't going to be easy," he assured him that it was "what he wanted to do." Id.

In the Spring of 1982, Terry and his wife moved to North Carolina for Special Forces training. Id. at 43.  Mr. Gilden testified that, after his son moved to North Carolina, he "would try and call [Terry] about every weekend.  That was my habit of keeping in touch with all the kids was to call them on the weekend and wake them up." Id. at 45.  In December 1982, Mr. Gilden's grand-daughter, Teresa was born. Id. at 46.  When his son received his first overseas assignment, Mr. Gilden did not know any of the details, including the fact that the assignment was in Beirut, Lebanon. Id. at 48.

Describing the events of April 18, 1983 and the days that immediately followed, Mr. Gilden testified:

> I was – my alarm went off, and I have a clock – using a clock radio.
> And when the alarm went off, that was the statement that I heard was
> that the embassy in Beirut had been, you know, had been bombed.
> And there was just a chill went through me, and, you know, I don't
> know exactly why, but, well, I got up, and I went to work, and I did
> not say anything to either my wife.  And then, that night, when the
> news was on, she had gone bowling, and when she came home, I was
> still up, which was unusual.  And she asked me if that's where Terry
> was, and I said yes.
>
> But then, the following day, at work, I received a call from Mary's
> brother, who was in the Ranger battalion [in Fort Lewis,
> Washington], and he called me and told me that Terry didn't make it.
> And I contacted my wife and met her at home.  And then, you know,
> I can't – from the chill going through, I kind of expected something.

Id. at 49-50.

Mr. Gilden and his wife went to Washington, D.C. to attend the memorial services, as he

testified:

> [W]e received a call that we were to go; they wanted us to come to Washington, D.C. for the memorial.  And the State Department made all of the arrangements as far as, you know, tickets and everything. We just got ready and came back here.  We were met at the airport by people from Terry's unit and the State Department, escorted to the hotel.
>
> At that point in time, nobody was supposed to know, you know, what he was doing.  He was just – he was assigned to the State Department.  And so, we were not allowed to talk to the media, which I didn't want to talk to anyway.  But we were put into the hotel and basically sealed off until we went to the – we went to the memorial service at Andrews, and they told us we were going to be about the third or fourth car, you know, into the area, and it wound up we were the first car.  We were the first ones through the hangar door, which was quite a shock.
>
> And I think, you know, as far as the ceremony, President Reagan spoke, and I don't know who else spoke, you know; the President came by and shook hands.  Most of it is a blur.  After the ceremony, we came back to the hotel, and then, we were taken to the airport, I think, the next day and flew back to Washington.

Id. at 40-51.

The Gilden family did not stay in Washington, D.C., for any of the other official ceremonies.  Id.  As John Gilden recalled, "we were asked if we wanted to attend, and I don't think any of us wanted to do another public, you know, appearance.  So we opted not to." Id.

After their return from Washington, D.C., the Gilden family planned a private memorial service for Terry in Brewster, Washington. Id. at 53.  Mr. Gilden described the service as:

> Very emotional.  The funeral home was packed, because Terry had worked in Brewster, you know, in the summertime, plus, my folks lived there.  And so, practically the whole town knew him, and my wife's family lived in Pateros, which is seven miles away, so there were a lot of those people who knew him.  And we – part of the Ranger battalion came over, and the chaplain from the Rangers' unit in Fort Lewis conducted the ceremony, the memorial ceremony.

308

<u>Id.</u>  Mr. Gilden did not recall "very much" about the ceremony itself, but he remembers speaking with some of his son's fellow Rangers, and that "one of the big concerns" among the Rangers was "you get all this training, and then, something like this happens, and you're not able to, you know, use it, defend yourself or anything." <u>Id.</u> at 54.

While certain events, such as the Oklahoma City bombing, have triggered particular memories of his son's death, Mr. Gilden also testified that "there are certain times that, you know, it just pops into your head, and you try to block it out, and it doesn't necessarily have to be any special event; I mean, its just – it'll pop in there.  Something may happen that reminds you of something he's said or done or whatever." <u>Id.</u> at 55.  But he recalls that his son had made the comment that "if anything happens to me, why, just, you know, don't dwell on it; go on with life.  You know, life goes on.  That's what I tried to do, but sometimes, it's not easy." <u>Id.</u>

When asked why he decided to participate in the litigation, Mr. Gilden answered:

> To support our daughter-in-law and our granddaughter, for one thing, and the other thing is to, you know, it's like, there needs to be a closing.  There needs to be a, you know, a – I don't know, a – the fact that somebody, you know, can go out and kill somebody and get away with it, you know, here, and even in other cultures, you know, you commit murder, you get found out, and you pay.  And in this case, I don't think anybody has paid . . . .

> But there comes a time but even though we have diplomatic relations with people, when you get into terror or murder, which is basically what it is, it's murder, then, somebody needs to be accountable . . . .

<u>Id.</u> at 57-58.

Because Terry Gilden was survived by both his wife and daughter, and because damages are only available to parents under Washington's wrongful death statute when there is no surviving

309

spouse or children, Mr. Gilden cannot recover for his loss under that statute.  See Wash. Rev. Code § 4.20.020.  Instead, Mr. Gilden is proceeding under an intentional infliction of emotional distress claim.  See Pls. Mem. in Supp. of State Law Claims at 130-31.  Because Mr. Gilden was domiciled in Washington on the date of his son's death in the bombing, the law of Washington will govern his intentional infliction of emotional distress claim.

Based on the pleadings and the evidence presented to the Court, Mr. Gilden has stated a valid claim for intentional infliction of emotional distress under Washington law, see Kloepfel, 66 P.3d at 632, and is entitled to recover from defendants compensatory damages for the loss associated with the mental anguish resulting from his son's untimely death.  The Court values his loss at $3.5 million.  See Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage awards for solatium claims).  Accordingly, the Court should award John Gilden $3.5 million on this default judgment.

### e.  *Lorraine Gilden*

Plaintiff Lorraine Gilden ("Mrs. Gilden") is the mother of Terry Gilden, who was killed in the April 18, 1983 bombing of the United States Embassy in Beirut. Tr. Vol. III at 60-61.  Mrs. Gilden, who was born in Pateros, Washington, is a United States citizen. Id. at 60.

Remembering when her son was a boy, Mrs. Gilden testified:

> He was always an outgoing and, you know, a rowdy little child, but he was – our other children weren't quite as – they were all quiet, and Terry was different from them.  But he – always into something. And, of course, he was always a good boy.  All of our children were, because their Dad was very strict with them.  So we never had any problems even through high school as far as being – they never smoked, drank or did drugs.

Id. at 61.  Mrs. Gilden testified that, during his high school years, her son played football and he

and his brother spent a lot time hunting, fishing, and hiking in Washington's mountains. Id. at 63,

65-66.

When he joined the Army after high school, Terry became was the first of Mrs. Gilden's

children to leave home. Id. at 67.  When asked how that made her feel, Mrs. Gilden responded,

"[o]h, mother wasn't very happy.  I cried when he left home.  I missed him, you know, because

we'd always – the four kids were always there.  It was just, you know, strange to have him gone."

Id.

After her son left home for Ranger training, he stayed in frequent touch with his family. Id.

at 68.  Remembering her son's visits home with his Ranger friends, Mrs. Gilden testified, "[h]e

always had – most of the time, he had some buddies with him, and they were always hungry when

they got there, so we fed them the whole weekend.  It seems like all we did was cook.  But we

didn't mind.  We loved having him home." Id. at 69.

Mrs. Gilden worried about her son while he was in the field:

> Well, I know he was, you know, jumping out of airplanes all the
> time.  And they had gone to training in Panama, and he almost lost
> his life there; I remember that.  And I always worried about him . . .
> he was in a rubber boat with weapons all tied on the bottom.  And it
> flipped over in the waves.  He was up against – he remembers, he
> said, I remember blacking out, and, you know, I always worried
> about him.  And I don't know what I said.  He said, oh Mom, don't
> worry about it; lights out, and you're gone, you know.  That's it, so,
> you know, but mother still worried.

Id. at 69.  At the same time, she was aware that the Rangers were "the most elite group in the

Army, and that's what he wanted to do.  And he really excelled at it and liked it very well." Id. at

70-71.  Though Mrs. Gilden was proud when her son left for Fort Bragg to begin Special Forces

training, she explained that "it was tearful when he left home, left to go, because I knew that I wouldn't see him for awhile." Id. at 75.

Mrs. Gilden went to North Carolina to visit her son over the Christmas holiday in 1982. Id. at 76-77.  According to Mrs. Gilden, her son "was so crazy about [his daughter].  He loved kids, babies so – yes, he was excited to be a father." Id. at 77.  Christmas 1982 was the last time that Mrs. Gilden saw her son. Id.

Prior to the events of April 18, 1983, Mrs. Gilden was not aware that her son Terry was working under the auspices of the State Department, or that he had been assigned to Beirut. Id. at 79-80.  Remembering the day of the bombing, she testified:

> I had worked that day, and we had a bowling tournament that night. And I think I got home about 10:30 at night, and John was pacing the floor . . . .  I remember him walking out of the bedroom.  And the news was on, and I looked at it.  And it was very unusual that he was up, and I said – I said is that where Terry is at?  And he said yes, so, we, you know, I don't think we slept that night.  And then, we got up and went to work the next morning, because we hadn't heard anything, and we didn't have any way to call.
>
> So I had left work in the early afternoon, I believe, to come – I had a doctor's appointment, so I stopped by the house.  And he caught up with me there at the house and told me to stay there; he was on his way home.  And I think I said something; it's Terry, isn't it?  And he said – I think he said yes.  I didn't know.  After that, it was just hysteria, I guess.

Id. at 80-81.  Ms. Gilden testified that the next couple of days were a "blur":

> I had called just one of my friends, and, of course, I called work, and, of course, from then on, there was a house full of people, and we were in the process of moving.  I think our son had to go get the last load, because we were moving from Spokane out farther out of town. And we were doing that.  And so, we had – the people from work would come, and then, all our friends in town, and they that brought food, and I don't recall.  I don't recall; I recall my son came over. All the kids came as fast as they could.  And then, we had a bunch of

> people there, so they decided to help us move, unpack some things. And they put pictures on the wall, and, you know, I mean, just trying to keep us busy, I guess but – and then, Mary called and said they wanted us to come to D.C. for the service.
>
> And, like I say, everything is kind of a blur.  Of course, all I did was cry.

Id. at 82.

A few days after her son's death, Mrs. Gilden and other members of the Gilden family traveled to Washington, D.C. to attend the memorial service at Andrews Air Force Base. Id. at 84. Describing the ceremony, Mrs. Gilden recalled:

> Well, I remember, I was the first one in the door to go in, and we had escorts, and I had this young airman.  And he gave me – I held onto his arm, because of – the Air Force band or something was playing a song, and then, we started – well, I started in, and, of course I saw the caskets and stuff, and I just stopped.  Well, he just very firmly grabbed me and just kept me going.  I just, you know, I recall the President speaking and all the people.  And that's, like I say, I was upset.

Id.

The Gilden family did not stay for any remaining services in Washington, D.C., as "we felt like  . . . .  We didn't want to stay that long." Id. at 86.  Instead, they returned to Washington State and held a memorial service for Terry in Brewster, Washington. Id.  Mrs. Gilden testified:

> I know there was a lot of people there, and his – I remember the chaplain was there.  He had married Terry and Mary, and, of course, there was no casket or anything.  They had set a picture up front.  But it was – I don't recall it very – I just knew there was a lot of people there.  Of course, afterwards, we all went over to Grandma Gilden's house, and everybody at the State Department, everybody had a big meal over there.  But everybody in town in Pateros had cooked, you know, brought food.  So there was a lot of food.  And all of his Ranger buddies, I don't know; about 20 of them stayed down in the basement at Grandma's house.  She had a big room.  So they were always – they stayed there for several days, I think, and they – and

313

> we fed them all and Grandma, and so, it was – I remember one night,
> all the Rangers – and a whole bunch of the guys and Mary and
> everybody had gone up on the hill, I think.  They just went up and
> built a bonfire.

Id. at 87.

Mrs. Gilden did not go back to work for several weeks following her son's death. Id. at 92.

As she testified:

> I just wasn't quite ready to go back.  And I did – I worked hard;
> when I worked, it was out at the base.  Of course, when people, you
> know, I had a lot of support from my fellow employees.  When I
> cried, they cried, or somebody came in and said they were sorry, you
> know, and so, I had a lot of support there.  But I really – as time went
> on, I really, like I say, get through the worst part of it.  But I never
> did, have gotten over it, of course.
>
> But when I get in the car to go home is when it really bothered me,
> too, so, after I had worked all day and got quiet, and I could think, I
> guess.

Id. at 92-93.

In the years since her son's death, there have been a number of tributes to him, both within

the Gilden family and publicly, as Mrs. Gilden explained:

> [W]e had a stone put up at the cemetery by my Dad, and I just, you
> know, because [Terry] was cremated; I just wanted something there,
> you know, to remember him by.  And when we were at home, we
> usually go and take flowers every year to it.  Of course, we have all
> our families there . . . and then, we went back in 1991 or 1992 to Fort
> Bragg for a service.  They had built a wall there at the unit.  And we
> had all gone back for the ceremony for that.
>
> And then, years later, we got a call – I guess it was – I don't know;
> 2000 or something, we got a call from his recruiter that – he worked
> at the Medical Lake High School and they had – one of his friends
> was the – became the high school principal there.  So they decided
> that they needed a picture of Terry in the school.  So they had called
> us for a picture.  And so, they had a ceremony, and we went over for
> that.

314

> And then, he has a marker out here at Arlington Cemetery, and his
> name is on the wall at the State Department.  Anne [Dammarell]
> helped us to get in to see that yesterday, so we got to see that.  And
> she took us up to the cemetery, which we appreciated.

Id. at 90-91.

Mrs. Gilden never received therapy to help her deal with the loss of son, stating, "I never

even thought of therapy, because I wasn't raised around – you know, I didn't even think about it,

you know, because I had a lot of support from my friends, and the kids were always worried about

us." Id. at 93.  She testified that her husband had "blocked it completely out":

> So I was kind of by myself in my, you know, grieving for awhile.
> But he, of course, as – we'd start talking about it.  But he didn't want
> to talk about it for a long time.  We'd get with the kids and start to
> talk about some of the stuff he did and, you know, things like that,
> but this hasn't been easy.  And I still – it just feels like it was
> yesterday; it's always with me.

Id. at 93-94.  Mrs. Gilden testified that she always thinks about her son's tragic death on his

birthday, testifying, "[w]hen it gets close to his birthday, you know, I always think about him and

Beirut, you know, the bombing, I always think about that." Id. at 94.

When asked why she decided to participate in this lawsuit, Mrs. Gilden testified, "[t]here's

never been anybody held accountable . . . [W]e never knew who or had never been told who did it,

so it was just someone needs to be held accountable for – you know, this terror stuff has just gotten

out of hand." Id. at 96.

Because Terry Gilden was survived by both his wife and daughter, and because damages

are only available to parents under Washington's wrongful death statute when there is no surviving

spouse or children, Mrs. Gilden cannot recover for her loss under that statute. See Wash. Rev.

Code § 4.20.020.  Instead, Mrs. Gilden is proceeding under an intentional infliction of emotional

distress claim. See Pls. Mem. in Supp. of State Law Claims at 130-31.  Because Mrs. Gilden was

domiciled in Washington on the date of her son's death in the bombing, the law of Washington

will govern her intentional infliction of emotional distress claim.

Based on the pleadings and the evidence presented to the Court, Mrs. Gilden has stated a

valid claim for intentional infliction of emotional distress under Washington law, see Kloepfel, 66

P.3d at 632, and is entitled to recover from defendants compensatory damages for the loss

associated with the mental anguish resulting from her son's untimely death.  The Court values her

loss at $3.5 million. See Dammarell I, 281 F. Supp. 2d at 196-98 (explaining typical damage

awards for solatium claims).  Accordingly, the Court should award Lorraine Gilden $3.5 million on

this default judgment.

## CONCLUSION

Under Rule 53 of the Federal Rules of Civil Procedure, the parties to this action have

twenty days from the date of the entry of these proposed conclusions of law and findings of fact to

file any objections thereto. Fed. R. Civ. P. 53(g)(2).  With regard to the claims of the Estate of

Phyllis Faraci under Pennsylvania's survival statute, if they want to pursue a claim for economic

damages suffered by the estate, they may submit additional briefing, within 14 days of the date of

entry of these proposed findings of fact and conclusions of law, providing the expert economic

analysis necessary to enable me to deduct Ms. Faraci's personal maintenance expenses.  After

receipt of the additional briefing, if any, I will make supplemental proposed findings of fact and

conclusions of law.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

Dated:

316